# EXHIBIT 2

Johnnie Williams vs Conn Appliances
Arbitration

1              AMERICAN ARBITRATION ASSOCIATION
2    _____

3
     JOHNNIE WILLIAMS, JR.,
4

5
           Claimant,
6

7
     vs.                              Case No.
8                                     01-17-0001-5149

9
     CONN APPLIANCES, INC.,
10

11
           Respondent.
12   _____

13

14                        ARBITRATION

15                      JULY 23, 2018
                          Volume I
16                      (Pgs 1-195)

17

18

19

20

21

22

23   _____

24   Reported By: Candace Covey, LCR, RPR, CRR, CVR-RM

25



                         **Orange Legal**
                         **800-275-7991**

Page 2

```
 1            A P P E A R A N C E S
 2
 3
 4   For the Claimant:
 5        MR. OCTAVIO "TAV" GOMEZ
          MR. SHAUGHN HILL
          MR. FRANK KERNEY,III
 6        Attorneys at Law
          Morgan & Morgan
 7        201 N. Franklin Street
          Suite 700
 8        Tampa, FL 33602
          slauredan@forthepeople.com
 9
10   For the Respondent:
11        MS. STEFANIE JACKMAN
          MR. DANIEL DELNERO
12        Attorneys at Law
          Ballard Spahr, LLP
13        999 Peachtree Street
          Suite 1000
14        Atlanta, GA 30309
          jjackmans@ballardspahr.com
15
          MR. ERIC TROUTMAN
16        MS. SUSAN MCDOWELL
          Attorneys at Law
17        Womble, Bond, Dickinson
          3200 Park Centre Drive
18        Suite 700
          Costa Mesa, CA 92626
19        (714) 557-3800
20
21
22
23
24
25
```

Page 4

```
 1   Exhibit 8                            118
          Mr. Williams' notes
 2
     Exhibit 9                            120
 3        Audio Recordings
 4   Exhibit 10                           120
          Conn-J Williams_000209 through 211
 5        Which are the dates that correspond
          With the audio recordings
 6
     Exhibit 11                           121
 7        Transcript of Audio Recordings
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2                                      Page
 3   OPENING STATEMENTS
     By Mr. Gomez                          7
 4   By Ms. Jackman                       23
 5   JEFFREY HANSEN
     Direct Examination
 6   By Mr. Gomez                         49
     Cross Examination
 7   By Mr. Delnero                       94
 8   JOHNNIE WILLIAMS
     Direct Examination
 9   By Mr. Hill                          97
10
11          E X H I B I T S
                                        Page
12
     Exhibit 1                           45
13        Mr. Hansen's CV
14   Exhibit 2                           46
          Mr. Hansen's Report
15
     Exhibit 2A                          49
16        CD
17   Exhibit 3                           87
          Noble Report
18
     Exhibit 4                          101
19        Retail Installment Contract and
          Security Agreement dated 8/31/15
20
     Exhibit 5                          105
21        Retail Installment Contract and
          Security Agreement dated 11/29/15
22
     Exhibit 6                          108
23        Subscriber Information from Sprint
24   Exhibit 7                          114
          Sprint Records Hard copy and CD
25
```

Page 5

```
 1              * * *
 2
 3        THE ARBITRATOR:  Let's commence this
 4   proceeding which is styled Johnnie Williams Junior
 5   versus Conn Appliances, Inc..  This is in the
 6   American Arbitration Association.  It's Case Number
 7   01-17-0001-549.  And I think what I'd like to ask
 8   everyone to do, we'll just go around the room and
 9   have you introduce yourselves for the record and who
10   you represent and in your case, Mr. Williams, that
11   you're the claimant.
12        MR. HILL:  Absolutely.  Shaughn Hill with
13   Morgan & Morgan here on behalf of the claimant,
14   Mr. Johnnie Williams Junior.
15        MR. WILLIAMS:  I'm Johnnie F. Williams
16   Junior, and I'm the claimant.
17        MR. KERNEY:  Good morning, everyone.  I'm
18   Frank Kerney, and I'm here on behalf of the claimant.
19        MR. GOMEZ:  I am Tav Gomez with Morgan &
20   Morgan on behalf of the claimant.
21        MS. McDOWELL:  Susan McDowell on behalf
22   of the respondent, Conn Appliances.
23        MR. TROUTMAN:  Good morning.  Eric
24   Troutman of Womble Bond Dickinson, also on behalf of
25   the respondent, Conn's.
```



Page 6

1      MR. WALTON:  I'm Clinton Walton on behalf
2  of the respondent.
3      MR. DELNERO:  Daniel Delnero of Ballard
4  Spahr, here on behalf of respondent Conn Appliances.
5      MS. JACKMAN:  Stefanie Jackman with
6  Ballard Spahr, also on behalf of Conn Appliances.
7      THE ARBITRATOR:  Thank you.  Let me back
8  up.  Mr. Walton, I did -- we did -- we were
9  introduced to each other a minute ago.  And you're
10  with Conn Appliances; is that correct?
11      MR. WALTON:  I am.  Yes, sir.  That's
12  correct.
13      THE ARBITRATOR:  Okay.  And where are you
14  from?
15      MR. WALTON:  From The Woodlands, Texas.
16  Just north of Houston.
17      THE ARBITRATOR:  All right.  And just so
18  the record is clear, what is your position with Conn
19  Appliances?
20      MR. WALTON:  I am senior manager of our
21  compliance team.
22      THE ARBITRATOR:  Okay.  Well, welcome you
23  all, to Memphis.  And, which -- Mr. Williams, you
24  know, we're the Memphians, I guess.  And you're from
25  Memphis, I guess.  Okay.  Well that -- thank you for

Page 7

1  that.  And so now I'll turn to the representatives on
2  behalf of the claimant.
3      MR. GOMEZ:  Yes.  And if you don't mind,
4  I'd like to stand so I don't have to keep turning, if
5  that's okay.
6      THE ARBITRATOR:  That's fine.  That's
7  fine.
8      MR. GOMEZ:  Thank you.  I'll try to keep
9  it brief.  In part, what we're going to try to do
10  during this mediation is simplify, for your benefit
11  and because we really know each other really well.
12  The facts of the case are very clear.  So let's go
13  through them real quick because what happened here
14  is, sometime in 2015 in July, Mr. Williams is going
15  to testify that without a doubt, he went, he made a
16  purchase at Conn's Appliances.  There was a couple
17  smaller TVs for his kids and a sound bar, and he
18  financed those through Conn's.  He then came back
19  sometime in November 2015 and bought a couple more
20  items.  And the first contract and the second
21  contract seemed to have been combined into the
22  November 2015 contract regarding all the purchases he
23  had with Conn's Appliances.
24      We're here today to discuss the November 2015
25  contract.  Within that contract, Mr. Williams is

Page 8

1  going to tell you he agreed that he was going to make
2  payments on that account.  He received the
3  merchandise, and he made some payments.  Within that
4  contract, he provided his cell phone number.  There's
5  not going to be any question as to whether that is
6  his cell phone number, that he carries that number,
7  that he answers the phone number, that it's under his
8  name.  That's not going to be a question.
9      So he provides that cell phone number to
10  Conn's.  Within the contract, Conn's indicates:  By
11  giving us your phone number, you're giving us consent
12  to use -- it's authorized.  Or to use any technology
13  we want to use.  It does state, "Nothing in this
14  contract will limit your ability to revoke -- to get
15  the calls to stop."  So that is a clause within the
16  contract that Mr. Williams signs, November 2015.
17      In March 2015, Mr. Williams is going to
18  testify he had some car troubles, he had to make some
19  payments that he hadn't planned for, and he fell
20  behind in his Conn's payments.  He received seven
21  phone calls within three days.  At which point he
22  then calls Conn's and says, "You've already called me
23  a thousand times."  Clearly he's exaggerating, but
24  he's going to testify.  You're going to be able to
25  hear these recordings.  So the best thing about this

Page 9

1  case is factually, you're going to get those
2  recordings.  "You've already called me a thousand
3  times.  You don't need to call me."  You know, he
4  understands, he acknowledges he owes the money.  And
5  he goes, "You don't need to call me."  The phone call
6  ends.
7      Where this case is egregious is, after that
8  date that he says "You don't need to call me," he
9  receives 1,118 predictive dial calls to his cell
10  phone.  So after that March call when he calls in, he
11  receives 1,118 calls.  We're going to fast forward,
12  and you're going to get to hear all the recordings.
13      But we're going to fast forward to another
14  one, July 2nd, 2016.  Mr. Williams answers the phone,
15  and he's going to tell you, and we're sorry, there's
16  going to be some cursing in that recording.  And he
17  literally says, "I don't tell you MF's to stop
18  calling me.  You call me every effing 15 minutes."
19  By that point, he's already received over 250
20  predictive dialer calls.  The account logs that the
21  defendant has that have been provided reflect that
22  that agent wrote "Customer said, 'stop calling,' hung
23  up."  So Mr. Williams clearly tells him to stop
24  calling.  What happens?
25      Next day, they're back calling him again.



**Orange Legal**
**800-275-7991**

Johnnie Williams vs Conn Appliances
Arbitration

10..13

Page 10

1   And they call him after that recording 934 more
2   times.  And at times, it's going to be a little
3   painful, and mostly for Conn's, because we're going
4   to hear these recordings and his repeated pleas of
5   "Why are you still calling me?  You're not supposed
6   to be calling me."  And the phone calls continue.
7   You're going to hear all those revocations.
8        So clearly, we don't have an issue as to
9   Mr. Williams, that he's the owner of the phone.  We
10  have no doubt that once you hear all the recordings,
11  you will find he revoked consent.  All the phone
12  calls occur within the United States to a person in
13  the United States.  Not an issue.  And none of them
14  were made for emergency purposes.  Not an issue.
15       So we're just going through the elements of
16  the TCPA sometimes and look at them.  The only issue
17  we have is predictive dialer.  Did they use a
18  predictive dialer when they made these phone calls?
19       I think this, if it were the case, could get
20  a little confusing, and I'm going to go ahead and
21  represent to you, we have an expert.  He wrote a
22  report.  We're going to introduce that report.  The
23  report has a lot of paragraphs, has a lot of legal
24  citations, technical citations.  And it discusses two
25  terms:  an ATDS, an automatic telephonic dialing

Page 11

1   system, and a predictive dialer.
2        This case, we have the burden of proof.  We
3   have to prove this case.  And I'm going to tell you,
4   if you hear random or sequential number generation,
5   we're not trying to argue that.  Today we're not
6   going to try to argue that Conn's randomly generated
7   a phone number and called Mr. Conn's (sic).  That
8   they sequentially generated numbers and then called
9   and Mr. Conn -- and Mr. Williams answered.
10       What I want to make clear is this:  A list is
11  created.  So here's the list.  Some of the arguments
12  might try to say, "Well, the TCPA requires this list
13  to be randomly or sequentially generated, these
14  numbers."  If you begin to hear those arguments,
15  we're literally going to say -- we're going to object
16  it's not relevant.  We're not arguing that Conn's is
17  randomly or sequentially generating these numbers.
18       We're going to argue that they dial from a
19  list of numbers that they uploaded to the dialer.  A
20  list of their own consumers.  A list that they
21  generated from their accounts.  Random or sequential
22  number generation is not what we're arguing today.
23  We're going to tell you that they use a predictive
24  dialer.
25       So what I want to make clear is:  Our expert,

Page 12

1   when he testifies, I'm not going to ask him "Well,
2   does it have the future capacity?  The potential
3   capacity?"  That's not what we're going to ask him.
4   We're going to literally go, "How were these calls
5   made?  Were they made in a predictive mode?"  How are
6   we going to be able to prove that?
7        Well, one, I think you're going to see one of
8   the exhibits, the website from Noble, that the system
9   itself is called the Noble Outbound Predictive
10  Dialer.  That's the name of the product they're
11  using.  It is literally called the Noble Outbound
12  Predictive Dialer.
13       Mr. Hansen is going to tell you, "Absolutely.
14  During the relevant time, not only did the system
15  have the capacity to act as a predictive dialer, they
16  called them in a predictive mode."  That's what he's
17  going to testify.  He's going to tell you, "I got 30
18  years doing -- I've run" -- he ran call centers.  He
19  ran a call center that was able to make one million
20  calls an hour.  And he's going to tell you, "I've
21  never used random or sequential number generation."
22  And like I said, we're not arguing that.  Conn's
23  called from a list of numbers.
24       So how else are we going to prove that Conn's
25  used a predictive dialer?  And I want to make sure I

Page 13

1   kind of explain in lay terms.  And I know you read
2   the case, but a predictive dialer, I believe what
3   you're going to hear from our expert, from Conn's
4   corporate representative is, you generate a list of
5   numbers so Conn's will go through at night, look up a
6   delinquent accounts, accounts that are delinquent.
7   And they create a list.
8        The list of those accounts that are
9   delinquent will then be divided into different
10  campaigns.  Which is, hey, this campaign is going to
11  be called on a predictive mode or a system mode.
12  They choose to call it "system," but it is a
13  predictive mode.
14       That's what we're talking about what happened
15  with Mr. Williams.  A list is created and he's
16  assigned to a predictive mode.  You might hear Conn's
17  say, "Well, there's a lot of human intervention
18  during the creation of this list."  Okay.  Even if
19  you told me that they go account by account looking
20  at it, we don't care because the TCPA applies.
21       And the FCC's interpretation and the District
22  and Circuit Courts refer to human intervention at the
23  time of dialing.  Clearly somebody programmed the
24  computer, bought the computer, turned on the
25  electricity.  But for an auto dialer, you've got to



Johnnie Williams vs Conn Appliances
Arbitration

14..17

1  prove that at the time of dialing, there was no human
2  intervention. When the phone numbers are literally
3  being dialed.
4       So what happens is this: Conn's creates
5  these lists. It is uploaded into the Noble dialer,
6  and the phone will then begin, or the system,
7  assuming it's 8 a.m. Eastern, and I'm just going to
8  create a scenario. 8 a.m. Eastern Time, the campaign
9  is ready. It's going to be dialed in predictive mode
10 like Mr. Williams received. And let's just pretend
11 there's a hundred agents at 8 a.m. assigned it.
12      In a predictive mode, you have an algorithm.
13 So predictive means timing. Is regarding timing and
14 trying to predict how many people are going to answer
15 depending on the number of phone calls we're going to
16 make. So for my example, I'm going to use a five.
17 One out of five people will answer. Let's just
18 pretend in my experience, I set my predictive dialer,
19 one out of five people should answer. So what the
20 system will do is, 8 a.m., boom, 500 phone calls
21 because I have 100 agents ready to answer.
22 Anticipating that one of the five will answer.
23      The dialer will dial 500 or thousands of
24 numbers because that's what it does. It's trying to
25 avoid people having to dial. It's trying to avoid

1  people listening to the phone ring. It's trying to
2  avoid some type of voice message or disconnected
3  number. So what it's doing is, the system will dial,
4  based on that algorithm, upon recognizing that
5  somebody answered that cell phone.
6       Upon believing -- the system believing that
7  there's a live person, it will then transfer the call
8  to the agent who's sitting right here. And the agent
9  who's sitting for Conn's will then go "Good morning,
10 Mr. Williams," as he pulls up the demographics, the
11 account, the balance. And that's when, one, you hear
12 that pause, it's that quick transfer, and two, is the
13 agent saying, "Hey, good morning, Mr. Williams. This
14 is Conn's." And they're reading all the information.
15      So the main thing about that is, the human
16 intervention of the creation of the list is not
17 relevant, and we're not going to spend a lot of time
18 on it. At the time of the dialing, we anticipate
19 you're going to hear from Conn's, "Well, we have
20 three, sometimes six people. It's like a NASA
21 center, and we're controlling the campaigns." And
22 absolutely, they're going to have people going, if
23 the electricity goes out, if an error occurs, they're
24 controlling the campaigns, the big campaigns. But
25 they're not -- nobody is dialing manually if you're

1  in a predictive mode.
2       So that's what we're talking about here. How
3  else can we prove that they use a predictive mode
4  outside of the fact that the system is called a Noble
5  Outbound Predictive Dialer? Well, you're going to
6  get an exhibit that is from the Noble dialer. And it
7  literally says, "call type." And it will say,
8  "broadcast" which is predictively dialing, but it
9  could also leave a pre-recorded message or it
10 literally says, "predictive." It'll say,
11 "predictive, predictive, predictive."
12      How else do we know they use a predictive
13 dialer? You're going to hear testimony that on
14 average, they'll have 850 employees. Agents that are
15 fielding these phone calls. And on average, on one
16 day, they make 600,000 calls. That comes out to be
17 705 calls per agent on a shift. Clearly they're
18 dialing a lot of numbers.
19      And as you can see by Mr. Williams, what
20 Conn's has done is, they have literally weaponized
21 this dialer. So when people fall behind, they will
22 begin to call you, and call you, and repeatedly call
23 you. Why would they do that? Because it works. The
24 frustration gets so bad that people will pay them to
25 try to stop the calls. And what Conn's is doing is

1  trying to climb on the hierarchy of creditors that an
2  individual might have just to try to stop the calls.
3       We're going to represent to you that this is
4  the kind of behavior that literally the FCC and the
5  TCPA was enacted for, and the FCC is trying to stop.
6  Is, you know, real businesses that are using this
7  type of technology to call an individual more than
8  1100 times. He got more phone calls -- and we're
9  going to introduce his cell phone records. He got
10 more phone calls from Conn's than from anybody else
11 in his entire life. He'll tell you that. Over 1100
12 calls.
13      So we're very confident. So what we're --
14 the reason why I'm taking a little bit of time here
15 to explain the predictive dialer is, we're not
16 alleging that they're randomly or sequentially
17 generating numbers. We're also not alleging future
18 capacity. If you hear "Well, can you modify a cell
19 phone to be a predictive dialer?" No. We're saying
20 during the relevant time which is March 2016 through
21 January 2017, their system had the pressing capacity
22 at that time, and not only did it have the capacity,
23 it dialed in predictive mode. It also left
24 pre-recorded messages.
25      You will hear that if, you know, even with

ORANGELEGAL

**Orange Legal**
**800-275-7991**

Page 18

1  our expert, they -- we have Mr. Hansen and I'm going
2  to limit his testimony as, is this a predictive
3  dialer, that's it.  We anticipate that Conn's is
4  going to call Mr. Sorini tomorrow.  Mr. Sorini is
5  going to tell you "I have a Ph.D. in physics."  He's
6  an expert like, on 16 things.  He's going to tell you
7  "I visited Conn's."  And he's going to tell you "I
8  went there and I looked at the system" and all this.
9  We might not even ask him a single question, or
10 except maybe one question:  Isn't it true that you
11 don't have an opinion as to whether their system is a
12 predictive dialer?  And he's going to say "Nope.  I
13 did not evaluate their system to see whether it's a
14 predictive dialer."
15       So then what we have here -- and the main thing
16 when they try to focus, because I think this hearing
17 could go really quick is, the number of phone calls
18 are going to be dictated by the records themselves.
19 Mr. Williams is going to come in here and try to
20 testify he's 69 years old.  Proud father of five
21 kids.  Two of them, he's actually just sole custodian
22 for them.  One is 14, one is 16.  The other three are
23 grown.  They're out of the house.
24       You know, he's got a pretty good memory
25 regarding this.  But he's not going to remember all

Page 19

1  1125 times he received a phone call.  But he's going
2  to tell you -- and the recordings will speak for
3  themselves.  That's why this case is so good.  You
4  literally are going to hear him pleading to get the
5  calls to stop.
6       The last thing I'll mention is, in the
7  briefing, we then read something about, you know,
8  that we -- that the lawyers didn't contact Conn's to
9  get them to stop.  I guess because he had contacted
10 Morgan & Morgan.  Which one, it was inappropriately
11 pled and we're not here in trial.  It's them.  But
12 Mr. Williams will tell you, "I called.  I was so fed
13 up with this.  Morgan & Morgan is everywhere.  I
14 called them.  Saw the commercial in July of 2016."
15       He calls sometime in July 2016.  He talked to
16 -- we have a call center, but it's for inbound calls.
17 He calls July 2016.  We turn him down.  And he's
18 going to tell you September 2016, we turned him down
19 and, you know, already apologized to him.
20       In October, he faxed us a list of phone calls
21 and logs that he was able to recreate from his cell
22 phone, and at that point we reopened the case.  He
23 got to a lawyer.  Lawsuit was filed in January.
24 That's the only thing that stopped the calls.
25 Literally the moment Conn's got served is the only

Page 20

1  thing that stopped the calls.
2       So thank you.  I know everybody travelled
3  from Texas, from California.  We're here from
4  Florida.  Thank you for hosting us.  And especially
5  because we know you have a family affair you're
6  dealing with.  But -- and I know I have an accent, so
7  if at any point you didn't understand me, please let
8  me know know, and I'll try to explain myself.  Thank you.
9       THE ARBITRATOR:  Thanks.  Can I just ask
10 you one quick question?
11       MR. GOMEZ:  Yes.
12       THE ARBITRATOR:  I've wondered about
13 this, and it's probably not really particularly
14 relevant.  But you mentioned that the first purchase
15 was in July of 2015, and it was two televisions and a
16 sound bar.  And then there was a subsequent purchase
17 in November of 2015.  I didn't recall what the
18 merchandise was.
19       MR. GOMEZ:  We're going to introduce
20 those.  The --
21       THE ARBITRATOR:  Again, probably doesn't
22 matter much, but I was just curious.
23       MR. GOMEZ:  -- itemized -- will you go
24 show him?
25       MS. JACKMAN:  I can tell you.  It was

Page 21

1  furniture.  And also the first agreement was actually
2  August 31st of 2015.
3       MR. GOMEZ:  Sorry.
4       MS. JACKMAN:  That was the televisions
5  and the sound bar.  The second was November 29th of
6  2015, and it was several pieces of furniture like a
7  table -- go ahead.
8       MR. HILL:  I believe it was a coffee
9  table as well as a computer-printer bundle.
10       THE ARBITRATOR:  Okay.  Again --
11       MS. JACKMAN:  I think there was one more
12 table, but they are listed.
13       MR. GOMEZ:  Yeah.  We have it right here.
14       THE ARBITRATOR:  -- not all relevant to
15 the collection calls, but I was curious about that as
16 I was reading these things.  And y'all can think
17 about the next question which again, may or may not
18 be outcome determinative, but I am curious about the
19 value of the merchandise that was purchased.
20       MR. GOMEZ:  The total amount of the --
21       THE COURT:  Which relates to the amount
22 of the debt and how much was due as you get further
23 on into March.
24       MR. GOMEZ:  Absolutely.  The amount that
25 was financed was $2,444.27.



Page 22

1      THE ARBITRATOR:  And that's the total for
2  all purchased?
3      MR. GOMEZ:  Well, there's also a finance
4  -- correct --
5      THE ARBITRATOR:  Okay.
6      MR. GOMEZ:  -- for both of them, but
7  there's a finance charge of $721.  The total number
8  of payments, if he made the payments throughout the
9  length of the contract, would have been $3,165.30.
10      MS. JACKMAN:  And some of the debt from
11  -- as you'll hear from Mr. Walton, some of the debt
12  from the first contract in August was rolled into --
13      THE ARBITRATOR:  The second.
14      MS. JACKMAN:  -- the second.
15      MR. GOMEZ:  So -- and we're going to --
16      THE ARBITRATOR:  And some was paid.  I
17  mean --
18      MR. GOMEZ:  Right.  He makes some --
19      THE ARBITRATOR:  He doesn't default until
20  March of 2016 or thereabouts.
21      MR. GOMEZ:  Absolutely.  He made some
22  payments.  We will introduce --
23      THE ARBITRATOR:  Okay.
24      MR. GOMEZ:  -- as we progress.  And look
25  --

Page 23

1      THE ARBITRATOR:  All right.
2      MR. GOMEZ:  -- feel free to ask us any
3  questions.  Because this is the beauty of
4  arbitration.  We get to actually --
5      MS. JACKMAN:  Well, and for what it's
6  worth, if it helps, Mr. Walton was kind enough to say
7  that the charge-off amount -- why don't you say,
8  Mr. Walton, so that it's coming from you?
9      MR. WALTON:  Certainly.  It was $2208 on
10  January 31st of 2017.
11      THE ARBITRATOR:  And is that just
12  principle and interest?
13      MR. WALTON:  That's the reduced portion.
14  At that time, it was considered as a profit loss.
15      THE ARBITRATOR:  Oh, well.  Okay.  All
16  right.  Okay.  So thank you, Mr. Gomez.  Who'd like
17  to speak on behalf of Conn Appliances?
18      MS. JACKMAN:  I am, Mr. Harris.
19      THE ARBITRATOR:  All right.  Ms. Jackman.
20      MS. JACKMAN:  Thank you.  To be candid,
21  we're not entirely sure why we're here.  We
22  understand that the claimant seeks to recover over
23  1.6 million dollars in this matter for alleged TCPA
24  violations by my client.  To prevail on a TCPA claim,
25  as you are aware, claimant has to prove that my

Page 24

1  client, Conn Appliances, called him on his cell phone
2  using an automatic telephone dialing system or ATDS,
3  as we'll likely call it for the rest of today,
4  without his consent.  So there's three elements right
5  there on the face of the language in the statute.
6      If claimant fails to establish any one of
7  these requirements, his claim fails as a matter of
8  law.  As the evidence is going to show, no single
9  call or attempted call -- and there is a distinction
10  in our view between received calls and attempted
11  calls, but we can come back to that.  But no call was
12  attempted or successfully placed to claimant using an
13  ATDS as that term is currently defined, or ever has
14  been defined under the TCPA.
15      It was not an ATDS before 2015, and you know
16  2015 was a significant point in history from our
17  prior discussions for TCPA.  It was not an ATDS after
18  2015.  And it is not an ATDS today after the D.C.
19  Circuit opinion in the ACA appeal.
20      The TCPA defines an ATDS to mean equipment,
21  and this is a quote:  "Equipment which has the
22  capacity to store or produce telephone numbers to be
23  called using a random or sequential number generator
24  and to dial such numbers."  For the record, the cite
25  for that language is 47 U.S.C. 227 (1).  The

Page 25

1  testimony you're going to hear today from Mr. Walton
2  who you've already met, as well as from both parties'
3  experts, is that Conn Appliances' dialing system is
4  simply not capable of doing any of these things.
5      It does not store numbers.  It does not
6  randomly generate numbers to be called.  It does not
7  sequentially generate numbers to dial.  In fact, as
8  we're going to tell you, Conn Appliances' dialing
9  system does not generate any numbers at all.
10      Mr. Walton is going to take you through each
11  step that is required for Conn Appliances' system to
12  even place a call to a consumer.  And you're going to
13  hear, as Mr. Gomez said, that this process involves a
14  lot of involvement from a team of humans.  They're
15  going to be called the credit systems administration
16  team.  That's what they're called at Conn Appliances.
17  And we're going to tell you about them.
18      They're a team of six people that every
19  single day go through a series of required efforts in
20  order to begin a campaign, in any mode, of contacting
21  consumers who may need payment reminders , maybe
22  requested follow-up communications, or as the case
23  was in this matter, have fallen behind on their
24  debts.  You're going to hear that every morning,
25  usually around 6 a.m., that credit systems management



Page 26

1 team begins the process of preparing the campaigns
2 for the day.
3      Here's what that entails. They have to build
4 what's called work cards. These work cards can
5 contain all of the numbers that are going to be
6 dialed within any campaign -- and we can focus on
7 collection campaigns -- that day. These numbers are
8 not sourced from the Noble dialing system.
9      And I want to talk to you about our systems
10 for a minute because you're going to hear an
11 explanation of that from Mr. Walton and Mr. Sorini.
12 And to be candid with you, despite my age, I
13 sometimes have trouble keeping up going with that, so
14 I want to make sure it's clear.
15      When the credit systems administration team
16 logs on at 6 a.m. in the morning, they come in to
17 work. They log onto the Latitude system. You're
18 going to hear about Latitude. Latitude is Conn's
19 collection system of record. It's where the agents
20 making calls to consumers put notes, indicate
21 promises to pay. It'll show when promises to pay are
22 broken. It's the system of record.
23      Latitude does have consumer numbers in it,
24 but it is also getting those numbers from somewhere
25 else. So what's important at this point is Latitude

Page 27

1 is not where the numbers are housed. Instead, the
2 numbers are housed in something called AS400 which is
3 yet a third system. The AS400 system is Conn
4 Appliances' point of sale system. It's the one that
5 if you go into one of their stores, I'm sure you've
6 seen them, because they're in Tennessee.
7      And you want to make a purchase, and you sit
8 down with the sales rep, they will take your
9 application information, they key in the numbers you
10 want. They're going to be the ones that you're going
11 to hear from Mr. Walton, keyed in the cell phone
12 number that Mr. Williams provided to us when he made
13 the purchases both times in August and November of
14 2015. The store reps will key that in.
15      So bringing this all together, in order to
16 make calls on the Noble system, the credit systems
17 administration team has to go into Latitude, but also
18 confirm the numbers in Latitude are correct in AS400
19 because consumers, as you will hear, might go back
20 into the store and change their contact information.
21 Request they not get calls. Who knows, but there's
22 no automatic reconciliation between AS400 and
23 Latitude.
24      So the credit systems administration team
25 first has to confirm those numbers in two different

Page 28

1 systems. None of which are calling systems. Then
2 load them into the Noble dialing system that then it
3 will be working with -- and I'm going to tell you
4 about that the rest of the day -- to ensure those
5 calls are attempted in accordance with the campaign
6 parameters.
7      So that process, as you'll hear from
8 Mr. Walton and from Mr. Sorini, our experts, on-site
9 observations usually takes about two hours each day.
10 At 8 a.m., campaigns generally have been reconciled,
11 numbers have been loaded onto these work cards by
12 this six-person team, and they are ready in the Noble
13 system. We are ready to go. So now what happens?
14      The Noble system starts dialing? No. Not at
15 all. Nothing could be further from the truth. But
16 you will hear that is how some versions of this very
17 system have operated in the past. We anticipate
18 their expert Mr. Hansen is going to tell you that
19 predictive dialers are not a new technology. He
20 cites you a patent from the '70s. These have been
21 around forever. I guess he fails to realize that
22 they can evolve and technology changes as you'll hear
23 today, because it has. Here's what happens next.
24      At 8 a.m. people start coming to work.
25 Collection agents. You're going to hear how those

Page 29

1 collection agents have to log into Latitude. They
2 have to log into Noble. They have to send
3 indications to the system that they're ready to
4 receive calls. The Noble system won't start placing
5 calls with them automatically. Another key
6 distinction from predictive dialers as they existed
7 in the '70s.
8      Instead, as you'll hear, the credit systems
9 administration team, those six people, have to
10 actually launch the campaigns that they've loaded in.
11 They have to say, go ahead and start. And that will
12 signal to the system to start placing calls with the
13 agents who are available to receive and communicate
14 with consumers who answer them. And lots of
15 consumers do not answer them.
16      But then the credit systems administration
17 team is still not done. And this is another key
18 distinction from traditional predictive dialers. A
19 traditional dialer, including prior and other
20 versions of the Noble system, I'm not an expert on
21 them, but they're able to manage certain things about
22 how these campaigns work. They're able to control
23 how fast or slow, and they will have a target that
24 they monitor to, as you'll hear from Mr. Hansen.
25      And they'll make adjustments as they see



Johnnie Williams vs Conn Appliances
Arbitration

30..33

Page 30

1 people come in and off campaigns. They go to the
2 bathroom. They have a lunch break. They're reaching
3 a lot of consumers, or they're not. All of that
4 functionality is replaced at Conn's. That
5 functionality has to be provided for our system to
6 work by the credit systems administration team, those
7 six people.
8     Those people, you'll hear Mr. Walton talk
9 about pulling the levers all day. The way it works
10 is, basically on the hour, generally, Conn's will
11 launch a new campaign. That credit systems team will
12 push "go ahead." Push a button. Start this campaign
13 that we loaded in the morning. And that will start.
14     But they have to monitor how that campaign is
15 going. The system won't do that for them. The
16 credit systems team, the six-person team, has to
17 watch availability of agents for calls. They have to
18 make adjustments in the pacing with which the Noble
19 system will ring additional consumers to say, slow it
20 down. We're reaching a lot of people. We're helping
21 them resolve their debt. We need to extend the
22 campaign. Or speed it up. Nobody is answering today
23 and we have a lot of people available.
24     What you need to understand is, unlike a
25 predictive dialing system, that functionality is

Page 31

1 provided by humans at Conn Appliances. Mr. Walton is
2 going to tell you about that because he was actually
3 one of the main people involved in making the
4 purchase in 2011 of the current system that Conn's
5 uses that has not changed in any way, shape, or form.
6 In fact, he'll tell you they can't change it because
7 they don't have access to the source code. It's a
8 cloud-based system. They don't have, you know, like
9 a box sitting in a room that they could go and
10 reprogram. They would actually have to go to Noble,
11 and have Noble reprogram the source code for them.
12 So then they've never done that, as you'll hear.
13     So it's the same today as it was in 2011.
14 He's also going to tell you about how we didn't have
15 any TCPA litigation before July of 2015 when the
16 reversed -- well, I should say now-reversed FCC order
17 came down. It was only after that order that all of
18 a sudden our system is a problem. And everyone here
19 agrees that that order has been reversed by the D.C.
20 Circuit in its March 2018 opinion.
21     In addition to what Mr. Walton is going to
22 tell you about our system and how it works, we have
23 our expert, Adam Sorini, who you've already heard
24 about. He's a Ph.D. in physics. He has spent his
25 career to date developing and evaluating different

Page 32

1 types of electronic systems, including a variety of
2 telephony systems. That's the industry term for
3 dialing systems, predictive dialers, things like
4 that. Including the Noble system.
5     You're going to hear that he actually, unlike
6 Claimant's expert, visited our facilities and sat
7 side by side with our credit systems administration
8 team. He was in there at 6 a.m. watching them do all
9 this work. And then he watched them launch
10 campaigns. And he watched them monitor and control
11 the pacing of those campaigns. And then he watched
12 them start a new campaign. He watched them pull all
13 those levers as part of his work in preparing his
14 opinion in this case.
15     And you're going to know that he and
16 Mr. Walton are the only people with that knowledge.
17 Because Mr. Hansen not only has never visited our
18 facilities -- and you know we've had other cases, and
19 Mr. Hansen has been our expert. He's going to tell
20 you he doesn't think it's important to do that,
21 because his opinion is based on general understanding
22 of all these different systems out there. And he
23 ultimately comes back to what the basic functionality
24 from a 1977 patent is, notwithstanding that
25 Mr. Walton and Mr. Sorini are going to tell you in

Page 33

1 very clear words, that doesn't exist in our system.
2     Mr. Sorini is going to confirm for you that
3 in his expert opinion and based and his observations,
4 his knowledge, his experience, his Ph.D., that our
5 system does not have the ability to randomly or
6 sequentially generate numbers to dial. And it is
7 unable to operate as a dialing system without
8 significant human support throughout multiple points
9 in the campaigns.
10     All of this testimony is going to be in stark
11 contrast to Mr. Hansen, Claimant's expert. He has no
12 degree or college -- formalized college education in
13 computer programming, computer systems, telephony in
14 general. He is not a member of industry
15 organizations like ACA and the collection space
16 PACE, which is a contract industry organization.
17     He'll admit he's never placed a call through
18 Conn's Noble dialing system. He will admit to you
19 he's never run any of the software as it sits on
20 Conn's system. He'll admit he's never gone on-site.
21 He'll tell you he doesn't think it matters. And he's
22 going to tell you this doesn't matter. You should
23 take him at his word and ask my client to hand over
24 1.6 million dollars to claimant in this case.
25     Based on violations that depend entirely on



Page 34

1 whether our system has the specific functionally I've
2 told you about and that he doesn't think is
3 important. He's also going to admit to you that none
4 of the individual system components that Latitude,
5 AS400, or the Noble components are capable of
6 randomly or sequentially generating numbers either.
7      We're also going to talk to him about a
8 recent decision from the Third Circuit called the
9 Dominguez case. Dominguez versus Yahoo. Where this
10 very opinion -- and this decision was after the D.C.
11 Circuit's opinion, reversing the FCC's 2015 order.
12 Where this very expert opinion, the same one he
13 offers here, was upheld as improper. And the Third
14 Circuit affirmed the District Court's
15 disqualification of Hansen for offering this very
16 same opinion. The District Court excluded him before
17 the D.C. Circuit's opinion. The Third Circuit
18 affirmed that decision after.
19      You've heard about these modes, and you're
20 going to hear more about them. And you're going to
21 see it. Predictive. Manual. Broadcast. You're
22 going to see this. These are modes that traditional
23 predictive dialers, including those created in 1977,
24 had. That doesn't mean they work that way in our
25 system, and you're going to hear they are a red

Page 35

1 herring in this case.
2      Mr. Walton is going to testify, and
3 Mr. Sorini, our expert, is going to confirm these
4 modes are just the way that we keep our campaigns, to
5 reuse them. The campaigns consist of direction on
6 how our call strategies are going to go. Call
7 accounts that are this many days behind and this
8 balance or haven't been called at this point or
9 whatever, right? We create a strategy. And we
10 capture that and save it in our system in a campaign.
11 And you'll see those numbers. You'll see
12 "predictive" and "70" with a bunch of weird stuff
13 that won't mean anything. But that's what it is.
14      But what's critical here for you to realize
15 is that none of the numbers that are called in that
16 campaign are stored in those campaigns. That's why
17 these modes aren't the same. There is -- there are
18 things out there where these modes can store numbers
19 and therefore become a predictive dialer subject to
20 the TCPA. That is not our system. And we will give
21 you the testimony on that from the people that work
22 our system every day.
23      You heard that Mr. Williams purchased two
24 flat screen TVs and some furniture. You've heard the
25 value of that. You've heard that this debt was

Page 36

1 charged off. You've heard that there wasn't, you
2 know, maybe -- this isn't a case where Mr. Williams
3 owed us hundreds of thousands of dollars or anything
4 like that.
5      But I think you need to understand who Conn
6 Appliances is. They've been accused by Counsel for
7 Mr. Williams in our briefing of being a prolific
8 violator of the TCPA and that we've weaponized our
9 dialing system. You're going to hear from Mr. Walton
10 that nothing could be further from the truth.
11      You're going to hear that Conn Appliances is
12 a national retailer of home goods such as furniture,
13 electronics and other household items. And that they
14 seek to provide credit opportunities to a wide
15 variety of consumers from all different walks of
16 life, including with very different credit scores.
17 And unlike a lot of lenders, Conn Appliances does not
18 exclude from its opportunities to obtain financing
19 people who have thin credit files, meaning very
20 little, or bad credit histories. They are not a
21 lender that requires a 700-plus credit score.
22      And you're going to hear from Mr. Walton, who
23 you've met and who you know is the senior manager of
24 compliance, that assisting these customers to remain
25 current on their debts, regardless of their

Page 37

1 challenges, regardless of their financial
2 difficulties, of which many of their clients such as
3 Mr. Williams experience frequently in connection with
4 the financed purchases of a few thousand dollars here
5 or there for household goods, all the time. And
6 you're going to hear about Conn's approach which is
7 to reach these people. To tell them of opportunities
8 and to assist them in coming current.
9      And you're going to actually hear calls in
10 this case where Mr. Williams is frustrated with the
11 calls, but as it goes on, it turns out when we were
12 able to get him to listen and tell him about
13 opportunities, he was interested in hearing more.
14 And he requested calls back. And he wanted to
15 continue communicating. You're going to hear that
16 there's a lot of confusion as to exactly what
17 Mr. Williams needed to help him resolve his
18 situation.
19      You're also going to hear that Mr. Williams
20 claims to have not retained counsel, I guess in a
21 formal sense, until December of 2016 because what
22 you're also -- and he put that in a sworn
23 interrogatory, Interrogatory Number 5 from us. And
24 you're going to see that he acknowledged he first
25 reached out to the Morgan & Morgan law firm in July.



Johnnie Williams vs Conn Appliances
Arbitration

38..41

Page 38

1  And in fact, the record will show that he reached out
2  three days, July 5th, three days after that call you
3  heard about from Mr. Gomez with the expletives in it,
4  which was July 2nd of 2016.
5        And what we're going to show you are a series
6  of ongoing communications between Mr. Williams and
7  the Morgan & Morgan law firm for that entire
8  six-month period.  Usually bi-weekly, sometimes a
9  little more.  Sometimes a little less.  Sometimes
10 multiple times within a week.
11      You're going to see a 17-minute conversation
12 with the Morgan firm.  You're going to see a
13 50-minute conversation with the Morgan firm.  You're
14 going to see a series of 5, 6, 7-minute conversations
15 with the Morgan firm.  You're going to see those
16 calls coming from a 901 area code which you -- we
17 will establish is this office -- not this office.
18 I'm sorry.  Which is their Memphis office.  As well
19 as an 813 number that we will establish belongs to
20 the paralegal for Mr. Gomez and his team.
21      We've been accused of weaponizing a statute.
22 But you also heard Mr. Gomez says that Mr. Williams
23 reached out because they're known.  Morgan & Morgan
24 is a national plaintiff's law firm.  And we're going
25 to show you evidence that shows they've weaponized

Page 39

1  the TCPA in this case against us to the tune of
2  1.6 million dollars, by letting these calls continue
3  and knowing they were continuing for six months
4  before they sent a letter that served to clarify very
5  quickly exactly what Mr. Williams wanted.  It could
6  have been a lot sooner and prevented a lot of
7  this alleged harm to Mr. Williams.  Conn Appliances
8  appreciates your efforts in this matter, and we
9  welcome the opportunity to be heard today.  So thank
10 you.
11      THE ARBITRATOR:  Thank you both.  Just, I
12 had a couple of questions marks as you were speaking.
13      MS. JACKMAN:  Sure.
14      THE ARBITRATOR:  Let me just look at them
15 real quickly.  First of all, I'm really not a Conn's
16 customer, so I'm not -- but there is a Conn's in our
17 area, but it's sort of distant from where I live.  So
18 I don't really know a whole lot.  I've seen their
19 ads, so I know the level of the range of merchandise
20 that they sell.  So I don't know too much about
21 Conn's specifically.  Although my -- well -- but a
22 minute ago you were speaking about Mr. Hansen as
23 being an expert that had not visited the Conn's call
24 center or whatever you call that facility.  Did you
25 say that he had served as Conn's expert before?

Page 40

1      MS. JACKMAN:  No, apologies.  He's worked
2  in a number of cases where we've represented Conn's
3  and Morgan is on the other side, for the Morgan firm.
4      THE ARBITRATOR:  Okay.  I thought that to
5  be the case, but when you said it, you said "our
6  expert."  I think now what you meant was that he was
7  an expert in a similar case.
8      MS. JACKMAN:  Yes.  He --
9      THE ARBITRATOR:  Or both.
10     MS. JACKMAN:  -- only testifies for
11 plaintiffs in TCPA cases.
12     THE ARBITRATOR:  Okay.
13     MS. JACKMAN:  He'll tell you that.
14     THE ARBITRATOR:  Okay.  I expected that
15 but the way you said it, I wanted to make sure.
16     MS. JACKMAN:  I apologize.
17     THE ARBITRATOR:  Well, that's fine.
18     MS. JACKMAN:  I'm still working on my
19 coffee.
20     THE ARBITRATOR:  No, no.  That's okay.
21 And Mr. Gomez, and again, I wrote a note.  Did you
22 say that the claimant is not arguing that this system
23 is a random predictive dialer?
24     MR. GOMEZ:  Correct.  What we're arguing
25 -- no, no.  We're arguing that it is a predictive

Page 41

1  dialer.
2      THE ARBITRATOR:  Okay.
3      MR. GOMEZ:  What we're not arguing is,
4  two-thirds of her opening statement refer to the
5  system doesn't have the capacity to randomly or
6  sequentially generate numbers.
7      THE ARBITRATOR:  Okay.
8      MR. GOMEZ:  Meaning the list that I was
9  describing, they have a list of their own consumers.
10 So they're not randomly or sequentially generating
11 the list of numbers.  All we're saying is, a list is
12 created.  And then once these six people launch the
13 campaign, the phone calls begin in a predictive mode
14 under that campaign.
15      So we're -- I'm not going to ask our expert,
16 we're not going to even bring up did -- does Conn's
17 randomly or sequentially generate numbers.  They're
18 collecting from their own clients.  So they're not
19 generating random phone numbers.  So you're never
20 going to hear us argue that predictive dialers that
21 you can see in the case law that we provided in these
22 -- since 2003, the FCC has said predictive dialers --
23 we were granted by Congress the ability, the
24 Congressional power to interpret the TCPA.
25      With the evolution of technology, we

9



**Orange Legal**
**800-275-7991**

Johnnie Williams vs Conn Appliances
Arbitration

42..45

Page 42

1  understand that people are buying lists now or have
2  their own lists of consumers.  Therefore, we are
3  including within the TCPA, predictive dialers, which
4  is systems that have the capacity to dial thousands
5  of numbers from a list.  So the list no longer has to
6  be randomly generated like in '91 when it was
7  originally enacted.  It's actually, now it can be
8  dialed from their own list.  And clearly you see six
9  people are dialing 600,000 calls.
10       THE ARBITRATOR:  Okay.  All right.  I
11  made a note about that.  I wanted to just see.
12       MR. GOMEZ:  Absolutely.
13       THE ARBITRATOR:  I may have just
14  abbreviated in my notes, but I get it.  There's a
15  little more to it than that.  Okay.  Well, if there
16  are no other opening comments, then...
17       MR. GOMEZ:  Just one thing I want to make
18  sure, and I'll prepare something to provide to you
19  tonight.  I think Ms. Jackman's allegation against
20  the attorneys at Morgan & Morgan not only is improper
21  because one, we're not on trial here.  Two, we're
22  going to provide you simple case law, a ton of cases
23  that says one, there's no duty to mitigate under the
24  TCPA.  Two, there's no unclean hands defense.  I just
25  don't want as we progress -- I've already explained

Page 43

1  and and brought it up, but it is an attack on the
2  attorneys as opposed to the facts of the case.  We
3  have no duty to mitigate.  You see what I'm saying?
4  Like I don't want to make sure that we have civility,
5  and attacking us like we're letting these calls occur
6  is just silly.  The law says it's not proper.
7  There's no duty to mitigate.  An unclean hands
8  defense does not apply to the TCPA.  We'll provide
9  you with all that case law tonight.  I'll get them
10  ready to you.  But the attacks on the law firm and
11  the lawyers is just not necessary, you know, between
12  the lawyers.
13       THE ARBITRATOR:  Well, I think --
14       MS. JACKMAN:  May --
15       THE ARBITRATOR:  Go ahead.  Sure,
16  Ms. Jackman.
17       MS. JACKMAN:  May I be heard?  Just
18  because I actually agree with Mr. Gomez.  I find it
19  unfortunate that I need to bring this information up,
20  but we cited for you in our prehearing brief cases
21  where notwithstanding, I'll say alleged TCPA
22  violations, Courts held that professional plaintiffs
23  did not have standing.  And here, we suggest this is
24  a case of that law firm working with Mr. Williams to
25  essentially make him a professional plaintiff, and he

Page 44

1  lacks standing.
2       MR. GOMEZ:  That's --
3       MS. JACKMAN:  Secondly, I -- let me be
4  heard.  This is a case where they seek not only
5  damages per call, but trebling.  While it may not go
6  to the point of whether they can prove their damages
7  on the statutory 500, we will provide for you, and
8  are happy to do so, the case law that makes clear for
9  purposes of treble damages a punitive aspect, this is
10  extremely relevant information.  And we can provide
11  that as well.
12       THE ARBITRATOR:  Well, let's do this.
13  We're going to hear from the witnesses, and the issue
14  about what Mr. Williams did is an appropriate issue
15  for all of you to inquire about.  And the parties are
16  Mr. Williams and Conn Appliances and no one else at
17  this point.
18       MR. GOMEZ:  Correct.
19       THE ARBITRATOR:  So why don't we stay in
20  that lane.  And I think we'll have in evidence what's
21  transpired.  And if it has some collateral issue to
22  something else or relates to maybe willfulness or
23  some level of withdrawal of consent or those issues
24  which seem to be very significant, maybe as least as
25  significant as the equipment that is used, why don't

Page 45

1  we stay in that, going down that road together.
2       MR. GOMEZ:  Absolutely.
3       THE ARBITRATOR:  Okay.  Anything else?
4       MR. GOMEZ:  Well, if you don't mind, if
5  we take like a five-minute break.  I'm going to call
6  Mr. Hansen.  I want to get it set up.
7       THE ARBITRATOR:  Sure.
8       MR. GOMEZ:  If you want to get a water so
9  when you come in --
10       THE ARBITRATOR:  Yeah.  Let's do that.
11       (Short break.)
12       THE ARBITRATOR:  Okay.  Mr. Gomez, are
13  you ready to proceed?
14       MR. GOMEZ:  Absolutely.  If we can go
15  back a little, sir?  Mr. Harris, what we're going to
16  do is respectfully we're going to ask to -- you have
17  two exhibits in front of you.  Exhibit Number 1 we're
18  going to introduce is Jeffrey Hansen's CV record
19  regarding his qualifications, experience.  This
20  should be five pages.  We've provided a copy to the
21  respondent, and we're going to be introducing as
22  Joint Exhibit Number 1.
23       (WHEREUPON, the above-mentioned document
24  was marked as Exhibit Number 1.)
25       Joint Exhibit Number 2 is going to be the



Page 46

1  written report by Mr. Hansen regarding this case.
2  I'm going to represent to you, there is a lot of
3  exhibits that you don't have in front of you. We're
4  going to be providing those via a CD, but I'm going
5  to try to minimize it and talk only about very few of
6  the paragraphs in front of us. But I believe our
7  respondent has an objection overall that I'm going to
8  allow her to place on the record, and then we can
9  start with Mr. Hansen with your permission.
10      (WHEREUPON, the above-mentioned document
11  was marked as Exhibit Number 2.)
12      THE ARBITRATOR: All right. Ms. Jackman?
13      MS. JACKMAN: Yes. With regard to
14  Exhibit 2, Mr. Hansen's report, the objection relates
15  to the exhibits to his report which is set forth,
16  those materials in Paragraph 13 of the report.
17  Specifically, we object to a number of the matters in
18  there not having anything that -- they're hearsay.
19  They relate in no way to anything that is from my
20  client, published by my client, relates to my client,
21  or is admitted by my client. Because what they will
22  say is that some of these materials like the Noble
23  manuals were produced by my client.
24      But we object specifically to the admission
25  of Exhibit C, Exhibit D. Those are, as I recall,

Page 47

1  Internet articles put out by a competitor, Ontario.
2  We object, the next two are patents, so that's not
3  prohibited. Exhibit G, H, I, Exhibit P, Exhibit R,
4  S, T, V, X, Y, Z, AA, AB, AC, AD, AE, AF, AG, AH, AI,
5  AJ, AK, AL. Hold on. I'm just reading through.
6  There's a variety of SEC filings and public filings
7  by my client. B, as in boy, A. BB, BC, BD, BE and
8  that's it.
9      And these are all items that have nothing to
10  do with my client, were not created by my client, and
11  are not reflective of the system as it's used by my
12  client, so we object to them being as -- offered as
13  evidence, including the fact that I know experts can
14  rely on hearsay because they are completely
15  irrelevant to how our system works in this case. So
16  we'd just like to state that, and then obviously
17  you'll make whatever rulings and give them the weight
18  that you think is appropriate when you resolve the
19  matter.
20      THE ARBITRATOR: Okay. Well, I have
21  noted that objection and listed all the specific
22  exhibits that Conn Appliances objects to. And
23  obviously I don't have them in front of me at this
24  point. I just have their titles. But to the extent
25  they're considered, I note your objection and will

Page 48

1  consider your objection at that time.
2      MS. JACKMAN: And for the record,
3  Arbitrator Harris, I always have the pleasure of
4  making that objection, but going forward my colleague
5  Mr. Delnero is going to be the attorney speaking on
6  this side for Mr. Hansen's portion.
7      THE ARBITRATOR: All right. Good.
8      MR. HILL: And Mr. Harris, if I may, the
9  --
10      THE ARBITRATOR: Sure.
11      MR. HILL: -- attachments to Mr. Hansen's
12  report are included on a CD. I've indicated that to
13  Ms. Jackman. If she would like to take a look at the
14  CD and confirm, that's fine. These have been
15  previously produced along with his report.
16      MR. GOMEZ: Why don't we mark that
17  Exhibit Number 3.
18      THE ARBITRATOR: Okay.
19      MR. GOMEZ: So we don't lose track.
20      THE ARBITRATOR: But it's really a part
21  of Exhibit 2?
22      MS. JACKMAN: It's cited in Paragraph 13.
23      MR. GOMEZ: It's cited and would you
24  rather have it as 2?
25      THE ARBITRATOR: Well, why don't you call

Page 49

1  it 2A?
2      MR. GOMEZ: 2A.
3      (WHEREUPON, the above-mentioned document
4  was marked as Exhibit Number 2A.)
5      MS. JACKMAN: Got it. And I assume that
6  it contains all of the materials, and I don't feel
7  the need to inspect it. I trust you gentlemen.
8      MR. GOMEZ: Thank you.
9      THE ARBITRATOR: Okay. Mr. Gomez, are
10  you ready to proceed?
11      * * *
12      JEFFREY HANSEN,
13  was called as a witness and having first been duly
14  sworn testified as follows:
15      DIRECT EXAMINATION
16  QUESTIONS BY MR. GOMEZ:
17  Q.   Good morning, Mr. Hansen. Can you please
18  state your name --
19  A.   Good morning.
20  Q.   Can you please state your name and spell your
21  last name for the record?
22  A.   Jeffrey Allan Hansen. Middle name A-L-L-A-N.
23  Last name Hansen, H-A-N-S-E-N.
24  Q.   And Mr. Hansen, who are you currently
25  employed by, or where do you work currently?



Johnnie Williams vs Conn Appliances
Arbitration

50..53

Page 50

1  A.    I am employed by Hansen Legal Technologies as
2  an expert witness.  Also I worked for a company
3  called Perspecta as a defense contractor.
4         THE ARBITRATOR:  Let me -- before we get
5  too far.  Why don't you-all adjust the volume down
6  just a little bit.  I think it will come through
7  clearer.  Mr. Hansen, can you speak again, just state
8  your name and we'll see if the volume is right.
9         THE WITNESS:  I'm Jeffrey Hansen.
10        THE ARBITRATOR:  That's -- is that --
11        MR. GOMEZ:  That's much better.
12        THE ARBITRATOR:  That's better.  Thank
13  you, sir.  We're just adjusting the technology.
14        THE WITNESS:  All right.
15  BY MR. GOMEZ:
16  Q.    Mr. Hansen, I'm going to ask you for a favor.
17  You clearly are appearing via video.  If you look at
18  any document, whether it's to refresh your
19  recollection or to make any analysis, would you
20  please let us know to make sure that all parties have
21  an understanding of what document you're looking at;
22  is that okay?
23  A.    Yes.
24  Q.    We have introduced as Exhibit Number 1, a
25  report that's provided that is five pages which

Page 51

1  describes your summary of qualifications and your
2  professional experience.  Would you mind putting that
3  in front of you and I'm going to be going through and
4  asking you some questions?
5  A.    Okay.  Would that be my report or my CV?
6  Q.    Your CV.
7  A.    All right.  I have that in front of me.
8  Q.    Okay.  So tell us a little bit, what
9  happened?  Did you graduate high school?
10  A.    That's correct.
11  Q.    And what did you do after you graduated high
12  school?
13  A.    If we turn to the last page of my CV, that
14  gives a little bit of my educational background.  I
15  graduated high school in 1991.  My last two years of
16  high school, I attended a trade school where I
17  learned electronic theory and radio TV/VCR repair.  I
18  was -- I started out as an electronic technician.  I
19  later went and continued that education in 1993.  In
20  1992, 1993, and in 1993, I picked up a role as a --
21  maintaining all the computers on board a ship that I
22  was on.  There was 36 computers.  There was
23  mainframes plus UNIVAC systems and various other
24  systems.  And it was my -- I was the only one to
25  maintain all of those.

Page 52

1  Q.    And let me ask you, sir.  If I may interrupt
2  you.  After high school then, you went into the U.S.
3  Navy, and you served as an electronics technician and
4  computer technician?
5  A.    That's correct.
6  Q.    Okay.  After -- what did you do between 1996
7  and 1997 with the Navy after you did the job that you
8  just described?
9  A.    I -- that one, 1996 to 1997, I have an entry
10  there for that experience there.  There, there was a
11  very small group of people where we set up a
12  600-station network, fiberoptic network.  It was a
13  wide area network.  It covered three geographical
14  locations.  We maintained all aspects of that
15  network.  We also maintained and operated all the
16  computers for all of the United States Pacific Fleet
17  as well.  We also taught.  We developed a course and
18  taught computer repair to all of Pacific Fleet.
19  Q.    Okay.  Mr. Hansen, you do not have a college
20  degree, correct?
21  A.    Correct.
22  Q.    Okay.  I'm not going to go through it all.
23  I'm going to try to expedite it, but you have
24  received -- after you graduated high school and you
25  went to the Navy, after that, have you had any type

Page 53

1  of continuing education regarding dialing systems and
2  electronic systems?
3  A.    Regarding computer systems, I have various
4  courses.  So some of those are listed there in my
5  education section of my CV.  So '96 I had Navy
6  standard microcomputer repair which would be the --
7  really the equivalent to the A+ certification, but
8  this is all before certification programs.  Then in
9  2003 Security Hardening, Microsoft Windows 2000
10  server family.  Security is an advanced -- computer
11  security is an advanced topic.  2005 e-discovery.
12  Why is digital different?  In 2006 some more specific
13  computer forensics education for both dragon software
14  and axis data.
15        But I would say a huge amount of my -- I
16  would highlight also, I have a certification section
17  in this CV where I listed several certifications.
18  Now, those are just a milestone that I reached along
19  in my career.  Really quite frankly, I took those
20  certifications and achieved those because I was
21  teaching those.  And my job entry from 2000 and 2004,
22  I was the director of training and the IT director.
23  To kind of give a little bit of perspective on that,
24  the IT director is the most senior IT position within
25  a company.  There I designed, built all the computer



**Orange Legal**
**800-275-7991**

1 networks, all the computer systems for five
2 facilities for a school. I also taught all of those
3 certification programs. It was designed to train
4 others to become network engineers themselves. These
5 were highly technical programs.
6 **Q.   And Mr. Hansen, these certifications that you**
7 **achieved, you're not keeping them all current,**
8 **correct, as your job does not require you to keep**
9 **these certifications current?**
10 A.   That's correct. When -- the certifications
11 are really only a benefit to those that need to
12 demonstrate some practical knowledge without the
13 experience, but with the experience that I have,
14 three decades of experience, it would -- it's rather
15 pointless to boast about those certifications.
16 **Q.   Okay. So let's jump to the job you have**
17 **described between 2000 and 2016 which is listed on**
18 **page 3 of your CV. And the one that I'm referring to**
19 **is titled PNS724. I'm sorry.**
20       THE ARBITRATOR: I'm sorry. What page?
21       MR. GOMEZ: It is page 3 and it's titled
22 2000 to 2016, P as in Paul, N as in Nancy, S as in
23 Sam.
24       THE ARBITRATOR: Yeah. I see it now. I
25 see it now.

1 BY MR. GOMEZ:
2 **Q.   So I want to ask you, because as you are**
3 **aware, this case involved predictive dialers and**
4 **telephone calls --**
5       MR. DELNERO: Objection. Facts not in
6 record. There's no evidence that there's a
7 predictive dialer. He's also leading the witness
8 improperly by feeding him testimony that it's a
9 predictive dialer. That has not been introduced.
10       MR. GOMEZ: This is not an --
11       THE ARBITRATOR: Well, I think we all
12 know what this case is about.
13       MR. GOMEZ: Yeah.
14       THE ARBITRATOR: I'd ask you not to lead
15 the witness. He is your witness. So please don't do
16 that.
17       MR. GOMEZ: Okay.
18       THE ARBITRATOR: Well, not please. Don't
19 do that.
20       MR. GOMEZ: Okay.
21       THE ARBITRATOR: But -- well, not please.
22 Don't do that.
23       MR. GOMEZ: Okay.
24       THE ARBITRATOR: But I think we all know
25 enough about this case to let that question go.

1       MR. GOMEZ: Okay.
2 BY MR. GOMEZ:
3 **Q.   Tell me a little bit about the experience you**
4 **have regarding setting up these networks and these**
5 **outbound call centers.**
6 A.   So during my time as the owner of P9724, I
7 built and -- designed and built computer networks for
8 various businesses. I've literally had hundreds of
9 businesses. But one of the -- one of my customers --
10 one of my largest customers, it's a full-time job,
11 actually. I ended up moving my office next door to
12 his so that I could be there all the time in the call
13 center. So from the very beginning of his call
14 center in 2000, he started out with a three line
15 predictive dialer for one agent. To currently, he
16 makes over a million calls an hour.
17       Every couple of months we would redesign his
18 whole call center. New equipment, new dialers, new
19 phone service providers. So we -- through that
20 process, we've used, I cannot even estimate how many
21 predictive dialers and auto dialers that we've used.
22 Huge number of different dialers that we've used.
23 Currently we've settled on one. One brand. But
24 before that, we've gone through several dozen.
25 Several dozen different brands for dialers.

1 **Q.   Was the Noble dialer one of the brands that**
2 **you used in that center?**
3 A.   Noble is not one of the ones. Noble remains
4 on my short list for if you need more bandwidth. But
5 we haven't used Noble.
6 **Q.   Okay. Tell me a little bit regarding Hansen**
7 **Legal Technologies, which I believe is found on**
8 **page 2 of your CV.**
9 A.   So having dealt with, of course, the software
10 applications of predictive auto dialers for numerous
11 years and setting up those call centers, I maintain
12 all the lists, whether it be the do-not-call list,
13 scrubbing list for cell phones, or even the
14 telemarketing list for that matter as well, we -- it
15 just happened to be that with Hansen Legal
16 Technologies, that happened to be a large area where
17 my expertise was needed. I would highlight that my
18 experience with predictive and auto dialers is, you
19 know, to kind of put it into perspective, those are a
20 software application of really any competent IT
21 professional should be able to pick up and use. And
22 my whole background was in IT. So it's really just a
23 very small set of what my -- what I can do. But it
24 just happened to be that my experience demanded that.
25 **Q.   Currently, are you hired to testify regarding**



Johnnie Williams vs Conn Appliances
Arbitration                                                                              58..61

Page 58

1  the type of equipment, the dialers, the modes?  Tell
2  me a little bit about your job as an expert, being
3  hired as an expert by -- in litigation, in cases.
4  A.     Quite often I'm called upon to, number one,
5  opine whether or not the system is an auto dialer,
6  whether it is a predictive dialer.  And, you know,
7  because of my experience with those systems.  Also
8  I'm quite often called upon to do an analysis on the
9  database of calls, specifically the call detail
10 records.
11 Q.     Okay.  And about how many times have you been
12 hired to testify or to create a report or to be
13 involved with civil litigation involving TCPA in the
14 last eight years?
15 A.     Well, I've been -- over the time of -- the
16 time that I've been doing this, I've been engaged on
17 somewhere over 550 cases.
18 Q.     And about all those cases, the 550 cases
19 involve alleged violations of the TCPA, or did they
20 involve -- and I just want to make sure that there
21 are 550 TCPA cases?
22 A.     Okay.  So of all of those cases, some of
23 those cases are call reporting cases in California.
24 So because of the similarities between the two, it's
25 hard to distinguish the two, but I would estimate

Page 59

1  that at least 75 percent or even 80 percent of all of
2  the cases that I've done were TCPA related.
3  Q.     Okay.  You have -- in your CV, you have
4  several cases and citations that you've listed on
5  page 1 and 2.  Did you get a chance to review the
6  cases that you listed there?
7  A.     Yes.
8  Q.     Okay.  And do they seem to be accurate, based
9  on your review of those cases?
10 A.     Yes.  The number of cases has grown, and that
11 list is of the cases that I've testified in.  That
12 list has grown and now contains 259.
13 Q.     Okay.  Let me ask you, have you ever been
14 retained to serve as an expert in a TCPA class
15 action?
16 A.     Yes.  Numerous.  Numerous of them.
17 Q.     If you can estimate, how many times have you
18 been retained to -- as an expert for a class action?
19 A.     I can probably do better just by saying the
20 time frame.  Over the ten years that I've been doing
21 this, the first five years were almost exclusively
22 class actions.  At this point, about, maybe 25,
23 30 percent of them are class actions.  It's kind of
24 hard to estimate just off the top of my head just
25 because the time involved in a class action is way

Page 60

1  longer.  So with a different amount of time applied
2  to each one, it's hard to kind of guess.
3  Q.     Okay.  And I've provided respondent's counsel
4  with a list that I was able to compile, but is it
5  your understanding that you have been the expert and
6  have opined, or at least been involved in class
7  actions with settlements exceeding over 120 million
8  dollars?
9  A.     Yes.
10 Q.     How long have you been working with
11 specifically predictive dialers?
12 A.     Since the year 2000.
13 Q.     I want to ask you regarding Conn's
14 Appliances.  And do you know about how many times
15 have you been retained by Morgan & Morgan to testify
16 as an expert against Conn's Appliances?
17 A.     I would estimate a couple of dozen times.
18 Q.     Okay.  What about by other plaintiff firms,
19 not Morgan & Morgan?
20 A.     I'm going to estimate around a hundred.
21 Q.     So a hundred of those -- or a hundred
22 cases outside of the couple dozens that Morgan &
23 Morgan has retained you for?
24 A.     I'm sorry.  Say again.
25 Q.     So it's a hundred different cases that do not

Page 61

1  include the couple dozen that Morgan & Morgan has
2  retained you for?
3  A.     I would estimate that would be the case.
4  There's -- these are fast moving, so it is kind of an
5  estimate, but I would say that there was at least a
6  hundred.  At least a hundred all together.  There's
7  probably more, but I'm trying to be conservative with
8  that estimate, though.
9  Q.     That is fine.  And we appreciate that.  Let
10 me ask you.  What about not necessarily Conn's
11 Appliances, but the Noble Predictive Dialer itself,
12 how many times have you been retained, whether it
13 involves Conn's or other defendants that use the same
14 Noble predictive dialer?
15 A.     Well, the Noble system predictive dialer is
16 probably the most common predictive dialer.  So as a
17 number, I cannot even estimate how many.  It's
18 countless.  Literally hundreds of times I've looked
19 at the Noble dialer.
20 Q.     Have you ever attended any webinars that were
21 actually given by Noble?
22 A.     Yes.  I try to regularly attend their
23 webinars.  Especially when it pertains to the dialers
24 that they have themselves.
25 Q.     Okay.  If you can briefly tell us what -- and



Page 62

1  I don't want you to go through all the documents. I
2  mean, your report will speak for itself. So I want
3  you to just briefly try to tell us, what did you do
4  once you were retained by Morgan & Morgan in order to
5  form a conclusion on this case regarding the Noble
6  dialer and being a predictive dialer?
7         MR. DELNERO: Objection. He's feeding
8  him the conclusion. I Would also object on the
9  grounds that the report's speaking for itself. He's
10  eliciting specific testimony but represented earlier
11  that the examination will not go into everything in
12  the report. And our plan is to cross-examine
13  Mr. Hansen on the testimony that's solicited, not
14  line by line of the report.
15         THE ARBITRATOR: Mr. Gomez?
16         MR. GOMEZ: Well, I'm simply asking him
17  what documents he looked at to form a conclusion,
18  just the general documents, not every single detail
19  of every exhibit.
20         THE ARBITRATOR: Do you plan to admit the
21  report? I mean, I think you already have marked it
22  as Exhibit 2.
23         MR. GOMEZ: Correct. Yeah. We intend --
24  of course we will note her objection, but we intend
25  to introduce his full report and exhibits.

Page 63

1         THE ARBITRATOR: Okay. So but at the
2  moment, all that's happened is these two have been
3  marked as exhibits, but they haven't yet been
4  admitted into evidence; is that correct?
5         MR. GOMEZ: And I apologize for that.
6         THE ARBITRATOR: Isn't that where we are?
7         MR. GOMEZ: We are.
8         THE ARBITRATOR: Okay.
9         MR. GOMEZ: And respectfully, clearly
10  this is arbitration, so it's a little more relaxed.
11  So I'm not sure. At this point we'd like to
12  introduce --
13         THE ARBITRATOR: I'm relaxed. I want you
14  to be too. But I just -- I think all I've done at
15  this point is mark, and you're now questioning him
16  about his qualifications.
17         MR. GOMEZ: Absolutely.
18         THE ARBITRATOR: And then you'll take it
19  from there. I'm not telling you how to proceed.
20         MR. GOMEZ: Absolutely.
21         THE ARBITRATOR: And so I think,
22  Mr. Delnero, you'll have an opportunity to
23  cross-examine him about his testimony. And if the
24  report is admitted, you'll have an opportunity to
25  cross-examine about that as well. So I don't think

Page 64

1  we ought to stop at this point and deal with that
2  objection. So Mr. Gomez, you can go ahead.
3         MR. GOMEZ: And respectfully,
4  procedurally we will move to admit the report and his
5  CV so we can proceed going through. And we
6  understand the objections that they made.
7         THE ARBITRATOR: Well, we'll deal with
8  that if it comes up.
9         MR. GOMEZ: Okay. And I just wanted to
10  make sure. Can we admit -- at this time, can we
11  admit the report --
12         THE ARBITRATOR: I'll let you, I'll let
13  you --
14         MR. GOMEZ: Go through it, okay.
15         THE ARBITRATOR: -- offer whatever -- at
16  whatever point you'd like to do it.
17         MR. GOMEZ: Okay.
18         THE ARBITRATOR: I don't know that
19  there's any -- I mean, have y'all talked? Is there
20  further objection as to whatever his qualifications
21  are? I mean, I'm interested in hearing whatever you
22  would like to have Mr. Hansen share for me, so...
23         MR. GOMEZ: All right. Okay. So what
24  I'm going to do is --
25         THE ARBITRATOR: I mean, you pointed out

Page 65

1  y'all all know each other.
2         MR. GOMEZ: Absolutely.
3         THE ARBITRATOR: Quite well.
4         MR. GOMEZ: And I apologize for including
5  you. Assuming that you will have the understanding.
6  At this point what I'd like to do is, based on the
7  fact that he has been acknowledged or has been hired
8  -- or if you want me to go to the predicate --
9         THE ARBITRATOR: I want you to have the
10  opportunity to do what you want to do. It is useful
11  to me rather than reading to have him explain as
12  specifically as he can. Not everything in his CV.
13  But things that are directly related, for example, to
14  his testimony that you're about to elicit as to his
15  opinion. And to the extent he's been involved in
16  previous Conn cases, that's of interest to me. I see
17  it on some of these.
18         MR. GOMEZ: Correct.
19         THE ARBITRATOR: But not to the extent
20  that he has shared.
21         MR. GOMEZ: Absolutely.
22         THE ARBITRATOR: So why don't you
23  proceed.
24         MR. GOMEZ: Okay.
25  BY MR. GOMEZ:



Page 66

1  Q.    Mr. Hansen, regarding federal -- or any type
2  of Federal Court, have you ever been admitted as an
3  expert in order to provide an opinion regarding
4  telephonic dialing systems?
5       THE ARBITRATOR:  Well, wait.  Did I
6  interject myself?  I think where you were was you
7  were asking him what he had done in this case.
8       MR. GOMEZ:  Correct.  And --
9       THE ARBITRATOR:  So I didn't mean to
10  backtrack.
11       MR. GOMEZ:  Oh, no, no.  But what I think
12  I'm going to do is, I'm just going to go ahead and
13  try to identify him as an expert.  Have you, you
14  know, recognize him as an expert, introduce his
15  report.  And then we can go line by line just
16  procedurally.
17       THE ARBITRATOR:  Does Conn Appliance
18  object to him testifying as an expert?
19       MR. DELNERO:  We do object to his
20  qualifications.  We can either do the voir dire now
21  on his qualifications.  Or the way we've done it in
22  the past is, they go through their full testimony.
23  They elicit whatever testimony they want.  And then
24  we cross-examine him.  And then after that, then we
25  object on the record to Mr. Hansen being an expert.

Page 67

1       THE ARBITRATOR:  Okay.  I like that
2  approach.
3       MR. GOMEZ:  Okay.
4       THE ARBITRATOR:  That seems to be very
5  efficient rather than back and forth.  Let's -- in
6  part because he's doing this remotely, why don't we
7  allow the claimant to go forward and then Conn
8  Appliances will have the opportunity to examine
9  qualifications or his opinions and any aspect of his
10  testimony.
11       MR. GOMEZ:  Thank you.
12  BY MR. GOMEZ:
13  Q.    Okay.  Mr. Hansen, so let's just go through.
14  You were testifying, and I had kind of veered into
15  what you did specifically for this case.  But let's
16  go through a little bit more regarding your
17  background as an expert in litigation.  Have you ever
18  been tendered as an expert in a TCPA litigation in
19  Federal Court?
20  A.    Yes.
21  Q.    And about how many times has that occurred?
22  A.    At least a couple of hundred times.
23  Q.    Have you ever actually testified in some of
24  these litigations, and by testify, I mean you've
25  given sworn testimony on either a trial, a hearing,

Page 68

1  or a deposition?
2  A.    Yes.  And that was the testimony section of
3  my report.  And again, I had a note that since the
4  writing of this report, that list has grown to 259
5  matters.
6  Q.    So the cases that I'm looking at in what's
7  been previously marked as Exhibit 1, and it's page 1
8  and 2, you've actually given some sort of testimony
9  on this cases, correct?
10  A.    Yes.  I've given additional testimony since
11  then, yes.
12  Q.    Okay.  And have you ever been deemed an
13  expert by a Court, by a Federal Court as -- in
14  regards to the TCPA and in regards to telephonic
15  dialing systems?
16  A.    It's my understanding that I was.
17  Q.    Okay.  Have you provided reports to Federal
18  Courts regarding your findings, regarding evaluating
19  different types of equipment, dialing equipment?
20  A.    Yes.
21  Q.    And have Courts accepted your testimony or
22  your findings regarding telephonic dialing equipment
23  as an expert?
24  A.    Yes.
25  Q.    So let's go through what you did in this case

Page 69

1  and, like I said, I want to try to keep it brief.  So
2  if you can please tell me, what documents did you
3  evaluate in order to make an opinion regarding the
4  dialing equipment used in this case?
5  A.    The document section that I listed here,
6  those are the documents that I considered.  In
7  Paragraph 13, basically the analysis of this system
8  is rather simple.  As a dialer administrator, one of
9  my jobs is going to shop for dialers, and that was
10  literally a daily thing.  Shopping for dialers.
11  Sometimes try them out.  It's like shopping for an
12  automobile, to give it a comparison there.
13       Basically the analysis is real simple.
14  Number one, look at the system as a system as a
15  whole, how it functions as a system.  And number two,
16  is it the product that it's being advertised to be?
17  You know, for example, this one here is a Noble
18  predictive dialing system, abbreviated PDS.  Is it
19  really the product that it is?  Is it that it's
20  advertised to be?  Does it have those capabilities as
21  a system?
22       So using -- I believe I used starting there
23  on -- I used five manuals total.  Exhibit BA, BB, BC,
24  BD, and BE actually.  I used five manuals.  These are
25  technical manuals that go far beyond actually the



Johnnie Williams vs Conn Appliances
Arbitration

70..73

Page 70

1  basic functionality of the system describing basic
2  functions that actually gets into the details.  Very
3  much like a technical manual of an automobile would
4  probably give a lot more information than what the
5  average consumer would need.  But using those, I
6  verified that the system is in fact a predictive
7  dialer.  That it has all of those features that are
8  common to all predictive dialers.  Plus additional
9  things.
10       I also brought in some other exhibits.  Some
11  of it from Noble Systems themselves.  Some of it not.
12  Each one of those I was establishing, you know, in
13  each one of those was -- that I referenced, when I
14  referenced them, I was establishing why I'm
15  referencing them.  I wasn't making the comparison to
16  those to the Noble Systems dialer.  I was making
17  another point such as in Exhibit B, C and D, for
18  example.
19       The terms that are used that are common in
20  the industry for the last half-century such as
21  "automatic telephone dialing system" and "predictive
22  dialer."  I did use some exhibits to establish the
23  history because I think that the history is rather
24  important.  Especially considering that the
25  predictive dialer, for example, was invented in 1974.

Page 71

1  And they have not changed in their functionality at
2  all.  Very much like the automobile.  You would have
3  the same functionality since 1974 to the present of
4  the automobile.  The auto dialer is the same way.
5  With the exception that they can call more numbers in
6  a shorter period of time.
7  Q.     And one of the things I'm going to do is, I
8  know you have a clear understanding, but when you're
9  referring to the term "predictive dialer," I want you
10 to tell me the way you're using it.  Of course you're
11 not giving us a legal opinion about a predictive
12 dialer.  I want you to tell me the technical
13 definition of how do you interpret a predictive
14 dialer.  What is its purpose?
15 A.     So I'll kind of cover both automatic
16 telephone dialing systems as it's used in the
17 industry because a predictive dialer is a subset of
18 that.  In the industry, over half a century ago,
19 we've named the system "automatic telephone dialing
20 system," the intent was to keep the definition and
21 the name the same.  It automatically dials telephone
22 numbers.  That's painful to say, so we shortened the
23 name to auto dialer.  "Auto" coming from the Greek
24 root "self," literally to mean self-dialer.
25       Now, a predictive dialer is a description of

Page 72

1  a dialing mode that the system has for agent calls.
2  And that is that they automatic telephone -- it's an
3  automatic -- where it automatically dials numbers,
4  but it does it in a predictive fashion.  It monitors
5  input to try to overcome the fact that 80 percent of
6  the recipients of those calls are not home.  So you
7  have a lot of answering machines.  A lot of no
8  answers.  That's 80 percent of an agent's -- call
9  agent's waste of time.
10       So the idea of a predictive algorithm is to
11  monitor the answers, to monitor the agents, and to,
12  you know, make calls based on its algorithm,
13  basically, to overcome that 80 percent of the calls
14  not being answered.  The idea is to keep the agent on
15  the phone with a live person at all times.
16       The bottom line is, is the average -- it is
17  adjusting the pacing on its own.  The average -- it's
18  going to average out four to five calls per agent.
19  So if you have a hundred agents come in at nine
20  o'clock in the morning and log on, that system, you
21  can expect it to blast out 500 phone calls to get
22  them going.
23 Q.     Okay.  And what I want to do is, I want to
24 kind of slow it down.  And I want to try to narrow
25 the scope to try to limit the time that we spend

Page 73

1  here.  So I want to be referring only to outbound
2  calls which I'm going to -- I'll make sure that we're
3  talking the same thing.
4  A.     Just a second.
5  Q.     I'm sorry?
6  A.     For some reason -- okay.  All right.  I'll
7  have you say that again.
8  Q.     Yes, okay.
9  A.     For some reason my phone was on the speaker.
10 Q.     Okay.  So what I want to do is I want to
11 limit your testimony to outbound phone calls.  So I
12 don't care about anybody calling in to a company.
13 I'm talking about phone calls going from, for
14 example, Conn's, out to its consumers; you understand
15 that?
16 A.     Yes.
17 Q.     Okay.  I understand that a lot of the Noble
18 Systems might have different modes.  Do you
19 understand what I mean by mode or platform?
20 A.     I'm assuming that you mean the different
21 dialing modes.
22 Q.     Correct.
23 A.     Such as predictive and preview and voice
24 broadcast.
25 Q.     Okay.  So why don't you tell us a little bit



Page 74

1  about your understanding of the Noble dialing system
2  and what different modes it has.
3  A.     The Noble system has predictive mode, which
4  is another value mode.  It has preview.  It has IVR,
5  which is a voice broadcast.  That would be
6  pre-recorded voice and -- artificial voice and
7  pre-recorded message and agentless calls.  And of
8  course at any time, anyone can pick up a phone and
9  make a call through it as well.
10  Q.     Okay.  So you just described five different
11  modes that you're understanding that a Noble dialer
12  can act; is that correct?
13  A.     Correct.
14  Q.     All right.  Let's go one by one to make sure,
15  and we're not going to go through all five because
16  not all of the modes are going to be relevant in this
17  case.  So I'm going to try to just point you to one,
18  and you can explain it to us.  And I want to kind of
19  go slow to make sure Mr. Harris and we all take an
20  understanding because your knowledge is going to be
21  much in depth.
22          THE ARBITRATOR:  Just real quick, what
23  was number four?  I was --
24          MR. GOMEZ:  IVR, which is interactive
25  voice response.

Page 75

1          THE ARBITRATOR:  Thanks.
2          MR. GOMEZ:  Okay.
3  BY MR. GOMEZ:
4  Q.     Let's go through predictive, but I want to go
5  fairly slow.  So I apologize for cutting you off when
6  you were describing predictive.  First of all, in a
7  predictive mode, based on your understanding of the
8  way the Noble system dials, and I want you -- and
9  it's going to be difficult, but I want you to stay
10  away from any type of random or sequential number
11  generators.  I'm just talking about predictive mode.
12  Can you dial from a list of full numbers, as far as
13  you know, the Noble dialer, can it dial from a list
14  of phone numbers?
15  A.     Yes.
16  Q.     Okay.  Does it matter where those numbers
17  came from?
18  A.     It doesn't.  It does not discriminate where
19  the numbers came from.
20  Q.     Okay.  Assuming that you upload a list of
21  phone numbers or a campaign, whatever we want to call
22  it, and I want to use the Noble dialer in a
23  predictive mode, tell me how will the Noble -- what
24  is your understanding of how will the Noble dialer
25  dial these numbers in a predictive mode?

Page 76

1  A.     So once the campaign is created and the
2  numbers are loaded, the schedule is set, the dialer
3  administrator would hit the start button.  Agents are
4  logged into the overall system.  Then the calls are
5  sent to them, once there's a connected call.
6          So once the system detects a live person on a
7  -- receiving the call, they will then be connected to
8  a live agent.  Most of us have experienced that where
9  we've received a call and there was a pause before --
10  after picking up the phone and before a live person
11  on the other end.  I agree to that.  That's a
12  predictive call.
13  Q.     Okay.  So let me go a little slow because I
14  know you just kind of described the entire process,
15  but I want to make sure we understand it.  So from
16  the list, you stated there's an algorithm that is --
17  what is that algorithm trying to adjust?
18  A.     That algorithm, it's not -- all it does is it
19  monitors the -- basically it's trying to monitor all
20  of these inputs that have to do with the answers, the
21  percentage of calls that are answered versus not
22  answered.  And it's adjusting the pacing of those
23  calls automatically.  So, and then if you're calling
24  an area where a lot of people are home, it may only
25  call out on three lines per agent.  Or it may blast

Page 77

1  out three calls per agent to get a live person.
2          But if you call an area where, say, there's,
3  you know, everybody is at work, 80, 90 percent of the
4  people are at work, now that system will be blasting
5  out five calls per agent in order to get a live one.
6  That's the whole intent of those predictive dialers.
7  It's about a 400 percent increase in calls that are
8  made.
9          MR. DELNERO:  I'm going to object on the
10  grounds that these are all hypothetical numbers to
11  that entire line of testimony rather than how the
12  system at issue here actually performed with respect
13  to calls to Mr. Williams.
14          THE ARBITRATOR:  I think you're right.
15  He's not talking about the calls to Mr. Williams.
16  He's describing for me and all of us how a predictive
17  dialer functions.  So I'm going to let him continue.
18          MR. GOMEZ:  Okay.  So --
19          THE ARBITRATOR:  But I agree with you,
20  it's not specific to what happened in this case.
21          MR. DELNERO:  Okay.  I just want to make
22  sure that was clear.
23  BY MR. GOMEZ:
24  Q.     Okay.  So let's continue with -- and just to
25  keep the numbers even because we're all lawyers, we



Page 78

1  have a lot engineers here.  Let's pretend there's a
2  hundred agents.  So if you use any type of scenario.
3  Let's pretend there's a hundred available agents.
4  You described a number three to five.  Is that what
5  -- and I guess it can vary.  But let's just say there
6  is five -- one out of five should answer.  Walk us
7  through how will the dialer go through the dialing of
8  those hundred or 500 phone calls.
9          MR. DELNERO:  Same objection on the
10  grounds as overly general.
11         MR. GOMEZ:  Go ahead.
12         THE ARBITRATOR:  Mr.  Gomez, go ahead but
13  --
14  A.    One of the campaigners created --
15         THE ARBITRATOR:  Mr. Gomez.
16         MR. GOMEZ:  One second.  One second,
17  Mr. Hansen.  There was an objection.
18         THE ARBITRATOR:  Right.  But this is
19  overview, and I think I'm getting it.  So if you want
20  to move along --
21         MR. GOMEZ:  Okay.  All right.
22         THE ARBITRATOR:  I'm ready for you to do
23  so.
24         MR. GOMEZ:  Okay.
25  BY MR. GOMEZ:

Page 79

1  Q.    Let's -- and just going through the five
2  hundred calls in our scenario, if a call is answered,
3  or the predictive dialer, the Noble dialer you're
4  describing seems to identify a live person, what
5  occurs at that point?
6  A.    Once it identifies a live person, it's going
7  to transfer the call.  It's going to connect it to a
8  live agent on your end.  Before that, the call is --
9  you know, the system is automatically making these
10  calls and then distinguishing between an answering
11  machine, no answers, and live recipients.  Live
12  recipients, it will send that to a live agent.
13  Usually another administrator will have a
14  pre-recorded message delivered for when it detects an
15  answering machine.
16  Q.    Okay.  If -- once it's transferred to that
17  agent, okay, do you know, based on your experience
18  and your understanding of the predictive mode, do you
19  know if the agent prior to that phone call being
20  transferred had any knowledge what number was being
21  dialed or who was being dialed?
22  A.    No.  Not at all.
23  Q.    Okay.  At the time of the dialing in a
24  predictive mode, is it your understanding that the
25  system is dialing the ten digits, or is there a

Page 80

1  campaign manager dialing the ten digits?  How does it
2  work in a predictive mode?
3  A.    In a predictive mode, the system is making
4  the calls.  It's doing the dialing.  In fact, once
5  that campaign has started, that dialer administrator
6  theoretically could leave, and the machine will
7  continue to do the work from there.
8  Q.    Okay.  Now briefly, let's talk about outbound
9  phone calls that are intended to deliver a
10  pre-recorded message.  So would you first start by
11  telling us, what is your understanding of what a
12  pre-recorded message is?
13         MR. DELNERO:  Objection to the extent
14  it's calling for a legal conclusion.
15         THE ARBITRATOR:  Okay.  Your objection is
16  noted.  Go ahead.
17         MR. GOMEZ:  Go ahead.
18  A.    So a pre-recorded message, the delivery of a
19  pre-recorded message is an agentless call.  No agents
20  involved.  We've also coined a term in the industry,
21  we call it "voice broadcasting" as well.  Which
22  implies -- the name implies it's broadcasting a
23  voice.  The idea with pre-records, to give you an
24  idea, when I would do a pre-recorded campaign, I
25  would hit the start button and I would leave.  And if

Page 81

1  the campaign was set to run for three days, I would
2  leave for three days.
3  BY MR. GOMEZ:
4  Q.    Okay.  And so walk me through how the message
5  is delivered.  So I know you understand it, but I
6  want to know if I have a list of phone numbers once
7  again, and I'm in the agent list or in the broadcast
8  mode, tell me how does the system dial out?  How does
9  it recognize it?  What does it do once it dials out?
10  A.    All right.  So once it dials, it dials from
11  the list.  Just as in predictive mode, it dials from
12  the list.  And it has also what's called "answering
13  machine detection."  And when it detects an answering
14  machine, we've instructed it to maybe wait a certain
15  number of seconds before playing the message.  For a
16  live person, when it detects that, it will just
17  immediately start playing the message which is a
18  audio file that you set on the dialer.  In the
19  campaign you set it to play an audio file.  And then
20  of course, the no-answers, it will just hang up on
21  and dial the next number.
22  Q.    Okay.  If -- how would you differentiate
23  between a pre-recorded message and the artificial
24  voice?
25  A.    A pre-recorded message is literally where



Page 82

1  somebody would record their own voice stating a
2  message.  Artificial voice is where you have the
3  computerized system with an artificial voice.  We've
4  heard those quite often when we call our bank's IVR
5  system, and it guides us through a menu with
6  artificial voice.  And especially when they start
7  stating our name.  It's reading that from a database,
8  and it's giving a computer-generated voice.  That's
9  artificial voice.
10 Q.    Okay.  Have you ever visited Conn's call
11 centers?
12 A.    No.
13 Q.    Have you ever been accepted as a witness --
14 as an expert witness in a hearing against Conn's?
15 A.    Yes.
16 Q.    I want to briefly point you out to some of
17 the paragraphs that you have in your report.
18 Paragraph 14 seems to indicate that you have, I
19 guess, analyzed Noble Systems in the last ten years.
20 Do you know when was the first time you analyzed the
21 Noble system as a predictive dialer?
22 A.    You know, I would have to say sometime
23 towards the very beginning of my work as an expert.
24 The Noble system's predictive dialer is perhaps the
25 most common predictive dialer out there.

Page 83

1  Q.    Okay.  And I do --
2  A.    I've literally looked into them hundreds of
3  times.
4  Q.    Okay.  And I want to make sure we
5  differentiate.  You can have the Noble system's
6  predictive dialer as an actual hardware equipment
7  where you can actually have it cloud-based; is that
8  your understanding?
9  A.    I would define it as software.  The hardware
10 is a standard computer, no different than any
11 computer that you might have in that room.  But the
12 system itself really is software.
13 Q.    Okay.  Do you know if Conn's has a physical
14 software, or if they're using a cloud for their Noble
15 system's predictive dialer?
16      MR. DELNERO:  Objection.  Speculation.
17 He's admitted that he has not actually been to Conn
18 Appliances' call center.
19      THE ARBITRATOR:  Okay.  But he just asked
20 him, what does he know.
21 BY MR. GOMEZ:
22 Q.    Okay.  So what do you know about Conn's
23 regarding -- do you know if they have the software
24 actually present, or if they have a cloud-based Noble
25 system?  What's your understanding?

Page 84

1  A.    Actually it's been stated by Conn's in
2  different matters.  Sometimes they've said that it
3  was a cloud-based system.  Sometimes they said it was
4  in a -- server in a closet.  Either way, the
5  experience of the dialer administrator is the same.
6  Because as you can imagine, if it is in a closet, it
7  is out of sight and out of mind.  So that is
8  plausible that you've just mistaken those times.  But
9  the experience is exactly the same.  There's no
10 barriers anymore with the internet, where the system
11 is physically located.
12      MR. DELNERO:  And I would move to strike.
13 As that was pure speculation.  He admitted that he's
14 heard it both ways and didn't say one way or the
15 other where it is.  One point he said a cloud.  One
16 point he said a closet.
17      THE ARBITRATOR:  I hear your questioning
18 of his testimony, but I think the appropriate time is
19 when you cross-examine him.  I heard what he said.
20 He's never been there.  It could be one or the other.
21 I'm hearing it.  I think you're entitled to go ahead
22 and continue.
23      MR. GOMEZ:  Thank you.
24 BY MR. GOMEZ:
25 Q.    Let's jump to Paragraph 20.  In

Page 85

1  Paragraph 20 you see --
2  A.    All right.
3  Q.    Yeah.  In Paragraph 20 which is on page 10 of
4  Exhibit Number 2, it seems to be that you describe
5  what we just went through regarding predictive
6  dialer; am I correct to make that assumption?
7  A.    That is correct.
8  Q.    When do you think was the first time you
9  began using or hearing the term "predictive dialer"
10 in the industry?
11 A.    It was early on in my IT career, relatively
12 early.  Sometime in the '90s.
13 Q.    What is your understanding of the purpose of
14 a predictive dialer?
15 A.    The purpose of the predictive dialer is to
16 overcome the fact that 80 percent of the recipients
17 of those calls are not home.  You know, to give you
18 an example, it would take a very, very long time to
19 go through a list of numbers reaching people, that
20 recipients of those calls, that 80 percent of them
21 are not home.  But the predictive dialer overcomes
22 that.
23      It keeps the callers with a live agent only
24 talking to somebody.  It -- when otherwise 80 percent
25 of that -- their time would be wasted.  That's the



Page 86

1  main function of it.  So with any industry, it's
2  estimated to be about a 400 percent increase in
3  productivity.
4  **Q.     And is it your experience regarding your**
5  **evaluation of the Noble predictive dialer that at the**
6  **time of the dialing in a predictive mode, is there**
7  **any human intervention regarding the dialing side?**
8  A.     Not at all.  In fact, at that time, the
9  dialer administrator could leave, which typically I
10 did.  Once I set up the campaign, I would leave.
11 Sometimes forever how long that campaign would last. 1
12 **Q.     Let me point you to Paragraph 44.  And I'm**
13 **not sure you heard regarding some of the objections**
14 **that were made, but I'm just simply saying, did you**
15 **get a chance to review what you marked as Exhibit AB**
16 **which is the SEC filings by Conn's?**
17 A.     Yes, I did.
18 **Q.     And all these documents here that seem to be**
19 **public filings with the SEC, do you actually review**
20 **those yourself?**
21 A.     Yes, I did.
22 **Q.     And did you see the term "predictive dialer"**
23 **within those filings that you reviewed?**
24 A.     Yes.
25       MR. GOMEZ:  Now, for purposes of this

Page 87

1  hearing, I would like to mark as Exhibit Number 3
2  what I'm going to represent is Bates stamped at the
3  bottom Conn's 2615 and continues through 2651.
4  BY MR. GOMEZ:
5  **Q.     Mr. Hansen, if you -- I know we have**
6  **previously provided this to you.  If you get a chance**
7  **to look at that.**
8       MR. GOMEZ:  If we can get it marked as.
9       MR. HILL:  Exhibit 3.
10      MR. GOMEZ:  Exhibit Number 3.
11      (WHEREUPON, the above-mentioned document
12 was marked as Exhibit Number 3.)
13      MR. GOMEZ:  And Mr. Harris, I would like
14 to move to introduce this into evidence.  I'm not
15 sure if Conn's has any objection to the introduction
16 of their data logs into the record.
17      MR. DELNERO:  Which document is it?
18      MR. GOMEZ:  It's page 2615.  Bates
19 stamped.
20      MR. HILL:  It's the Noble report.
21      MR. DELNERO:  Okay.  No objection.
22      THE ARBITRATOR:  All right.  Why don't
23 you state what it is for the record and my notes.
24      MR. GOMEZ:  And as Plaintiff's --
25      THE ARBITRATOR:  I mean, I got the Bates

Page 88

1  numbers --
2       MR. GOMEZ:  Okay.
3       THE ARBITRATOR:  But I didn't get what --
4  the report's name.
5       MR. GOMEZ:  This is going to be the Noble
6  dialer report that was provided by Conn's as part of
7  discovery.
8       THE ARBITRATOR:  Okay.  Go ahead.
9  BY MR. GOMEZ:
10 **Q.     And Mr. Hansen, did you get a chance to**
11 **review the document that we just described as the**
12 **Noble dialer report?**
13 A.     Yes, I have.
14 **Q.     Okay.  And by looking at this report -- and**
15 **I'm going to call your attention to the first column**
16 **which is titled "Call Time."  Do you see that?**
17 A.     Yes, I do.
18 **Q.     There's a term underneath it that says**
19 **"broadcast."  What is your understanding of that**
20 **term, at least in your review of Noble and all the**
21 **times you have been hired as an expert against Conn's**
22 **Appliances?**
23 A.     That would be the agentless call that I was
24 talking about earlier that we nicknamed in the
25 industry as a voice broadcast.  This is the name of

Page 89

1  this call report.
2  **Q.     Okay.  Is your understanding that at the time**
3  **that a broadcast call is made the way they describe**
4  **on that first column on Bates stamp 2615, at the time**
5  **of the dialing, there was not any human intervention,**
6  **based on your review of the Noble dialer, the manuals**
7  **and everything else?**
8  A.     That's correct.  There's no human
9  intervention in the dialing.
10 **Q.     Let's go down about ten rows to a term that**
11 **says "predictive," and tell me if you see that.**
12 A.     That was -- yes, I do see it.
13 **Q.     I'm sorry?**
14 A.     Yes, I do see "predictive."
15 **Q.     Okay.  And is it your understanding that that**
16 **predictive description is the predictive mode that we**
17 **described earlier?**
18 A.     Yes, it is.
19 **Q.     Going down about 15, do you see an entry that**
20 **says "manual"?**
21 A.     Yes.
22 **Q.     And do you know what that means?**
23 A.     Yes.  That would be where an agent picked up
24 the phone and called.  And actually to kind of give
25 you a note there, notice the "Latit" in the -- next



Johnnie Williams vs Conn Appliances
Arbitration

90..93

Page 90

1  to the right of that.  That's an indicator that they
2  were calling that number using the Latitude
3  collection notes or something.  Not the dial-up.
4  Q.     How many times would you say you've actually
5  been admitted as an expert in civil litigation in
6  Federal Court?
7  A.     It's not one of those things that I make an
8  effort to really keep track of, but I would have to
9  say -- I couldn't even estimate how many.  Perhaps
10  hundreds of times.
11         MR. GOMEZ:  If I could just have one
12  second.
13         THE ARBITRATOR:  Sure.
14         MR. GOMEZ:  Mr. Harris, at this time we
15  would move to admit Mr. Hansen as an expert and also
16  to admit his report and CV.
17         MR. DELNERO:  Arbitrator Harris, we will
18  object following our cross-examination.  I would
19  however move to strike all references in the report
20  to random or sequential number generation.  Mr. Gomez
21  at the beginning conceded that Conn Appliances does
22  not randomly or sequentially generate numbers.  No
23  testimony was elicited regarding it, so if they're
24  going to concede that point, that will streamline and
25  make my cross-examination more efficient if I don't

Page 91

1  have to then cross-examine him on those points.
2         THE ARBITRATOR:  Mr. Gomez?
3         MR. GOMEZ:  And we have no objection.  We
4  are not going to raise an issue that the list was
5  from any random or sequentially generated numbers.
6         THE ARBITRATOR:  The list of calls.
7         MR. GOMEZ:  Well, the list of phone
8  numbers that are dialed.
9         THE ARBITRATOR:  List of phone numbers,
10  right.
11         MR. GOMEZ:  Yeah.  The list of phone
12  numbers.
13         THE ARBITRATOR:  All right.  With that
14  understanding, we'll admit Exhibit 1 and Exhibit 2
15  and go forward with obviously Conn's counsel having
16  the opportunity to cross-examine further.
17         MR. GOMEZ:  That's fine.  And we don't
18  have any more questions for Mr. Hansen at this point.
19  I'm sorry.  Did I miss something?  I was...
20         THE ARBITRATOR:  I don't know.
21         MR. DELNERO:  No.
22         MR. GOMEZ:  No, no.  We don't have any
23  questions at this point.
24         THE ARBITRATOR:  All right.  Do y'all
25  want to proceed now or do you want?

Page 92

1         MR. HILL:  Mr. Harris, I would just
2  respectfully request we could just take a quick
3  three-minute break if that's okay.
4         THE ARBITRATOR:  Is that okay with y'all?
5         MR. DELNERO:  That's fine with us.
6         THE ARBITRATOR:  All right.  Well,
7  let's --
8         MR. GOMEZ:  What time is your meeting?
9         THE ARBITRATOR:  That's what I was going
10  to talk about.
11         MR. DELNERO:  Can we mute so that this
12  discussion isn't in front of the witness?
13         MR. GOMEZ:  Let's make sure that -- yeah.
14         MR. KERNEY:  Jeff, we'll call you right
15  back.
16         THE ARBITRATOR:  No, no, no.  Let's
17  don't.  We'll just -- he's off.  You can't hear us,
18  can you?
19         MR. GOMEZ:  No.
20         THE ARBITRATOR:  I guess not.  All right.
21  Okay.  We're going to take -- it's never two minutes.
22  Why don't we take a five-minute break, and then
23  you'll have an opportunity to examine Mr. Hansen.
24  How long do you think that -- just I know not holding
25  you to it.  What do you think, time period you need.

Page 93

1         MR. DELNERO:  I'm thinking approximately
2  30 minutes.  It could go longer.  Some of it depends
3  on how long he takes to answer questions.
4         THE ARBITRATOR:  Sure.  All right.  So if
5  we started back up at, say, eleven, our time, 25,
6  then that would get us to about noon-ish.  And so we
7  could take a break.  Well, you may have questions.  I
8  can't hold this -- I don't want to hold this guy on
9  the phone while we go have lunch.
10         MR. GOMEZ:  Well, I want to make sure.
11  You told us you had --
12         THE ARBITRATOR:  Well, I know, but they
13  -- they've given me a window while we're sitting here
14  of 11:30 to one to have this call, but it's about a
15  30-minute call.  So I could tell them I could do it
16  at 12:15.
17         MS. JACKMAN:  That might be the best way
18  to go.
19         THE ARBITRATOR:  That gives you plenty of
20  time.  And then if we have to come back to him, we
21  just will.  Is that okay?
22         MR. GOMEZ:  That's good.  That's fine.
23         THE ARBITRATOR:  All right.  So let's
24  take this little brief break.  I'll let them know
25  when I can have that 30-minute window.



Page 94

1       (Short break.)
2       THE ARBITRATOR:  Let's do this.  When we
3   were marking Exhibit 2, we forgot to mention 2A which
4   is included with 2.
5       MR. HILL:  Correct.
6       THE ARBITRATOR:  So assuming there's no
7   objection, that it be included along with Exhibit 2.
8       MR. DELNERO:  No objection.
9       MS. JACKMAN:  We are -- subject to our
10  prior.
11      THE ARBITRATOR:  Subject to your prior
12  comments.  And your cross examination.  Okay.  So
13  we're back to you, Mr. Hansen.  Thank you, and you're
14  still under oath.
15      THE WITNESS:  All right.
16          CROSS EXAMINATION
17  QUESTIONS BY MR. DELNERO:
18  Q.    Good morning, Mr. Hansen.
19  A.    Good evening -- or good afternoon for you
20  anyway.
21  Q.    We'll strike the time already.  So before we
22  broke, Mr. Gomez and you were discussing exhibit
23  marked as Exhibit 3 which was the Noble dialer
24  report.  Do you recall that exhibit?
25  A.    Yes.

Page 95

1   Q.    And I believe on the left column, you were
2   discussing what you identified as broadcast or
3   predictive.  Do you recall that testimony?
4   A.    Yes.
5   Q.    From that document, how can you determine
6   that the calls were actually made in predictive mode?
7   A.    This is -- what we have here in front of us
8   is from the call detail records which is a detail log
9   or accounting of every call that is placed.  The
10  very, very top, you see the column name which is
11  "call_typed."  That's another way of saying the
12  dialing mode.
13      MR. DELNERO:  No further questions.
14      THE ARBITRATOR:  Anything further,
15  Mr. Gomez?
16      MR. GOMEZ:  No.
17      THE ARBITRATOR:  Thank you, Mr. Hansen.
18  I believe you're excused.
19      THE WITNESS:  Okay.  Thank you.
20      THE ARBITRATOR:  That being the case,
21  maybe we should adjourn for lunch at this point.
22      MS. JACKMAN:  If that works for you,
23  great.
24      THE ARBITRATOR:  Oh, yeah.  That's fine.
25  All right, but let's do this.  This may be a little

Page 96

1   longer than you like.  But -- and I may be able --
2   why don't you turn off the Polycom, and that will
3   make sure he's not listening in.  All right.  So
4   we're going to -- if everybody is ready, is there
5   anything else we could do right now, or y'all all
6   ready to adjourn for lunch?  Some of y'all are in
7   different time zones.
8       MR. HILL:  It's probably best to adjourn
9   for lunch.  Cause we're going to be doing --
10      THE ARBITRATOR:  All right.  Okay.  So
11  when you come back, there's two rooms you can use.
12  You can use this room if you want.  I'm going to go
13  upstairs and probably be able to make this call
14  sooner.  Why don't we just plan on one hour.  That
15  will be plenty of time.  And if you get back sooner
16  and I come down sooner, we'll start a little sooner,
17  but let's shoot for coming back at 12:45 because
18  getting there this early, you'll have plenty of --
19  you won't be in any lines, I don't think.
20      (Lunch break.)
21      THE ARBITRATOR:  Okay.  On behalf of the
22  claimant, who's --
23      MR. HILL:  Yes.  As our next witness,
24  we're calling the claimant, Mr. Johnnie Williams.
25      THE ARBITRATOR:  You might want to, just

Page 97

1   for the record, share your name for the --
2       MR. HILL:  Yes.  This is Shaughn Hill
3   with Morgan & Morgan on behalf of the claimant.  Our
4   next witness is the claimant himself, Mr. Johnnie
5   Williams.
6           *  *  *
7           JOHNNIE WILLIAMS,
8   was called as a witness and having first been duly
9   sworn testified as follows:
10          DIRECT EXAMINATION
11  QUESTIONS BY MR. HILL:
12  Q.    Mr. Williams, could you please state your
13  full name for the record?
14  A.    Johnnie Freeman Williams Junior.
15  Q.    And where do you currently reside?
16  A.    Memphis, Tennessee.  Cordova, Tennessee.
17  Q.    Is that in the Memphis area?
18  A.    Yes.  Uh-huh.
19  Q.    And how long have you been in the Memphis
20  area for?
21  A.    2004.  December.
22  Q.    Okay.  Did you ever live in Memphis prior to
23  that?
24  A.    Yes.  I was born and raised in Memphis.
25  Q.    Okay.  And where did you move when you left



Johnnie Williams vs Conn Appliances
Arbitration

98..101

Page 98

1  Memphis?
2  A.    Cleveland, Ohio.
3  Q.    Okay.  And did you move back from Cleveland
4  to Memphis?
5  A.    Yes.  That was in December, 2004.
6  Q.    Okay.  Are you presently employed?
7  A.    No.  I'm retired.
8  Q.    Okay.  When did you retire?
9  A.    December, 2006.
10  Q.    Where did you retire from?
11  A.    Ford Motor Company.
12  Q.    How long did you work with Ford?
13  A.    17 years.
14  Q.    What positions did you hold with Ford?
15  A.    I worked as an iron sampler in the foundry in
16  Ohio and parts distribution here in Memphis.
17  Q.    Now, you mentioned that you lived in Cordova.
18  Does anyone else live with you?
19  A.    My two dependent children that I have custody
20  of.  I'm a divorced single father.  I have a
21  16-year-old daughter and a 15-year-old son.
22  Q.    Okay.  And you indicated that you're the sole
23  provider; is that correct?
24  A.    Yes.
25  Q.    So you don't receive any sort of child

Page 99

1  support?
2  A.    No.
3  Q.    Okay.  And I believe you just mentioned your
4  kids are 14 and 16 years old; is that correct?
5  A.    That's correct.
6  Q.    Okay.  Are they currently in school?
7  A.    Yes.
8  Q.    You know, Mr. Williams, before we begin, I
9  want to ask you, you know, do you suffer from any
10  sort of health conditions?
11  A.    Yes.  Anxiety.  COPD.  They -- I've heard
12  that you never get over it, but I don't really claim,
13  but I have experienced congestive heart failure and
14  irregular heartbeats some years ago.
15  Q.    Now, with those conditions, are you on any
16  sort of prescription medications?
17  A.    Yes, I am.
18  Q.    Okay.  You don't necessarily need to go into
19  what those medications are, but do you experience any
20  sort of side effects from those medications?
21  A.    Yes.  COPD, prednisone is one of the
22  medicines that I have to take on a regular basis.
23  They...
24  Q.    And how does that impact your day-to-day
25  life?

Page 100

1  A.    Well, it causes me extra weight gain that I'd
2  rather not have.  I'm not used to.  Anxiety.  I take
3  clonazepam which certain times of day, it make me
4  sleepy, just depending on what's going on.
5  Q.    Okay.  But do any of the medications you're
6  taking impact your ability to tell the truth?
7  A.    No.
8  Q.    Okay.  Do any of the medications, you know,
9  impact your recollection?
10  A.    No.
11  Q.    Okay.  So even though you're on these
12  medications every day, you're prepared to testify as
13  to the truth?
14  A.    That's correct.
15  Q.    Now, I kind of want to start from the
16  beginning here.  How did you first hear about Conn's?
17  A.    TV commercial.  They were advertising
18  different appliances that you can come and get, and
19  your credit didn't have to be that good.  And I don't
20  know.  I looked into it, and I was able to get some
21  merchandise from them.
22  Q.    Okay.
23  A.    Even though my credit wasn't that great.
24  Q.    Now, you've mentioned that you looked into
25  it, and you were able to get some merchandise from

Page 101

1  them.  You know, my understanding is that you first
2  went into or purchased merchandise from Conn's on
3  August 31st of 2015; is that correct?
4  A.    That sounds correct to me, yes.
5        THE ARBITRATOR:  2000 what?
6        MR. HILL:  '15.  And if we can go ahead
7  and mark this as Exhibit 4.  Counsel, this is their
8  retail installment contract from the August 31st,
9  2015.
10        MS. JACKMAN:  No objection.
11        (WHEREUPON, the above-mentioned document
12  was marked as Exhibit Number 4.)
13        MR. HILL:  I'm just going to pass this
14  exhibit to the witness.
15  BY MR. HILL:
16  Q.    Mr. Williams, I've placed a document before
17  you.  The first page on there is Bates stamped Conn J
18  Williams 000251.  The header of this document at the
19  very top is labeled "Retail Installment Contract and
20  Security Agreement."  Do you see that?
21  A.    Yes.
22  Q.    Okay.  And there's a date on there of August
23  31st of 2015.  Do you see that as well?
24  A.    August...
25  Q.    Take your time.



Page 102

1    MR. GOMEZ:  Use this one.  Why don't we
2  pass that to Mr. Harris so he can actually see it.
3    MR. HILL:  Okay.
4    THE ARBITRATOR:  All right.  Thank you.
5  BY MR. HILL:
6  Q.    Looking at the box in the top left corner,
7  just below where it says "Retail Installment
8  Contract," there's a date there.  That says
9  8/31/2015.  Do you agree with that?
10  A.    Yes.
11  Q.    Okay.  And the box directly to the right of
12  that, it appears there's a full name that reads
13  Williams, Junior Johnnie F.  Do you see that?
14  A.    Yes.
15  Q.    Okay.  Now, within that same box on the
16  bottom line there, there's a telephone number listed.
17  That telephone number is (901) 319-6319.
18  A.    That's my cell number.
19  Q.    Now, that was going to be my next question.
20  Do you recognize that number?
21  A.    Yes.
22  Q.    Okay.  And you recognize that number to be
23  your cell phone number; is that correct?
24  A.    Yes.
25  Q.    Okay.  How long have you had that cell phone

Page 103

1  number for?
2  A.    Roughly guessing, maybe six years.  Seven
3  maybe.
4  Q.    Okay.
5    MR. HILL:  And just for the purposes of
6  our direct examination today, I'm just going to refer
7  to that number as the number ending in 6319 so I
8  don't have to read it every time.  Do you have any
9  issues with that?
10    THE ARBITRATOR:  No.
11    MR. HILL:  Okay.
12    MS. JACKMAN:  Is it easier to say it's
13  the cell phone, Shaughn?
14    MR. HILL:  Or we can call it the cell
15  phone if everyone's in agreement with that.
16    MS. JACKMAN:  Sure.  No objection.
17    MR. HILL:  Okay.
18  BY MR. HILL:
19  Q.    Now, I see your cell phone number is listed
20  there under "telephone number home."  Do you agree
21  with that?
22  A.    Yes.
23  Q.    Okay.  And directly next to that box, there's
24  a box that reads "employment," and again it contains
25  that same number ending in 6319.  Do you see that?

Page 104

1  A.    6319.  That's the only number that I've had
2  for years.
3  Q.    Correct.  And you would agree that within
4  that box, your number is listed twice, correct?
5  A.    Yes.  Uh-huh.
6  Q.    Okay.  And as you testified a moment ago,
7  that was your cell phone.  Did you have a landline
8  number at that time?
9  A.    No.
10  Q.    Okay.  And you had mentioned that you retired
11  in 2016, so I'm assuming that wouldn't have been your
12  employment number; is that correct?
13  A.    That's correct.
14  Q.    Okay.  Now, at the very bottom of this page,
15  I see a signature next to a date that says August 31
16  of 2015.  Do you recognize that signature?
17  A.    Yes.
18  Q.    Okay.  And is that your signature?
19  A.    Yes.
20  Q.    Okay.  And actually, Mr. Williams, before I
21  move on, do you recall what you financed from Conn's
22  at that time?
23  A.    Yes.  Two 32-inch TVs.  Flat screens.  And a
24  stereo system.
25  Q.    Okay.  And are you still in possession of

Page 105

1  those items?
2  A.    Yes.
3  Q.    All right.
4    MR. HILL:  If we could go ahead and mark
5  this as Plaintiff's Exhibit 6.  Counsel, this is the
6  retail installment contract for November 29th of
7  2015.  The first Bates stamped pages Conn J Williams
8  000226.
9    MS. JACKMAN:  Six or five?
10    MR. HILL:  Or excuse me.  Five.
11    MS. JACKMAN:  No objection.
12    (WHEREUPON, the above-mentioned document
13  was marked as Exhibit Number 5.)
14    MR. HILL:  And if we can just mark this
15  as Exhibit 5.  Thank you.
16    THE ARBITRATOR:  Do you need this one or
17  do you have one?
18    MR. HILL:  Tav, if you could you hand me
19  a copy?
20    MR. GOMEZ:  Absolutely.
21  BY MR. HILL:
22  Q.    And Mr. Williams, I'm placing this document
23  before you.  It's relatively similar to the previous
24  document.  However, do you see the date in the top
25  left corner there?  It says November 29th, 2015?



Page 106

1  A.    Yes.
2  Q.    Okay.  And again, in that next box, I see
3  your name.  I also see your cell phone number, 6319,
4  listed twice.  Would you agree with that?
5  A.    Yes.
6  Q.    Okay.  And again, at the bottom of this page,
7  I see a signature next to a date that says November
8  29th, 2015?
9         (Telephone interruption.)
10         (Off the record discussion.)
11         THE ARBITRATOR:  Okay.  Sorry for the
12  interruption.  That was on us.
13  BY MR. HILL:
14  Q.    Mr. Williams, getting back to the original
15  installment contract, I see a signature at the bottom
16  there next to a date that says 11/29/2015.  Do you
17  recognize that signature?
18  A.    Yes.
19  Q.    All right.  What do you recognize that
20  signature to be?
21  A.    That's mine.
22  Q.    That's your signature?
23  A.    Yes.
24  Q.    Okay.  So do you have any reason to dispute
25  that you've entered into this retail installment

Page 107

1  contract --
2  A.    No.
3  Q.    -- with Conn's on November 29th, 2015?
4  A.    No.
5  Q.    Okay.  And Mr. Williams, you may not recall,
6  but on the back page of this retail installment
7  contract Bates stamped Conn J Williams 000265,
8  there's a number of what we'll call additional
9  disclosures and contract terms.  Do you see that?
10  A.    Yes.
11  Q.    Okay.  Within the first paragraph of these
12  disclosures and contract terms, there's a specific
13  provision that states "Nothing in this agreement
14  shall designate an exclusive manner for revoking your
15  consent to receive calls at a particular wireless
16  telephone number or condition your purchase of good
17  or services from Conn's on your consent to receive
18  debt collection or other calls from or on behalf of
19  Conn's."  Do you have any reason to dispute that that
20  term was a part of the retail installment contract
21  when you had signed it on November 29th, 2015?
22  A.    No.
23  Q.    Okay.
24         MR. HILL:  And Counsel, I'm going to pass
25  forward to you, it's the subscriber information that

Page 108

1  we had received from Sprint in response to a subpoena
2  that was previously produced as Bates stamped
3  Williams 001530-1533.
4         MS. JACKMAN:  Is this going to be
5  Exhibit 6?
6         MR. HILL:  Yes.
7         MR. KERNEY:  I'm sorry, Shaughn, which is
8  this?
9         MR. HILL:  The subscriber info.  It
10  should be in Tab 7.
11         MS. JACKMAN:  We don't have an objection,
12  but note these are documents provided to both of us
13  by Sprint, so...
14         MR. HILL:  Okay.
15         MS. JACKMAN:  Yeah.
16         MR. HILL:  So we'll go ahead and
17  introduce that as Exhibit 6.
18         (WHEREUPON, the above-mentioned document
19  was marked as Exhibit Number 6.)
20  BY MR. HILL:
21  Q.    And Mr. Williams, do you recognize this
22  document that I've placed before you?  Have you seen
23  this document before?
24  A.    Yes.
25  Q.    Okay.  You have seen that document?

Page 109

1  A.    Yes.
2  Q.    I want to direct your attention towards kind
3  of the bottom third of this page.  There's a
4  subsection that's entitled "Account Details."  It
5  says the account established date was September 15th
6  of 2015.  Do you see that?
7  A.    Not yet.  Yes, I see it.
8  Q.    Okay.  And under "account billing addresses,"
9  it says that it's effective September 15th of 2015.
10  John Williams provides an address of 2614
11  Northumberland Lane Apartment 4 Memphis, Tennessee
12  38128.  Do you see that?
13  A.    Yes.
14  Q.    Okay.  And was that your address at the time?
15  A.    Yes.
16  Q.    Okay.  And under the next subsection entitled
17  "Subscriber Details," there's a section that says
18  "personal telephone number" and then lists a number
19  of (901) 319-6319.  Do you see that?
20  A.    Yes.
21  Q.    And as you testified earlier, that's your
22  cell phone number; is that correct?
23  A.    Yes.
24  Q.    Okay.  So it's safe to say that you've had
25  that cell phone number basically for the entirety of



Johnnie Williams vs Conn Appliances
Arbitration

110..113

Page 110

1  the calls that you received from Conn's?
2  A.     Yes.
3  Q.     **Do you still have that cell phone number**
4  **today?**
5  A.     Yes.
6         MR. HILL:  And Counsel, in the interest
7  of saving paper, because Mr. Williams' carrier logs
8  were rather substantial, roughly 2,000 pages, we've
9  included them on a CD here.  We'd like to introduce
10 that as an exhibit for Arbitrator Harris's purposes.
11 They've previously provided in their totality.
12        MS. JACKMAN:  To be clear, are these the
13 cell phone records?
14        MR. HILL:  These are the cell phone
15 records received in response to the subpoena from
16 Sprint.  You should have received the same.
17        MS. JACKMAN:  So this is going to be
18 Exhibit 7?
19        MR. HILL:  This will be Exhibit 7,
20 correct.
21        MS. JACKMAN:  And we have a full copy,
22 correct?  A paper copy with us?  So we actually -- we
23 may need to be able to show them.
24        MR. HILL:  Sure.  That's fine.
25        MS. JACKMAN:  So we don't --

Page 111

1         MR. HILL:  I've just included them on a
2  CD.
3         MS. JACKMAN:  Yeah.  That's no problem.
4  And we'll use them in our cross.
5         MR. HILL:  Absolutely.
6         MS. JACKMAN:  Sure.  Exhibit 7.
7         MR. HILL:  Exhibit 7.  If we could just
8  go ahead and mark this as Exhibit 7.
9         THE ARBITRATOR:  So let me see if I
10 understand.  These are all the cell phone records
11 that you obtained from Sprint?
12        MS. JACKMAN:  Well, actually, you raise a
13 good point, Arbitrator Harris.  Why don't we just use
14 the paper copy that we have because I know what's on
15 there and I've never -- I haven't reviewed that.
16        MR. HILL:  Sure.  If we would rather do
17 that, yeah.  I think that's fine.
18        MS. JACKMAN:  Can we do that and we'll
19 make that Exhibit 7.  And Daniel, would you grab them
20 out?
21        MR. KERNEY:  I just don't want to make
22 the cell phone records part of the record for
23 purposes of the transcript.  That's the one thing I
24 worry about.
25        MR. GOMEZ:  Wait.  We don't need to order

Page 112

1  as an exhibit.  Reorder it.
2         MR. KERNEY:  Okay.  That's fine.
3         MS. JACKMAN:  Oh, yeah.
4         MR. GOMEZ:  It's better to have the --
5         MS. JACKMAN:  What they're saying is --
6  can we go off the record for a second?
7         THE ARBITRATOR:  Yes.
8         (Off-the-record discussion.)
9         MS. JACKMAN:  And you are welcome to keep
10 that with it, Arbitrator Harris, because you can take
11 that home much more easily than this.
12        MR. HILL:  Are the other dates there
13 between that I believe they should run from April 1st
14 of '17 to -- excuse me -- April 1st of...
15        MS. JACKMAN:  '15, I think.
16        MR. HILL:  I thought it was '16.
17        MS. JACKMAN:  Was it '16?  You are right.
18 It's '16.  I apologize.  That was long before we had
19 the contracts.
20        MR. DELNERO:  I think that's this
21 notebook.
22        MR. HILL:  Yeah.  If you wouldn't mind.
23 Thank you.
24        MS. JACKMAN:  So we'll make the hard
25 copies the official.

Page 113

1         MR. HILL:  Sure.
2         MS. JACKMAN:  We can slide that in there
3  if it's more convenient for Arbitrator Harris, but we
4  all agree these are complete.
5         MR. HILL:  That's -- yeah.
6         MS. JACKMAN:  Given how thick they are.
7         MR. HILL:  That's correct.  That's a lot
8  of pages.
9         MS. JACKMAN:  Does that make sense,
10 Arbitrator Harris and work for you?
11        THE ARBITRATOR:  You're giving me this so
12 it's more convenient for me to take them home?
13        MS. JACKMAN:  I have no idea, sir, when
14 you plan to look at these.
15        THE ARBITRATOR:  No, I'm kidding you.
16 All right.  Let me make sure I understand.  Are we --
17 the cell phone records that are in the hard copy
18 binders are the same records that are on the CD
19 that's been marked Exhibit 7?
20        MR. HILL:  That is correct.
21        THE ARBITRATOR:  So why don't we make it
22 all collective Exhibit 7.
23        MR. HILL:  Sure.
24        THE ARBITRATOR:  And we'll have a hard
25 copy and electronic copy, whichever is the most


ORANGELEGAL

**Orange Legal**
**800-275-7991**

Page 114

1  convenient.
2         MR. HILL: Sure. Absolutely.
3         (WHEREUPON, the above-mentioned document
4  was marked as Exhibit Number 7.)
5         THE ARBITRATOR: All right. So this is
6  all collective Exhibit 7.
7         MS. JACKMAN: And for the record, the
8  Bates are Williams 1 through Williams 1254.
9         MR. HILL: No.
10        MS. JACKMAN: Oh, excuse me. 2019. I
11 thought -- I was never good at guessing the number of
12 jelly beans in the jar.
13        THE ARBITRATOR: So it's 2109 pieces of
14 paper.
15        MR. DELNERO: Correct.
16        THE ARBITRATOR: Okay.
17        MS. JACKMAN: We made it double-sided,
18 sir.
19        MR. DELNERO: You have a fireplace.
20        THE ARBITRATOR: So as we go forward, do
21 you expect to be pointing me to certain portions of
22 the hard copy?
23        MR. HILL: I don't know that we'll get
24 into that during the direct.
25        THE ARBITRATOR: Maybe not? Okay.

Page 115

1         MR. HILL: I just wanted to make sure
2  that was part of the record.
3         THE ARBITRATOR: No, that's fine. All
4  right. Well, just put that CD in the cover of the
5  first part.
6         MR. HILL: There we go.
7         THE ARBITRATOR: Go ahead.
8         MR. HILL: Okay. Thank you.
9  BY MR. HILL:
10 Q.     And Mr. Williams, I don't know that we had
11 discussed this, but do you recall what you had --
12        THE ARBITRATOR: So we put those into
13 evidence, and that's all we've done with them?
14        MR. HILL: Correct. That's all we've
15 done with them.
16        THE ARBITRATOR: So now you're going
17 forward with something else?
18        MR. HILL: Yes.
19        THE ARBITRATOR: Okay.
20 BY MR. HILL:
21 Q.     And I believe we may have kind of glossed
22 over this, but on November 29th of 2015, you had
23 financed some additional items from Conn's. Do you
24 recall what those items were?
25 A.     Yes. There was a glass cocktail table. Also

Page 116

1  a desktop computer and printer.
2  Q.     Okay. Was there anything else or is that all
3  that you can recall?
4  A.     I think that was it.
5  Q.     Okay. And are you still in possession of
6  those items?
7  A.     Yes.
8  Q.     Okay. And you know, we talked briefly about
9  your cell phone records a moment ago. Let me ask you
10 this. Do you pay monthly for your cell phone plan?
11 A.     Yes.
12 Q.     Okay. And is it a, you know, like a prepaid
13 plan, or do you pay by the minute?
14 A.     No. I pay from month to month. Unlimited
15 calls for the four of us. Well, my two children and
16 fiancee, she's on the plan. She pretty much takes
17 care of it. There's four of us on the plan.
18 Q.     Okay. But as we saw from the subscriber
19 information a moment ago, the plan is in your name;
20 is that correct?
21 A.     Yes, it's my name.
22 Q.     Okay. So you're not paying on a per call
23 basis; is that a fair statement?
24 A.     No. No.
25 Q.     Okay. As it relates to your cell phone, does

Page 117

1  anyone else use that phone on a regular basis?
2  A.     No.
3  Q.     Okay. And Mr. Williams, do you recall when
4  you began receiving calls from Conn's in relation to
5  the equipment that you financed?
6  A.     Yes.
7  Q.     And if you have notes that refresh your
8  recollection, you're allowed to look at those.
9  A.     I believe it was March 4th.
10 Q.     All right. That was the first call that you
11 received from Conn's?
12 A.     Yes. Yes.
13 Q.     Okay. Do you know why Conn's was calling you
14 at that time?
15        THE ARBITRATOR: March 4th, 2016?
16        THE WITNESS: Yes.
17        THE ARBITRATOR: Okay.
18 BY MR. HILL:
19 Q.     And do you know why Conn's was calling you at
20 that time?
21 A.     I don't remember.
22        (Telephone interruption.)
23        THE ARBITRATOR: What is that?
24        MS. JACKMAN: While we're interrupted for
25 one moment -- oh, I'm sorry. Arbitrator Harris, do



Johnnie Williams vs Conn Appliances
Arbitration

118..121

Page 118

1  you have something?
2       THE ARBITRATOR:  Just if he calls again,
3  we'll tell him he's got the wrong number.
4       MS. JACKMAN:  We notice that Mr. Williams
5  is using some notes.  I understand, but we would ask
6  those be marked as an exhibit as well and into the
7  record.
8       THE ARBITRATOR:  Do you have any
9  objection to that?
10       MR. HILL:  We don't have any objections.
11  That's fine.
12       MS. JACKMAN:  Do you want to make that
13  Exhibit 8?
14       MR. HILL:  Sure.
15       (WHEREUPON, the above-mentioned document
16  was marked as Exhibit Number 8.)
17       (Short break.)
18  BY MR. HILL:
19  Q.     So you testified a moment ago that Conn's had
20  began calling you on March 4th of 2016; is that
21  correct?
22  A.     Yes.
23  Q.     Okay.  I'm going to go ahead and play for you
24  an audio recording that was provided to us by Conn's.
25  It's previously Bates stamped Conn-J Williams_00003.

Page 119

1  I'm going to represent to you that this audio
2  recording is from March 6th of 2016.
3       MR. KERNEY:  Are you going to mark this
4  as an exhibit?
5       MR. HILL:  Yeah.  If we can go off for
6  just a moment.
7       THE ARBITRATOR:  Sure.
8       (Short break.)
9       THE ARBITRATOR:  Do you want to describe
10  Exhibit 11 now?
11       MR. HILL:  Absolutely.
12       THE ARBITRATOR:  As to what it is and
13  have it marked and admitted into evidence with
14  whatever comments y'all have.
15       MR. HILL:  Sure.  Absolutely.  So we are
16  going to mark Exhibit 11 as the transcriptions of the
17  audio recordings that Plaintiff's Counsel intends on
18  playing this afternoon.  It is going to be audio
19  files 000003 through 000208.
20       MR. TROUTMAN:  Shaughn, 9 and 10 have not
21  been marked or admitted on the record yet.
22       MR. HILL:  Okay.
23       MS. JACKMAN:  And just for the record,
24  the transcripts are offered for convenience.  The
25  call recordings themselves, Exhibit 9, which will be

Page 120

1  entered in a moment are the official record.
2       THE ARBITRATOR:  Do you agree with that?
3  Do you agree with Ms. Jackman's comments?
4       MR. HILL:  Yes.  Yes.
5       THE ARBITRATOR:  Okay.  Let's stop and
6  mark Exhibit 11.  And then we'll go back as
7  Mr. Troutman pointed out, and we can ask that they be
8  admitted into evidence.  So are we all on the same
9  page?
10       MR. HILL:  And at this time, we'd ask to
11  move the collective audio recordings as a collective
12  Exhibit 9.  The plaintiff intends on playing.
13       (WHEREUPON, the above-mentioned document
14  was marked as Exhibit Number 9.)
15       MR. HILL:  Additionally we ask to enter
16  in Exhibit 10 which is Conn-J Williams_000209 through
17  -- I believe it was 211 which is the dates that
18  correspond with the audio recordings.
19       (WHEREUPON, the above-mentioned document
20  was marked as Exhibit Number 10.)
21       THE ARBITRATOR:  And Exhibit 11?
22       MR. HILL:  And Exhibit 11 we're moving as
23  the audio transcriptions.
24       THE ARBITRATOR:  Of selected calls.
25       MR. HILL:  Of the selected calls,

Page 121

1  correct.
2       (WHEREUPON, the above-mentioned document
3  was marked as Exhibit Number 11.)
4       THE ARBITRATOR:  Okay.  And then they'll
5  all be admitted into evidence.
6       MR. HILL:  Okay.  Now if we could go
7  ahead and play Bates stamped 000003 which as we
8  previously identified being March 6th of 2016.  And
9  for those following along, this is going to be on
10  page 3.
11       THE ARBITRATOR:  Just a second.  Why
12  don't we get this out of the way.
13       MR. HILL:  Sure.
14       THE ARBITRATOR:  Actually, I believe
15  there's -- it should be two sets.  They're not all in
16  the same clip.  That goes from --
17       MR. HILL:  Correct.  So that should go
18  from audio files 136 through 208.  And that should be
19  from 003 to 012.
20       THE ARBITRATOR:  All of this is part of
21  11?
22       MR. HILL:  Correct.
23       THE ARBITRATOR:  Let's put Exhibit 11.
24  So you know that's more than one.  Okay.  I think I'm
25  good to go.  Will you tell me where to start?



Page 122

1        MR. HILL:  Yes.  If you'll turn to page 3
2 entitled audio file number Conn-J Williams 00003.
3        THE ARBITRATOR:  Okay.
4        MR. KERNEY:  We're ready.
5        (WHEREUPON, audio recording is played
6 into the record.)
7 BY MR. HILL:
8 Q.     Now, Mr. Williams, obviously the audio
9 recording speaks for itself, but did you recognize
10 your voice on that call?
11 A.     Yes, I did.
12 Q.     And was that in fact you who called in to
13 Conn's?
14 A.     Yes.
15 Q.     Okay.  Now, during that audio recording, you
16 told the agent that Conn's had called you a thousand
17 times.  Now, you clearly don't believe that Conn's
18 had actually called you a thousand times by that
19 time, do you?
20 A.     Well, no.  It just seemed like it.  So many
21 times.
22 Q.     Okay.  And I'm going to represent to you that
23 Conn's Noble report which is previously admitted as
24 Plaintiff's Exhibit 3 actually reflects seven calls
25 between March 4th of 2016 and March 6th of 2016 prior

Page 123

1 to this audio recording.  Would you have any reason
2 to dispute that?
3 A.     No.
4        MS. JACKMAN:  We're going to object.
5 He's asking to speculate as for a record, showing our
6 records have been produced.  So I don't see the
7 foundation for him to dispute what we attempted to do
8 or didn't attempt to do.  He wouldn't know if he
9 didn't receive the calls, for instance, and I suspect
10 that they're not going to have him testify that he
11 recalls receiving every single call that's in the
12 Noble report, or although they're not in yet, the
13 account notes that will be coming.
14        MR. HILL:  Well, as I had stated, it's a
15 reflection of your Noble report that's been entered
16 as an exhibit.  If there's something that's incorrect
17 as to what I had stated, I'm happy to address that.
18        THE ARBITRATOR:  I thought he agreed that
19 he had been called seven times which is what the
20 records reflect.
21        MS. JACKMAN:  So is the testimony that he
22 is specifically recalling seven calls that day?
23        THE ARBITRATOR:  I don't know.
24        MR. HILL:  And again, I didn't say that
25 he called seven times that day.  I said between

Page 124

1 March 4th of 2016 and March 6th of 2016.
2        THE ARBITRATOR:  It wasn't one day.  I
3 thought the point you were trying to make was --
4        MR. HILL:  That --
5        THE ARBITRATOR:  -- he had said a
6 thousand.  He maybe even said a hundred thousand, as
7 I read it.  But in any event, he's now agreeing that
8 the Noble system records of seven calls in that
9 window of time leading up to that Sunday are correct.
10        MR. HILL:  That is correct.
11        THE ARBITRATOR:  Is that what you're
12 trying to demonstrate?
13        MR. HILL:  Yes, sir.
14        THE ARBITRATOR:  And you don't disagree
15 with that?  And your records -- he's agreeing to your
16 records.
17        MS. JACKMAN:  If that's what they're
18 doing and agreeing with our records and he's
19 testifying he recalls receiving volume at that, I'd
20 expect him to be able to do it throughout the case.
21 And therefore I have no objection for that point.
22        THE ARBITRATOR:  Let's just stick what
23 with what he said so far.
24        MR. HILL:  Okay.
25        THE ARBITRATOR:  But Mr. Williams --

Page 125

1 well, I'll let you ask.  Your objection is noted.  I
2 think I understand what he's -- his testimony has
3 been which is that the -- he -- despite what might
4 have been said in the call, the actual facts were
5 that seven calls were made in that window of time
6 leading up to Sunday?
7        MR. HILL:  Correct.  I'll move on.
8        THE ARBITRATOR:  Is that?
9        MR. HILL:  Yeah.  The records speak for
10 itself.
11        THE ARBITRATOR:  Okay.  All right.
12        MR. HILL:  That's fine.
13        THE ARBITRATOR:  Okay.
14 BY MR. HILL:
15 Q.     Now, Mr. Williams, you know, during that call
16 as well, you specifically tell the agent -- and I
17 believe this is reflected on audio transcription
18 page 5 line 5, "Mr. Williams:  Now you know you all
19 should be able to roll with me and not call me every
20 day about that because I know that I owe you, and I
21 know that I'm coming to pay you.  And I'm telling you
22 that and you don't have to keep calling me."  What
23 did you mean by that?
24 A.     I meant that I understood that I had an
25 obligation, and I had agreed to pay them.  And I was



Johnnie Williams vs Conn Appliances
Arbitration

126..129

Page 126

1  supposed to pay them, and I didn't need to be
2  reminded every 20, 30 minutes.  Well, maybe it was a
3  hour or so at that time.
4  Q.  Okay.  And did you want the calls to stop at
5  that point?
6  A.  Yes.
7  Q.  Now, you'd also told the agent a little bit
8  earlier in the conversation, you said -- and this is
9  on page 4 line 8 of the audio transcription, "That is
10  ridiculous.  If I had known that, I'd never done
11  business with Conn's."  Now, why did you tell the
12  agent that?
13  A.  I didn't think it was necessary for -- to be
14  called so many times.  Like pressure.  I mean, I had
15  every intention of doing what I said I was going to
16  do and the payments I set aside.  To do what I said I
17  was going to do.  I had every intention of doing it.
18  I didn't feel that that unnecessary pressure -- that
19  that pressure was necessary for me to do what I was
20  supposed to do.
21  Q.  And did you continue to make payments to
22  Conn's after this date?
23  A.  Yes.
24  Q.  Let me ask you this.  Did Conn's stop calling
25  you after this date?

Page 127

1  A.  No.
2  Q.  Do you know how many times Conn's called you
3  after this?
4  A.  Over 1100.
5  Q.  Okay.  So you don't know exact number.  You
6  just know it was over 1100; is that fair?
7  A.  Yeah.
8  Q.  Okay.  Now I want to fast forward a bit to an
9  audio recording that I'm going to represent to you is
10  from May 10th of 2016.  It was previously Bates
11  stamped as Conn-J Williams_000085.  And this will be
12  a part of the collective Exhibit 9.
13  MR. GOMEZ:  Are you ready?
14  MR. HILL:  Yes.
15  THE ARBITRATOR:  What page are you on?
16  MR. HILL:  This will be page 23.
17  MR. GOMEZ:  This is 85?
18  MR. HILL:  Correct.
19  (WHEREUPON, audio recording is played
20  into the record.)
21  BY MR. HILL:
22  Q.  Mr. Williams, having heard that audio
23  recording, do you recognize your voice on that call?
24  A.  Yes.
25  Q.  And can you confirm that that is in fact you?

Page 128

1  A.  Yes.
2  Q.  Okay.
3  THE ARBITRATOR:  Just a minute.  What was
4  the date of that call?
5  MR. HILL:  That call was from May 10th of
6  2016.
7  THE ARBITRATOR:  Okay.  I just wanted to
8  make sure I had that right.  The first one you played
9  was March 6th.
10  MR. HILL:  Of 2016.
11  THE ARBITRATOR:  Of 2016.  And that one
12  was May 10th, 2016.
13  MR. HILL:  Yes, sir.
14  THE ARBITRATOR:  And this number of
15  $105.51 was the normal monthly payment.
16  MR. HILL:  That is my understanding.
17  THE ARBITRATOR:  That reoccurred.
18  MR. HILL:  Yes, sir.
19  THE ARBITRATOR:  Okay.  Okay.  Thanks.
20  BY MR. HILL:
21  Q.  Now, again Mr. Williams, you know, the audio
22  recording obviously speaks for itself.  But there is
23  a moment in there where you tell the agent, and it's
24  reflected on audio transcription page 25 line 22
25  where you tell the agent, "You know, I'd appreciate

Page 129

1  it if you get your buddies to stop calling me all day
2  long because I'm not going to answer it.  Why do I
3  want to answer for?  You know what I mean."  Now, why
4  did you tell the agent you'd appreciate it if he
5  could get his buddies to stop calling you all day
6  long?
7  A.  Well, because it was -- it got to be really
8  annoying and frustrating, and I could go on and on.
9  When you explain to somebody about the bill or when
10  you're going to come in and pay it and all of that.
11  You shouldn't have to do it but once, you know.  And
12  even after you do that, 30 minutes later you got
13  another phone call.  45 minutes after that you got
14  another phone call.  15 minutes after that you got
15  another phone call.
16  And I got to the point where I could kind of
17  recognize the numbers, and I just -- I'd answer a
18  call, but then all day long, no one would answer.
19  You know, it just ruined my whole day.  Answering the
20  call, explaining all the same thing over and over
21  again.
22  Q.  All right.  And you know, obviously you had
23  continued to get calls up to this point.  Do you have
24  any idea about how many times -- and you know, the
25  Noble report will speak for itself, but do you have



Page 130

1  any idea about how many times Conn's was calling you
2  on a daily basis around that time?
3         MS. JACKMAN: I'm going to object to the
4  form of the question.  He can't know how many times
5  Conn's called him.  He can --
6         MR. HILL: If he --
7         MS. JACKMAN: Let me finish.  He can
8  testify to the number of times he received a call
9  that he recalls, but there can be a distinction.  You
10  can attempt to place a call that isn't received.  He
11  said he has a shared line with three other people.
12         MR. HILL: No.  That's not what he
13  testified to.
14         THE ARBITRATOR: Okay.  Well, here's what
15  my confusion about the question is.  I didn't know
16  what period of time you're talking about.
17         MR. HILL: I'm talking around May --
18         THE ARBITRATOR: Well, I mean, if you
19  just wanted to talk very generally about some
20  unspecific period of time, I don't know that that's
21  really helpful to the issues.
22         MR. HILL: Okay.
23         THE ARBITRATOR: And, but...
24         MR. HILL: I understand.
25         THE ARBITRATOR: I'd suggest maybe you

Page 131

1  rephrase that.  And so that I can follow along.  Let
2  me just share with you what I'm observing.  We
3  started with a payment due in March, and then it was
4  going to be made the following Friday.  And then we
5  jumped to May.  And so talking generally about calls
6  isn't really helpful.  Now, if the Noble records are
7  going to show me what's happening between those days,
8  I can pull them out and try to follow you.
9         MR. HILL: Okay.
10         THE ARBITRATOR: But it might be more
11  illustrative to me if you could talk about how many
12  calls he received in those interim periods.
13         MR. HILL: Sure.  Absolutely.
14         THE ARBITRATOR: So would you like for me
15  to have in front of me the Noble call list?
16         MR. HILL: Yes, please.  If you could.
17  That would be very helpful.
18         MS. JACKMAN: And for context, your
19  request indicated exactly what I was getting at.
20  Received, there will be calls in there that show no
21  connect.  No discussion.  So there's a distinction.
22  And that's all I was trying to make with that
23  objection, Arbitrator Harris.  I think you understood
24  it.
25         THE ARBITRATOR: Yes, I did.  And I was

Page 132

1  really just trying to share for you all a more
2  chronological way for me to follow along.
3         MR. HILL: Sure.  Absolutely.
4         THE ARBITRATOR: Just a suggestion.
5         MS. JACKMAN: For the record, those --
6  Exhibit 3 is not what I was referencing.  That's a
7  Noble report.  I was referencing what our account
8  notes, our Latitude system notes that show this
9  information.  Shaughn, are you wanting to use the
10  Noble report, or were you wanting to use the account
11  notes?
12         MR. HILL: We can cross-reference the
13  two, but my understanding is that the Noble report --
14  and I'm sure Clint will testify as to this later is
15  that it's a report that's generated by the dialing
16  system automatically, and it's printed.  So it
17  reflects every single call.
18         MS. JACKMAN: I was just wanted to make
19  sure I was using the same exhibit as you.  We can
20  start.
21         MR. HILL: Okay.
22  BY MR. HILL:
23  Q.     And Mr. Williams, just so we can kind of
24  clear something up Ms. Jackman just brought up a
25  moment ago, you mentioned a moment ago that you have

Page 133

1  three other members on your wireless plan; is that
2  correct?
3  A.     Yes.
4  Q.     Okay.  Do they have their own separate phone
5  lines?
6  A.     Yes.  Their own phone line.  Different
7  numbers.
8         THE ARBITRATOR: He already covered that.
9  He said his phone was almost exclusively used by him.
10         MS. JACKMAN: My apologies for the
11  misunderstanding.
12         THE ARBITRATOR: And I'm sure somebody's
13  answered each of our phones on some infrequent basis.
14         MS. JACKMAN: My apologies for
15  misunderstanding.
16         THE ARBITRATOR: But going back, just I'm
17  really trying to help understand.
18         MR. HILL: I understand.
19         THE ARBITRATOR: I'm really trying to
20  understand so I'm wanting to help you help me
21  understand.
22         MR. HILL: Sure.
23         THE ARBITRATOR: And if you don't mind,
24  can we just go back to where we started which was, I
25  believe --



Page 134

1  MR. HILL:  March 6th.
2  THE ARBITRATOR:  -- about March the 3rd?
3  MR. HILL:  The first call that we had
4  identified --
5  THE ARBITRATOR:  I'm sorry.  The payment
6  was -- the first call you identified was March
7  the 6th.
8  MR. HILL:  Correct.
9  THE ARBITRATOR:  And I'm looking at the
10  Noble report, Exhibit 3, and it shows five calls in
11  March leading up to that date.
12  MR. HILL:  And so it's not entirely
13  accurate.  If you'll flip to the following page.  And
14  when I say it's not accurate, I should say it's
15  accurate.  It's just out of order.  In the middle of
16  the following page, there's two calls from March 6th
17  of 2016 at 11:26 a.m. and 2:44 p.m.
18  THE ARBITRATOR:  Okay.
19  MS. JACKMAN:  This was why I suggested
20  the account notes.  I imagine they're coming in
21  through Clint one way or the other.
22  THE ARBITRATOR:  Okay.  I see, and --
23  MS. JACKMAN:  Because those are
24  chronological, Arbitrator Harris.  And the way this
25  -- this is the way it comes out of the system.

Page 135

1  THE ARBITRATOR:  Okay.
2  MS. JACKMAN:  Which is why I don't
3  usually reference it because it's odd.
4  THE ARBITRATOR:  All right.  I'm caught
5  up on March.
6  MR. HILL:  Okay.
7  THE ARBITRATOR:  Now I'll let you take it
8  from there.
9  MR. HILL:  Okay.
10  THE ARBITRATOR:  And I'm caught up on
11  what you've already -- he's already testified about
12  about May the 10th.
13  MR. HILL:  Okay.
14  BY MR. HILL:
15  Q.    And Mr. Williams, if you could just take a
16  look at this Noble report.  Are you able to identify
17  the calls that were made to your cell phone in April
18  of 2016?
19  MS. JACKMAN:  Objection.  I'm sorry.  But
20  he cannot testify to the contents of a report that my
21  client produced from its Noble dialing system.  He
22  just can't do that.
23  MR. HILL:  It speaks for itself.
24  MS. JACKMAN:  He doesn't have that
25  knowledge.  This doesn't reflect anything that could

Page 136

1  give him that knowledge.  Account notes have detail
2  that at least could refresh -- he can't read a report
3  we said and just say, "you're right, rubber stamp,
4  that's everything."  He doesn't have that knowledge.
5  THE ARBITRATOR:  Wait a minute.  Wait a
6  minute.  I can.  This is in evidence, and I see
7  Mr. Williams' phone number, and I see the dates of
8  calls.  Now, I didn't think anybody has any objection
9  to that --
10  MS. JACKMAN:  I'm not objecting to this.
11  I'm objecting to asking Mr. Williams to start telling
12  us about what a business record we produced that's
13  never been provided to him other than in context of
14  this litigation allows him to say about his
15  recollection of calls.
16  MR. HILL:  And what I'd ask him was if
17  this document reflected calls in April.
18  THE ARBITRATOR:  Has he ever seen it?
19  MR. HILL:  Yes.  He's seen it.  We went
20  through this together.  He's seen this document
21  before.  He didn't produce it.  It was produced by
22  Conn's.
23  THE ARBITRATOR:  Okay.  Well, why don't
24  you go ahead with your --
25  MR. KERNEY:  I'm so sorry to interject.

Page 137

1  You know, I think what we're trying to accomplish is
2  hey, you got this many calls after that last
3  conversation.  Maybe when we're done with this
4  testimony, we can go off the record and get a call
5  count so we can just say hey, we agree that there's
6  this many calls reflected on that report in between
7  certain periods of time.  I was going to ask
8  Mr. Walton to do that for us later on anyway, but if
9  it's being -- if we're getting into it right now,
10  that might be an easier way --
11  THE ARBITRATOR:  We can do that.  That's
12  fine.
13  MS. JACKMAN:  Well, that actually
14  illustrates exactly what I'm getting at.  There's the
15  evidence as to what he recalls receiving, and he has
16  to testify from his own knowledge.  And then there's
17  the evidence about what we show we attempted.  And
18  there can be a big distinction there.  Calls don't
19  always go through.  They don't connect.  There are
20  missed calls.
21  I'm saying that he has to testify from his
22  own knowledge of what he recalls happening from March
23  of 2016 forward, as to calls.  And that may or may
24  not line up with our records, but supplementing our
25  records for his memory is not appropriate.  We will



Page 138

1 not be able to tell you how many calls Mr. Williams
2 received. We will be able to tell you how many calls
3 we attempted. There is a distinction.
4         MR. HILL: And we have his call logs
5 already entered in as an exhibit. That is going to
6 be cross referenced to give us an exact --
7         THE ARBITRATOR: Okay. All right. Well
8 --
9         MS. JACKMAN: So why aren't we using his
10 call records?
11         THE ARBITRATOR: All right. Here's what
12 I think we need to do. We need to focus on
13 Mr. Williams' testimony --
14         MR. HILL: Sure.
15         THE ARBITRATOR: -- Mr. Williams' memory.
16 And he needs to testify of his own knowledge.
17         MR. HILL: Okay.
18         THE ARBITRATOR: So let's stay there.
19         MR. HILL: We'll stay --
20         THE ARBITRATOR: And if these other
21 records come in in some other way, or maybe they're
22 already in to some extent, we'll deal with that
23 separately.
24         MR. HILL: Okay.
25         THE ARBITRATOR: But I think we might

Page 139

1 never get to the end if Mr. Williams is testifying of
2 his own knowledge or plus whatever --
3         MR. HILL: That's fine.
4         THE ARBITRATOR: -- their business
5 records show.
6         MR. HILL: Okay. That's fine.
7         THE ARBITRATOR: And then have him -- the
8 lawyers have to help him do it. And that's not
9 really what we're here for.
10         MR. HILL: Sure. No problem. Okay.
11 BY MR. HILL:
12 **Q.    Now, Mr. Williams, after you had, you know,**
13 **instructed the agent to have his buddies not call you**
14 **anymore, did Conn's continue to call you after this**
15 **date?**
16 A.    Yes.
17         THE ARBITRATOR: So are we back in May?
18         MR. HILL: This is from May 10th of 2016.
19         THE ARBITRATOR: Okay. Good.
20 BY MR. HILL:
21 **Q.    And these calls continued after you**
22 **previously made the statement on March 6, 2016 that**
23 **you don't have to keep calling me; is that correct?**
24 A.    Yes.
25 **Q.    Okay. All right. Let's move forward to an**

Page 140

1 **audio recording that I'm going to represent to you is**
2 **from July 2nd of 2016.**
3         MR. HILL: It's previously Bates stamped
4 Conn's-J Williams_000023. Within the audio
5 transcripts, this will be reflected on page 7.
6         MR. GOMEZ: 23?
7         MR. HILL: Correct.
8         (WHEREUPON, audio recording is played
9 into the record.)
10 BY MR. HILL:
11 **Q.    Mr. Williams, did you recognize the voice on**
12 **that audio recording?**
13 A.    Yes.
14 **Q.    Okay. Was that you?**
15 A.    Yes.
16 **Q.    Okay. You know, you seemed particularly**
17 **agitated on this call. Do you recall why that was?**
18 A.    I had been harassed to a point that I'm not
19 really me. I mean, to cause me to speak the way I
20 spoke. I had really reached a limit that, you know,
21 like almost like I lost it, you know, because I had
22 been called so many times. And explained over and
23 over and over and over again that I had a situation.
24 And I had explained this to five or six, maybe ten
25 people, I don't remember. When you get to a point

Page 141

1 where you get tired of explaining the same thing over
2 and over and over and over again. And yes, I guess I
3 kind of lost it for a minute.
4 **Q.    Okay. And let me ask you this. Did you**
5 **think that, you know, by possibly using maybe some**
6 **more forceful language, I'll characterize it as, that**
7 **that might get the calls to stop?**
8 A.    No.
9 **Q.    And why didn't you think that would get the**
10 **calls to stop?**
11 A.    Because the calls weren't going to stop. I
12 couldn't think of anything to do to make the calls
13 stop. The calls didn't -- did not stop until I
14 contacted Morgan & Morgan.
15 **Q.    Okay. And we'll dive into that a little bit**
16 **later.**
17 A.    Okay.
18 **Q.    But after this call -- and you kind of just**
19 **touched on this, but you continued to receive calls**
20 **from Conn's; is that correct?**
21 A.    Yes.
22 **Q.    Okay. Now, you know, we heard the audio**
23 **recording. You know, there's some pretty strong**
24 **language in there. I'm going to play an audio**
25 **recording from you five days later, from July 7th of**



Johnnie Williams vs Conn Appliances
Arbitration

142..145

Page 142

1  2016.
2         MR. HILL:  This was previously Bates
3  stamped as Conn's-J Williams_000103.  Within the
4  audio transcriptions this should be on page 28.
5         MR. GOMEZ:  And you say 103?
6         MR. HILL:  Correct.
7         (WHEREUPON, audio recording is played
8  into the record.)
9  BY MR. HILL:
10 Q.     Mr. Williams, was that you on that audio
11 recording?
12 A.     Yes.
13 Q.     Okay.  And you recognize your voice?
14 A.     Yes.
15 Q.     Now, during that audio recording, you
16 mentioned to the agent that you had an emergency that
17 had set you back.  Do you recall what that emergency
18 was?
19 A.     Yes.  I had a car repair and I was -- had up
20 to about 16, $1700, something like that.
21 Q.     Okay.
22 A.     And it threw everything off.
23 Q.     Okay.  Is that one of the reasons that you
24 had continued to fall behind?
25 A.     Yes.

Page 143

1  Q.     And as you mentioned, you retired back in
2  2006.  Are you on a fixed income?
3  A.     Yes.
4  Q.     Okay.
5         THE ARBITRATOR:  Was that the end of the
6  call?
7         MR. HILL:  That was the end of the call,
8  correct.
9  BY MR. HILL:
10 Q.     Let's move forward to a call about six days
11 later on July 13th of 2016.
12        MR. HILL:  It's previously Bates stamped
13 as Conn's-J Williams_000109.  And the audio
14 transcription is going to be on page 36.
15        MS. JACKMAN:  What was the Bates again?
16 I'm sorry.
17        MR. HILL:  109.
18        MS. JACKMAN:  Thank you.
19        (WHEREUPON, audio recording is played
20 into the record.)
21 BY MR. HILL:
22 Q.     And Mr. Williams, was that you that we heard
23 on the recording there?
24 A.     Yes.
25 Q.     That was your voice?

Page 144

1  A.     Yes.
2  Q.     Okay.  You tell the agents during that call
3  -- I'm going to reference on page 37 beginning on
4  line 2, said "I done talked to you all.  I mean, I'm
5  talking to you like that because I done talked to you
6  all a thousand times, sometimes two, three times a
7  day."  You know, were there occasions where you spoke
8  with Conn's agents on more than one time a day?
9  A.     Yes.
10 Q.     And, you know, shortly thereafter you tell
11 the agents beginning on line 9 that "Things should
12 start to shape up real soon, but I don't need you to
13 remind me of it every day.  I will never forget."
14 What did you mean by that?
15 A.     It meant that I didn't need them to remind
16 me.
17 Q.     And how was Conn's reminding you at the time?
18 A.     The phone calls.  I heard myself say three
19 times.  I believe I said three times a day or
20 something like that.  It really was more than three
21 times a day.  You know, it was probably three times a
22 day that I talked to them during that time.  Which
23 means that I explained my situation three times
24 during that particular day.  There was some other
25 calls I got, I'm sure, that day that I did not

Page 145

1  respond to, did not answer.
2  Q.     And when you didn't answer a call from Conn's
3  -- let me ask you this.  Did you ever see any missed
4  calls from Conn's on your cell phone?
5  A.     Yes.  Always.
6  Q.     And did you ever receive any voice mails from
7  Conn's?
8  A.     Yes.
9  Q.     So it's safe to say you didn't answer every
10 single call from Conn's; is that correct?
11 A.     No.  It was too frustrating.
12 Q.     Okay.  And you also make a comment here that
13 you didn't need them to remind you every day because
14 you will never forget.  What did you mean by you will
15 never forget?
16 A.     Well, I mean, behind the calls that I already
17 received and I talked to them, I mean, it's something
18 that's always on your mind.  Always on your mind.
19 How can I get this taken care of.  How can I get this
20 taken care of.  How can I stop these phone calls.
21 How can I find some peace.
22 Q.     All right.  I want to listen to an audio
23 recording from the very next day, July 14th of 2016.
24        MR. HILL:  This was previously Bates
25 stamped Conn's-J Williams_000110.  And the audio



Johnnie Williams vs Conn Appliances
Arbitration

146..149

Page 146

1  transcription is going to be on page 38.
2        (WHEREUPON, audio recording is played
3  into the record.)
4  BY MR. HILL:
5  Q.    Again, Mr. Williams, is that you who we heard
6  on that audio recording?
7  A.    Yes.
8  Q.    Okay.  Now, during this conversation
9  reflected on page 38 line 18, specifically tell the
10  agent, you said, "there's no need for you to be
11  calling me over and over and over again."  Later in
12  that conversation you again tell the agent, "there's
13  no reason for you to keep calling me.  Okay?"  What
14  did you mean by that?
15  A.    I had -- I'm sure I had spoke to them and
16  told them where I was financially or when I could
17  approximately make a payment.  And explained whatever
18  I needed to explain.  And I didn't feel that it
19  was -- I didn't know if it was illegal or what, but
20  it didn't feel -- I didn't feel that it was just for
21  someone to call me that many times every day.  Every
22  day.  Early in the morning.  Every day.
23  Q.    By this point, did you want to receive any
24  calls from Conn's?
25  A.    No.

Page 147

1        MR. HILL:  I'm going to play another
2  recording for you.  This is from July 15th, 2016.
3  Again, this is the following day after what we just
4  listened to.  Previously been Bates stamped as
5  Conn's-J Williams_000111.  And that's going to be on
6  transcription page will be page 40.
7        (WHEREUPON, audio recording is played
8  into the record.)
9  BY MR. HILL:
10  Q.    Mr. Williams, it's obviously a relatively
11  brief recording, but did you recognize your voice on
12  that call?
13  A.    Yes.
14  Q.    And you almost immediately tell the agent
15  that you've spoken to them plenty, plenty, plenty of
16  times and you'll be making your payment real soon.
17  You go on to say that they don't have to keep calling
18  you every 15 or 30 minutes.  Were there times when
19  Conn's was calling you every 15 or 30 minutes?
20  A.    Without a doubt.
21  Q.    Okay.  As you testified a moment ago, you
22  didn't believe that Conn's should be calling you at
23  all at this time; is that correct?
24  A.    That's correct.
25  Q.    Okay.  All right.  Now we're going to go to

Page 148

1  the next day, July 16th of 2016.
2        MR. HILL:  This audio recording is Bates
3  stamped Conn's-J Williams_000112.  And that's going
4  to be on page 41 of the audio transcription.
5        THE ARBITRATOR:  What's the date?
6        MR. HILL:  July 16th of 2016.
7        (WHEREUPON, audio recording is played
8  into the record.)
9  BY MR. HILL:
10  Q.    And Mr. Williams, is that your voice on that
11  audio recording?
12  A.    Yes.
13  Q.    Okay.  Towards the beginning of the call, you
14  mentioned that you'd actually just spoken to a Conn's
15  agent less than ten minutes prior.  Do you know why
16  Conn's was calling you again following that
17  conversation?
18  A.    No.  It made no sense to me.  I'd just talked
19  to somebody.  And why wouldn't that somebody let the
20  other somebody know that they just talked to me, why
21  would this person call me, then another person call
22  me ten minutes later?  I don't understand.
23  Q.    And during that conversation, you hear the
24  agents say that without a valid amount of what you
25  can pay, we can't remove the phone calls until you

Page 149

1  have a valid arrangement.  You know, why is it that
2  you weren't able to enter into an arrangement with
3  Conn's at that time?
4  A.    Well, they several times had offered me some
5  type of a deal where I could pay this amount and then
6  this would happen like this, and it would be all
7  better.  And it sounded good.  But they never offered
8  me that type of a deal during a time when I was
9  coming to make a payment and had some money to make a
10  payment.  They offered me the deal, when they offered
11  me something like that, it was always a time when I
12  had nothing.
13  Q.    And already -- as we've already heard on a
14  number of these audio recordings, you know, you've
15  asked Conn's to stop calling you numerous times by
16  this date.  You know, other than getting caught up on
17  the payments, did you feel there was anything you
18  could have done to get the calls to stop?
19  A.    I didn't know what to do to get the calls to
20  stop.  What they were -- they actually driving me a
21  little nuts.  And I'd never experienced anything like
22  that before.  Not ever, and I'm 69.  And I've had
23  some debts before.  Plenty.  But I've never
24  experienced anything like that before.  Every day or
25  not every day but every few days, I'm on the verge of



Johnnie Williams vs Conn Appliances
Arbitration

150..153

Page 150

1 cursing somebody out. I mean...
2 Q. Sounds like you were pretty frustrated.
3 A. My children in this. Probably trying to
4 figure out, dad, what's going on. I don't know how
5 to explain that.
6 Q. And, you know, you had also mentioned during
7 this call that you were getting ready for a funeral.
8 Said it was a friend's mother's funeral and you
9 didn't have time to talk. You know, in response, the
10 agent apologizes but goes on to state, "It's just
11 without a valid amount of what you're able to pay,
12 the collection efforts are going to continue." How
13 did that make you feel?
14 A. Not too good. I mean, why would they
15 continue? I mean, I knew it was going to continue
16 anyway. So I really wasn't paying that much
17 attention. But being -- after hearing that and this
18 is not the first time I've heard it, I've been
19 actually trying to figure out whose funeral was it.
20 And I can't remember whose funeral was it. Probably
21 I wanted to get off the phone because I was tired of
22 talking to them.
23 Q. Okay. So it was just a -- you know, you
24 can't recall off-hand whether you were actually going
25 to a funeral. You just wanted to end the call?

Page 151

1 A. I thought about it and thought about it and
2 thought about it, and I cannot remember whose funeral
3 it was.
4 Q. Okay. So is that just potentially another
5 way to end the call with Conn's?
6 A. Yes.
7 Q. Okay.
8 A. Unless it was my auntie's funeral -- well,
9 not a friend's mother. I can't remember that.
10 Q. Okay.
11 MR. HILL: I want to fast forward about
12 four days to July 20th of 2016. I'm going to play an
13 audio recording for you. It's been previously Bates
14 stamped as Conn's-J Williams_000117. And that is
15 going to be on page 44 of the transcription.
16 MR. DELNERO: What date was that again?
17 MR. HILL: That should be July 20th of
18 2016.
19 MR. DELNERO: Okay.
20 (WHEREUPON, audio recording is played
21 into the record.)
22 BY MR. HILL:
23 Q. Mr. Williams, was that your voice that we
24 heard on the audio recording there?
25 A. Yes.

Page 152

1 Q. Okay. And during this call, you make a
2 couple of comments to the agent that I would like to
3 highlight. You know, you question the agent being,
4 why they have to call you over and over and over
5 again. You know, you also instruct the agent to stop
6 calling you every 15 or 20 minutes. You know, you
7 said you'd appreciate it if you'd stop doing that.
8 A. Yes.
9 Q. You know, you sounded pretty upset on this
10 call. Now, why were you so upset?
11 A. Well, I said every 15 or 20 minutes and
12 that's a fact. And that can really work your nerves.
13 Not only work your nerves, but it's depressing. It's
14 depressing. First of all, I know that I have these
15 things to take care of. And then I find myself in a
16 position not to be able to do it. And that's not why
17 I opened the accounts. I opened the accounts because
18 there was some stuff I needed. And I also needed to
19 get my credit to a point where I could purchase a
20 home for me and my children instead of being in an
21 apartment.
22 Q. Okay. Let me ask you this. You heard the
23 agents say that you just made a payment of a hundred
24 dollars, you know, a day or two prior. And you tell
25 her that that was a, you know, a serious sacrifice.

Page 153

1 A. Yes.
2 Q. You know, what did you mean there was such a
3 serious sacrifice for you?
4 A. Because I don't know. Something had to go
5 lacking. I can't remember exactly what it was at the
6 time.
7 Q. Money was tight at the time though; is that
8 fair?
9 A. Yes. Yes, without a doubt.
10 Q. But, you know, as is evidenced by the
11 recording as well as the account --
12 MS. JACKMAN: I'm trying not to
13 interrupt, but there was an awful a lot of leading.
14 I just would ask that it be kept to a minimum.
15 THE ARBITRATOR: Mr. Hill, I think you're
16 having a lot of leading. And he's your witness, so
17 let's try to change the form of your questioning.
18 MR. HILL: Sure. Absolutely.
19 BY MR. HILL:
20 Q. Did you still intend on paying for the items
21 that you had financed from Conn's at this time?
22 A. Yes.
23 MR. HILL: The next recording I want to
24 play from you is from three days later on July 23rd,
25 2016. It's been previously Bates stamped as Conn's-J



Johnnie Williams vs Conn Appliances
Arbitration

154..157

Page 154

1   Williams_000121. It's going to be page 48 in the
2   audio transcripts.
3       (WHEREUPON, audio recording is played
4   into the record.)
5   BY MR. HILL:
6   **Q.    Mr. Williams, was that your voice that you**
7   **heard on the recording there?**
8   A.    Yes.
9   **Q.    You know, you sounded particularly upset on**
10  **this call. Why is that?**
11  A.    I believe I hadn't been long made a payment.
12  And didn't know why they were calling me again just
13  like that. That fast. And I had explained so many
14  times what I was experiencing and the fact that I was
15  doing all I can to make it better. But the constant
16  calling, harassing, that wasn't helping me. That
17  wasn't helping me. That wasn't helping them either,
18  I don't guess, you know. If I didn't have it, I
19  didn't have it. I couldn't present it.
20  **Q.    Understood.**
21      MR. HILL: All right. The next audio
22  recording we're going to play is from two days later
23  on July 25th of 2016. This has been previously Bates
24  stamped as Conn's-J Williams_000081. That is going
25  to be on page 23 of the audio transcripts. Or excuse

Page 155

1   me. It will be page 21.
2       (WHEREUPON, audio recording is played
3   into the record.)
4   BY MR. HILL:
5   **Q.    Mr. Williams, was that your voice that we**
6   **heard on the audio recording?**
7   A.    Yes.
8   **Q.    And as reflected on page 22 line 4 of the**
9   **transcript, you specifically tell the agent, "I would**
10  **appreciate it if you would stop calling."**
11  A.    Yes.
12  **Q.    Did Conn's stop calling you after that date?**
13  A.    No. No, they did not.
14  **Q.    Okay.**
15      MR. GOMEZ: If you don't mind, if we can
16  take a break before we get to the next recording.
17  We've been going for almost an hour and a half.
18      MR. HILL: Sure. That's fine.
19      MR. GOMEZ: Do you guys mind? I need to
20  go to the restroom.
21      THE ARBITRATOR: No. Please do.
22      (Short break.)
23      THE ARBITRATOR: Back to more calls?
24      MR. HILL: We're back on. We're back to
25  more calls.

Page 156

1       THE ARBITRATOR: Okay.
2       MR. GOMEZ: I'm loading that in.
3       THE ARBITRATOR: Let me know when you're
4   ready.
5       MR. GOMEZ: Which is the last Bates
6   stamped? That was July 25th, what number?
7       MR. HILL: 81.
8       MR. GOMEZ: 81?
9       MR. HILL: Correct.
10      MR. GOMEZ: I'm ready whenever you are.
11      MR. HILL: Okay.
12  BY MR. HILL:
13  **Q.    Mr. Williams, where we left off a moment ago,**
14  **July 25th of 2016, we heard you tell an agent, "I**
15  **would appreciate it if you would stop calling." Did**
16  **Conn's continue to call you after this date?**
17  A.    Yes.
18  **Q.    All right. I next want to play an audio**
19  **recording for you. It's roughly eight or nine days**
20  **later on August 3rd of 2016 which was previously**
21  **Bates stamped as Conn's-J Williams_00037.**
22      MR. HILL: On the transcription, that is
23  going to be page 8.
24      (WHEREUPON, audio recording is played
25  into the record.)

Page 157

1   BY MR. HILL:
2   **Q.    Okay. Mr. Williams, was that your voice that**
3   **we heard on the audio recording there?**
4   A.    Yes.
5   **Q.    Okay. During that audio recording, I hear**
6   **the agent mention, or she actually asked you, she**
7   **goes, "What caused you to fall behind because they're**
8   **not putting that in the system?" How did that make**
9   **you feel?**
10  A.    Well, I had explained it several times, and
11  it seemed like they would have made a note of it, you
12  know, so as to not ask me that same thing over again.
13  But I guess that didn't happen.
14  **Q.    Now, you also tell the agent, you said, "I**
15  **even got an eviction notice that I'm dealing with**
16  **because I cannot. I have a 14-year-old daughter. I**
17  **have a 12-year-old son, and we cannot be put out on**
18  **the street. I can't let that happen." Did you have**
19  **other bills at this time that you were dealing with**
20  **outside of the bill from Conn's?**
21  A.    Yes. Yes. I experienced a thing -- I don't
22  know if the management company seemed like they
23  wanted to raise the rent or something or whatever.
24  Anyway, I fell a little bit behind and it seemed like
25  they wanted to get me out of the place. And I



Johnnie Williams vs Conn Appliances
Arbitration

Page 158

1  couldn't let that happen because where were we going
2  to go?  Me and my children, we can't go live with
3  nobody.  We wouldn't want to do that, no way.
4       So somehow I had to handle that, you know.
5  And it wasn't easy.  I went through something, you
6  know, to be able to stay where we stay.  We had to
7  have some place to live.  We had to have a roof over
8  our head.  We had to have transportation.  We had to
9  have food.  That was more important to me than
10  anything at that time.
11  **Q.    All right.**
12       MR. HILL:  I'm going to play an audio
13  recording for you from the very next day, August 4th
14  of 2016.  This was previously Bates stamped Conn's-J
15  Williams_000128.  That's going to be page 49 of the
16  transcription.
17       (WHEREUPON, audio recording is played
18  into the record.)
19  BY MR. HILL:
20  **Q.    Mr. Williams, was that your voice that we**
21  **heard on the audio recording there?**
22  A.    Yes.
23  **Q.    Okay.  During that call you tell the agent,**
24  **you say, "Calling me every day ain't doing no good."**
25  **What did you mean by that?**

Page 159

1  A.    Well, calling me wasn't going to make me have
2  no money.  I wished it would.  That would have been
3  -- made me a lot happier myself.  And also on that
4  particular day, there was one of those days when I
5  really physically did not feel good besides not
6  feeling good mentally, physically I did not feel
7  good.  I don't remember if it was COPD.  It might
8  have been right about the time that they diagnosed me
9  with COPD.  I didn't understand COPD.  I'm still
10  trying to understand COPD.  I know when I can't get
11  my breath, and I can't breathe like I'm supposed to.
12  Then if I've got some aggravation going on in the
13  background during that time, then I experience
14  anxiety along with that, and that makes that worse.
15  And if it continued, and I don't have the medicine,
16  then I got to get some place fast.
17  **Q.    Mr. Williams, I'm going to play an audio**
18  **recording for you now.  This is about a week after**
19  **this past call, on August 11th of 2016.**
20       MR. HILL:  It was previously Bates
21  stamped Conn's-J Williams_000136.  I believe this is
22  actually going to be in the second set of the
23  transcripts.
24       THE ARBITRATOR:  Okay.
25       MR. HILL:  And that will begin on page 3.

Page 160

1       (WHEREUPON, audio recording is played
2  into the record.)
3  BY MR. HILL:
4  **Q.    Mr. Williams, was that your voice we heard on**
5  **that audio recording?**
6  A.    Yes.
7  **Q.    Okay.  You know, there was a couple of**
8  **comments you've made in that conversation you had**
9  **with the Conn's agent that I want to discuss with**
10  **you.  First, you made mention to the agent that you**
11  **had eaten beans and cornbread the night before and**
12  **that your daughter didn't like that and had to eat**
13  **Ramen noodles.  You know, why is it that you were**
14  **telling the agent that?**
15  A.    I really don't know.  I guess I was trying to
16  make her understand that just, you know, there was
17  something else I would prefer to cook for dinner, but
18  that was all I had to cook.  And I had cooked that so
19  many times that, I mean, I grew up eating beans and
20  cornbread, so I didn't have a real problem.
21  Sometimes my kids might.  But that was all I had to
22  cook.  And it was actually good.  My daughter, she
23  don't do that.  But at least we had something.  And
24  -- but that was next to nothing.  But we were blessed
25  to have that, you know.

Page 161

1  **Q.    Okay.  You know, you go onto tell the agent**
2  **you say, "Oh, well, since you all call me so much, I**
3  **hope it is you that calls me back."  What made you**
4  **say that?**
5  A.    Well, she seemed a little different from some
6  of the other people that call me.  You know, she
7  seemed to have a sweet spirit.  And -- in the
8  beginning, anyway.  And I guess if somebody else was
9  going to call me, I would have preferred that it be
10  her because seemed like she, in the beginning, like
11  she was a little more understanding.  But at the same
12  time, I really didn't want to talk anymore, even to
13  her.
14  **Q.    All right.  And when you say you didn't want**
15  **to talk anymore, are you stating specifically as it**
16  **relates to --**
17  A.    Another time when she decided to call, I
18  really didn't.  I wanted to get off the phone.
19  **Q.    Okay.  Now, did you actually want Conn's to**
20  **call you back?**
21  A.    No.
22  **Q.    All right.  You also mentioned something else**
23  **that I found was pretty interesting.  You know, you**
24  **tell -- the agent asked, she makes a comment about,**
25  **you know, you've been speaking with different people,**



Page 162

1  but the fact that you're hanging up and you're not
2  setting up payment arrangements, you know, you kind
3  of cut her off and you tell her, "I hang up when
4  people don't say nothing to me, you know.  They call
5  my phone, don't say nothing.  Call me early in the
6  morning, wake me up, don't say nothing."  What did
7  you mean by that?
8  A.    Well, first of all, I not only hang up when
9  people didn't say anything, I hang up when they did
10 say something, because I had been driven to that
11 point where I was just totally tired, frustrated, and
12 I don't know what else I could think of as far as the
13 way I felt.  But early in the morning and I was
14 asleep and then wake me up and I'm saying "hello.
15 Hello.  Hello."  And nobody is saying anything.  When
16 I look at the phone number, it's one of Conns' phone
17 numbers, and they didn't do that just one time.  They
18 did that plenty times.
19 Q.    Was that -- you know, would you say that was
20 a common occurrence?
21 A.    Yes.
22 Q.    You know, you also tell the agent, you say
23 that "I hang up, I get frustrated and I am because
24 what you were doing, you remind me that I know I
25 don't have no money."  How did that make you feel?

Page 163

1  A.    Not good.  Not good at all.  Sometimes even
2  in the midst of being without but, you know, thankful
3  that you do have some place to stay, you know, and
4  not have to go live with somebody else and stuff like
5  that.  You still got something to be thankful for.
6  And maybe I was experiencing a degree of peace.  Then
7  I get the phone call and it reminds me that I got
8  nothing in my pocket.  It just so happened that the
9  immediate needs were met, but I didn't have no money
10 for them.  I didn't have any for myself, either.
11 Q.    I understand.  And was it just when you spoke
12 with agents that you were reminded that you had no
13 money?
14 A.    Yes.  That was -- yes.  That was a real
15 wake-up call.  I was broke.
16 Q.    What about when you saw missed calls?
17 A.    Missed calls.  I got plenty of them.  I mean,
18 it got to the point where I see a number, I know who
19 it was that had called me.  Maybe when I was in the
20 other room or phone was in one room other and I was
21 in the other room, and sometimes the phone be in my
22 hand and I see the number when I choose not to answer
23 it.  I'm already frustrated.  Why allow myself to be
24 even more frustrated by the questions, explaining
25 something that I've already explained over and over

Page 164

1  again.
2  Q.    All right.  I want to move forward to a
3  couple of weeks to an audio recording from September
4  2nd of 2016.
5         THE ARBITRATOR:  Just one second.  Let me
6  catch up with you.
7         MR. HILL:  Yes, sir.
8         THE ARBITRATOR:  Okay.  What page did you
9  say?
10        MR. HILL:  It's going to be September 2nd
11 of 2016.  This audio recording was previously Bates
12 stamped Conn's-J Williams_000148.  That's going to be
13 page 10 of the audio transcript.
14        (WHEREUPON, audio recording is played
15 into the record.)
16 BY MR. HILL:
17 Q.    Mr. Williams, is that your voice that we
18 heard on the audio recording?
19 A.    Yes.
20 Q.    Okay.  You know, during this call, you kind
21 of explained to the agent it's not their bill, isn't
22 important, but you're just trying to, you know, catch
23 up on some other bills such as rent and things like
24 that.  You know, what did you mean by that when you
25 told the agent that?

Page 165

1  A.    I was trying to work out something with the
2  management company where I wouldn't have to give them
3  as much as they were asking for at the time.  Where I
4  could pay Conn's some money, take care of a couple of
5  other things.  But they kind of -- it was a situation
6  where it just wouldn't work.  And it just wouldn't
7  work.  And I had to give them all of what I had.
8  Q.    You know, you also tell the agent that it's
9  frustrating for you to continue to talk about it.
10 You say, "That's why I answer sometimes and sometimes
11 I don't answer.  Okay.  I don't answer at the time
12 but I'm afraid you're going to cause me a little more
13 and remind me that I don't have no money."
14 A.    Yeah.
15 Q.    How does that make you feel?
16 A.    Less than a man at times.  Because of I
17 didn't understand what I was going through.  I mean,
18 I been through some stuff before, and it's just,
19 well, it was a little hard for me to deal with at
20 this time in my life to be going through that.
21 Q.    Mr. Williams, I'm going to play an audio
22 recording for you now.  It's about four days later
23 from September 6th of 2016.
24        MR. HILL:  It's previously Bates stamped
25 as Conn's-J Williams_000150.  And it's going to be on



Johnnie Williams vs Conn Appliances
Arbitration

166..169

Page 166

1  page 19 of the transcript.
2        THE ARBITRATOR:  What was the date again?
3        MR. HILL:  That is September 6th of 2016.
4        MR. GOMEZ:  You said that was 150?
5        MR. HILL:  Correct.
6        (WHEREUPON, audio recording is played
7  into the record.)
8  BY MR. HILL:
9  Q.     Mr. Williams, is that your voice that we
10  heard on the audio recording?
11  A.     Yes.
12  Q.     Okay.  You know, during this call, you know,
13  you tell the Conn's agent, you try to explain your
14  financial situation to 30 or 40 different people.
15  You know, the agent responds, says some 21 --
16  beginning on line 2, "I completely understand, sir,
17  but this is a secured loan.  That is why you're
18  receiving these phone calls.  You have our
19  merchandise that you are not currently paying your
20  monthly payments on."  Let me ask you this.  Did
21  Conn's ever offer to come pick up the merchandise?
22  A.     No.  No.
23  Q.     Did they ever request that you bring it back
24  in?
25  A.     No.

Page 167

1  Q.     Okay.  And you mention here, you said you're
2  going to pay you all.  Did you still intend on paying
3  for the merchandise at that time?
4  A.     Yes.
5  Q.     All right.  I'm going to move forward a
6  little bit to an audio recording from October 4th of
7  2016.  It's a little bit of -- less than a month
8  after the recording we just listened to.
9        MR. HILL:  This is going to be Bates
10  stamped Conn's-J Williams_000162.
11        THE ARBITRATOR:  What was the date again?
12        MR. HILL:  October 4th of 2016.  And
13  that's going to be on transcription page -- I believe
14  it should be 34.
15        (WHEREUPON, audio recording is played
16  into the record.)
17  BY MR. HILL:
18  Q.     Mr. Williams, was that your voice on the
19  audio recording?
20  A.     No.  That was my fiancee speaking.
21  Q.     What was your fiancee's name?
22  A.     Tina Pity.
23  Q.     Okay.  And during that audio recording, you
24  hear Ms. Petty say that you weren't around and that
25  you were in a hospital right now?

Page 168

1  A.     Yes.
2  Q.     Were you having some medical issues at the
3  time?
4  A.     Yes.  I had been in two or three times in the
5  last couple of years, maybe four.  I'm not for sure.
6  I can't remember exactly which time it was or what I
7  was experiencing at the time that I was in.  I don't
8  remember if it was -- I've been in twice, I know for
9  COPD.  I don't know of anything else.  I don't
10  remember just what I was exactly going through at the
11  time.
12  Q.     Okay.  All right.  I'm going to move on to
13  another recording from about ten days later on
14  October 14th of 2016.
15        MR. HILL:  This was previously Bates
16  stamped as Conn's-J Williams_000166.  It's going to
17  be found on page 35 of the audio transcription.
18        (WHEREUPON, audio recording is played
19  into the record.)
20  BY MR. HILL:
21  Q.     Mr. Williams, is that your voice that we
22  heard on that audio recording?
23  A.     Yes.
24  Q.     Okay.  And towards the end of the
25  conversation, I hear you tell the Conn's lady, you

Page 169

1  said "Don't call me no more."  Did Conn's continue to
2  call you after this conversation?
3  A.     Yes.
4  Q.     Okay.  You know, you also question the agent
5  if she knows what in the morning it is.  Did this
6  call wake you up?
7  A.     Yes.
8  Q.     Was it common for you to get calls from
9  Conn's early in the morning?
10  A.     They didn't always do it, but they got to a
11  point where they did do it on a regular basis.
12  Q.     Would you ever wake up to missed calls from
13  Conn's?
14  A.     Yes.
15  Q.     Okay.  All right.  I want to play you an
16  audio recording --
17        THE ARBITRATOR:  Just a minute.
18  Mr. Williams, do you know what time that call was?
19        THE WITNESS:  No, sir.  I don't remember
20  exactly what time it was.  I'm not an early morning
21  person.  There have been times that I've had to get
22  up early in the morning maybe to see my kids off to
23  school or something.  That was a time when I was --
24  before I retired I was used to getting up at 4:30 or
25  5:00 in the morning, putting two kids in the car



Johnnie Williams vs Conn Appliances
Arbitration

Page 170

1 seats, warming the car up, taking them to daycare and
2 going to work and all of that. But after retirement,
3 I got out of the habit of being up that early in the
4 morning. So if it were 7:30, for me, it might have
5 been early. You know, I may have been up and laid
6 back down.
7        MS. JACKMAN: We, for convenience, since
8 you were asking, we can tell you our records show
9 this was at 8:24 in the morning. And we're happy to
10 stipulate to that. It's what our records show.
11       MR. HILL: Okay.
12       THE ARBITRATOR: 8:25.
13       MS. JACKMAN: 24, sir.
14       THE ARBITRATOR: 8:24 his time?
15       MS. JACKMAN: Yes.
16       THE ARBITRATOR: Okay. Thank you. Go
17 ahead.
18 BY MR. HILL:
19 Q.    So Mr. Williams, I want to play you another,
20 you know, recording from three days later on
21 October 17th of 2016.
22       MR. HILL: This was previously Bates
23 stamped Conn's-J Williams_000167. And it's going to
24 be on page 37 of the transcript.
25       (WHEREUPON, audio recording is played

Page 171

1 into the record.)
2 BY MR. HILL:
3 Q.    Mr. Williams, is that you we heard on this
4 audio recording?
5 A.    Yes.
6 Q.    Okay. During this call, you told the agent
7 -- I'm looking at page 37 line 13, you said, "Y'all
8 are not supposed to be calling me like this, though."
9 What did you mean by that?
10 A.    I had told them time and time again, "Please
11 don't call me." You know, I know when I'm supposed
12 to pay whatever I'm supposed to pay. Don't call me
13 every day, all day, every day. That particular day,
14 I didn't feel good. I don't know what was bothering
15 me, but I felt really bad, whatever it was.
16       And to listen to somebody talking to me about
17 a bill or that I couldn't do anything about that very
18 moment, it was really aggravating. What it would do
19 is make me feel even worse because of the anxiety
20 business. It will make it like, magnified however
21 I'm feeling. If I'm feeling bad, it makes it even
22 worse.
23       So normally I hang up when I got tired of
24 talking or didn't have nothing to say, but I remember
25 that day I carried on a conversation with whoever

Page 172

1 that was was making me feel worse. And I didn't
2 choose to feel any worse than I already did, so I
3 just hung the phone up.
4 Q.    And as you testified, you know, a few minutes
5 ago, you'd been in the hospital, you know, around
6 that time as well; is that correct?
7 A.    Yes.
8 Q.    Okay. Were you having ongoing health issues
9 at the time?
10 A.    Yes.
11 Q.    All right. I'm going to play you an audio
12 recording from the very next day, October 18th of
13 2016.
14       MR. HILL: This was previously Bates
15 stamped Conn's-J Williams_000168. This can be found
16 on page 39 of the audio transcripts.
17       (WHEREUPON, audio recording is played
18 into the record.)
19 BY MR. HILL:
20 Q.    Mr. Williams, during that call, I heard you
21 tell the agent with Conn's multiple times that they
22 weren't supposed to be calling you like that. What
23 did you mean by that?
24 A.    I meant that -- just what I said. He wasn't
25 -- he shouldn't -- he wasn't supposed to be calling

Page 173

1 me like that every day, just calling every day, all
2 day. I mean, I understood that I had a bill with
3 them. And I had every intention of paying it. When
4 I get the money in my hand and bring it to them, I'd
5 bring it to them. I didn't need reminding of it.
6 And if so, I didn't need reminding of it every 15,
7 20, 30 minutes all day long, every day. I didn't
8 need that kind of remind.
9       I mean, it's not like that I'm mentally ill
10 or nothing. I have some anxiety, but I'm not
11 mentally ill. And I'm not -- I don't have
12 Alzheimer's, you know, so I know this. I don't need
13 you to call me all day long, every day. I mean, that
14 would actually drive a person a little crazy maybe.
15 Q.    And you also tell the agents that "I don't
16 appreciate y'all calling me 10, 15 times a day early
17 in the morning."
18 A.    Yes.
19 Q.    You know, if you can recall, were there
20 occasions where Conn's called you more than ten times
21 in a day?
22 A.    Yes.
23 Q.    How did that make you feel?
24 A.    Frustrated, angry, humiliated.
25 Q.    Now, you also mentioned that -- you said,



Johnnie Williams vs Conn Appliances
Arbitration                                                                                                    174..177

Page 174

1   "You know y'all stress a person out calling 10 to 15
2   times every day, even on Sundays if I'm not
3   mistaken." Were these calls also stressful for you?
4   A.      Very, very.  And it's almost like picking on
5   somebody, you know, and they can't do anything about
6   it.  Except they can curse you out and everything,
7   but they can't really do anything about it.  Can't
8   stop the phone calls, you know.  They're already
9   aggravated.  They're annoyed.  They know what they're
10  dealing with, trying to find a way out of it.  But
11  then you just continued to pick on them because, you
12  know, even though they can't do anything about it,
13  but like you're getting pleasure out of picking on
14  them, pissing them off.
15  Q.      Now, you just mentioned a moment ago,
16  you said, "you can't stop the phone calls."
17  A.      No.
18  Q.      What made you believe you couldn't stop the
19  phone calls?
20  A.      I tried everything I knew to stop it.  I
21  could change my number.  I chose not to do that.
22  Q.      All right.  I'm going to play -- I next want
23  to play an audio recording for you from the very next
24  day.  This is from October 19th of 2016.
25          MR. HILL:  This was previously Bates

Page 175

1   stamped Conn's-J Williams_000169.  And that's going
2   to be on page 43 of the audio transcription.
3           (WHEREUPON, audio recording is played
4   into the record.)
5   BY MR. HILL:
6   Q.      Mr. Williams, was that your voice that we
7   heard on the audio recording?
8   A.      Yes.
9   Q.      Okay.  And is October 19th your birthday?
10  A.      Yes.
11  Q.      Okay.  You know, again during this call, I
12  heard you say "Y'all are not supposed to be calling."
13  A.      Yes.
14  Q.      Okay.  What made you say that?
15  A.      It was a repeat of what I had been telling
16  them for months and months.
17  Q.      Now, I also heard the agent say -- well,
18  actually let me ask you this.  You told the agent
19  that you had made a payment the day previously.  Were
20  you still trying to pay off the merchandise that you
21  purchased from Conn's at this time?
22  A.      Yes.
23  Q.      And the agent -- I'm looking at page 44
24  beginning on line 14.  He tells you that "If you made
25  a payment and we got it, I will get you off the list,

Page 176

1   brother."  Do you know what list he's referring to?
2   A.      No.  I had no idea.
3   Q.      Okay.
4   A.      I mean, if there was a list, you know, it
5   seemed like he would have looked at the list before
6   he called me, you know.
7   Q.      Okay.  All right.  I'm going to play an audio
8   recording for you from the very next day,
9   October 20th of 2016.
10          MR. HILL:  This was previously Bates
11  stamped Conn's-J Williams_000170.  And that's going
12  to be found on page 4 of the audio transcripts.
13          (WHEREUPON, audio recording is played
14  into the record.)
15  BY MR. HILL:
16  Q.      Mr. Williams, was that your voice we heard on
17  the audio recording?
18  A.      Yes.
19  Q.      Okay.  During this call when you told the
20  agent you say, "well y'all have been calling and not
21  saying nothing.  You've been calling early in the
22  morning while I'm asleep."  Can you elaborate what
23  you meant by Conn's had been calling and not saying
24  nothing?
25  A.      They would call and I'd answer the phone, say

Page 177

1   "hello."  It would be nobody say anything.  I'd say
2   "hello."  Nobody would say anything.  I'd say
3   "hello."  Still nobody say anything.  And I'd hang
4   the phone up.
5   Q.      Okay.
6   A.      Now, why they did that, I don't know.
7   Q.      Is there anything particularly frustrating
8   about those types of calls?
9   A.      Very frustrating.  Well, I guess it would be
10  just as frustrating as if they were there.  But I
11  guess even more by the call -- me getting the call
12  and then there be nobody there.
13  Q.      Okay.  All right.  I'm going to fast forward
14  about six days to October 26th of 2016.
15          MR. HILL:  This audio recording was
16  previously Bates stamped Conn's-J Williams_00060.  I
17  believe that actually is going to be in the other
18  audio transcripts.  That should be on page 13, I
19  believe.
20          (WHEREUPON, audio recording is played
21  into the record.)
22  BY MR. HILL:
23  Q.      Mr. Williams, was that your voice that we
24  heard on that audio recording?
25  A.      Yes.



Johnnie Williams vs Conn Appliances
Arbitration

178..181

Page 178

1  Q.    Okay.  Towards the end of that call, you tell
2  the agent that all they're doing is frustrating you,
3  stressing you out and pissing you off.  You know,
4  what made you say that?
5  A.    Because that's exactly what was happening.
6  And that's not the first time.  It wasn't the last
7  time.  That's -- that was an everyday thing.
8  Q.    Okay.
9  A.    I had nothing else to say.
10 Q.    Sure.  All right.  I'm going to play another
11 audio recording from you -- for you from the very
12 next day, October 27th of 2016.
13        MR. HILL:  This was previously Bates
14 stamped as Conn's-J Williams_000175.  And that should
15 be on page 49 of the second transcription.
16        THE ARBITRATOR:  Second, we're back on
17 the second?
18        MR. HILL:  Yes, sir.
19        MR. KERNEY:  Are we ready?
20        THE ARBITRATOR:  Yes.
21        (WHEREUPON, audio recording is played
22 into the record.)
23 BY MR. HILL:
24 Q.    Mr. Williams, was that your voice that we
25 heard on the audio recording?

Page 179

1  A.    Yes.
2  Q.    Okay.  And within that recording, you hear
3  the agent ask you to verify your date of birth and
4  you say "no, no, no.  You're not supposed to be
5  calling me."  You know, why is it that you told the
6  agent, "no, no, no" when he asked to verify your date
7  of birth?
8  A.    Well, the calls are just -- it's just so many
9  calls and it's so annoying, and I just was -- one of
10 those times you just don't even want to talk at all,
11 period.  And I mean, I just didn't -- I just wasn't
12 going to talk.  There was nothing else to say.  I
13 don't know why he called me.
14 Q.    Okay.  The next audio recording I'm going to
15 play is actually from the very same day, October 27th
16 of 2016.
17        MR. HILL:  And this was previously Bates
18 stamped as Conn's-J Williams_000061.  That's going to
19 be the first transcript again.  That will be page 17.
20        (WHEREUPON, audio recording is played
21 into the record.)
22 BY MR. HILL:
23 Q.    Mr. Williams, was that your voice we heard on
24 that audio recording?
25 A.    Yes.

Page 180

1  Q.    Okay.  And the last little portion of that
2  recording, I'm looking at page 19 beginning on
3  line 8, you tell the agent, "You woke me up a little
4  while ago.  This is the second time you called me.  I
5  appreciate if you don't call me no more today
6  neither, you know?"  You know, was it -- were there
7  occasions where you spoke with Conn's agents on more
8  than one time per day?
9  A.    Yes.
10 Q.    Okay.  And you also said that they'd woke you
11 up a little while ago.  Is that something that
12 occurred, you know, on more than one occasion?
13 A.    Yes.
14 Q.    And you tell the agent you'd appreciate it if
15 you don't call me no more today neither?
16 A.    I meant at all, you know.  I knew he'd
17 probably try to -- he'd probably call back again that
18 same day, but I meant not at all.
19 Q.    Okay.
20 A.    But I mean, that wasn't what I was going to
21 get.  You know, I'd be lucky if he didn't call me
22 back no more that day, I'd be lucky.  But I meant not
23 at all.
24 Q.    Understood.  Okay.  All right.  I'm going to
25 play for you now an audio recording from the very

Page 181

1  next day, October 28th of 2016.
2        MR. HILL:  This was previously Bates
3  stamped as Conn's-J Williams_000176.  It's back to the
4  second transcript.  And that should be on page 50.
5  And Mr. Williams, if you need to take a break, please
6  let me know.
7        THE WITNESS:  Okay.
8        THE ARBITRATOR:  What's the date again,
9  October what?
10        MR. HILL:  It's going to be October 28th
11 of 2016.
12        (WHEREUPON, audio recording is played
13 into the record.)
14 BY MR. HILL:
15 Q.    Okay.  This was a relatively quick recording,
16 but Mr. Williams, was that you who we heard on that
17 recording?
18 A.    Yes.
19 Q.    Okay.  And you end the call by telling the
20 agent "Y'all aren't supposed to be calling me."  What
21 made you say that?
22 A.    I've been saying that all the time, telling
23 them every day all day long not to call me.  And I
24 just chose not to talk at all.
25 Q.    Okay.  All right.  The next recording I want



Page 182

1  to play for you is going to be about five days later
2  on November 2nd of 2016.
3         MR. HILL:  This was previously Bates
4  stamped as Conn's-J Williams_000177.  This is going
5  to be on page 51 of the transcript.
6         (WHEREUPON, audio recording is played
7  into the record.)
8  BY MR. HILL:
9  Q.     And Mr. Williams, was that you who we heard
10  on that audio recording?
11  A.     Yes.
12  Q.     Okay.  And during this call, you explained to
13  them, you said, "I'm very frustrated, I'm stressed
14  and I would kick your ass if I was face to face with
15  you."  What made you say that?
16  A.     I was that kind of angry.  I was that kind of
17  angry.  I don't feel -- I was just kind of getting
18  fed up at certain points, you know.  Sometimes you
19  kind of relax a little bit and kind of maybe forgive
20  a little bit because of the constant harassing, you
21  know.  But at that time, I guess, I was at a point
22  where I couldn't deal with no form of harassing that
23  particular day.  There were days like that.  Some
24  days I could kind of deal with it.  And then go on.
25  But some days it just -- I couldn't do it at all.

Page 183

1  Q.     And let me ask you this.  Was it anything
2  about this particular agent that set you off?
3  A.     I'm not sure.  I'm not sure.  It may have
4  just been the one -- the couple before him got me to
5  that point.  I'm not sure.
6  Q.     So it could have been a cumulative effect?
7  A.     Yes.
8  Q.     Okay.  Now, you also told the agent that the
9  first time they call you in the middle of the month
10  because you know they're going to call you, you
11  discussed a payment arrangement at that time.  Now,
12  what made you so sure they were going to call you?
13  A.     Well, they hadn't stopped calling before,
14  so -- and they kept calling every day even though I'd
15  said "don't call."  I knew they were going to call
16  because my telling them not to call is not going to
17  stop them from calling.  So when he had the deal that
18  he was going to offer me, I said well, you know, if
19  you really got the deal for me, then get with me in
20  the middle of the month when I have the money to make
21  the type of payment that you want me to make.  Then
22  we'll do this deal.
23         But you wait until I don't have no money.
24  Then you want to give me a deal.  Which means, in
25  order to get the deal, I've got to make some kind of

Page 184

1  substantial payment, whatever is required at that
2  time.  But I never got the money when you want to
3  give me the deal.  When I got the money then, you
4  don't mention no deal then.
5  Q.     Okay.  All right.  I want to next play a
6  recording from about six days later on November 8th
7  of 2016.
8         MR. HILL:  This was previously Bates
9  stamped Conn's-J Williams_000182.  It's going to be
10  on page 54 of the transcript.
11         THE ARBITRATOR:  November what?
12         MR. HILL:  It's November 8th of 2016.
13         THE ARBITRATOR:  Okay.
14         MR. GOMEZ:  Shaughn, did you say 182?
15         MR. HILL:  Correct.
16         (WHEREUPON, audio recording is played
17  into the record.)
18  BY MR. HILL:
19  Q.     Mr. Williams, was that you we heard on that
20  audio recording?
21  A.     Yes.
22  Q.     Okay.  Towards the beginning of that call,
23  you tell the agent, "Why y'all keep calling me?
24  Y'all aren't supposed to be calling me."  What made
25  you say that?

Page 185

1  A.     Same reason.  I've been telling them all the
2  time to stop calling me.  But I know all the time it
3  was not going to do any good.  Maybe I'd get lucky,
4  but I didn't.
5  Q.     Okay.  All right.  I next want to play an
6  audio recording for you from the very same day,
7  November 8th of 2016.
8         MR. HILL:  This is Bates stamped Conn's-J
9  Williams_000183.  You'll find this on page 56 of the
10  transcript.
11         (WHEREUPON, audio recording is played
12  into the record.)
13  BY MR. HILL:
14  Q.     Okay.  That was a relatively short audio
15  recording.  But Mr. Williams, was that your voice
16  that we heard on that recording?
17  A.     Yes.
18  Q.     Okay.  And in that recording, you tell the
19  agent "This is ten times y'all have called me today.
20  Don't call me no more.  You ain't supposed to be
21  calling me, no way."  Did Conn's continue to call you
22  after that recording?
23  A.     That same day, I'm not sure, I don't
24  remember, but the next day if not that same day, the
25  next day for sure.  And every day after.



Johnnie Williams vs Conn Appliances
Arbitration
186..189

Page 186

1 Q.    So the calls continued after you specifically
2 instructed them "Don't call me no more"?
3 A.    Yes.
4 Q.    Okay.  The next recording I want to play for
5 you is three days later, November 11th of 2016.
6        MR. HILL:  This was previously Bates
7 stamped Conn's-J Williams_000187.  It can be found on
8 page 57 of the transcript.
9        (WHEREUPON, audio recording is played
10 into the record.)
11 BY MR. HILL:
12 Q.    Mr. Williams, was that your voice that we
13 heard on the audio recording there?
14 A.    Yes.
15 Q.    Okay.  And, you know, during this call, you
16 again tell the agent that "Y'all are not supposed to
17 be calling me period."  I know you've kind of
18 explained why you said that up to that point.  You
19 know, can you tell us again why you were telling the
20 agent that?
21 A.    Well, I don't understand.  I never understood
22 why.  I can understand you calling a person once,
23 twice maybe and, you know, talk to that person,
24 explain to you what the situation is and what they
25 mean to do as far as handling it, making everything

Page 187

1 okay.  But then, you know, to keep -- to continue to
2 get the calls nonstop asking you the same thing,
3 expecting you to explain -- give an explanation every
4 time they call.  And then your birthday when you
5 answer the phone.  It gets really, really
6 frustrating.
7        And you wonder what part of the game is this.
8 And you get so angry that you would like to reach out
9 and choke somebody.  And you can't do it because
10 you're on the phone.  And it's good that you are on
11 the phone so you don't get yourself in a lot of
12 trouble.
13 Q.    I understand.  And you also tell the agent,
14 you say that you're not feeling good.  You know,
15 these calls are just adding more stress on to it.
16 A.    And then they still want to keep on talking.
17 Excuse me for cutting you off.
18 Q.    That's okay.  All right.  Mr. Williams, we're
19 going to move forward a little bit.  I'm going to
20 play an audio recording for you from December 5th of
21 2016.
22        THE ARBITRATOR:  Let me catch up with you
23 just give me a second.
24        MR. HILL:  Yes, sir.
25        MR. KERNEY:  What Bates number is that?

Page 188

1        MR. HILL:  It's 74.
2        MR. GOMEZ:  Did you say 74 or 174?
3        MR. HILL:  74.
4        THE ARBITRATOR:  Okay.  What date are we
5 on now?
6        MR. HILL:  Yes, sir.  So this is going to
7 be December 5th of 2016.  It's Bates stamped Conn's-J
8 Williams_00074.  It's going to be from the first set
9 of transcriptions, I believe, on page 20.
10        (WHEREUPON, audio recording is played
11 into the record.)
12 BY MR. HILL:
13 Q.    Mr. Williams, that audio recording is pretty
14 self-explanatory, but is that your voice that we
15 heard on there?
16 A.    Yes.
17 Q.    Was that you who told the agent Alicia that
18 they're not supposed to be calling you?
19 A.    Yes.
20 Q.    All right.  I'm going to play you another
21 recording from the very next day, December 6th of
22 2016.
23        MR. HILL:  This is previously Bates
24 stamped Conn's-J Williams_000197.  And that's going
25 to be on page 60 of the second transcript.

Page 189

1        (WHEREUPON, audio recording is played
2 into the record.)
3 BY MR. HILL:
4 Q.    Mr. Williams, was that your voice that we
5 heard on that audio recording?
6 A.    Yes.
7 Q.    And did you hear yourself twice tell the
8 agent that they're not supposed to be calling you
9 anyway?
10 A.    Yes.
11 Q.    And did you hear the agent respond that "You
12 owe money.  What do you mean we're not supposed to
13 call you?  You have merchandise."  Did you hear the
14 agent say that?
15 A.    I heard him say something to that effect.
16 Q.    Okay.  Well, I'm looking at the transcript
17 right now, and obviously the audio recording is the
18 best evidence here.  But it shows, it says, "You owe
19 money.  What do you mean you're not supposed to -- we
20 are not supposed to call you?  You have merchandise."
21 How does that make you feel?
22 A.    Well, the same annoyed frustration from the
23 phone calls, with, you know, if he wanted the
24 merchandise, he could have come and got the
25 merchandise, you know, and left me alone.



Johnnie Williams vs Conn Appliances
Arbitration

190..193

Page 190

1 Q.    Okay.  And I notice that, you know, your
2 account seems to be getting a little bit further and
3 further delinquent?
4 A.    Yeah.
5 Q.    You know, were you struggling to make --
6 continue to make payments at this time?
7 A.    Yeah.  I was in a major struggle.
8 Q.    Okay.  Were you still trying to make your
9 payments?
10 A.    Yes.
11 Q.    All right.  The next --
12        THE ARBITRATOR:  Just a minute.
13        MR. HILL:  Yes, sir.
14        THE ARBITRATOR:  Okay.  Go ahead.  Thank
15 you.
16        MR. HILL:  Okay.
17 BY MR. HILL:
18 Q.    Mr. Williams, the next recording I'm going to
19 play for you is about -- a little less than two weeks
20 later on December 19th of 2016.
21        MR. HILL:  This was previously Bates
22 stamped Conn's-J Williams_000203.
23        (WHEREUPON, audio recording is played
24 into the record.)
25        THE ARBITRATOR:  What page?

Page 191

1        MR. HILL:  Page 63 of the transcript.
2        THE ARBITRATOR:  All right.  Thank you.
3 Go ahead.
4        (WHEREUPON, audio recording is played
5 into the record.)
6 BY MR. HILL:
7 Q.    Mr. Williams, the audio recording is
8 self-explanatory, but is that you that we heard on
9 the call there?
10 A.    Yes.
11 Q.    Okay.  And I'm going to play one more
12 recording for you from December 28th of 2016.
13        MR. HILL:  This was previously Bates
14 stamped Conn's-J Williams_000208.  This can be found
15 on page 64 of the transcription.
16        THE ARBITRATOR:  What's the date again?
17        MR. HILL:  It's December 28th of 2016.
18        THE ARBITRATOR:  Okay.
19        (WHEREUPON, audio recording is played
20 into the record.)
21 BY MR. HILL:
22 Q.    Mr. Williams, is that your voice that we
23 heard on that audio recording?
24 A.    Yes.
25 Q.    Okay.  And in this call, you tell the agent

Page 192

1 you don't feel good, you don't want to talk and
2 you're not supposed to be calling me.  Did Conn's
3 continue to call you after this conversation?
4 A.    I'm sure they did.
5 Q.    Okay.  Let me ask you this.  How did you get
6 the calls from Conn's to finally stop?
7 A.    The calls from Conn's did not stop until I
8 contacted Morgan & Morgan.
9 Q.    Okay.  You say when you contacted Morgan &
10 Morgan.  When did you first contact Morgan & Morgan?
11 A.    I believe it was -- I believe it was July.
12 Q.    Of what year, do you know?
13 A.    Of 2016.
14 Q.    Okay.  And as we've heard today, the calls
15 had continued after July of 2016, so what happened
16 after that?
17 A.    Well, Morgan & Morgan turned me down as far
18 as taking the case at first and...
19 Q.    Did you -- after your case was turned down by
20 Morgan & Morgan, did you follow up with them again?
21 A.    Yes, I did.  I got back with them in November
22 and they took it.
23 Q.    Okay.  And you may not know offhand, but do
24 you know when this lawsuit was filed on your behalf?
25 A.    January 2017.

Page 193

1 Q.    Okay.  And let me ask you this.  You know,
2 when you were receiving these calls from Conn's, you
3 know, between March of 2016 and January of 2017, were
4 you present in the United States at the time you
5 received these calls?
6 A.    Yes.
7 Q.    And did you ever use any sort of call
8 blocking app or anything like that to try to block
9 the calls from Conn's?
10 A.    No.
11 Q.    And why not?
12 A.    I didn't think about it.  I don't know if I
13 would have done it if I had thought about it.  I just
14 hoped that they would have the decency not to do
15 that.  It wasn't necessary.  Why would somebody want
16 to frustrate somebody like that?  I don't know.
17 Q.    Let me ask you this.  You mentioned a couple
18 of times today that you would recognize, you know,
19 some of the numbers that Conn's was calling you from.
20 You know, were they only calling you from one single
21 number?
22 A.    No.  There was plenty of numbers they would
23 call me from.  You know, after receiving the call
24 from this number or that number, it got to the point
25 when I could recognize the number or the way they



Johnnie Williams vs Conn Appliances
Arbitration

194..195

Page 194

1  were, the sequence that it would end, I could kind of
2  tell that it was Conn's calling.
3  **Q.    Okay.**
4  A.    And I didn't have no choice.
5        MR. HILL:  Can we just take a quick
6  five-minute break?
7        THE ARBITRATOR:  Sure.
8        (Short break.)
9      (WHEREUPON, the transcript continues in
10  Volume II.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 195

1              C E R T I F I C A T E
2
3  STATE OF TENNESSEE
4  COUNTY OF SHELBY
5
6
7        I, CANDACE S. COVEY, Licensed Court Reporter,
8  hereby certify that I reported the foregoing
9  deposition by machine shorthand to the best of my
10  skills and abilities, and thereafter the same was
11  reduced to typewritten form by me.
12        I further certify that I am not related to
13  any of the parties named herein, nor their counsel,
14  and have no interest, financial or otherwise, in the
15  outcome of the proceedings.
16        I further certify that in order for this
   document to be considered a true and correct copy, it
17  must bear my original signature and that any
   unauthorized reproduction in whole or in part and/or
18  transfer of this document is not authorized, will not
   be considered authentic, and will be in violation of
19  Tennessee Code Annotated 39-14-104, Theft of
   Services.
20
21
22
          CANDACE S. COVEY, LCR, RPR, CRR, CVR-CM
23        Notary Public State of Tennessee
24        My Notary Commission Expires:  02/17/2021
          LCR #145 - Expires:  6/30/2018
25



**Orange Legal**
**800-275-7991**

1       AMERICAN ARBITRATION ASSOCIATION

2   _____

3

    JOHNNIE WILLIAMS, JR.,

4

5           Claimant,

6

7

    vs.                          Case No.
8                                01-17-0001-5149

9

    CONN APPLIANCES, INC.,

10

11

            Respondent.

12  _____

13

14              ARBITRATION

15              JULY 23, 2018
                Volume II
16              (Pgs 196-372)

17

18

19

20

21

22

23  _____

24  Reported By: Candace Covey, LCR, RPR, CRR, CVR-RM

25



Page 196

```
 1              A P P E A R A N C E S
 2
 3
     For the Claimant:
 4
            MR. OCTAVIO "TAV" GOMEZ
 5      MR. SHAUGHN HILL
            MR. FRANK KERNEY,III
 6      Attorneys at Law
            Morgan & Morgan
 7      201 N. Franklin Street
            Suite 700
 8      Tampa, FL 33602
            slauredan@forthepeople.com
 9
10   For the Respondent:
11      MS. STEFANIE JACKMAN
            MR. DANIEL DELNERO
12      Attorneys at Law
            Ballard Spahr, LLP
13      999 Peachtree Street
            Suite 1000
14      Atlanta, GA 30309
            jjackmans@ballardspahr.com
15
            MR. ERIC TROUTMAN
16      MS. SUSAN MCDOWELL
            Attorneys at Law
17      Womble, Bond, Dickinson
            3200 Park Centre Drive
18      Suite 700
            Costa Mesa, CA 92626
19      (714) 557-3800
20
21
22
23
24
25
```

Page 197

```
 1              I N D E X
 2                                      Page
 3
     CLINT WALTON
 4   Direct Examination
     By Mr. Kerney                      217
 5   Cross Examination
     By Ms. Jackman                     301
 6   Redirect Examination
     By Mr. Kerney                      364
 7
 8
 9              E X H I B I T S
                                        Page
10   Exhibit 12                         226
            Reserving
11
     Exhibit 13                         226
12          Policies
13   Exhibit 14                         250
            Latitude history
14
15
16
17
18
19
20
21
22
23
24
25
```

CLINT WALTON
Direct Examination
By Mr. Kerney — 217
Cross Examination
By Ms. Jackman — 301
Redirect Examination
By Mr. Kerney — 364

Exhibit 12 — 226 Reserving
Exhibit 13 — 226 Policies
Exhibit 14 — 250 Latitude history

Page 198

```
 1              * * *
 2
 3      THE ARBITRATOR:  Okay.  Mr. Hill?
 4      MR. HILL:  Okay.  Yeah.  Mr. Harris,
 5  before we get started, we have a -- Mr. Williams'
 6  cell records here that we would like to enter as
 7  Exhibit 12.  I can represent to you that Mr. Williams
 8  and I, this is a highlighted copy of his records.
 9  We've gone through and cross referenced the calls
10  from the Noble report with his cell records.
11      We've come up with a call count.  You know,
12  with this being arbitration, we feel this is the
13  easiest way to establish a call count showing that
14  the calls had passed through the network and ended up
15  at his cell phone.  And respectfully, we'd like to
16  admit this as an exhibit as opposed to sitting here
17  with Mr. Williams tonight going through every single
18  call with him and getting a count.  I'm happy to have
19  him verify that these are his records, that we went
20  through them together.  But I think for our purposes,
21  this is the easiest way to identify the total number
22  of calls that were placed from Conn's to
23  Mr. Williams' cell phone and that passed through the
24  network.
25      MS. JACKMAN:  What are those records?  I
```

Page 199

```
 1  just can't see.  I've never seen this before.
 2      MR. HILL:  Sure.  And it's something we
 3  have not provided to you previously.  It was work
 4  product.  We're happy to provide you a copy via
 5  e-mail.
 6      MR. KERNEY:  And let me just throw out
 7  that in those records, you know, one of the things
 8  that's tough is we're not seeking damages on every
 9  call.  Right?  The calls that are manually made, we
10  would not be seeking damages on because those aren't
11  made from a predictive dialer.  So what's going to
12  happen is that these records are going to reflect
13  approximately 40 calls more than we believe are
14  actionable.  So this will demonstrate that there are
15  1,158 calls that were received by the network, made
16  by Conn's and received by the wireless network.  We
17  wouldn't be seeking damages on all those calls.
18  We're just introducing them for the purpose of
19  showing the 1,118 calls we are seeking damages on,
20  were in fact received.
21      THE ARBITRATOR:  1,118?
22      MR. HILL:  Yes.
23      MR. KERNEY:  Yes, sir.
24      THE ARBITRATOR:  And Ms. Jackman, you
25  have not seen this?
```



Johnnie Williams vs Conn Appliances
Arbitration

200..203

1       MS. JACKMAN:  No.  I've never received
2   anything highlighted.  This is not the best evidence
3   of this.  We have account notes, it's curious we've
4   used in every other arbitration, but we're now using
5   today.  And Mr. Kerney just said there's highlighted
6   in here 50 more calls than they want.  So yes, I
7   object to this as completely unreliable evidence.
8   Not the best evidence.  Not previously provided.  It
9   was admitted as work product.  And I don't think it's
10  sufficient or appropriate proof in this case.
11      MR. KERNEY:  Mr. Harris, let me just add.
12  Again, the 50 more calls are reflected on their
13  report.  Those calls are just reflected as manual
14  calls.  And again, we're not seeking damages on those
15  calls.  We're conceding that --
16      MS. JACKMAN:  Are they highlighted in the
17  exhibit you're showing?
18      MR. KERNEY:  Absolutely.  It's showing
19  every call.
20      MS. JACKMAN:  Okay.  We have account
21  notes that show all the calls that you -- we use in
22  every other case.
23      THE ARBITRATOR:  We're going to -- now,
24  y'all, this is like some of our earlier phone calls.
25  We're going to talk one side at a time.

1       MR. KERNEY:  Okay.
2       THE ARBITRATOR:  All right.
3       MR. KERNEY:  So our --
4       THE ARBITRATOR:  Mr. Kerney?
5       MR. KERNEY:  Yes.  Yes, sir.
6       THE ARBITRATOR:  Do you want to speak
7   with regard to these records?
8       MR. KERNEY:  Sure.
9       THE ARBITRATOR:  Okay.
10      MR. KERNEY:  So these records have been
11  cross-referenced with Conn's own report.  Conn's
12  report that showed all the calls that were quote,
13  unquote, attempted, as Conn's calls it, by their
14  system.  So every time their phone system dialed a
15  call to our client's cell phone number, the system
16  made a record of it.  And we've marked that as
17  Exhibit 3, and we've called it the Noble report.  We
18  cross referenced that with our client's cell phone
19  records.  To show that our client did in fact receive
20  a certain number of phone calls, we have highlighted
21  those calls on his records.
22      All we've done is made a demonstrative
23  exhibit showing that the calls that are reflected as
24  made by their system were received by our client.
25  Again, the best evidence in our opinion is the Noble

1   report.  Because it shows every call that Conn's
2   attempted to make to the cell phone number in
3   question.  We simply just cross-referenced his cell
4   phone records to show yes, he did in fact receive
5   those telephone phone calls.
6       MR. TROUTMAN:  Can we go off the record
7   for a second?
8       MR. KERNEY:  Sure.
9       THE ARBITRATOR:  Yes.
10      (Off-the-record discussion.)
11      THE ARBITRATOR:  Okay.  So, where were
12  we?  We have records that the claimant would like to
13  submit that the respondent has not had an opportunity
14  to review.  And what I would like for the parties to
15  do this evening is to take whatever time is necessary
16  to review these records and see if they're consistent
17  with other documents that are in the record, and if
18  there is a continuing objection as to those.  And the
19  parties' lawyers can discuss what's in those records,
20  what they are relying upon, and the 40 or so that
21  maybe they're not relying upon.  So I would like for
22  y'all to do that this evening.
23      I'm told in our off-the-record discussion
24  that there was agreement that Mr. Walton's testimony
25  could be today, and I'm prepared to hear that as late

1   as that requires.
2       MR. GOMEZ:  And if I may interrupt, we
3   did say we were going to try to get Mr. Walton.
4   Clearly this went a lot longer than we anticipated.
5   It's not like we have, you know, the case is set for
6   two days.  Mr. Delnero will still be here.  This
7   hearing has been set for a long time.  I think either
8   one of the three lawyers that will remain here can
9   also defend or direct Mr. Walton.
10      So even though Ms. Jackman did say, "well,
11  I'm going to do these two witnesses," we said "well,
12  look, we can try to get everybody in."  I thought it
13  was a chance we could maybe get everybody today.
14  Unfortunately these hearings don't always go as
15  smooth as they can.  So I just want to make sure you
16  understand what --
17      MS. JACKMAN:  So may I add some
18  information to that for clarity, please?
19      THE ARBITRATOR:  Sure.
20      MS. JACKMAN:  We raised this two weeks
21  ago.  I never thought there was a conflict that could
22  take over from a trial.  But we had planned from the
23  beginning to have Mr. Troutman take care of our
24  expert.  So when we raised it, it was because I
25  cannot be here tomorrow.  We went forward.



Johnnie Williams vs Conn Appliances
Arbitration

204..207

Page 204

1        THE ARBITRATOR:  Right.
2        MS. JACKMAN:  Last Wednesday, so after
3  you ruled on that conflict, Mr. Kerney requested a
4  scheduling call with myself and Daniel, and we had
5  one.  During that call, I made very clear there was
6  nothing I could do.  My flight is at 6 a.m. tomorrow.
7  I made very clear that I was responsible for the
8  cross of Mr. Williams and the direct of Mr. Walton.
9  I was requested by Mr. Gomez during that call to get
10  Mr. Sorini here, our expert, if I could today,
11  because it would go so fast, and I said well, we had
12  previously discussed that in order to not, you know,
13  keep costs under control and not have Mr. Sorini
14  here, who is a testifying expert, more than we wanted
15  that we understood they were fine with everyone just
16  agreeing he'd go Tuesday morning for scheduling.
17  They reaffirmed that was fine.  We moved forward with
18  the rest of that.
19        Yesterday I had the pleasure of seeing
20  Mr. Gomez at the airport, and as we were standing in
21  the baggage claim, he reiterated how fast he thought
22  this would go.  I apologized that I couldn't get
23  Mr. Sorini here and again appreciated their
24  willingness to have him tomorrow.  And then we talked
25  about how we might actually have some time tonight to

Page 205

1  relax and see Memphis.
2        We have asked a total of two questions in
3  this hearing.  Everyone knows that I will not be here
4  tomorrow, and you need to understand -- I understand
5  there looks like there's a lot of help.  I am the
6  lead counsel in this matter.  Mr. Delnero is my
7  associate.  This is Mr. Troutman's first case with
8  me, and it would be the first case he directs
9  Mr. Walton.  Mr. Walton is critical.  I have directed
10  him in five prior hearings, prepared him for three
11  prior depositions.  And I flew in yesterday at noon
12  and spent yesterday afternoon and evening preparing
13  him.
14        We request the following, because this is
15  absolutely unacceptable.  They knew what their
16  presentation would be, and nothing we've asked today
17  or done has changed the fact that they were going to
18  -- I noted when they started with Mr. Williams and it
19  was at 1 p.m., nothing changes how long they knew it
20  would take to play their call recordings, present
21  that testimony.  This is the first I've heard of it.
22  It is directly contrary to what I heard, what I
23  prepared on.
24        So here's what we would like.
25  Notwithstanding that I'm supposed to be crossing

Page 206

1  Mr. Williams, we would like to table that until
2  tomorrow morning, and Eric will handle that as he has
3  been here and heard his testimony.  And Mr. Troutman
4  is an experienced trial lawyer and an experienced
5  lawyer, he can do that.
6        But as to Mr. Walton, I request they be
7  limited to 30 minutes, and I will do my very best,
8  because I've seen them go several hours, I will do my
9  very best to limit my testimony, which would not just
10  be the cross but also we attempt to just get it all
11  done for efficiency, to an hour.  To ensure that that
12  happens today.
13        Because I've already even checked flights.
14  There's no option.  There's no one that can cover for
15  me.  I'm presenting to a board of people that have
16  been flown in from Mexico and Spain.  And then I'm
17  prepping 24 executives for an imminent and extremely
18  sensitive regulatory investigation that's beginning.
19  And I swear to you that this conflict came up when we
20  disclosed it to you.
21        And I apologize.  There is no one else that
22  can do it.  My associate on that case is Mr. Delnero.
23  He's flying home tomorrow night and driving up to
24  where we are to be there at 8 a.m. to help me finish
25  on Wednesday everything.  So I am extremely

Page 207

1  prejudiced by their conduct and the way they've
2  presented, and I don't see what was unanticipated
3  about this.
4        MR. KERNEY:  Mr. Harris, I think we can
5  accommodate Ms. Jackman.  I don't know.  I think
6  there's some confusion here.  We can -- if that's the
7  situation, we can accommodate her, but we certainly
8  can't be limited to 30 minutes of direct for
9  Mr. Walton.  I mean, obviously he's a key witness to
10  this case.  He's a senior manager of compliance for
11  Conn's Appliances, and she's previously seen us take
12  hours taking testimony from him.  So it's not fair
13  for us to be limited to 30 minutes when we're set for
14  a two-day hearing and Conn's is anticipating calling
15  Adam Sorini tomorrow who might testify for
16  30 minutes.
17        MS. JACKMAN:  Well, it's not fair for
18  Mr. Troutman to jump in after I spent and have spent
19  a lot of time --
20        MR. KERNEY:  But we -- Mr. Harris said --
21  and look, let me just say this.  Today, I thought
22  when we were coming in here, we were leaving at four
23  o'clock today.  So the fact that can we stay here
24  late is great.
25        MS. JACKMAN:  How is that even possible



Page 208

1  with the amount of time each of those recordings
2  played?  I wasn't asked to stipulate that the
3  recordings should just come in.
4           MR. KERNEY:  So I thought that --
5           MS. JACKMAN:  How is that even possible?
6           THE ARBITRATOR:  Okay.  Well let's --
7           MS. JACKMAN:  We've asked you questions.
8           MR. KERNEY:  So anyway, my point is, we
9  can keep going.  And we can finish up with
10  Mr. Williams, and then we can jump into Mr. Walton
11  if you guys are willing to stay.  It's five o'clock.
12  We can do what we need to do and go to eight o'clock
13  at night.  It doesn't matter to me.  I just thought
14  for everybody's sake it might be better to do it
15  tomorrow.
16       I certainly don't want to break up the
17  testimony of my client and the cross and give -- no
18  offense -- but give Eric an extra night to go prepare
19  to cross-examine my client, right?  I want him to do
20  that right now.  And I want to have a fair
21  opportunity to take testimony from Mr. Walton.  But
22  we can accommodate you, the fact that you're here --
23          MS. JACKMAN:  Well then, here's what we
24  need to think about because we actually, believe it
25  or not, have some work to do tonight, namely our

Page 209

1  expert lands at 5:30, and we're working with him.
2  Mr. Troutman is using that as his prep time.  So do
3  we want to just press pause on everything?  And I
4  don't know how they want to accommodate this.  And
5  they created this situation.  We've asked two
6  questions.  We're on this record for maybe five
7  minutes.
8           THE ARBITRATOR:  Well, first of all, it
9  is now fortuitous that I'm -- we didn't have to stop
10  at four o'clock.  But it is kind of hard to
11  understand how all those recordings could have
12  possibly moved any faster.  I don't think any of us
13  caused that delay.  We listened to every word of it.
14          MR. GOMEZ:  The expert, Mr. Hansen, as
15  you know, as we've really little limited the portion
16  regarding the not random or sequential.  That, I
17  thought would taking 40 minutes based on the
18  objection regarding, you know, whether or not he was
19  qualified as an expert or --
20          THE ARBITRATOR:  I --
21          MR. GOMEZ:  -- that might have taken
22  another -- I took an extra hour and a half maybe that
23  it wouldn't have --
24          THE ARBITRATOR:  Maybe, but that -- I
25  don't think any objection contributed much to the

Page 210

1  time it took for Mr. Hansen's testimony.  Okay.  What
2  can we do?  We can still set aside this issue about
3  these documents.  You've not had an opportunity to
4  review them.  I want you to have an opportunity to
5  review them.  We can -- it seems to me, if you only
6  have one or two more questions for Mr. Williams,
7  then...
8           MR. HILL:  My only questions for
9  Mr. Williams were related to those documents.
10  Outside of that, they're welcome to start their
11  cross.
12          THE ARBITRATOR:  Okay.  And then we could
13  do that.  And let's see...
14          MS. JACKMAN:  We believe it's critical
15  for you to hear from Mr. Walton today.
16          THE ARBITRATOR:  Well, yeah.  I mean --
17          MS. JACKMAN:  And that's what we
18  understood would happen, and we would be done by
19  4 p.m.
20          THE ARBITRATOR:  Right.  Right.  But can
21  we still accomplish that?  Can we have the
22  cross-examination of Mr. Williams and all the
23  testimony of Mr. Walton this evening?
24          MS. JACKMAN:  We can if they're limited.
25  They've chosen how to use what's going on now eight

Page 211

1  hours of testimony, that under the contract my client
2  is covering and we've used -- my opening was -- let's
3  call it 15 minutes.
4           THE ARBITRATOR:  Well, I --
5           MS. JACKMAN:  We're under a half hour.
6  They can be limited so we have some time.
7           THE ARBITRATOR:  I don't know how anybody
8  can --
9           MR. HILL:  Mr. Harris, respectfully --
10          THE ARBITRATOR:  We've already been long
11  about how long it's taken for witnesses so far.  So
12  we might be right, we might be wrong about how long
13  Mr. Walton's testimony might take.  The point is, we
14  can go as long as we can go with completing
15  Mr. Williams and hearing the testimony from
16  Mr. Walton this evening.  That still leaves your
17  expert for tomorrow which is what we've expected.
18          MS. JACKMAN:  We may need additional time
19  then if Mr. Troutman is here who will be closing
20  tomorrow because I'm not here.  So he needs to hear
21  the testimony, and he needs time to prepare his
22  witness.  So we may need to think about how we start.
23          THE ARBITRATOR:  Maybe we don't start at
24  nine.  Maybe we start --
25          MR. KERNEY:  At noon.



Johnnie Williams vs Conn Appliances
Arbitration

212..215

Page 212

1     THE ARBITRATOR:  At some other time.
2     MR. TROUTMAN:  At a minimum, can we move
3  on to Mr. Walton's testimony and reserve the cross
4  examination with inclusion?  Because I do agree, it's
5  critical that Ms. Jackman have the opportunity to
6  direct Mr. Walton.  That's pretty intense testimony.
7     THE ARBITRATOR:  That seems like a
8  practical solution.  Any reason why your client --
9  he's going to be with us through the duration.  If we
10 could get this --
11    MR. KERNEY:  If that's going to resolve
12 the issue, that's fine.
13    THE ARBITRATOR:  Well, it's a step.
14    MR. KERNEY:  Yeah.  I mean, look.  We're
15 -- I'm sorry it took so long.  We're not trying to
16 stonewall anyone.  It's just, it's a lot of stuff, a
17 lot of material.  So why don't we just -- that sounds
18 like a great solution.  Why don't we table
19 Mr. Williams.  I'm sure Mr. Troutman can prepare to
20 do that tonight and prep his witness.  And then we
21 can move on to Mr. Walton.
22    THE ARBITRATOR:  All right.
23    MR. KERNEY:  We don't have an objection
24 if you need to leave early to go hang with your
25 witness.

Page 213

1     MS. JACKMAN:  He can't leave early.  He's
2  doing the closing tomorrow.
3     THE ARBITRATOR:  Okay.  Well, why don't
4  we move forward with Mr. Walton, and then we'll let
5  you -- at that point, we'll let you have maybe the
6  first word about when you'd like to start tomorrow.
7  I mean, THE assembling all of us back together in a
8  -- this is not -- that's not where we want to go.  I
9  mean, that's fine for me and Mr. Williams, but for
10 every one of the rest of you, the cost of that is
11 crazy.  And so...
12    MS. JACKMAN:  We've had to do it before.
13 Yes, we agree.
14    THE ARBITRATOR:  I think we can go
15 forward with Mr. Walton.  And then we'll see where we
16 are whenever that winds up.  And -- but not impose
17 some limit because we don't know whether that's going
18 to work or not.  And then you can tell us when you
19 think you can be available, having met with your
20 expert tomorrow.
21    MR. TROUTMAN:  Okay.
22    THE ARBITRATOR:  And, so okay.  Is there
23 any other questions that you want to ask of
24 Mr. Williams at this point?
25    MR. HILL:  On direct, not at this time.

Page 214

1  No, sir.
2     THE ARBITRATOR:  All right.  And by the
3  way, somehow before we get to the end of this, they
4  need to have an opportunity to go through these
5  records.  So have you given them a copy?
6     MR. GOMEZ:  I'm going to go ahead and
7  e-mail them right now.  And you know what, I can make
8  a color copy.
9     THE ARBITRATOR:  Give them a real set.
10    MS. JACKMAN:  Yeah.  A single copy would
11 be fine too.  We are all able to work together.
12    MR. GOMEZ:  I'll get that down while Mr
13 --
14    THE ARBITRATOR:  Wait a minute.  Who can
15 do that for you?
16    MR. GOMEZ:  I'll do it.  There's a FedEx
17 right nearby.  We'll just get it, he only needs two
18 seconds --
19    THE ARBITRATOR:  No, no, no, no.  We'll
20 run it through our copier.  Come on.
21    (Short break.)
22    THE ARBITRATOR:  So as I understand where
23 we are in order to do our best to accommodate
24 everyone's schedules, we're going to defer or hold in
25 abeyance the cross-examination of Mr. Williams until

Page 215

1  tomorrow, correct?
2     MR. KERNEY:  Yes, sir.
3     THE ARBITRATOR:  And we are going to go
4  forward with the rest of the claimant's proof,
5  including the calling of Mr. Walton.  And when that
6  concludes, then I think the respondents will then
7  offer testimony from Mr. Walton.  And we're going to
8  do our best to do that this evening as efficiently as
9  we can, particularly from -- if we can from the
10 claimant.  So that they'll have the time they need so
11 that he can travel.  When do you leave?  Tonight,
12 tomorrow?
13    MR. WALTON:  I was planning on being here
14 tomorrow based on --
15    MS. JACKMAN:  He's the corporate
16 representative so he's --
17    THE ARBITRATOR:  Oh, yeah.  So you are
18 going to be here.  But I'm sorry.  It's Ms. Jackman
19 --
20    MS. JACKMAN:  That's okay.
21    THE ARBITRATOR:  -- that has to get on a
22 plane at 6 a.m.
23    MS. JACKMAN:  Yes.
24    THE ARBITRATOR:  Or whatever it is.
25 Where do you have to go?



Page 216

1    MS. JACKMAN:  I'm going -- I can't tell
2 you where exactly because you'll figure out who's in
3 trouble, but it's in South Carolina.
4    THE ARBITRATOR:  That's okay.
5    MS. JACKMAN:  How about that?
6    THE ARBITRATOR:  I don't care.
7    MS. JACKMAN:  There aren't many.
8    THE ARBITRATOR:  That's hard to get from
9 here.  First thing you have to go to Atlanta, right?
10    MS. JACKMAN:  I am connecting through
11 Atlanta, yes.
12    THE ARBITRATOR:  Yeah.  Okay.  All right.
13 Then okay.
14       *  *  *
15    CLINT WALTON,
16 was called as a witness and having first been duly
17 sworn testified as follows:
18    DIRECT EXAMINATION
19 QUESTIONS BY MR. KERNEY:
20 Q.    Mr. Walton, you understand you're being
21 presented here today as Conn's corporate
22 representative, correct?
23 A.    I do.
24 Q.    Okay.  And please tell us your current job
25 title with Conn's.

Page 217

1 A.    Senior manager of compliance.
2 Q.    And as the senior manager of compliance, what
3 are the duties associated with that position?
4 A.    My responsibilities are specific to policy,
5 procedure, training, quality assurance, assisting our
6 operation teams when we think in context of customer
7 disclosures, albeit point of sale, media, radio, TV,
8 internet to cover our credit operation.
9 Q.    Okay.  And in terms of outbound collections,
10 what are your job responsibilities?
11 A.    To provide the policy procedure with those
12 team members, work in accordance with the operation
13 team members to make sure that we've met the
14 guidelines that we've put in place.
15 Q.    And how long have you served in that position
16 for?
17 A.    Since 2011.
18 Q.    And how long have you been with Conn's for in
19 total?
20 A.    Two decades now.  1997 is when I hired in
21 with Conn's.
22 Q.    Now, prior to today, I assume you've reviewed
23 the account in question belonging to Mr. Johnnie
24 Williams?
25 A.    Yes, sir.

Page 218

1 Q.    Okay.  And in reviewing your account, I'm
2 sure you've familiarized your with the audio
3 recordings and the account history, correct?
4 A.    Yes, sir.
5 Q.    Okay.  And you're aware of Conn's collection
6 policies and procedures?
7 A.    I am.
8 Q.    And in many instances, you actually helped
9 author those policies and procedures; is that
10 correct?
11 A.    Over time.  Yes, sir.
12 Q.    Okay.  We're here today to discuss calls to a
13 phone number, (901) 319-6319.  Is that your
14 understanding?
15 A.    Yes, sir.
16 Q.    Okay.  But I'm going to call that the
17 claimant's cell phone number moving forward.  If we
18 need to talk about any other telephone number, we'll
19 address it in full.  Now, in your review of this
20 account, are you aware of Conn's sending text
21 messages to the claimant's cell phone number at any
22 point in time?
23 A.    I am.
24 Q.    All right.  And so Conn's only sends text
25 messages to cell phone numbers; is that correct?

Page 219

1 A.    Yes, sir.  That's correct.
2 Q.    Okay.  So Conn's believed the claimant's
3 telephone number to be a cellular telephone number,
4 correct?
5 A.    Yes, sir.
6 Q.    Okay.  Tell us what business Conn's is
7 primarily engaged in.
8 A.    We are a retailer.  Been a retailer since
9 1890.  Started our credit operation in 1965, when at
10 that time, it was a lockbox underneath the cash
11 register before we incorporated as a company.  And
12 since 1965 predominantly, we have operated as a
13 retail installment sales contract.  It's called a
14 registered creditor in many of the states versus a
15 lender.  Until in 2016 when we started introducing
16 credit products that were traditional loan products.
17    And our primary business as a retailer is
18 such that we have our in-house credit operation where
19 we provide YES MONEY financing, is our trademark to
20 customers that predominantly will not be able to
21 obtain credit at some of our competitors in the
22 various markets that we sell related to the
23 merchandise such as TVs, furniture, appliances,
24 things of that nature.  So yes, sir.  Predominantly
25 we are a retailer that offers in-house credit.



Johnnie Williams vs Conn Appliances
Arbitration

220..223

Page 220

1   Q.    And Conn's is publicly traded today, correct?
2   A.    We are.  Yes, sir.
3   Q.    You have approximately 4500 employees?
4   A.    That's correct.  Yes, sir.
5   Q.    And that's in all operations from management
6   to retail store employees to collections, everybody?
7   A.    That's everyone included.  Yes, sir.
8   Q.    Okay.  I want to talk today about outbound
9   calls that Conn's made to the claimant's cell phone
10  number.  And I would call those collection calls.
11  Would you call those collection calls as well?
12  A.    We are making collection attempts to
13  Mr. Williams in this case.  Yes, sir.
14  Q.    Okay.  Yeah.  I want to use the terminology
15  that would you use in-house, so if at any point in
16  time I refer to a document as a Noble report and you
17  would call it something different, let me know.  And
18  I will try to use the right term.
19  A.    Okay.
20  Q.    So you agree with me that Conn's' records
21  show that Conn's attempted over 1100 calls to the
22  claimant's cell phone number?
23  A.    As I recall, the number was over a thousand.
24  Not -- I don't know the 1100 that you mentioned
25  specifically but somewhere in a thousand.  Yes, sir.

Page 221

1   Q.    Okay.  And Conn's made those 1,000-plus phone
2   calls from a period between approximately March of
3   2016 and January of 2017; is that correct?
4   A.    Yes, sir.  That covers the date range.
5   Q.    Okay.
6         THE ARBITRATOR:  Say that again.  What
7   dates?
8         MR. KERNEY:  Between March of 2016 and
9   January of 2017.
10        THE ARBITRATOR:  Okay.  Thank you.
11  BY MR. KERNEY:
12  Q.    And so all of those calls would have been
13  outbound collection calls, correct?
14  A.    Yes, sir.  For Mr. Williams and our attempt
15  to contact Mr. Williams, it was in response to his
16  account, his Conn's account being past due.
17  Q.    You would agree that those calls were not
18  made for an emergency purpose, correct?
19  A.    No, sir.
20  Q.    Okay.  And those calls are all made by your
21  own in-house agents, not a third party vendor,
22  anything like that?
23  A.    Those are Conn's employees.  Yes, sir.  No
24  third party.
25  Q.    And I understand you have call centers in

Page 222

1   both the U.S. and the Philippines today; is that
2   accurate?
3   A.    Today.  Yes, sir.
4   Q.    During the time when the calls were made to
5   Mr. Williams back March 2016 through January 2017,
6   would those calls have all been made from the U.S.
7   call centers?
8   A.    As I recall, looking at Mr. Williams' call
9   records in Latitude, I believe all of those would
10  have been state-side.  I didn't see an indication by
11  the employee numbers that we had any of the
12  associates as an example in the Philippine office.
13  Q.    Okay.  Now, in your call centers, you have
14  how many U.S. call centers?
15  A.    We have four.  Four total.
16  Q.    Okay.  Where are they located?
17  A.    That would be Beaumont, Texas.  San Antonio,
18  Texas.  We have Phoenix, Arizona.  We have St. Jo,
19  Missouri.
20  Q.    Okay.  You have about 850 agents employed in
21  those call centers, correct?
22  A.    In total.  Just to be clear, as you mentioned
23  earlier, we have a few that are offshore.  So in
24  total, 850.
25  Q.    Okay.  Those 850 agents, my understanding,

Page 223

1   they make approximately 600,000 outbound calls per
2   day.  Is that number accurate still today?
3   A.    Yes, sir.  Right in the same average that we
4   see in the daily, about 300,000 to 330,000 past due
5   customers at least one day past due.
6   Q.    Okay.  So you have total active customer
7   accounts, approximately how many?
8   A.    Today just under 700,000 active customers.
9   Q.    Okay.  And between 300- and 330,000 of those
10  are delinquent in any given month?
11  A.    On any given day, at least one day past due.
12  Yes, sir.
13  Q.    Okay.  And those are the folks that you're
14  placing these 600,000 calls to every day?
15  A.    Yes, sir.  That would be the group of
16  accounts.
17  Q.    Okay.  Now, pursuant to Conn's own internal
18  policies and procedures, my understanding is you
19  don't have a cap as to the maximum number of calls
20  you'll make to a borrower in a single day; is that
21  true?
22  A.    That's correct.  Yes, sir.
23  Q.    Okay.  And my understanding is, you begin
24  collection calls as soon as one day after a missed
25  payment occurs.  So if a payment is due on



Johnnie Williams vs Conn Appliances
Arbitration

224..227

Page 224

1 January 1st, Conn's will begin collection calls on
2 January 2nd; is that correct?
3 A.     That can happen.  Not in every situation.
4 But it can.  And we do make phone calls from time to
5 time that early.  Predominantly before, in most of
6 our states, late fees start assessing around ten
7 days, and we try to make an early attempt before that
8 late fee assessment occurs.  So you may have seen for
9 Mr. Williams, for example, where we may have called
10 at day 3 or day 4.  It just depends based on
11 management's direction.
12 Q.     Okay.  Now, you have Telephone Consumer
13 Protection Act policies and procedures in effect to
14 ensure compliance; is that correct?
15 A.     We put those in place after July of 2015 as
16 an abundance of caution.
17 Q.     Okay.  Let's take a look at those real quick.
18       MR. KERNEY:  I have a set for you as
19 well.  Do you have a set for Arbitrator Harris?
20       MR. HILL:  Yeah.  Absolutely.
21       MR. KERNEY:  We're going to ask to mark
22 this as our next exhibit which will be potentially
23 13.  And we'll move to introduce those.  I think 12,
24 we were reserving.
25       MS. JACKMAN:  Yes.  We're reserving 12.

Page 225

1       MR. KERNEY:  Is that okay if we reserve
2 12?
3       MS. JACKMAN:  Sure.
4       (WHEREUPON, the above-mentioned document
5 was marked as Exhibit Number 13.)
6       THE ARBITRATOR:  Okay.  I have it.  Do
7 you need it back?
8       MR. KERNEY:  No, no.  That's a copy for
9 you.
10       THE ARBITRATOR:  Okay.
11 BY MR. KERNEY:
12 Q.     So Mr. Walton, have you seen this series of
13 documents before?
14 A.     Yes, sir.
15 Q.     What are these documents?
16 A.     This is telephone handling, phone status
17 handling.
18 Q.     Okay.  And were these the policies in effect
19 during the relevant period, March of 2016 through
20 January of 2017, when Conn's was making calls to
21 Mr. Williams?
22 A.     The relevant documents would start, for this
23 period of time, starting with document at the bottom
24 right-hand corner, number 2608 and then taking us
25 through to 2614.

Page 226

1 Q.     Okay.  So let's start on 2608.
2 A.     Okay.
3       MS. JACKMAN:  Can we hold on for one
4 minute?
5       MR. KERNEY:  Sure.
6       MS. JACKMAN:  If he just testified the
7 relevant documents are that range, can we remove from
8 the exhibit the prior ones since he said they're not
9 relevant?
10       MR. KERNEY:  I'm going to come back to
11 them, so we'll see.
12       MS. JACKMAN:  Okay.  I'll reserve my
13 objection.
14       MR. KERNEY:  Okay.
15 BY MR. KERNEY:
16 Q.     So I'm looking at the page Bates stamped
17 2608, and the heading here is "Telephone Handling
18 Procedure, Stop Call Request and TCPA Status."  Can
19 you tell me what this document is?
20 A.     Yes, sir.  Exactly -- we try to title things
21 as close to the procedure that we can.  So this
22 indeed is a telephone handling procedure.  And the
23 introduction of the last portion of the title, TCPA
24 status.  This is the time period that we installed
25 the Compliance Appliance call server for Noble, which

Page 227

1 at the time it was actually titled TCPA Solution.
2 And that's where you see the title TCPA.  This is in
3 reference to that solution.
4       And then the training and handling of calls
5 as it relates to agents that work in that system, but
6 then encompassing in general when we speak to a
7 customer based on their phone number that we reached.
8 And then the ending result, how agents can approach
9 those particular scenarios.  So it's a broad
10 document.
11 Q.     Okay.  So I'm reading the first paragraph
12 here.  "Because of TCPA regulations, Conn's enacted
13 policies regarding how cell phone numbers are handled
14 on customer accounts.  The cell phone policy was
15 implemented to ensure that we obtain permission from
16 the customer in order to call their cell phone
17 numbers."  I'm looking down now at the chart here
18 that's at the bottom.
19 A.     Okay.
20 Q.     And it's -- to me it's like, I guess, a
21 matrix, and this shows different scenarios where your
22 agents are supposed to handle an account differently
23 based on requests from different individuals.  Is
24 that an accurate depiction of that graph at the
25 bottom?



Page 228

1  A.     Yes, sir.
2  Q.     Okay.  So I'm looking at the first kind of
3  portion here.  At the top I see RPC.  What does that
4  stand for?
5  A.     That's abbreviated for right party of
6  contact.
7  Q.     Okay.
8  A.     For us, that means the customer.
9  Q.     Okay.  This is a policy here for if Conn's
10 reaches a right party or a customer, what should
11 happen with regards to the disposition of certain
12 calls; is that correct?
13 A.     Yes, sir.
14 Q.     Okay.  So I'm looking at the first column
15 there or the first row there rather, is customer
16 request.  And the first column says "stop calling."
17 My reading of this is that the phone status should
18 change to cease.  What does that mean?
19 A.     We have phone status designations within
20 Latitude, and the cease designation says that
21 particular phone number, when it's marked as cease,
22 will stop and prevent any additional phone calls or
23 contact wherever that phone number may be associated.
24 As an example, if it's associated to ten additional
25 customer accounts, then by an agent marking it as

Page 229

1  ceased, it will then from our credit system team, we
2  would actually recognize that and transfer that same
3  status to the additional ten accounts.  That's what
4  that means.
5  Q.     Okay.  And then I see, "the agent should
6  honor the request," which I assume means to honor the
7  stop calling request?
8  A.     That actually just going vertical, it reads
9  "honor request and TO to manager."
10 Q.     Okay.  What is "TO manager"?
11 A.     Turn over or take over.  It means to identify
12 the call to a manager and ask the manager to come in.
13 Q.     So then it says "manager follow plus seven
14 days."  What does that mean?
15 A.     That's the actual follow-up date.  We have
16 the ability, I think you heard a few of our agents on
17 calls earlier for Mr. Williams, where we were
18 explaining that we could move out the phone calls.
19 It's called a follow-up date.  And we have the
20 ability to actually move out the phone calls for a
21 followup with a customer.
22 Q.     Okay.  So if a customer says "stop calling,"
23 your agent should change the phone status to cease,
24 and transfer the call to a manager.  And the manager
25 should then follow-up with a phone call within seven

Page 230

1  days; is that accurate?
2  A.     No, sir.
3  Q.     Okay.  Tell me what should happen there.
4  A.     No, sir.  While the agent is on the call with
5  the customer, the agent is to identify and either
6  raise their hand or put the call on mute and ask for
7  the assistance of a manager.  And have the manager
8  come over and take the call.  And then have the
9  manager speak with the customer and actually identify
10 and validate what the request would be.  And then in
11 that particular instance, at the end of the phone
12 call, the follow-up date would be moved out for seven
13 days.
14        And what's real important in that particular
15 scenario and why you see as we look at landlines in a
16 bit, this is a really benchmark change for us at
17 Conn's relative to August 2015, specific to the
18 July 2015 order.  Related to our policies before and
19 after the declaratory order in July 2015.  And our
20 customers historically and even today, when they've
21 made a request to make a change to their phone
22 contact, we want to make sure that we're actually
23 validating that information.  And that's why again,
24 we would ask for a manager to come in.
25        So it's not actually a transfer from an agent

Page 231

1  to a manager.  But actually physically asking them to
2  come over and what we call tie into, they can
3  actually tie into the phone call with their headset.
4  Q.     Great.  Let's talk about the next column
5  there.  "The customer requests stop calling and hangs
6  up.  The phone status should be changed to 'do not
7  use,' and the agent should honor the request."  Tell
8  me what that means.
9  A.     In that particular instance, when the agent
10 has had the ability to, you know, ask some
11 identifying information, we have the ability to
12 actually mark the phone as "do not use."  And a "do
13 not use" designation simply means that it marks that
14 phone number out of the main Noble Solution system
15 and allows future calling in a manual status.
16        Some years ago, we had a desk phone much like
17 what we have here on this table.  Or now we have the
18 ability to call through our Compliance Appliance.
19 But that's what the "do not use" means.  All right.
20 And then lastly, "do not use" is a one-to-one
21 relationship.  That phone number specifically on that
22 account when it's marked as "do not use," unlike
23 "cease," it's only on that one account.  So if a
24 customer happened to have multiple phones --
25 Q.     Sure.



Johnnie Williams vs Conn Appliances
Arbitration

232..235

Page 232

1   A.      Or excuse me -- that same phone number on
2   multiple accounts, the agent would have to repeat
3   that for each of their Conn's accounts.
4   Q.      Absolutely.  So in this situation, if you
5   call a customer and the customer verifies his date of
6   birth, and then the customer says, "you know what, I
7   don't want you calling me anymore" and slams the
8   phone down, your agent is supposed to mark that phone
9   number "do not use," and he should get no more calls
10  in predictive or broadcast mode; is that correct?
11  A.      Not specifically.  No, sir.  The other
12  portion of this training, albeit new hire training or
13  recurrent training, which I'm a part of and actually
14  administrate for Conn's, is to recognize, have we
15  asked good, probing questions?  What's the request of
16  the customer?  Many of our customers have more than
17  one phone number.  And specifically that's part of
18  our question.  Are they asking for either, only call
19  me at this particular number?  Never call me again?
20  Or exactly what is their request?  And so that's the
21  additional piece here that we do training on.
22  Specific to each of these scenarios.
23  Q.      Okay.  How about the fact that this says
24  "stop calling and hangs up"?  If someone just shouts
25  "stop calling" and hangs up, their agent obviously

Page 233

1   has no opportunity for followup; would you agree?
2   A.      If we're hung up on, that -- I would agree
3   with that.
4   Q.      Okay.
5   A.      We wouldn't have any action to take at that
6   point.
7   Q.      So the way I read the policy, it says in that
8   situation, someone screams "stop calling" and hangs
9   up on you and your agent has no opportunity for
10  followup, you should mark the number in question "do
11  not use" and not call it anymore; is that correct?
12  A.      No, sir.  I disagree.  That would be too
13  literal of a reading.  The actual training and how we
14  process this from a call center perspective is to
15  engage with the customer and ask some good, probing
16  questions before we've made those types of decisions
17  to mark the phone.  What we find is, and specifically
18  that's an odd request.  Many of our customers are
19  happy and actually request that we remind them each
20  month.  So it's really important that we get that
21  right.
22  Q.      Okay.  So let's skip down to the heading
23  "UC."  UC, I understand, represents unidentified
24  caller; is that correct?
25  A.      That's correct.

Page 234

1   Q.      Okay.  So if that means anybody you call who
2   you can't identify as your customer or doesn't
3   identify themselves as a third party, friend, or
4   relative or anything like that; is that accurate?
5   A.      Yes.
6   Q.      Okay.  So if you call and an unknown person
7   picks up and screams "stop calling" and then hangs
8   up, your agent should mark the phone number as "do
9   not use" and then not place any more calls to that
10  account; is that correct?
11  A.      Not -- again, going back to the literal.
12  There are still additional questions that we do train
13  to ask and verify.  As an example, we may have
14  reached a particular number, could have changed
15  owners.  And we would want to know that if we were
16  asking for the Smiths and now it's the Brown.
17  Q.      So the fact that this says "hangs up" is
18  irrelevant, really?
19  A.      No, sir.  It's scenario-based.
20  Q.      Okay.  So I just don't understand why it says
21  "hangs up" and then you keep saying you have to ask
22  follow-up questions.  In a hang-up situation,
23  wouldn't it be impossible to ever ask a follow-up
24  question?
25  A.      No, sir.  Again, just kind of going back to

Page 235

1   the scenario and the real-life situation that our
2   agents deal with and having the ability to ask good
3   questions and probe around that, of which we do train
4   on as we consider how we handle telephones, that's
5   how in context we think through a matrix of such as
6   this.  It's not an all-encompassing document.
7   Q.      Okay.  Let's turn to the page Bates stamped
8   2611.
9   A.      Okay.
10  Q.      So I'm looking at the section that says, the
11  very top section, "because of TCPA regulations,
12  Conn's enacted policies regarding how cell phone
13  numbers are handled on customer accounts.  This cell
14  phone policy was implemented to ensure that we obtain
15  permission from the customer in order to call their
16  cell phone numbers."  Agree?
17  A.      Yes, sir.
18  Q.      Okay.  I want to move down to "Remember the
19  following steps."  "All verbal requests to cease or
20  stop calling any cell phone from a customer or third
21  party will be honored by the company and processed by
22  a manager."  So tell me what that means.
23  A.      Yes, sir.  The desire, the intent is to ask a
24  manager to get engaged on the call and then have the
25  opportunity to speak to that individual.  Could be



Johnnie Williams vs Conn Appliances
Arbitration

236..239

Page 236

1 the customer.  Could be a third party.  A
2 non-customer is how we think about third parties.
3 And then follow-up from the agent's probing questions
4 and asking good qualifying questions of what the
5 request really means.
6 Q.      Okay.  Let's then turn to the next page Bates
7 stamped 2612.
8 A.      Okay.
9 Q.      And I'm sorry.  Does this only apply to place
10 of employment, this particular policy?
11 A.      In both pages?
12 Q.      No.  On page 2612.
13 A.      2612, okay.  I believe it gave a scenario
14 down below the first one, if we're calling a place of
15 employment.  And then, let me read through the rest.
16 It just gave a scenario on the first call campaign.
17 Q.      Okay.  Let's move down to the next page then.
18 2614.
19 A.      Okay.
20 Q.      I want to look at the second scenario, which
21 is titled "Stop Calling on a Cell Phone."
22 A.      Okay.
23 Q.      The Latitude result code is RP which means
24 right party, correct?
25 A.      For Latitude, it actually means refusal to

Page 237

1 pay is what that stands for.
2 Q.      Okay.  Refusal to pay?
3 A.      Which is a right party.
4 Q.      Okay.  So let's talk about the description.
5 "Customer is defensive and insisting for calls to
6 stop.  Customer does or does not hang up.  Agent must
7 transfer call to manager who will follow up and set
8 out for seven days."  So your policy here is that if
9 a customer is insisting for calls to stop and hangs
10 up, you're going to transfer the call to a manager to
11 stop the calls for seven days; is that accurate?
12 A.      It's called a takeover, and so it's not the
13 literal transfer.
14 Q.      Sure.
15 A.      So -- in the call center, how this actually
16 happens is the agent would place the call on mute,
17 and I would be raising my hand saying, "Mr. Frank, I
18 need some help.  Can you come help me?"  In a perfect
19 scenario, then that's when we heard on some of these
20 phone calls where a manager is coming over and
21 introducing themselves.  It doesn't always happen
22 that way.  They may be tied up on another phone call,
23 but that's literally how that would happen.
24 Q.      Okay.  Let's set the policies aside for a
25 minute and just talk generally speaking.  Tell me

Page 238

1 about Conn's stop-calling policy as it pertains to
2 cell phones.  Are there any magic words that a
3 customer needs to say in order to stop the calls to
4 their cell phone?
5 A.      No magic words.  Really the key there is
6 clarity of the request of the customer.  Going back
7 to a similar answer for you.  The clarity portion of
8 actually understanding what the customer's request
9 truly is, based on their unique scenario, really
10 helps us identify, based on what we know, that our
11 customers really demand of us as a company for
12 monthly phone calls.
13        We don't send out monthly statements and
14 such.  My group actually call monitors about 1200 to
15 1500 phone calls where we actually listen to that
16 many phone calls each month.  And the majority of
17 those phone calls' interactions are very positive,
18 and customers are asking for those reminder phone
19 calls.  And so as we train and think about documents
20 such as this and engage with the agents, it's really
21 important that we're asking those clarifying
22 questions from a customer to make sure that we really
23 understand.  So there's not a magic number of words
24 or words, et cetera.
25 Q.      What if a customer doesn't want to answer

Page 239

1 those clarifying questions, and they just want to say
2 "stop calling me" and hang up the phone?  Does Conn's
3 honor that?
4 A.      In those instances, and we understand, don't
5 like hearing when customers are upset.  Our business
6 is predicated on a customer coming back and
7 re-shopping us, which we see about 65 percent of that
8 each year.  In that particular instance, we want that
9 customer to be given the opportunity to actually
10 explain to us what their desire is.  And they have
11 the right to hang up on us.  They have the right not
12 to answer, and we understand that.  We get it.
13 Q.      Okay.  Let's talk about your collection
14 agents.  Can you explain to me how those agents are
15 compensated?
16 A.      They're compensated by an hourly wage, and
17 then based on their collection performance.
18 Specifically, how many in dollar amounts of past due
19 balances that they're able to cure by the end of each
20 calendar month, a 30 or 31-day month.  And based on
21 that, there's a string of metrics that then
22 potentially qualifies them for an additional
23 incentive or a bonus.  That could be things such as
24 non-impactful:  Did you show up to work on time?  Did
25 you complete your training?  How were your Q and A



Page 240

1  scores?
2       And then relative to their metrics on how
3  well they collected as well.  So there's a number of
4  things that would qualify them in order to
5  potentially earn more money.
6  **Q.     Okay.  Now, I understand when an agent is**
7  **handling an outbound or inbound call, he or she is**
8  **responsible for notating the account within your**
9  **Latitude system; is that accurate?**
10 A.     Yes, sir.  We think about Latitude as our
11 repository for all of our collection interaction.
12 **Q.     Okay.  I know you and I get the chance to**
13 **talk a couple of times of year, but Mr. Harris**
14 **doesn't, unfortunately for him, have to hear these**
15 **conversations all the time.  What is the Latitude**
16 **system?**
17 A.     Latitude is our collection platform.
18 Specifically, it's where our agents go and they
19 actually type in notes of the interactions that
20 they've had with the customer, whether it's an
21 inbound or an outbound phone call.  Additionally, we
22 list all of our call attempts.  We list the times
23 where we send text messages or e-mails related to the
24 aging of the account.  And then lastly, Latitude is
25 our phone maintenance system of record for each

Page 241

1  customer.
2       Some of the values and such that we see
3  relative to Mr. Williams' account, for example,
4  that's -- the financials are pushed from another
5  system to Latitude.  And Latitude isn't an all-in
6  type of accounting or aging system.  It's nothing
7  more than a repository for our interaction with a
8  customer.
9  **Q.     Okay.  Now, if your agents fail to properly**
10 **notate an account following a communication with a**
11 **customer, is there any potential for them to be**
12 **sanctioned or disciplined?**
13 A.     Yes, sir.
14 **Q.     Okay.  So if a customer is talking about they**
15 **want the calls to stop, and your agent doesn't notate**
16 **on the account, can he or she be disciplined for**
17 **that?**
18 A.     Yes, sir.  They could be disciplined just to
19 -- we think about it as disciplined, sanctioned it's
20 -- anyways, we don't use that terminology.  But it's
21 discipline.
22 **Q.     In Texas that might be a spanking or**
23 **something like that.  But no.  I mean, you could**
24 **punish them financially or fire them or something**
25 **like that?**

Page 242

1  A.     It's a progressive disciplinary action,
2  technically speaking, is how we think about that.
3  **Q.     Okay.  So what would be the first step?**
4  A.     Technically on a first step interaction would
5  be a memo.  It's a written memo to the agent for a
6  training opportunity.  And then from there, we
7  progress through to a more formal, written corrective
8  up to and including final warnings.  And then the
9  very last step which would be the fifth step in this
10 particular instance, if we had that occur, then the
11 agent could be terminated.
12 **Q.     Okay.  Can your agents also be disciplined or**
13 **sanctioned somehow if they fail to properly place a**
14 **cease and desist or stop call on an account when a**
15 **customer requests calls to their cell phones stop?**
16 A.     They could be on a particular scenario.  Yes,
17 sir.  Including a number of things.  And that's
18 directly where my group, my team that I have
19 oversight to the company for.
20 **Q.     Okay.  Well, based on your position in the**
21 **group you have oversight for and your understanding**
22 **of Conns' policies and procedures, what mistakes**
23 **were made by your agents with regards to the handling**
24 **of this account?**
25      MS. JACKMAN:  Objection.  Lacks

Page 243

1  foundation.  There's been no evidence or testimony
2  that mistakes have been made.
3       THE ARBITRATOR:  Well, he just asked him
4  what mistakes have been made.  I think he can answer
5  it.  I think he can be asked that question.  His
6  answer, we'll have to hear.
7  A.     Yes, sir.  I can handle that question.  My
8  review of the accounts is that we didn't have any
9  mistakes.  Did we have opportunities?  We don't like
10 -- and another thing that I manage is complaints.  We
11 don't like hearing complaints.  We do recognize that,
12 and we understand that our business is built on
13 repeat business.  Did we have any mistakes related to
14 policy in this particular instance?  No, sir.  We
15 have some opportunities.  We'd like to have a better
16 outcome.  Yes, sir.
17 BY MR. KERNEY:
18 **Q.     Okay.  All right.  I want to show you what we**
19 **previously marked as Exhibits 4 and 5, which are two**
20 **retail installment contracts that pertain to this**
21 **account.**
22      MR. KERNEY:  Does Mr. Harris have a copy?
23      MR. HILL:  I believe, Mr. Harris, he
24 should have that.  It's 4 and 5.
25      THE ARBITRATOR:  Give me a second.  It's



Page 244

1  behind me.  I was making some notes.  Okay.  I have 4
2  and 5.
3         MR. KERNEY:  Okay.  Great.
4         THE ARBITRATOR:  Are we through with 13?
5         MR. KERNEY:  I'm sorry?
6         THE ARBITRATOR:  Are we through with 13?
7         MR. KERNEY:  Yes.  We're through with 13.
8  Thank you.
9  BY MR. KERNEY:
10  Q.    Okay.  So Mr. Walton, you've seen these
11  contracts before today, correct?
12  A.    Yes, sir.  I have.
13  Q.    Okay.  The first contract is Bates stamped
14  251 through 252, and that appears to be a contract
15  from August the 31st of 2015; is that accurate?
16  A.    Yes, sir.
17  Q.    Okay.  And then I want to look at the second
18  contract which is Bates stamped 264 to 265.  That
19  appears to be from November 29th, 2015; is that
20  correct?
21  A.    Yes, sir.
22  Q.    Okay.  So my understanding in looking at this
23  account is that on November 29th, it looks like
24  Mr. Williams went into the Austin Peay Plaza here in
25  Memphis, and he financed some additional items

Page 245

1  through Conn's.  And what Conn's did was they rolled
2  over the first contract into the second contract; is
3  that accurate?
4  A.    Yes, sir.  Technically that's termed as an
5  add-on purchase.
6  Q.    Okay.
7  A.    And if I could point you to -- because is
8  really important, underneath the right-hand side, the
9  itemization of the amount financed, it's number
10  three.  And then directly underneath it, it's titled
11  "Gross Previous Indebtedness."
12  Q.    Yes, sir.
13  A.    Of $1103.  That was the remaining balance
14  from the August purchase.
15  Q.    Okay.  So that merged with this contract and
16  created one new active account; is that correct?
17  A.    Yes, sir.
18  Q.    Okay.  Flip to the second page for me, if you
19  will.
20  A.    Okay.
21  Q.    The first paragraph here is what I think
22  gives Conn's consent to call Mr. Williams on his cell
23  phone.  Okay?  It says, "You certify that you are the
24  subscriber and/or customary user of the telephone
25  numbers, including without limitation, wireless

Page 246

1  numbers provided by you to us or our affiliates
2  acting on our behalf.  You hereby consent to receive
3  autodialed and/or pre-recorded message calls and SMS
4  messages including text messages from us, our
5  affiliates, marketing partners, agents and others
6  calling on our behalf at any telephone numbers that
7  you have provided, including calls related to
8  informational debt collection or any other Conn's
9  business purpose.  You also hereby consent to receive
10  any such calls and messages to any telephone numbers
11  that you may provide in the future, including
12  wireless telephone numbers.  During the term of this
13  agreement, you also agree to notify Conn's if any
14  telephone number for which you have provided consent
15  is one, relinquished by you or two, changed by you.
16  Nothing in this agreement shall designate an
17  exclusive manner for revoking your consent to receive
18  calls at a particular wireless number or condition
19  your purchase of good or services from Conn's on your
20  consent to receive debt collection or other calls
21  from or on behalf of Conn's."  Would you agree with
22  that?
23  A.    Yes, sir.  That's the statement here in the
24  disclosure.
25  Q.    Okay.  And is that -- the purpose of that

Page 247

1  contract to obtain consent to call Mr. Williams on
2  his cell phone?
3  A.    Yes, sir.
4  Q.    Okay.  Do you agree that it says that he --
5  "nothing designates an exclusive manner for
6  Mr. Williams to revoke his consent to receive
7  telephone calls at a particular wireless number"?
8  A.    Yes, sir.  That is this statement.
9  Q.    Okay.  So you agree that Mr. Williams was
10  free to revoke consent to receive those calls to his
11  cell phone?
12  A.    Yes, sir.
13  Q.    Okay.
14         MR. KERNEY:  And I'm going to ask the
15  Arbitrator, Mr. Harris, I don't know if you want to
16  take notice of the arbitration clause in here for
17  jurisdictional purposes, I don't know if that's an
18  issue at this stage.
19         THE ARBITRATOR:  I don't think anybody is
20  -- I mean, you had a lawsuit in the beginning.
21         MR. KERNEY:  Yeah.  I'm just making sure
22  that we're covering all of our bases.
23         THE ARBITRATOR:  It was sent here because
24  of the arbitration provision.  I don't think anybody
25  has --



Johnnie Williams vs Conn Appliances
Arbitration

248..251

Page 248

1          MR. KERNEY:  Fair enough.
2          THE ARBITRATOR:  -- issue with that.
3          MS. JACKMAN:  No objection.
4          THE ARBITRATOR:  You should have told me
5  a few months ago.  Really.  Okay.  Are you through
6  with those agreements?
7          MR. KERNEY:  Yes.  For right now.  Yes.
8          THE ARBITRATOR:  Okay.
9  BY MR. KERNEY:
10  Q.      Okay.  So then I want to look at the Latitude
11  history for that second contract and...
12          MR. HILL:  I believe that should be
13  Tab 5.
14          MR. KERNEY:  We haven't introduced this,
15  Shaughn, have we?
16          MR. HILL:  No.
17          MR. KERNEY:  Okay.
18          MR. GOMEZ:  That will be 14.
19          MR. KERNEY:  Yes.  So we'll mark that as
20  14.
21          MR. HILL:  Sure.
22          MS. JACKMAN:  For the record, do we want
23  to say the Bates labels?
24          MR. KERNEY:  Yes, absolutely.  So this is
25  Bates stamped 213 through 244.

Page 249

1          MS. JACKMAN:  This is Exhibit 14, you
2  said?
3          MR. KERNEY:  Yes, ma'am.
4          (WHEREUPON, the above-mentioned document
5  was marked as Exhibit Number 14.)
6  BY MR. KERNEY:
7  Q.      Mr. Walton, can you tell us what this
8  document is?
9  A.      Yes, sir.  I can.  This was the conversation
10  we were having earlier related to the Latitude
11  collection history notes, account history notes.
12  Q.      Okay.  So in looking at this page here, it
13  looks to me like the very first account that -- or
14  excuse me -- the very first call that was made to
15  Mr. Williams on this account would have been made on
16  December 3rd, 2015 from the Noble dialer; is that
17  correct?
18  A.      Yes, sir.  December the 3rd.
19  Q.      Okay.  And that was just a couple of days
20  after the account was opened.  Was that an
21  information or welcome call?
22  A.      We do send those.  Yes, sir.
23  Q.      Okay.
24  A.      If I can.  When a customer has made a new
25  purchase with us, it's a welcome call.  And we give

Page 250

1  just some general information about our website and
2  how they can contact us.
3  Q.      Okay.  And I see the mode that that call was
4  made in.  I think I can identify by the code B-I-N-S;
5  is that correct?
6  A.      Yes, sir.  That's the name of the campaign.
7  Q.      Okay.  And so that campaign identifies the --
8  what I would call the mode of calling as broadcast
9  mode; is that correct?
10  A.      This indeed is broadcast.  Yes, sir.  This
11  entry.
12  Q.      Okay.  So my understanding is when you look
13  in that row after any call, if the code begins with a
14  B, it's going to be a broadcast mode call.
15  A.      Yes, sir.  If it begins with a B and then
16  there's later campaigns that we introduce where if a
17  B is included, then that's also a broadcast as well.
18  Q.      Okay.
19  A.      Yeah.
20  Q.      And then I notice that there's -- sometimes
21  there can be calls in there that are just coded
22  "manual."  Tell me what a manual call is.
23  A.      Manual is where, in our work card and in our
24  campaign setup, the agents are actually logging in
25  and they've been instructed to either -- we have the

Page 251

1  ability to, with their mouse, click on a phone number
2  and actually activate a phone call or type in the
3  actual ten digits of the phone number and that's
4  based on the senior leadership of the collection call
5  center.  They give those instructions on a daily
6  basis to various management team members.
7  Q.      Okay.  So I saw on this account that Conn's
8  made calls in three different modes.  The first is
9  manual which you just described where an agent is
10  entering the phone number and planning on calling one
11  specific customer; is that a fair summation of a
12  manual call?
13  A.      And I would just add to that, yes, sir.  I
14  agree.  But we also see a campaign designation of
15  L-A-T-I.  That's how we know it's in manual.  The
16  call is not originated from Latitude.  It's just the
17  abbreviation for Latitude, for the actual work group
18  that they were in.
19  Q.      Great.  Thank you.  And then the other two
20  modes that I saw on there are what I think Conn's
21  calls system assisted mode but would be coded on --
22  through your Noble dialer as predictive mode; is that
23  correct?
24  A.      Yes, sir.
25  Q.      Okay.  And then broadcast mode.  And I think



Page 252

1  we've called it broadcast here, and I think Noble
2  codes it as broadcast as well; is that correct?
3  A.   Yes, sir.
4  Q.   Okay.  Great.  So we'll come back to those in
5  a minute.  Let me ask you.
6  A.   I --
7  Q.   Go ahead, sir.
8  A.   I did see in reviewing Mr. Williams' account,
9  we also had the Compliance Appliance mode as well,
10  the separate server, the Compliance Appliance server
11  as well.
12  Q.   Absolutely, yes.  Thank you.  So would you
13  briefly tell me about your personal training on the
14  TCPA or TCPA compliance excluding any conversations
15  with Mr. Troutman or Ms. Jackman or Mr. Delnero or
16  any of the other lawyers?
17        MS. JACKMAN:  Well, for the record, we
18  don't contend that they're subject to the TCPA
19  because the whole thing here we're not using an ATDS
20  within the meaning of that statute, so just clarity
21  to the extent that the question presumes that we have
22  a compliance obligation as a matter of law, I object.
23        THE ARBITRATOR:  Okay.  You can proceed.
24  Your objection is noted.
25  A.   Yes, sir.  My training, I've had a lot of

Page 253

1  roles within Conn's.  My official training
2  professional certification started in 2011.  And
3  shortly thereafter, 2012, I earned the professional
4  designation of the compliance officer designation
5  with the trade group ACA.  And for that designation,
6  it requires classroom on-site seminars as well in
7  some instances, and then after you reach a certain
8  level, then you have to maintain a number of credit
9  hours each year, which includes training on all
10  regulations specific to credit, including TCPA.  So I
11  had the opportunity since 2011 to actually have
12  certification in that area among others.
13  BY MR. KERNEY:
14  Q.   Okay.  So is it your position as the senior
15  manager of compliance that Conn's is not obligated to
16  comply with the TCPA because the dialing equipment
17  Conn's is using is not regulated by the TCPA?
18        MS. JACKMAN:  Objection.  That calls for
19  a legal opinion, discussions with counsel, and he's
20  not a lawyer.  He has no legal training.  So I think
21  it's improper.
22        MR. KERNEY:  So I was just asking in his
23  capacity as the compliance manager.  He raised the
24  policies and procedures.
25        MS. JACKMAN:  That doesn't mean that he's

Page 254

1  responsible for determining what laws Conn's is and
2  is not subject to.  Instead as a compliance -- senior
3  manager of compliance, he then would draft policies
4  in accordance with direction he gets.  Those are
5  legal conclusions.  They necessarily involve
6  discussions with in-house legal at Conn's.  And
7  again, I reiterate my objection that it calls for
8  privileged information.  It's not proper.
9        THE ARBITRATOR:  Well, Mr. Walton,
10  without the advice of Conn's Counsel, are you even
11  able to answer that question?
12  A.   Yes, sir.  I can state our position.  In that
13  we don't believe that we operate in ATDS.  More
14  definitively, we do not operate in ATDS.  That's our
15  position.
16        THE ARBITRATOR:  Okay.
17  BY MR. KERNEY:
18  Q.   So Mr. Walton, let me ask you a question.
19  What does the term "predictive dialer" mean to you?
20  A.   You and I, we've had a few discussions here.
21  That's a pretty loaded question, and it goes back to,
22  was that pre-2015, July 2015 or after?  And
23  "predictive" is one of those terminologies in the
24  context of telephony systems, telephone systems that
25  today has a different meaning than what it had 20

Page 255

1  years ago.
2  Q.   Sure.
3  A.   When it started operating systems, so in
4  context today has a much different meaning.
5  Q.   Okay.  We've talked about this before.  Okay?
6  And I think we generally agree on the example that I
7  always give you.  Which is hypothetically there's
8  five agents available to field calls.  A predictive
9  dialer might make 25 calls at a time, knowing that
10  most likely only one out of five customers will
11  answer the call and be transferred to an agent.  Do
12  you agree with that sort of general summation of what
13  a layman's definition of predictive dialer is?
14  A.   Very layman's with a lot of layers
15  potentially based on the complexities of telephony
16  systems that are out there in the market.  But in a
17  general sense, in a very, very layman's term, yes,
18  sir.
19  Q.   Yes.  Absolutely.  And one of the ideas
20  behind a predictive dialer is it maximized the
21  efficiency of agents.  Agents don't have to call and
22  listen to the phone ring and wait for someone to pick
23  up.  The agents just field calls and have calls
24  transferred to them, correct?
25  A.   That's one usage of that as well.



Johnnie Williams vs Conn Appliances
Arbitration

256..259

Page 256

1  Predominantly in space of telemarketing when we think
2  in that context.  Of how those systems were designed
3  and marketed and put in use many years ago.  But from
4  a very layman's context, yes, sir.  Generally I can
5  agree and we can talk more about our system.  But
6  yes, sir.
7  Q.    Okay.  Great.  So the system in question is
8  your Noble system, correct?
9  A.    Noble Solution Corporate -- it's abbreviated
10 Noble Solution Corporation, NSC, that's our
11 cloud-based solution.
12 Q.    That's the platform that you used to make
13 outbound calls to Mr. Williams, correct?
14 A.    Yes, sir.
15 Q.    Okay.  And that's -- you've used that system
16 since 2011, Conn's has exclusively used Noble since
17 2011?
18 A.    Yes, sir.  October 2011.  Over that period of
19 time, we've used a few other systems, not relevant
20 here in this particular case with Mr. Williams.  But
21 that is our predominant system that's in use today,
22 and it's been that way at least for the past two
23 years.
24 Q.    Okay.  And you lease that technology from
25 Noble Systems, correct?

Page 257

1  A.    It's actually a license agreement.  We are
2  able to access that software -- let me clarify.  We
3  have software that is available that -- however to
4  operate and activate it through a URL, to actually
5  log into the URL, and it's very, very akin to having
6  a license agreement with Facebook.  We can go in and
7  actually perform the function it's designed to do,
8  but we have no access to change it, modify it, things
9  of that nature.
10 Q.    So the tech guys call it "closed source
11 software" or something like that; is that correct?
12 A.    "Closed source" or a new term now is "locked
13 down."
14 Q.    Okay.  But the point is, you're obtaining
15 this technology license from Noble.  You can't modify
16 it.  What you get is what you get, and you have no
17 control over modifying it on your end?
18 A.    That's correct.
19 Q.    Okay.  So I want to talk about -- the first
20 mode I want to talk about, okay.  Because I want to
21 talk about both predictive or system assisted as you
22 call it, and broadcast.  I'm going to talk about
23 system assisted first.  So when you're preparing
24 every day to contact a group of customers, you load
25 those customers into what's called a campaign; is

Page 258

1  that correct?
2  A.    Yes, sir.  The end result in Noble is termed
3  a campaign.
4  Q.    Okay.  And the campaign contains all sorts of
5  information about borrowers.  Their name, their
6  demographics, and would also include their telephone
7  number, correct?
8  A.    To clarify, within Noble, we have some basic
9  information for a customer that is ultimately loaded
10 by our credit system administration team, that the
11 group of team members that are responsible for that.
12 And just to clarify, it's very basic information
13 within Noble such as the customer's name and address,
14 the total amount due, their monthly payment and the
15 due date that they're due.  And the phone number.
16 Any additional contractual information, that is not
17 what we would include in that campaign within Noble.
18 That would reside more in Latitude that we were
19 looking at earlier.
20 Q.    Okay.  So specifically what I want to talk
21 about are the phone numbers.  Okay?  So let's just
22 skip the other stuff and say, when you upload a
23 campaign every morning, it's going to include the
24 phone numbers that you plan to call, correct?
25 A.    Yes, sir.  That is correct.

Page 259

1  Q.    Okay.  And those campaigns are on your system
2  for the day, purge every night, reloaded the next
3  day?
4  A.    Yes, sir.
5  Q.    Okay.  Your system then in -- again, this
6  system assisted mode or predictive mode, whatever you
7  want to call it, your system is then applying the
8  parameters that Conn's credit management system's
9  team sets to determine how to call those customers
10 throughout the day?
11 A.    Yes, sir.  Just to clarify, the credit system
12 administration team in conjunction with the
13 instructions from the management team of the call
14 center.
15 Q.    Okay.
16 A.    So it's two-part, but the actual group of
17 humans that's making that function happen is the
18 credit system administration team.
19 Q.    Now, when your agents are ready to field
20 calls in predictive or system assisted mode, let's
21 say ten agents are in at work at 8 a.m. ready to
22 begin taking calls, you set the parameter for how
23 many calls Noble should make, sometimes on a per
24 agent basis, and the system makes the calls and as
25 customers answer, they are transferred to the agent;



**Orange Legal**
**800-275-7991**

Page 260

1  is that correct?
2  A.    No, sir.  Our system in its design, when we
3  think about it, on a campaign  level.  It's not the
4  total number of phone calls for an agent.  Instead
5  it's based on two key factors.  One is the number of
6  lines, phone lines that are assigned per each agent.
7  That's our license agreement with Noble.  So that
8  tells us how many phone calls that we could
9  potentially have active for an agent at any given
10  time.
11       And then secondly, it's the abandon rate.
12  How many calls would have been unanswered.  And those
13  are the two letters that we are actually working when
14  we think about our credit system team.  And so that
15  would be part of the settings that we would utilize.
16  Q.    Absolutely.  So your agents, when they're
17  ready to field calls in predictive mode, they're
18  sitting there.  They don't know who they're going to
19  get a call from until the call gets transferred to
20  them.  The system is making calls.  Johnnie Williams
21  picks up.  His call then gets transferred to
22  available agent.  Mr. Williams' information then
23  autopopulates on that agent's screen, and the
24  collection call begins, correct?
25  A.    The process, the system is not actually

Page 261

1  performing all of those steps by itself.  Just for
2  clarity.  The credit system team that is responsible
3  for setting those campaigns and starting those
4  campaigns from start to finish, which is multiple
5  times throughout the day, they start the campaign.
6  The agents log in.  Based on those parameters in the
7  campaign and the availability of the agents, then
8  there is some poll rallying that takes place with a
9  lot of exceptions where the credit system team would
10  have to engage and manually go in and move agent
11  groups from time to time.
12       But in essence, the agents are logging in.
13  And although that they know that they will see
14  customers that are at least 30 days past due, as an
15  example, they have not previewed, in this particular
16  instance in this campaign, they have not previewed
17  that account before the call is given to them.
18  Q.    Right.  Because the system is dialing more
19  people than there are agents available, and the
20  system is transferring those individuals who answer
21  to available agents?
22  A.    At a very basic level.  Yes, sir.
23  Q.    Okay.  At the time that the customers ten
24  digit telephone number is dialed in system assisted
25  mode or predictive mode, whatever you want to call

Page 262

1  it, the Noble system dials the ten digit telephone
2  number, correct?
3  A.    In system assisted, in that particular
4  instance, yes, sir.  But technically, with the
5  two-step process of credit system team activating the
6  campaign, and then an agent actually being logged in
7  which activates the campaign.  Yes, sir.
8  Q.    Absolutely.  But the phone number being
9  dialed, done by Noble, no person is taking a ten
10  digit phone number, correct?
11  A.    In that particular instance.  No, sir.
12  Q.    Okay.  Same as in broadcast mode.  The system
13  is dialing the ten digit phone number, not an
14  individual person?
15  A.    Same explanation there for broadcast as well.
16  Along with the credit system team and the agent
17  logging in, conceptually if all the agents have
18  logged out, then dialing stops.
19  Q.    Okay.  And you're dialing 600,000 phone
20  numbers every single day.  So you're dialing many,
21  many phone numbers at any single time, correct?
22  A.    Yes, sir.
23  Q.    Okay.  What's the most number of outbound
24  phone numbers you're dialing at one given time?
25  A.    We're completely limited based on the total

Page 263

1  number of staff members and the total number of phone
2  lines that we have on agreement with Noble.  So we
3  have a maximum that we could ever call.  And over
4  time, that has changed in ratios from two to three
5  phone lines per agent.  I think we've had ratios up
6  to five.  Today I believe that we're at three.  And
7  so it's solely dependent on the number of agents we
8  have logged in at a particular time.  And then the
9  number of phone lines as well.  And so your example,
10  if you have a hundred and there's three phone lines,
11  potentially it could be three hundred phone lines
12  that would be active.
13  Q.    Okay.  And you have 850 agents.  Each has up
14  to three phone lines per agent, correct?
15  A.    Yes, sir.
16  Q.    Okay.
17  A.    And to clarify, on the 850, we would see
18  concurrently seven days a week, we would have about
19  65, 70 percent of our staff covering the hours from
20  eight o'clock until nine o'clock at night.
21  Q.    Okay.  But theoretically if all -- let's say
22  800 agents all sat down and they were all ready to
23  field calls and they each had three lines.  Your
24  system could dial 2400 calls at a single time and
25  transfer those back to the agents who were available?



Johnnie Williams vs Conn Appliances
Arbitration

264..267

Page 264

1    A.    That's about the right number.  Yes, sir.
2    Q.    Okay.  You talked briefly about a 2015 FCC
3    order that I know to be regulating the TCPA.  Is that
4    the order you're talking about?
5    A.    Yes, sir.  Specific to the training
6    documents, that was a important distinction based on
7    the timing of those.
8    Q.    Okay.  You, in your policies and procedures,
9    in your Latitude system, call a certain call mode
10   "system assisted mode."  Your Noble system that you
11   lease and you cannot change the coding of internally
12   codes those same calls as predictive mode, correct?
13   A.    Yes, sir.
14   Q.    Okay.  Prior to some point in 2015, Conn's
15   colloquially internally called their system the auto
16   dialer at points, correct?
17   A.    It's called dialer, auto dialer.
18   Q.    Predictive dialer?
19   A.    Predictive dialer.  In the industry, it was
20   very commonplace.  And happened to be part of a trade
21   group.  It was very commonplace to speak of any of those
22   telephony system, telephone system in any of those
23   terms.  And people would generally walk away and
24   think you're talking about your telephone system.
25   Q.    Absolutely.  Okay.  I want to ask you about a

Page 265

1    term called "abandoned call."
2    A.    Okay.
3    Q.    I heard on some of the recordings we heard
4    earlier today, Mr. Williams complaining to several
5    different agents about "I picked up and there was no
6    one there."  Something to that extent.  Tell me what
7    abandoned call means to you?
8    A.    The abandoned call feature that we operate in
9    within Noble is simply in two scenarios.  One, where
10   we have a phone call that's available and a customer
11   might be on the line waiting for an agent to be
12   available.  And the customer wouldn't hear any -- and
13   you're saying "hello, hello."  That's one scenario.
14   The other scenario is simply where the call could
15   have abandoned in -- where I have an agent that's
16   available and then transit where the customer has
17   hung up as well.  And so that's how we think about
18   abandon rates.
19   Q.    Okay.  When we talked earlier about there
20   being three lines for every available agent.  Let's
21   say just one agent is logged in.  Okay?  And they
22   make -- the three calls are made at one time for that
23   agent.  Two of the three people answer.  The first
24   guy gets transferred back to your agent.  Would the
25   second guy who answer end up with an abandoned call?

Page 266

1    A.    They would.  In that particular instance.
2    With exception.
3    Q.    So an abandoned call in essence means your
4    system has overdialed or the algorithm didn't work,
5    and there would be more people who answered than
6    there are agents available to field calls?
7    A.    It just simply means that we had more
8    customers to answer the phone than we had an agent
9    available.  And the exception to that scenario is
10   where our credit system team comes into play, would
11   recognize that, and by skill set assignment were able
12   to assign over another agent group to take that phone
13   call.
14   Q.    Okay.  And I was trying to read the manual
15   and understand as much as I could about abandoned
16   calls, and I came across a feature of Noble called
17   quota dialing.  Are you using a quota dialing
18   function in system mode?
19   A.    No, sir.  That really goes at the core of
20   what our system is.  It's very customized and
21   directly reason why they got my vote those many years
22   ago and why we selected and I agreed to make the
23   purchase.  It's more of a telemarketing feature that
24   you're referencing, and that's not what our system is
25   designed to do.

Page 267

1    Q.    Okay.  All right.  I want to talk about the
2    other mode that we had talked about earlier which is
3    broadcast mode.  My understanding of broadcast mode
4    is that in essence, you're using that in a campaign
5    where you don't anticipate a customer to pick up most
6    likely.  So Conn's is either one, transmitting
7    potentially a pre-recorded voice message to the
8    customer reminding them of their missed payment, or
9    alternatively, if the customer does pick up the call,
10   connecting the agent or the customer to the IVR, the
11   interactive voice response system; is that correct?
12   A.    Yes, sir.  With one caveat there, in that the
13   credit system team receives that type of instruction
14   in that campaign setting such that either on the
15   first phone call of the day, we may attempt to leave
16   a message or it could be the last attempt as well.
17   That would be the only caveat there, but otherwise,
18   yes, sir.
19   Q.    Okay.  When I say Conn's may leave a
20   pre-recorded message, when I say pre-recorded
21   message, I mean a voice actor has recorded a message
22   that says, "Hello this is Conn's.  Please call us
23   back.  Thank you so much."  Is that the same type of
24   thing you're talking about?
25   A.    That's one scenario.  The second scenario



Page 268

1 would be that we utilize a function, a text-speech
2 function. Such that we have a voice actor who has
3 recorded that generic message, but we do have the
4 ability to actually insert "Mr. Frank Kerney, this is
5 an important message from Conn's" and that would be
6 the electronic speech event.
7 **Q.    Sure. That's -- the text-to-speech is the**
8 **computerized voice we've all played with that says**
9 **your name kind of in that funny computer voice,**
10 **correct?**
11 A.    Yeah. It's not as human as probably most
12 would like it to hear but yes, sir, that's right.
13 **Q.    So if I answer a broadcast mode call, I'm**
14 **going to be connected to the IVR and it's going to**
15 **say, "Hello, Frank Kerney" in the text-to-voice**
16 **speech; is that correct?**
17 A.    We've employed a few different options. One,
18 would be such as that or simply not recognize it, not
19 route the customer to the IVR and instead route them
20 to an available agent.
21 **Q.    Okay. I want to look now at -- back at the**
22 **Latitude account notes.**
23 A.    Okay.
24 **Q.    Do you still have those pulled up?**
25 A.    Yes, sir.

Page 269

1 **Q.    Okay.**
2         MS. JACKMAN: Exhibit 14? Just for the
3 record.
4         MR. KERNEY: I apologize. Yes. It
5 should be exhibit --
6         MS. JACKMAN: Just making it easier on
7 Arbitrator Harris.
8         THE ARBITRATOR: I have it.
9         MR. KERNEY: Yes. It should be 14. You
10 got it.
11 BY MR. KERNEY:
12 **Q.    So I want to flip -- well, I'm looking at the**
13 **first page here. Okay? I think you can help me**
14 **identify it. I'm looking at the date of March 4th,**
15 **for example. And I see that your Noble system made**
16 **one, two, three, four calls on that day; is that**
17 **correct?**
18 A.    Yes, sir. The Noble campaigns that were
19 active, that was four. The entry that you see on
20 March the 4th at 5:02, that's actually an agent who
21 took an unidentified caller. So an agent actually
22 interacted and actually made that note there. But
23 the actual call attempts, we had four.
24 **Q.    Okay.**
25 A.    Yes, sir.

Page 270

1 **Q.    Let's turn to the next page.**
2 A.    Okay.
3 **Q.    I want to start -- let's start at April 12th.**
4 A.    Okay.
5 **Q.    How many calls did Conn's make to**
6 **Mr. Williams' cell phone on April 12th?**
7 A.    Okay. A total of 12.
8 **Q.    Okay. How about on the next day, the 13th of**
9 **April?**
10 A.    11.
11 **Q.    Okay. And then finally let's look at the**
12 **14th, how many calls on that day?**
13 A.    14 total.
14 **Q.    Okay. 14. So you placed 37 calls over those**
15 **three days to Mr. Williams; is that correct?**
16 A.    Call attempts. Yes, sir.
17 **Q.    Okay. Would it be atypical for you to see 14**
18 **calls made to a single cell phone number in a given**
19 **day?**
20 A.    No, sir. Specifically based on the end
21 result of that phone call, what we're speaking of
22 earlier on the campaigns where our credit system team
23 would recognize the end result, whether that would be
24 a busy signal or some type of line interruption, we
25 do, from a credit system perspective, allow campaigns

Page 271

1 to retry phone numbers. So it's not odd, if that's
2 your question.
3 **Q.    Okay. I want to flip back to what's what I**
4 **call the Noble report which was Exhibit 3.**
5 A.    I didn't get that.
6         MR. KERNEY: Do we have a copy, Shaughn?
7         MR. HILL: The Noble report? I
8 believe...
9         MR. KERNEY: Right here.
10         MR. HILL: I don't have a copy in this
11 folder.
12 A.    Thank you.
13 BY MR. KERNEY:
14 **Q.    So I know Latitude shows us all the calls**
15 **that were made. But it can be, in my opinion, a**
16 **little bit harder to read. Would you agree that all**
17 **the calls that are reflected on Latitude are also**
18 **reflected on this Noble report?**
19 A.    In general they should be. I've not
20 performed a comparison here for Mr. Williams. But in
21 general.
22 **Q.    But they should be, right?**
23 A.    Should be.
24 **Q.    And this document, Exhibit 3, the Noble**
25 **report, this is something that is generated**



Page 272

1  automatically by your Noble system, correct?
2  A.    It's the end result.  It's not that it's
3  actually generated.  It's just the end result of the
4  call log.  It's held in a repository outside of the
5  system where we have, from a credit system
6  perspective, download a -- an ad hoc file.  So it's
7  not created, just the end call log.
8  Q.    Okay.  And so if I want to know what mode a
9  specific call was made in, I can look here at the
10  first column which says "call type."  And if I see
11  "broadcast," I know it was in the broadcast mode you
12  just described for us.  If I see "predictive," I know
13  it's in the predictive or system assisted mode you
14  just described for us.  And if I see "code manual," I
15  know that one of your agents picked up and dialed a
16  ten digit phone number, correct?
17  A.    Yes, sir.
18  Q.    Okay.  I -- first of all, does Conn's call
19  customers from one single number, or do you call from
20  many different numbers?
21  A.    We have outposts.  The local phone number for
22  a customer.  And so a customer in an area like
23  Houston, Texas, they may have six potential local
24  phone numbers for that customer that they would see
25  in their caller ID which transacts back to our call

Page 273

1  centers.
2  Q.    Okay.  So I went through Mr. Williams' cell
3  phone records, and I saw a lot of different phone
4  numbers.  Would it shock you if I told you that the
5  over 1,000 calls that you said Conn's has made were
6  made with about 50 different telephone numbers?
7  A.    Over time.  No, sir.  We make updates over
8  time.
9  Q.    Okay.  Would it be surprising to you if on a
10  day where 14 calls were made, 10 of the 14 calls came
11  from different phone numbers?
12  A.    No, sir.  And that's very specific to the
13  campaigns or the actual groups and delinquency groups
14  that have been assigned to phone numbers.
15  Q.    Okay.  All right.  I want to turn to some
16  specific conversations.  I know we heard these
17  earlier today.  I'm going to only play a few.
18        MR. KERNEY:  I don't want everyone to get
19  upset.  I only have like five that I want to play.
20  So I want to just play these for Mr. Walton real
21  briefly and just ask him a few follow-up questions.
22  So the first one I want to listen to is from March
23  6th, 2016.  And it was Bates stamped 3.
24        THE ARBITRATOR:  Just a minute.  Before
25  you turn that on, are you going to be able to

Page 274

1  reference back to the written transcript?
2        MR. KERNEY:  We can if that would be
3  better for everyone else.
4        THE ARBITRATOR:  It's going to be very
5  hard for me to find.
6        MR. KERNEY:  Oh, no, no, no.  We can just
7  listen to the recording.
8        THE ARBITRATOR:  No, no.  I would like to
9  reference it to the page with the transcript.
10        MR. KERNEY:  I think we can do that.
11        THE ARBITRATOR:  Because it will be a lot
12  easier to find later than to go listen to this.  I
13  could read it.
14        MR. KERNEY:  Absolutely.
15        MR. HILL:  And Mr. Harris, this will be
16  page 3 of the first audio transcript.
17        THE ARBITRATOR:  Page 3 of the first
18  transcript.
19        MR. HILL:  Correct.  It's Bates stamped
20  00003.
21        THE ARBITRATOR:  Okay.  And those
22  transcripts were 11, correct?  Thanks.
23        (WHEREUPON, audio recording is played
24  into the record.)
25  BY MR. KERNEY:

Page 275

1  Q.    All right.  Now, in the transcript on page 5
2  line 5, I'm going to read your quote.  "I'm telling
3  you, you don't have to keep calling me."  Does Conn's
4  think that that was a do-not-call request from
5  Mr. Williams?
6  A.    No, sir.
7  Q.    Why not?
8  A.    There's additional parts of the conversation
9  where the agent explains to Mr. Williams that we had
10  an arrangement.  We would set up his follow-up date
11  for the date by which he promised.  At which time he
12  agreed.
13  Q.    Okay.
14        MR. KERNEY:  The next call I want to play
15  is from July the 2nd.  What do you need?
16        MR. HILL:  Do you have the Bates stamped
17  number?
18        MR. KERNEY:  No.  That's what I'm looking
19  for.
20        MR. HILL:  All right.  It's going to
21  be --
22        THE ARBITRATOR:  Y'all hang on just a
23  second.
24        MR. KERNEY:  It's 23.  Mr. Harris, tell
25  me when you're ready.



Page 276

1          THE ARBITRATOR: I'm sorry, what?
2          MR. KERNEY: Just let us know when you're
3 ready.
4          THE ARBITRATOR: I will. Just a second.
5 Okay. All right. Thank you.
6          MR. KERNEY: Okay. So the next one we're
7 going to listen to is from July the 2nd, 2016, and
8 it's Bates stamped 23.
9          MR. HILL: That'll be page 7 of the
10 transcript.
11          (WHEREUPON, audio recording is played
12 into the record.)
13 BY MR. KERNEY:
14 **Q.    Okay. So what I heard Mr. Williams say**
15 **there, "I talked to someone the other day. I told**
16 **them what was going on. I told them what I was going**
17 **to do. You call me every 15 fucking minutes." And**
18 **prior to that, he said, "Yeah. Look. I done told**
19 **you motherfuckers to stop calling me." We all just**
20 **heard that. Does Conn's think that it should have**
21 **continued to call Mr. Williams following that**
22 **conversation?**
23 A.    Yes, sir. In this particular scenario, it
24 was one that, you know, we were discussing earlier on
25 the training document of why it's important to have

Page 277

1 the opportunity to understand from the customer
2 exactly what their request is. Our customers today
3 really predicate that they ask of us for reminder
4 phone calls. And making changes to that is very
5 contrary to our interaction with our customer base.
6 And that's why we really train on this various
7 scenarios to ask a customer exactly what their wishes
8 might be.
9 **Q.    Sure. So you don't think you can interpret**
10 **Mr. Williams' wishes from "Look. I done told you**
11 **mother effers stop calling me"?**
12 A.    Well, sir, to be very candid, our business,
13 when we think about the call center, you know, folks
14 aren't always happy to hear from us on that end of
15 the business. We understand that. We don't always
16 hear customers in the most pleasant attitude or mood.
17 So it's not uncommon to hear a customer who is angry
18 or upset. It doesn't mean that they're angry or
19 upset with Conn's in particular. But when we think
20 about it in that context, customers are no different
21 than you or me. We have bad days. We train our
22 agents to be respectful of that and understand.
23 We've got to ask good, probing questions when we
24 start thinking about changing their communication
25 terms.

Page 278

1 Q.    Okay. So let's look at the Noble report,
2 Exhibit 3 on the page Bates stamped 2621.
3          THE ARBITRATOR: 26 what?
4          MR. KERNEY: 2621.
5 A.    Okay. Yes, sir.
6          THE ARBITRATOR: Just a minute.
7 BY MR. KERNEY:
8 **Q.    In the days leading up to that, right, the**
9 **28th and 29th of July --**
10 A.    Yes, sir.
11 **Q.    How many calls does this report reflect that**
12 **you made to Mr. Williams' cell phone?**
13 A.    I can take a moment and count them if that's
14 what you're asking.
15 **Q.    Yeah. Yeah. Excuse me. June 28th and 29th**
16 **leading up to the July 2nd call. Those would be the**
17 **calls on this page. How many calls were in those**
18 **days?**
19 A.    June 28th and 29th?
20 **Q.    Yes.**
21 A.    For those two days, there were a total of 24
22 attempts.
23 **Q.    Okay. And then let's look at the Latitude**
24 **notes, page 219 that correspond to that call.**
25          THE ARBITRATOR: Just hang on a second.

Page 279

1 The transcript that we just -- or the audio that we
2 just heard, what date was that?
3          MR. KERNEY: July the 2nd.
4          THE ARBITRATOR: Is there some reason
5 it's not showing on here?
6          MR. KERNEY: That's an inbound call.
7          MR. HILL: No, it's not.
8          MR. KERNEY: That's an outbound call.
9 Well, we'll look at the Latitude notes because that
10 will be the easier place to follow. So let's look at
11 page 219 if we can.
12          MS. JACKMAN: For the record, Exhibit 14
13 is where he's going instead.
14          THE ARBITRATOR: Oh, okay. I'm behind
15 you. Just a minute. Let me go back then. I was --
16 when you started talking about July the 2nd, and
17 listened to a transcript that I was told July 2nd. I
18 was just curious when you started about the days
19 leading up to July 2nd, why that July 2nd doesn't
20 appear there. And y'all can tell me what the answer
21 is when you figure it out. But you asked, just so I
22 get my notes right, you asked how many calls he made.
23 How many calls were made to Mr. Williams' cell phone
24 from June 28th, 2016 until what date?
25          MR. KERNEY: June 29th.



Johnnie Williams vs Conn Appliances
Arbitration

Page 280

1       THE ARBITRATOR:  Just in those two days.
2       MR. KERNEY:  Yes.
3       THE ARBITRATOR:  And the answer,
4   Mr. Walton, was how many?
5       THE WITNESS:  It was 24 attempts.
6       THE ARBITRATOR:  24 attempted calls.
7       THE WITNESS:  Yes, sir.
8       THE ARBITRATOR:  Okay.  And now, then you
9   wanted to move to the Latitude report, is that what
10  you were doing?
11      MR. KERNEY:  Yes, sir.
12      THE ARBITRATOR:  Which is Exhibit 14?
13      MR. KERNEY:  Yes, sir.  And it's Bates
14  stamped 219, the page that we're on.
15      MS. JACKMAN:  That's the collection's
16  system of notes.
17      THE ARBITRATOR:  Yeah.  Right.  219.  I
18  don't have a Bates.  219.  Okay.  Go ahead.
19      MR. KERNEY:  Okay.
20  BY MR. KERNEY:
21  Q.    So I'm glad we flipped back to this because
22  now I see that there's also calls made on June
23  the 30th.  So how many calls are on June 30th?
24  A.    11.
25  Q.    Okay.  And then how many calls on July

Page 281

1   the 1st?
2   A.    A total of four phone calls.
3   Q.    Okay.  And then on the 2nd, it looks like
4   Mr. Williams picked up the second call you made to
5   him; is that correct?
6   A.    There was a 9:20 a.m.  And then at 10:47.
7   Q.    Isn't there also an 8:21 a.m.?
8   A.    Oh, thank you.  Yes, sir.
9   Q.    So at 8:21 a.m. you call Mr. Williams.  He
10  doesn't pick up.  At 9 --
11  A.    I'm sorry.  If I can correct you.
12  Q.    Uh-huh?
13  A.    Yes, sir.  At 8:21, that's the actual
14  campaign titled 16HC.  The agent who actually took
15  that phone call, their entry is directly below that.
16  And within Latitude and Noble, the Noble entry is in
17  central time at 8:21, and the agent is in Eastern
18  time.  Thank goodness today we've got those synced,
19  but that's why you're seeing the two different time
20  periods.  That is indeed the same phone call.
21  Q.    So that call we just heard where he says "I
22  done told you mother effers stop calling me" was on
23  July 2nd at 8:21 a.m.?
24  A.    I don't know.  We would have to look at the
25  audio listing from Noble and compare that.

Page 282

1   Q.    Okay.  Well, look at the account note.
2   A.    Uh-huh?
3   Q.    Excuse me.  I'm sorry.
4       MR. KERNEY:  Where is that?
5       MR. HILL:  It's the next page at the top.
6       MR. KERNEY:  Thank you.
7   BY MR. KERNEY:
8   Q.    So let's turn to the next page.  I'm sorry.
9   Sorry about that.  Okay.  So the next page.  I'm
10  sorry.  Look at the entry from July 2nd at 11:46 a.m.
11  "Customer said 'stop calling' and hung up."  So
12  that's the entry that corresponds with that last one,
13  correct?
14  A.    I would agree with that.  Yes, sir.  In my
15  review of Mr. Williams.  Yes, sir.
16  Q.    So your agent noted that Mr. Williams said
17  "stop calling" on your account note?
18  A.    Uh-huh?
19  Q.    Okay.  After that, did you call him again on
20  July the 2nd?
21  A.    No, sir.  We do not.
22  Q.    Did you call him on July 3rd?
23  A.    Yes, sir.  We did.
24  Q.    Did you call him on July 4th?
25  A.    Yes, sir.

Page 283

1   Q.    How many times on July 4th?
2   A.    Let's see.  Three times.
3   Q.    How many times on July 5th?
4   A.    Nine.
5   Q.    Okay.  Let's go to -- let's skip ahead, or
6   let's skip back, rather, to June 28th.  The days kind
7   of leading up to that conversation we heard.  I want
8   to talk about the time of each call that was made on
9   June the 28th.  So that's on page 218, again the
10  calls begin.  So I see the first call came at
11  8:25 a.m.  Agreed?
12      THE ARBITRATOR:  All right.
13      MR. KERNEY:  I'm sorry.
14      THE ARBITRATOR:  Hang on a second.
15      MR. KERNEY:  We're on 218 of Exhibit 14.
16      THE ARBITRATOR:  Yeah.  Sorry.
17      MR. KERNEY:  No.  It's my fault.  I'm
18  going fast.
19      THE ARBITRATOR:  You've got to remember
20  I'm over here.
21      MR. KERNEY:  Sorry.
22      THE ARBITRATOR:  You're going pretty
23  quickly.  I appreciate that, but every now and then I
24  have to slow you down.
25      MR. KERNEY:  I figured we all wanted to



Johnnie Williams vs Conn Appliances
Arbitration

284..287

Page 284

1 get home.  I'm sorry.
2           THE ARBITRATOR:  All right.  So we're on
3 June 28th, and we're on Bates stamped 218.
4           MR. KERNEY:  Yes, sir.
5           THE ARBITRATOR:  And down at the bottom.
6           MR. KERNEY:  Yes, sir.
7           THE ARBITRATOR:  Okay.
8 BY MR. KERNEY:
9    Q.    So the first call made to Mr. Williams on
10 that day was made at 8:25 a.m., correct?
11   A.    Yes, sir.
12   Q.    The next call would be at 9:15 a.m., correct?
13   A.    Yes, sir.
14   Q.    The next call would be at 11:11 a.m.,
15 correct?
16   A.    Yes, sir.
17   Q.    The next call would be at 11:47 a.m.; is that
18 correct?
19   A.    That's the next entry.  Yes, sir.
20   Q.    Okay.  The next call from the same day is at
21 12:15 p.m., correct?
22   A.    Yes, sir.  That is correct.
23   Q.    The next call is at 1:12 p.m., correct?
24   A.    Yes.
25   Q.    The next call is at 2:07 p.m., correct?

Page 285

1    A.    Yes.
2    Q.    The next call after that is at 2:11 p.m.,
3 correct?
4    A.    Yes, sir.
5    Q.    So you called him four minutes later at 2:11
6 p.m.?
7    A.    That is -- let me look back at the entry
8 here.  Yes, sir.  That is, in that particular
9 instance.
10   Q.    Okay.  The next call is going to be at
11 2:58 p.m.; is that correct?
12   A.    That's correct.
13   Q.    Okay.  So you called Mr. Williams at 2:07,
14 2:11, and then 2:58; is that all correct?
15   A.    Yes.
16   Q.    Okay.  Then you called him again at
17 4:06 p.m.?
18   A.    Yes.
19   Q.    You called him again at 5:48 p.m.?
20   A.    Correct.
21   Q.    You called him again at 6:08 p.m.?
22   A.    Yes.
23   Q.    Then you called him at 7:13 p.m.?
24   A.    Yes.
25   Q.    Then you called him at 8:09 p.m.?

Page 286

1    A.    Correct.
2    Q.    Then you called him at 8:15 p.m.?
3    A.    Yes.
4    Q.    Was that the -- and then was that the last
5 call for the day?
6    A.    Yes, sir.  That's correct.
7    Q.    Okay.
8           THE ARBITRATOR:  What are the 9:15's?
9           THE WITNESS:  Those correspond,
10 Mr. Harris, to the entry at 8:15.  That's the one
11 hour difference.
12           THE ARBITRATOR:  Oh, okay.  Got you.  All
13 right.
14           THE WITNESS:  Yes, sir.
15 BY MR. KERNEY:
16   Q.    Okay.  The next one I want to listen to is
17 going to be from July the 25th.  And that's Bates
18 stamped 81.
19           MR. GOMEZ:  Do you know the page?
20           MR. HILL:  Yeah.  That's what I'm pulling
21 out.  That's going to be page 21, I believe.
22           MR. KERNEY:  Before you play that, let me
23 ask just a follow-up question.
24 BY MR. KERNEY:
25   Q.    We just saw you made a lot of calls on June

Page 287

1 28th to Mr. Williams.  And we saw sometimes you
2 called three times within a single hour; is that
3 correct?
4    A.    Based on the response, yes, sir.  We saw a
5 few occurrences.
6    Q.    Why would Conn's call a customer three times
7 within the same hour?
8    A.    Based on the end result, what happened on the
9 end of the phone call, whether we reached a machine,
10 a busy signal.  That potentially would have been
11 placed from the credit system team members that set
12 up the campaign as an opportunity to retry that
13 number.  And over eight hours -- excuse me --
14 eight o'clock in the morning until nine o'clock at
15 night, about 13 hours, we do make attempts to reach
16 customers.  Our customers aren't typically eight to
17 five.  They work varying shifts, and it's really a
18 tough part of our contact business when we think
19 about when is the right time to reach someone.  And
20 so that's not uncommon, I think, what we've just
21 seen.
22 BY MR. KERNEY:
23   Q.    Okay.  Let's play the call from July 25th
24 which again is Bates stamped 81.
25           MR. HILL:  That's going to be page 21 of



Page 288

1  the transcript.
2        THE ARBITRATOR: Okay.
3        (WHEREUPON, audio recording is played
4  into the record.)
5        MR. KERNEY: Okay.
6  BY MR. KERNEY:
7  **Q.    Does Conn's believe that it should have**
8  **continued to call Mr. Williams following that**
9  **conversation?**
10  A.    Yes, sir.
11  **Q.    I heard Mr. Williams say "I would appreciate**
12  **it if you would stop calling me." Can you tell me**
13  **what is ambiguous about that statement?**
14  A.    Well, in this particular call, Mr. Williams
15  hung up on us at that time. And the original agent,
16  Pamela, to the manager that was being introduced,
17  didn't have the opportunity to have any additional
18  conversation with Mr. Williams.
19  **Q.    So in order for Mr. Williams to get Conn's to**
20  **stop calling him, he would have to tell your agents**
21  **some specific information; is that correct?**
22  A.    Yes, sir. And that specific information
23  would simply be to have additional points in the
24  conversation of what he's asking us to do. I think
25  what we've heard is that the terminology was "we

Page 289

1  would appreciate if you didn't, you know, tell your
2  buddies to stop calling or tell your buddies to slow
3  up." Our agents are trying to engage and I think
4  what you've heard several times, the intent of our
5  phone call is to, as Mr. Williams said earlier in one
6  of the additional phone calls, to help protect their
7  credit. We want them to come back and shop us again.
8  And short of us actually hearing a good, clear
9  request, the agents that we've heard acted
10  appropriately when we think about their phone
11  handling.
12  **Q.    So you don't think on any of the three**
13  **recordings we've listened to this afternoon since**
14  **we've been taking testimony from you, that Conn's**
15  **heard a good, clear request for the calls to stop?**
16  A.    No, sir.
17  **Q.    Okay. I'm thinking back to that contract we**
18  **talked about more, the contract from November the**
19  **29th. The contract says "Nothing within this**
20  **contract shall designate an exclusive manner for**
21  **revoking your consent to receive these calls."**
22  **Wouldn't "I done told you motherfuckers to stop**
23  **calling me" be one way of revoking consent to**
24  **telephone calls?**
25  A.    I think that would be a very poor assumption.

Page 290

1  Not understanding who our client base is and what the
2  expectations are of our customers. And I understand
3  I've had an opportunity where most in this room
4  haven't. I've performed this job for 20 years. And
5  I understand what our customer base is. I ran that
6  business until 2008.
7        And when I took on other responsibilities
8  with Conn's I took on the training. And I understand
9  and our customers understand specifically how
10  important those phone calls are. It's important that
11  we engage and I truly understand. In going back to
12  our earlier comment, customers have the right and the
13  opportunity to be upset. We never try to persuade
14  them one way or the other. But when they're making a
15  request, it's very important that we clearly
16  understand what that request might be. Very
17  important.
18  **Q.    So wouldn't you agree that you're designating**
19  **the way that they can revoke consent? They have to**
20  **follow your specific protocol to give you the**
21  **information you want to terminate the calls?**
22  A.    No, sir. In this example, that's a big leap
23  to make an assumption that the customer is telling us
24  in some way, shape or fashion that they want to make
25  a change. Well, what change in this specific area

Page 291

1  are they asking of us to do? There could be
2  alternatives to that. Do they only want to be called
3  in a certain manner? Don't call us this frequently.
4  Or call at a different phone number. There's other
5  parts of that conversation we really need to uncover
6  and understand.
7  **Q.    Okay. All right.**
8        MR. KERNEY: I'm going to flip to a call
9  that's from October 17th, 2016. That was Bates
10  stamped 168. And it's on page 39 of our transcript.
11        THE ARBITRATOR: Hang on a second.
12        MR. KERNEY: I believe the particular
13  recording is on 168.
14        THE ARBITRATOR: All right. If you
15  wouldn't mind, on this audio you're about to play,
16  can you just start over with the date and where it is
17  in the transcript, please.
18        MR. KERNEY: Yes, sir. It's October 17th
19  of 2016.
20        THE ARBITRATOR: Okay.
21        MR. KERNEY: Okay. I'm sorry. I'm
22  talking about October 14th. I apologize. And that's
23  Bates stamped 33. Or excuse me, 166.
24        MR. HILL: And that's going to be in the
25  second set of transcripts. That should be on --



Page 292

1  beginning on page 35.
2        THE ARBITRATOR:  Okay.
3        (WHEREUPON, audio recording is played
4  into the record.)
5  BY MR. KERNEY:
6  Q.    Does Conn's think that Mr. Williams revoked
7  his consent to receive phone calls during that
8  conversation?
9  A.    No, sir.
10 Q.    All right.  We've heard a lot of
11 conversations today, right?  You sat here and we've
12 heard, I don't know, 30 or 35 recordings that
13 Mr. Hill played.  Do you believe at any point today
14 you heard anything from Mr. Williams during a
15 recorded conversation with Conn's that should have
16 prompted Conn's to stop calling Mr. Williams' cell
17 phone?
18 A.    No, sir.  Going back to, I think, a similar
19 question you asked me earlier.  No, sir.  Our agents
20 performed as we would have anticipated.
21 Q.    Okay.  Have you spoken to any of the agents
22 that handled the servicing of this account?
23 A.    Not specific to Mr. Williams' case.  No, sir.
24 Q.    Okay.  So you haven't followed up with
25 anybody about their handling of any portion of any of

Page 293

1  this account?
2  A.    Not specific to the case.  Going back to my
3  management responsibilities, if any of these phone
4  calls maybe came up during our Q/A process, they
5  could have been given feedback over the years, but
6  not that I'm aware of.
7  Q.    Okay.
8        MR. KERNEY:  I would like at this time,
9  Mr. Harris, to ask Mr. Walton to confirm a call count
10 total for us.  But I don't want to have him sit here
11 and count calls.  I think it's something that he can
12 probably do tonight, and we can follow up with him
13 tomorrow.  But I asked him earlier how many calls,
14 and he said over a thousand.  But that's obviously
15 not an accurate number.
16      My count of how many total broadcasts or
17 predictive mode calls were made is 1,118 after
18 March 6th, which we're alleging is the first
19 revocation on the account.  I don't want to burden us
20 and waste a bunch of time.  So maybe we can reach an
21 agreement that Mr. Walton will tonight go through his
22 records and count the broadcast and predictive mode
23 calls and text messages that were sent to
24 Mr. Williams' cell phone after March 6th, 2016.
25        THE ARBITRATOR:  Well, y'all can go talk

Page 294

1  about that.  I mean, you're asking --
2        MR. KERNEY:  Sure.  Sure.  I mean, is
3  that an okay way to proceed with you, Stefanie?  I
4  don't want to make us waste time, but Clint is going
5  to be the one that interprets the records best.
6        MS. JACKMAN:  Well, we're not intending
7  to put Mr. Walton up tomorrow.  This is your case.
8  You have some exhibit we're already looking at
9  tonight that purports to establish that 1,118 calls.
10 I don't know why we would need Mr. Clint to then give
11 corresponding testimony.  That exhibit is reserved on
12 the record, and that's what you've said you were
13 relying on and we're looking at it tonight in a bunch
14 of -- in addition to doing a bunch of other things,
15 so no, I don't think it's reasonable.
16        MR. KERNEY:  Well, he's the senior
17 manager of compliance.  He should be able to know how
18 many times they called.  We're suing Conn's on a per
19 count basis.  I find it hard to believe he doesn't
20 know that exact number to be totally honest with you.
21 We asked opposing Counsel to calculate this for us
22 last week.  For some reason they have not.  We can
23 have Mr. Walton count them.  It won't take him more
24 than ten minutes.  And then we can go back on the
25 record.  He can tell us the number and we can move

Page 295

1  on.  I'm just trying to not waste time here today.
2        THE ARBITRATOR:  To count to a thousand?
3        MR. KERNEY:  He should be able to know.
4  First of all, there's -- on these pages, once you get
5  through the first couple of pages, there's 34 calls
6  on every single page of the Noble report.  You can
7  count how many total pages there are, multiply by 34
8  and then subtract out the manual mode calls.  It's
9  not that big of an exercise, but I want to know how
10 many total calls they made.
11        MS. JACKMAN:  So if I may, that's what I
12 understand I'm supposed to be checking, their
13 highlighted just produced today Exhibit 12.  And
14 here's, to address the request last week is made
15 clear, we do not contend that call attempts, and
16 you've heard Mr. Walton say over a thousand attempts,
17 are recoverable.  So I'm not going to have my witness
18 who has a lot to do, spend time preparing and
19 counting on something that we don't think is
20 supportable or the appropriate measure of damages in
21 this case, should damages even be appropriate,
22 because we contend we're not using an ATDS.  So I
23 think they have, assuming we're okay with it after
24 our review tonight, what they need, and I don't see a
25 need for further testimony beyond what they already



Page 296

1  have and what we're checking tonight.
2        MR. KERNEY:  Can I just clarify why?  Our
3  cell phone records show every call Conn's made
4  including the manual calls.  I don't believe the
5  manual calls are actionable.  I don't believe they
6  did anything wrong by placing a manual call.  I think
7  they were well within their rights.  But I think the
8  predictive mode calls and the blast mode calls are
9  violations of the TCPA.
10       MS. JACKMAN:  So it's much faster for us
11 to look through your highlighted record and strike
12 out the 40's that are highlighted --
13       MR. KERNEY:  Ma'am, how --
14       MS. JACKMAN:  -- then to have him count
15 to a thousand tonight when he's helping us prepare
16 our expert.  This is intended to cause a burden.
17       THE ARBITRATOR:  Well, Mr. Kerney, to
18 accommodate everyone, you have not completed your
19 proof.  You still say -- well, first of all, we've
20 got cross-examination of Mr. Williams, and you may
21 have some questions of Mr. Williams.  I think it is
22 the burden of the claimant to put on its proof.  And
23 your proof hasn't -- isn't going to conclude tonight.
24 And y'all can work on it this evening and see what
25 you can come back with.  You know, if you can think

Page 297

1  of a way to count it, think of a way to count it.
2  And we'll just have to address that tomorrow.
3  Mr. Walton will be here, and maybe y'all can come up
4  with some mutually agreeable way of --
5        MR. KERNEY:  I can certainly -- if we
6  want to go in this way, I can certainly go through
7  each day, and we can count right now.  I just think
8  it's a silly way to do it.
9        MS. JACKMAN:  Well, hold up.  I thought
10 you explained -- Arbitrator Harris, when we were
11 discussing the new exhibit, I thought he explained
12 that what they did was take our Noble dialing report
13 which is Exhibit 3, and match it against their
14 client's cell phones which I recall the cell phone
15 records during this case as Exhibit 7.  And say that
16 they cross-referenced it to show that every call in
17 that Noble report that our system put out also was
18 captured in Mr. Williams's cell phone records.
19       Then Mr. Kerney says, we also highlighted 40
20 others that are manual because those were in that
21 Noble report, but we don't want to recover for those.
22 And I objected and said well, then, you're admitting
23 this as overinclusive, but my point is, is if we can go
24 through it tonight and do our analysis, he has what
25 he needs in that report according to how he is

Page 298

1  construing the recoverable calls in this case.  Call
2  attempts.  Are you with me on that?
3        MR. KERNEY:  Okay.  So if we're going to
4  stipulate that you're going to cross-reference that,
5  tell us what you think is incorrect in it, and then
6  we'll enter it as an exhibit, that's fine with me.
7        MS. JACKMAN:  I do not have time to do
8  all that.
9        THE ARBITRATOR:  I don't know that we can
10 expect somebody to just on the fly stipulate to that
11 if they haven't even read it.  So what we've got is a
12 set that we can give to Conn's, and I'll give your
13 set back to you.  And y'all are going to just have to
14 do your best with the resources you have to work on
15 that this evening.
16       MR. KERNEY:  Sure.  I just have one
17 follow-up question for Mr. Walton.  Then we're done.
18       THE ARBITRATOR:  I would also point out
19 I'm not -- if what you're seeking to establish is
20 that more than a thousand -- or at least not less
21 than a thousand calls were made, I think he's
22 testified to that effect.
23       MR. KERNEY:  Sure.
24       THE ARBITRATOR:  The last hundred of them
25 or however many that might be, you can think about

Page 299

1  those.  The importance of that.
2        MR. KERNEY:  Okay.  Yeah.  It's just
3  because we're asking for damages on a per call basis.
4        THE ARBITRATOR:  I understand.
5        MR. KERNEY:  So that extra hundred calls
6  should be $150,000.
7        THE ARBITRATOR:  I understand.
8        MR. KERNEY:  Okay.
9        THE ARBITRATOR:  But the burden is on you
10 to present your case.
11       MR. KERNEY:  Okay.
12       THE ARBITRATOR:  Did you say you have
13 some other questions of Mr. Walton at this point?
14       MR. KERNEY:  Yes.
15 BY MR. KERNEY:
16 **Q.     Okay.  Mr. Walton, you would agree that the**
17 **Noble report that we marked as Exhibit 3 accurately**
18 **reflects every attempt Conn's made to contact the**
19 **claimant's cellular telephone number, correct?**
20 A.    Similar answer I gave you earlier,
21 Mr. Kerney.  Without going through and looking at
22 each entry to make sure that Latitude matches to it,
23 I don't doubt that I wouldn't find a match.  But I've
24 just not performed that.
25       MR. KERNEY:  Okay.  I have nothing



Johnnie Williams vs Conn Appliances
Arbitration

300..303

Page 300

1 further.
2         MS. JACKMAN: So we went about an hour
3 and a half. I need to use the ladies' room. I don't
4 want to take a long break. I know what time it is.
5         THE ARBITRATOR: No, that's fine.
6         (Short break.)
7             CROSS EXAMINATION
8 QUESTIONS BY MS. JACKMAN:
9 Q.     Mr. Walton, just to get us back into the
10 discussion here, you said you were the senior manager
11 of compliance. Can you tell me the areas of your
12 responsibility in that role?
13 A.     Policies and procedures, training specific to
14 the call center operations, regulatory training,
15 oversight over quality insurance, assisting the
16 operations teams when we think about customer
17 disclosures, point of sale, and then the various
18 media types. TV, radio, internet, et cetera. That's
19 areas of responsibility that I'm either involved
20 with, with a final say, or I'm engaged with from a
21 project or oversight perspective.
22 Q.     And I heard you say you have over 20 years of
23 experience in this industry. What do you mean when
24 you say "this industry"?
25 A.     The credit call center and retail industry.

Page 301

1 Retail in general, I'll date myself as pushing about
2 30 years. Goodness. With Conn's over the past
3 21 years.
4 Q.     And is that including collections work?
5 A.     Yes, ma'am.
6 Q.     Have you ever worked as a collector?
7 A.     I did.
8 Q.     How long did you do that?
9 A.     That was my tour of duty, if you will, when I
10 first joined Conn's. I had previous retail
11 management experience, and they said "well, we would
12 like to try you in a few different areas, but first
13 we want you to learn the credit business. And that
14 means we're going to have you go take phone calls and
15 understand what that means about our business at
16 Conn's."
17         So for the first 12 months, every month and a
18 half maybe, maybe every two months, if I performed
19 well and I was given a new assignment. And I was an
20 agent. I was treated as an agent. On an accelerated
21 path, but after about 12 months. Then I was named as
22 a supervisor and started managing teams for our call
23 center.
24 Q.     So you said that was your tour of duty when
25 you first started. When did you start at Conn's?

Page 302

1 A.     December 15th, 1997.
2 Q.     And you've been there continuously ever
3 since?
4 A.     Yes, ma'am.
5 Q.     Okay. And do you attend any industry
6 conferences?
7 A.     I do.
8 Q.     Which ones?
9 A.     Those primarily hosted by the ACA.
10 Q.     What is that?
11 A.     The American Collection and Professionals.
12 When you think about credit. Over the years I've
13 also been a member of NACM, national credit
14 management that's more specific to business, to
15 business lending. Then National Installment Lenders
16 Association. That's more on the loan side. But
17 today I am a member, not Conn's. I am a member of
18 the ACA.
19 Q.     You personally?
20 A.     Me personally.
21 Q.     Do you have any certifications through ACA?
22 A.     I do.
23 Q.     What are those?
24 A.     The compliance officer designation. That's a
25 professional designation that you go through course

Page 303

1 work, and then you have to maintain that once you've
2 achieved that designation each year with varying
3 credits. I've also obtained the scholar and fellow
4 designation. That's -- for both of those together,
5 that's achieving 36 credit units of the collection
6 industry. By obtaining -- or excuse me -- attending
7 seminars, webinars to count for your credits toward
8 that.
9 Q.     And these are things that ACA, the collection
10 industry organization, gave you?
11 A.     Yes, ma'am.
12 Q.     Okay. How long have you had those
13 certifications?
14 A.     All of those were completed in 2000- -- end
15 of 2012.
16 Q.     And you've maintained it since?
17 A.     Yes, ma'am.
18 Q.     We heard Arbitrator Harris say this morning
19 he wasn't necessarily familiar with Conn's. He
20 hadn't had an opportunity to shop it. I think he's
21 become more familiar as we've gone today, but can you
22 tell us what types of customers Conn's serves?
23 A.     The primary focus is the customer who, maybe
24 they've had a credit challenge. They've had a thin
25 credit file. And what we typically see when we look



Page 304

1  at the profile of the customer on their credit
2  history, they've actually shopped or attempted to
3  shop and attain credit at some of our competitors.
4  And where we're a bit different, and our niche in the
5  market is that we really understand that's an
6  under-served market.  That has been our core customer
7  base for a number of years.
8       And when we think about that relationship,
9  the premise is to build -- help that customer build a
10 credit history and start maintaining that on an
11 ongoing basis, and hopefully we have an end result
12 like what we've been able to accomplish.
13 Historically we see about 60, 65 percent of our
14 existing customers re-shop us each year.  And over
15 the past several years, just kind of tell you how
16 that ties into us as a retailer, we've put major
17 focus on our product categories.  If you go and you
18 look at any competitors, whether it's TVs,
19 electronics or furniture, you'll find the same high
20 quality products in those locations as you'll see at
21 Conn's, but with an exception.  We don't have the
22 models two, three or four down.  We're not in it from
23 a perspective of trying to have a knock-off brand.
24 We want to give customers high value.  And we really
25 made that focus.  Ss that ties into our credit

Page 305

1  offering for a customer.  So that the customer and we
2  hear it, we do have customers that will send us good
3  letters that say "Look, you know, in my neighborhood,
4  the doctor down the street" --
5           MR. KERNEY:  Objection.  This is hearsay.
6           MS. JACKMAN:  He is testifying to --
7           THE ARBITRATOR:  Let's just move forward.
8           THE WITNESS:  So yes, sir.  Would you
9  like me to finish?
10          THE ARBITRATOR:  Yeah, sure.  Go ahead.
11 A.    Oh, okay.  Very short, very quick.  Our
12 customers have the opportunity to shop just like
13 someone with a high network would.  They can buy the
14 same 80-inch TV as the doctor down the street would.
15 BY MS. JACKMAN:
16 **Q.    Do you experience the same types of default**
17 **rates that these high end financially benefitted**
18 **people do with your customer base?**
19 A.    We have a higher default rate, and that's
20 baked into our model, so we contemplate that.
21 **Q.    So am I correct that there's a higher risk**
22 **with people that have thin files or less than stellar**
23 **credit histories?**
24 A.    Yes.  There is, and we try to mitigate that
25 in several ways.  We offer down payments to lessen

Page 306

1  the amount that ultimately will be financed.  What
2  you've heard from our agents that are with
3  Mr. Williams attempting to make offers for re-aging
4  programs, payment programs, helping them get back on
5  track.  So we understand that that is part of our
6  offering to the customer and how we think about that
7  relationship.
8  **Q.    So I know that Mr. Hansen was a long time ago**
9  **now, but I want to refocus us on where we started**
10 **first.  Just whether our system, the Noble dialing**
11 **system, is an ATDS, which is a threshold requirement**
12 **for the TCPA.  So you've testified that you have**
13 **overseen that credit systems administration team in**
14 **the past; is that right?**
15 A.    Yes.
16 **Q.    And now how do you interact with them in your**
17 **compliance role?**
18 A.    It's from an oversight perspective, whereas
19 in years past, that was my job.  Matter of fact, that
20 was one of my first initial responsibilities for
21 Conn's, was operating our telephone system or
22 telephony system.  And over the years I've had the
23 opportunity to purchase two of our phone systems.
24 The most recent being Noble.
25 **Q.    Okay.  We'll get to that.  But why don't you**

Page 307

1  **tell me how this system at a higher level operates,**
2  **because I've made-- as you've heard in my opening,**
3  **I've made a lot of statements about it.**
4  A.    The Noble system that we have a license
5  agreement towards is a cloud-based system.  Unlike
6  other offerings that are offered by Noble or other
7  competitors where you can actually buy a series of
8  servers, computer servers, and plug it into your
9  office building and hook it up to a phone line, this
10 is different.  It operates in the cloud.  And our
11 main -- two main reasons that we went that direction
12 was simply, we knew that we were going to have growth
13 as a company.  At this time in 2011 we were only in
14 three states.  Today we're in 14.  So we knew what
15 was coming.  Additionally, we had just come off of
16 four evacuations where we actually picked up our
17 corporate office and moved to safe sites because of
18 hurricanes.  And that meant that the old technology
19 that we had, we actually packed it in FedEx trucks
20 and in the back of my trunk of my car and went to a
21 safe site and plugged things in.
22      Now, when we think about where we are today
23 being cloud, it is accessed from a URL.  There is
24 some software that our credit system team members
25 have loaded into their PC to operate the Maestro and



Page 308

1  Harmony software solutions.  And again, it gives us
2  the flexibility, albeit from San Antonio or from
3  Beaumont, Texas call center, for an agent to actual
4  log in in either of those facilities by achieving
5  that through a URL.
6        The last important piece of that is that it
7  is a license agreement.  And going back to my comment
8  with Mr. Frank earlier, it's very akin to like,
9  Facebook.  You're only an end user, and as much as I
10  would like to change the color of a particular button
11  within Noble, I can't.  Conn's has no access to
12  changing of the code, if you will.
13  **Q.     So when Mr. Hansen said he had heard from**
14  **people at Conn's that a system is in a closet,**
15  **sometimes in the cloud, would you agree with his**
16  **characterization?**
17  A.     No.  No, ma'am.  Not at all.
18  **Q.     Why not?**
19  A.     We do not have anything in the closet or --
20  at any of our facilities.
21  **Q.     Okay.  So we've talked about the credit**
22  **systems administration team.  But can you tell**
23  **Arbitrator Harris what that is?**
24  A.     It's a group of humans.  I know we've kind of
25  talked around it a bit so far, but it's actually a

Page 309

1  team of six individuals including their managers.
2  And the credit system team is responsible for
3  operating the Noble telephony system.  And their day
4  begins very early in the morning, around 6 a.m.  And
5  when we think about reconciling the customers that
6  maybe have just reached a first day past due or new
7  customers to Conn's, their job early in the morning
8  is to take that information from our internal Conn's
9  platform which is the AS400, that's our point of sale
10  system.  That's a proprietary system that we've had
11  for a number of years.  The credit system team is
12  actually taking that information from the AS400 and
13  reconciling that along with our IT team as well,
14  against the financials to make sure that if, at the
15  end of the day the previous day, that we were
16  supposed to have 1,000 customers who made payments,
17  that the next morning those 1,000 customers have
18  their payments that have been updated.  And now who's
19  left from that perspective of potentially being past
20  due.  So the credit system team members are a part of
21  that process in reconciling that information.
22  **Q.     Why are they reconciling that to make sure**
23  **for instance if a payment was due the day before it**
24  **was made?**
25  A.     So if a customer made a payment, we want to

Page 310

1  make sure that we have an appropriate accounting of
2  that.  And not call a customer that does not need a
3  phone call.
4  **Q.     How many people?  You said that the credit**
5  **systems administration team is a team of humans.  How**
6  **many today?**
7  A.     Six including the members of -- we actually
8  have two, a working manager and then one director
9  that oversees that group.
10  **Q.     Was it the same size in 2016 when the calls**
11  **were attempted in this case?**
12  A.     Yes, ma'am.  Roughly we may have fluctuated.
13  Historically it would have been between three and
14  four.  I think we've added one director since that
15  time, so maybe plus one.
16  **Q.     Okay.  And I heard you telling Mr. Kerney**
17  **about pulling levers.  This is the team that you're**
18  **referring to when you talk about that, or somebody**
19  **else?**
20  A.     This is the team, the credit system
21  administration team.
22  **Q.     Okay.  So you started saying that they come**
23  **in and 6 a.m. and they do their reconciliation.  You**
24  **told us why.  What do they do next after they finish**
25  **their reconciliation?**

Page 311

1  A.     Now that we have the grouping of customers,
2  there is an FTP process that -- a file transfer
3  process that the credit system team members are then
4  uploading to Latitude.  And Latitude is where we
5  start preparing what's called work cards.  Which
6  ultimately becomes the basis for our campaigns within
7  Noble.  But the work within Latitude is furthering
8  the reconciliation and preparing those work cards.
9  And within those work card assignments, those are
10  directions that have been given to the credit system
11  team members by the call center management.  And that
12  may have been simply by an e-mail.  It could have
13  been a verbal conversation.  But it's a form of
14  instructions on how we would consider for that next
15  day's calling and groupings of campaigns based on
16  delinquencies.  Based on any other caveats that the
17  collection management team members may have.  And so
18  they're performing that work within Latitude.
19  **Q.     So just to make sure I'm following you.  The**
20  **work cards are prepared by the credit systems**
21  **administration team?**
22  A.     Yes, ma'am.
23  **Q.     Okay.  And you've talked about two systems.**
24  **So let's just get it clear.  What is Latitude?**
25  A.     Latitude is the collection platform.  It's



Page 312

1  much like a big file cabinet that the agents are
2  going in and actually typing in notes of their
3  conversation.  Or I think as we've seen as well, it
4  actually shows the call attempts over the history of
5  the account.
6  Q.    And just to draw the line, are those the
7  account notes you were talking about before,
8  Exhibit 14?
9  A.    Yes, ma'am.
10 Q.    So those are the Latitude notes?
11 A.    That is correct.
12 Q.    Okay.  Does Latitude house any numbers to use
13 to contact consumers?
14 A.    So, yes.  We actually maintain within
15 Latitude the phone numbers specific for each customer
16 and then their phone status.
17 Q.    Where do those numbers come from?  Does
18 Latitude keep track of them?
19 A.    So phone numbers originate the customer.
20 And they originate from the customer in two ways.  A
21 customer today at Conn's can go to our Conn's website
22 and create a credit application.  And that's about 46
23 percent of our business today.  And that's a customer
24 who actually goes in and types in all of their own
25 information for a credit application.  If approved,

Page 313

1  they come into the store, see a sales associate, and
2  they complete the transaction.
3       The other percentage that we would see is a
4  customer -- and there's a small percentage that
5  actually mail in an application which they're doing
6  the same thing, but they're putting a pen to a sheet
7  of paper.  Smaller percentage.  But then the other
8  larger majority is a customer who physically walks
9  into our store.  They see a sales associate.  They
10 let our sales associate know that they are interested
11 in credit.  And the sales associate's asking for that
12 information.  And the sales associate is asking for
13 the customer's phone number, address, date of birth,
14 et cetera.  And so that information's given to us
15 from the customer in two different methods.
16 Q.    Okay.  What is the system at the point of
17 sale called where the customer's in-store information
18 would be inputted by the Conn's agent in the store?
19 A.    Yes, ma'am.  That's the AS400 system.
20 Q.    Okay.  And does the AS400 system talk to the
21 Latitude system in anyway?
22 A.    There is -- after we've established an
23 account for a customer, because it is point of sale,
24 we have a cash register that is exactly what that
25 sounds like.  And throughout the day as we're getting

Page 314

1  payments from customers, we do a talk between
2  Latitude and AS400 on the cash register to show we've
3  made a payment, we've received a payment.  And that
4  way, we can keep our agents up to speed.
5       And then additionally, if we happen to --
6  wanted to call a customer in a later call campaign,
7  then Latitude would have that recent payment that we
8  could exclude from the next call campaigns that would
9  happen.  Outside of that, that's the interaction
10 between Latitude and AS400.
11 Q.    Okay.  Are there any other systems?  I know
12 that our expert Adam Sorini is going to talk about
13 Fiserv.  What's that?
14       THE ARBITRATOR:  What is it?  Spell that.
15       MS. JACKMAN:  F-I-S-E-R-V, Fiserv.
16 BY MS. JACKMAN:
17 Q.    What is that?
18 A.    Yes, ma'am.  That is what we considered our
19 system of record for the customer payment history.
20 And much of what the literal sounds like, it's the
21 accounting, the aging of an account.
22 Q.    Okay.
23 A.    And in various states, there are applicable
24 ways in which we have to rebate customers that pay
25 early.  Or age accounts based on their interest

Page 315

1  structure in a particular state.  That's Fiserv's
2  function.  And then the output there is a customer
3  payment history.  So when customers call us for a
4  payment history, that's exactly what our agents are
5  doing.  They're logging into Fiserv and sending that
6  via e-mail or putting that in a postal envelope for a
7  customer.
8  BY MS. JACKMAN:
9  Q.    Okay.  And just to be clear and avoid
10 confusion, can the Latitude system make calls?
11 A.    No, ma'am.
12 Q.    Can the AS400 system make calls?
13 A.    No.
14 Q.    Can the Fiserv system make calls?
15 A.    No, ma'am.
16 Q.    Okay.  All right.  So the credit systems team
17 has developed the work cards based on the campaign
18 and instructions they got from the call center
19 management or collection management.  What happens
20 next?
21 A.    So now the processing within Latitude, we are
22 ready now to send a file to Noble.  And that again,
23 is through FTP, file transfer process.  The actual
24 format is in a dot CSV file so it compresses all of
25 those key attributes for a customer.  The name,



Johnnie Williams vs Conn Appliances
Arbitration

316..319

Page 316

1  address, phone number, the next due date, the monthly
2  payment, the phone number that we are going to
3  attempt to dial.
4      Some real basic information that is then sent
5  to Noble in that process. Such that whenever the
6  agent is taking a call from an inbound call or an
7  outbound call, that screening information that they
8  see, that screen alert has that basic information, so
9  they know immediately who's on the line.
10  **Q.    So just to be clear, you're not suggesting**
11  **the credit systems administration teams sits there**
12  **and manually through like coding zeroes and ones into**
13  **Noble, uploads work cards, that there's an electronic**
14  **transmission?**
15  A.    Yes, ma'am.
16  **Q.    And the credit systems team makes that**
17  **transmission happen?**
18  A.    That is correct. Through that FTP process.
19  **Q.    And then the Noble system starts making**
20  **calls?**
21  A.    No, ma'am.
22  **Q.    What happens next?**
23  A.    The credit system team is not done. So this
24  takes us to -- goodness, we're probably pushing
25  seven, a little bit after seven o'clock in the

Page 317

1  morning. Within Noble now at the campaign level, the
2  campaigns are now being further modified, based on
3  those work instructions that the credit system
4  administration team has received from the collection
5  management.
6  **Q.    How so?**
7  A.    Well, typically based on the end result of
8  the phone call, for example, the customer has made a
9  payment, are we're going to include/exclude those
10  customers? So they're going in and actually setting
11  for each campaign those parameters. And then I think
12  what we spoke about earlier, such as the number of
13  lines per agent. And then lastly the abandon rate
14  feature as well.
15      So we're making those settings within
16  campaign, the campaign setting for Noble. And this
17  process takes the credit system team members right up
18  to the eight o'clock window. And then we stop and we
19  wait.
20  **Q.    So the system can start making calls at eight**
21  **o'clock?**
22  A.    No, ma'am. So we stop and we wait. And the
23  credit system team members, by this time we have
24  typically two of two credit system administration
25  team members on staff, on site. So then at

Page 318

1  eight o'clock, as soon as we hit eight o'clock, then
2  the credit system team members are actually
3  activating the campaign. But then --
4  **Q.    Let me stop you there.**
5  A.    Oh, yes, ma'am.
6  **Q.    How does the credit systems team at 8 a.m.**
7  **activate a campaign?**
8  A.    They actually go in to the Noble system, and
9  the campaign that has been given to them from their
10  work instruction by the management team, they
11  actually go in and activate. They -- it's performing
12  a run function to give us an end result to say that
13  within 30 to 60 days past due, you have a thousand
14  customers to call. And once they perform their run
15  function, then the campaign is activated, and it's
16  ready, and it's ready for the next step. Which is,
17  we have to have agents start logging in before any
18  call activity can begin.
19  **Q.    Okay. So you need agents to log in. Why?**
20  A.    The function of the Noble system, the
21  solution we have, no phone calls will take place
22  unless the agents actually log in.
23  **Q.    Now, when you've loaded these campaigns in**
24  **the morning, will they just run automatically once**
25  **they're in there and your credit systems**

Page 319

1  **administration team has done this reconciliation and**
2  **gone into the campaigns, or does it have to follow**
3  **some other process?**
4  A.    Their day is still yet just beginning. Now
5  we have active calls that are taking place. I think
6  I heard the terminology, I guess, it's like a small
7  NASA operation. The credit system team members have
8  multiple screens on their desk, and they're by call
9  center, they're managing the calling activity per
10  campaign.
11      And throughout the campaign, they're
12  identifying are we getting some of our desired
13  targets, such as are we keeping our abandoned rates
14  low, we're not hanging up on customers, dropping
15  phone calls, things of that nature. They're also
16  actively looking for those opportunities where they
17  may mainly engage, and this happens quite often,
18  where we recognize certain campaigns are busier than
19  others. And based on their ability to go in and
20  actually move groups of agents from one campaign to
21  the next to handle call volume, that is a function
22  that they perform all throughout the day.
23  **Q.    Okay. So if I'm understanding you, when**
24  **you're telling Mr. Kerney there's lever pulls by the**
25  **credit systems administration team, looking at their**



Page 320

1  NASA dashboard, one of those is to control for agent
2  availability?
3  A.      Agent availability.  The number of line
4  assignments.  Their abandon rates.
5  Q.      Okay.
6  A.      And then the currents that I think that I
7  have maybe shared before is that you may have started
8  with ten agents that logged in to a campaign, and for
9  whatever reason, a manager had a good reason to have
10  a quick meeting, and they pull all ten agents away.
11  Well, there might be calls that are holding.  And
12  that credit system team is actually actively managing
13  that monitoring, they go in and recognize that, and
14  they shift and move, mainly move agents to go cover
15  those phone calls.
16  Q.      You also mention that the team is pulling
17  levers with regard to the abandon rate.  Why, what
18  does that mean?
19  A.      Well, from a very pure customer service
20  level, typically our target of abandon calls is three
21  percent or less.  And while the campaign has the
22  ability to help manage to that, we do see spikes, for
23  example, around pay dates where our call centers get
24  busy.  We have an influx of customers that either
25  answer the calls or have an influx of customers

Page 321

1  calling in.  And for those periods of time, we're
2  breaking that three percent abandon rate.  So our
3  credit system team members are going in, recognizing
4  that, and making those modifications to the abandon
5  thresholds or the actual line assignments and then
6  mainly picking agents and moving them from one to the
7  other.
8  Q.      Okay.  You recall Mr. Hansen describing a
9  predictive algorithm this morning?
10  A.      Yes, ma'am.  I do.
11  Q.      Do you have an understanding of what he was
12  referring to based on your experience, what this
13  predictive algorithm is?
14  A.      It's a common terminology that's used, has
15  been used in the industry.  And in form of
16  algorithms, there are systems, more predominantly on
17  the telemarketing side, that at a very basic level
18  will, you know, predict by, based on algorithm, the
19  particular calling activities or end result that
20  would happen.  Such that you see that you have
21  certain phone calls that need to be addressed.  And
22  it's trying to or attempting to throttle down, slow
23  down, or speed up calling.  Based on complex
24  algorithms.
25          Very much so on the telemarketing side of the

Page 322

1  business, the effort there is the more calls I can
2  make, the more sales that I can get.  I have direct
3  experience with that.  Not only working in
4  telemarketing before coming to Conn's but also too
5  our exercise in purchasing two systems.  And one of
6  the key things that we were not interested in were
7  purchasing systems that had these additional
8  complexities around telemarketing, because there's
9  other compliance rules to consider that are built in
10  that our system does not have.  And that's why we
11  went the route we did with Noble.
12  Q.      So I am understanding you that the system you
13  have, which we'll talk about in a minute, when you
14  purchased it, does not have this predictive
15  algorithm.  That's what the credit system
16  administration team is providing in its efforts?
17  A.      Yes, ma'am.  You're correct.
18  Q.      When did you purchase -- and when I
19  say you, Noble or Conn's, purchase the Noble system
20  that was involved in the calls placed to
21  Mr. Williams?
22  A.      We installed in October 2011, so our actual
23  purchase was about six months prior to that date.
24  Q.      And you said before this was cloud-based,
25  correct?

Page 323

1  A.      Yes, ma'am.
2  Q.      And why was that important?
3  A.      Very important.  Again, going on our history
4  with having to move operations.  So the cloud was --
5  is where we wanted to be at.  Then additionally with
6  the flexibility of having potentially credit system
7  team members, not just in one location but in the
8  future maybe we operated in a few different
9  operations as well.  But that's really the uniqueness
10  of the cloud.  And when we went down that path before
11  deciding on the Noble Solution about a year and a
12  half before that, Noble did not have that offering in
13  the cloud.  It was something that a few, only a few
14  companies were actually offering.  And we just didn't
15  like the offers that were on the table, so we waited.
16  We came back around and Noble, along with a few
17  others, had that cloud opportunity.  And we happened
18  to be one of the first clients for Noble in the cloud
19  space.
20  Q.      Okay.  Are there -- who controls the cloud
21  where the dialing technology you're using lives?
22  A.      Noble, and in very generic way, Noble does.
23  Q.      Okay.  Do you have the ability to reprogram
24  anything in the cloud, you meaning Conn's?
25  A.      No, ma'am.  When we think about programming



Page 324

1  or the actual source code, that was my real basic
2  illustration earlier of attempting to change the
3  color of a particular button or function, no, ma'am.
4  We have none of that ability.
5  Q.    So if you did need to change or wanted to
6  change something, who would have to do that?
7  A.    That would be Noble.
8  Q.    And from 2011 forward, have you ever asked
9  them to change anything about the system you
10  purchased?
11  A.    No, ma'am.
12  Q.    Okay.  And Are you aware of any changes that
13  have been used or made?
14  A.    No, ma'am.  Over time they've made software
15  updates where maybe they have decided to move a
16  button from one function to the next or one screen to
17  the next, but...
18  Q.    Mostly cosmetic?
19  A.    Very, very cosmetic.  And so over time
20  they've released, you know, version dot two, dot
21  three, et cetera.
22  Q.    But it didn't change the basic system you
23  purchased in 2011 and how it works?
24  A.    No, ma'am.  It did not.
25  Q.    And how it places calls?

Page 325

1  A.    No changes to that.
2  Q.    You heard Mr. Hansen talking this morning
3  about his experience with Noble dialing systems and
4  other predictive dialers.  I know you disagree, but
5  can you tell us why you disagree that your system is
6  not like those?
7          MR. KERNEY:  I'm just going to make one
8  -- just a quick objection.  Mr. Walton is here as a
9  corporate representative.  I think tomorrow we're
10  hearing from Mr. Sorini who's supposed to be the
11  rebuttal expert to Mr. Hansen for --
12          MS. JACKMAN:  Well, I'll say that he's
13  going to testify this system, one of the reasons he
14  helped purchase it is because it's customizable.
15          THE ARBITRATOR:  I think he can go
16  forward and testify.
17  BY MS. JACKMAN:
18  Q.    Do you need me to repeat my question back?
19  A.    Yes, ma'am.  If you don't mind.
20  Q.    So you know, we heard what Mr. Hansen said
21  this morning.  I think you think your system works
22  differently.  How, based on your experience and being
23  involved in vetting and purchasing it is it
24  different?
25  A.    Well, we had the ability to customize with

Page 326

1  Noble.  And that's really the big key.  And one of
2  the main reasons why, outside of the cloud, that
3  we've selected Noble.  The ability to remove any of
4  those features that when you think about the example
5  I gave earlier about predictive, about telemarketing
6  features, et cetera, performing manual -- or excuse
7  me -- automatic updates to the national do-not-call
8  list for telemarketing.  None of those things are
9  required for our business.  And having the ability to
10  customize is very important.
11  Q.    And those things that you were just
12  describing, like the telemarketing and those add-ons,
13  if I understood you, those are the types of benefits
14  of the predictive algorithm from your experience as a
15  telemarketer that you could see in the system as
16  benefitting, but you didn't need.  Am I understanding
17  you correctly?
18  A.    That is correct.  And then to supplement that
19  as well, you know, our business necessitated we need
20  a solution that allowed us to have inbound call
21  traffic management and have the ability to
22  cross-utilize agents who, in the event that we didn't
23  have the inbound call traffic that we needed, the
24  ability to have a system that would allow us active
25  management to, from a skill set, to move agents into

Page 327

1  other roles.  And that was, again, one of the unique
2  features with Noble.
3  Q.    Have you -- we know that we've produced some
4  Noble manuals in this case.  Mr. Hansen discussed
5  them.  Do those manuals to your knowledge describe
6  your system?
7  A.    No, ma'am.  Not specifically, no.
8  Q.    How can that be if Noble gave them to you?
9  A.    We have requested over the years for Noble to
10  provide us a specific manual for our system.  It's
11  one of their offerings that they give is a
12  customizable solution.  So the manuals that I've seen
13  related to this case and I think they're posted on
14  their websites as well, are just very generic.  And
15  depending on your total solution that you purchase
16  with Noble really dictates which of those features
17  you may or may not have.
18  Q.    So based on your experience with your -- the
19  Conn's Noble system, do you think somebody could read
20  those Noble reports and have an accurate view of how
21  your particular customized system works?
22  A.    No, ma'am.  They would -- not knowing our
23  system may not -- they wouldn't have a full
24  understanding about our system versus maybe someone
25  else that's a Noble customer.



Johnnie Williams vs Conn Appliances
Arbitration

Page 328

1  Q.    Do those manuals to your knowledge talk about
2  a credit systems administration team being necessary
3  to work on the Noble system?
4  A.    No, ma'am. Not that specific. No.
5  Q.    Okay. You also heard Mr. Hansen talk about
6  broadcast mode. You've discussed with Mr. Kerney.
7  My recollection was Mr. Hansen said that humans don't
8  need to be involved when the dialing is done in
9  broadcast mode. Do you recall testimony like that?
10  A.    I do, earlier today.
11  Q.    Do you agree with it?
12  A.    No, ma'am.
13  Q.    Why not?
14  A.    First of all, that's not a feature of our
15  solution, of our Noble Solution that we have.
16  Secondarily, from any of our calling campaigns, our
17  credit system team members can't walk away for days
18  like I heard Mr. Hansen say, and the dialing still
19  take place.
20  Q.    Okay. Let me stop you. You said there were
21  two reasons. The first one, it's not part of our
22  system. Please elaborate. What do you mean?
23  A.    Yes, ma'am. We do not have the ability to
24  have calling that takes place without agents actually
25  log in to an active campaign.

Page 329

1  Q.    And then you said they can't walk away for
2  three days. Is there any period of time that the
3  credit systems administration team can walk away and
4  campaigns will keep going?
5  A.    They could take a quick restroom break. But
6  then if they happen to be walked away and stepped
7  away for any additional extended period of time, the
8  campaign effectively could stop, but then we may have
9  ten agents or a hundred agents sitting there waiting
10  for the next campaign. And that takes the credit
11  system team to come back and restart that. And if I
12  wasn't that clear earlier, the credit system team,
13  while it may start for one team, their first campaign
14  in the morning, the credit system team has to then
15  start the next campaign and the next campaign until
16  their shift ends.
17  Q.    So if the credit systems team, they're not
18  supposed to walk away, just walks away in the middle
19  of a campaign, what's going to happen on that
20  campaign?
21  A.    The calls would go to zero. If we started
22  with a thousand, we can get to zero.
23  Q.    So that means it will finish?
24  A.    It will finish.
25  Q.    Will it do it by beginning to do that

Page 330

1  algorithm, to control the abandon rate, agent
2  availability?
3  A.    No, ma'am. We do not have that as part of
4  our solution.
5  Q.    Okay. So how will that impact how the
6  system, if your whole credit systems administration
7  team walks out, how the system, the Noble system
8  completes the campaign?
9  A.    It would be very ineffective. We would drop
10  phone calls. We may have those agent groups that had
11  improper number of phone lines based on their contact
12  that's taking place at that particular time. It
13  would be very inefficient, and we would have very
14  poor customer service.
15  Q.    Would that outcome be avoided if your system
16  ran that predicted algorithm we heard about?
17  A.    I've never -- in my experience in looking at
18  four dialing systems, I've never seen one that
19  provides that type. Although they market and, you
20  know, I've seen that and actually seen them in use,
21  they market that they can do exactly what the humans
22  can do that we employ, never seen that happen.
23  Q.    Let me try a different way. In your
24  experience though, if the system had their algorithm
25  we heard about instead of the credit systems

Page 331

1  administration team, would it still be attempting to
2  control abandon rates, and if a whole group gets
3  called off the floor by a manager shifting the calls,
4  pulling those levers that your team pulls on your
5  system?
6  A.    To some degree. But not to the degree that
7  our human teams have the ability to do, but yes,
8  ma'am. If it had that type of algorithm built into a
9  predictive type of setting, it would attempt to
10  perform some of that.
11  Q.    So if Hansen's seen dialing systems that have
12  that algorithm use that algorithm, it wouldn't
13  surprise you to hear the testimony he had this
14  morning based on your own experience; is that right?
15  A.    Oh, yes, ma'am. I agree with that because
16  I've seen other systems that market it and have
17  similar types of algorithms.
18  Q.    Mr. Hansen also said this morning that you
19  don't need any humans to be involved in doing dialing
20  in a predictive mode. Do you recall that testimony?
21  A.    Yes, ma'am.
22  Q.    Do you agree with that testimony as it
23  relates to your system?
24  A.    Not to our system. No, ma'am.
25  Q.    And is that for any reasons other than those



Orange Legal
800-275-7991

Page 332

1 you've gone through?
2 A.    No, ma'am. Exactly the same answer that I
3 would have for what we walked through thus far.
4 Q.    Okay.  So whether calls are placed in
5 broadcast or predictive using Conn's customized
6 system, the answer is the same.  The credit systems
7 team has to be involved?
8 A.    Yes, ma'am.
9 Q.    Okay.  You said you train your collectors on
10 the TCPA?
11 A.    Yes.  We do and just to clarify, that was
12 posted July 2015 when you started seeing job aids and
13 procedure documents that really stated the TCPA.
14 Q.    Okay.  And you've said what our position is,
15 that we don't think we're using an ATDS; am I
16 recalling that correctly?
17 A.    Yes, ma'am. That's exactly what I said.
18 Q.    Okay.  Why are you training if the statute
19 doesn't apply?  I understand there's a big
20 development in 2015.  Why are you training anyway to
21 recognize and honor a cease and desist when it is
22 clearly stated to you?
23 A.    A straightforward response that we take in
24 compliance is out of an abundance of caution.  My job
25 is to reduce risk, potential risks for the company.

Page 333

1 There are things, for example, like the FDCPA that
2 strictly didn't apply to us.  However, there's a
3 harassment clause in there.
4       We put procedures in place to take care of
5 the customers.  And so we do those types of things
6 out of an abundance of caution.
7 Q.    And I heard you talking to Mr. Kerney about
8 the need to ask probing questions, the need to get
9 managers on to try to understand.  Why?  Why is that
10 important with customers like Mr. Williams and in
11 circumstances we've heard today?
12 A.    What we see out of our customer base is that
13 a vast majority rely on those reminder phone calls as
14 their only source for their method of paying at
15 Conn's.  Our current delivery system today at point
16 of sale is that a customer had a coupon book to make
17 their future payments.  We do not provide -- because
18 it's a retail installment contract, it's not a
19 revolving charge card, so we don't send out monthly
20 statements.  It's a different type of credit card.
21 So customers rely on that.
22 Q.    Can I show you what's already in the record
23 as Exhibit 13?  It's the policies and procedures.  Do
24 you have that in front of you, Mr. Walton, or should
25 I provide it?

Page 334

1 A.    I have it here.  It starts with 2604 is the
2 first page I have.
3 Q.    Okay.
4       THE ARBITRATOR:  Just a minute.  Let me
5 catch up with you.
6       MS. JACKMAN:  Of course.  And when you
7 have it, I'll tell you which page.  Mr. Walton, it
8 will be 2612 if you want to get there now.  The Bates
9 label 2612.
10       THE ARBITRATOR:  Okay.  I'm there.
11 BY MS. JACKMAN:
12 Q.    All right.  On 2612 do you see the title, it
13 says "How to properly probe a right party contact"?
14 A.    Yes, ma'am.
15 Q.    What does that mean?
16 A.    This is the scenario that I was discussing
17 earlier with Mr. Frank.  Specifically about some
18 types of scenarios that might happen on our
19 interaction with customers.  These are just simply
20 examples of scenarios that might come up.
21 Q.    I want to look at Question 1 and the helpful
22 scenario tip.  I see the underlying "You must try to
23 persuade the customer not to" and referencing
24 Question 1, "restrict us from calling them."  Do you
25 see that?

Page 335

1 A.    Yes, ma'am.
2 Q.    Can you tell me what you're training your
3 agents to do there?
4 A.    It's really to recognize our customer base
5 and what we experience where customers rely on those
6 reminder phone calls, which goes right back into the
7 customers who come in to shop us, are attempting to
8 build their credit history.  And that helps us
9 certainly as a business, as a retailer have a repeat
10 customer re-shop.
11 Q.    If a customer calls in and is angry and is
12 saying "stop calling me," is it important to be able
13 to validate who that person is before proceeding?
14 A.    Yes, ma'am.
15 Q.    Why is that?
16 A.    Without knowing, properly knowing who we're
17 speaking to, then we, number one, from a consumer
18 privacy perspective, we can't make changes to their
19 account without properly identifying who they are.
20 And that's a critical component.
21 Q.    Do you need to verify they're the authorized
22 person to make changes?
23 A.    Yes, ma'am.
24 Q.    So when Mr. Kerney was giving you a scenario
25 on his time with you about if somebody just calls,



Johnnie Williams vs Conn Appliances
Arbitration

336..339

Page 336

1 screams, "stop calling" and then hangs up, why would
2 that not be a cease and desist?
3 A.    If it's just very hypothetical, simple such
4 as that, then in that particular instance, we
5 wouldn't make any changes.  We do not know who we're
6 speaking to in order to make a proper change or honor
7 their request.
8 Q.    Does Conn Appliances allow calls to be made
9 to consumers before 8 a.m.?
10 A.    No, ma'am.
11 Q.    Do they allow calls to be made after 9 p.m.?
12 A.    No, ma'am.
13 Q.    Okay.  And we've already talked about these
14 notes being in Central time and explained that; is
15 that correct?
16 A.    Yes, ma'am.
17 Q.    So those call restrictions are also going to
18 be cognizant of the consumer's time zone?
19 A.    Yes, ma'am.
20 Q.    How is that controlled and monitored?  How do
21 you ensure that happens?
22 A.    Our credit system team members per campaign
23 within Noble have the ability to recognize the
24 customer's area code first, and then based on current
25 time that we are in, that we're operating, we

Page 337

1 recognize then where the customer may live based on
2 their time zone, and then if they happen to be in a
3 call campaign, we would not call a customer who
4 happens to have a Hawaii phone number at eight
5 o'clock in the morning.
6 Q.    Okay.
7 A.    Then we have a default that the credit system
8 team accurately manages if we are unable to determine
9 the appropriate area code, then we default to a ZIP
10 code in some instances as well.
11 Q.    Are your agents allowed to curse at
12 consumers?
13 A.    No, ma'am.
14 Q.    Did you hear them doing anything like in all
15 the calls we heard today at any point?
16 A.    No.
17 Q.    What would happen if they did?
18 A.    We would terminate.
19 Q.    Do you allow your agents to lie or
20 misrepresent things to consumers when they're talking
21 about them?
22 A.    No, ma'am.
23 Q.    Do you let them say you're going to get a
24 visit from the police, for instance, if you don't pay
25 this debt, or anything like that to scare them into

Page 338

1 paying?
2 A.    No, ma'am.  And just to clarify, that's part
3 of what I manage for quality assurance.  And those
4 are the areas that we look for.
5 Q.    If somebody did that, what would happen?
6 A.    We would terminate.
7 Q.    Did you hear anything that you think rose to
8 that level in all the calls we heard today?
9 A.    No, ma'am.
10 Q.    We know you're familiar with Mr. Williams'
11 account, so let's turn to that.
12 A.    Okay.
13 Q.    Do you recall we've talked about that the
14 first balance rolled into the second.  Do you recall
15 whether the second agreement from November 2015 was
16 paid in full by Mr. Williams?
17 A.    I do recall, and no, ma'am, it reached
18 charge-off status.
19 Q.    When did it reach charge-off status?
20 A.    January 31st of 2017.
21 Q.    So when it reaches charge-off status on
22 January 31st, 2017, what does that mean?
23 A.    That means as a company, we have kept the
24 account on our books for seven months without at
25 least a minimum payment being paid.  And that

Page 339

1 particular time in January 2013 -- or 2017 -- excuse
2 me -- it's either been 210 days or 239 days past due,
3 based on how the calendar fell.  So in effect, seven
4 months past due.
5 Q.    Okay.  Do you recall if Mr. Williams ever
6 returned the merchandise he purchased to Conn's?
7 A.    No, ma'am.  I don't.  I have not seen that in
8 our records as I prepared for today's session.
9 Q.    Did you see any evidence that you initiated,
10 meaning Conn's, initiated any effort to repossess
11 that furniture and those television sets?
12 A.    I'm aware and I believe on one of the phone
13 calls we were attempting to ask for potentially a
14 voluntary return.  We do not -- as a company since
15 2012, we do not actively have folks that go out and
16 from a repossession perspective go out and knock on
17 doors.  There's one caveat is that if we happened to
18 have delivered a lot of items for a customer, then if
19 they're asking because of nonpayment to return that,
20 then we would in turn send a delivery team out to
21 pick up those items, but it's not a proactive
22 process.  It's authorized voluntary with a customer.
23 Q.    So as far as you know, based on your review
24 of your records, Mr. Williams might still have these
25 items?



Page 340

1   A.     Yes, ma'am.  And I happen to be here for
2   Mr. Williams' testimony earlier, and I understand
3   that he still had those.
4   Q.     How did you come to have Mr. Williams' cell
5   phone number?
6   A.     That was given to us by Mr. Williams at the
7   time of application.
8   Q.     When you say that, do you mean when he went
9   in the store in November?
10   A.     Actually in both purchases would be August.
11   And in November as well.
12   Q.     Okay.  So he provided his cell phone as his
13   contact number for contacting both transactions?
14   A.     Yes, ma'am.  To our sales associate.
15   Q.     Okay.  And how would that have been entered
16   into the system, is that that AS400 system?
17   A.     That would have been the AS400, and that
18   would have been our sales associates asking
19   Mr. Williams for his contact information, his phone
20   number, address, things of that nature.
21   Q.     Okay.  Do you remember when Mr. Williams
22   became delinquent on his account with Conn's?
23   A.     March 4th, 2016, just a few days after that
24   particular due date.
25   Q.     Okay.  Let's look back at Exhibit 14, the

Page 341

1   Latitude account notes.
2   A.     Okay.
3   Q.     I'll get the -- all right.  So for the
4   record, we're on page Bates labeled 213 in
5   Exhibit 14.  I want to direct you to those calls that
6   you discussed with Mr. Kerney that occurred on
7   March 4th.  I believe you testified there were four
8   calls made that day?
9   A.     Yes, ma'am.  That's correct.
10   Q.     Okay.  How can I tell if those connected to
11   Mr. Williams, or what happened when you made those
12   call attempts?
13   A.     The comment field, when we look at the
14   Latitude entry and we can look at the March 4th at
15   10:20 a.m. in the morning.  If I start there and I
16   run directly across that line horizontal and I go to
17   the comment area, then I keep moving.  And the end
18   result, we see some codes.  An MC.  And an AM.  We
19   would see those codes, and that would give us the end
20   result of the call.
21   Q.     Okay.  So can you tell me if you actually
22   spoke to Mr. Williams on the 4th?
23   A.     We did not on the 4th.  No, ma'am.
24   Q.     Okay.  We know you did on the 6th.  So let's
25   talk about that.  Actually before you do that, my

Page 342

1   apologies.  I want to back up for just one second.  I
2   want you to tell me, can you tell from the Latitude
3   notes the maximum times you spoke with Mr. Williams
4   on any given day from March 4th when he went
5   delinquent forward?  Are you able to do that from
6   these notes?
7   A.     Yes, ma'am.
8   Q.     Have you done that analysis?
9   A.     I haven't personally.  No, ma'am.
10   Q.     Okay.  Well, let's take a minute and can you
11   go through and tell me the maximum number of times
12   and I'm looking for the day, whatever day the most
13   times you actually spoke with Mr. Williams?
14   A.     Okay.
15   Q.     All right?
16   A.     All right.
17        MR. KERNEY:  If it saves some time, we've
18   done it and it's two.
19        MR. TROUTMAN:  We'll take that
20   stipulation.
21        MS. JACKMAN:  Yeah.  That was our
22   understanding as well.
23   BY MS. JACKMAN:
24   Q.     Mr. Walton, would you have any reason to
25   disagree with that based on your knowledge of the

Page 343

1   calling practices and just general approach?
2   A.     No, ma'am.  That seems correct.  And I've had
3   a chance to review through the call notes, but I
4   would agree with that based on what I've seen.
5   Q.     Okay.  Let's go forward to March 6th.  And
6   we'll talk about -- remember we heard that call.
7   We've heard a few times today now.  I'm not going to
8   play it again where Mr. Williams said not to call
9   until Friday.  Can you -- I'll represent to you that
10   I did a Google search.
11        MS. JACKMAN:  You can accept my
12   stipulation or we can have Mr. Walton do the same
13   search.  And March 6th, 2016 was a Sunday.  Can we
14   stipulate?
15        MR. KERNEY:  Sure.
16        MS. JACKMAN:  Or would we like to have
17   him run it, because I'm fine with that.
18        MR. KERNEY:  I think we can agree that it
19   was a Sunday.
20        MS. JACKMAN:  Okay.  So since we're
21   stipulating for the record the Google search I ran
22   was:  What day of the week was March 6th, 2016 in
23   Google.  And it came back and told me Sunday.
24        THE ARBITRATOR:  Okay.
25   BY MS. JACKMAN:



Johnnie Williams vs Conn Appliances
Arbitration                                                           344..347

Page 344

1  Q.    Can you tell me when the next call after
2  Sunday, March 6th, the one we've heard was played and
3  where he requested we wait until Friday was placed or
4  attempted --
5        MR. GOMEZ: It's actually a Wednesday.
6  A.    I --
7        MS. JACKMAN: Are you sure? I had the
8  wrong. I did the wrong year.
9        MR. GOMEZ: It's --
10 BY MS. JACKMAN:
11 Q.    When was the next call after March 6th, 2016
12 attempted on this account?
13 A.    The next phone call was on April the 4th of
14 2016.
15 Q.    Okay. So you didn't call him again?
16 A.    No.
17 Q.    After that?
18 A.    No, ma'am. Not after the March 6th, 2016
19 date.
20 Q.    Not even on Friday as he said you could?
21 A.    No, ma'am.
22 Q.    Why not?
23 A.    Well, we would have a couple of things that
24 may have occurred. We can look back and see if a
25 payment was made.

Page 345

1  Q.    Well, just tell me what's in the notes.
2  A.    Yes, ma'am. That's what I'm looking at.
3  Q.    Oh, okay. Sorry. My apologies.
4  A.    Within Latitude, there was actually a payment
5  that was made on March the 11th of 2016.
6  Q.    So do you think, because you've been asked a
7  lot about what you think about what he asked, do you
8  think Conn's did exactly what Mr. Williams requested
9  on March 6th and not call him until again at least
10 next Friday?
11 A.    Yes, ma'am.
12       THE ARBITRATOR: What was the date of
13 that payment again?
14       THE WITNESS: On March the 11th of 2016.
15       MS. JACKMAN: Which I'll also put in the
16 record if you Google is Friday. And I Googled it
17 using the same search, Googled that date, March 11th,
18 2016.
19 BY MS. JACKMAN:
20 Q.    Let's jump forward to the May 10th, 2016 call
21 that we've heard.
22       MR. HILL: That's Bates stamped 23.
23       MS. JACKMAN: I'm going to ask you to
24 take Exhibit 11 back out, Arbitrator Harris, those
25 transcripts of the calls. And in the first set. You

Page 346

1  know, '01 to whatever.
2        THE ARBITRATOR: Got it.
3        MS. JACKMAN: I'm going to direct you to
4  page 26. Mr. Walton, I don't know if you have a set
5  of these, so I'm just going to send one down to you.
6        THE WITNESS: Okay.
7        MS. JACKMAN: This is actually my working
8  one, it's got some circles. That's what I'm going to
9  direct you to, but I'll direct you all to it now on
10 the record.
11       MR. KERNEY: Finish what you're saying,
12 then I'll make an objection that I have but go ahead.
13       MS. JACKMAN: Okay. I want to focus him
14 rather than replaying this whole call to, in that
15 transcript on page 26 lines 12 to 14, I want to ask
16 him what it says.
17       MR. KERNEY: And I was just going to make
18 an objection here earlier that the records speak for
19 themselves, so talking about the March 6th call, we
20 disagree that Mr. Williams said, "Please call me on
21 Friday," or whatever the testimony was just now. The
22 record speaks for itself. So that's all. That's the
23 only objection I have.
24       THE ARBITRATOR: Okay. Go ahead.
25       MS. JACKMAN: Yeah. I'm just trying

Page 347

1  to...
2        THE ARBITRATOR: Go ahead.
3  BY MS. JACKMAN:
4  Q.    Tell me what lines 12 through 14 on page 26
5  of Exhibit 11 say, please, with regard to the request
6  Mr. Williams made on May 10, 2016.
7  A.    On line 12 the agent states "That phone
8  number that we did reach you, is that a good phone
9  number for you." That takes me to line 14
10 Mr. Williams, "Yes. Uh-huh?"
11 Q.    Okay. And we understand from Mr. Williams'
12 testimony that he contends that he -- that's one of
13 the times he told you to stop calling?
14 A.    That's what I understood from Mr. Williams,
15 yes.
16 Q.    And can you locate where that is, because I
17 suggest it's a little bit higher up on the page.
18 A.    Yes, ma'am. It's back earlier in the phone
19 call.
20 Q.    Okay. It may not be on the page I gave you.
21 A.    I don't have it here on this page.
22 Q.    But the point I'm trying to establish is that
23 at the end of the call, what did Mr. Williams do?
24 A.    He agreed that the phone number that we have
25 is a good contact number before the call ends.


ORANGE LEGAL

1  Q.    And based on how you train your agents, would
2  they understand that as a consent to be continuing to
3  have calls at that number?
4  A.    Yes, ma'am.
5  Q.    Now let's get to going back to the Latitude
6  notes. We're going to keep the transcripts and
7  Latitude notes for the remainder of this part so that
8  people will know what's coming. In the Latitude
9  notes, Mr. Kerney asked you about some entries on
10 June 28th, 2016. For the record, those are shown on
11 the page in Exhibit 14 Bates labeled 219. If I
12 remember your testimony, you did agree that there was
13 a call at 2:07 p.m. on the 28th, 2:11 and 2:58,
14 correct?
15 A.    Yes, ma'am.
16       THE ARBITRATOR: Sorry. Say the date
17 again.
18       MS. JACKMAN: Apologies. It was
19 June 28th of 2016.
20       THE ARBITRATOR: 28th.
21       MS. JACKMAN: The first one at 2:07 up at
22 the top.
23       THE ARBITRATOR: I got it. Just a
24 minute.
25       MS. JACKMAN: These are the ones

1  Mr. Kerney discussed with Mr. Walton.
2        THE ARBITRATOR: Yeah. Okay. Just a
3  minute. Starting at 2:07.
4  BY MS. JACKMAN:
5  Q.    If I recall your answer, it was that there
6  were three calls in an hour, and that could happen
7  depending on outcome. Am I recalling that correctly?
8  A.    Yes, ma'am.
9  Q.    Okay. Well, what was the outcome in these
10 three calls?
11 A.    There was a call attempt, but we didn't speak
12 to Mr. Williams.
13 Q.    Okay. And so how does that relate to the
14 outcome causing possibility of three attempts in an
15 hour?
16 A.    That means that we would attempt to redial a
17 phone number in some instances.
18 Q.    Because you didn't reach them?
19 A.    Yes, ma'am.
20 Q.    Okay. Let's go to the July 2nd call. We
21 know a lot about it. We've heard about it. And I
22 just want to ask you to clarify one of the things you
23 told Mr. Kerney. You said that the needs of the
24 customer based in understanding what they need is why
25 it was appropriate for Conn's not to treat this as a

1  revocation. Do you recall that?
2  A.    Yes, ma'am.
3  Q.    What did you mean?
4  A.    Our customer base that historically has
5  relied on phone calls for a reminder of making their
6  payments, it's really -- they're very dependent, very
7  dependent on how we are able to provide that service
8  to a customer. And we understand that customers have
9  every right to be upset. That will happen. Maybe
10 not at Conn's, maybe at other folks. Could be at
11 Conn's.
12       But looking past that and truly understanding
13 and asking good questions of what they're really
14 asking us to do. What action are they asking us to
15 take? And so in this particular instance, because we
16 didn't have an opportunity to speak to Mr. Williams
17 at length about that, my answer is --was such that we
18 took the appropriate action in this particular
19 instance.
20 Q.    Okay. Now, going back to Exhibit 11. In the
21 first portion of that, the 0001 to whatever, the
22 transcripts.
23 A.    Okay.
24       THE ARBITRATOR: Okay. Where are you?
25       MS. JACKMAN: The transcripts.

1        THE ARBITRATOR: Okay. Which page are
2  you on?
3        MS. JACKMAN: Page 34, lines 22 to 24.
4        THE ARBITRATOR: What day are we on?
5        MS. JACKMAN: I was just going to say for
6  the record, this is the transcript from the July 9th,
7  2016 call Bates label 105. It's already in evidence.
8        THE ARBITRATOR: Which lines?
9        MS. JACKMAN: 22 to 24.
10 BY MS. JACKMAN:
11 Q.    Mr. Walton, how many days after July 2nd is
12 July 9th?
13 A.    We have seven days.
14 Q.    Okay. Can you read to me what line 22 to 24
15 say within that transcript?
16 A.    Line 22 by Mr. Williams, "Okay. Okay. Hold
17 up. I need you to call me back next week. I've got
18 something to take care of. Okay." And that's the
19 end of 24.
20 Q.    Would your agents understand Mr. Williams'
21 statement "Call me back next week" to be consent to
22 be called?
23 A.    Yes, ma'am.
24 Q.    Okay. Now, believe it or not, there is one
25 call that I would like to put in the record that



Johnnie Williams vs Conn Appliances
Arbitration

Page 352

1  isn't already in the record.  And my colleague has
2  stepped out.  So I'm going to do my best without him.
3       MS. JACKMAN:  Actually, sir, do you guys
4  have all the call recordings?
5       MR. KERNEY:  No.  We have them on just a
6  G drive are the ones that we have.
7       MR. GOMEZ:  I only have the ones we
8  played.
9       MS. JACKMAN:  Okay.
10      MR. HILL:  Which one are you looking for,
11  Stefanie?  I don't know that we played all of them
12  that we --
13      MS. JACKMAN:  I'm looking for the one
14  Bates labeled 123.  If you don't have it with you, we
15  have it, I just figured it would be easier since
16  you're already set up, and I stink at technology.
17      MR. HILL:  I don't think we have that
18  one.
19      MR. GOMEZ:  I'll look and see.
20      MS. JACKMAN:  It's okay.  I can play it.
21  Just give me a minute because despite my age,
22  technology is actually not my thing.
23      MR. KERNEY:  While she looks for that,
24  can we go off the record for a minute?
25      THE ARBITRATOR:  Sure.

Page 353

1       (Short break.)
2       MS. JACKMAN:  All right.  So just to
3  orient us, already in the record, July 25th, 2016,
4  there's a call that was discussed with Mr. Williams,
5  Bates labeled 81.  This is going to be a call from
6  July 26th, 2016, so the next day.  I do not have it
7  transcribed, and I apologize.  But it is Bates label
8  123, and it will be provided in the thumb drive that
9  we give you.  I'm going to play it.
10      THE ARBITRATOR:  Bates label what?
11      MS. JACKMAN:  I'm sorry.  123.  123.  And
12  of course, this is not having sound.  Give me just
13  one moment.
14      MR. TROUTMAN:  You had it on mute.
15      MS. JACKMAN:  I had it off mute.  I'm
16  putting it in my computer.  That was so
17  disappointing.  Here we go.  Always better on my own.
18  Here's the call.
19      (Short break.)
20      MS. JACKMAN:  Okay.  So back on the
21  record is Bates label 123 from July 2016 -- I'm
22  sorry.  July 26, 2016.
23      (WHEREUPON, audio recording is played
24  into the record.)
25      MS. JACKMAN:  And that's the end of the

Page 354

1  recording.
2  BY MS. JACKMAN:
3  Q.    Mr. Walton, what did you hear Mr. Williams
4  tell the Conn's agent in that July 26th recording?
5  A.    Said to call him back.
6  Q.    Okay.  What would your agent have understand
7  that he wanted them to do?
8  A.    That we could call back.  And I think we
9  heard that agent, we also heard the agent saying
10  "well, you're asking for me to call you back, I can't
11  do that."
12  Q.    Now let's look at Exhibit 11 again, the
13  transcripts.  But this time we're going to be in the
14  second set, the later set.  And I can let you know
15  this will be our last call recording today as well.
16      THE ARBITRATOR:  Go ahead.
17      MS. JACKMAN:  In the second set of
18  Exhibit 11 page 13 lines 6 through 8, this is the
19  transcript of the September 2nd, 2016 call that's
20  already in at Bates label 148.
21      THE ARBITRATOR:  September what?
22      MS. JACKMAN:  2nd, 2016.
23      THE ARBITRATOR:  Okay.
24      MS. JACKMAN:  Okay.
25  BY MS. JACKMAN:

Page 355

1  Q.    Mr. Walton, can you look at page 13 line 6
2  through 8 which is in the middle of what was, as I
3  recall, about a seven-minute long call on
4  September 2nd.  Tell me what it says.
5  A.    Yes, ma'am.  Mr. Williams:  "Well, you know,
6  you can check back with me.  You know, I never know
7  how God is going to see fit to bless."
8  Q.    And was that in the -- can you tell me what
9  statement he made that in the context of?  Was it a
10  request for payment and what he might be able to pay?
11  A.    Yes, ma'am.  The next series above that, they
12  were discussing when the payment could potentially be
13  posted or run.
14  Q.    What would your agent understand that to be?
15  A.    That there was no change to his future
16  contact.
17  Q.    And would they understand that to allow them
18  to call him?
19  A.    Yes, ma'am.
20  Q.    Okay.  You can put that aside.  We heard a
21  lot of calls today after that initial July 2nd call,
22  the one with the language.  And Mr. Kerney asked you
23  if you thought your agents had made any mistakes.
24  And my recollection is you testified your agent has
25  acted as you had expected them to.  Am I recalling



Johnnie Williams vs Conn Appliances
Arbitration
356..359

Page 356

1 that correctly?
2 A.    Yes, ma'am.
3 Q.    What did you mean by that?
4 A.    That the agents were professional.  That the
5 agents that were continuing to ask Mr. Williams on
6 his call some more information and probe.  And then
7 once the call ended, that in this particular scenario
8 that we heard, that there was no change to the phone
9 number.
10 Q.    Okay.  Did Mr. Williams make all of the
11 regular scheduled payments on his account?
12 A.    No, ma'am.
13 Q.    Do you know the date of the last full
14 payment, meaning he made a full monthly payment?  Do
15 you know when that was?
16 A.    I do.  The last full payment goes back to
17 July 18th of 2016.
18 Q.    Okay.  Can you tell -- what are you looking
19 at there, Mr. Walton?
20 A.    I'm looking at the Latitude, the very first
21 page.
22 Q.    Exhibit 14?
23 A.    I don't have a tab on that.
24 Q.    I'll represent it's Exhibit 14.  My
25 apologies.

Page 357

1 A.    Thank you.
2 Q.    The very first page?
3 A.    Yes, ma'am.
4 Q.    Okay.  Can you help me understand how you
5 determined that his last payment in full was in July?
6 A.    I know that this particular exhibit, it
7 happens to match up with the Fiserv payment history,
8 to the actual date of payment for Mr. Williams'
9 account because there were no additional credits or
10 debits issued against his account.  So this is a good
11 representation to see the payment history for
12 Mr. Williams specifically.  Didn't always happen that
13 way, but I do recall actually reviewing and
14 researching when that last payment was.
15 Q.    Well, let me just quickly -- I know it's been
16 a long day.  Let me point you to Exhibit 5, the
17 November 2015 retail installment contract.  Ask you
18 to review, if you have that, what his scheduled
19 monthly payment was.
20 A.    Correct, for a.
21 Q.    And then let me know if that changes your --
22 the date on which he made his last full payment under
23 the monthly payment under the agreement.
24 A.    Yes, ma'am.  It was due on the 3rd of each
25 month for $105.51.

Page 358

1 Q.    Okay.  Looking back at Exhibit 14, I don't
2 see a payment on July 18th for $105.51.  I see it for
3 a hundred.  But above it on May 14th, I see a
4 $105.51.  Was that the date he made the last payment
5 in full on his account?
6 A.    Yes, ma'am.  But the -- my reference to July,
7 although it was $5 short, he paid a bit more than
8 that.  Because of the delinquency status, those
9 additional moneys went to late fees.
10 Q.    Okay.
11 A.    Yes, ma'am.
12 Q.    I understand.  Can you tell from this
13 Exhibit 14 on the first page, which for the record is
14 Bates labeled 213, the date that any payment was last
15 made on Mr. Williams' account?
16 A.    Yes, ma'am.  We can.
17 Q.    What date is that?
18 A.    It was on October the 6th -- excuse me --
19 October the 18th of 2016.
20 Q.    And for how much?
21 A.    $60.
22 Q.    And that's less than the amount that was owed
23 each month --
24 A.    Yes, ma'am.
25 Q.    -- under the contract?

Page 359

1 A.    Yes, ma'am.
2 Q.    From your review of the Latitude notes
3 preparing for this case, did you see any broken
4 promises to pay by Mr. Williams?
5 A.    Yes, ma'am.
6 Q.    What's a "promise to pay"?
7 A.    When our agents have asked for an arrangement
8 with a customer, we set the future follow-up date
9 based on the date of the anticipated promise.  And if
10 that date happens to pass without the agreed-upon
11 amount to be paid by the customer, then that would
12 show as a broken promise.
13 Q.    What's the impact of a promise to pay on the
14 collection calls?
15 A.    That would then have the account open for
16 additional future calls if that promise was broken.
17 Q.    Okay.  Would any call -- so you give them
18 time to see if they're going to deliver on the
19 promise before making further calls?
20 A.    Yes, ma'am.
21 Q.    What happens if that date comes and goes,
22 meaning it's a broken promise?
23 A.    Then the date of the promise that was broken,
24 that very next business day, our credit system teams
25 would recognize those follow-up dates and include



Page 360

1  those in the additional campaigns for that particular
2  day.
3  Q.     Last couple of questions.  This morning
4  Mr. Gomez said in his opening statement that Conn's
5  placed over 900 calls after July 2nd.  Do you know
6  how many calls were attempted by Conn's after 7/2?
7  Do you agree with that statement?
8  A.     My recollection, 900 is the number that I'm
9  familiar with.
10 Q.     That was attempts?
11 A.     Attempts.  Yes, ma'am.
12 Q.     Would you know if Mr. Williams received them
13 based on your files?
14 A.     No, ma'am.  We only have what we show from
15 our system of record.  Our call attempts.  We don't
16 know if it actually connected on the customer end.
17 Q.     Okay.  Do you know how many calls were
18 attempted before 7/2, ballpark?
19 A.     About 180.
20 Q.     Okay.  Did you actually count them, or is
21 that just sort of eyeballing it and doing your best?
22 A.     That was one of the areas that I reviewed for
23 today's case.
24 Q.     Okay.  Last thing you mentioned, this account
25 charged off on January 31st, 2017; is that right?

Page 361

1  A.     Yes, ma'am.
2  Q.     In Exhibit 14 the Latitude notes, can you
3  turn to Bates label 244, it's the very last page.
4  A.     Okay.
5  Q.     Can you tell me if any calls were placed on
6  this account after it charged off on January 31st,
7  2017?
8  A.     I can.  And there were no additional phone
9  calls.
10 Q.     Do you see any reference to receiving any
11 sort of legal demand?  We've heard testimony about
12 that.  On that day in these notes?
13 A.     No, ma'am.  Not in those notes.
14 Q.     So based on these notes, why did the calls
15 stop?
16 A.     Two reasons.  More predominantly, we happened
17 to have two things happen at the same time.  We
18 received the notice of litigation on January 31st
19 from Mr. Williams, and that stopped all dialing.  But
20 then additionally, we also had the charge-off of the
21 account on the same day of which there's a rest
22 period.  If there was no legal status, we may have
23 attempted in the future, but in this instance, we
24 received a litigation notice from Mr. Williams.
25        MS. JACKMAN:  I don't need a break, but

Page 362

1  may I just confer briefly with Mr. Troutman?
2        THE ARBITRATOR:  Yes.
3        MS. JACKMAN:  That's all I have with
4  Mr. Walton.
5        THE ARBITRATOR:  Mr. Walton, could you --
6  you were testifying about the last payment that was
7  made, the $60 payment we heard about.
8        THE WITNESS:  Yes.
9        THE ARBITRATOR:  And you said that was on
10 October the 18th of 2016.  Can you show me where on
11 Exhibit 14 that shows up?
12        MS. JACKMAN:  Turn to the first page.
13        THE WITNESS:  The very first page.
14        THE ARBITRATOR:  On the first page?
15        MS. JACKMAN:  Yes, sir.  Right here.
16        THE ARBITRATOR:  Oh, okay.  I'm looking
17 down here.  Oh, okay.  I get it.  All right.  Let me
18 look at that, just a second.  So that's on Bates
19 2013.
20        THE WITNESS:  Yes, sir.  That was the
21 first page.
22        THE ARBITRATOR:  Okay.  I see payments
23 now.  Sorry.  I was looking down all those...
24        THE WITNESS:  And Mr. Harris, just to
25 clarify my statement, I happen to be very familiar

Page 363

1  with Mr. Williams' account and so my reference
2  earlier about the Fiserv payment history, I know this
3  to be in sync.  It doesn't always happen that way.
4  This was a good, quick reference for us to be able to
5  identify the payment history for Mr. Williams.
6        THE ARBITRATOR:  Okay.  I get it.  Thank
7  you.
8        THE WITNESS:  Yes, sir.
9        THE ARBITRATOR:  All right.  Any further
10 questions of Mr. Walton?
11        MR. KERNEY:  Yeah.  Just a couple.
12        REDIRECT EXAMINATION
13 QUESTIONS BY MR. KERNEY:
14 Q.     So Mr. Walton, I know you testified that your
15 system is cloud-based and that you can't change the
16 coding; is that correct?
17 A.     Yes, sir.
18 Q.     That's one of the reasons why if we print the
19 Noble report, it still identifies the call mode as
20 predictive, whereas you internally call it system
21 mode, correct?
22 A.     Yes, sir.  It's one of the nuances, if you
23 will.
24 Q.     Okay.  Your credit team has six people.  Did
25 I understand your credit systems team, the



Page 364

1 individuals who oversee all these phone calls, did I
2 understand you to say it's two individuals per shift?
3 A.    Typically on a day we run, for that group, we
4 have a director which makes up one of the six
5 individuals.  We have a working manager.  And then
6 the other associates are scheduled throughout the
7 day.  Seven days a week.  The weekends are a bit
8 lighter for us, so it's not always every two-hour
9 segments that we have two individuals but pretty
10 consistent with that.
11 Q.    So when you talk about this team in this
12 control center, it's typically two people at a time,
13 not six, correct?
14 A.    With one exception.  The overlap during the
15 middle of the day, when all of their shifts kind of
16 overlap each other.  Yes, sir.
17 Q.    How many shifts in a day?
18 A.    Typically run three.
19 Q.    Okay.  So if they're making 600,000 calls a
20 day, those two-man shifts are overseeing about
21 200,000 calls per shift, correct?
22 A.    Yes, sir.  That's correct.
23 Q.    Okay.  And those two people are located
24 where?
25 A.    In San Antonio, Texas.

Page 365

1 Q.    Okay.  And they're overseeing the calls that
2 are being made in all four of your call centers,
3 correct?
4 A.    Yes, sir.
5 Q.    Okay.  You were asked about whether or not
6 your system could run automatically once it begins.
7 You said that agents could walk away for some period
8 of time, correct?
9 A.    The credit system team members, for like, a
10 restroom break.  Yes, sir.
11 Q.    Correct.  So your agents have to be there
12 obviously to field calls, right?  But then the credit
13 systems team, they can go to the bathroom, they can
14 do something.  The system will continue to place
15 calls for some period of time?
16 A.    Yes, sir.
17 Q.    Okay.  At no time is the credit systems team
18 dialing telephone numbers, correct?
19 A.    They are.  Yes, sir.
20 Q.    You said that the abandon rate is set to
21 three percent or less; is that correct?
22 A.    That's typically what we measure to.  You
23 have the ability to modify that.
24 Q.    Of course.  So if you're making 600,000
25 outbound calls today and the abandon rate is three

Page 366

1 percent, then there's 18,000 calls today potentially
2 that are abandon calls; is that accurate?
3 A.    Could be.
4 Q.    So 18,000 times a day you call a customer and
5 that customer picks up and hears dead air?
6 A.    They could or either they hung up on us.
7 Q.    Okay.  How much do you pay Noble for every
8 month for the license to use their software?
9 A.    It was on a per agent basis, and I forget
10 exactly what that dollar value was per agent.
11 Q.    I think you've testified before that it's
12 over a million dollars a year; is that correct?
13 A.    On an annual basis.  Yes, sir.
14 Q.    Okay.
15       MR. KERNEY:  All right.  I have nothing
16 further.  Thank you, Mr. Walton.
17       THE ARBITRATOR:  Anything further,
18 Ms. Jackman?
19       MS. JACKMAN:  We had one request to try
20 to expedite things tomorrow.  There are two numbers
21 that are going to be relevant on the cross of
22 Mr. Williams.  And we can do one of two things.
23 Morgan & Morgan can stipulate that they belong to
24 their law firm or we can call them right now.  And
25 the reason that I'm suggesting it now is because no

Page 367

1 one will be there so you can hear what picks up as
2 opposed to disturbing someone during their work day
3 tomorrow.  Guys, in the past, we've just stipulated.
4 How do you want to handle it?
5       MR. KERNEY:  I have no idea what phone
6 number you're talking about or anything.
7       MS. JACKMAN:  One is the main line for
8 this office, (901) 333-1900.  The other is a line I
9 use to contact you guys in Tampa.  (813) 223-0979.
10       MR. GOMEZ:  We'll call and check.  We
11 don't even have a consumer protection team here.
12       MS. JACKMAN:  I would rather just call
13 them tonight.  It's one less thing we have to do
14 tomorrow.  How about we do that on a speaker?
15       THE ARBITRATOR:  Well, wait a minute.
16       MS. JACKMAN:  It takes two seconds.
17       THE ARBITRATOR:  The question is, is are
18 those phone numbers Morgan & Morgan phone numbers?
19       MR. KERNEY:  Yeah.  And I don't know
20 either of those numbers off the top of my head.
21       MS. JACKMAN:  I suggest let me just call
22 them.  I did it last night to confirm I was right.
23 And it took me a minute.  And it's after hours, so no
24 one will pick up.  It's very efficient.
25       THE ARBITRATOR:  All right.  Let's find



Page 368

1    out.
2         MS. JACKMAN:  All right.  I'll just use
3    my cell phone.  First number I'm going to dial is
4    (901) 333-1900.
5         (WHEREUPON, audio recording is played
6    into the record.)
7         MR. KERNEY:  I can -- we can agree that's
8    John Morgan's voice.
9         MS. JACKMAN:  All right.  The other one
10   I'm going to call.  Are we stipulating that's the
11   main line to this office, because I know 901's a
12   Memphis --
13        MR. HILL:  I don't know if that's the
14   main line or not.
15        MR. GOMEZ:  If it is Morgan & Morgan --
16        THE ARBITRATOR:  I tell you 901 is
17   Memphis.
18        MR. KERNEY:  If it's John Morgan, we're
19   agreeing that's Morgan & Morgan's number.
20        THE ARBITRATOR:  I think I've seen that
21   phone number.
22        MS. JACKMAN:  Here's the other one.  For
23   the record, this is 813, which I understand to be a
24   Tampa ZIP code, 223-0979.  And you know, I didn't
25   show you guys before, but after I can show my call

Page 370

1         MS. JACKMAN:  Thank you for that.  It
2    just makes it faster.
3         MR. GOMEZ:  Do you need anything else
4    from us tonight?
5         THE ARBITRATOR:  I don't need anything
6    else.  All right.  So we're off the record for
7    tonight.
8         (WHEREUPON, day 1 of the arbitration
9    concluded at approximately 8:36 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 369

1    history so you can see that I dialed these
2    accurately.
3         (WHEREUPON, audio recording is played
4    into the record.)
5         MR. GOMEZ:  That's one of our --
6         MR. HILL:  Okay.  Presuit paralegal.
7    Okay.
8         MS. JACKMAN:  He works in your office?
9         MR. HILL:  He's a presuit paralegal.
10        THE ARBITRATOR:  You said he's a presuit
11   paralegal?
12        MR. HILL:  Yeah.  He's one of our intake
13   guys.
14        THE ARBITRATOR:  Okay.  I think that we
15   established that those are Morgan & Morgan phone
16   numbers.
17        MS. JACKMAN:  And he screens potential
18   cases?
19        MR. KERNEY:  Let's call John Morgan's
20   cell phone.
21        MS. JACKMAN:  And I have Perry Masoned
22   the case.
23        MR. GOMEZ:  Okay.  So what time tomorrow?
24   Do you want to do 10 a.m.?
25        MR. TROUTMAN:  Let's do 10 a.m.

Page 371

1              C E R T I F I C A T E
2
3    STATE OF TENNESSEE
     COUNTY OF SHELBY
4
5
6
7         I, CANDACE S. COVEY, Licensed Court Reporter,
8    hereby certify that I reported the foregoing
9    deposition by machine shorthand to the best of my
10   skills and abilities, and thereafter the same was
11   reduced to typewritten form by me.
12        I further certify that I am not related to
13   any of the parties named herein, nor their counsel,
14   and have no interest, financial or otherwise, in the
15   outcome of the proceedings.
16        I further certify that in order for this
17   document to be considered a true and correct copy, it
     must bear my original signature and that any
     unauthorized reproduction in whole or in part and/or
18   transfer of this document is not authorized, will not
     be considered authentic, and will be in violation of
19   Tennessee Code Annotated 39-14-104, Theft of
     Services.
20
21
22                        __
                CANDACE S. COVEY, LCR, RPR, CRR, CVR-CM
23              Notary Public State of Tennessee
24              My Notary Commission Expires:  02/17/2021
                LCR #145 - Expires:  6/30/2018
25



Johnnie Williams vs Conn Appliances
Arbitration

```
 1              AMERICAN ARBITRATION ASSOCIATION

 2      _____

 3

        JOHNNIE WILLIAMS, JR.,
 4

 5
             Claimant,
 6

 7
        vs.                            Case No.
 8                                     01-17-0001-5149

 9
        CONN APPLIANCES, INC.,
10

11
             Respondent.
12      _____

13

14                       ARBITRATION

15                     JULY 24, 2018
                         Volume III
16                     (Pgs 373-565)

17

18

19

20

21

22

23      _____

24      Reported By: Candace Covey, LCR, RPR, CRR, CVR-RM

25
```



**Orange Legal**
**800-275-7991**

Johnnie Williams vs Conn Appliances
Arbitration

374..377

Page 374

1          A P P E A R A N C E S

2

3

4    For the Claimant:

5          MR. OCTAVIO "TAV" GOMEZ
           MR. SHAUGHN HILL
           MR. FRANK KERNEY,III
6          Attorneys at Law
           Morgan & Morgan
7          201 N. Franklin Street
           Suite 700
8          Tampa, FL 33602
           slauredan@forthepeople.com

9

10   For the Respondent:

11         MR. DANIEL DELNERO
           Attorneys at Law
12         Ballard Spahr, LLP
           999 Peachtree Street
13         Suite 1000
           Atlanta, GA 30309
14         jjackmans@ballardspahr.com
15         MR. ERIC TROUTMAN
           MS. SUSAN MCDOWELL
16         Attorneys at Law
           Womble, Bond, Dickinson
17         3200 Park Centre Drive
           Suite 700
18         Costa Mesa, CA 92626
           (714) 557-3800

19

20

21

22

23

24

25

Page 375

1            I N D E X

2                                    Page

3

     JOHNNIE WILLIAMS
4    Cross Examination
       By Mr. Troutman              380
5    Redirect Examination
       By Mr. Hill                  450
6    Recross Examination
       By Mr. Troutman              462

7

     CLOSING STATEMENTS
8    By Mr. Gomez                   466
     By Mr. Troutman                486
9    By Mr. Gomez                   523

10

              E X H I B I T S

11                                   Page
12   Exhibit 12                     449
           Stipulation

13

     Exhibit 15                     446
14         Interrogatories
15   Exhibit 16                     461
           Mr. Williams' handwritten call log

16

17

18

19

20

21

22

23

24

25

Page 376

1          * * *

2

3         MR. HILL:  All right.  And Mr. Harris, I
4    was stating a moment ago, there was an issue that was
5    raised by respondent in a prehearing brief, as well
6    as their opening statement with regards to unclean
7    hands and failure to mitigate damages that we'd like
8    to address briefly, if you're open to that.
9         THE ARBITRATOR:  Okay.
10         MR. HILL:  So yesterday as you had heard,
11   Ms. Jackman had made comments with regards to failure
12   to mitigate damages and unclean hands, and she had
13   accused Morgan & Morgan of essentially weaponizing
14   the TCPA.  To be quite honest, we don't feel that was
15   appropriate and took offense to that.  We don't
16   believe that it's proper to assert that claim against
17   lawyers.  It's not something that's applicable.
18        I can represent to you that our consumer
19   protection department has never been accused of any
20   sort of impropriety by any lawyer or district court.
21   More importantly, if she was going to make that
22   argument, we would contest that it's an affirmative
23   offense that wasn't otherwise properly pled.  It's
24   something that should have been pled in the response
25   to our statement of claim and never was.  It was

Page 377

1    raised for the first time in the prehearing brief
2    just days before the hearing.
3         You know, we view that as essentially the
4    equivalent of us raising a breach of contract claim
5    in our, you know, prehearing brief.  You know, that's
6    not proper under either Tennessee law or the Federal
7    law.  And again, we don't think that's a defense
8    that's otherwise applicable here.  Respondent is not
9    going to be able to cite a single case that addresses
10   failure to mitigate or unclean hands as being
11   applicable to the attorneys or the plaintiff in a
12   TCPA case.
13        With that said, you know, if you'd like to
14   take a look, we've gathered over a dozen cases that
15   we believe are on our point, that support our
16   position that it's not appropriate.  And further, you
17   know, without waiving any sort of attorney-client
18   privilege here, you know, we can represent to you,
19   you heard the audio recordings yesterday.  Many of
20   them came from September, October, November, December
21   of Mr. Williams consistently being in contact with
22   Conn's.  Telling them that they're not supposed to be
23   calling him.  Telling them not to call him.
24        And you know, we'll represent to you again
25   that Mr. Williams had contacted us in July.  We're

Page 378

1  not denying that.  You know, he had been in contact
2  with us.  We were trying to get some records for him.
3  Eventually he had a conversation with our intake
4  paralegal, Mr. Todd Whitley who we heard on that
5  recording yesterday.  And on September 9th of 2016,
6  Mr. Whitley had informed Mr. Williams that his case
7  was being turned down because we didn't have the
8  documentation we needed.
9       I can represent to you that about a month and
10  a half later in mid to late October, Mr. Williams did
11  provide us with some, you know, the materials that we
12  needed to further investigate his claims,
13  specifically a call log that's been previously
14  produced to the respondent.  Shortly thereafter, we
15  had reopened his case.  And again, you know, we filed
16  this lawsuit in January.
17       You know, I don't think that there was
18  anything that was inappropriate or otherwise improper
19  about the procedure prior to this case and you, know,
20  raising that argument yesterday, we felt was, you
21  know, not only inappropriate but offensive.  And I
22  just felt that we should address that before, you
23  know, we continue with these proceedings here today.
24  So if you'd like to take a look at the case law, I
25  have that for you, we've made copies for opposing

Page 379

1  Counsel.  But again, I just felt that it was
2  something that needed to be addressed.
3            THE ARBITRATOR:  Okay.  Well, let's do
4  this.  I'd be happy to look at the materials you
5  have.  But I'm not going to stop the proceedings --
6            MR. HILL:  I understand.  I just --
7            THE ARBITRATOR:  -- to do that.  And
8  let's share that with Mr. Troutman.  And to the
9  extent that becomes an issue, I appreciate the
10  material.
11            MR. HILL:  Absolutely.
12            THE ARBITRATOR:  We'll look at it then.
13  We'll just have to see how far we get into that.
14            MR. HILL:  Yes, sir.
15            THE ARBITRATOR:  Mr. Troutman, do you
16  need to respond to that at this point at all?
17            MR. TROUTMAN:  I don't believe I do.
18            THE ARBITRATOR:  All right.
19            MR. TROUTMAN:  I'm sorry if we hurt your
20  feelings.
21            MR. HILL:  I appreciate that.
22            THE ARBITRATOR:  Well, I mean --
23            MR. KERNEY:  We still love you.
24            THE ARBITRATOR:  Well, we'll get to that
25  if we need to.

Page 380

1            MR. HILL:  Okay.
2            THE ARBITRATOR:  All right.  So we don't
3  have -- anything else that we need to address
4  preliminarily at this point?
5            MR. TROUTMAN:  I don't believe so.
6            THE ARBITRATOR:  Okay.  So Mr. -- we --
7  Ms. Jackman had to travel, so Mr. Troutman, you're
8  going to take the respondent's proof from this point
9  on.
10            MR. TROUTMAN:  Correct.
11            THE ARBITRATOR:  Okay.  Go ahead.
12            MR. TROUTMAN:  And so for the record,
13  Mr. Williams will now be cross examined.
14            CROSS EXAMINATION
15  QUESTIONS BY MR. TROUTMAN:
16  Q.   Hi, Mr. Williams, how are you?
17  A.   Good.  How are you?
18  Q.   I'm doing okay.  It was kind of a late
19  evening for me.
20  A.   Me also.
21  Q.   You feeling okay this morning?
22  A.   Yeah.  Yeah.  Better than late yesterday
23  evening, that's for sure.
24  Q.   I know yesterday you mentioned that you
25  suffer from anxiety.

Page 381

1  A.   Yes.
2  Q.   Being cross examined can be difficult for
3  anyone, and being cross examined by me is going to be
4  even more difficult than by most.  I'm kidding.  I'm
5  going to, actually, to the contrary, I'm actually
6  going to do my best to be kind and gentle today.
7  Mostly I'll be honest with you, because I think this
8  case was over after opening statement.  That being
9  said, if at any point you want to take a break,
10  please just answer my question, and we'll take a
11  break.
12  A.   Okay.
13  Q.   And I'm sure these folks will tell you that
14  never happens in cross examination, but I want to
15  make sure that you're comfortable.  I really do.
16  A.   Okay.  I appreciate that.
17  Q.   So I'm going to tell you something that's
18  kind of funny.  I turned 40 on Friday, Mr. Williams.
19  A.   40?
20  Q.   And it's one of those events, at least it was
21  for me, where you kind of take stock of who you are
22  and how you're advancing through life, at least I
23  did.  And I'm noticing, as I'm getting older, various
24  changes in myself.  And it's kind of -- they're not
25  all flattering changes, I'll be honest.



Johnnie Williams vs Conn Appliances
Arbitration

Page 382

1  A.    Yeah.
2  Q.    I'm wondering, sir, as you have kind of
3  progressed through your stages of life, have you seen
4  yourself changing in any way?  Did you feel like
5  maybe you've become more stubborn than maybe when you
6  were younger?
7  A.    No.  In some areas.
8  Q.    Okay.
9  A.    You know, in some areas, you know.  Like,
10 well, when I was younger, I guess maybe I wouldn't
11 listen.  You know, you got your own head.  You're
12 thinking your way is the right way to do it.  Or you
13 know, not really using any wisdom because you really
14 don't have that much when you're really young and you
15 know.  But getting older, I pay attention more and I
16 listen more.  Even to somebody that's younger than
17 myself.  Because you can learn from a wine head on
18 the corner.  You know, God will use a wine head to
19 get across his point, you know, what he wants you to
20 know, you know?  So I -- even, say my younger kids.
21 My kids.  Not my younger kids.  Well, all of my kids,
22 you know.  I listen to all of them, you know?
23 Q.    It's important to listen to people.
24 A.    Yeah.
25 Q.    To be respectful of people.

Page 383

1  A.    Yes.
2  Q.    To not be dismissive of folks when they're
3  talking to you.
4  A.    Uh-huh.
5  Q.    You would agree with that?
6  A.    Yeah.
7  Q.    You would agree that when folks are providing
8  you information, that's a valuable thing?
9  A.    Yes.
10 Q.    And that, in most instances at least, sir,
11 you would welcome information, especially that that
12 could potentially help you; isn't that true?
13 A.    That's true.
14 Q.    Even the folks on the street that are talking
15 to you might have some wisdom to provide; isn't that
16 true?
17 A.    That's true.
18 Q.    And you're welcoming that sort of
19 information, be it in person or maybe even over the
20 phone; isn't that true?
21 A.    Yeah.
22 Q.    Now, this case is an interesting case.  To
23 me, it's an interesting case.
24 A.    Uh-huh.
25 Q.    And I presume it's an interesting case to

Page 384

1  you.
2  A.    Yes.
3  Q.    Because what it turns on is your state of
4  mind with respect to phone calls.  And it's difficult
5  for me as an attorney to get inside of your mind.
6  And I'm going to suggest to you, you don't have to
7  agree with this, that it is difficult even for you to
8  go back in time and recreate exactly what you were
9  thinking at any given time.  Would you agree with
10 that?
11 A.    Say that again.
12 Q.    Is it difficult for you, looking back in
13 time, to try to think about what your state of mind
14 was at any particular moment in time?  That's hard,
15 isn't it?
16 A.    I would say sometimes.  I guess it depend on
17 what the situation is, because some things, you can
18 actually, you know, when you're taken back to that
19 time, you know, and it could be so dramatic that you
20 never forget, you know, exactly how it went.
21 Q.    Yeah.  You can remember exactly what you
22 meant at that moment?
23 A.    Yeah.  And the feelings and the emotions that
24 you feel, they're still with you.  You know, they can
25 be brought to the surface.  They may be back in the

Page 385

1  subconscious but, you know, when this is brought out,
2  when it's talked about, I mean, you can actually go
3  back and feel, six months you can go back and feel
4  exactly what you felt six months ago.  I can.
5  Q.    How is your memory?  Are you feeling like you
6  have a pretty good memory, sir?
7  A.    My memory, I would say, is maybe not what it
8  should be.  But I don't have any form of Alzheimer's.
9  Thank God for that.  I know I'm 69 and I'm almost 70,
10 but I got no Alzheimer's.  I don't expect to have
11 any.  But now and then, I can kind of forget
12 something.  You know, my kids let me know that, you
13 know.  "Well daddy, you forgot," you know.  And I
14 said, "well, yeah, maybe I did," you know.  But I'm
15 old enough to forget sometimes, you know.
16 Q.    I respect that.  Now, sir, you understand in
17 this proceeding, you're sworn to tell the truth and
18 the whole truth and nothing but the truth, correct?
19 A.    That's true.
20 Q.    And part of that means if you don't remember
21 something, sir, you can't go back and make something
22 up and try to fill in gaps that you don't recall.
23 A.    Okay.
24 Q.    Are you aware of that?
25 A.    Yes.



Johnnie Williams vs Conn Appliances
Arbitration

386..389

Page 386

1  Q.    Were you aware of that yesterday when you
2  were testifying?
3  A.    Yes.
4  Q.    Okay.  And so when you were giving testimony,
5  sir, everything you said, that was the truth as you
6  remembered it; is that correct?
7  A.    That's correct.
8  Q.    You didn't make anything up, did you?
9  A.    No.
10  Q.    Okay.  Are you an honest man?
11  A.    I would like to think of myself as being an
12  honest man.
13  Q.    Are you an honest man?  That's the question.
14  A.    Yes.
15  Q.    Do you keep your commitments, sir?
16  A.    I do the best I can.  I'm, you know, I'm not
17  perfect.  And I don't know of anyone who's perfect
18  that walked the earth but Jesus Christ.  And
19  naturally, I'm not perfect.
20  Q.    You're a religious fellow?
21  A.    I am a child -- consider myself a child of
22  God.  And I do the best I can to be pleasing in his
23  eyesight.  And I don't always get there.  But I do
24  the best I can.
25  Q.    When you were talking with Conn's, did they

Page 387

1  ever lie to you?
2  A.    Did they ever lie to me?
3  Q.    Did they ever lie to you?
4        MR. HILL:  Your Honor, I'm going to
5  object to the extent that this calls for speculation.
6  A.    There's nothing -- I'm not emotional.  The
7  air, the -- something's in the air.  Allergy or
8  something.
9        MR. TROUTMAN:  Uh-huh.
10        MR. KERNEY:  I don't know if Mr. Harris
11  had a ruling on that objection or not.
12        THE ARBITRATOR:  Did you have a response
13  to that objection, Mr. Troutman?
14        MR. TROUTMAN:  What was the objection?
15        THE ARBITRATOR:  That the question --
16        MR. HILL:  Objection.  Calls for
17  speculation.
18        THE ARBITRATOR:  The question that he
19  asked was --
20        MR. TROUTMAN:  Okay.  I'll rephrase it.
21        THE ARBITRATOR:  All right.
22  BY MR. TROUTMAN:
23  Q.    To your knowledge, sir, did Conn's ever lie
24  to you?
25  A.    Did they ever lie to me?

Page 388

1  Q.    Did they ever lie to you?
2  A.    That's something I never thought about,
3  whether they lied to me or not.
4  Q.    Okay.  Did you ever lie to them?
5  A.    If I did, I don't remember it.
6  Q.    Okay.  Did you ever curse at you, sir?
7  A.    No.
8  Q.    Did you ever curse at them?
9  A.    Yes.
10  Q.    Did they ever hang up on you?
11  A.    No.  Not that I can remember.
12  Q.    You ever hang up on them?
13  A.    Yes.
14  Q.    Were they ever disrespectful to you in any
15  way, sir?
16  A.    Were they disrespectful to me?
17  Q.    Yeah.
18  A.    I would say so.
19  Q.    How so?
20  A.    You asked did -- just then, did they ever
21  hang up on me, and I told you no, not that I could
22  remember.  But I can remember hanging up on them
23  because I felt they were disrespectful.
24  Q.    You felt they were disrespecting?
25  A.    Yes.

Page 389

1  Q.    And that's because, correct me if I'm wrong,
2  you feel very strongly, I suppose, that you told
3  Conn's repeatedly to stop calling you; is that true?
4  A.    That's true.
5  Q.    And you felt and feel now very strongly that
6  they should have listened to you; isn't that true?
7  A.    Yes.
8  Q.    And if you're not listened to, you feel
9  disrespected, don't you?
10  A.    Yes.
11  Q.    And you testified, I believe, that you felt
12  to a certain degree as if you were less than a man.
13  Do you recall those words?
14  A.    Yes.
15  Q.    And you felt you were less than a man because
16  Conn's wasn't listening to you; is that correct?
17  A.    Let me think about it.  Because they wouldn't
18  listen to me?  I don't think it's that, no.  I
19  think -- no, no, no.
20  Q.    And when you talked about feeling less than a
21  man, you talked about that in the sense of in your
22  children's eyes.  Do you recall that?
23  A.    Yes.
24  Q.    And the fact that you were unable to meet
25  your obligations, sir, that is what made you feel



Johnnie Williams vs Conn Appliances
Arbitration

390..393

Page 390

1  like less than a man in your children's eyes; isn't
2  that true?
3  A.    Okay.  Well, I believe in my children's eyes,
4  I am their father.  Someone that's in their life that
5  they love.  And that they receive love from and
6  guidance.  Okay.  Me myself, my personal feeling was
7  I felt that somewhere I dropped the ball for a
8  minute.  And I would like for them not to see me drop
9  no ball or even think that daddy dropped a ball
10  somewhere.
11  Q.    Uh-huh.
12  A.    Because I'm supposed to be on top of things
13  that concern me and them and the household.  So did
14  they discover that -- did I tell them that I was
15  struggling in a certain area?  I don't remember
16  whether I did or not.  But I felt like they may have
17  seen that, or they have seen me struggle where maybe
18  somehow I shouldn't have been, but I was.  But that
19  is life.  There are struggles in life, and you will
20  have them.  Everybody will.  Even myself.
21  Q.    You don't remember whether or not you talked
22  to your children about the situation at all?
23  A.    I don't think I did.
24  Q.    Okay.  You talked a little bit about your
25  upbringing -- and if everyone will bear with me here.

Page 391

1  We haven't had a chance to depose you.  So I'd like
2  to know a little bit, if that's okay.  You grew up --
3  where did you grow up?
4  A.    I grew up in Memphis, Tennessee.
5  Q.    And I know you've got two kids -- that was
6  mentioned on a couple of occasions, that live with
7  you currently; is that right?
8  A.    Yes.
9  Q.    Are you married, sir?
10  A.    No.  I'm divorced.
11  Q.    What happened with your marriage, sir?
12       MR. HILL:  Your Honor, I'm going to
13  object as to the relevance of this line of
14  questioning.  I'm not sure what his prior marriage
15  has anything to do with receiving phone calls from
16  Conn's Appliances.
17       THE ARBITRATOR:  How long ago were you
18  divorced?
19       THE WITNESS:  2007.
20       THE ARBITRATOR:  Mr. Troutman, what does
21  this have to do --
22       MR. TROUTMAN:  I'll move on.
23  BY MR. TROUTMAN:
24  Q.    Have you ever sued anyone before, sir?
25  A.    Have I ever sued anyone before?

Page 392

1  Q.    Have you ever sued anybody?
2  A.    I've had two car accidents.  I'm not sure
3  that I sued anyone.  I was never in, you know, a room
4  like this with people.  I had a real estate thing
5  some years ago when I was much younger.  Other than
6  that, no.
7  Q.    Okay.  So three lawsuits, you'd say?
8  A.    I beg your pardon?
9  Q.    Three lawsuits?
10       MR. HILL:  I'm going to object.  That's a
11  mischaracterization --
12       THE ARBITRATOR:  I don't think he said
13  any lawsuits.
14  BY MR. TROUTMAN:
15  Q.    Oh.  So you've not pursued any lawsuits?
16       THE ARBITRATOR:  Two car accidents and a
17  real estate thing years ago.
18       THE WITNESS:  Yes.
19       THE ARBITRATOR:  I'm not sure there was
20  any lawsuits involved.
21  BY MR. TROUTMAN:
22  Q.    Well, let me make sure then --
23       THE ARBITRATOR:  Go ahead.
24  BY MR. TROUTMAN:
25  Q.    -- to clarify that.  Were you the -- the two

Page 393

1  lawsuits and the real estate thing, excuse me --
2       THE ARBITRATOR:  Two car accidents.
3  BY MR. TROUTMAN:
4  Q.    The two car accidents and the real estate
5  thing, did those result in litigation, a lawsuit?
6  A.    I'm trying to remember.  I need to have a
7  good understanding, you know.  You're a lawyer, I'm
8  not.  There are lawyers in the room.  As far as
9  exactly what is the definition of lawsuit.  Then
10  maybe I can answer that question.
11  Q.    Okay.  So as you sit here right now, you're
12  not sure sufficiently what a lawsuit is?
13  A.    I may not be.  I want to make sure -- you
14  know, I don't want to tell you the wrong thing.
15  Q.    Okay.  You told us one, that you're retired,
16  and two, that you found Conn's by way of those
17  commercials that you saw.  Do you watch a fair amount
18  of TV, would you say?
19  A.    Not as much as some people, you know, not --
20  I wouldn't consider myself a couch potato or nothing
21  like that, but I like watching the news.  Maybe I
22  watch the news too much.  But I like to know what's
23  going on.  I watch Blue Bloods.  That's my favorite.
24  Q.    That's a good show.
25  A.    Yeah.



Page 394

1 Q.    You ever seen any Morgan & Morgan
2 commercials?
3 A.    Yes.
4 Q.    Yeah?  How many of those would you say you
5 saw before you decided to sue Conn's?
6       MR. HILL:  Again, I'm going to object.
7 This calls for speculation.
8       THE ARBITRATOR:  Mr. Williams, go ahead,
9 to the extent you know.
10 A.   You know, before I contacted Morgan & Morgan,
11 I saw Morgan & Morgan commercials every day.
12 BY MR. TROUTMAN:
13 Q.   Uh-huh.
14 A.   Some I kind of, I listened to, but I saw no
15 need for me to call Morgan & Morgan.  You know, not
16 at the time I was, you know, seeing the commercials.
17 You know, I was watching TV and a commercial run
18 across the TV.  I didn't even think about calling
19 Morgan & Morgan for anything, even a car accident.
20      It did cross my mind, but I didn't get into
21 it like that, you know.  After being harassed,
22 humiliated and some more feelings, you know, have to
23 get into by Conn's, in my mind and my heart, I'm
24 looking for an outlet, you know.  I don't care if I
25 can get this, this that I'm dealing with every day

Page 395

1 and why I got to feel this way every day, why I got
2 to go through this every day, why I got to argue,
3 fuss and cuss.  How can this stop?  They don't stop
4 calling me.  I don't care what I say.
5 Q.    Okay.
6 A.    I don't care how many curse words I use.
7 Still not going to stop.  And I'm still going to feel
8 the way I'm feeling, and I don't feel that I deserve
9 that even though I was unable to pay.
10 Q.   Okay.
11 A.   Now, when -- after so much of that, then I
12 see a commercial about Morgan & Morgan.
13 Q.   Then you saw the commercial?
14 A.   That's related to this, then yes, I called
15 them.
16 Q.   Well, hang on, sir.
17 A.   Because I figure that the calls would stop.
18 Q.   Hang on, sir.
19 A.   That's the only way to do it.
20 Q.   Hang on, sir.
21 A.   Okay.
22 Q.   What came first?  You seeing commercials or
23 you feeling harassed?
24 A.   Feeling harassed.
25 Q.   You never saw a commercial for Morgan &

Page 396

1 Morgan until you saw -- until you felt harassed; is
2 that true, sir?
3 A.    Say that again.
4 Q.    You never saw a Morgan & Morgan commercial
5 until after you felt harassed; is that true, sir?
6 A.    No, that's not true.
7 Q.    All right.  You saw the Morgan & Morgan
8 commercials first, right?  Yes or no, sir.
9 A.    Not related to this situation.
10 Q.   You never saw a commercial related to TCPA
11 from Morgan & Morgan or harassing phone calls before
12 you felt harassed; is that true, sir?
13 A.   No.
14 Q.   That's not true?
15 A.   Okay.  Let's get this straight.
16      THE ARBITRATOR:  I didn't get that
17 answer.
18      THE WITNESS:  Okay.
19      THE ARBITRATOR:  Why don't we back up a
20 minute.
21      THE WITNESS:  Okay.
22      THE ARBITRATOR:  I think that sequence
23 got out of whack there.
24      THE WITNESS:  Okay.
25      THE ARBITRATOR:  Mr. Troutman, can you

Page 397

1 just start back with your --
2      MR. TROUTMAN:  Yes, sir.
3      THE ARBITRATOR:  I understand where
4 you're trying to go, but I think he got confused.
5      MR. TROUTMAN:  I understand.
6      THE ARBITRATOR:  Can we just back up, and
7 let's walk through it carefully.
8      MR. TROUTMAN:  Let's have a nice, clean
9 record.
10 BY MR. TROUTMAN:
11 Q.   Sir, my question is very simple.
12 A.   Okay.
13 Q.   You agree with me that Morgan & Morgan runs
14 commercials regarding, quote, harassing, debt
15 collection calls; you agree with that?
16 A.   Yes.  I agree with that.
17 Q.   You have seen those commercials; you agree
18 with that?
19 A.   Yes.
20 Q.   My question is simply:  You saw those
21 commercials before any sort of purported harassment
22 by my client; isn't that true?
23      MR. HILL:  No, again, I'm going to
24 object.  This calls for speculation.
25      THE ARBITRATOR:  Well, let's --



Johnnie Williams vs Conn Appliances
Arbitration

398..401

Page 398

1        MR. TROUTMAN:  Okay.  The --
2        THE ARBITRATOR:  I asked Mr. Troutman to
3  back up and go through it carefully, and that's what
4  he's doing.
5        MR. HILL:  I understand.
6        THE ARBITRATOR:  And I don't think there
7  was anything objectionable about the way he asked
8  that question.  You may have to repeat it, because
9  we've interrupted, so...
10       MR. TROUTMAN:  I think I have the
11  testimony.  Let me just correct it or make sure that
12  it is clear.
13  BY MR. TROUTMAN:
14  **Q.     Your testimony, sir, is you never saw one of**
15  **those commercials until after you felt harassed by**
16  **Conn's; isn't that true?**
17  A.     That's true.
18  **Q.     That was good timing.  When would you say,**
19  **sir, you first felt harassed by Conn's?**
20  A.     I can't really give you a month or a date.  I
21  can't.  I can't, you know.  My memory is not that
22  good.  And I didn't write it down, "okay, today I'm
23  being harassed by Conn's.  And this is the date."
24  No, I don't remember that.  But when that started, it
25  made me so unhappy and so miserable that, you know,

Page 399

1  it put me in a desperate mode.  This has got to stop.
2  **Q.     Did you call Morgan & Morgan immediately upon**
3  **feeling harassed?**
4  A.     Of course not, because I didn't know that
5  they dealt with that type of situation of mine.
6  **Q.     You had no idea?**
7  A.     No, I had no idea.
8  **Q.     How --**
9  A.     I don't know how long had gone by with me
10  experiencing what I was experiencing before I saw the
11  commercial.  I can't tell you that.  But when I did
12  see it, a light bulb lit up in my head.  Maybe I can
13  stop these phone calls.
14  **Q.     Well, we're going to listen to some**
15  **recordings here in a second.  Before we get to that,**
16  **let's check a couple of pretty basic boxes.  We**
17  **already established, of course, that you obtained**
18  **some furniture and electronic goods from Conn's,**
19  **correct?**
20  A.     Yes.
21  **Q.     You signed a contract, correct?**
22  A.     Yes.
23  **Q.     You agreed to pay back the sums that you**
24  **borrowed on the terms set forth in that contract,**
25  **correct?**

Page 400

1  A.     Yes.
2  **Q.     At the time that you signed that contract,**
3  **you intended to meet those obligations, didn't you?**
4  A.     That's true.
5  **Q.     And you understood that if you didn't meet**
6  **those obligations, there might be various**
7  **consequences?**
8  A.     Well, yes.
9  **Q.     I imagine as a father, I know one of the**
10  **things I'm trying to teach my kids, I'm sure you're**
11  **doing the same, is that there are responsibilities in**
12  **life?**
13  A.     That is true.
14  **Q.     And if you fail to meet your**
15  **responsibilities, no matter whose fault it is, if you**
16  **fail to meet your responsibilities there are**
17  **consequences.  Do you agree with that statement?**
18  A.     Yes.
19  **Q.     And amongst the consequences, for instance,**
20  **of failing to pay back debt is that the person to who**
21  **you owe the debt might contact you and ask you to pay**
22  **it.  You agree with that?**
23  A.     Yes.
24  **Q.     And there's nothing unusual or wrong about**
25  **that, is there?  In your opinion.**

Page 401

1  A.     Well, I wouldn't say that there was anything
2  wrong, but I would say that there is a way.  There is
3  a way.  You know, there's a -- there's definitely a
4  right way and a wrong way.  You know, Conn's wouldn't
5  call me up and say, "hey, Mr. Williams, give us our
6  money or we're going to come over and put a knot or
7  hook a hickey upside your head."  Which wouldn't be
8  the right way.
9  **Q.     That wouldn't be the right way.  And that's**
10  **not what Conn's did, right?**
11  A.     No.  They didn't do that.
12  **Q.     Yeah.  They didn't threaten you --**
13  A.     No.
14  **Q.     -- did they?  Nobody showed up at your door,**
15  **did they?**
16  A.     No.
17  **Q.     You know, I don't want to talk too much about**
18  **my back story, but I grew up in interesting**
19  **circumstances.  And I remember my phone ringing**
20  **continuously like, ring, ring, ring, ring, ring.  Two**
21  **seconds later, ring, ring, ring, ring, ring.  Three**
22  **seconds later, ring, ring, ring, ring, ring.  This**
23  **was in the '80s before the law had kind of developed,**
24  **and debt collectors would literally just cause your**
25  **phone to ring constantly for 20 minutes at a stretch,**



Johnnie Williams vs Conn Appliances
Arbitration

402..405

Page 402

1  never taking a breath.  That never happened to you,
2  did it, sir?
3  A.    Ring, ring, ring, ring, ring?  I don't ever
4  remember my phone ringing like that.
5  Q.    And nobody -- we already established nobody
6  ever called you names, nobody ever threatened you,
7  nobody ever did anything that made you feel as if you
8  were going to be hurt in any way; isn't that true?
9  A.    Nobody did nothing like that, no.
10 Q.    Yeah.  But you were concerned by the volume
11 of phone calls; is that right?
12 A.    Of course.
13 Q.    If they had called you once a day, would you
14 want -- would you be okay with that?
15 A.    Well, you know, that would have been more
16 sensible.
17 Q.    Okay.
18 A.    And maybe even acceptable.  Well, one a day,
19 once a day, that's still too much, I mean --
20 Q.    Okay.
21 A.    If I know that I owe you and I'm trying to
22 pay you, you don't have to call me every day.  Do you
23 understand what I'm saying?
24 Q.    When did you decide that you weren't going to
25 pay Conn's?

Page 403

1  A.    That I wasn't going to pay?
2  Q.    Yeah.
3  A.    After however long it had been that I had
4  been going through this, I just -- I basically just
5  said, "to hell with it."  You know, I mean, you know,
6  when you can't seem to reach a mutual agreement or an
7  understanding or something, and you just can't work
8  with the person or some people, or you just can't
9  work with them.  I just left it alone.
10 Q.    Did you want to reach a mutual agreement?
11 A.    Yes, of course.
12 Q.    You wanted to reach a mutual understanding?
13 A.    Yes.  Because that would have been the
14 honorable thing to do.
15 Q.    How does one reach a mutual agreement?
16 A.    How?
17 Q.    How?  What is the mechanism by which a mutual
18 agreement -- I'll ask it differently.  Sir, can you
19 have an agreement with somebody without talking to
20 them?
21 A.    No.  I don't think so.
22 Q.    And at all times throughout this entire
23 process of you dealing with Conn's, you wanted a
24 mutual agreement, didn't you?
25 A.    Well, you know what?

Page 404

1  Q.    Yes or no, sir?
2  A.    Yes.
3  Q.    That would be the honorable thing to do,
4  right?
5  A.    Yes.  Yes.
6  Q.    In order to do the honorable thing, to have a
7  mutual agreement between you and Conn's, you had to
8  talk to them; isn't that true?
9  A.    That's true.
10 Q.    And Conn's, sir, for its part, reached out to
11 you.  I won't characterize their conduct as
12 honorable, but they reached out to you to form a
13 mutual agreement, didn't they?
14 A.    To an extent, maybe.
15 Q.    Didn't they do that, sir --
16 A.    To an extent.
17 Q.    -- on virtually every single phone call we
18 listened to?
19 A.    No, no.  Abso- -- no.
20 Q.    Didn't they reach out to you, sir and ask you
21 to agree to pay a partial amount, something that
22 would be within your means so that they could put
23 your account back in good standing and set you up in
24 a way that you could continue to meet your
25 obligations in a way that was comfortable for you?

Page 405

1  A.    Well, you know what, it seems like when they
2  asked me something like that, it was at a time when I
3  had no money, and instead I couldn't do the agreement
4  because it calls for some kind of money up front,
5  whether it was 25, 30, 40 or $50, it calls for at
6  least something, some amount up front in order to do
7  whatever it was that they were presenting to me.  And
8  every time it was presented to me, it was at a time
9  when I had no money.
10      Almost like they knew I had no money.  And
11 I'm trying to figure out, well, how do they know I
12 don't have no -- I don't have no -- I couldn't do it.
13 If I could have done it, I would have done it.  I was
14 looking for a way to get some -- on the right track.
15 Q.    You were looking for a way?
16 A.    Of course.
17 Q.    Do you think Conn's was looking for a way
18 too?
19 A.    Maybe.
20 Q.    Yeah.
21 A.    But not -- and Conn's is a big business.  I'm
22 just an ordinary guy.                              0
23 Q.    I'm just an ordinary guy too.               3
24 A.    Okay.  Well --
25 Q.    And I look at the situation, sir, and I see



Page 406

1  you wanting to have an agreement.
2  A.    Okay.
3  Q.    And I see Conn's wanting to have an
4  agreement.  And you were feeling as if you can't meet
5  the terms at the time that they're suggesting it, and
6  so they keep calling you back to see if things have
7  changed and maybe now would be a time that you could
8  meet this mutual agreement and do the honorable
9  thing.  And sir, you keep hanging up on them.
10  A.    Okay, okay.  Can I talk for a minute?
11  Q.    You can.
12  A.    Can I?
13  Q.    Yes.
14  A.    Okay.  You know, I remember some years ago,
15  an older guy said to me, and I try to listen to older
16  guys because they've been here longer, they know a
17  lot of stuff, you know.  And he said to me, he said,
18  "you know, if I can hear you and you can hear me,
19  then we get what you call an understanding.  Whereas
20  understanding, there's no room for confusion."  Okay.
21  Now, when Conn's called me and I'm telling them I
22  don't feel good.  I don't want to have this
23  conversation.  I don't want to have the conversation
24  with you no way.  But being that I don't feel good
25  physically, I really don't want to have this

Page 407

1  conversation with you.  And then, you on the other
2  end, and you steady saying, "well, look,
3  Mr. Williams, can we take this card, and we can take
4  this particular number and prepay to have it set all
5  up?"  That's not something I want to talk about.  I
6  don't feel good.  I don't want to talk about any of
7  that.  Timing is not right.
8  Q.    The timing is not right?
9  A.    No, it's not right.  But I'm telling you the
10  timing is not right, but you're steady going on.
11  That's why I hang the phone up.
12  Q.    But timing changes, doesn't it?
13  A.    There comes a time -- there were times when
14  you noticed on the recordings that I didn't pick up
15  the phone and answer the phone and say "hey" and
16  curse nobody out.
17  Q.    Cir- --
18  A.    I said -- I listened and I said -- well, they
19  said, "well, Mr. Williams, how are you doing?"  I
20  said "well, how you doing?"
21  Q.    Yeah.  Over time, circumstances change,
22  right?  Your feelings change, don't they?
23  A.    Yeah.
24  Q.    What you want?
25  A.    Surely, yeah.

Page 408

1  Q.    What you want in terms of communication from
2  people changes, doesn't it?
3  A.    Sometimes.
4  Q.    And sometimes -- today you might be, dare I
5  say, in a bad mood and just not want to deal with
6  them.  But maybe tomorrow you're in a better mood,
7  and you're willing to hear and try to reach that
8  mutual understanding; isn't that true?
9  A.    I agree with that.
10  Q.    So on one day you might say, "you know what,
11  I don't want you to call me anymore."  But then the
12  next day, you might be grateful for that phone call
13  because now you might have an opportunity to reach a
14  deal; isn't that true?
15  A.    Well, that never happened.
16  Q.    But that never happened, sir?
17  A.    No.
18  Q.    Because just factually, you were never in a
19  position to be able to make the deal, right?
20  A.    Whenever they presented it to me, no, I
21  wasn't in a position to do it, no.
22  Q.    And of course Conn's couldn't know what your
23  situation was; isn't that true?
24  A.    Well, it almost seemed like they had a
25  crystal ball, you know.

Page 409

1  Q.    Yeah.
2      MR. TROUTMAN:  Let's play some
3  recordings.  We're going to listen to Recording
4  Number 3 first.  I'll give Daniel a couple of seconds
5  to cue this up.
6      MR. GOMEZ:  Do you want any speaker or is
7  it loud enough?
8      MR. TROUTMAN:  Should we pause it?
9      THE ARBITRATOR:  Can we pause it?
10      MR. TROUTMAN:  I'm sorry.
11      MR. GOMEZ:  I didn't know if you wanted
12  the speaker.  That's the only thing I'd asked.
13      THE ARBITRATOR:  Well, I could hear that,
14  but what I was going to ask, is it possible prior to
15  playing the audio to give me the date, and are these
16  audios where we actually have transcripts or not?
17      MR. HILL:  I believe there should be a
18  transcript for this, and if I'm not mistaken, I
19  believe it's the recording of March 6th, 2016.
20      MR. TROUTMAN:  Yeah.
21      THE ARBITRATOR:  If you don't have the
22  transcripts, that's okay.  I just need some way to
23  reference back to it.  The date would be perfect.
24  Look, if y'all aren't ready with the transcripts, I'm
25  not trying to make you stop what you're doing.  I



Johnnie Williams vs Conn Appliances
Arbitration

410..413

Page 410

1  just want to for sure know the date of what we're
2  doing.
3        MR. TROUTMAN:  Yeah.  The transcripts are
4  a little tricky.
5        THE ARBITRATOR:  Okay.  Well then, that's
6  fine.  I'll listen and make notes.  Just --
7        MR. TROUTMAN:  March 6th is the date?
8        MR. DELNERO:  Yes.
9        THE ARBITRATOR:  If you could just give
10  the date of the call.
11        MR. TROUTMAN:  So Daniel, can I trust you
12  to provide us with the date as we tee up each of
13  these?  Because I don't have that written down here.
14        THE ARBITRATOR:  Is that -- Daniel, is
15  that --
16        MR. DELNERO:  Sure.
17        THE ARBITRATOR:  -- accessible to your
18  screen, or how --
19        MR. DELNERO:  No.  But I --
20        THE ARBITRATOR:  You have notes?
21        MR. DELNERO:  -- believe I know where
22  almost all of these are.
23        THE ARBITRATOR:  Okay.
24        MR. HILL:  I have the transcripts in
25  front of me.  I can direct you to the pages if you'd

Page 411

1  like.
2        MR. TROUTMAN:  Okay.  So we're going to
3  do Number 3.
4        THE ARBITRATOR:  All right.  Well, why
5  don't we go at it that way.  If you could say the
6  date and if you really can, quickly --
7        MR. HILL:  Absolutely.
8        THE ARBITRATOR:  -- give me the page
9  number.  I just want to be able to get back to it
10  later.
11        MR. HILL:  Sure.  Absolutely.
12        MR. DELNERO:  This one is March 6th,
13  2016.
14        THE ARBITRATOR:  When y'all aren't here
15  to help me.  March --
16        MR. GOMEZ:  Do you want the transcript
17  itself?  I can pull it for you.
18        THE ARBITRATOR:  Well, hang on.  Let me
19  get those two.  This is March 6, 2016.  Do you know
20  the transcript number?
21        MR. HILL:  Yes.  I believe it's --
22  Mr. Troutman, I'd say it's Bate's stamped Number 3,
23  and it should be Page 3 in your transcript, sir.
24        THE ARBITRATOR:  Thank you.
25        MR. DELNERO:  Everybody ready?

Page 412

1        (WHEREUPON, audio recording is played
2  into the record.)
3  BY MR. TROUTMAN:
4  Q.     So in this call recording, it begins with you
5  reaching out to Conn's and saying, "we need to have
6  an agreement.  We need to come to a mutual
7  understanding," right?  That's how the call begins?
8  A.     Yes.
9  Q.     And when you reached out to Conn's, Conn's
10  was willing to listen to you, weren't they?
11  A.     To an extent.
12  Q.     I mean, the call recording speaks for itself.
13  But they listened to you respectfully, they heard you
14  out, they didn't cut you off or hang up on you, did
15  they?
16  A.     Yeah.  I think she did say at the end that
17  they wouldn't call me no more for, you know, those
18  two or three days that I was waiting to get with
19  them, you know.
20  Q.     And they didn't call you during that time
21  frame, did they?
22  A.     I'm not sure.  Maybe not.  I don't remember.
23  Q.     Okay.
24  A.     They may not have.  I don't remember.
25  Q.     Okay.  I think there was testimony last night

Page 413

1  that between that Sunday, which you represented it
2  was a Sunday, and that Friday when you made the
3  payment, and in fact you did make the payment, sir,
4  you did keep your word on that occasion.
5  A.     Yeah.
6  Q.     And Conn's kept its word too.  It didn't call
7  you during that time frame.  You called in.  You had
8  a mutual understanding.  Both sides kept it.  It
9  worked out.
10  A.     Uh-huh.
11  Q.     You were happy and Conn's was happy.
12  A.     Yeah.
13  Q.     Now, you did say some words there, "you don't
14  have to keep calling me."  And if I'm understanding
15  your counsel's position correctly, I think they're
16  arguing that you didn't just mean, "you don't have to
17  keep calling me on this payment."  But that that
18  meant you never wanted to hear from Conn's ever again
19  for any purpose.  And so I guess I figure I'll just
20  ask you.  When you said in that specific call
21  recording, "you don't have to keep calling me," did
22  you mean, "I don't ever want to hear from you again,
23  Conn's"?
24  A.     Well, whenever the next time came up, if
25  there was a next time that I was late or something,



Johnnie Williams vs Conn Appliances
Arbitration

414..417

1   if it meant that I was going to get calls 14 times a
2   day, no, I didn't want them to call me.
3   Q.     Okay.  Did you say that?
4   A.     I'm sure I did.  I mean, I've said how many
5   times a day --
6   Q.     Well, hang on.  It's very important that I
7   completely understand your testimony in this
8   instance.  And I want to focus just on this call
9   recording because context is very important in this
10  case.
11  A.     Okay.
12  Q.     As we just described, there was one payment
13  of 105.51 due at this time.  You had decided that you
14  were going to make that payment by Friday.  Conn's
15  decided it was going to honor that agreement and not
16  call you anymore.  You said, "you don't have to keep
17  calling me."  Those words meant, "you don't have to
18  keep calling me regarding this $105.51 payment
19  because I'm going to make the payment on Friday;"
20  isn't that true?
21         MR. HILL:  I'm going to object to the
22  extent it's a mischaracterization of his testimony.
23         THE ARBITRATOR:  You can answer the
24  question.
25  A.     So what are you asking me again?

1   BY MR. TROUTMAN:
2   Q.     What I'm asking you is, when you said, "you
3   don't have to keep calling me," on that call
4   recording that we just listened to together, you
5   meant, "you don't have to keep calling me regarding
6   this $105.51;" isn't that true?
7   A.     Okay.  Okay.  Okay.
8   Q.     Do you agree with that?
9   A.     Yeah.  That was that one time.
10  Q.     Okay.
11  A.     We were able to work it out.
12  Q.     Thank you.
13         MR. TROUTMAN:  Let's move on to Recording
14  Number 85, please.
15         MR. DELNERO:  This one is May 10th, 2016.
16         MR. HILL:  And that should be on page, I
17  believe, it's 23 of the transcript.
18         THE ARBITRATOR:  I have it.
19         (WHEREUPON, audio recording is played
20  into the record.)
21  BY MR. TROUTMAN:
22  Q.     So this recording was May 10, 2016.  At this
23  time, based on that recording, do you remember
24  feeling harassed by Conn's?
25  A.     Yes.

1   Q.     You felt harassed at that time, sir?
2   A.     At some -- yes.  To an extent, yes.
3   Q.     You agree the agent was quite polite with
4   you?
5   A.     He was.
6   Q.     He asked you whether or not there was
7   anything else he could help you with.  You said
8   everything was fine.
9   A.     That's true.
10  Q.     He asked you whether or not that was still a
11  good number to reach you at.  You said it was.
12  A.     That was the number that you-all had.  That
13  was my personal cell phone number and the only phone
14  that I have.  So it was the only phone that you could
15  reach me at, period.
16  Q.     And that --
17  A.     You know, but that doesn't mean to just call
18  my phone number all day long, every day.  Just
19  whenever you felt like harassing somebody, call my
20  number.  That didn't mean that.
21  Q.     That $105.51 that was due at that time, you
22  reached an agreement that you were going to make that
23  payment by Friday on that call, correct?
24  A.     Yeah.  That's what it sound like to me.
25  Q.     Uh-huh.  And this statement that "you can get

1   your buddies to stop calling," again, like we talked
2   about in March and this May call, what that meant
3   was, "you can stop calling me about this payment
4   because I'm going to make it," correct?
5   A.     Well, I'm sure that if I talked to them,
6   that, you know, I had tried to address that or
7   whatever, or maybe I didn't know when I was going to
8   be able to make the payment.  But evidently, they had
9   worked my nerves when I -- for me to say to him,
10  "stop -- can you get your buddies to stop calling
11  me," because I had already been harassed.  You know.
12  Now, when me and him talked, then we were able to
13  reach an agreement.  That doesn't happen with
14  everybody that works for Conn's that call me.
15  Q.     I'm sorry --
16  A.     There were very, very few.  One was a lady
17  that I said, she seemed to have a sweet spirit.
18  Q.     My question --
19  A.     But that doesn't mean I want her to call -- I
20  want her to call me every day.  That didn't mean
21  that.
22  Q.     My question, sir --
23  A.     Okay.
24  Q.     -- was a little bit different, I think.  It
25  was merely, when you said, "can you get your buddies



Page 418

1  to stop calling," what you meant was, "stop calling
2  about this $105.51 payment that I'm going to make on
3  Friday," correct?
4        MR. HILL:  Again, I'm going to object as
5  to the mischaracterization of his testimony.
6        THE ARBITRATOR:  Overruled.  Go ahead and
7  answer the question, Mr. Williams.
8  A.    That was -- okay.  He and I had talked.  We
9  reached an agreement, that was taken care of.  We had
10 an understanding.
11 BY MR. TROUTMAN:
12 Q.    So the answer to my question is yes, sir?
13 A.    What was your question again?
14 Q.    When you said, "get your buddies to stop
15 calling," you meant with regards to the $105.51
16 payment that you were going to make that Friday;
17 isn't that true?
18 A.    That means that me and him had an
19 understanding.  I don't know what the buddies, what
20 they were going to do or if they called any more
21 about it.  But me and him understood that the payment
22 was going to be made that day.  And that was that.
23 Q.    And so there was no more need for calls
24 regarding that payment?
25 A.    No.  There was definitely no more needs, no.

Page 419

1  Q.    And that's what you were saying to him,
2  "There's no more need to call me on this payment,"
3  correct?
4  A.    That's true.
5  Q.    Okay.
6        MR. TROUTMAN:  Let's move on to Recording
7  Number 23.
8        MR. DELNERO:  This one is July 2nd, 2016.
9        MR. HILL:  Did you say 23?
10       MR. TROUTMAN:  Yes.
11       MR. HILL:  I believe that should be on
12 page 7 of the transcript.
13       MR. DELNERO:  It's July 2nd, 2016.
14 Everybody ready?
15       THE ARBITRATOR:  Yes.
16       (WHEREUPON, audio recording is played
17 into the record.)
18 BY MR. TROUTMAN:
19 Q.    Well, that's a change.  So we've listened to
20 the two recordings that your counsel has played and
21 provided to the arbitrator with respect to your
22 request purportedly to have calls stopped, and in
23 both instances, we've established that you just
24 wanted calls to stop regarding that specific payment.
25 Why did you tell them that you had asked for calls to

Page 420

1  stop when you hadn't?
2  A.    Let me understand here because I'm not really
3  understanding.  Can you make yourself a little
4  clearer?
5  Q.    Sure.
6  A.    Okay.
7  Q.    There were call recordings that had been
8  played by your counsel.  We just listened to the only
9  two call recordings played by your counsel that came
10 earlier in time than the July 2nd call.  The July 2nd
11 call is the one with the naughty language.  I'm
12 asking you --
13 A.    What date was that?
14 Q.    That's July 2nd, yeah.  And July 2nd, you say
15 "haven't I asked you," bad words --
16 A.    Yeah.  Okay.
17 Q.    -- "to stop calling."
18 A.    Okay.
19 Q.    I'm saying well, that's interesting because
20 we just listened to the recordings, sir, and
21 actually, no, you didn't ever tell Conn's to stop
22 calling other than with respect to two specific
23 payments.
24 A.    Yes, I had.  Yes, I had.
25 Q.    So there's some call recordings that just

Page 421

1  don't exist, sir, that your counsel hasn't played?
2  A.    I don't know.  But evidently if I said that,
3  I had talked to them and I had asked them evidently.
4  Yeah.
5  Q.    And your counsel just overlooked those?
6  A.    Well, I don't know what happened with that.
7  But for me to say that, I must have talked to them.
8  Q.    It must have been true, right?
9  A.    I must have talked to them.
10 Q.    You would never lie to Conn's, correct?
11 A.    I would never what?
12 Q.    You would never lie, right?
13 A.    I would never lie?
14 Q.    Right?
15 A.    I never said that.  And I never said that --
16 and I'm not saying that I might have lied to Conn's
17 either.  You know, I mean, you said I said that I'd
18 never lie.  It's not like, you know, I don't ever
19 tell a lie.  Or I never told a lie or I never lied.
20 You got me -- I'm not confused, but I don't know what
21 this is you're trying to say.  You know, I'm trying
22 to understand what it is you're trying to say.
23 Q.    Did that woman deserve to be screamed at,
24 sir?
25 A.    Did she?



Johnnie Williams vs Conn Appliances
Arbitration

422..425

Page 422

1  Q.     Did she?
2  A.     She got me at a point where I was thoroughly
3  frustrated, aggravated from phone calls.  From phone
4  calls from Conn's.  Otherwise I would have been a
5  gentleman when I answered the phone.
6  Q.     So that call that she made to you, that set
7  you off, sir?  Is that what you're saying?
8  A.     You know, I could have been frustrated in the
9  very beginning.  Okay?  But evidently, I had gotten
10 some calls or something from Conn's to even -- to
11 kind of go off like that on her.  I had already been
12 frustrated.
13 Q.     Uh-huh.  Now, we walked through two occasions
14 in which you folks came to an agreement, right, and
15 now we've got a third delinquency.  You'll have to
16 forgive Conn's for assuming maybe if they've reached
17 out to you and had a conversation with you, you might
18 be able to come to another understanding like you had
19 previously.  That's reasonable in this instance,
20 wouldn't you agree, sir?
21 A.     Well, you know something?  So many people
22 from Conn's call me.  I don't know how many people.
23 You know.  Now, if I said to them, "oh, I don't have
24 it today, there's nothing I can do about it," you
25 know.  "And I'll get back with you as soon as I get

Page 423

1  it in my hand" or something.  Well, the person from
2  Conn's would say, "well, let's -- Mr. Williams, let's
3  postdate a check" or some stuff like that.  "And take
4  care of it in advance."  Well, I wasn't going to do
5  it like that.  And I just told you, you know, I'm
6  going to deal with it.  Why we got to go through all
7  of that.  And why you got to force the issue for us
8  to do it like that.
9  Q.     Sir, my question was not a hypothetical.  It
10 was specific.  And it was simply, wouldn't you agree
11 with me, given the context, that this was a
12 reasonable thing for Conn's to do to try to call you
13 in light of your delinquency and the previous two
14 occasions where you have successfully reached a
15 mutual understanding.  Isn't that reasonable of
16 Conn's to do, sir?
17 A.     Well, you know, if -- for them to call me the
18 way they call me, it's like abusing, you know, the
19 calling privilege, you know.  Just call over and over
20 and over and over again all day long every day.  Now,
21 how you expect a guy to be a gentleman?  You know,
22 you thoroughly ruffled his feathers totally.  The
23 gentleman is gone for now.
24 Q.     So the answer to my question is, you didn't
25 think it was reasonable?

Page 424

1  A.     For that particular phone call there?
2  Q.     That particular phone call.  That's all I'm
3  asking about, sir.
4  A.     Well, it may have been.  I don't know, but
5  evidently I had gotten some calls before then in
6  order for me to be in that frame of mind.
7  Q.     Did you have other debts at that time, sir,
8  that you might have owed to other creditors?
9  A.     No.
10 Q.     You had no other debts, sir?
11 A.     Nothing nobody called me like that -- nobody
12 has every called me like that before in my life.
13 Q.     Sir, please listen to my question.
14 A.     Yes.
15 Q.     You're under oath.  You had no other debts at
16 this time?
17 A.     Yeah.  I got bills that I had to pay.
18 Q.     And you, in fact, received calls from other
19 creditors at that time?
20 A.     Now and then maybe.  Now and then.  Not like
21 this.  Never before like this.
22 Q.     So the answer to my question is yes; isn't
23 that true?
24 A.     That the call was okay?  A okay phone call?
25 Q.     Different question, sir.

Page 425

1  A.     Okay.
2  Q.     You were receiving calls from other creditors
3  at this time; isn't that true?
4  A.     Probably.  But nobody called me like this,
5  you know, every day, all day long, every day.  You
6  know, it's simple, I mean, for a person.  I mean,
7  it's acceptable for someone to call you and remind
8  you of a bill that you owe them.  You know, that's
9  acceptable.  But when you call as many times as
10 Conn's called me, as many days and time -- and early
11 -- that's not acceptable.
12 Q.     Sir, so the answer to my question is yes?
13 A.     I'm not sure whether it is or not.  Because
14 evidently, I'm not understanding your question
15 thoroughly.
16     MR. TROUTMAN:  Arbitrator Harris, will
17 you assist me with this witness and ask him to please
18 listen carefully to my question and respond to my
19 question?
20     THE ARBITRATOR:  Yeah.  Mr. Williams, you
21 need to listen carefully to the question.  I'm going
22 to ask Mr. Troutman to repeat it.
23     THE WITNESS:  Okay.
24     THE ARBITRATOR:  And see if you
25 understand it.  If you understand it, you need to



Page 426

1  give him your best answer.
2          THE WITNESS:  Okay.
3          THE ARBITRATOR:  Okay?
4          THE WITNESS:  Yes, sir.
5          THE ARBITRATOR:  Mr. Troutman?
6  BY MR. TROUTMAN:
7  Q.      My question is simply, July 2nd of 2016, were
8  you receiving calls from other creditors at that
9  time?
10  A.     I don't remember.
11  Q.     Thank you, sir.
12  A.     Okay.
13  Q.     In your calls with Conn's, were you taking
14  notes?
15  A.     Taking notes?
16  Q.     Were you taking notes?
17  A.     What do you mean?
18  Q.     Did you have a pen and a piece of paper, and
19  did you take that pen and write on the paper during
20  your calls with Conn's?
21  A.     I don't think so, no.
22          MR. TROUTMAN:  Can we play Recording 85?
23          MR. DELNERO:  This was the May 10, 2016.
24          MR. HILL:  I believe that was page 23.
25          MR. TROUTMAN:  I'm sorry.  That's the

Page 427

1  wrong recording.  I apologize.  I apologize.  We just
2  listened to Recording 85.  A couple of days back.
3          MR. DELNERO:  Yeah.
4          MR. TROUTMAN:  I tell you what, let's
5  move on.  Let's listen to Recording Number 74.
6          MR. DELNERO:  I don't have the date on
7  this one.
8          MR. HILL:  I believe that's page 20.
9          THE ARBITRATOR:  It's Recording 74.  And
10  it's page 20 in which set?
11          MR. HILL:  The first set.
12          THE ARBITRATOR:  The first set?
13          MR. HILL:  Yes, sir.
14          THE ARBITRATOR:  All right.  Yeah.  I see
15  74.  Okay.
16          (WHEREUPON, audio recording is played
17  into the record.)
18  BY MR. TROUTMAN:
19  Q.      This was an interesting phone call to me for
20  a couple of reasons.  I'm going to ask you some
21  questions here.  First, you asked her for her name
22  twice.  Did you hear that?
23  A.     Yes.
24  Q.      And there was a gap in between.  Did you hear
25  that?

Page 428

1  A.     Yes.
2  Q.      And during that gap, you were writing down
3  Alecia's name, weren't you?
4  A.     I don't remember.  I really don't remember.
5  And I don't know why I would be writing her name
6  down.  I may have wanted to remember her name.
7  Q.      Did you receive a log, a document from Morgan
8  & Morgan asking you to keep track of your phone
9  calls, sir?
10  A.     Did I receive a log?
11  Q.     Yeah.
12  A.     You know, I wrote down phone calls --
13  Q.     Oh.
14  A.     -- at a certain period of time, yes.
15  Q.     So you did take notes?
16  A.     Yes.
17  Q.     Oh, okay.
18  A.     So you know, I don't know.  Maybe I was.
19  Q.     All right.  And so my question was, did
20  Morgan & Morgan give you a log to fill out?
21  A.     Did Morgan & Morgan give me a log?  No, they
22  didn't give me no log.
23  Q.     They never gave you a document, sir?
24  A.     No.
25  Q.     They never gave you a document that you could

Page 429

1  write notes on?
2  A.     No, no, no.
3  Q.     Okay.  But you were taking notes, weren't
4  you?
5  A.     I might have.
6  Q.     Where are they?
7  A.     Where are they?
8  Q.     Yeah.  Where are the notes?
9  A.     Well, I gave them to them.
10  Q.     To who?
11  A.     To Morgan & Morgan.
12  Q.     Okay.  So you do remember that there were
13  notes --
14  A.     They didn't give me nothing to write on.  I
15  wrote on my own paper, you know, what I needed to
16  write down.
17  Q.     So you did write notes on your own paper, and
18  you gave them to your counsel?
19  A.     Well, yeah, you know, you still -- they
20  called me how many times a day though?  14 times a
21  day or 11 times a day.  And 1158 phone calls.
22  Q.     And sir, when you were taking those notes,
23  the purpose of you taking those notes was to record
24  the number of calls you were receiving; isn't that
25  true?



Page 430

1   A.     What am I supposed to do?
2   Q.     **Sir, listen to my question. The purpose of**
3   **you taking those notes was to record the number of**
4   **calls you were receiving; isn't that true?**
5   A.     I mean, well, maybe I -- maybe I shouldn't
6   have done that, is that what you're saying?
7   Q.     **I'm not saying anything, sir. I'm asking you**
8   **a question. The purpose of you taking those notes**
9   **was to record the number of calls you were receiving;**
10  **isn't that true?**
11  A.     Well, after getting to a certain point, I'm
12  sure I probably needed to write something down, you
13  know, because there was so many that I did not write
14  down that I had received.
15  Q.     **And your purpose in taking those notes was to**
16  **track the number of calls you were receiving; isn't**
17  **that true?**
18  A.     That may be true.
19  Q.     **Thank you, sir. And you wrote down, amongst**
20  **other things, the name of the person contacting you;**
21  **isn't that true?**
22  A.     That may be.
23  Q.     **At that time, this recording was December 5th**
24  **of 2016, the amount that you owed was now $573.06; is**
25  **that true?**

Page 431

1   A.     Now, I don't remember what I owed.
2   Q.     **Okay. At that point in December of 2016,**
3   **were you still interested in coming to a mutual**
4   **agreement with Conn's?**
5   A.     Of course.
6   Q.     **And when Alecia called you, you took a note**
7   **of her name and you told her -- and this is**
8   **interesting. To me it's interesting. I'm going to**
9   **ask you about this. You didn't tell her "don't call**
10  **me." You didn't tell her "I'm not interested in**
11  **dealing with you folks." You said, quote, you're not**
12  **supposed to be calling me.**
13  A.     Uh-huh.
14  Q.     **You used that specific phrase on multiple**
15  **recordings that we heard yesterday. Do you remember**
16  **that?**
17  A.     Well, you know, if you ask somebody not to
18  call you and they continue to call you, you know, and
19  yes, I said "you're not supposed to be calling me."
20  Q.     **That specific phrase over and over again.**
21  A.     Okay. Uh-huh.
22  Q.     **Where did that phrase come from, sir?**
23  A.     It came from out of my mouth.
24  Q.     **Did you just decide that that was the phrase**
25  **you were going to use, "you're not supposed to be**

Page 432

1   **calling me," or did somebody suggest that to you?**
2   A.     If they did, I don't remember anybody
3   suggesting that to me. I said a lot of things, and
4   nobody had to suggest anything that I said, that I
5   can remember.
6   Q.     **And you heard Alecia ask you, "well, what do**
7   **you mean we're not supposed to be calling you?" You**
8   **heard that, right?**
9   A.     Uh-huh.
10  Q.     **And you hung up on her, didn't you, sir?**
11  A.     Did I hang up? I mean, I hung up many times.
12  Q.     **Did you answer her question when she asked**
13  **you, "what do you mean you're not supposed to be**
14  **calling her" -- "we're not supposed to be calling**
15  **you"?**
16  A.     Well, if I hung up, it's because I didn't
17  want to talk. Or maybe I talked to somebody earlier
18  or whatever, you know, because yes, I probably did
19  hang up.
20  Q.     **You'll agree with me that the words, "you're**
21  **not supposed to be calling me" are different than**
22  **"don't call me anymore." Those are different words,**
23  **aren't they?**
24  A.     They mean the same thing though, don't they?
25  Q.     **Do they? To you, do they mean the same**

Page 433

1   **thing?**
2   A.     To me? To me?
3   Q.     **To you, they mean the same thing?**
4   A.     Yeah, to me.
5   Q.     **Now, to Alecia, did you get the sense that it**
6   **meant the same thing to her when she asked you "what**
7   **do you mean"?**
8   A.     I just didn't want to get into it. It meant
9   "just don't call me."
10  Q.     **How many times, sir, in all these recordings**
11  **that we listened to, did you actually say the words,**
12  **"don't call me anymore"?**
13  A.     I said the same thing in probably different
14  phrases plenty of times.
15  Q.     **Those words, sir. "Don't call me anymore."**
16  **How many times did you say it?**
17  A.     I don't remember.
18  Q.     **Did you say it more than once?**
19  A.     I didn't count that. But I said it.
20  Q.     **You were never charged for the calls that you**
21  **received from Conn's, were you?**
22  A.     Charged for the calls?
23  Q.     **Correct.**
24  A.     That's received from Conn's, charged?
25  Q.     **Correct.**



Johnnie Williams vs Conn Appliances
Arbitration                                                                                                                                  434..437

Page 434

1   A.      Charged for the calls that's received from
2   Conn's?
3   Q.      Correct.
4   A.      No.
5   Q.      You spoke with Morgan & Morgan 31 times
6   between July and December of 2016; isn't that true?
7   A.      Between what?
8   Q.      Between July and December of 2016, you spoke
9   with Morgan & Morgan's offices 31 times; isn't that
10  true?
11  A.      I don't think so.
12  Q.      How many times do you recall speaking with
13  Morgan & Morgan between July and December of 2016?
14  A.      Between July and what?
15  Q.      July and December of 2016.
16  A.      Probably four, five maybe.  I mean, nothing
17  like what you just said.
18  Q.      Okay.  Let's pull out Exhibit 7.
19          MR. TROUTMAN:  Will you help me, Daniel?
20          MR. DELNERO:  Sure.
21          MR. HILL:  And Mr. Harris, as we have
22  mentioned before, I'm just not certain what the
23  relevance of this is.
24          THE ARBITRATOR:  So you're objecting as
25  irrelevant, is that what you're saying?

Page 435

1           MR. HILL:  Yes.
2           THE ARBITRATOR:  Mr. Troutman, what is
3   your view?
4           MR. TROUTMAN:  Well, we've already
5   discussed what he meant at various times, what he
6   communicated and why he communicated those things to
7   Conn's.  All very relevant to this case.  I suppose,
8   from a certain perspective, none of this is relevant
9   because we didn't use an ATDS, but setting that issue
10  aside --
11          THE ARBITRATOR:  Well, we're going to put
12  that one aside.  I'll overrule the objection and let
13  you go forward.
14          MR. TROUTMAN:  All right.
15  BY MR. TROUTMAN:
16  Q.      So let's take a look, sir.  We're going to
17  start with Exhibit 7, and for this portion of the
18  testimony, for the record, we're going to be
19  referring to Exhibit 7.  If I forget to keep
20  mentioning Exhibit 7, we are talking about Exhibit 7.
21  And we're going to start with page 179.  And I will
22  represent to you, sir, that yesterday as part of an
23  exercise before we concluded evidence, we called two
24  phone numbers to establish that they were Morgan &
25  Morgan phone numbers.  The two numbers are

Page 436

1   (901) 333-1900.
2           And so I want to start with -- on page 179, I
3   just want you to take a look here, can you -- and
4   Counsel has marked this entry with a pen.  Can you
5   just take a look?  Do you recognize this document,
6   sir, as your cell phone records?
7   A.      That's my number.
8   Q.      Okay.
9   A.      Wait a minute, let me look at it.  One
10  minute.  319-6319 is my number.
11  Q.      That's your number.  And then here in the
12  second column, we see the called number on that date.
13  It's (901) 333-1900 and we've established that's a
14  Morgan & Morgan number.  As we look, we see that the
15  call started at 12:05, and it ended at 12:22.  So you
16  had a 17-minute call with Morgan & Morgan on
17  July 5th --
18          MR. HILL:  I'm sorry, what number was
19  that to?
20  BY MR. TROUTMAN:
21  Q.      -- 2016.
22          MR. TROUTMAN:  Let me just complete my
23  question, please.
24  BY MR. TROUTMAN:
25  Q.      You had a 17-minute call on July 5th of 2016

Page 437

1   with a Morgan & Morgan office at (901) 333-1900,
2   correct?
3   A.      Oh, you're asking me?  Okay.  This is my
4   number.  And you're saying what?  That I talked to
5   somebody at this number?
6   Q.      (901) 333-1900, a Morgan & Morgan number.
7   A.      Uh-huh.
8   Q.      For 17 minutes on July 5th, correct?
9   A.      Okay.  Well, that may be.
10  Q.      Okay.  Let's move on to the next -- 195 is
11  going to be the Bate number.  Looking at a July 13,
12  2016 entry.
13          MR. GOMEZ:  Counsel, if you have the list
14  or you want to it into the record, we'll read.  We
15  don't think you're going to make it up.  So if you
16  want to just kind of read --
17          MR. TROUTMAN:  Perfect.
18          MR. GOMEZ:  -- the dates and the length
19  of the conversation, that might be the easiest way so
20  we don't spend --
21          MR. TROUTMAN:  Perfect.  And --
22          MR. HILL:  If you could just provide the
23  number that was called as well.
24          MR. TROUTMAN:  So we'll do that now.  And
25  stop me if you think there's a better process here.



Johnnie Williams vs Conn Appliances
Arbitration

438..441

Page 438

1  But as long as you'll accept these representations as
2  already in evidence, we can establish the point and
3  move on.
4         MR. GOMEZ:  Absolutely.
5         MR. TROUTMAN:  So July 5th, 2016 --
6         THE ARBITRATOR:  So what we're agreeing
7  to -- y'all are agreeing to is that the --
8  Mr. Williams' cell phone records reflect calls to a
9  Morgan & Morgan number that you're going to identify,
10  for your purposes, on specific days and a length of
11  time.  And that's a more efficient way than asking
12  Mr. Williams to look at, what, the records.  All he
13  can really say is what the records say.
14         MR. HILL:  Correct.
15         THE ARBITRATOR:  It seems like.
16         MR. TROUTMAN:  Yes.
17         THE ARBITRATOR:  And if you want to ask
18  him about any specific call, I guess you can.
19         MR. HILL:  We're going to object to the
20  extent that there's attorney-privilege there, but...
21         THE ARBITRATOR:  Well, if he remembers,
22  obviously.
23         MR. HILL:  Yeah.
24         THE ARBITRATOR:  Okay.
25         MR. TROUTMAN:  So we talked about

Page 439

1  July 5th.  July 13th, 2016, we have a six-minute and
2  37-second call to (901) 333-1900, as reflected on
3  Bate Number 0195.  On July 14, 2016, we have a
4  six-minute and 35-second call to phone number
5  (813) 223-0979, as reflected on Bate 0196.  On
6  July 19, 2016, we have a three-minute and 39-second
7  call to the (901) 233-1900 [sic] number reflected on
8  Bate Number 00207.  On July 25th, 2016, we have a
9  six-minute and 12-second call with phone number (901)
10  333-1900, reflected on Bate Number 0219.  Also on
11  July 25th, 2016, we have a 50-minute and 49-second
12  call to phone number (901) 333-1900 on Bate Number
13  0219.  The record should reflect therefore there were
14  six conversations in July 2016.  Moving into August.
15         THE ARBITRATOR:  What was the last one?
16  What was the date of the last one?
17         MR. TROUTMAN:  July 25th, 2016, there
18  were two calls.
19         THE ARBITRATOR:  Oh, got it.
20         MR. GOMEZ:  You said 50 minutes, is that
21  one call or two calls?
22         MR. TROUTMAN:  50 minutes one call, 5-0,
23  50 minutes and 49 seconds on July 25th, 2016.
24         MR. HILL:  I'm sorry.  That was with the
25  Tennessee office, correct?  Or the 901 number?

Page 440

1         MR. TROUTMAN:  That is correct.
2         MR. HILL:  Okay.
3         MR. TROUTMAN:  Moving into August, we
4  have a two-minute and 21-second call on August 2nd,
5  2016 to (901) 333-1900 reflected on 232, Bate Number
6  232.  On August 19, 2016, we have a six-minute and
7  9-second call to (901) 333-1900 reflected on Bate
8  0263.  On August 22nd, 2016, we have a one-minute and
9  27-second call to (813) 223-0979 reflected on 0266.
10       On August 22nd, 2016, we have a second call,
11  two minutes and 14 seconds to (901) 333-1900
12  reflected on 0266.  On August 23rd, we have an
13  eight-minute and 30-second call to phone number
14  (813) 223-0979 reflected on 0269.  Those are the
15  calls from August.
16       Moving into September, we have a two-minute
17  and 13-second call on September 6th, 2016 to phone
18  number (901) 333-1900.  On --
19         MR. GOMEZ:  What one was that?
20         MR. TROUTMAN:  Two minutes and
21  13 seconds.
22         MR. HILL:  And I apologize.  What number
23  was that?
24         MR. TROUTMAN:  (901) 333-1900.
25         MR. HILL:  Thank you.

Page 441

1         MR. TROUTMAN:  On September 8th, 2016, we
2  have a two-minute and 27-second call to phone number
3  (901) 333-1900 reflected on Bates stamped number
4  0297.  On September 8th, 2016, we have a one-minute
5  and 37-second call with phone number (901) 333-1900
6  reflected on 0297.  On September 9th, 2016, we have a
7  five-minute and 6-second call with phone number (813)
8  223-0979 reflected at 0297.
9       Moving into October.  We have a two-minute --
10  on October 14, 2016, we have a two-minute and
11  33-second call with (901) 333-1900 reflected on 0359.
12  On October 17, 2016, we have a two-minute and
13  55-second call with (813) 223-0979.  This is on Bate
14  0363.  On July 25th, 2016, we have a two-minute and
15  1-second call to (901) 333-1900.
16         THE ARBITRATOR:  What date?
17         MR. HILL:  You said July 25th?
18         MR. TROUTMAN:  I'm sorry.  I skipped
19  through this here?
20         THE ARBITRATOR:  Well, no.  You were in
21  October, and then you jumped back to July.
22         MR. TROUTMAN:  Did I say July?
23         THE ARBITRATOR:  Uh-huh.
24         MR. TROUTMAN:  I misspoke.  October 25th,
25  2016.  I apologize.  October 25th, 2016, we have a



Page 442

1  two-minute and 1-second call to (901) 333-1900
2  reflected on 0374.  On October 27th, 2016, we have a
3  one-minute and 52-second call with (901) 333-1900
4  reflected at 0377.  On October 28th, 2016, we have a
5  one-minute and 15-second call with (901) 333-1900.
6      (Cell phone interruption.)
7      THE ARBITRATOR:  Excuse me.  That's off.
8      MR. TROUTMAN:  Reflected at 0381.  On
9  October 31st, 2016, we have three calls to
10  (901) 333-1900.  First, a one-minute, 30-second call.
11  Or one-minute, 32-second call.  Second, a one-minute,
12  17-second call.  And third, a 3-minute, 17-second
13  call.  Those are reflected on Bate 0386.
14      Moving into November, we have a call on
15  November 2nd, 2016, for ten minutes and 18 seconds.
16  Phone number (901) 333-1900, this is 0392.  On
17  11/9/2016, we have two calls to (901) 333-1900.  The
18  first, a three-minute and 46-second call.  The second
19  a one-minute and 7-second call reflected at 0404.  On
20  November 10th, 2016, we have a five-minute and
21  15-second call to (901) 333-1900 reflected at 0405.
22  On November 16th, 2016, we have a one-minute and
23  24-second call to (901) 333-1900 reflected at 0414.
24  On November 28th, 2016, we have an eight-minute and
25  two-second call with phone number (901) 333-1900

Page 443

1  reflected on 0438.
2      On December 15th, 2016, we have a four-minute
3  and 42-second call with (901) 333-1900 reflected on
4  0463.  On January 18th, 2017, we have a two-minute
5  and 33-second call with phone number (901) 333-1900,
6  0515.
7      Now, having read all of that into the record,
8  compilation of evidence already in the record of
9  Exhibit 7 and, sir, you having had the opportunity to
10  hear me go through that exercise, I'll ask you the
11  question again.
12  BY MR. TROUTMAN:
13  Q.   How many times did you say you spoke to
14  Morgan & Morgan between July and December of 2016?
15  A.   Well, I was listening to you call them off,
16  but I did not count them.  And you know, I was
17  sitting here thinking about that -- the fact that
18  Morgan & Morgan is the law firm that's representing
19  me.  We do have to communicate, don't we?  Wouldn't
20  you say?
21  Q.   When did they start representing you, sir?
22  A.   I believe it was as soon as July, was it?
23      MR. HILL:  Mr. Williams, you had written
24  down some notes yesterday.  Would that help refresh
25  your recollection?

Page 444

1  A.   So are you saying this is before they were
2  representing me?  Is that what you're --
3  BY MR. TROUTMAN:
4  Q.   I'm asking you, sir.  When did they start
5  representing you?
6  A.   I believe it was March 6th, '16.
7  Q.   Do you remember submitting interrogatory
8  responses in this case?
9  A.   Any what?
10  Q.   Do you know what an interrogatory is?
11  A.   No.
12  Q.   Do you remember receiving some written
13  questions that Conn's asked you to respond to?
14  A.   No.
15      MR. TROUTMAN:  Do you have a copy of the
16  interrogatories?
17  A.   No.  I don't remember receiving it.
18  BY MR. TROUTMAN:
19  Q.   Do you remember having a document presented
20  to you that you had to review and verify as accurate
21  and sign under penalty of perjury in front of a
22  notary?
23  A.   I'm not saying I didn't but no, I don't
24  remember.
25  Q.   Okay.  I'll run that down for you real quick.

Page 445

1  Before -- as he's working on that, I don't want to
2  change topics, but we walked through all of those
3  different -- actually I never got an answer to my
4  original question.  I apologize.  I'm getting myself
5  sidetracked.
6      Having gone through the exercise of me
7  reciting all of these entries from Exhibit 7 already
8  in evidence, would you like to revise your testimony
9  with regards to how many times you spoke with Morgan
10  & Morgan between July and December of 2016, or are
11  you standing by your testimony of only four calls?
12  A.   Well, I don't really know how many calls.
13  You know, it seemed like only a few to me.  You know,
14  and having talked as long as 50 minutes, I don't
15  remember talking to anyone that long.  I'm not saying
16  that I didn't, but that doesn't -- I don't remember
17  having that much to say for a 50-minute call.
18  Q.   Okay.  Well, because I think it's important
19  for us to have an understanding as to when you were
20  actually represented by Morgan & Morgan, I'm going to
21  show you a document we'll mark next in order, I
22  believe 15, and that you will -- I'm not sure it's
23  appropriate to move an interrogatory into evidence,
24  but --
25      THE ARBITRATOR:  Well, we need to mark



Johnnie Williams vs Conn Appliances
Arbitration

446..449

Page 446

1  it.  That's an interesting question, an interrogatory
2  in an arbitration proceeding, whether it's already --
3  whatever it is, so let's mark it as the next exhibit.
4        (WHEREUPON, the above-mentioned document
5  was marked as Exhibit Number 15.)
6        THE ARBITRATOR:  And if you'd like for it
7  to be in evidence, suggest it.
8        MR. TROUTMAN:  Okay.  So I'm just going
9  to --
10       THE ARBITRATOR:  Submit that.
11 BY MR. TROUTMAN:
12  Q.    I'm just going to go ahead and read this to
13 you.  Actually, take a look, before we do that, take
14 a look at page 7 of what has been marked Exhibit 15
15 that may or may not need to be moved, but we'll move
16 it to the extent it needs to be moved.  Do you see
17 your signature there on page -- it's noted as
18 page 20, the last page of Exhibit 17, do you see the
19 signature there?
20  A.    Yes.
21  Q.    Do you see where it says, "under penalty of
22 perjury, I declare I have read the foregoing answers
23 to interrogatories, and the answers are true and
24 correct."  Do you see that?
25  A.    Yeah.

Page 447

1  Q.    Okay.  And you did, in fact, read these
2  responses, correct?
3  A.    On here?
4  Q.    The responses that this verification is
5  attached to.  You did, in fact, read these, did you
6  not?
7        MR. HILL:  Just flip through it.
8        THE WITNESS:  Okay.
9  BY MR. TROUTMAN:
10  Q.    Sir, the pending question is just whether or
11 not you read these when you verified them?
12  A.    I'm sure I did at some -- I signed it.  At
13 some point in time, I'm sure I did.
14  Q.    You say you're sure you did.  As you sit
15 here, you don't have a recollection of that?
16  A.    Remembering what all I read over here, no.  I
17 don't have, you know, remember like it was yesterday
18 everything that I read over here.  But I do remember
19 this paper.
20  Q.    Okay.  Looking at Interrogatory Number 5 on
21 page 6 of Exhibit 17, I think it's needless to read
22 the entire thing into the record, so I'm just going
23 to read the last two sentences of the response.  "To
24 the best of plaintiff's knowledge, plaintiff first
25 contacted Morgan & Morgan's intake department call

Page 448

1  center in July of 2016 regarding the harassing
2  telephone calls from respondent.  Plaintiff's claim
3  was initially turned down.  Plaintiff did not consult
4  with an attorney until December of 2016."
5        With those facts stated and verified, can you
6  please answer my original question, sir, of when
7  Morgan & Morgan began representing you in this case?
8  A.    Then it must have been December; is that
9  correct?
10  Q.    You tell me.
11  A.    So what is your question again?
12  Q.    When did Morgan & Morgan begin representing
13 you in this case?
14  A.    According to this, it's December.
15  Q.    Is that your testimony?  Not what the
16 document says, sir, I'm asking you for your testimony
17 here today.
18  A.    Okay.  December.
19  Q.    Okay.  Between July of 2016 and December of
20 2017, you will agree with me that you spoke with
21 Conn's' agents dozens of times; would you agree with
22 that statement?
23  A.    Between what?
24  Q.    Between July and December of 2016, you spoke
25 with Conn's' agents dozens of times; would you agree

Page 449

1  with that statement?
2  A.    Yeah.  Yeah.
3  Q.    And in none of those calls did you ever
4  inform any Conn's agent that you had consulted with
5  or spoken to Morgan & Morgan regarding harassing
6  phone calls; isn't that true?
7  A.    No.  I did not say anything like that.
8  Q.    Okay.
9        MR. TROUTMAN:  I don't have any further
10 questions.
11       MR. KERNEY:  Can we take a break?
12       MR. TROUTMAN:  Sure.
13       THE ARBITRATOR:  Yes.
14       (Short break.)
15       MR. DELNERO:  So in lieu of actually
16 entering in Exhibit Number 12, we are going to
17 stipulate that it reflects 1100 calls in non-manual
18 mode from Conn Appliances to the claimant's cell
19 phone after March 6, 2016.  Eric, I describe that
20 correctly?
21       MR. TROUTMAN:  I trust you.
22       MR. KERNEY:  And when we say
23 "non-manual," we're talking broadcast predictive
24 mode?
25       MR. DELNERO:  Yes.



Johnnie Williams vs Conn Appliances
Arbitration

450..453

Page 450

1          MR. KERNEY: Okay.
2          THE ARBITRATOR: Okay. So in lieu of
3  counting all that, you've agreed upon this number of
4  1100, is that --
5          MR. KERNEY: Correct.
6          THE ARBITRATOR: -- essentially what
7  you're -- okay.
8      MR. HILL: Correct.
9      MR. DELNERO: Correct.
10         THE ARBITRATOR: Okay.
11         MR. HILL: Are we ready? Okay.
12             REDIRECT EXAMINATION
13  QUESTIONS BY MR. HILL:
14  Q.     Mr. Williams, I just have a few questions for
15  you. When you were speaking with Mr. Troutman, he
16  kind of discussed with you about, you know, how you
17  felt about these calls and how it's difficult to, you
18  know, kind of relive those feelings after some time
19  has passed, but you've had the opportunity to, you
20  know, review the account history, listen to those
21  audio recordings. Did you find it difficult to, you
22  know, kind of relive those feelings?
23  A.     Yes.
24  Q.     You found it difficult to relive those
25  feelings?

Page 451

1  A.     Yes. Because it brought it back. It like
2  took me right back to that period of time in my life
3  when I was experiencing this every single day. Every
4  day.
5  Q.     Okay. And I think you answered my question.
6  I think I just phrased it poorly. And you know, how
7  did you feel when you were receiving these calls?
8  A.     I felt stressed, humiliated, frustrated,
9  harassed, almost like somebody just said, "well,
10  let's call Mr. Johnnie Williams and harass him
11  today," you know. That's how I felt. All of those
12  calls. All those many calls. Those many calls. It
13  don't take that many calls to make me understand that
14  I've got a payment to pay. I already know that. I
15  know that.
16  Q.     And let me ask you this. Mr. Troutman had
17  played, you know, some audio recordings for you. I
18  believe the first one that he played was from
19  March 6th of 2016, and you know, within that
20  recording, obviously it speak for yourself, but we
21  hear you tell the Conn's agent that they don't have
22  to keep calling you. And you know, Mr. Troutman went
23  on to assert that you had only meant that it was as
24  it related to that payment. Did you need to keep
25  receiving calls from Conn's with regards to your

Page 452

1  payment?
2  A.     No.
3  Q.     Did you want to continue to receive calls
4  from Conn's for any payments?
5  A.     No. No. No. No. I am -- I would like to
6  see myself -- I consider myself being a fairly
7  responsible individual. One thing that was
8  important, credit reference, you know, I wanted, I
9  needed, you know, even to pay the kind of interest
10  that I was being charged and the amounts I was being
11  charged for the merchandise. I needed the reference
12  because I needed to purchase a home for me and my
13  children. Instead of an apartment.
14  Q.     And let me ask you this. There's a second
15  recording that was played where, I believe it was
16  from May 10th of 2016, and you know, you tell the
17  agent that you didn't want -- or he could tell his
18  buddies to quit calling you. You know, what did you
19  mean by that?
20  A.     I meant, okay, me and this person had talked,
21  and I guess, you know, we had had a meeting of the
22  minds, you know, conditions that present themselves,
23  we were able to talk and understand each other and we
24  had an understanding, and it wasn't necessary for all
25  of these other people to keep calling me, because

Page 453

1  they had been calling me before I talked to this
2  person. They had been calling me. And there was one
3  where I kind of went off. They had been calling me
4  before that happened.
5  Q.     Okay.
6  A.     They had me rattled.
7  Q.     Okay. And that's what I want to talk to you
8  about next as well. You know, I believe the one
9  where you're -- and again, you went off, was the
10  July 2nd of 2016. And you know, you tell them, look,
11  you know, the Conn's agent, you used some pretty
12  strong language there, you know. "I done told you
13  mother effers to stop calling me."
14  A.     Yeah. Yeah. Yeah.
15  Q.     You know, Mr. Troutman had made a reference
16  that, you know, we had only heard two other prior
17  recordings, you know -- or two recordings prior to
18  that conversation. But had you received more than
19  two calls from Conn's between March 6th of 2016 and
20  July 2nd of 2016?
21  A.     Between March 6th, 2016?
22  Q.     Yeah.
23  A.     And what?
24  Q.     July 2nd of 2016. Were you continuing to
25  receive calls from Conn's during that time?



Johnnie Williams vs Conn Appliances
Arbitration                                                                                              454..457

Page 454

1  A.     Yes.
2  Q.     Okay.
3  A.     Yes.
4  Q.     Now, Mr. Troutman had also talked about, you
5  know, well, isn't it reasonable, you know, to expect
6  calls, you know, when you're late on a payment,
7  wouldn't you want that.  Let me ask you this.  Do you
8  know how many times Conn's had called you after
9  March 6th of 2016 regardless of mode?
10  A.     Yes.
11  Q.     And how many times had they called you?
12  A.     1158 times.
13  Q.     And you say "1158 times," do you think it's
14  reasonable to call someone 1158 times?
15  A.     I'll tell you what.  It will get on your last
16  nerve.  You know, you can be holier than thou, and
17  you may just lose all of that in an instant with 1158
18  calls.
19  Q.     So is it fair to say you didn't feel that
20  that was reasonable?
21  A.     That was unreasonable.
22  Q.     Okay.  Now, Mr. Troutman had also gone
23  through, you know, your call records, and I think he
24  said that he identified about 31 calls, you know,
25  from your cell phone, you know, to, you know, various

Page 455

1  Morgan & Morgan offices between July of 2016 and
2  December of 2016.  You know, and when he first asked
3  you that question, you said that you believed you had
4  spoken with Morgan & Morgan about four or five times.
5  A.     Yes.
6  Q.     You know, of those 31 calls that Mr. Troutman
7  identified, only five were actually to an 813 number,
8  which is a Florida office.  Now, is that why -- or is
9  that potentially one of the reasons you believe you
10  had only spoken with Morgan & Morgan four to five
11  times?
12  A.     Yes.
13  Q.     Okay.  And when you were calling those
14  numbers, you know, a lot of those Tennessee numbers,
15  do you recall -- I mean, were you calling our local
16  office or were you calling, you know, like the 1-800
17  number or the call center?
18  A.     You know, he was speaking about the time that
19  I was on the phone like 50 minutes, and the only
20  thing that -- it had to be that I was calling a 800
21  number or something and being put on hold listening
22  to some music or something all the time until I got
23  one of you guys on the phone, because I never talked
24  to anybody for a whole 50 minutes.  I didn't talk to
25  nobody for a whole 50 minutes.  Our conversations was

Page 456

1  always short.
2  Q.     Okay.  So you believe that some of that time
3  maybe accounted for was potentially a transfer or
4  being placed on hold, something to that effect?
5  A.     That's true.  You know, that's the reason I
6  didn't quite understand what he was saying, why I
7  talked to somebody 50 minutes.
8  Q.     And Mr. Troutman had also mentioned, you
9  know, needing to be able to speak with someone in
10  order to come to a mutual agreement.  I know you
11  stated that you wanted to come to a mutual agreement.
12  A.     Yes.
13  Q.     You know, did you -- or don't you think that
14  Conn's could have contacted you in a different way to
15  come to a mutual agreement?  Aren't there other ways
16  of communications other than calling you 1158 times?
17         MR. TROUTMAN:  Leading, but go ahead.
18  A.     I think that they could have put a manager or
19  someone on the phone who was -- had the type of
20  experience or the knowledge as far as dealing with --
21  really dealing with people and understanding that
22  people run into difficulties sometimes and that they
23  mean well.  But sometimes things go bad.  Okay?  Now
24  how can we help you when someone asked me, "well, how
25  can -- we're willing to help you do this, and we're

Page 457

1  willing to help you do that."
2         But so many of them came to me like that, it
3  sounded like a bunch of bull, because nobody came to
4  me like that when I come in and have a -- make a
5  payment, say okay, you making this payment, that's
6  good.  Okay.  You overpaid over this amount right
7  here.  Okay.  Now we could have worked something else
8  for you.
9  BY MR. HILL:
10  Q.     Okay.  And Mr. Williams, I just want to touch
11  on that a little bit.  You talked about, you know,
12  these mutual agreements, people needing to be heard.
13  I believe Mr. Troutman had used that phrase.  Did you
14  feel like you were being heard when you were telling
15  these Conn's agents multiple times to stop calling
16  you?
17  A.     No, they weren't hearing me.  They weren't
18  even hearing me the times when I told them I didn't
19  feel good.  And I don't want to talk to you right
20  now.  I really didn't want to talk to them at all,
21  but especially at a time like that, because if I'm
22  feeling bad, then -- if I can't breathe good, and if
23  you can't -- if anyone can't breathe, you're going to
24  feel bad.  If you gasping, trying to catch your
25  breath and it's getting a little shorter and a little



Page 458

1  shorter, you're getting real concerned.  Because, you
2  know, it gets so short and there's no breath, then  1
3  you're not here anymore.
4  **Q.     Okay.**
5  A.     So you're getting concerned.
6  **Q.     And --**
7  A.     Then if you've got some anxiety, and it kick
8  in, then you're going to feel even worse.
9  **Q.     Okay.**
10  A.     And then you got a person talking to you on
11  this end, and the more they talk to you, the worse
12  you feel, you going to hang that phone up.
13  **Q.     And Mr. Williams, I hear you and I know**
14  **you've expressed those sentiments, you know,**
15  **throughout this hearing.  I certainly appreciate**
16  **that.  You know, one last thing that I want to touch**
17  **on, and Mr. Troutman had mentioned you taking some**
18  **notes, something to that effect.  And you said,**
19  **"yeah, you know, that might have been possible."  I**
20  **want to put in front of you a document that was**
21  **previously produced by our office that's Bates**
22  **stamped as Williams_002022 through 2028.**
23          MR. HILL:  And Counsel, if you want to
24  take a look at this, you're welcome.
25          MR. TROUTMAN:  Yes, please.

Page 459

1          MR. GOMEZ:  I have an extra copy.  We may
2  even have a third copy.
3          MR. HILL:  Okay.  And did you have any
4  objections as to us entering that as exhibit?  Are we
5  on 16?
6          MR. TROUTMAN:  Can we establish what it
7  is?
8          MR. HILL:  Sure.  Absolutely.
9          MR. TROUTMAN:  Okay.
10          MR. HILL:  Okay.
11  BY MR. HILL:
12  **Q.     Mr. Williams, do you recognize the document**
13  **I've placed before you?**
14  A.     Yes.
15  **Q.     And do you recognize the handwriting on that**
16  **document?**
17  A.     Yes.
18  **Q.     And whose handwriting --**
19  A.     That's mine.  That's mine.
20  **Q.     Okay.  And did you write all the entries on**
21  **every single page within here?**
22  A.     Every last one.
23  **Q.     Okay.  And can you describe for me what this**
24  **is?**
25  A.     This is a call record from my cell phone for

Page 460

1  the time -- the dates, the times that I received
2  phone calls from Conn's and...
3  **Q.     And let me ask you this.  When you were**
4  **putting together, you know, we'll just call these**
5  **these call logs, you know, were you doing that every**
6  **single time that you received a call from Conn's, or**
7  **did you go back through your phone?**
8  A.     I went back through my phone because there
9  were times when I missed calls.  There was some times
10  I would not answer.  But I went back through my
11  phone.
12  **Q.     Okay.**
13  A.     And some of them may be some that I answered,
14  you know, but all I had to do was go through my
15  phone.
16  **Q.     Okay.  And I want to direct your attention to**
17  **the top left-hand corner here.  This appears to be --**
18  **it doesn't appear to be handwriting but rather, you**
19  **know, some sort of computer entry with a date of**
20  **October 14th of 2016.  Do you see that?**
21  A.     Yes.
22  **Q.     Okay.  And what do you recognize that, you**
23  **know, time stamp to be?**
24  A.     Right here?
25  **Q.     Correct.**

Page 461

1  A.     It says "Dobbs Ford."
2  **Q.     Let me ask you this.  Could it be a --**
3  **evidence of a fax confirmation?**
4          MR. TROUTMAN:  Leading, but go ahead.
5  A.     It could very well be, because I can remember
6  me being at Dobbs Ford and asking them to fax
7  something for me and they did.
8  BY MR. HILL:
9  **Q.     Okay.**
10          MR. HILL:  Mr. Harris, at this time we
11  ask to move this in as Exhibit 15 or 16, whatever we
12  may be on at this point.
13          MR. TROUTMAN:  16, no objection.
14          THE ARBITRATOR:  I believe it's 16.
15          MR. HILL:  16, thank you.
16          THE ARBITRATOR:  They're all upside down.
17          MR. HILL:  I apologize.
18          THE ARBITRATOR:  Can we just -- the top
19  -- is yours upside down too?  We'll fix it.
20          MR. HILL:  Okay.  And I have nothing
21  further on redirect.
22          THE ARBITRATOR:  They're upside down
23  because we sent them upside down.  We'll just mark
24  this one.  Okay.
25          (WHEREUPON, the above-mentioned document



Page 462

1 was marked as Exhibit Number 16.)
2         RECROSS EXAMINATION
3 QUESTIONS BY MR. TROUTMAN:
4 Q.    All right. So Mr. Williams, I want to make
5 sure that I have a very, very clear understanding.
6 A.    Okay.
7 Q.    Of Document 16. Exhibit 16.
8 A.    Okay.
9 Q.    You just testified that this is a log of
10 calls that you received from Conn's, correct?
11 A.    Well, I went into my phone and got the
12 information out. I didn't receive them from Conn's.
13 Those are times when Conn's called me.
14 Q.    All right. So you weren't necessarily
15 contemporaneously writing down -- let me use a
16 different word. You weren't, as calls were coming
17 in, specifically writing them down, but you went back
18 and you compiled a list of all of the calls that
19 showed up actually on your handset, correct?
20 A.    I may have. I may have. I got everything
21 out of my phone that I could get out of my phone.
22 Q.    Okay. So in order to create this log, you
23 went back to your phone, your handset that was
24 receiving calls from Conn's, and you looked for every
25 single call you could find; isn't that true?

Page 463

1 A.    I probably did. I also got every call that
2 came in that I missed from that time on.
3 Q.    Okay.
4 A.    So every call that I could get from Conn's, I
5 got it, that I could get off my phone.
6 Q.    And your purpose in doing so was to create as
7 complete a record of calls received as you possibly
8 could, correct?
9 A.    Well, you know, as frustrated as I was and
10 I'm looking for some relief because I am totally
11 stressed, don't you think that was the thing for me
12 to do?
13 Q.    Sir, please listen to my question.
14 A.    Okay.
15 Q.    The purpose of your creating this log,
16 Exhibit 16, was to have as comprehensive, as complete
17 a record of calls that you received as possible;
18 isn't that true?
19 A.    Yes.
20 Q.    And you engaged in all appropriate effort,
21 and you diligently went through your handset and
22 found every single call and recorded it on this log,
23 Exhibit 16; isn't that true?
24 A.    I'm sure I did.
25 Q.    And so if something is not on this log,

Page 464

1 Exhibit 16, that means you did not receive the call
2 on your handset; isn't that true?
3         MR. HILL: Again, I'm going to object to
4 the extent the records speak for themselves.
5         THE ARBITRATOR: You can answer the
6 question.
7 A.    If it's not on that list, then I didn't
8 receive it? No. No. No. There was more stuff that
9 -- that's not on the list that I did receive. I just
10 didn't -- wasn't able to get it on paper. For
11 instance --
12 BY MR. TROUTMAN:
13 Q.    You've answered my question.
14 A.    Okay.
15         MR. TROUTMAN: Nothing further.
16         MR. HILL: At this time --
17         THE ARBITRATOR: Anything further?
18         MR. HILL: No. No, sir. At this time,
19 claimants rest.
20         THE ARBITRATOR: Okay. Mr. Troutman,
21 anything further?
22         MR. TROUTMAN: At this time respondent
23 rests.
24         THE ARBITRATOR: All right. Are the
25 parties ready to close the record for the proceeding?

Page 465

1         MR. GOMEZ: Yes.
2         MR. KERNEY: Yes.
3         MR. TROUTMAN: Yes.
4         THE ARBITRATOR: The record will be
5 deemed closed. We talked yesterday about options.
6 Final arguments, post-hearing briefs or some
7 combination thereof. What do y'all prefer, and when
8 would you like to do that?
9         MR. TROUTMAN: We certainly, speaking for
10 respondents, prefer a closing argument. We'll be
11 prepared to do that one hour from now.
12         MR. GOMEZ: We'll do the same.
13         THE ARBITRATOR: Is that acceptable?
14         MR. GOMEZ: Yes.
15         THE ARBITRATOR: Okay. Well, let's call
16 it 12:20. Why don't we -- you've got a plane at
17 4-ish. That gives you plenty of time. Well, why
18 don't we reconvene in an hour, which will be 1:20,
19 and I'll see y'all back then.
20         (Short break.)
21         THE ARBITRATOR: Okay. Is everyone ready
22 to proceed?
23         MR. TROUTMAN: We are.
24         THE ARBITRATOR: And Mr. Gomez?
25         MR. GOMEZ: Absolutely. Thank you.



Johnnie Williams vs Conn Appliances
Arbitration

466..469

Page 466

1        THE ARBITRATOR: Go ahead.
2        MR. GOMEZ: If you don't mind, I would
3   like to stand just so I can move around a little bit.
4        THE ARBITRATOR: Sure.
5        MR. GOMEZ: First of all, thanks
6   everybody. Thank you, Mr. Harris, for hosting us.
7   And thanks -- everybody presented a really good case.
8   I appreciate the professionalism. More importantly,
9   I know we joke at times, but this is a very serious
10  matter. Of course we're here, involved in an
11  arbitration hearing. We're talking about a time that
12  was very difficult for Mr. Williams. And I've
13  represented to him, even though at times both sides
14  and even Mr. Harris will kind of participate in some
15  good conversation, this is a very serious matter.
16  And it involved an incredibly difficult time for him.
17  So I'm going to take this time to kind of be a little
18  more serious and express our opinion about the case,
19  what we believe the evidence and what the law is.
20       In 1991, the TCPA was enacted by Congress,
21  and it was to protect consumers from these
22  robo-calls, from these automated calls that were
23  being, of course, began to use. This technology that
24  was being used in order to allow companies to make a
25  lot of phone calls. Instead of hiring people, you

Page 467

1   could use a computer to dial a lot of numbers.
2        Congress gave Congressional powers to the FCC
3   to interpret this law and gave them the power to, as
4   technology changes, to evolve the law. To kind of
5   keep up with technology. In 2003, the FCC sort of
6   short-shrifted the requirement that an ATDS used at
7   random or sequential number generator, by ruling a
8   system can qualify as an ATDS even if it does not
9   create and dial ten digits. It went on to say in
10  that same order in 2003, while some predictive
11  dialers cannot be programmed to be generating random
12  or sequential numbers, they still satisfied the
13  statutory definition of an ATDS. This order came out
14  in 2003. Within its power, the FCC said, "hey, we
15  notice the advancements in technologies." People are
16  now buying lists. They are no longer dialing 11111,
17  11112. They're not generating random numbers. What
18  they're doing is, they'll go and they'll upload the
19  Memphis phone book, and they're going to dial them
20  all. And they're going to try to sell them
21  something, or if you're a debt collector, we're going
22  to upload our delinquent accounts, and we're going to
23  dial them all.
24       So the FCC understood back in 2003 that
25  dialing from a list with these predictive dialers

Page 468

1   actually was controlled by the TCPA. In 2008, the
2   FCC put out another order after taking petitions from
3   both plaintiffs, consumers and of course the ACA and
4   the financial institutions. And in 2008, the FCC
5   affirmed that a predictive dialer constitutes an ATDS
6   and is subject to the TCPA restrictions and the use
7   of auto dialers. This happened in 2008. Once again,
8   there's no confusion about what the FCC said on that
9   topic.
10       2012, the FCC again came out and said -- they
11  described the definition of an ATDS. And they said
12  it covers any equipment that has the specific
13  capacity to generate numbers and dial it without
14  human intervention, regardless of whether it's
15  dialing random or sequential numbers, meaning that it
16  can dial from a list, but if the equipment has the
17  capacity -- and I want to make sure I'm clear on
18  that -- if the equipment has the capacity to dial
19  from a list, where the list came from, whether this
20  is a randomly or sequentially generated list or if
21  it's a preset list like I explained earlier regarding
22  the Yellow Pages or accounts, it can dial if it's
23  automated.
24       We anticipate you're going to hear in 2015,
25  the FCC even expanded that more. And it talked about

Page 469

1   not only current capacity but future capacity. Such
2   order in the 2015 was immediately appealed, it went
3   to the D.C. Court of Appeals, and as the briefing
4   shows, the ACA International versus FCC actually
5   indicated that the 2015 portion that broadly expanded
6   to future capacity, not just present capacity, but
7   future capacity was overly broad and went ahead and
8   sent that back to the FCC for more interpretation.
9        Now, I think Mr. Troutman will actually maybe
10  agree with me that there is no doubt that in 2003 and
11  ever since, the FCC, the commission that is in charge
12  of interpreting the TCPA, has wanted predictive
13  dialers to be regulated by the TCPA. There's no
14  question about what they intended to do. He might
15  argue the ACA International action reversed the
16  previous orders, he might go into that, but he's not
17  going to argue we're confused about what the FCC
18  wanted to do in '03, '08, '12 and even '15.
19       Now, ever since this case began, you were
20  misled. And we're going to talk about some of those,
21  and I'm going to point out some of the biggest
22  statements that came out starting from opening and
23  throughout this entire hearing. The first statement
24  you heard, and Mr. Troutman will get a chance to get
25  up here and literally call me out on this.



Page 470

1 Throughout this hearing, from the beginning -- from
2 opening statement to a lot of legal objections to
3 Mr. Walton's testimony, it was represented to you
4 that the TCPA does not apply to Conn's. It was said
5 literally through the opening, and Mr. Walton told us
6 that. He says, "we use this TCPA compliance thing
7 the way we use the FCTPA, they don't really apply to
8 us."
9        Well, that's not true. Why isn't it true?
10 Because we know that Conn's uses pre-recorded
11 messages. And its own independent violation of the
12 TCPA -- or the TCPA are pre-recorded messages. I
13 could take this conference phone right now, I could
14 dial Mr. Harris' cell phone number, and upon his
15 voicemail or him picking up, I can play a recording
16 from Elvis Presley. A pre-recorded message from
17 Elvis Presley. I better have -- I'm going to be
18 under the TCPA because I'm using a pre-recorded
19 message. The equipment is not necessarily have to be
20 a predictive dialer, even though of course most of
21 the time it is. But the use of a predictive dialer
22 is an independent violation of the TCPA.
23        And Conn's, in its broadcast mode, delivers
24 pre-recorded messages. And Mr. Walton testified to
25 that, plus Mr. Wilson [sic] got pre-recorded

Page 471

1 messages, and you have the Latitude records
2 reflecting, you know, when it was made in broadcast
3 mode, and then a message was left. So the first
4 statement that was completely misleading is that TCPA
5 doesn't apply to Conn's. Well, of course it does.
6 They use pre-recorded messages.
7        What other kind of inflammatory statements
8 did we hear in the opening? Well, Mr. Wilson, he's a
9 professional plaintiff. Well, that's a pretty big
10 accusation. Clearly, any type of lawsuit is public
11 record. When asked, Mr. Williams said, "I've been in
12 two car accidents and some real estate thing. I
13 don't even know if it was a lawsuit." He tried to
14 say, "well, what do you mean by a lawsuit?" Like,
15 did if somebody sue him, or when there's a crash, is
16 there a lawsuit? We didn't expand on it. But
17 clearly you haven't heard any evidence that he's a
18 professional plaintiff. That he's building TCPA
19 lawsuits or any kind of lawsuit. But that allegation
20 was made. And those are the kind of things that are
21 being -- and I'm going to point you throughout the
22 evidence, things that are just -- statements that
23 were made that are now trying to reflect poor on the
24 claimant.
25        So let's go through the witnesses. The first

Page 472

1 witness we called was Mr. Hansen. Mr. Hansen, as you
2 heard, graduated high school, he went to the Navy.
3 After the Navy, he did -- well, and actually before I
4 even get there. Let's talk about finally, we're in
5 Tennessee. What does the Sixth Circuit say about the
6 TCPA? Because ultimately, this is the circuit we're
7 in.
8        So I'm going to pass you the case that came
9 out last week. Parchman versus SLM Corporation. And
10 of course, we're not going to read it now. I just
11 want to briefly point to a couple of things. Under
12 the "background" section, it literally says that
13 "TCPA prohibits a party from making a call using any
14 automatic telephonic dialing system or an artificial
15 or pre-recorded voice." So that statement I just
16 made regarding playing an Elvis pre-recorded message,
17 literally under "background," third sentence. The
18 Sixth Circuit is agreeing with me, if you use a
19 pre-recorded message during a transmission to a cell
20 phone, you are under the TCPA.
21        Just briefly going through and, you know,
22 anybody can read this later on, but it also goes to
23 say, "The primary purpose of the TCPA was to protect
24 individuals from the harassment, invasion of privacy,
25 inconvenience, nuisance and other harms associated

Page 473

1 with unsolicited automated calls." That just came
2 out last week, and it's describing to you what does
3 the Sixth Circuit think about the TCPA.
4        Now, going to Mr. Hansen. Mr. Hansen
5 appeared on the TV. He told you he graduated high
6 school, went to the Navy. He then told you for the
7 last 30 years, he's been working with predictive
8 dialers. He went ahead and told you that he has been
9 in over 500 civil litigations. He's actually built
10 and managed a call center that even has the ability
11 to make 1,000,000 calls per day, and he provided a
12 report in this case. That report, which is
13 Exhibit 2, if you have any questions regarding, is
14 the Noble predictive dialer a predictive dialer.
15        You can go through it, and he makes some
16 simple examples about what a predictive dialer is.
17 He describes how it functions. He describes to you,
18 it's sort of like a motor vehicle. It still has the
19 same -- it works in the same way, the whistles, the
20 horns, the windows, the power buttons. Things have
21 improved, but the functionalities of a motor vehicle,
22 of an automobile remain the same. And he explains
23 that to you.
24        He explains that he has been in over 500
25 civil litigations at least 75 percent involving the



Johnnie Williams vs Conn Appliances
Arbitration

474..477

Page 474

1  TCPA, the law we're here for.  He also told you --
2  and we have his CV as Exhibit 1.  He has provided
3  testimony in 55 Federal cases, and he lists them
4  through here.  He told you, "I have been retained as
5  an expert for over 100 class actions," resulting in
6  over 120 million dollars already in settlements.
7  He's got a lot more that are still pending.
8        He went ahead and told you how familiar is he
9  with the Noble dialer.  He says, "well, the Noble
10  dialer is one of the most common.  It's one of the
11  most popular dialers."  He told you he's been hired
12  to provide an expert testimony regarding the Noble
13  dialer, not necessarily just with Conn's, but this
14  licensing -- this license that Conn's has, of course
15  Noble also provides it to other businesses.  He has
16  been hired.  He has written reports regarding the
17  Noble dialer, regarding other financial institutions,
18  regarding maybe other potential defendants.
19        Well, he also told you regarding Conn's
20  specifically, he said, "I have been hired over 100
21  times by lawyers other than Morgan & Morgan to write
22  reports, to serve as an expert against Conn's."  Over
23  100 times against Conn's.  He also told you at least
24  two dozen times, Morgan & Morgan and the consumer
25  protection department has hired him to actually serve

Page 475

1  as an expert against Conn's.  And he clearly told
2  you, "I have read the manuals."  This is another
3  interesting point.
4        So he explained, "I've read the Noble
5  manuals."  Mr. Walton also indicated, "hey, we
6  provided the manuals to us.  We received manuals from
7  Conn's.  We provided those to Mr. Hansen.  He used
8  them to write his report."  One of things that I
9  found so interesting was when Mr. Walton was
10  testifying, he said, "well, but we have our Noble
11  dialer is customized.  And there's things that we
12  don't have.  Now, they do have a Noble manual that
13  could be customized for us.  We just never asked for
14  it."
15        Your entire defense is:  We do have this
16  Noble product, but we customize it so it doesn't
17  qualify to the TCPA.  But they don't have their
18  customized Noble manual, and they're just giving us
19  the general manual.  Well, we weren't very concerned
20  and Mr. Hansen wasn't very concerned because
21  Mr. Hansen said, "look, the Noble system they're
22  purchasing isn't a cloud."  It could be in a closet
23  like they used to have it, I guess, when he was --
24  but they have some, I guess, floods and they have to
25  move them.  But they go, "it's in a cloud."

Page 476

1        And they don't have the abilities close code.
2  They don't have to make the -- they don't have the
3  ability to change these Noble predictive dialer not
4  to be a predictive dialer.  I mean, the name of the
5  product is the Noble predictive dialer.  It does --
6  in his description, in Mr. Walton's description of
7  what he does is exactly what Mr. Hansen said.  How it
8  dials, it dials from a campaign.  And agents need to
9  log in, but it dials exactly the same way that
10  Mr. Hansen did.  And it has the ability that has been
11  described throughout the case law, which is to dial
12  thousands of numbers without human intervention at
13  the time of the dialing.
14        He went on to tell you that once the campaign
15  is launched, the system will have the ability to dial
16  those numbers.  You can have some people overseeing
17  the campaigns.  But at the time of the dialing, the
18  system is the one that's actually doing the dialing.
19        So let's move on real quick to Mr. Williams.
20  And Mr. Williams of course is the most important
21  person here, at least from our side.  He is father of
22  five, sole supporter of two of them.  And the main thing
23  is, you heard a real person.  Those recordings, you
24  heard them.  You know, the record speaks for
25  themselves.

Page 477

1        I can -- you know, Mr. Hill tried to get a
2  little bit of how he felt.  Mr. Troutman tried to
3  say, "well, maybe you remember not exactly what you
4  were doing, how you were feeling or what you meant."
5  But you heard him.  A real human being.
6  Unfortunately, it is senior citizens and individuals
7  of advanced age that suffer the most from robo-calls,
8  but it's for one simple reason.  They answer the
9  phone more.  See, it is a difficult culture.
10        He doesn't know how to block all 50 different
11  numbers that Conn's is calling from.  He answers
12  throughout the entire -- I mean, he's answered in
13  December.  He's answering almost once a month and
14  talking to them.
15        Now, you have the Latitude notes, and you're
16  going to have the ability to see that we might have
17  heard 20, 22 recordings.  That's a lot of
18  communications.  I mean, we're not going to sit here
19  and go -- but you're going to hear -- or you're going
20  to see, at least, well, it seems to be a
21  conversation, we want to make sure.  I mean, those
22  are in the record.  You'll get to at least see, and
23  you know, some of them are not relevant, but you're
24  going to be able to see that it wasn't just this
25  times that he talked to them.



Page 478

1    So he asked, he says March 6th, "you don't
2  need to call me anymore." Okay. Conn's has
3  stipulated that after that day, they called him on
4  predictive or broadcast mode 1,100 times. "You don't
5  have to call me no more." Or I'm sorry. "You don't
6  need to call me," is exactly what he said. "You
7  don't need to call me." He said "you don't need to
8  call me." It's on the record. They have that
9  recording. Yet they continue to call him using this
10  automated technology, the predictive mode and the
11  broadcast mode.
12    He goes on on May 10th to say, "hey, get your
13  buddies to stop calling me." He goes on on July 2nd,
14  "I done tell you MFs to stop calling me." Crazy
15  clear. Now remember, the law says, "hey, you can
16  revoke in any way." Their contract says literally on
17  page 2, "nothing in this contract shall limit the way
18  that you revoke consent." It's also interesting when
19  you read that first portion of the contract, it
20  literally says, "by providing us your number, us, our
21  affiliates acting on our behalf, you hereby consent
22  to receiving auto-dialed and/or pre-recorded
23  messages, calls and SMS." This is a contract that
24  Conn's writes, that he's agreeing to receive
25  auto-dial calls.

Page 479

1    He tells them to stop calling. Mr. Troutman
2  is like, "did you tell them 'don't call me anymore.'"
3  "Well, those exact words, no." But I'm going tell
4  you, there is nobody in this room that goes, I was --
5  there's some ambiguity. There's something -- I don't
6  understand what he means, but I've already been
7  telling you MFs to stop calling me. You call me
8  every Fing 15 minutes.
9    Conn's seems to fall back in, "well, our
10  customers, they want to be called. Our customers,
11  they like the calls. They want the calls to remind
12  them." We're talking about Mr. Williams. There is
13  nothing ambiguous about what he says. You know, we
14  don't get here and talk about, "hey, some people send
15  you letters saying 'thank you for giving -- allowing
16  me to buy this.'" We didn't get into how many times
17  have people told you to stop and you continue to
18  call. No. We're talking about one man. There's
19  nothing ambiguous about this. The calls continued
20  after this.
21    So they moved to Mr. Walton. And Mr. Walton
22  has been working for Conn's for 20 years. He is
23  coming here to attempt to defend an indefensible
24  case. Okay. We start real quick with Exhibit 13.
25  And Mr. Kerney went into detail.

Page 480

1    Right here, these are your policies and
2  procedures, these are your training. It literally is
3  called "TCPA status." And during the relevant time,
4  this training material says, "right party contact,
5  stop calling." Underneath, "cease." Did that happen
6  here? No. You're reading these notes too literally.
7  There's more information that's needed.
8    Well, let me give another example. Right
9  here it says, "stop calling and hangs up." He hung
10  up. How are you going to get more information? It
11  says "stop calling and hangs up." Well, we still
12  need more information. I'm going to represent to you
13  a couple of things. One, this policies and
14  procedures, they're written for us. They're written
15  so we can come here and be like, "look, we're
16  training people." This case doesn't involve one
17  agent. If this was one revocation, one person
18  hearing, "stop calling," then, you know, even a guy
19  at McDonalds can spit on your burger. You know, it
20  could happen. One rogue agent.
21    We're talking about systematically a culture
22  of people over and over hearing this, hearing him
23  say, "I'm sick." Saying, "don't call me no more."
24  Saying, "I would appreciate if you don't call me."
25  Saying, "tell you buddies not to call me." And it

Page 481

1  continues. I mean, nothing, nothing can be more
2  certain that Conn's, in their exhibit, in their call
3  notes, having the agent on July 2nd say, "customer
4  stated, 'do not call.'" It's in the notes. They
5  have a recording. Yet they sit here and go, "well,
6  some of the people want some more calls."
7    Now, the reason why we loved the testimony of
8  Mr. Walton stated was one, he had knowledge of the
9  contract and the language. And the July 2nd call on
10  its own, not only violates the TCPA, it violates
11  their own contract where it says, "hey, nothing here
12  limits how you may revoke." Mr. Williams received
13  calls after March 6th. He received calls up to
14  July 2nd.
15    We went through all those calls, and then we
16  went in through and discussed the Noble system again.
17  And he gave us a great example. He says, "you're
18  right. The Noble system that we purchased is closed
19  code," is what he used. We cannot change it. It's
20  like facebook. I can't change that facebook is
21  social media. I can put a picture of a puppy. I can
22  put a picture of Mr. Troutman, but I cannot change
23  what facebook is.
24    So he explained how the -- he went through a
25  long description of even how do you get the phone



Johnnie Williams vs Conn Appliances
Arbitration

482..485

Page 482

1 numbers. "Some of them apply online. Some come to
2 our office." Some -- okay. The numbers, he provided
3 them. Well, he went through a process of, "at 6 a.m.
4 we have a system," well, he actually called them a
5 "credit system administrators." And he went on to
6 say, between 6 and 7 a.m., these people tried to
7 reconcile this account and make sure and all this.
8 So much work. Between 7 a.m. and -- I'm sorry,
9 between six and seven. Between 7 and 8 a.m., they
10 now begin to assign these accounts, these campaigns
11 to a mode. Predictive mode, broadcast mode, and
12 they're separating and there's so much human
13 intervention. Then he goes, "at 8 a.m. we begin
14 launching campaigns."
15     What's interesting is, they might try to say,
16 "well, we don't have a predictive dialer. We don't
17 have an automated system." Mr. Hansen referred to
18 the term "auto-dial" as "self-dial." At the time of
19 the dialing, there's no human intervention. Once --
20 and he described exactly like Mr. Hansen said. Once
21 8 a.m. hits and a campaign is launched, if the agents
22 have signed in -- because predictive mode, by its
23 nature, requires agents.
24     Predicting is all about trying to figure out
25 -- they say they have three lines. Ten agents, three

Page 483

1 lines, make 30 calls. Mr. Kerney said, "let's say
2 all 800 of your employees show up at once. You're
3 going to dial 2400 calls?" Absolutely.
4     Think about it. It dials 600,000 calls a
5 day. Well, this credit system administration team,
6 man, they're moving levers. There's so much human
7 intervention. Two people. So two people. They're
8 not dealing with individual calls. The time that the
9 call is dialed, nobody is looking at it.
10     Well, Mr. Hansen doesn't know, he's never
11 visited our place. Mr. Gomez has never visited
12 Conn's. Okay. Well, let's see what Mr. Walton says.
13 Three percent -- what they try to accomplish is less
14 than three percent abandonment. That means 18,000
15 calls are made by the dialer, and there's no agent
16 available. What happened to Mr. Williams?
17     You want to talk about automated, you want to
18 talk about what this lawyer is trying to prevent?
19 That. That harassment is when you were a kid and you
20 will prank call somebody and not talk and hang.
21 Well, when you're getting 14 calls a day, I mean, 14
22 calls in one day. 11 and 12, we went through those
23 three dates. The calls within one hour. We went
24 through those three dates.
25     We're clearly able to demonstrate that Conn's

Page 484

1 has literally weaponized this. And I told you at the
2 beginning, and this is true of word. But I tell you
3 why that is. He said, "yeah, some of the creditors
4 might have been calling me, but nobody calls me like
5 this. Nobody calls me 1100 times." Nobody that he
6 knows would ever, maybe in his entire life nobody has
7 called him like that, I think he might have
8 testified.
9     He was going through a difficult time. But
10 the main thing I want you is I want you to keep your
11 focus on simple examples. And is this. During that
12 football game. Before the football game, LSU is
13 playing Alabama and hopefully they'll win because
14 Alabama has been winning five championships in nine
15 years. There's a lot of people attending to the
16 parking lot. There's a lot of people in security
17 letting people in. There's a referee and
18 cheerleaders and all that.
19     Once kickoff starts, the game starts. That's
20 when the campaign is launched and the numbers are
21 dialed. That's the game. During the game in the
22 football game, you have people walking up and down,
23 vendors selling stuff. They're not the game.
24     The game, the campaign, what the TCPA, what
25 the FCC is trying to accomplish is to regulate the

Page 485

1 industry from doing what they did to Mr. Williams.
2 Call and call and call. And they will say, "well,
3 sir, what's the reason for your delinquency?" He
4 will tell them, "I don't have any money. I won't
5 have money until day 11." Three hours later. Next
6 day later. "Sir, what is the reason?" You hear it
7 over and over. And you heard a human telling you
8 that.
9     So I'm going to finish real quick with this.
10 We need to prove that calls were made to the
11 plaintiff's cell phone. There's no doubt we did
12 that. We need to prove that they were not made for
13 emergency purposes. Mr. Walton testified they were
14 not made for emergency purposes. We need to show
15 that he asked for the calls to stop and therefore
16 revoking consent. The record speaks for themselves.
17 You have those recordings beginning March 6th, going
18 through all the way to July 2nd and throughout it.
19 And lastly, we need to show the calls were made in a
20 predictive or in a broadcast mode. And we have a
21 stipulation that 1100 of those calls were made in
22 that mode.
23     So I'm going to represent to you, we have
24 satisfied each and every portion of our case, and
25 I'll reserve the next 20 minutes for my rebuttal.



Johnnie Williams vs Conn Appliances
Arbitration
486..489

Page 486

1  Thank you.
2       THE ARBITRATOR:  Thank you, Mr. Gomez.
3  I'm going to let you-all finish.  I may have some
4  questions afterwards, so I don't want to --
5       MR. GOMEZ:  And if you want to do them as
6  we go as opposed to --
7       THE ARBITRATOR:  Okay.
8       MR. TROUTMAN:  I would love to hear the
9  questions now --
10      THE ARBITRATOR:  Well, no.  I'd rather do
11 it afterwards.
12      MR. GOMEZ:  Oh, okay.  Absolutely.  It's
13 your position.
14      THE ARBITRATOR:  Because you may answer
15 some of the questions I have, and I want y'all to
16 have the opportunity to complete your presentation.
17 I'm just alerting you, don't pack up, I may have a
18 few questions afterwards if that's all right with
19 you.
20   Mr. Troutman.
21      MR. TROUTMAN:  Thank you, Mr. Harris.
22 May it please the Court.  This is actually a fairly
23 interesting case to be handling, kind of on the cusp
24 of what I'm going to call my great 40th birthday
25 where I'm taking stock of all things.  I was brought

Page 487

1  in as an expert in ATDS issues.  I do nothing but
2  defend TCPA litigation.  That has been my entire
3  career for the last seven years.  I have personally
4  advocated in front of the FCC, you know, with all of
5  the commissioners.  I literally do nothing but TCPA
6  litigation in terms of defense of cases and also
7  compliance work.
8       I was brought in because I was informed that
9  this forum and all folks present could be -- could
10 use some additional guidance and ultimately, of
11 course, argument in favor of demonstrating what an
12 ATDS actually is under the law today, given the
13 history of developments in the law.  And I intend,
14 fully, to walk you through that today.
15      But I will admit that as time has gone on,
16 I've been somewhat engrossed by the facts of this
17 case.  And at some point later in this presentation,
18 I will address a number of issues that I think are
19 interesting.  Now, I am blessed to have a trial
20 lawyer and a very sharp Arbitrator who undoubtedly
21 can already draw whatever inferences are appropriate
22 from most of the facts.  You don't need me to point
23 out inconsistencies or changed testimony.  Although I
24 might still give in and do that anyway.  But for the
25 most part, we're going to talk about the law here

Page 488

1  today.
2       Here's the law.  Telephone Consumer
3  Protection Act as written in 1991.  There are several
4  components that we need to keep in mind as we move
5  through the presentation.  First, of course it is
6  unlawful for any person to make a call -- to make any
7  call using any automatic telephone dialing system or
8  an artificial or pre-recorded voice.
9       And I'm going to concede a point right at the
10 outset, I agree with Mr. Gomez that these are two
11 different components of the statute.  And one need
12 not comply or meet both requirements in order for a
13 call to be at issue.  Either the use of an ATDS or
14 the use of a pre-recorded voice are independently
15 sufficient to state a claim.  So far, we're in
16 agreement.
17      I will draw at -- here at this point a
18 distinction between calls to cell phones, which are
19 governed by Section 1A and calls to landlines, which
20 are governed by Section 1B.  The distinction being,
21 in order to have liability for calls to cell phones,
22 you must make the call that is successfully
23 completed, whereas with regards to residential calls,
24 you need only initiate the call.  That is merely,
25 start the calling process.  We'll address that in

Page 489

1  additional detail later.
2       For now, we need to talk about what an
3  automated telephone dialing system is.  Although
4  there is going to be quite a bit of dispute around
5  the edges, at the core there is no question as to
6  what the statute says.  As enacted back in 1991 and
7  never amended to this very date, the definition has
8  been the same.  The term "automatic telephone dialing
9  system" means equipment with the capacity to store or
10 produce telephone numbers to be called, using a
11 random or sequential number generator and to dial
12 such numbers.  That's just what the statute says.
13 And since this was back in 1991, there can be little
14 doubt as to what Congress intended at that time.  Can
15 we give this a play?  Can that be done?
16      (WHEREUPON, audio recording is played
17 into the record.)
18      MR. TROUTMAN:  So of course, these are
19 the sorts of messages that Congress was targeting
20 when it passed this act in 1991.  This clip we just
21 watched is actually from 1993.  The technology being
22 the sequential number generator that calls in order
23 is exactly the sort of technology that was at issue.
24 Next slide.
25      We need to be very, very clear with ourselves



Page 490

1  as to why the TCPA was enacted.  It was not enacted
2  to target debt collection calls.  Now I want to be
3  very clear.  I am not arguing that the TCPA doesn't
4  apply to debt collection calls, but it is important
5  to keep in mind the legislative history when we're
6  looking at the statute as it was ultimately adopted.
7       According to the legislative history found at
8  public 102 to 243, Section 2, 105 STAT 2394, 1991,
9  these are the findings that Congress made justifying
10  the passage of the TCPA.  (1) The use of the
11  telephone to market goods and services to the home
12  and other businesses is now pervasive due to the
13  increased use of cost-effective telemarketing
14  techniques.  (2) Over 30,000 businesses actively
15  telemarket market goods and services to business and
16  residential customers.  (3) More than 300,000
17  solicitors call more than 18,000,000 Americans every
18  day.  (4) Total United States sales generated through
19  telemarketing amounted to $435 billion in 1990.  (5)
20  Unrestricted telemarketing can be an intrusive
21  invasion of privacy and when emergency or medical
22  assistance telephone line is seized, a risk of public
23  safety.  (6) Many consumers are outraged over the
24  proliferation of the intrusive nuisance calls to
25  their home from telemarketers. (7) Over half the

Page 491

1  states now have statutes restricting various uses of
2  the telephone for marketing, but telemarketers can
3  evade their prohibitions through interstate
4  operations, therefore Federal law is needed to
5  control residential telemarketing practices.  (8) The
6  Constitution does not prohibit -- and we're going to
7  talk about the Constitution in a second.  The
8  Constitution does not prohibit restrictions on
9  commercial telemarketing solicitations.  (9)
10  Individual privacy rights, public safety interests
11  and commercial freedoms of speech and trade must be
12  balanced in a way that protects the privacy of
13  individuals and permits legitimate telemarketing
14  practices.
15       All told, Arbitrator Harris, there are nine
16  specific references to telemarketing in the
17  underlying legislative history of the TCPA.  There
18  are zero references to debt collection.  And so
19  although we do not disagree that, for instance, when
20  you use an automated voice, even if you are
21  collecting on a debt, as opposed to telemarketing,
22  the statute applies to you.  The fact that the TCPA
23  was designed to target telemarketing informs us as to
24  why Congress enacted such a narrow statute with
25  respect to the ATDS.  Next slide.

Page 492

1       And to be clear, this isn't just legislative
2  history, and this isn't just from 1991.  The United
3  States Supreme Court has held that the reasons TCPA
4  was passed is because consumers were outraged over
5  their proliferation of intrusive nuisance
6  telemarketing calls.  The Second Circuit, TCPA was
7  enacted to address the volume of unwanted
8  telemarketing calls.  Privacy -- and this is the
9  Third Circuit.  Privacy interest in avoiding
10  telemarketing calls.
11       The Sixth Circuit should mark the NMP LLC,
12  656F.3d 440, Sixth Circuit case August 3rd, 2011,
13  quote, Congress enacted the TCPA because consumers
14  complained that unsolicited telemarketing calls were
15  a nuisance and invasion of privacy.  In fact,
16  virtually every Circuit Court of Appeal has addressed
17  and accepted that the basis behind the TCPA was
18  telemarketing.  Next slide.
19       And the FCC understood this so clearly, that
20  back in 1992 when it first enacted the TCPA via its
21  implementing order, it addressed debt collection
22  calls specifically.  And it states:  In addition, we
23  tentatively concluded that debt collection calls are
24  exempt from the TCPA prohibitions against
25  pre-recorded message calls because they are

Page 493

1  commercial calls which do not convey an unsolicited
2  advertisement and do not adversely affect residential
3  subscriber rights.
4       This was the thought process of the FCC and
5  Congress at the time the act was passed.  Next slide.
6  And to be very clear as to what an ATDS is, looking
7  at the 1995 ruling, this is four years later.  The
8  addressing what an automated telephone dialing system
9  is, FCC explains it.  The TCPA requires a call dialed
10  to numbers generated randomly or in sequence
11  autodialed and delivered by artificial or
12  pre-recorded voice messages must identify the caller.
13  Autodialed calls are calls that were randomly or
14  sequentially generated as of 1995.  Next slide.
15       So why would Congress enact such a narrow,
16  narrow, narrow definition of ATDS?  Well, we've
17  addressed one reason which is telemarketing is what
18  they were after, right?  Just blasting out these
19  random messages.  That was what was going on with
20  Homer Simpson, that's what the Congress legislative
21  findings show.
22       But there's another reason, which was alluded
23  to which is the Constitution, right?  These
24  communications are free speech.  They might not be
25  pleasant free speech in all instances, but we have to



**Orange Legal
800-275-7991**

Johnnie Williams vs Conn Appliances
Arbitration

494..497

Page 494

1  admit, they're speech.  It's me contacting you, you
2  contacting me, people trying to reach telemarketers.
3  They are protected, they're constitutional in the
4  sense that they're not false, in most cases.  Scam
5  calls would be.
6       But for instance, an informational call, so
7  long as it's not false or it's not obscenity, all the
8  general protected classes of constitutional
9  communication, they're constitutional.  And it should
10 be noted, to the next slide, that five times on that
11 basis, one, two, three, four, five, District Courts
12 have held that strict scrutiny actually applies to
13 the TCPA.  And under the Sixth Circuit standard,
14 strict scrutiny means:  No state action that limits
15 protected speech, which these calls are protected
16 speech, will survive strict scrutiny unless the
17 restriction is narrowly tailored to be the least
18 restrictive means available to serve in compelling
19 government interest.
20      So again, all of this informs why Congress
21 enacted such a narrow statute.  It's up against
22 strict scrutiny on a First Amendment issue, which is
23 the speech that folks are using.  And they have to be
24 narrow to the specific issue.  It has to be narrowly
25 tailored, the least restrictive means, to attack a

Page 495

1  compelling governmental interest.  Here the
2  compelling governmental interest is, of course, the
3  proliferation of nuisance telemarketing calls.
4       Congress adopted a narrow way to attack that
5  specific concern.  That is why we have the definition
6  of ATDS that we see in the statute.  To the extent
7  the TCPA viewed as just a general prohibition on
8  speech without consent, which is how they would like
9  you to essentially read the statute, that's a flat
10 violation of well-settled Supreme Court law going
11 back to 1943.  Actually that was not a quote, this is
12 a characterization.
13      In that case, it was actually a very similar
14 statute where you've got an individual that has --
15 that had a tele- not telemarketer but somebody
16 knocking on their door on a Sunday to talk to them
17 about buying a pots or pans, and there was an
18 ordinance in the city saying, you have to first get
19 someone's consent before you knock on the door to
20 solicit.  And the Supreme Court said, "no.  That is
21 flat unconstitutional.  You are preventing someone
22 prohibitively, affirmatively, in a prior restraint
23 sort of way, from making constitutional speech unless
24 that person opts out."  And the Supreme Court said,
25 "you can't do that."

Page 496

1       So the TCPA has to be read very, very
2  narrowly, because if you read it broadly, then it's
3  exactly that sort of prior restraint on
4  constitutional speech that would never pass
5  constitutional muster.  So again, all of this informs
6  why we have this narrow reading.
7       All right.  So let's move on to the next
8  slide.  So what's all this about predictive dialers,
9  right?  The statute doesn't mention predictive
10 dialers.  There's no mention of a predictive
11 algorithm.  Where does this come from?  And there's
12 no question, I agree with Mr. Gomez.
13      In 2003, the FCC took it upon itself, based
14 upon a number of complaints it was receiving
15 regarding something called robo-calls, and I still
16 don't know what a robo-call is.  I know what an
17 autodialed call is, we know the definition of that.
18 I guess I don't know what a robo-call is.  And it
19 decided that it was going to hold a predictive
20 dialers, which were at the time what telemarketers
21 had begun using, as you heard Mr. Gomez say in his
22 own closing remarks, telemarketers were using
23 predictive dialers, and therefore the FCC, wanting to
24 continue the trend of preventing telemarketing calls,
25 expanded the FCC to include predictive dialers.  Go

Page 497

1  back, please.
2       Now, this is the absolute most critical piece
3  of the case.  Which is, as we're about to see, these
4  '03 and '08 orders have been overruled by the D.C.
5  Circuit Court of Appeal.  They no longer exist.
6  They're gone.
7       So we're back to the original language of the
8  statute.  But even if the predictive dialer rulings
9  were still good law, and they're not, but even if
10 they were, as we're going to see, there is absolutely
11 no evidence that Mr. Williams received calls from
12 Conn's in predictive mode as defined by the FCC in
13 Mr. Hansen's own expert testimony.
14      I was treated to the opening statement of
15 Mr. Gomez in which I heard two things I never thought
16 I was going to hear.  One is that they were going to
17 stipulate away the use of a random or sequential
18 number generator.  You understand we had Dr. Sorini
19 flown in across the country to come and explain to
20 you that our dialer does not make use of a random or
21 sequential number generator.  That's literally why
22 Dr. Sorini prepared a report.  And Mr. Hansen's
23 report was full of claims to the contrary.  That
24 somehow he deduced that we were using a random or
25 sequential number generator without ever actually



Johnnie Williams vs Conn Appliances
Arbitration

498..501

Page 498

1  looking at our system.
2       That was supposed to be the great battle of
3  experts.  That's why I was flown out here myself to
4  present to you.  And it all got taken away in a
5  wonderful stipulation that I deeply appreciate by
6  Mr. Gomez, because they're right.  We don't use a
7  random or sequential number generator.  But without
8  that hook, they have no choice but to prove, in a way
9  that they have not done, that Conn's used a
10  predictive dialer to place the calls at issue.  Next
11  slide.
12       So first, let's talk about the predictive
13  dialer ruling being overruled.  If the Court finds
14  that the predictive dialer rulings were overruled, as
15  the Court should, the case is effectively over.  The
16  reason for that is, contrary to Mr. Gomez's
17  statements, there is zero evidence as to the number
18  of pre-recorded calls that were actually received by
19  Mr. Williams.  Complete failure of proof on
20  pre-recorded calls.  They must prove the calls were
21  placed in predictive mode in order to succeed.  And
22  predictive mode has something -- a very specific
23  definition as we'll see.
24       But first, let's establish that the
25  predictive dialer rulings from '03 and '08 were

Page 499

1  overruled.  The D.C. Circuit Court of Appeals
2  directly addressed the challenge to the FCC's ATDS
3  rulings in ACA International PFCC.  The Court
4  ultimately held that the '03 and '08 ATDS rulings
5  were inconsistent with the FCC's own 2015 ruling.
6  And as a result of that inconsistency, the D.C.
7  Circuit set everything aside and overruled it all.
8       Let's walk through that.  This is the
9  language of the ACA International decision.  I
10  apologize that it's so small, but I am going to read
11  this because I think it is important.  This is the
12  D.C. Circuit's opinion.  "As a threshold matter, the
13  commission maintains that the court lacks
14  jurisdiction to entertain petitioner's challenge
15  concerning the functions the device must be able to
16  perform."  That is the FCC claim.
17       The D.C. Circuit lacked the authority to
18  reconsider the '03 and '08 orders.  The agency
19  reasons that the issue was resolved in prior agency
20  orders, specifically declaratory rulings in 2003 and
21  2008, including that the statutory definition of an
22  ATDS includes predictive dialers.  Dialing equipment
23  that can make use of algorithms to assist
24  telemarketers with predicting when a sales agent will
25  be available to take calls.  Predictive dialers are

Page 500

1  those that make use of algorithms to assist
2  telemarketers in predicting when a sales agent will
3  be available to take calls.
4       According to the FCC, because there was no
5  timely appeal from those previous orders, it is too
6  late now to raise a challenge by seeking review of a
7  more recent declaratory ruling that essentially
8  ratifies the previous one.  We disagree.
9       The FCC argued to the D.C. Circuit Court of
10  Appeal, that the D.C. Circuit Court of Appeal lacked
11  jurisdiction to reconsider and analyze those '03 and
12  '08 orders on predictive dialers.  The D.C. Circuit
13  said, you're wrong.  We absolutely do have that
14  ability.  They go on to do exactly that.
15       While the 2015 ruling indicates in certain
16  places that a device must be able to generate and
17  dial random or sequential numbers to meet the TCPA's
18  definition of an auto dialer, it also suggests the
19  computing view.  That the equipment can meet the
20  statutory definition even if it lacks that capacity.
21  And in the 2003 order, the commission had made clear
22  that while some predictive dialers cannot be
23  programmed to generate random or sequential numbers,
24  they still satisfy the statutory definition of an
25  ATDS.

Page 501

1       By reaffirming that conclusion in its 2015
2  ruling, the commission supported the notion that a
3  device can be considered an auto dialer even if has
4  no capacity to generate random or sequential numbers.
5  The 2015 ruling correspondingly expresses that
6  predictive dialers can differ from other dialers.  So
7  which is it?  This is the language of the D.C.
8  Circuit.
9       Does a device qualify as an ATDS only if it
10  can generate random or sequential numbers to be
11  dialed, or can it do so even if it lacks that
12  capacity?  The 2015 ruling, while speaking to the
13  question in several ways, gives no clear answer.  It
14  might be permissible for the commission to adopt
15  either interpretation.
16       So the D.C. Circuit reviews the '03 and '08
17  order, finds them inconsistent with the 2015 order,
18  sets aside all of those rulings, but it gives this
19  ray of light to the commission and ultimately to the
20  plaintiff.  Which is, if the FCC wants to go back and
21  go back to the drawing board and issue a ruling that
22  is consistent with the statute, its findings will
23  probably be upheld by the D.C. Circuit Court of
24  Appeal the next time around.
25       But for now, those rulings are in



Johnnie Williams vs Conn Appliances
Arbitration

502..505

1  disagreement. And Sessions v Barclays, the Circuit
2  Court -- excuse me, the District Court, Northern
3  District of Georgia, Judge May, well-respected judge
4  down there, gives us this very succinct analysis. I
5  was very long-winded, she was very succinct. Here's
6  a paragraph. "The D.C. Circuit and ACA International
7  clearly held that it invalidated all of the FCC's
8  pronouncements as to the definition of capacity, as
9  well as its descriptions of the statutory functions
10  necessary to be in ATDS, and despite the FCC's
11  challenge to the Circuit Court's ability to view the
12  earlier predictive dialer rulings, the D.C. Circuit,
13  quote, set aside the FCC's treatment of those matters
14  without qualification." The end.
15  '03 and '08 are gone. They don't exist.
16  What exists? These other cases agree. Okay. Next.
17  So what's left? Without the predictive dialer
18  rulings, what are you left with? You're left with
19  the language of the statute. And this is from the
20  Dominguez v Yahoo case, which just came out last
21  month.
22  Here in affirming a denial -- excuse me.
23  Affirming the grant of a summary judgment in favor of
24  the defendant, the Third Circuit Court of Appeal
25  looked specifically at what functions are required to

1  demonstrate the use of an ATDS. And here's what the
2  Court says: Ultimately, the plaintiff, Dominguez,
3  cannot point to any evidence that creates a genuine
4  dispute of fact as to whether the e-mail SMS service,
5  at issue in that case, had the present capacity to
6  function as an auto dialer by generating random or
7  sequential telephone numbers and dialing those
8  numbers. On the contrary, the record indicates that
9  the e-mail SMS service sent messages only to numbers
10  that have been individually and manually inputted
11  into the system. The device could only call from a
12  list of numbers. It could not randomly or
13  sequentially generate them. And therefore, the
14  device is not an ATDS.
15  So yes, you heard Conn's say repeatedly that
16  the TCPA does not apply to it. And this is why:
17  Because it does not use a device that randomly or
18  sequentially generates numbers. This case was over
19  in opening statement. As soon as Counsel Gomez
20  admitted that our device lacked that capacity, the
21  question of fact that hung up the Arbitrator in the
22  original motion was resolved.
23  We're only here because the Arbitrator,
24  probably properly, found at the time of the
25  dispositive motion, that there was a question of fact

1  as to the capacity of a Conn's dialer. As to its
2  ability to randomly or sequentially generate numbers.
3  That was conceded away in opening statement. There
4  was literally no reason to proceed with the case.
5  But it was fun.
6  All right. Moving on. We'll note that four
7  cases, you saw an earlier slide, we have five -- we
8  have a number of cases finding that the ACA ruling
9  set aside the predictive dialer rulings. We'll
10  concede. There are a couple of District Courts that
11  are struggling with this, and they're not sure what
12  to make of the D.C. Circuit's ruling.
13  Some say that they're not even sure whether
14  or not it set aside -- whether or not the D.C.
15  Circuit's ruling is binding across the country or
16  not. There's -- some Courts are struggling with
17  this. The Third Circuit Court of Appeal, the Second
18  Circuit Court of Appeal both looking at the issue,
19  have concluded that yes, the D.C. Circuit Court of
20  Appeal's ruling, under the Hobbs Act, is binding
21  across the entire country. It was an appeal from all
22  Circuit Courts, from the omnibus, sent to the D.C.
23  Circuit. The D.C. Circuit's ruling is binding.
24  There's a lot of confusion. We're not going
25  to hide the fact that there's some confusion out

1  there. I'm here to try to make this clear. Okay?
2  I've kind of broken it down piece by piece, as to why
3  it is that those two orders are gone. We don't hide
4  that there are cases that are still confused. But
5  the Arbitrator should not be confused. The law is
6  crystal clear at this point, as the Sessions case
7  makes clear, as the Dominguez case makes clear, as
8  ACA itself makes clear.
9  So what if -- I mean, the case is over. But
10  what if I'm wrong and the predictive dialer rulings
11  are still good law, somehow? Okay. Well, we saw
12  already from the ACA case what a predictive dialer
13  is. A predictive dialer is a dialer that uses a
14  predictive algorithm to predict when an agent is
15  going to be available to take a call. The really
16  neat thing is that Mr. Hansen adopts that exact same
17  definition of what a predictive dialer is. And I'm
18  sure the Arbitrator noted our very brief cross
19  examination of Mr. Hansen, and there was a reason for
20  that, of course, which is, we thought Mr. Hansen was
21  a great expert for us, and we appreciate Mr. Gomez
22  calling him.
23  Mr. Hansen established what a predictive
24  dialer is. A predictive dialer, in Mr. Hansen's
25  words, is a dialer that makes use of a predictive



Page 506

1  algorithm to determine when an agent is available to
2  take a call.  However, Mr. Hansen never reviewed
3  Conn's system.  There is only one piece of evidence
4  as to whether or not Conn's system had the capacity
5  to make use of a predictive algorithm in order to
6  predict when an individual agent might be available
7  to take a call, and that testimony is of course the
8  testimony of Mr. Walton.
9      And at 7:34 p.m. yesterday, late in the
10  evening, the crucial piece of evidence in this case
11  came out.  Which was that Counsel Jackman asked
12  Mr. Walton, "Does Conn's system make use of a
13  predictive algorithm?"  And he of course said, "no".
14  Because in -- rather than use the predictive
15  algorithm, Conn's has people that determine when
16  agents are going to be available and throttles the
17  scope and the speed at which the dialer is operating
18  manually.  It absolutely does not make use of a
19  predictive algorithm.
20      And although Mr. Hansen relies upon the
21  general manuals that he pulled off of some website
22  somewhere, and we don't dispute and we never have
23  disputed that Noble makes a system, a deviation of
24  which we are using, and that Noble system off the
25  shelf can operate predictively, there is absolutely

Page 508

1  oversee exactly what's happening on the floor.  And
2  we're going to decide how fast these agents are going
3  to work, how many lines are going to be available.
4  We are going to do all of this stuff.  We're not
5  going to rely on this predictive algorithm.
6      Okay.  I can't explain why that decision has
7  been made.  But the fact is, that decision was made.
8  And as a result, the simple undisputable fact is that
9  we did not -- Conn's did not use a predictive dialer
10  to contact the plaintiff.  The only piece of
11  evidence, circumstantial though it is, that would
12  rebut what I just said, is this print-out report that
13  came from the Noble system, that everyone agrees is
14  just kind of generated stock from the Noble system
15  that uses this word "predictive."  But there has been
16  no testimony, nor could there be, that that
17  predictive print-out sheet means that the system was
18  actually operating or had the capacity to operate
19  predictively at that time.  It's just a relic, a
20  dinosaur of the capacities that the system could
21  have, if used by other people and if otherwise
22  generated -- excuse me, if otherwise utilized by
23  others.  In other words, let me try that sentence
24  again.  I don't think that was well struck.
25      The system came pre-programmed with this

Page 507

1  no evidence that Conn's system is in alignment with
2  that.  And to the contrary, the only evidence, the
3  undisputed evidence, came from Mr. Walton that Conn's
4  system does not and never had that capacity.
5      Now, Mr. Gomez and Mr. Hansen keep talking
6  about automobiles.  So I will say that this is a
7  situation as if Conn's saw an automobile sitting out
8  there.  And for reasons that I can't describe or
9  explain, and I can't even say I agree with, they
10  decided to just pull the engine out of the
11  automobile, hook it up to a horse and ride around in
12  it.  They're using horses as opposed to the
13  automobile's engine to accomplish something, frankly
14  less effectively.
15      There was argument made by Mr. Kerney that,
16  "I mean, guys, if you just use the software, if you
17  just went out and bought the software, you could do
18  this a lot more effectively."  We didn't dispute
19  that.  That's probably true.  But the fact is that
20  they don't make use of the predictive algorithms.
21  The belief, as Mr. Walton told you, from Conn's is
22  that that's for telemarketers.  And we're not going
23  to do things that telemarketers do.  We're going to
24  do things that we do, that work for our business.
25  And for us, we want to use these individuals to

Page 509

1  print-out of predictive, irregardless of whether or
2  not the capacity to dial predictively remained in the
3  system.  That was Mr. Walton's testimony.  So they
4  just never went and bothered changing the word
5  "predictive" out of that print-out.  They didn't
6  think it mattered.  It was just a word.  But as
7  everyone has told you, there was literally no
8  predictive dialer used.  There was no algorithm used.
9  Ever, at any point.  There was no testimony.
10      So those words on that print-out, as
11  Mr. Hansen said, "hey look, I just read what the
12  print-out says, it says 'predictive,' so it must mean
13  predictive."  Yeah.  He'll be forgiven for leaping to
14  that conclusion, but that's just not the facts here.
15  There's just no evidence to connect that dot.
16      So what happened with Dr. Sorini?  I already
17  explained this.  We know we made some promises in
18  opening statement that he was going to testify and
19  what he was going to say.  But after the admission
20  was made that we don't use a random or sequential
21  number generator, we didn't need him any more, so we
22  sent him home.
23      So circling back to that last issue, and I
24  would represent that the waterfall of analysis here
25  is first, are the '03 and '08 orders overruled?  If



Page 510

1  so, we win.  Second, if the '03 and '08 orders are
2  still good law, was there evidence of calls placed in
3  predictive mode?  If not, we win.  Third is, can they
4  take refuge in pre-recorded calls?  There's a failure
5  of proof on that issue too.  There was no evidence
6  that calls were actually played, that he actually
7  received calls.  There is no evidence as to how many
8  such calls were played.
9        The Fifth Circuit Court of Appeals, the only
10  Circuit Court of Appeal to look at this specific
11  issue, and it is crystal clear that pre-recorded
12  calls that do not actually play are not actionable.
13  So if Conn's was not using a predictive dialer, which
14  it wasn't, it could attempt to call our friend,
15  Mr. Williams, using a pre-recorded voice a thousand
16  times a day.  And if a message didn't actually play,
17  it's not a violation of the statute.  So on that
18  basis, Conn's is entitled to judgment.  The end.
19        I will mention, however, as I did earlier,
20  the difference between making a call and initiating a
21  call.  In order to be made, the call needs to be
22  completed.  And there's another component to it as
23  well.  Next slide.  The 1992 implementing order from
24  the FCC looks at the issue of calls to cell phones.
25  And it tries to package everything up and decide when

Page 511

1  is a call to a cell phone actionable.
2        And here's what it says:  Based on the plain
3  language of 227(e)13, which is the section you're
4  suing under, we conclude that the TCPA did not intend
5  to prohibit auto dialer or pre-recorded message calls
6  to cellular customers for which the called party is
7  not charged.  A call is not made unless it goes
8  through and gets charged for it.  He admitted in
9  cross examination he never got charged for the call.
10  Case dismissed.
11        But let's break this down.  Stop for a
12  second.  Walk away from the dialer issues, put that
13  in a box, off it goes.  And turn now to the facts of
14  the case transcending the dialer.  Let's assume I'm
15  wrong about everything I just said.  I don't like
16  that assumption, but for the purposes of this, let's
17  just assume I'm wrong.
18        Let's assume that the '03 and '08 orders are
19  still good law, they prove that we did dial
20  predictively through evidence I didn't see and that
21  they somehow proved exactly the number of calls that
22  were connected, went all the way through, that he
23  answered, he was charged for and that there was a
24  pre-recorded voices that were actually playing.
25  Let's assume all that evidence is out there.  It's

Page 512

1  still fine.  So long as we have his consent.  And
2  there's no dispute that we had the plaintiff's
3  consent initially.  No dispute about that at all.
4        So the question is, did he revoke his
5  consent?  Well, these cases, they do make me
6  philosophize on occasion, as Mr. Gomez alluded I
7  might do, about kind of the nature of the human
8  animal and just how fickle a writhing coil of impulse
9  we all are.  And how frail our memories can be.  And
10  when we look back on events, especially when we are
11  feeling emotions, how we view events in a way that
12  seems to justify what we want those events to
13  justify.
14        Classic example is in this case when we start
15  with the first few calls.  That March 6th call
16  recording, it is crystal clear, as he admitted on
17  cross examination that what he was asking is for the
18  calls regarding that $105 payment to stop because
19  he's going to make that payment on Friday.
20  Nonetheless, Counsel Kerney, Counsel Gomez tell you,
21  "nope," that he meant at that time, that very first
22  time he said "stop calling," he never, ever wanted to
23  hear from Conn's ever again for any purpose ever
24  again, and Conn's should never have called him again.
25  That's just silly.  That is absolutely not what the

Page 513

1  evidence shows.  And Mr. Williams admitted that on
2  cross examination.
3        Then of course on redirect, he changed his
4  testimony after meeting with his counsel.  That's
5  fine.  I mean, that's fine.  He can say whatever he
6  wants to say.  And Counsel can make use of whatever
7  tactics they want to make use of.  The evidence is
8  very clear.
9        And then we move on to the next event, which
10  was in May.  And it's the same thing all over again.
11  He says "stop calling" with respect to one specific
12  payment because he was going to make that payment at
13  the end of the week.  They have an agreement, Conn's
14  honors that agreement, they don't call him anymore.
15  And yet Counsel would have you believe that that
16  meant he never wanted to receive calls again.
17        And then of course, we have this July 2nd
18  call that just comes like a bolt of lightning.  This
19  is the naughty language call.  Where does this even
20  come from?  They're having nice, responsible
21  communications.  Mr. Williams said, "hey, look, we
22  want to make a deal.  I want to make a deal."
23  Everyone seems to be working together so well.  And
24  then suddenly in July, something changes.  Something
25  changes.  And all of a sudden, there's just a change.



Page 514

1  He doesn't want to cooperate any more with Conn's.
2         And right about that time, coincidentally
3  enough, he's talking to Morgan & Morgan.  And we put
4  on the evidence -- we put on the evidence, and we'll
5  get here in a second, of all the continuing
6  communications that he had with Morgan & Morgan.  In
7  going back to the frailty of the human animal, it's
8  so interesting the way that we can start perceiving
9  facts in the way that we want to perceive them, to
10 advance our own personal narrative.  And there is no
11 question in my mind, there should be no question in
12 the Arbitrator's mind, that of course he saw
13 commercials for Morgan & Morgan before he decided
14 that he was a victim here.  And I wonder how many of
15 those commercials he had to see before he decided
16 that he was actually being harassed, as opposed to
17 just a guy that was trying to work out a deal to pay
18 off some equipment that he purchased.
19        It was so fascinating to see that right
20 around July when he starts communicating with Morgan
21 & Morgan, his tone changes.  His demeanor changes.
22 He's no longer interested in having these productive
23 conversations.  And he starts saying things that are
24 very vague.  He doesn't say, "do me a favor, don't
25 call me anymore, okay, on this phone number."  He

Page 515

1  doesn't stay on the line to answer the probing
2  questions that Mr. Walton says were coming.  He
3  starts hanging up on people.
4         And he starts using this phrase repeatedly,
5  "you shouldn't be calling me.  You shouldn't be
6  calling me."  Like a parrot.  "You shouldn't be
7  calling me.  You shouldn't be calling me."  He
8  doesn't say "don't call me."  And when the agent
9  asks, as the agent does, "what do you mean, we
10 shouldn't be calling you?"  He doesn't stay on to
11 explain.  Why?  Because he wants the calls to keep
12 coming.
13        Because at that point, Conn's has changed in
14 his mind from somebody to whom he owes a legitimate
15 obligation for items he purchased and agreed to pay
16 back.  Conn's has changed.  Now it's a cash register.
17 He's had his communications with Morgan & Morgan.
18 He's been under the influence of all this
19 advertising.  He now sees them as a cash register.
20 And he has to keep those calls coming.
21        But at the same time, he knows these call
22 recordings are going to get played to an arbitrator
23 one day, because Morgan & Morgan of course tells him
24 that, because they're right.  That is exactly what's
25 going to happen.  So he has to change his tone.

Page 516

1         And he starts saying things like, "oh, I'm
2  going to be out on the street."  "Oh that, you know,
3  that deal sounds good."  You can almost kind of hear
4  it in his voice as he's talking to people.  "Oh, that
5  deal sounds pretty good."  You can almost tell that
6  he kind of wants to take the deal.  He kind of wants
7  cooperate.  The noble man inside of him, and there is
8  a piece of him, I believe, that is a noble man.  That
9  does want to meet his responsibilities.  And that
10 piece of him comes out in these recordings.  And you
11 hear him saying, "yeah.  Yeah.  That sounds pretty
12 good."
13        But he holds back.  Why?  Because he's not
14 going to deal with Conn's any more because he's going
15 to sue them.  And he's going to keep these calls
16 coming.  And he stops making payments specifically so
17 that those calls will keep coming.  Prior to July,
18 before he starts talking to Morgan & Morgan, he is
19 making more or less complete payments.  It's no
20 coincidence that the last complete payment was made
21 in July 18 of 2016 and that no further complete
22 payments were ever made after he started talking with
23 Morgan & Morgan.  In fact, no payments at all were
24 made following October.
25        And I asked him why that was, and he said he

Page 517

1  just decided, to hell with it.  What had changed?
2  Morgan & Morgan -- excuse me, Conn's agents were
3  never abusive to him.  They never used foul language
4  when he threatened to kick their ass.  The Conn's
5  agents just absorbed it with good humor.  They never
6  threatened him.  He threatened them.  He abused them.
7  He hung up on them.  He was disrespectful to them.
8  He was dismissive to Conn's.  Conn's always behaved
9  professionally.  Indeed, in my opinion, admirably.
10        He claims that Conn's was picking on him.  It
11 was clear to me who was picking on who in these phone
12 calls.  And it was not clear to me, as they will have
13 you infer, that it's because he was feeling annoyed
14 or harassed or frustrated.  To the contrary.  He
15 wanted those calls to continue.  And that is exactly
16 why he did not say something like, "do me a favor,
17 folks.  Don't call this cell phone any more at all.
18 I don't want to hear from you any more.  Here's a
19 letter.  Stop calling me.  And by the way, I've got a
20 lawyer."  If he wanted the calls to stop, that's what
21 he would have and could have and should have said.
22        And we need to keep in mind that what he
23 wants, that state of mind, crucial in this case.
24 Consent is a state of mind.  That is in the
25 restatement.  That is out of the Third Circuit case



Johnnie Williams vs Conn Appliances
Arbitration

518..521

Page 518

1  of Gager.  Consent is nothing more than a state of
2  mind.  So long as he is welcoming these calls,
3  consent has not been revoked.  And the standing cases
4  that have been provided to the Arbitrator by Conn's
5  clearly make that out.
6       Of course, we know our dear friend
7  Mr. Williams, again, kernel of an honorable man, I
8  have no doubt.  Nonetheless, prone to exaggeration,
9  prone to falsehood.  We know that he told Conn's'
10  agents he was at a funeral he never attended.  We
11  know that he cannot have been hundreds of thousands
12  of calls when there were just seven.  Talked to you a
13  thousand times when it never happened.  Talked to you
14  -- testified in front of the Arbitrator, yesterday,
15  right there in that chair, that he talked to them
16  three times, at least three times a day on multiple
17  occasions, and of course we have a stipulation that
18  that just never happened.  There was never more than
19  two calls where they actually talked to him in a
20  single day.  It just never occurred.
21       Then again, when I asked him how many times
22  he talked to his counsel, "oh, it was just four, five
23  times."  Make what you will of the facts.  Whatever
24  you need to do to advance your narrative.  Does that
25  mean he's a bad person?  No.  He's just a person,

Page 519

1  right?  We all fall subject to this.  That's exactly
2  what's going on here.
3       But you can't lose sight of this.  You cannot
4  lose sight of this.  It's difficult because I don't
5  know, and I can't know, and I guess I could have
6  invaded the privilege, but it was so unclear as to
7  when the representation actually began, I just
8  decided to steer clear of it.  But if you match up
9  these communications with the phone calls and you
10  start seeing these vague -- this vague language
11  that's being used, you start seeing him withdrawing
12  from any effort to reach a deal.  Even though he
13  testified, you might remember, he testified he always
14  wanted to reach a deal.  He always wanted to come to
15  an understanding.  And you can't come to an
16  understanding without communication.  And in this
17  instance, you can't have communication without a
18  phone call.  All that seems to mean that he wanted
19  the calls to continue.
20       And my favorite part of the re-cross, by the
21  way -- excuse me, at the cross was when Counsel said,
22  "hey, well, what else could Conn's have done to
23  communicate with you?"  And he said, it was
24  beautiful, "they could have got a manager on the line
25  to talk to me."  And you heard the recordings.

Page 520

1  Conn's literally did that.  On multiple occasions.
2  They got the advanced individuals, the managers, the
3  supervisors to come on the line to say, "hey,
4  Mr. Conn's," or excuse me, "Mr. Williams," and you
5  heard the urgency in her voice.  "Mr. Williams, stay
6  on the line.  Stay on the line.  We can help you.  We
7  can help you.  Stay on the line."  "Oh, you know,
8  that sounds pretty good."  You almost see Conn's
9  trying to bring him in.  He's backing away, "That
10  sounds pretty good, but I just, I can't."  You can
11  almost here the voice of Morgan & Morgan in the back
12  of his head.  You can almost hear it.  It's like the
13  angel and the devil.  "Oh, man, I want to take this
14  deal, but I can't take this deal.  What do I do?"
15       I thought the August 6th, 2016 recording was,
16  frankly it was my favorite recording.  The manager,
17  in fact, on the line just like Mr. Williams suggested
18  should have happened.  And said, "Mr. Williams, we
19  understand that you want to get out of this
20  situation.  We understand you want to meet your
21  obligation.  If you can make one payment of $135,
22  that's $30 more than your regular payment.  If you
23  make that one payment, we will catch you up for June,
24  we will catch you up for July, we will catch you up
25  for August.  We're going to give you a three-for-one

Page 521

1  special."  And he says, "oh, you know, that sounds
2  pretty good, but nah."
3       I keep coming back to this weird language.
4  "You aren't supposed to be calling me.  You aren't
5  supposed to be calling me."  Not "don't call me.  I
6  don't want to hear from you any more.  I'm not
7  interested in dealing with you any more.  Here's your
8  stuff back.  I don't want it."  Just "you aren't
9  supposed to be calling me."  What does that even
10  mean?  What does that even mean?
11       Counsel would have you believe that that's
12  the revocation.  No, it's not.  Revocation has to be
13  clear and expressed.  "You weren't supposed to be
14  calling me" could mean any number of things.  It
15  could mean, from his perspective, he doesn't owe the
16  debt.  It could mean, from his perspective, there was
17  some other arrangement that had just been reached and
18  Conn's agent needs to talk to him about that.  It
19  doesn't mean anything.
20       It certainly doesn't mean that he's asking
21  expressly for all communications to stop from that
22  point on.  And that's what's so interesting also
23  about this case, is the constant characterizations
24  that I heard from Counsel and from Mr. Williams
25  alike, that "I told them to stop so many times, so



Page 522

1 many times, so many times." We listened to the
2 recordings. And no, he didn't. The records speak
3 for themselves.
4      And there were a couple of vague instances
5 where it seemed like he was saying "stop calling,"
6 but we've cleared those up, that he meant with
7 regards to specific payments. But for the most part,
8 it was, "you aren't supposed to be calling me." And
9 even if on day one he did say, "don't call me," and
10 he meant it, you heard him admit that by day two or
11 by day three, he might have changed his mind and
12 welcomed that next call and been happy to receive it
13 and talk to the person because sometimes
14 circumstances change.
15      And that is ultimately the vagrancy of the
16 human being and its thriving coil of impulse, that
17 what you might want today might not be in your best
18 interest. It might not be what you want tomorrow.
19 And the TCPA is such an interesting little statute,
20 to the extent it applies to debt collection, which I
21 would articulate and have that it does not.
22      Because it leaves us all looking at a
23 situation where ultimately what Conn's was trying to
24 do at every moment was in Mr. Williams' best
25 interest. Trying to get him to do right, meet his

Page 523

1 contractual obligations, bring his account back
2 current, which is just the right, noble and honorable
3 thing to do, the legally required thing to do, and
4 the thing that he admitted he actually wanted to do.
5 And yet Counsel tells us that these are exactly the
6 sorts of calls that Congress intended to prevent.
7 That's not true on any number of levels.
8      I want to thank you for your time and for
9 your attention. If you have any questions, I'm happy
10 to answer them. Thank you.
11      THE ARBITRATOR: Thank you, Mr. Troutman.
12 Mr. Gomez?
13      MR. GOMEZ: Thank you. Well, I am a
14 little disappointed because at the introduction, we
15 got to watch a video. And Mr. Troutman was not very
16 sincere about the video he showed us, because if you
17 notice, Simpson had this machine and he tells his
18 wife, "I hope" -- she says, "I hope you're not going
19 to call all our neighbors." He goes, "I've uploaded
20 a list of all the people in our city. And the system
21 is going to dial them and play them a pre-recorded
22 message." There wasn't randomly generating numbers.
23 He uploaded the list of everybody in the city. So
24 hopefully we can clear that up, because that list was
25 actually uploaded, just like -- it was actually a

Page 524

1 predictive dialer back in 1993.
2      Mr. Troutman was brought into this case as an
3 expert. He told you, "All I do is TCPA." Seven
4 years. Well, he should have at least given us the
5 credit to say, "I know Mr. Gomez, Mr. Kerley and
6 Mr. Hill, all they do is TCPA." We have a lot of
7 cases together, as you can see, we have a good
8 relationship.
9      Mr. Troutman took you in a history tour of
10 the TCPA. And he quoted 1991, he went through to
11 read nine sentences about telemarketing. We don't
12 dispute it. 1991, people were just calling wild,
13 asking you to sell stuff. It was telemarketing
14 thing. He then went forward to 1995. He took you
15 through a tour, and he's very eloquent. And he came
16 up here and he was hired, as you heard, to be a
17 dialer expert, to come here and tell you about the
18 law.
19      He just didn't tell you one huge thing. He's
20 a great writer too. He can write. He has a great
21 team of writers with him. And pretty much every
22 single argument you heard, every single argument you
23 heard was addressed 45 days ago in Tennessee.
24      The great thing about having an arbitration
25 is you do get to ask these questions. You get to ask

Page 525

1 me questions, you get to ask him questions, and you
2 got 14 days. You're going to get a chance to read
3 the Martha Ammons versus Ally Financial. You're
4 going to get to read a gem. Judge Crenshaw,
5 literally the chief Judge in the Middle District of
6 Tennessee, heard pretty much every argument
7 Mr. Troutman just made.
8      I'm talking about -- and we briefed it and we
9 provided it to you, but of course I am going to give
10 you all a copy. I know Mr. Troutman may have this
11 framed, but the great thing about Ammons versus Ally
12 is both Mr. Troutman and my team argued this exact
13 case. So let's begin with the title: Martha Ammons
14 versus Ally Financial. It's a car loan and they're
15 collecting on a debt. Mr. Troutman is trying to tell
16 you it might not even be constitutional. Debt
17 collection doesn't even apply.
18      Yet Judge Crenshaw granted summary judgment
19 on several issues, but this is a debt collection
20 case. Now, the great thing about this case, and as
21 you go through it, you're going to see, he cites a
22 lot of case law. And 90 percent of it is debt
23 collection. The TCPA is content mutual, and you get
24 to ask Mr. Troutman, "Mr. Troutman, isn't it true
25 that a lot of Courts, Circuit Courts, all these cases



Page 526

1  deal with content mutual."  The TCPA is content
2  mutual.
3      If you're calling me with a pre-recorded
4  message, I don't care if you're selling me anything
5  or if you're collecting a debt.  If you call me with
6  an ATDS, I don't care what it is about, and that's
7  why it's constitutional.  It is a content mutual.
8  And debt collection, the TCPA applies to debt
9  collection.  I mean, literally that case breaks it
10  down.
11      So let's go through some of the arguments
12  that were made by Mr. Troutman.  And I'm going to
13  look for my Ammons case so I can follow along.  I'm
14  also going to pass to you, and I'll guide you through
15  it, but let's go through the Ammons argument.  I'm
16  going to ask you to turn to page 18.  Mr. Troutman
17  pointed to you and told you there is a big difference
18  between making a call, initiating a call and trying
19  to differentiate between them.
20      The Court also declines to embrace Ally's
21  argument that because Ammons did not always answer
22  her telephone, some volume of Ally's calls were not
23  made.  The argument you literally just heard right
24  here.  Let's continue.  The plain language of the
25  TCPA prohibits making any call.  Ally is essentially

Page 527

1  suggesting that the statute's language not only
2  requires that a call be made or placed in a ATDS, but
3  that the owner of the cellular telephone number be
4  contemporaneously aware of the call.  This argument,
5  just like you heard today, although linguistically
6  intriguing, does not hold water.
7      Ally has neither identified any FCC
8  regulation or order that interprets the TCPA's
9  prohibition to include such requirement nor cited any
10  particularly convincing legal authority
11  distinguishing initiating from making.  I know you
12  sat there and you're looking at this presentation and
13  you're going, it seems to be a difference.  Well,
14  Judge Crenshaw has the ability, not only as Chief
15  Judge, but he has a Magistrate Judge, he has law
16  clerks, he's not listening to just 38 hours of
17  exhausting work here.  He briefed it.  We briefed it.
18  There's your argument.  There's your conclusion by a
19  Chief Judge.  But when you read this, you are going
20  to see it littered with exactly the arguments that
21  you heard.  So let's go through some of the other
22  arguments that were involved today.
23      Mr. Troutman went through and quoted the
24  language from the ACA ruling.  And of course, just
25  like any good advocate, will quote the portions that

Page 528

1  he finds beneficial.  What he failed to show, and if
2  you look at page 12, the Court literally breaks down
3  ACA.  And he clearly talks about a very, very
4  important issue.
5      One, every time the Court refers to -- I
6  don't want to say revoke, but sending back the FCC
7  2015 -- any language from the 2015 or any language
8  being ambiguous or being beyond what the FCC was in
9  charge to do, it uses a singular.  It uses "order."
10  You might say, "well, I don't know.  That language I
11  read and Mr. Troutman presented seemed pretty good."
12  Of course, the FCC -- the ACA and the D.C. Court of
13  Appeals went through steps.  And it said the FCC is
14  saying we can't review the '03 and '08.  We disagree.
15  We can look at them.
16      But when it came down to striking language,
17  they go, "we're going to strike the latest attempt by
18  the FCC."  Latest.  They also refer to it as "the
19  order."  I told you at the beginning and I read you
20  the paragraphs.  2003 simply said "debt collection."
21  So it's fine because you have the ability, you have
22  14 days.
23      In 2003, the FCC order literally says "debt
24  collection," that TCPA applies.  There's not even a
25  question.  You can ask Mr. Troutman, that's -- you

Page 529

1  get a right to ask questions.  Doesn't the 2003 FCC
2  order say "debt collection," that TCPA applies?
3  Doesn't every case almost cited here says that these
4  are all debt collection calls?
5      So it's important that you understand that as
6  you heard these arguments, they're all addressed
7  here.  And they're incredibly, incredibly explained.
8  He talks about, in page 16 if you don't mind going to
9  it.  We just referred to this, but I just want to
10  make sure we go through it.  Five lines from the
11  bottom.  "These harms are not limited to answered
12  calls."  And then even in the second to last
13  paragraph, it says, "most of the cases consider the
14  calls received by the plaintiff as a whole instead of
15  evaluating standing separating for each of the
16  calls."
17      I'm just trying to point out as we go through
18  this order the different portions that you heard
19  today that have actually been argued before.  So
20  let's go through these -- through some of the points
21  that he made.  And just to show you, Mr. Troutman
22  talked about, well, the person.  And what does a
23  person do when maybe they're now faced with, you know
24  changing their -- no, he asked Mr. Williams, "well,
25  things can change; isn't that true?"



Johnnie Williams vs Conn Appliances
Arbitration

530..533

Page 530

1    The reason why I want to bring that up is, he
2  told you the last payment that Mr. Williams did, the
3  last full payment Mr. Williams did to Conn's was
4  right when he talked to Conn's [sic]. That's false.
5  That's not even close to being right. Page 1 of the
6  Latitudes, the last complete payment, May 4th. The
7  good thing is, you have these records. When he told
8  you, "you can tell, and I can read, and I'm 40 years
9  old," I'm 44. Maybe those four years got me a little
10 more knowledge, but I'm going to tell you.
11    He told you once he started talking to Morgan
12 & Morgan, things changed. Well, we know. We have
13 his cell phone records. July 5th, he called Morgan &
14 Morgan for the first time. We know that. That
15 conversation where he's cursing, that's July 2nd.
16 That's three days earlier. That's not when he talked
17 to Morgan & Morgan.
18    But then he also represented to you, "hey,
19 the last complete payment happened in July. And then
20 he made a little bit of payments." No, no. Look at
21 page 1 of the Latitude notes, which is Exhibit 14.
22 Literally he goes through the payments. May 14th is
23 the last time that he makes a payment for 105.51.
24 May 14th.
25    Mr. Troutman tried to corner. That's as a

Page 531

1  very good advocate. "Had you seen a Morgan & Morgan
2  commercial before you ever decided to make them a
3  call -- or before you felt harassed," was his
4  question. Have you ever seen -- and I understand
5  he's in California, he doesn't get to see Morgan &
6  Morgan, but we make commercials about everything.
7  You want a class action? We got it. You want
8  workers' comp? You got it. He said, "have you seen
9  a commercial prior to feeling harassed?" "Yes."
10    Well, he was trying to imply that that's what
11 made him feel harassed. He goes, "I didn't know they
12 did this law." Now, you know, we don't have an
13 expert here to testify how often our harassment
14 commercial comes on. But clearly we have commercials
15 all the time. What it is is literally it's trying to
16 insinuate, like Mr. Williams was hiding the ball.
17    And he said some offending things like,
18 "Mr. Williams, you may be a man of character" or "you
19 might have some" -- but let's talk about what really
20 happened. We know March 6th, "You don't need to call
21 me any more." There's no doubt. You have those
22 recordings. What do we know? May 10th, "tell your
23 buddies to stop calling me."
24    Let's talk about this big change that
25 Mr. Troutman tried to pose to you. July 2nd, he

Page 532

1  curses at them. He literally curses at them and
2  tells them not to call. I'm not even going to repeat
3  the language, you all heard it. Three days later, he
4  calls Morgan & Morgan.
5    So let's see how much he's hiding the ball.
6  July 25th, "I would appreciate if you don't call me."
7  I don't think he's hiding the ball July 25th. You'll
8  get a chance to listen to that recording. You have
9  it. 20 days after he called Morgan & Morgan, "I
10 would appreciate it if you don't call me." What
11 about October 14th, 2018 [sic]? "Don't call me no
12 more." Mr. Troutman leaves this, "you aren't
13 supposed to be calling me," up here. I'm
14 disappointed he doesn't have up here the July 2nd
15 conversation where he clearly and unequivocally tells
16 them to stop calling.
17    His main point is this: Mr. Gomez, in his
18 opening statement -- and I've got to tell you, we did
19 make this case and I know we went really late. Both
20 sides made a good effort about simplifying the case.
21 The calls to the cell phone, no dispute about that.
22 He brought up an interesting point. He brought you
23 up a 1991 quote about if you're not charged for the
24 phone call, it's not actionable. You get a right to
25 ask me and him, and you can ask me and you can ask

Page 533

1  him. And you can give us 24 hours. I don't even
2  need -- I don't need two hours, and I will provide
3  that if I have an unlimited plan with AT&T, I don't
4  get charged per hour. Nobody does. But the TCPA
5  applies. Nobody gets charged per minute now. Some
6  people do, but that is just another thing that
7  they're just going to throw and stick -- throw
8  spaghetti at the wall and see what sticks. You can
9  ask him or I can provide that law. I don't have a
10 problem if you give us any -- give us six hours to
11 give you any of these legal questions.
12    So the calls were made to his cell phone.
13 There's no doubt about that. The calls were made
14 using a predictive dialer. Okay. So the great thing
15 about having an arbitration is we have a stipulation.
16 We close the case. They're stipulating that they
17 made 1100 calls in broadcast mode or predictive mode.
18 It's a stipulation. It's part of the record.
19    Their dialer logs, Exhibit 3 quotes it
20 predictive dialer. It is called a Noble Outbound
21 Predictive Dialer. Yet he's trying to say our
22 predictive dialer that is named a predictive dialer
23 that dials like a predictive dialer is not really a
24 predictive dialer.
25    He goes on to say, "We won this case when



Johnnie Williams vs Conn Appliances
Arbitration

534..537

Page 534

1  Mr. Clint Walton said it does not have an algorithm
2  that is trying to measure some texts."  Well, you
3  were briefed with some case law.  And I'm sure we
4  have three copies of this Strauss versus CBE Group.
5  Two phone calls were made in that case that were made
6  with a Noble dialer.  And let's see if we can have
7  one for Mr. Troutman, even though I know he's
8  familiar with it.
9       The Court, in page -- I know it's
10  double-sided, so two, three and four, and I can get
11  closer to Mr. Troutman.  Literally describes what a
12  predictive dialer is according to the FCC in 2003.
13  And he states, "a predictive dialer is hardware when
14  paired with certain software which has the capacity
15  to store or produce numbers and dial those numbers at
16  random in sequential order or from a database of
17  numbers without human intervention.  To determine
18  whether a dialer is a predictive dialing system, and
19  therefore an ATDS, the primary consideration is
20  whether human intervention is required at the point
21  in time at which the number is dialed."
22       That is the definition, and you can look at
23  the case law and you, know, we have briefed all these
24  cases, and you have a lot of cases that we briefed.
25  If you notice, in our briefing for this case, we not

Page 535

1  only listed the cases that were good for us, we
2  listed the cases that were bad.  And unlike
3  Mr. Troutman, you can read the brief portion for the
4  cases.
5       Eight cases currently have made a finding
6  that ACA did not strike the 03 and '08 orders or the
7  '12 orders.  The '12 is not even addressed, and it
8  addresses predictive dialer.  Eight Courts have done
9  it including Judge Crenshaw.  In his own motion,
10  Judge Crenshaw.
11       So the Noble dialer was found to be a
12  predictive dialer in Strauss versus CBE.  But let's
13  see.  Could another Court after ACA make a finding
14  that the Noble dialer -- they didn't say Noble
15  dialer, they said predictive dialer.  Not just that
16  it's a predictive dialer, that it's actually an ATDS?
17  Absolutely.  You've got it, and we gave it to you.
18  It's Estrellita -- Reyes or we'll just call it Reyes
19  versus BCA Financial Services.  I'm going to give
20  Mr. Troutman a copy, but I'm going to pass it to you.
21       And once again, this is a Noble dialer.
22  You're going to see that all -- what you're looking
23  at -- if you're looking at is the system a predictive
24  dialer, is whether or not it can dial thousands of
25  numbers without human intervention.  Mr. Clint Walton

Page 536

1  told you once a campaign is launched, we have these
2  two people:  the credit system administrators and
3  they're running this campaign.  If they walked away,
4  that wouldn't be good.  Well, why not?  Well, it
5  wouldn't be good because it's not good for customer
6  service.  Also it wouldn't be good because nobody is
7  there to see if there's not enough agents, if we're
8  getting too many abandoned calls.
9       Did he ever say the system cannot dial
10  without these two people?  No, because the system
11  dials.  That's what the system does.  He was asked,
12  "isn't it true that these credit system
13  administrators do not participate in the dialing?"
14  Absolutely.  How can they?  For them to try to say,
15  "we took the wheels of the car and we got a horse."
16  What, you got 600,000 horses?  You're making 600,000
17  calls with 150 people.  You're calling it predictive.
18       Until 2015, you called it auto dialer, and
19  you called it predictive dialer.  You changed the
20  name because, oh, you're getting sued.  That's what
21  you heard.  Like literally, like, "yeah, we just
22  changed the name.  They call it system now."
23       As I stated to you, you have 13 cases.  Now,
24  Mr. Troutman got up here, I hope you didn't see me
25  shake my head because I do like him a lot.  He talked

Page 537

1  to you about Dominguez versus Yahoo.  Dominguez
2  versus Yahoo.  He quoted you a paragraph.  Did he
3  tell you Dominguez versus Yahoo doesn't involve phone
4  calls?  Did he tell you that in Dominguez versus
5  Yahoo, nobody once said "predictive dialer"?  They
6  were e-mail to SMS.  Literally where Yahoo is writing
7  an e-mail, going through the network and it gets
8  converted into an SMS.
9       And he's trying to say, "look, it needs to
10  randomly or sequentially."  Yeah.  Because it's not a
11  predictive dialer.  You're sending e-mails to SMS.
12  It has nothing to do with the case at hand.  It
13  doesn't involve a predictive dialer.
14       He told you, "I do agree pre-recorded
15  messages apply to the TCPA."  So he did not came out
16  and said it, but by acknowledging, "Mr. Gomez and I
17  do agree on one thing:  Pre-recorded messages are
18  independent.  You don't have to have an ATDS.  That
19  TCPA applies."  Therefore agreeing with me.  Every
20  statement you heard that the TCPA does not apply to
21  Conn's is false.  They use pre-recorded messages.
22       Now, they did say that they didn't prove it.
23  But Mr. Walton didn't deny that they use pre-recorded
24  messages.  But we did prove it.  Why?  Because we
25  have their evidence.  Exhibit 3 will literally tell



**Orange Legal**
**800-275-7991**

Johnnie Williams vs Conn Appliances
Arbitration

538..541

Page 538

1  you every broadcast mode that was made.  As opposed
2  to every predictive that was made.  You will also get
3  a Latitude with a B in the action portion.  And
4  Mr. Walton described it, when you're going through
5  and you see a B, you know, we first thought it was
6  only at the beginning in broadcast, and we discussed
7  with him.
8       And Mr. Hansen also testified broadcasting is
9  another way of saying a pre-recorded message.  But it
10  shows you what happened.  It shows you how many calls
11  there was.  I mean, they expect Mr. Williams to keep
12  track of this?  We have the records.  You have
13  privity to all the records.  You know, we tried and I
14  am thankful they stipulated to the calls, but you
15  can't oversee the fact that they stipulated to 1100
16  predictive calls.
17       Your only decision is:  Did he revoke and
18  when did he do it?  That's literally what you're
19  deciding.  Did he tell Conn's to stop calling?  If he
20  did, then how many calls after that?  More
21  importantly, did -- does predictive dialing, just
22  like those eight cases, agree with, are predictive
23  dialers still under the TCPA?  I present it to you
24  and I said in the beginning.  I don't think
25  Mr. Troutman is going to disagree.  And he never did.

Page 539

1       Since '03, every intent of the FCC has been
2  to include predictive dialers.  Every Circuit Court,
3  every District Court has followed the FCC and said
4  predictive dialers are part of the ATDS.  Conn's now
5  is literally saying, "well, ACA came out March 16,
6  2018."  March 16, 2018.  And it revoked this
7  predictive dialers apply under the FCC.  That's what
8  they're saying.
9       What's so interesting is, what was their
10  defense before March 16th?  They had a predictive
11  dialer.  They were calling, they -- you know, the law
12  on predictive dialers -- Mr. Walton said, "well, the
13  law changed in '15."  I read to you, Mr. Troutman
14  agreed, predictive dialers have been part of the TCPA
15  since '03.
16       Now you might say, "well, Mr. Gomez, you did
17  give me Strauss that addressed Noble dialer being
18  found a predictive dialer and part of an ATDS.  You
19  also gave me Reyes versus BCA, finding exactly the
20  same.  Not only is it a predictive dialer, but it
21  also qualifies under the TCPA.  And I'm going to give
22  you a last one.  A more recent one, but it involves
23  Conn's.  It is an award.  It is an arbitration.
24       And it is exactly Conn's versus -- Summers
25  versus Conn's, the same finding is made.  Not only is

Page 540

1  it a predictive dialer, it qualifies under the TCPA.
2  Arbitrator trebled damages in that case, and why?  We
3  haven't talked about treble damages.  I told you at
4  the beginning, this was an egregious case.  I wasn't
5  lying.  They call him 1100 times.  They call him more
6  than that.  Because they call him some manual calls.
7       And you notice how they clearly differentiate
8  the manual calls.  And we do too.  We're not even
9  trying to collect for them.  That's the way we always
10  go.  We're only talking about predictive.  We're only
11  talking about broadcast.  But what we have, 1100
12  calls.  I suggest that you find that when he says,
13  "you don't need to keep calling me," that's a
14  revocation.  Maybe you think, "well, that's not that
15  strong," but they have the recording, they have the
16  record.  It should be 500 calls after that, which is
17  $1100.
18       Next time when he goes, "hey, you need to
19  tell your buddies to stop calling me," maybe you find
20  a revocation there or not.  You're the finder of
21  fact.  July 2nd when he says, "I've been telling you
22  MFs to stop calling me."  There's no excuse about
23  that.  And even Mr. Troutman, when he was going
24  during his cross, he stopped there.  He went, you
25  know, he played the first one, "did you mean one

Page 541

1  payment, another payment," then he played the second
2  one.  On July 2nd, he stopped.  He wasn't going to
3  argue, "hey, we don't know what you meant."  I know
4  Mr. Walton did, but everybody knew what he meant.
5       At one point, it becomes trouble.  It becomes
6  1500.  Okay?  You heard about the stuff that he was
7  actually going through.  I mean, he kept answering --
8  I don't want you to fall into this trap of, oh, this
9  was a set-up by Morgan & Morgan or something.  I
10  mean, look.  You got with you 13 cases.  13 cases.
11  We already gave them to you.  Literally saying
12  plaintiff has no duty to mitigate because the TCPA is
13  a strict liability.  You might say, "well, why give
14  strict liability to a law like this?"  Very simple.
15  If you want to use this technology, if you want to
16  ball out and call a lot of people without employing a
17  lot of people, you run a risk.  Mr. Troutman said,
18  there's consequences.  You're going to go ahead and
19  use this predictive dialer.
20       Every day on average, Conn's leaves 18,000
21  people hanging on the phone with no one there.
22  That's what they try to accomplish.  Three percent
23  abandonment.  And they're trying to say, "we don't
24  have this automated caller," or "we don't have a
25  predictive dialer."  Of course they do.  Do the math.



**Orange Legal**
**800-275-7991**

Johnnie Williams vs Conn Appliances
Arbitration

542..545

Page 542

1 706 calls per agent per day based on their average.
2      You're going to get a chance to ask us
3 questions. Like I said, I will welcome any of the
4 issues that I just presented to you, whether it's a
5 content mutual, whether it's the decisions, because
6 Mr. Troutman gave you three decisions that are
7 against -- meaning he read you Sessions, and I will
8 tell you. In the 11th Circuit, three or four
9 decisions -- three decisions at least, they were all
10 going FCC's 2015 only stroke -- I'm sorry. ACA only
11 referred to the 2015 order.
12      It was not a very in-depth decision, but
13 Sessions did address that and say, "we don't believe
14 it." But he didn't make a final determination
15 because the case is going back. It reopened
16 discovery. The case is not resolved. That case is
17 still ongoing.
18      The other two cases, and I want to make sure
19 I differentiate them. The other two cases -- and
20 Judge Crenshaw goes into a great detail. The other
21 two cases that Mr. Troutman referred to are both
22 Ninth Circuit cases, Nevada and Arizona. And both of
23 them involve a manual clicker application. Which is
24 this. And if you remember, Mr. Walton talked about a
25 similar process. Where you will go and highlight a

Page 543

1 number and click to dial. And if they had that, we
2 wouldn't -- and you know, that might be, that's --
3 the manual calls or whatever, if that was a manual
4 call but that involved a manual clicker application.
5      No evidence was presented today that any
6 human at the time of dialing actually made the call.
7 That there was human intervention at the time the ten
8 digits were dialed. More importantly, you never
9 heard, and I've got to praise you on how many notes
10 you took during the testimony. That was incredible.
11 We probably didn't even need the court reporter. We
12 could have just used yours. No offense. But
13 anyways, but you never heard Mr. Walton say, "our
14 system is not a predictive dialer." The only thing
15 they said was, "well, we don't use this algorithm
16 portion." And as you're going to read in CB's versus
17 -- Strauss versus CB in the 2003 and every
18 definition, that might be a technical -- while the
19 technical capabilities of it. But the ability to
20 dial thousands of numbers without human intervention
21 is what the case is about.
22      So we're going to respectfully submit, and we
23 welcome any questions in the short briefing because I
24 know we have a hearing coming up soon. But thank you
25 for your time. And thank you once again to opposing

Page 544

1 Counsel and to Mr. Walton.
2      THE ARBITRATOR: All right. Thank you,
3 Mr. Gomez. Let me ask you to do this. Mr. Gomez, I
4 appreciate you handing me those cases that you have
5 relied upon in your argument. And some of those I
6 had read -- I have read. And some of the judges I am
7 acquainted with. Certainly Judge Stokes and Judge
8 Crenshaw, and I know of the arbitrator in Nashville,
9 I believe, that cited this case that y'all, I think,
10 were involved in.
11      But Mr. Troutman, could I ask you to do this,
12 could you print that PowerPoint? It was -- some of
13 it was a little distant for me, and I didn't want to
14 interrupt you to say I can't see some of those words,
15 but could you print that so that I would have that
16 material to go along with the material that Mr. Gomez
17 submitted.
18      MR. TROUTMAN: Absolutely.
19      THE ARBITRATOR: And if you want to send
20 it to me electronically, you can, or if you want to
21 -- however you want to do it. But --
22      MR. TROUTMAN: We'll do so.
23      MR. GOMEZ: Could I bother you to see if
24 you e-mail it, could I get a copy of it, too?
25      THE ARBITRATOR: Yeah.

Page 545

1      MR. TROUTMAN: Oh, yeah.
2      THE ARBITRATOR: Please share. And I
3 didn't want you to contribute any more argument about
4 it, but some of it was obviously language from
5 decisions or the statute itself and you can, you
6 know, whatever that person is, Simpson or something.
7 Yeah, I don't -- sorry. If you could send me that, I
8 would like to be able to look at that at the same
9 time as I'm looking at what's previously been
10 submitted, but also those specific cases you shared
11 with me, Mr. Gomez. Let me just see though if I --
12 and really, I'm glad I waited because I believe that
13 most, if not all, of my questions were answered.
14      One, though, is this. In Judge Crenshaw's
15 decision, I think it was something Ally --
16      MR. KERNEY: Ammons versus Ally.
17      THE ARBITRATOR: Ammons versus Ally
18 Financial, Judge Crenshaw. In the end, the Court
19 ruled that the issue of consent could not be decided
20 on summary judgment, that that was -- or withdrawal
21 of consent was a factual determination that would
22 have to be made. And of course, if this is not an
23 ATDS, we don't get there. But if we do get to the
24 point of consent, there are multiple days that might
25 have constituted withdrawal of consent. Whether you



Johnnie Williams vs Conn Appliances
Arbitration

546..549

Page 546

1  go to the March day, the May day, the July day or
2  some other days.  In these records, if that was an
3  issue and you know, y'all have done this count of
4  1100 that you've stipulated to from the March date to
5  the end, but what if the withdrawal of consent is,
6  you know, September?  Is there a way for me to count?
7          MR. GOMEZ:  I would suggest one thing.
8  And you know, of course with Counsel.  What I would
9  like to do is do this.  Mr. Walton did testify that
10  it was 900 after the July 2nd, but instead of just
11  having you look back at the transcript, I will offer,
12  and of course we will work together with all three of
13  our firms, and I will literally go the days that we
14  allege that there was a revocation and e-mail you
15  within the next -- by Friday if you allow us, what we
16  agree, maybe that, you know, because we can count the
17  dialer logs we matched up with -- the dialer logs
18  that Noble dialer provided, you could count just from
19  there.  Just how many calls are.  Or you could call
20  -- or you can count from the cell phone records.
21          If it's the July 2nd date, Mr. Walton said,
22  "I know it was 900."  And the record could reflect
23  that.  If there is any other date, we can literally
24  either try to work counting them and provide either
25  two competing ones and how we accomplish or hopefully

Page 547

1  one joint one and give it to you within 24 and 48
2  hours.
3          THE ARBITRATOR:  Well, okay.  It seems to
4  me it's the claimant's assertion that consent was
5  withdrawn.
6          MR. GOMEZ:  Correct.  Absolutely.
7          THE ARBITRATOR:  At some point.  March,
8  May, July or another day.
9          MR. GOMEZ:  Correct.
10          THE ARBITRATOR:  There are other calls
11  are more explicit.  One talks about "I would
12  appreciate it," I mean, there are different --
13          MR. GOMEZ:  Correct.
14          THE ARBITRATOR:  -- ways that things were
15  expressed that may or may not constitute consent.
16  But it seems to me that there was original consent,
17  and it's part of the claimant's position that consent
18  was withdrawn.
19          MR. GOMEZ:  Correct.
20          THE ARBITRATOR:  Could you do what you
21  just suggested --
22          MR. GOMEZ:  Absolutely.
23          THE ARBITRATOR:  -- and use the dates you
24  believe, from the possible dates --
25          MR. GOMEZ:  Correct.

Page 548

1          THE ARBITRATOR:  -- that you have shown
2  in evidence --
3          MR. GOMEZ:  Yes.
4          THE ARBITRATOR:  -- of Mr. Williams
5  withdrawal of consent and count so I don't have to
6  count.
7          MR. GOMEZ:  Absolutely.
8          MR. TROUTMAN:  Yes, sir.
9          THE ARBITRATOR:  And you guys can look at
10  that and give it consideration.  But that gets me to
11  another question which is, it possible to withdraw
12  consent and then change your mind?  And say, "I do
13  want to continue to have conversation about" --
14          MR. GOMEZ:  Absolutely.
15          THE ARBITRATOR:  -- "a program."
16          MR. GOMEZ:  Well --
17          THE ARBITRATOR:  And I don't know if you
18  can solve that for me, but --
19          MR. GOMEZ:  Okay.
20          THE ARBITRATOR:  -- is it possible to do
21  that?  I mean --
22          MR. GOMEZ:  It's -- you know, as you
23  noted, it's, you have -- there's a difference between
24  consent and expressed consent.  So for example, the
25  reason there is an explanation, when you sign that

Page 549

1  contract, you give an expressed consent --
2          THE ARBITRATOR:  Right.
3          MR. GOMEZ:  -- clearly.  When you say
4  "stop calling," if later on they call him and they
5  go, "Mr. Williams, we're going to give you A, B, C
6  and D," or whatever.  He goes, "hey, your cell phone
7  number, is it 9319?"  "Yes."  "Are we able to call
8  you or send you any automated messages, automated
9  texts," if they let him know, he goes, "yes,"
10  absolutely.  You can always re-consent.
11          You can apply for a new loan, you can -- you
12  know, you see what I'm saying?  So if you provide
13  your number in a manner that is indicating you're
14  once again giving consent, absolutely.  If simply
15  they go, "hey, we want to make sure, you know, what
16  is your date of birth?  What is your phone number?"
17  And you're identifying it or simply -- so that would
18  be a question --
19          THE ARBITRATOR:  I know.
20          MR. GOMEZ:  -- of fact.  Did he really --
21          THE ARBITRATOR:  Okay.
22          MR. GOMEZ:  -- give consent to --
23          THE ARBITRATOR:  Well, stay --
24          MR. TROUTMAN:  May I, please?
25          THE ARBITRATOR:  Sure.



Johnnie Williams vs Conn Appliances
Arbitration

Page 550

1    MR. TROUTMAN:  I've been sitting very
2 quietly --
3    THE ARBITRATOR:  No, you have.
4    MR. TROUTMAN:  -- waiting for everyone to
5 have their say, but there are a couple of things I
6 really need to address.  And that last one is really
7 important.  That is Counsel's characterization of
8 what he wished the law was.  But the real law is
9 that, absolutely consent can be re-granted any time
10 you re-provide the phone number.  That's expressed
11 consent over again.  And there's a case called
12 Lawrence v Bayview Services out of the 11th Circuit
13 that's directly on point.
14    THE ARBITRATOR:  Well, if you would like
15 to send me that one, I'll let you do that one too.
16 But let me -- back to my question.  You've answered
17 it, which is, you have the initial consent.
18    MR. GOMEZ:  Yes.
19    THE ARBITRATOR:  You have, arguably,
20 withdrawal of consent.
21    MR. GOMEZ:  Yes.
22    THE ARBITRATOR:  It seems to me there
23 could be a call that occurs after that that is -- if
24 it's used in an ATDS, is in violation of the statute.
25 But if you pick up the call and you say, "I want to

Page 551

1 make a new payment arrangement, and it will be next
2 Friday and give me a call," I mean, you know, it's
3 you could -- if it was expressed, you could once
4 again consent to the resumption of calls?
5    MR. GOMEZ:  It will be, and you will, as
6 a finder of fact --
7    THE ARBITRATOR:  I --
8    MR. GOMEZ:  -- that will make that.  I
9 think what I can do is, and hopefully Mr. Troutman
10 can agree but we'll see, I can do this.  When I send
11 you the count that we get, I'm going to circulate it
12 to Mr. Troutman, and we'll get that done before the
13 end of tomorrow.  If Mr. Troutman wants to include a
14 date and say, "we believe" -- because you might then
15 have, if you believe that re-consent and then
16 re-revocation, we will try to work defendant is
17 alleging this many calls.  Another revocation
18 to try to avoid you counting.  You clearly have the
19 records.  But you know, I mean the recordings.
20    THE ARBITRATOR:  Well --
21    MR. GOMEZ:  But what I want to do is help
22 you, so...
23    THE ARBITRATOR:  Well, I may end up
24 having the need to do it myself.  But -- and I
25 recognize that I'm creating, what is the phrase?

Page 552

1 There's a phrase in Canada, dog's breakfast.  Y'all
2 know that --
3    MR. TROUTMAN:  Dog's breakfast, that's
4 what Commissioner --
5    THE ARBITRATOR:  You know, where they put
6 all the food out for the dogs, it's just a mess.
7 Well, I realize if there was consent, withdrawal of
8 consent, some ambiguity about withdrawal of consent.
9 Consent.  Some ambiguity about re-consent.  You know,
10 now we're talking about from March to December or
11 January, of in and out, in and out, in and out.  And
12 I don't want to create that.  I don't want to create
13 the problem.  But the facts are what they are.
14    MR. KERNEY:  And I think --
15    THE ARBITRATOR:  Well, okay.  We're just
16 kind of talking.  Go ahead.
17    MR. TROUTMAN:  Let me do a couple of
18 things.  I don't want to depart too far from that,
19 that current discussion.  I will note I literally
20 offered a stipulation to this effect earlier.  It was
21 rejected --
22    THE ARBITRATOR:  Oh.
23    MR. TROUTMAN:  -- and now evidence is
24 closed, and I'm not comfortable with Counsel
25 revisiting evidence and submitting additional

Page 553

1 information.  And most importantly, along that line
2 is this Summers case, this Summers case is being
3 submitted --
4    MR. GOMEZ:  And before we move to --
5    MR. TROUTMAN:  Counsel, please.
6    THE ARBITRATOR:  But --
7    MR. GOMEZ:  But you're getting out of the
8 argument.  1100 calls were stipulated to.  I just
9 want to make sure that we don't move to another
10 argument.  We --
11    THE ARBITRATOR:  Well --
12    MR. TROUTMAN:  Eleven --
13    MR. GOMEZ:  There's a stipulation 1100
14 after March 6th --
15    MR. TROUTMAN:  Counsel, I've sat very
16 quietly and let everybody address various things
17 without saying a peep.
18    MR. GOMEZ:  Okay.
19    MR. TROUTMAN:  I need to address a couple
20 of things.
21    THE ARBITRATOR:  Okay.  We'll talk a
22 little more, and then we'll get back to what we're
23 going to do.  Go ahead.
24    MR. TROUTMAN:  So this Summers case was
25 never submitted into evidence.  And it is not an



Page 554

1  analysis of any issues.  It was a factual finding
2  that should have been submitted before close, if it
3  was going to be considered.
4         THE ARBITRATOR:  Well, I don't know how
5  it's evidence either.
6         MR. TROUTMAN:  And we --
7         THE ARBITRATOR:  I mean, look, I mean,
8  you're -- what you've submitted me in many instances,
9  most instances, are trial court decisions --
10        MR. TROUTMAN:  Correct.
11        THE ARBITRATOR:  -- and many times
12  they're not final.  And I mean, there's a lot and
13  one, the Summers is an arbitration award.
14        MR. TROUTMAN:  To complete the --
15        THE ARBITRATOR:  And you can read it and
16  you can't really tell what the underlying facts were.
17  You just have what you're likely to get from me,
18  which is an award.  Which is likely to be, you
19  know --
20        MR. TROUTMAN:  The key issue is that --
21        THE ARBITRATOR:  -- dollars.
22        MR. TROUTMAN:  -- Counsel asked you to
23  draw an inference --
24        THE ARBITRATOR:  Or not.
25        MR. TROUTMAN:  -- draw an inference

Page 555

1  factually from this award regarding willfulness.  And
2  it is important that the Arbitrator understand that
3  we have 12 rulings in our favor that Conn's won that
4  were not submitted because the evidence was closed.
5         THE ARBITRATOR:  Well --
6         MR. TROUTMAN:  So if they're going to ask
7  you to rely on this, we ought, in fairness, be able
8  to submit all of the rulings where we've won --
9         THE ARBITRATOR:  I don't think it's being
10  presented as evidence --
11        MR. TROUTMAN:  Okay.  That's fine.
12        THE ARBITRATOR:  -- I think it was
13  presented as, to what extent it is, a decision by an
14  arbitrator.
15        MR. TROUTMAN:  To the extent it's not
16  being relied upon as evidence of willful conduct --
17        THE ARBITRATOR:  No.  And see --
18        MR. TROUTMAN:  -- then that's fine.
19        THE ARBITRATOR:  -- that gets to be the
20  rest of the dog's breakfast, which is, okay, some of
21  these withdrawals of consent might be clear.  Some
22  might be ambiguous.  In one instance, conduct
23  thereafter might be willful.  In another instance, it
24  might not be willful.  These are a lot of calls.
25  1100 calls over $2600 or whatever it was amounted to

Page 556

1  be.  And there's no changing those numbers.  But at
2  what point they -- you know, where in the continuum
3  they all fall is what I'm being asked to determine.
4  And again, if this is an ATDS.
5         Okay.  So what I would like to have is your
6  screen, your PowerPoint information.  And then can
7  y'all agree to endeavor to do a count after certainly
8  the three dates that you rely upon as being
9  withdrawal of consent?
10        MR. GOMEZ:  Yeah.  There was four dates,
11  and I'll go ahead and provide those.  The March 6th.
12  Yeah, we'll go -- I'll go through and set them, I
13  mean.  Yeah.  There's the March 6th --
14        THE ARBITRATOR:  All right.
15        MR. GOMEZ:  -- the May 10th.
16        MR. KERNEY:  We'll provide you the list.
17        MR. GOMEZ:  Yeah.  We'll provide the
18  list.
19        THE ARBITRATOR:  I don't -- the record is
20  closed.  I don't want any new evidence.
21        MR. GOMEZ:  Absolutely.  No new evidence.
22  No new evidence.
23        THE ARBITRATOR:  But to enable me to wade
24  through the volume of 1100 calls by putting them --
25  by summarizing them in an orderly way after the

Page 557

1  asserted withdrawal of consent, I think would be
2  useful.  So I'm giving them the opportunity to do
3  that.  Mr. Troutman, do you want an opportunity to do
4  anything with regard to that?  I mean, you don't have
5  to -- you can think about it.
6         MR. TROUTMAN:  Yeah.  Well, I believe it
7  was their burden to have done that already.  I
8  understand that the Arbitrator is allowing them the
9  opportunity to do so now.
10        THE ARBITRATOR:  Well, I hear you.  But I
11  believe it would be my burden to count it if I chose
12  some date other than -- I mean, yes, y'all agreed
13  this was 1100 from March the 6th forward.  But I'm
14  the one that's got to go dig through records --
15        MR. TROUTMAN:  We --
16        THE ARBITRATOR:  And look, y'all -- I
17  mean, I'm trying, but you guys are fast at sorting
18  through --
19        MR. KERNEY:  Sure.
20        THE ARBITRATOR:  -- these various --
21        MR. TROUTMAN:  Yeah.  I mean --
22        THE ARBITRATOR:  -- named reports, you
23  know, and I --
24        MR. TROUTMAN:  Yeah.
25        THE ARBITRATOR:  There is some level of



Page 558

1   help, I would appreciate it.
2        MR. TROUTMAN:  We're happy to help you.
3   I mean, again, I just want it to be noted that that's
4   literally what we offered to do earlier.  And then
5   they closed evidence after denying my request to --
6   to offer to do exactly that.  In my view, they have
7   failed to make that proof.
8        THE ARBITRATOR:  Well, I don't know.
9        MR. TROUTMAN:  But I understand.
10       THE ARBITRATOR:  I don't know about all
11  your conversations about what --
12       MR. TROUTMAN:  Okay.
13       THE ARBITRATOR:  -- y'all would -- and at
14  this point, gentlemen, all I know is I've got 1100,
15  and if it turns out that withdrawal of consent is a
16  critical day, I'm trying to avoid doing my best to
17  count among records that are all totally new to me.
18  And I hope that y'all appreciate that.
19       MR. KERNEY:  Yeah.  We'll have something
20  to you by the --
21       THE ARBITRATOR:  Okay.  Let me just see
22  then.  And if you -- can we also agree that the
23  14 days doesn't begin to run until you give me that?
24       MR. KERNEY:  Yes.
25       MR. GOMEZ:  Absolutely.  And we will have

Page 559

1   it to you, if you let us know by Friday --
2        THE ARBITRATOR:  I don't care.  You can
3   take whatever time -- you've got to travel, your --
4   today is lost.  And you've got to exchange it back
5   and forth.  All I want is an understanding that the
6   14 days doesn't begin --
7        MR. GOMEZ:  Absolutely.
8        THE ARBITRATOR:  -- until it's provided
9   to me.  And also Mr. Troutman provides me his
10  PowerPoint.  And if you need to be excused, go ahead.
11  All right.  So I don't have anything further.  If --
12  was there something else about that?  All right.  But
13  do -- what would you -- what date would you like?
14  Would you like next Wednesday?  What do you want --
15       MR. GOMEZ:  We will have that to you, we
16  will have it to them, but before the end of
17  tomorrow --
18       MR. KERNEY:  Later today.  We're not
19  leaving until tomorrow.  We'll have you guys
20  something tonight.
21       MR. GOMEZ:  And we'll have it today, but
22  you're going to be traveling, just by --
23       THE ARBITRATOR:  He's in California.  Are
24  you going to California?
25       MR. TROUTMAN:  Yeah, California.  I mean,

Page 560

1   I personally am unlikely to be involved with this
2   process.  I know Stefanie Jackman is tied up, as we
3   heard.  I mean, it's unlikely anyone is going to have
4   a chance to lay eyes on it --
5        MR. GOMEZ:  Why don't we do next Tuesday?
6        MR. TROUTMAN:  -- until next week.
7        THE ARBITRATOR:  Next Tuesday's good.
8   That's a week.
9        MR. GOMEZ:  Yeah.  Let's do next Tuesday,
10  like that would give -- you know, even the weekend.
11  I mean, we work during the weekend, so it doesn't
12  matter.
13       MR. TROUTMAN:  I don't want to be
14  difficult, but since -- literally the two individuals
15  that will be responsible for this for Conn's aren't
16  here.  Can we go until next Friday at least?
17       MR. GOMEZ:  Yeah.  Well --
18       THE ARBITRATOR:  Yes.
19       MR. GOMEZ:  -- what about we go until
20  next Friday, and we'll make every attempt to get it
21  done before.
22       THE ARBITRATOR:  Yes.  I mean, it's not
23  like I'm not thinking about this.
24       MR. GOMEZ:  No, no.  Of course.
25       MR. KERNEY:  Great.

Page 561

1        THE ARBITRATOR:  Why don't we say next
2   Friday, which I believe is the -- gosh.
3        MR. GOMEZ:  Where is Stefanie when we
4   need her to Google?
5        THE ARBITRATOR:  August, are we into
6   August?  Next week.
7        MR. KERNEY:  So are you looking for the
8   date?
9        THE ARBITRATOR:  Yeah.  Next Friday.
10       MR. KERNEY:  Next Friday --
11       MR. TROUTMAN:  August 3rd, I believe.
12       MR. KERNEY:  Yes, sir.
13       THE ARBITRATOR:  Okay.  August 3rd.  And
14  it's my understanding you've submitted multiple
15  prehearing briefs, and you've had your final
16  argument.  Neither party -- side wants an opportunity
17  to submit any further --
18       MR. HILL:  No.
19       MR. GOMEZ:  No.
20       THE ARBITRATOR:  -- legal memorandum?
21       MR. GOMEZ:  No thank you.
22       THE ARBITRATOR:  Or post-hearing --
23       MR. GOMEZ:  No, thank you.
24       THE ARBITRATOR:  -- brief?
25       MR. GOMEZ:  We've spent enough time.



Johnnie Williams vs Conn Appliances
Arbitration

562..565

Page 562

1        MR. TROUTMAN:  Well, we would appreciate,
2   this Summers award does bother me.  And we do have a
3   number of competing awards that I feel in good faith
4   I ought to be able to offer at this point in exchange
5   to theirs.
6        MR. GOMEZ:  One, they even don't involve
7   us.  It's very difficult --
8        MR. TROUTMAN:  It involves Conn's.
9        MR. GOMEZ:  Correct.  But it's Conn's and
10  us.  That's Conn's and us.  We don't know who --
11       MR. TROUTMAN:  The identity of --
12       MR. GOMEZ:  -- is opposing --
13       MR. TROUTMAN:  The identity of opposing
14  Counsel doesn't matter.  The issue is that if the
15  arbitration --
16       MR. KERNEY:  You know what?  Who cares?
17  Submit them.
18       MR. TROUTMAN:  Okay.
19       MR. GOMEZ:  You know what?  Just strike
20  this.  I don't to want create even more work.  If
21  that's what it will take, just strike this.  Look,
22  what does it matter?  The evidence is what the
23  evidence is.
24       THE ARBITRATOR:  Let me say this.  I
25  couldn't possibly -- I mean, all Arbitrator Hughes

Page 563

1   did was make an award, and I'm not bound by that
2   award.
3        MR. GOMEZ:  Why don't we -- if you allow
4   us, let's just strike it.  We've given you enough
5   work.  We'll strike that.
6        THE ARBITRATOR:  Okay.
7        MR. GOMEZ:  If you don't mind.  You can
8   even give back the -- it's good enough.  And we
9   really appreciate your time and effort.  I mean,
10  clearly, you've been more than kind with us.
11       THE ARBITRATOR:  I mean, there's nothing
12  in there that's --
13       MR. GOMEZ:  No.  We appreciate --
14       MR. KERNEY:  Precedential or anything.
15  We get it.
16       MR. GOMEZ:  We appreciate it.
17       THE ARBITRATOR:  You're -- it's certainly
18  nothing in there that is -- been submitted into
19  evidence or any -- provides any precedential value
20  for this case.
21       MR. TROUTMAN:  Uh-huh.  I understand that
22  the Arbitrator knows that that's a different factual
23  record.  But again, I know my client would be upset
24  with me if I didn't --
25       THE ARBITRATOR:  No, that's fine.

Page 564

1        MR. TROUTMAN:  -- address the issue that
2   we have won other cases on this exact issue, but
3   that's fine.  I agree, they did not involve
4   Mr. Gomez.
5        MR. GOMEZ:  Okay.
6        MR. TROUTMAN:  That's also true.
7        MR. GOMEZ:  Okay.  All right.
8        THE ARBITRATOR:  Oh, okay.  All right.
9   Well, then we adjourn.
10       (WHEREUPON the arbitration concluded at
11  approximately 3:35 p.m.)

Page 565

1               C E R T I F I C A T E
2
3   STATE OF TENNESSEE
4   COUNTY OF SHELBY
5
6
7        I, CANDACE S. COVEY, Licensed Court Reporter,
8   hereby certify that I reported the foregoing
9   deposition by machine shorthand to the best of my
10  skills and abilities, and thereafter the same was
11  reduced to typewritten form by me.
12       I further certify that I am not related to
13  any of the parties named herein, nor their counsel,
14  and have no interest, financial or otherwise, in the
15  outcome of the proceedings.
16       I further certify that in order for this
17  document to be considered a true and correct copy, it
     must bear my original signature and that any
     unauthorized reproduction in whole or in part and/or
18  transfer of this document is not authorized, will not
     be considered authentic, and will be in violation of
19  Tennessee Code Annotated 39-14-104, Theft of
     Services.
20
21
22               _____
                 CANDACE S. COVEY, LCR, RPR, CRR, CVR-CM
23               Notary Public State of Tennessee
24               My Notary Commission Expires:  02/17/2021
                 LCR #145 - Expires:  6/30/2018
25

