# EXHIBIT 6

**AMERICAN ARBITRATION ASSOCIATIONCONSUMER ARBITRATION PROCESS**

| | | |
|---|---|---|
| Johnnie Williams, | : | |
| | : | |
| Claimant, | : | |
| | : | |
| v. | : | **CASE NO. 01-17-0001-5149** |
| | : | |
| Conn Appliances, Inc., | : | |
| | : | |
| Respondent. | : | |
| _____ | : | |
| | : | |

## <u>RESPONDENT'S  DISPOSITIVE MOTION</u>

Respondent Conn Appliances, Inc. ("Conn Appliances") respectfully moves to dismiss this action pursuant to Rule 33 of the American Arbitration Association's Consumer Arbitration Rules in light of the D.C. Circuit Court of Appeals' binding decision in *ACA Int'l v. FCC*, No. 15-1211, 2018 WL 1352922 (D.C. Cir. March 16, 2018) (the "ACA Opinion"). A copy of the ACA Opinion is attached as Exhibit A. Under the Hobbs Act, 28 U.S.C. § 2342, "Congress unambiguously deprived the federal district courts of jurisdiction to invalidate FCC orders by giving exclusive power of review to the courts of appeals." *Mais v. Gulf Coast Collection Bureau, Inc*., 768 F.3d 1110, 1113 (11th Cir. 2014); *see also Alpha Tech Pet, Inc. v. Lagasse, LLC*, Nos. 16 C 513; 16 C 4321, 2017 U.S. Dist. LEXIS 182499 (N.D. Ill. November 3, 2017). The ACA Opinion is therefore applicable throughout the country, not just within the DC Circuit.

To prevail on his TCPA claim, Claimant must prove that Conn Appliances' telephonic system qualifies as an automatic telephonic dialing system ("ATDS"). Claimant's expert in this matter relies on three FCC Orders to argue that Conn Appliances placed calls via an ATDS: 2003, 2008, and 2015. *See* Exhibit B, Report of Jeffrey Hansen. The ACA Opinion set aside all

three FCC Orders as they related to the definition of an ATDS. That is significant, because those three orders dispensed with the statutory requirement that a system must randomly and sequentially generate numbers to be dialed to qualify as an ATDS under the TCPA. *See* 47 U.S.C. § 227(a)(1) (defining an ATDS as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator[,] and to dial such numbers."). Thus, the statute itself now controls, and it requires random or sequential number generation, not just dialing from a stored list.

As detailed in the expert report of Dr. Adam Sorini, Conn Appliances' system is not capable of randomly or sequentially generating numbers, and then dialing those numbers. *See* Exhibit C, Report of Dr. Adam Sorini. Accordingly, it does not meet the statutory definition of an ATDS. Under the ACA Opinion, the statutory definition of an ATDS is the only governing authority in place, as the 2003, 2008, and 2015 FCC Orders have all been set aside. Conn Appliances is therefore entitled to summary judgment on the ground that it did not place any calls via an ATDS, which is an issue on which Claimant has the burden of proof.

## BACKGROUND

**I.      This Action.**

This case does not involve any telemarketing or solicitation calls. Instead, it involves calls Conn Appliances placed to its customer, Claimant Johnnie Williams, after Claimant fell behind on his payments to Conn Appliances. Moreover, the calls were placed to Claimant at the same number Claimant provided on the Retail Installment Sales Contract Claimant executed in connection with financing appliance and furniture purchases he made at a Conn Appliances retail location. *See* Exhibit D, Retail Installment Sales Contracts between Conn Appliances and Claimant.

Claimant alleges that Conn Appliances placed calls to his cell phone using an ATDS after he allegedly revoked his express written consent to receive calls from Conn Appliances. But under the TCPA, Claimant must prove that the calls were made via an ATDS, not just that he revoked consent. In light of the recent D.C. Circuit opinion, the threshold requirement of an ATDS is not met as a matter of law with regard to Conn Appliances' dialing system.

Conn Appliances' expert, Dr. Sorini, examined and tested the Noble dialing system Conn Appliances used to place calls to Claimant, and ultimately concluded that it is not an ATDS. Report of Dr. Sorini, ¶¶ 76-77. Specifically, Dr. Sorini concluded that Conn Appliances' Noble dialing system does not have the ability to randomly or sequentially generate numbers to be dialed, and that his opinion is consistent with an affidavit from the founder of Noble Systems, James K. Noble. *See id* ¶¶ 11, 55, & 76-77; see also Exhibit E, Affidavit of James K Noble. He also explained that the commands Claimant's expert believes could generate random or sequential numbers could not actually be performed on Conn Appliances' Noble dialing system. Report of Dr. Sorini¶¶ 65-76 (explaining that Hansen's commands would not generate random or sequential numbers that could be dialed by Conn Appliances' telephonic system). Finally, he demonstrated that Claimant's expert's claim that "all" computers can generate random numbers is simply incorrect. *Id.* ¶¶ 63-64.

Instead, Conn Appliances' system requires "extensive human input, feedback, and management . . . to keep the system functioning." *Id.* ¶ 32. The process starts prior to 7 AM, at which point members of the Conn Appliances Credit Systems Team manually create work cards of various numbers to call in connection with certain collection strategies from Conn Appliances' account servicing system, Latitude. The team then manually loads the work cards into Conn Appliances' Noble dialing system. *Id.* ¶¶ 28 & 33-41. Phone numbers are then dialed

from these work cards using Conn Appliances' Noble dialing system, which the Credit Systems Team constantly monitors and manages to control calls placed from the work cards. *Id.* ¶ 29. The Noble dialing system does not randomly or sequentially generates numbers to be dialed. To the contrary, it is "[o]nly after the manual loading of customer numbers as part of the overall customer account data via a set path can the Conn's call center system function." *Id.* ¶ 77.

Put simply, the "Noble software system used by Conn's is not capable of producing telephone numbers to be called using a random or sequential number generator and dialing such numbers." *Id.* ¶ 11.

## II.    The ACA Opinion

The ACA Opinion addressed various challenges to the 2015 FCC Order, which took a very broad view of the definition of an ATDS. *See In re the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, FCC 15-72, 30 F.C.C.R. 7961 (July 10, 2015), available at https://apps.fcc.gov/edocs_public/attachmatch/FCC-15-72A1.pdf. The 2015 FCC Order repeated statements from two prior FCC orders – 2003 and 2008 – that dialers that place calls from stored lists can be considered an ATDS even if they do not randomly or sequentially generate those numbers. *See* ACA Opinion, pp. 23-25.  As part of the ACA appeal, the FCC (in briefing authored under and argued by the prior administration) argued that the D.C. Circuit did not have authority to re-examine these findings because there was not a timely appeal of the 2003 and 2008 orders. *Id.* pp. 23-24.

The D.C. Circuit, however, held that it did have authority to set aside the FCC's prior opinions on whether random or sequential number generation is required for a system to be an ATDS. *Id.* p. 24. The consistent error among these three orders is that the FCC expanded the

definition of an ATDS to include systems that do not have the capability to randomly or sequentially generate numbers to be dialed. *Id.* pp. 23-25. A The D.C. Circuit, in rejecting the FCC's contradictory prior orders, pointed out the orders also appeared to require that a system be able to randomly or sequentially generate numbers in other parts of the order. *Id.*

Significantly, the D.C. Circuit held that "random or sequential" referred to *number generation*, not the manner in which numbers are dialed. *Id.* pp. 25-26. As the court reasoned, "random or sequential" cannot refer to the manner in which numbers are dialed because, at bottom, a list of numbers must be dialed in an order that is either random or sequential. *Id.* p. 24 ("Anytime phone numbers are dialed from a set list, the database of numbers must be called in *some* order – either in a random or some other sequence."). The court thus held that "the [FCC's] ruling, in describing the functions a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decisionmaking. . . . *We must therefore set aside the Commission's treatment of those matters*." *Id.* p. 29 (emphasis added).

The D.C. Circuit also set aside the 2015 FCC Order's treatment of "capacity" under the TCPA. The court framed the opinion by noting that Congress enacted the TCPA to combat "'the proliferation of intrusive, nuisance calls to [consumers'] homes from telemarketers." *Id.* p. 6 (quoting the Congressional Record). The court then held that the FCC's "expansive understanding of 'capacity' in the TCPA is incompatible with a statute grounded in concerns about hundreds of thousands of 'solicitors' making 'telemarketing' calls on behalf of tens of thousands of 'businesses.'" *Id.* p. 18. This holding is particularly significant in this matter because Claimant's expert repeatedly relies on the FCC's now-overturned expansive reading of potential capacity in his report. *See, e.g.,* Report of Mr. Hansen ¶¶ 18, 19, 23, 26-28, 31, 36-38, 41.

## ARGUMENT

The TCPA defines an ATDS as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator[,] and to dial such numbers." 47 U.S.C. § 227(a)(1). The D.C. Circuit described the requirement as follows:

> In short, the TCPA generally makes it unlawful to call a cell phone using an ATDS. And an ATDS is equipment with the "capacity" to perform each of two enumerated functions: (i) storing or producing telephone numbers "using a random or sequential number generator" and (ii) dialing those numbers.

ACA Opinion, p. 7.

This statutory definition requires that a system be able to generate phone numbers randomly or sequentially and then dial the numbers. *See Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 372-73 (3d Cir. 2015) ("we agree with the District Court's definition of 'random or sequential' number generation (i.e., the phrase refers to the numbers themselves rather than the manner in which they are dialed) and its holding that the statutory definition does in fact include such a requirement").[1] Additionally, a system that requires human intervention to place a call is not an ATDS. *See Smith v. Stellar Recovery, Inc.*, No. 15-cv-11717, 2017 WL 955128, at *3 (E.D. Mich. Mar. 13, 2017); 30 F.C.C.R. 7961 ¶ 17. And "[t]he fact that a company possesses or uses an ATDS is not sufficient to show that the company used the ATDS to call a particular person." *Carlisle v. Green Tree Servicing, LLC*, No. 1:15-cv-2332, 2016 WL 4011238, at *1 (N.D. Ga. Jul. 27, 2016) (holding that calls were not placed through an ATDS even though they

---

[1] On remand, the district court granted summary judgment to Yahoo, holding that Plaintiff presented no evidence that Yahoo used equipment to call him that had the capacity to generate random or sequential numbers and to dial those numbers. In addition, the Court excluded Hansen's opinions under the *Daubert* standard. *See Dominguez v. Yahoo!, Inc.*, CV 13-1887, 2017 WL 390267, at *1 (E.D. Pa. Jan. 27, 2017).

were placed through a system capable of making predictive calls because the calls at issue required human intervention).

As Dr. Sorini explained, and consistent with James Noble's Affidavit, Conn Appliances' Noble dialing system is not capable of randomly or sequentially generating numbers to be dialed. Report of Dr. Soirini ¶¶ 11, 55, & 76-77; Affidavit of James K. Noble. Instead, all calls are made from work lists of numbers provided by Conn Appliances' customers. The Conn Appliances Credit Systems Team manually creates each work list and loads it into the telephonic system. Then, the only numbers that are dialed are the numbers provided by customers – such as Claimant – and which the Credit Systems Team (not the dialing system) selected to be included in the work lists. The system thus does not, and is not capable of, randomly and sequentially generating numbers. Instead, it relies on numbers purposely selected by Conn Appliances employees through a manual process. Accordingly, the system is not an ATDS. *Id.*

Despite the statutory definition, Claimant's expert and counsel typically rely on the three now-defunct FCC orders from 2003, 2008, and 2015 to argue that random or sequential number generation is not required if a telephonic system can dial from a stored list. *See, e.g.,* Report of Mr. Hansen ¶¶ 18, 19, 23, 26-28, 31, 36-38, 41. As explained above, those three orders are no longer relevant, in any way, following the ACA Opinion. *See* ACA Opinion, pp. 24-27 (rejecting the FCC's expansive interpretation of an ATDS). Accordingly, the statute itself – which is "clear and unambiguous," *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 951 (9th Cir. 2009) – requires random and sequential number generation, not merely dialing from a stored list. *See Marks v. Crunch San Diego, LLC,* 55 F. Supp. 3d 1288, 1291-92 (S.D. Cal. 2014) ("If the statute meant to only require that an ATDS include any list or database of numbers, it would simply define an ATDS as a system with 'the capacity to store or produce numbers to be called';

'random or sequential number generator' would be rendered superfluous.").[2] And where statutory text is controlling, the role of a court or arbitrator is simply to apply it as written, *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,* 530 U.S. 1, 6 (2000). The text of the TCPA plainly requires random or sequential number generation for a system to be an ATDS.

Correctly limiting the definition of an ATDS to random or sequential number generation "using a random or sequential number <u>generator</u>" not only is compelled under the text of the TCPA, it is also consistent with its legislative history. As the D.C. Circuit emphasized, the TCPA was designed to combat unwanted *telemarketing* calls. *See, e.g.,* ACA Opinion pp. 6-7 & 18. Unlike creditors attempting to reach their customers, telemarketers have historically used random or sequential number generators as their intention is to reach as many *potential* customers as possible. For example, the patent Hansen cites in his report as being an early example of an ATDS – US Patent No. 3943289 – describes a system telemarketers would use to generate and dial sequential numbers. *See* Report of Dr. Sorini ¶¶ 59-61. Telemarketers – particularly unscrupulous telemarketers – need to reach as many people as possible to pitch their products or services. Random or sequential number generation can accomplish that goal.

When creditors seek to place account administration calls to their customers, by contrast, random or sequential number generation makes no sense. If you are trying to collect money John Smith – or Johnnie Williams – owes you, you would call John Smith at the number he provided. You would not randomly generate numbers and dial them until you happen to hit upon John Smith's number. If each digit in a phone number is generated randomly, there are 10 billion different possible sets of phone numbers ($10^{10}$). You would not randomly or sequentially dial

---

[2] *Marks* is currently on appeal to the Ninth Circuit, but the appeal was stayed pending resolution of the ACA Opinion.

10 billion possible combinations of 10-digit numbers in hopes of dialing the number John Smith gave you on his credit application! Thus, it is no surprise that Conn Appliances does not use a system that even remotely resembles the one described in the patent for a sequential number generator or some other system that relies on a random or sequential number generator. *See id.* ¶ 61 ("Conn's call center system is a completely different type of system, since it does not have the capability to generate and call sequential telephone numbers.").

Given the congressional goal of limiting unwanted robocalls from telemarketers, prohibiting calls placed via systems that randomly or sequentially generate numbers also makes intuitive sense. It is improper to read the random or sequential number generation requirement out of the TCPA, as both the congressional intent and the language of the statute mandate it. If courts or the FCC believe a broader set of dialing systems should be regulated, the proper remedy is for Congress to amend the statute, not "re-interpret" it to mean something wholly different than the congressional language and purpose. *See Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718, 1724-25 (2017) (rejecting an effort to expand the definition of "debt collector" to include "debt buyer" based on changes within the collections industry between when the Fair Debt Collection Practices Act was enacted in 1977 and when the case was decided in 2017). As the Supreme Court held, "while it is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question that, on everyone's account, it never faced." *Id.* at 1725.

Justice Gorsuch's reasoning for a unanimous Supreme Court in *Henson* applies equally to Claimant's and his expert's arguments here. In 1991, Congress enacted a specific, clearly worded statute to address a specific issue – telemarketing calls to randomly or sequentially generated

telephone numbers. It would be "quite a lot of speculation," *id.* at 1725, to speculate as to whether that same Congress would have wanted to also ban calls to current customers from a list of numbers compiled by inputting a phone number provided by the customers themselves. The D.C. Circuit rejected the FCC's attempt to do so; it would be improper for the Arbitrator to reach a contrary decision here.

Moreover, reading the statute to define equipment as an ATDS if it merely "store[s] or produce[s] telephone numbers" contradicts the phrase "using a random or sequential number generator." Doing so would have the absurd result of including even personal cellular telephones as an ATDS, a proposition the D.C. Circuit rejected, as all cell phones contain lists of numbers (or at least the potential to have a list of numbers) from which the user can place calls.

The D.C. Circuit also held that the statutory "random and sequential" requirement applies to generating numbers, not the manner in which numbers are dialed. ACA Opinion pp. 25-26. Thus, it is not enough that a list of numbers be dialed in a random or sequential fashion. The numbers have to actually be *generated* randomly or sequentially to meet the statutory definition.

In the event the Arbitrator declines Claimant's expert's invitation to re-write the TCPA to remove the random or sequential number generation requirement, he boldly asserts that "all computers can generate random . . . numbers." As Dr. Sorini concisely points out, "[t]his is incorrect." Report of Dr. Sorini ¶ 64. Indeed, "many computer systems can operate without the ability to generate random numbers." *Id.* Dr. Sorini then demonstrates that all computers cannot generate random or sequential numbers using the commands Hansen includes in his report. *Id.* ¶¶ 65-76. In fact, the Noble software Conn Appliances licenses for its telephonic system is not capable of generating random or sequential numbers in the manner Hansen describes. *Id.* ¶¶ 70-71; 76-77.

Indeed, nowhere in Hansen's report does he even purport to show a way in which the telephonic and computer systems used by Conn Appliances can generate random or sequential numbers and then dial them. Instead, he relies solely on his false claim that "all" computer systems have this capacity. Moreover, even if Hansen was correct that all computers can randomly or sequentially generate numbers, the Arbitrator could not rely on it to find Conn Appliances' system is an ATDS, because the D.C. Circuit held that the TCPA cannot be so broad as to encompass devices in widespread, regular usage such as cellular telephones. *See* ACA Opinion p. 19 ("Nothing in the TCPA countenances concluding that Congress could have contemplated the applicability of the statute's restrictions to the most commonplace phone device used every day by the overwhelming majority of Americans.").

Accordingly, nothing in the current, post-ACA Opinion state of the law supports a finding that Conn Appliances called Claimant via an ATDS. Conn Appliances placed calls to Claimant via a process that involves significant human intervention. It did not place calls to Claimant via a random or sequential number generator, nor does it have the capacity to place calls using random or sequential number generation. Report of Dr. Sorini ¶¶ 11, 55, 76-77. Claimant's claim should therefore be dismissed, and an award entered in favor of Conn Appliances.

Claimant will likely claim that language on page 27 of the ACA Opinion arguably permits the FCC to issue a new order that dispenses with the random or sequential number generation requirement found in the text of the statute. Conn Appliances maintains that if the FCC attempted to do so, it would be rejected under *Henson* and the ACA Opinion. More fundamentally, however, speculation as to what the FCC *might* be permitted to do in the *future* does not inform the current state of the TCPA, which consists of the plain language of the

statute. Such speculation also seems unlikely to materialize, as the current Chairman of the FCC

– Ajit Pai – dissented from the 2015 FCC Order as follows:

> As three separate petitions explain, trial lawyers have sought to apply this prohibition to equipment that *cannot* store or produce telephone numbers to be called using a random or sequential number generator and that *cannot* dial such numbers.
>
> That position is flatly inconsistent with the TCPA.  The statute lays out two things that an automatic telephone dialing system must be able to do or, to use the statutory term, must have the "capacity" to do. If a piece of equipment cannot do those two things—if it *cannot* store or produce telephone numbers to be called using a random or sequential number generator and if it *cannot* dial such numbers—then how can it possibly meet the statutory definition? It cannot. To use an analogy, does a one-gallon bucket have the capacity to hold two gallons of water?  Of course not.
>
> That's long been the FCC's approach. When the Commission first interpreted the statute in 1992, it concluded that the prohibitions on using automatic telephone dialing systems "clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services[], because the numbers called *are not generated in a random or sequential fashion*." Indeed, in that same order, the Commission made clear that calls not "dialed using a random or sequential number generator" "are not autodialer calls."

*See* Exhibit F, Dissenting Statement of Commissioner Ajit Pai, p. 3.

If speculation as to how the FCC might rule were appropriate, which it is not, Chairman

Pai's view that random or sequential number generation is required likely provides the best

guidance. And under his view, Conn Appliances did not place calls via an ATDS.

Commissioner O'Reilly's recent press release further undercuts the possibility that the

FCC is poised to adopt another expansive reading of an ATDS. In it, he states that the ACA

decision "will not lead to more illegal robocalls *but instead remove unnecessary and

inappropriate liability concerns for legitimate companies trying to reach their customers who

want to be called*." Exhibit G, Statement of Commissioner Michael O'Reilly on D.C. Circuit

TCPA Decision (emphasis added). This statement is fully consistent with limiting the TCPA to

the Congressional focus on calls to randomly or sequentially generated numbers rather than expanding it to include calls placed by creditors to their customers.

<u>**CONCLUSION**</u>

A key issue in this action is the definition of an ATDS and whether Conn Appliances placed calls to Claimant using such a device. Conn Appliances originally requested a postponement of the hearing so that the Arbitrator and Parties would have the benefit of the D.C. Circuit's decision in the ACA Proceeding. That decision has now been rendered, and it set aside the expansive FCC orders on which Claimant and his expert rely, leaving the actual text of the TCPA as the only governing law. Because the TCPA's statutory text plainly requires that a system randomly or sequentially generate numbers to be dialed to qualify as an ATDS, and Conn Appliances' Noble dialing system does not (and cannot) perform these functions, an award dismissing Claimant's TCPA claim is appropriate.

Dated:  March 23, 2018

*s/ Stefanie H. Jackman*
Stefanie H. Jackman
Georgia Bar No. 335652
Daniel L. Delnero
Georgia Bar No. 347766
BALLARD SPAHR LLP
999 Peachtree Street, Suite 1000
Atlanta, GA 30309
Telephone: 678.420.9300
Facsimile: 678.420.9301
jackmans@ballardspahr.com
delnerod@ballardspahr.com

*Counsel for Respondent*

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 19, 2016              Decided March 16, 2018

No. 15-1211

ACA INTERNATIONAL, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

CAVALRY PORTFOLIO SERVICES, LLC, ET AL.,
INTERVENORS

---

Consolidated with 15-1218, 15-1244, 15-1290, 15-1304,
15-1306, 15-1311, 15-1313, 15-1314, 15-1440, 15-1441

---

On Petitions for Review of an Order of
the Federal Communications Commission

---

*Shay Dvoretzky* argued the cause for petitioners ACA
International, et al.  With him on the joint briefs were *Helgi
C. Walker*, *Monica S. Desai*, *Amy L. Brown*, *Jonathan Jacob
Nadler*, *Christopher J. Wright*, *Jennifer P. Bagg*, *Elizabeth
Austin Bonner*, *Robert A. Long*, *Yaron Dori*, *Brian Melendez*,
*Tonia Ouellette Klausner*, *Keith E. Eggleton*, *Kate Comerford*

EXHIBIT A

2

*Todd*, *Steven P. Lehotsky*, and *Warren Postman*. *Lindsay S. See* entered an appearance.

*Charles R. Messer*, pro se, was on the brief for *amicus curiae* Charles R. Messer in support of ACA International's petition.

*Paul Werner* argued the cause for petitioner Rite Aid Hdqtrs. Corp. With him on the briefs was *Brian Weimer*.

*Thomas C. Mugavero*, *Steven A. Augustino*, *Jonathan E. Paikin*, *Jonathan G. Cedarbaum*, *Blaine C. Kimrey*, and *Bryan K. Clark* were on the joint briefs for intervenors MRS BPO LLC, et al. in support of petitioners.

*Don L. Bell*, *II* was on the brief for *amicus curiae* The National Association of Chain Drug Stores, Inc. in support of petitioner Rite Aid Hdqtrs. Corp.

*H. Russell Frisby*, *Jr.*, *Harvey L. Reiter*, *Aryeh Fishman*, *Michael Murray*, and *Jay Morrison* were on the brief for *amici curiae* American Gas Association, et al. in support of petitioners.

*Charles H. Kennedy* was on the brief for *amici curiae* The American Bankers Association, Credit Union National Association and The Independent Community Bankers of America in support of petitioners.

*Andrew B. Clubok*, *Susan E. Engel*, and *Devin S. Anderson* were on the brief for *amicus curiae* The Internet Association in support of petitioners.

*Joseph R. Palmore* and *Seth W. Lloyd* were on the brief for *amici curiae* Retail Litigation Center, Inc., National Retail

3

Federation, and National Restaurant Association in support of petitioners.

*Bryan N. Tramont* and *Russell P. Hanser* were on the brief for *amicus curiae* CTIA-The Wireless Association in support of petitioners.

*Eric J. Troutman* was on the brief for *amici curiae* American Financial Services Association, Consumer Mortgage Coalition, and Mortgage Bankers Association in support of petitioners. *Jan T. Chilton* and *Kerry W. Franich* entered appearances.

*Amy M. Gallegos* was on the brief for *amicus curiae* Communication Innovators in support of petitioners.

*Scott M. Noveck*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *William J. Baer*, Assistant Attorney General, U.S. Department of Justice, *Kristen C. Limarzi*, *Steven J. Mintz*, Attorneys, *Jonathan B. Sallet*, General Counsel, Federal Communications Commission, *David M. Gossett*, Deputy General Counsel, and *Jacob M. Lewis*, Associate General Counsel.

*Craig L. Briskin* and *Julie Nepveu* were on the brief for *amici curiae* National Consumer Law Center, et al. in support of the Federal Communications Commission 2015 Omnibus Declaratory Ruling and Order.

*Marc Rotenberg* and *Alan Butler* were on the brief for *amici curiae* Electronic Privacy Information Center (EPIC) and Six Consumer Privacy Organizations in support of respondents.

4

Before:  SRINIVASAN and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge.*

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*:  Unwanted robocalls are an all-too-familiar phenomenon.  For years, consumers have complained to the Federal Communications Commission about automated telemarketing calls and text messages that they did not seek and cannot seem to stop.

Congress sought to address consumers' concerns with undesired robocalls in the Telephone Consumer Protection Act of 1991.  The TCPA generally prohibits the use of certain kinds of automated dialing equipment to call wireless telephone numbers absent advance consent.  The Act vests the Commission with authority to implement those restrictions.

In this case, a number of regulated entities seek review of a 2015 order in which the Commission sought to clarify various aspects of the TCPA's general bar against using automated dialing devices to make uninvited calls.  The challenges encompass four issues addressed by the agency's order:  (i) which sorts of automated dialing equipment are subject to the TCPA's restrictions on unconsented calls; (ii) when a caller obtains a party's consent, does a call nonetheless violate the Act if, unbeknownst to the caller, the consenting party's wireless number has been reassigned to a different person who has not given consent; (iii) how may a consenting party revoke her consent; and (iv) did the Commission too narrowly fashion an exemption from the TCPA's consent requirement for certain healthcare-related calls.

5

We uphold the Commission's approach to revocation of consent, under which a party may revoke her consent through any reasonable means clearly expressing a desire to receive no further messages from the caller.  We also sustain the scope of the agency's exemption for time-sensitive healthcare calls.

We set aside, however, the Commission's effort to clarify the types of calling equipment that fall within the TCPA's restrictions.  The Commission's understanding would appear to subject ordinary calls from any conventional smartphone to the Act's coverage, an unreasonably expansive interpretation of the statute.  We also vacate the agency's approach to calls made to a phone number previously assigned to a person who had given consent but since reassigned to another (nonconsenting) person.  The Commission concluded that calls in that situation violate the TCPA, apart from a one-call safe harbor, regardless of whether the caller has any awareness of the reassignment.  We determine that the agency's one-call safe harbor, at least as defended in the order, is arbitrary and capricious.

We therefore grant the petitions for review in part and deny them in part.

I.

The federal government's efforts to combat unwanted robocalls have spanned nearly three decades, involving two federal agencies and a number of congressional enactments. In the Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994, 15 U.S.C. § 6101 *et seq.*, Congress empowered the Federal Trade Commission to regulate the telemarketing industry.  The FTC's measures include a general bar against calling any telephone number on the "do-

6

not-call registry" without consent or an established business relationship.  16 C.F.R. § 310.4(b)(1)(iii)(B); *see* 15 U.S.C. § 6151(a).  This case does not concern the FTC's initiatives.

This case instead concerns the Federal Communications Commission's efforts to combat unwanted robocalls pursuant to its authority under the TCPA.  Some of the Commission's restrictions on telemarketing calls mirror measures established by the FTC.  *Compare* 16 C.F.R. §§ 310.4(b)(1)(iii)(B), 310.4(c), *with* 47 C.F.R. § 64.1200(c).  But the agencies' initiatives also differ in various respects.  Of relevance here, only the TCPA specifically restricts the use of an "automatic telephone dialing system" to make calls.  47 U.S.C. § 227(b)(1)(A).  Petitioners challenge the Commission's interpretation and implementation of various TCPA provisions pertaining to automated dialing equipment.

## A.

Congress enacted the TCPA in 1991 based on findings that the "use of the telephone to market goods and services to the home and other businesses" had become "pervasive due to the increased use of cost-effective telemarketing techniques." 47 U.S.C. § 227 note, Pub. L. No. 102-243, § 2(1), 105 Stat. 2394, 2394.  "Many consumers," Congress determined, "are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers."  *Id.* § 2(6)-(7).

The TCPA restricts calls both "to any residential telephone line" and to "any telephone number assigned to a . . . cellular telephone service."  47 U.S.C. § 227(b)(1)(A)(iii), (B).  This case solely concerns the latter restrictions on telephone calls to wireless numbers.

7

Congress, in that regard, made it "unlawful . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service," "unless such call is made solely to collect a debt owed to or guaranteed by the United States." *Id*. § 227(b)(1)(A)(iii). The statute defines an "automatic telephone dialing system" (ATDS, or autodialer) as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* § 227(a)(1).

In short, the TCPA generally makes it unlawful to call a cell phone using an ATDS. And an ATDS is equipment with the "capacity" to perform each of two enumerated functions: (i) storing or producing telephone numbers "using a random or sequential number generator" and (ii) dialing those numbers. The general prohibition on autodialer calls to wireless numbers is subject to three exceptions. The central exception for purposes of this case is for calls made with "prior express consent." There are also exceptions for emergency calls and calls made to collect government debts.

The TCPA vests the Commission with responsibility to promulgate regulations implementing the Act's requirements. *Id.* § 227(b)(2). The Act also grants the Commission specific authority to fashion exemptions from the general prohibition on autodialer calls to wireless numbers, where the calls are "not charged to the called party." *Id.* § 227(b)(2)(C). As Congress explained, the FCC "should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy." *Id.* § 227 note, Pub. L. No. 102-243, § 2(13), 105 Stat. 2394, 2395.

8

Since the TCPA's enactment, the FCC has issued a series of rulemakings and declaratory rulings addressing the Act's reach. In 2003, for instance, the agency concluded that the statute's restrictions on "mak[ing] any call" using an ATDS encompass the sending of text messages. *See* In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (2003 Order), 18 FCC Rcd. 14,014, 14,115 ¶ 165 (2003).

The Act contains a private right of action permitting aggrieved parties to recover at least $500 in damages for each call made (or text message sent) in violation of the statute, and up to treble damages for each "willful[] or knowing[]" violation. 47 U.S.C. § 227(b)(3). There is no cap on the amount of recoverable damages. The Commission has noted a surge in TCPA lawsuits (including class actions) in recent years, likely attributable in part to the "skyrocketing growth of mobile phones." In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (2015 Declaratory Ruling), 30 FCC Rcd. 7961, 7970 ¶¶ 6-7 (2015).

B.

In a Declaratory Ruling and Order issued in 2015, the Commission (with two Commissioners dissenting) addressed 21 separate petitions for rulemaking or requests for clarification. In this court, petitioners and intervenors seek review of four aspects of the Commission's order.

*First*, the Commission sought to clarify which devices for making calls qualify as an ATDS—i.e., equipment that "has the capacity" to "store or produce telephone numbers to be called, using a random or sequential number generator," and "to dial such numbers." 47 U.S.C. § 227(a)(1). With regard

9

to whether equipment has the "capacity" to perform the enumerated functions, the Commission declined to define a device's "capacity" in a manner confined to its "present capacity."    Instead, the agency construed a device's "capacity" to encompass its "potential functionalities" with modifications such as software changes.  2015 Declaratory Ruling, 30 FCC Rcd. at 7974 ¶ 16.

The Commission also addressed the precise functions that a device must have the capacity to perform for it to be considered an ATDS.    The Commission reaffirmed prior orders deciding that "predictive dialers"—equipment that can dial automatically from a given list of telephone numbers using algorithms to predict "when a sales agent will be available"—qualify as autodialers.  *Id.* at 7972 ¶ 10 & n.39. The Commission further explained that a "basic function[]" of an autodialer is to "dial numbers without human intervention."  *Id.* at 7975 ¶ 17.  At the same time, the Commission also declined to "clarify[] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention."  *Id.* at 7976 ¶ 20.

*Second*, the Commission spoke to whether, and when, a caller violates the TCPA by calling a wireless number that has been reassigned from a consenting party to another person without the caller's knowledge.  The Act specifically permits autodialer calls "made with the prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A).  If the "called party" for those purposes refers to the *intended* recipient of a call or message, a caller would face no liability when using an ATDS to call a number believed to belong to a consenting party, even if the number in fact has been reassigned to another person who has not consented.

10

The Commission, though, determined that the term "called party" refers not to "the intended recipient of a call" but instead to "the current subscriber" (i.e., the current, nonconsenting holder of a reassigned number rather than a consenting party who previously held the number). 2015 Declaratory Ruling, 30 FCC Rcd. at 7999 ¶ 72. But the Commission did not hold a caller strictly liable when unaware that the consenting party's number has been reassigned to another person. Instead, the agency allowed one—and only one—liability-free, post-reassignment call for callers who lack "knowledge of [the] reassignment" and possess "a reasonable basis to believe that they have valid consent." *Id.* at 8000 ¶ 72.

*Third*, the Commission clarified the ways in which a consenting party can revoke her consent to receive autodialer calls. The Commission decided that callers may not unilaterally designate the acceptable means of revocation. It also declined to prescribe its own set of mandatory revocation procedures. Rather, it concluded that "a called party may revoke consent at any time and through any reasonable means"—whether orally or in writing—"that clearly expresses a desire not to receive further messages." *Id.* at 7989-90 ¶ 47; *id.* at 7996 ¶ 63.

*Fourth*, and finally, the Commission exempted from the autodialer provision's consent requirement certain calls to wireless numbers "for which there is exigency and that have a healthcare treatment purpose." *Id.* at 8031 ¶ 146. It declined, however, to give the exemption the reach desired by certain parties that are in the business of healthcare-related marketing calls.

We will take up the challenges to those four aspects of the Commission's 2015 ruling in the same order.

11

II.

Under the Administrative Procedure Act, we assess whether the Commission's challenged actions in its 2015 order were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We review the lawfulness of the Commission's interpretations of the TCPA using the two-step *Chevron* framework. That inquiry calls for examining whether "Congress has directly spoken to the precise question at issue," and, if not, whether "the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

To be lawful, the Commission's challenged actions must also satisfy the Administrative Procedure Act's requirement that they not be arbitrary or capricious. Arbitrary-and-capricious review includes assuring that the agency "engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Review of agency action for arbitrariness and capriciousness sometimes entails essentially the same inquiry as review of an agency's exercise of statutory interpretation under *Chevron*'s second step. *See id.* at 52 n.7; *Agape Church, Inc. v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013).

Applying those standards to petitioners' four sets of challenges to the Commission's 2015 Declaratory Ruling, we set aside the Commission's explanation of which devices qualify as an ATDS, as well as its understanding of when a caller violates the Act by calling a wireless number previously held by a consenting party but reassigned to a person who has not given consent. We sustain, however, the Commission's ruling that a party can revoke consent through any reasonable means clearly expressing a desire to receive no further calls or

12

texts, and we also uphold the scope of the Commission's exemption for time-sensitive, healthcare-related calls.

## A.

We first consider the Commission's effort to clarify which sorts of calling equipment qualify as an ATDS so as to fall subject to the general prohibition against making calls using such a device without consent. The statute defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C § 227(a)(1). That definition naturally raises two questions: (i) when does a device have the "capacity" to perform the two enumerated functions; and (ii) what precisely are those functions? We conclude that the Commission's approach to those two questions cannot be sustained, at least given the Commission's unchallenged assumption that a call made with a device having the capacity to function as an autodialer can violate the statute even if autodialer features are not used to make the call.

## 1.

a. In addressing what it means for equipment to have the "capacity" to perform the autodialer functions enumerated in the statute, the Commission rejected the arguments of various parties that a device's capacity must be measured solely by reference to its "present capacity" or its "current configuration" without any modification. 2015 Declaratory Ruling, 30 FCC Rcd. at 7974 ¶ 16. The Commission instead determined that the "capacity" of calling equipment "includes its potential functionalities" or "future possibility," not just its "present ability." *Id.* at 7974 ¶ 16; *id.* at 7975 ¶ 20.

13

The Commission reasoned that the "functional capacity of software-controlled equipment is designed to be flexible, both in terms of features that can be activated or de-activated and in terms of features that can be added to the equipment's overall functionality through software changes or updates." *Id.* at 7974 ¶ 16 n.63. And the Commission found support for its "potential functionalities" approach in dictionary definitions of the term "capacity," one of which is "the potential or suitability for holding, storing, or accommodating." *Id.* at 7975 ¶ 19 (quoting *Capacity*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/capacity (as visited May 18, 2015)).

In challenging the Commission's approach, petitioners argue that the term "capacity" in the statutory definition of an ATDS can refer only to a device's "present ability," i.e., its current and unmodified state, not its "potential ability" taking into account possible upgrades or modifications. It is far from clear, though, that labels such as "present" ability versus "potential" ability should carry dispositive weight in assessing the meaning of the statutory term "capacity." After all, even under the ostensibly narrower, "present ability" interpretation advanced by petitioners, a device that "presently" (and generally) operates as a traditional telephone would still be considered have the "capacity" to function as an ATDS if it could assume the requisite features merely upon touching a button on the equipment to switch it into autodialer mode. Virtually any understanding of "capacity" thus contemplates some future functioning state, along with some modifying act to bring that state about.

Consequently, the question whether equipment has the "capacity" to perform the functions of an ATDS ultimately turns less on labels such as "present" and "potential" and more on considerations such as how much is required to

14

enable the device to function as an autodialer:  does it require the simple flipping of a switch, or does it require essentially a top-to-bottom reconstruction of the equipment?      And depending on the answer, what kinds (and how broad a swath) of telephone equipment might then be deemed to qualify as an ATDS subject to the general bar against making any calls without prior express consent?

b.      Here, the Commission adopted an expansive interpretation of "capacity" having the apparent effect of embracing any and all smartphones:  the device routinely used by the vast majority of citizens to make calls and send messages (and for many people, the sole phone equipment they own).  It is undisputed that essentially any smartphone, with the addition of software, can gain the statutorily enumerated features of an autodialer and thus function as an ATDS.  The Commission in its ruling did not question the observation of a dissenting Commissioner that "[i]t's trivial to download an app, update software, or write a few lines of code that would modify a phone to dial random or sequential numbers."  2015 Declaratory Ruling, 30 FCC Rcd. at 8075 (Comm'r Pai, dissenting).  The Commission itself noted that "[d]ialing options" are now "available via smartphone apps" that enable "[c]alling and texting consumers *en masse*."  *Id.* at 7970 ¶ 7.

The Commission's ruling concluded that app downloads and other software additions of that variety—and the enhanced functionality they bring about—are appropriately considered to be within a device's "capacity."  The ruling states that equipment's "functional capacity" includes "features that can be added . . . through software changes or updates."  *Id.* at 7974 ¶ 16 n.63.  As a result, "a piece of equipment can possess the requisite 'capacity' to satisfy the statutory definition of an 'autodialer' even if, for example, it

15

requires the addition of software to actually perform the functions described in the definition." *Id.* at 7975 ¶ 18. The Commission reinforced the point in an example set forth in its brief in this case: "If I ask whether the Firefox browser has the 'capacity' to play Flash videos, it would be natural for you to answer 'Yes, if you download the Flash plug-in'—and it would be incorrect for you to answer 'No.'" FCC Br. 29.

If a device's "capacity" includes functions that could be added through app downloads and software additions, and if smartphone apps can introduce ATDS functionality into the device, it follows that all smartphones, under the Commission's approach, meet the statutory definition of an autodialer. The Commission's ruling does not deny that conclusion.

To the contrary, a number of parties specifically argued to the agency "that a broad interpretation of 'capacity' could potentially sweep in smartphones because they may have the capacity to store telephone numbers to be called and to dial such numbers through the use of an app or other software." 2015 Declaratory Ruling, 30 FCC Rcd. at 7976 ¶ 21. Rather than resist that contention, the Commission assumed its correctness, responding that, even if smartphones qualify as autodialers, it was unclear to the Commission that the "typical use of smartphones" would be "likely" to give rise to "unwanted calls" of a kind producing "legal action." *Id.* at 7977 ¶ 21. A dissenting Commissioner read that portion of the Commission's order to "acknowledge[] that smartphones are swept in under its reading," such that "each and every smartphone . . . is an automatic telephone dialing system." *Id.* at 8075 & n.576 (Comm'r Pai, dissenting). The Commission did not disagree or suggest otherwise.

16

c.   If every smartphone qualifies as an ATDS, the statute's restrictions on autodialer calls assume an eye-popping sweep.  Recall that the statute generally bars the use of an ATDS to make any call (or send any text message) without prior express consent, and tags each violation with a minimum $500 penalty in damages for each individual recipient of each prohibited call or message.  The reach of the statute becomes especially pronounced upon recognizing that, under the Commission's approach, an uninvited call or message from a smartphone violates the statute even if autodialer features were not used to make the call or send the message.  *Id.* at 7976 ¶ 19 n.70.  We explore that interpretive issue in greater depth below (*infra* § II.A.3); but for now, it suffices to appreciate the Commission's understanding that, as long as equipment has the "capacity" to function as an autodialer—as is true of every smartphone under the agency's view—*any* uninvited call or message from the device is a statutory violation.

Imagine, for instance, that a person wishes to send an invitation for a social gathering to a person she recently met for the first time.  If she lacks prior express consent to send the invitation, and if she obtains the acquaintance's cell phone number from a mutual friend, she ostensibly commits a violation of federal law by calling or sending a text message from her smartphone to extend the invitation.  *See* 2015 Declaratory Ruling, 30 FCC Rcd. at 8076 (Comm'r Pai, dissenting).  And if she sends a group message inviting ten people to the gathering, again without securing prior express consent from any of the recipients, she not only would have infringed the TCPA ten distinct times but would also face a minimum damages recovery against her of $5,000.

Those sorts of anomalous outcomes are bottomed in an unreasonable, and impermissible, interpretation of the

17

statute's reach.   The TCPA cannot reasonably be read to render every smartphone an ATDS subject to the Act's restrictions, such that every smartphone user violates federal law whenever she makes a call or sends a text message without advance consent.

A "significant majority of American adults" owned a smartphone even by 2013.  *Riley v. California*, 134 S. Ct. 2473, 2484 (2014).  And as of the end of 2016, nearly 80% of American adults had become smartphone owners.  *See 10 Facts About Smartphones as the iPhone Turns 10*, Pew Research Ctr., June 28, 2017, http://www.pewresearch.org/fact-tank/2017/06/28/10-facts-about-smartphones (last visited Dec. 18, 2017).  That figure will only continue to grow, and increasingly, individuals own no phone equipment other than a smartphone.  *See id.*; *Wireless Substitution: Early Release of Estimates From the National Health Interview Survey, January–June 2017*, Nat'l Ctr. for Health Statistics 1 (Dec. 2017), https://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless2017 05.pdf.

It is untenable to construe the term "capacity" in the statutory definition of an ATDS in a manner that brings within the definition's fold the most ubiquitous type of phone equipment known, used countless times each day for routine communications by the vast majority of people in the country. It cannot be the case that every uninvited communication from a smartphone infringes federal law, and that nearly every American is a TCPA-violator-in-waiting, if not a violator-in-fact.

In that regard, it is notable that Congress, in its findings setting forth the basis for the statute, found that some "30,000 businesses actively telemarket goods and services to business

18

and residential customers" and "[m]ore than 300,000 solicitors call more than 18,000,000 Americans every day." 47 U.S.C. § 227 note, Pub. L. No. 102-243, § 2(2)-(3), 105 Stat. 2394, 2394. Those sorts of predicate congressional findings can shed substantial light on the intended reach of a statute. *See Sutton v. United Airlines, Inc.*, 527 U.S. 471, 484-87 (1999).

Of course, there is no expectation that a statute's reach necessarily will precisely match Congress's findings about a problem it aims to address, and Congress might well fashion a statute's operative provisions with built-in flexibility to accommodate expansion of the concerns animating the legislation over time. But a several-fold gulf between congressional findings and a statute's suggested reach can call into doubt the permissibility of the interpretation in consideration.

That is what happened in *Sutton*. There, the Supreme Court rejected an interpretation of the term "disability" in the Americans with Disabilities Act that would have treated some 160 million persons as disabled in the face of congressional findings contemplating the population of disabled persons as numbering only 43 million. *See id.*; *id.* at 494-95 (Ginsburg, J., concurring). (After *Sutton*, Congress amended the statutory findings and the statute to allow for an expansive application. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2, 122 Stat. 3553, 3554.)

Here, as in *Sutton*, the Commission's expansive understanding of "capacity" in the TCPA is incompatible with a statute grounded in concerns about hundreds of thousands of "solicitors" making "telemarketing" calls on behalf of tens of thousands of "businesses." The Commission's interpretation would extend a law originally aimed to deal with hundreds of

19

thousands of telemarketers into one constraining hundreds of millions of everyday callers.

The Commission's capacious understanding of a device's "capacity" lies considerably beyond the agency's zone of delegated authority for purposes of the *Chevron* framework. As we have explained, "even if the [statute] does not foreclose the Commission's interpretation, the interpretation [can] fall[] outside the bounds of reasonableness" at *Chevron*'s second step. *Goldstein v. SEC*, 451 F.3d 873, 880-81 (D.C. Cir. 2006). That is because an "agency['s] construction of a statute cannot survive judicial review if a contested regulation reflects an action that exceeds the agency's authority." *Id.* (quoting *Aid Ass'n for Lutherans v. United States Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003)).

In *Aid Ass'n*, for example, we examined Postal Service regulations that excluded nonprofit organizations' use of certain reduced postage rates. We found the regulations to be incompatible with congressional intent. The regulations, we said, "constitute an impermissible construction of the statute under *Chevron* Step Two because the interpretation is utterly unreasonable in the breadth of its regulatory exclusion." 321 F.3d at 1178.

In this case, similarly, the Commission's interpretation of the term "capacity" in the statutory definition of an ATDS is "utterly unreasonable in the breadth of its regulatory [in]clusion." *Id.* Nothing in the TCPA countenances concluding that Congress could have contemplated the applicability of the statute's restrictions to the most commonplace phone device used every day by the overwhelming majority of Americans.

20

The Commission suggested in its ruling that, unless "capacity" reached so broadly, "little or no modern dialing equipment would fit the statutory definition." 2015 Declaratory Ruling, 30 FCC Rcd. at 7976 ¶ 20. But Congress need not be presumed to have intended the term "automatic telephone dialing system" to maintain its applicability to modern phone equipment in perpetuity, regardless of technological advances that may render the term increasingly inapplicable over time. After all, the statute also generally prohibits nonconsensual calls to numbers associated with a "paging service" or "specialized mobile radio service," 47 U.S.C. § 227(b)(1)(A)(iii), yet those terms have largely ceased to have practical significance.

In any event, the Commission retains a measure of authority under the TCPA to fashion exemptions to the restrictions on use of autodialers to call wireless numbers. *Id.* § 227(b)(2)(C). The agency presumably could, if needed, fashion exemptions preventing a result under which every uninvited call or message from a standard smartphone would violate the statute.

d. In its briefing before our court, the Commission now submits that its order in fact did not reach a definitive resolution on whether smartphones qualify as autodialers. As we have explained, however, a straightforward reading of the Commission's ruling invites the conclusion that all smartphones are autodialers: the ruling explained that a number of parties specifically raised the issue; and it responded, not by disputing the parties' concerns that smartphones would be covered by the statutory definition under the agency's approach, but instead by accepting that conclusion and then questioning whether uninvited calls in fact would be made and lawsuits in fact would be brought.

21

It is highly difficult to read the Commission's ruling to leave uncertain whether the statutory definition applies to smartphones.  And any uncertainty on that score would have left affected parties without concrete guidance even though several of them specifically raised the issue with the agency, and even though the issue carries significant implications—including the possibility of committing federal law violations and incurring substantial liability in damages—for smartphone owners.

At any rate, even assuming the Commission's ruling could be conceived to leave room for concluding that smartphones do not qualify as autodialers, that result itself would be unreasonable and impermissible.  The Commission's order, in that event, would not constitute reasoned decisionmaking and thus would not satisfy APA arbitrary-and-capricious review.  *See United States Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 754 (D.C. Cir. 2015).

Administrative action is "arbitrary and capricious [if] it fails to articulate a comprehensible standard" for assessing the applicability of a statutory category.  *Id.* at 753.  If a "purported standard is indiscriminate and offers no meaningful guidance" to affected parties, it will fail "the requirement of reasoned decisionmaking."  *Id.* at 754.  That will be the case if an agency cannot satisfactorily explain why a challenged standard embraces one potential application but leaves out another, seemingly similar one.  *See id.* at 754-55.

That would be precisely the situation here if, as the Commission now contends in its briefing before us, its order in fact left open the possibility that smartphones fail to meet the statutory definition of an ATDS.  In the same briefing, the Commission, as noted, simultaneously maintained that the

22

Firefox browser has the "capacity" to play Flash videos because the Flash plug-in can be downloaded. Precisely the same logic seemingly should compel concluding that smartphones have the "capacity" to function as autodialers because apps carrying the requisite features can be downloaded. If the Commission believes smartphones nonetheless do not meet the definition of an autodialer, there is no explanation of "this differential treatment of seemingly like cases." *Id.* at 755 (internal quotation marks omitted).

The Commission did say in its order that "there must be more than a theoretical potential that the equipment could be modified to satisfy the 'autodialer' definition." 2015 Declaratory Ruling, 30 FCC Rcd. at 7975 ¶ 18. But that ostensible limitation affords no ground for distinguishing between a smartphone and the Firefox browser. In light of the ease of downloading an app to a smartphone, there is no evident basis for concluding that the Firefox browser has more than a mere "theoretical potential" to play Flash videos by downloading a plug-in, but a smartphone nonetheless has only a "theoretical potential" to function as an autodialer by downloading an app.

The point is fortified by the sole example of a mere "theoretical potential" set forth by the Commission in its order. That example involves a traditional rotary-dial phone (which by now is approaching obsolescence): the Commission observed that "it might be theoretically possible to modify a rotary-dial telephone to such an extreme that it would satisfy the definition of 'autodialer,' but such a possibility is too attenuated . . . to find that a rotary-dial phone has the requisite 'capacity' and therefore is an autodialer." *Id.* A rotary phone has no relevant similarity to a smartphone. To the contrary, whereas a smartphone and the Firefox browser substantially resemble one another in their amenability to an

23

upgrade via the addition of software, they substantially differ in that regard from a rotary-dial phone, which has no such capability.

In the end, then, the Commission's order cannot reasonably be understood to support the conclusion that smartphones fall outside the TCPA's autodialer definition: any such reading would compel concluding that the agency's ruling fails arbitrary-and-capricious review.  The more straightforward understanding of the Commission's ruling is that all smartphones qualify as autodialers because they have the inherent "capacity" to gain ATDS functionality by downloading an app.  That interpretation of the statute, for all the reasons explained, is an unreasonably, and impermissibly, expansive one.

2.

Recall that the statutory definition of an ATDS raises two sets of questions:  (i) when does a device have the "capacity" to perform the functions of an autodialer enumerated by the statute?; and (ii) what precisely is the content of those functions?  The impermissibility of the Commission's interpretation of the term "capacity" in the autodialer definition is compounded by inadequacies in the agency's explanation of the requisite features.  Having addressed the first issue, we now turn to the second one.

a.  As a threshold matter, the Commission maintains that the court lacks jurisdiction to entertain petitioners' challenge concerning the functions a device must be able to perform.  The agency reasons that the issue was resolved in prior agency orders—specifically, declaratory rulings in 2003 and 2008 concluding that the statutory definition of an ATDS includes "predictive dialers," dialing equipment that can make

24

use of algorithms to "assist[] telemarketers in predicting when a sales agent will be available to take calls."   2015 Declaratory Ruling, 30 FCC Rcd. at 7972 ¶ 10 n.39;  *see also* In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (2008 Declaratory Ruling), 23 FCC Rcd. 559 (2008); 2003 Order, 18 FCC Rcd. 14,014. According to the Commission, because there was no timely appeal from those previous orders, it is too late now to raise a challenge by seeking review of a more recent declaratory ruling that essentially ratifies the previous ones.  We disagree.

While the Commission's latest ruling purports to reaffirm the prior orders, that does not shield the agency's pertinent pronouncements from review.  The agency's prior rulings left significant uncertainty about the precise functions an autodialer must have the capacity to perform.  Petitioners covered their bases by filing petitions for both a declaratory ruling and a rulemaking concerning that issue and related ones.  *See, e.g.*, Prof'l Ass'n for Customer Engagement, Inc. Pet. 3-4; ACA Int'l Pet. 6; GroupMe, Inc. Pet. 3; Glide Talk, Ltd. Pet. 13.   In response, the Commission issued a declaratory ruling that purported to "provid[e] clarification on the definition of 'autodialer,'" and denied the petitions for rulemaking on the issue.  2015 Declaratory Ruling, 30 FCC Rcd. at 8039 ¶ 165 & n.552.  The ruling is thus reviewable on both grounds.  *See* 5 U.S.C. § 554(e); *Biggerstaff v. FCC*, 511 F.3d 178, 184-85 (D.C. Cir. 2007).

b.  The statutory definition says that a device constitutes an ATDS if it has the capacity to perform both of two enumerated functions:   "to store or produce telephone numbers to be called, using a random or sequential number generator"; and "to dial such numbers."   47 U.S.C. § 227(a)(1)(A)-(B).  The role of the phrase, "using a random or sequential number generator," has generated substantial

25

questions over the years. The Commission has sought to address those questions in previous orders and did so again in the 2015 Declaratory Ruling we consider here.

The Commission's most recent effort falls short of reasoned decisionmaking in "offer[ing] no meaningful guidance" to affected parties in material respects on whether their equipment is subject to the statute's autodialer restrictions. *Postal Regulatory Comm'n*, 785 F.3d at 754. A basic question raised by the statutory definition is whether a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed. Or is it enough if the device can call from a database of telephone numbers generated elsewhere? The Commission's ruling appears to be of two minds on the issue.

In certain respects, the order conveys that equipment needs to have the ability to generate random or sequential numbers that it can then dial. The order twice states that, to "meet[] the TCPA's definition of 'autodialer,'" the equipment in question must have the capacity to "dial random or sequential numbers." 2015 Declaratory Ruling, 30 FCC Rcd. at 7972 ¶ 10; *see also id.* at 7974 ¶ 15. And it is clear from context that the order treats the ability to "dial random or sequential numbers" as the ability to *generate* and then dial "random or sequential numbers."

To see why, it is helpful to understand that the ruling distinguishes between use of equipment to "dial random or sequential numbers" and use of equipment to "call[] a set list of consumers." *Id.* at 7972 ¶ 10. Anytime phone numbers are dialed from a set list, the database of numbers must be called in *some* order—either in a random or some other sequence. As a result, the ruling's reference to "dialing random or sequential numbers" cannot simply mean dialing from a set

26

list of numbers in random or other sequential order:  if that were so, there would be no difference between "dialing random or sequential numbers" and "dialing a set list of numbers," even though the ruling draws a divide between the two.  *See id.* at 7973 ¶¶ 13, 14.  It follows that the ruling's reference to "dialing random or sequential numbers" means generating those numbers and then dialing them.

The Commission's prior declaratory rulings reinforce that understanding.  In its 2003 ruling addressing predictive dialers, the Commission observed that, "[i]n the past, telemarketers may have used dialing equipment to *create and dial* 10-digit telephone numbers arbitrarily."  2003 Order, 18 FCC Rcd. at 14,092 ¶ 132 (emphasis added).  But the industry had "progressed to the point where" it had become "far more cost effective" instead to "us[e] lists of numbers."  *Id.*  Again, the Commission suggested it saw a difference between calling from a list of numbers, on one hand, and "creating and dialing" a random or arbitrary list of numbers, on the other hand.  Or as the Commission has elsewhere said, numbers that are "randomly or sequentially generated" differ from numbers that "come from a calling list."  In re Implementation of the Middle Class Tax Relief and Job Creation Act of 2012, 27 FCC Rcd. 13,615, 13,629 ¶ 29 (2012) (quoted in 2015 Declaratory Ruling, 30 FCC Rcd. at 8077 (Comm'r Pai, dissenting)).

While the 2015 ruling indicates in certain places that a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer, it also suggests a competing view:  that equipment can meet the statutory definition even if it lacks that capacity.  The Commission reaffirmed its 2003 ruling insofar as that order had found predictive dialers to qualify as ATDSs.  2015 Declaratory Ruling, 30 FCC Rcd. at 7972-73 ¶¶ 12-14.  And

27

in the 2003 order, the Commission had made clear that, while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS.  2003 Order, 18 FCC Rcd. at 14,091 ¶ 131 n.432; *id*. at 14,093 ¶ 133.  By reaffirming that conclusion in its 2015 ruling, the Commission supported the notion that a device can be considered an autodialer even if it has no capacity itself to generate random or sequential numbers (and instead can only dial from an externally supplied set of numbers).  The 2015 ruling correspondingly expresses that "predictive dialers" can differ from other "dialers that utilize random or sequential numbers instead of a list of numbers."  2015 Declaratory Ruling, 30 FCC Rcd. at 7973 ¶ 14.

So which is it:  does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity?  The 2015 ruling, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers).  It might be permissible for the Commission to adopt either interpretation.  But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order.

The choice between the interpretations is not without practical significance.  Petitioners and various amici describe calling equipment that they wish to use to call set lists of cellular numbers without any generation of random or sequential numbers.  *See* ACA Int'l Reply Br. 21; Am. Bankers Ass'n Amicus Br. 29-30.  And at least some predictive dialers, as explained, have no capacity to generate random or sequential numbers.

28

The uncertainty in the 2015 ruling, moreover, does not stop with the question of whether a device must be able to generate random or sequential numbers to meet the statutory definition. The ruling is also unclear about whether certain other referenced capabilities are necessary for a dialer to qualify as an ATDS.

For instance, the ruling states that the "basic function" of an autodialer is the ability to "dial numbers without human intervention." 2015 Declaratory Ruling, 30 FCC Rcd. at 7973 ¶ 14; *id.* at 7975 ¶ 17. Prior orders had said the same. 2003 Order, 18 FCC Rcd. at 14,092 ¶ 132; 2008 Declaratory Ruling, 23 FCC Rcd. at 566 ¶ 13. That makes sense given that "auto" in autodialer—or, equivalently, "automatic" in "automatic telephone dialing system," 47 U.S.C. § 227(a)(1)—would seem to envision non-manual dialing of telephone numbers.

But the Commission nevertheless declined a request to "clarify[] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention." 2015 Declaratory Ruling, 30 FCC Rcd. at 7976 ¶ 20. According to the Commission, then, the "basic function" of an autodialer is to dial numbers without human intervention, but a device might still qualify as an autodialer even if it cannot dial numbers without human intervention. Those side-by-side propositions are difficult to square.

The Commission further said that another "basic function[]" of an ATDS is to "dial thousands of numbers in a short period of time." *Id.* at 7975 ¶ 17. But the ruling imparts no additional guidance concerning whether that is a necessary condition, a sufficient condition, a relevant condition even if neither necessary nor sufficient, or something else. Nor does it indicate what would qualify as a "short period of time."

29

Again, affected parties are left in a significant fog of uncertainty about how to determine if a device is an ATDS so as to bring into play the restrictions on unconsented calls.

In short, the Commission's ruling, in describing the functions a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decisionmaking. The order's lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the Commission's expansive understanding of when a device has the "capacity" to perform the necessary functions. We must therefore set aside the Commission's treatment of those matters.

3.

We briefly note an additional statutory provision affecting the scope of the TCPA's restrictions on autodialer calls to cell numbers—a provision we ultimately have no occasion to examine because of the way the case has been presented to us. Two TCPA provisions work together to establish the reach of the general prohibition against making autodialer calls without prior consent. The first provision, as we have seen, defines the equipment—viz., "automatic telephone dialing system"—subject to the statutory prohibition. 47 U.S.C. § 227(a)(1). The second provision then incorporates that definition in setting out the scope of the prohibition: "It shall be unlawful for any person . . . to *make any call* (other than a call made for emergency purposes or made with the prior express consent of the called party) *using any automatic telephone dialing system* . . . to any telephone number assigned to a . . . cellular telephone service[.]"  *Id.* § 227(b)(1)(A)(iii) (emphases added).

30

Petitioners have confined their challenge to the Commission's understanding of the first of those provisions, the statutory definition of an autodialer, and our analysis has been focused on that issue. Petitioners have raised no challenge to the Commission's understanding of the second provision—i.e., to the agency's interpretation of what it means to "make any call using any" ATDS. In particular, in the case of a device having the "capacity" both to perform the autodialer functions set out in the statutory definition and to perform as a traditional phone, does the bar against "making any call using" an ATDS apply only to calls made using the equipment's ATDS functionality? Or does the bar apply to all calls made with a device having that "capacity," even ones made without any use of the equipment's autodialer capabilities? Or does the bar apply to calls made using certain autodialer functions, even if not all of them?

The Commission's ruling endorsed a broad understanding under which the statute prohibits any calls made from a device with the capacity to function as an autodialer, regardless of whether autodialer features are used to make a call. 2015 Declaratory Ruling, 30 FCC Rcd. at 7975 ¶ 19 n.70. A dissenting commissioner, by contrast, read the pertinent statutory phrase, "make any call," to mean "that the equipment must, in fact, be used *as an autodialer* to make the calls" before a TCPA violation can be found. *Id.* at 8088 (Comm'r O'Rielly, dissenting in part and approving in part).

The dissenting commissioner's interpretation would substantially diminish the practical significance of the Commission's expansive understanding of "capacity" in the autodialer definition. Even if the definition encompasses any device capable of gaining autodialer functionality through the downloading of software, the mere possibility of adding those features would not matter unless they were downloaded and

31

used to make calls.  Under the dissent's understanding of the phrase, "make any call," then, everyday calls made with a smartphone would not infringe the statute:  the fact that a smartphone could be configured to function as an autodialer would not matter unless the relevant software in fact were loaded onto the phone and were used to initiate calls or send messages.

Petitioners, however, raise no challenge to the Commission's understanding of the statutory words, "make any call using" an ATDS, and the parties therefore have not presented arguments on the issue in their briefing before us. Our consistent practice in such a situation is to decline to address (much less resolve) the issue.  *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 697 (D.C. Cir. 2016).  We "sit to resolve only legal questions presented and argued by the parties."  *Id.* (internal quotation marks omitted).  We nonetheless note the issue in light of its potential interplay with the distinct challenges petitioners do raise.  The agency could choose to revisit the issue in a future rulemaking or declaratory order, and a party might then raise the issue on judicial review.

## B.

We now turn to the Commission's treatment of circumstances in which a consenting party's cell number has been reassigned to another person.  While there is no consensus about the exact numbers of reassignments, there is no dispute that millions of wireless numbers are reassigned each year.  In the event of a reassignment, the caller might initiate a phone call (or send a text message) based on a mistaken belief that the owner of the receiving number has given consent, when in fact the number has been reassigned to someone else from whom consent has not been obtained.

32

Does a call or message in that situation violate the statutory bar against making autodialer calls without prior consent? The Commission's answer is yes, apart from a one-call, post-reassignment safe harbor. We set aside the Commission's interpretation on the ground that the one-call safe harbor is arbitrary and capricious.

1.

The pertinent statutory language generally renders it unlawful "to make any call (other than a call made for emergency purposes or made with the *prior express consent of the called party*) using any automatic telephone dialing equipment or prerecorded voice." 47 U.S.C. § 227(b)(1)(A) (emphasis added). The Commission, in its ruling, initially addressed who is properly considered the "called party" when a consenting party's number is reassigned to another person: does "called party" refer to the person the caller expected to reach (whose consent had previously been obtained), or does it refer to the person actually reached, the wireless number's present-day subscriber after reassignment (whose consent has not been obtained)?

The Commission adopted the latter interpretation. 30 FCC Rcd. at 7999-8001 ¶¶ 72-73. The result is that the reassignment of a wireless number extinguishes any consent given by the number's previous holder and exposes the caller to liability for reaching a party who has not given consent. An alternative approach, the Commission reasoned, would "effectively require consumers to opt out of such calls when the TCPA clearly requires the opposite—that consumers opt in before they can be contacted." *Id.* at 8004 ¶ 80.

The agency also refused to "place any affirmative obligation" on new subscribers to inform callers that a

33

wireless number now belongs to someone else.  *Id.* at 8011 ¶ 95.  The ruling thus expressly contemplates that a new subscriber could "purposefully and unreasonably" refrain from informing a good-faith caller about a number's reassignment "in order to accrue statutory penalties."  *Id.* (formatting modified).  In that regard, the Commission described a reported case in which the new, post-reassignment subscriber waited to initiate a lawsuit until after having received almost 900 text alerts that were intended for the previous subscriber.  *Id.* at 8011 ¶ 94 & n.324.

The Commission acknowledged that even the most careful caller, after employing all reasonably available tools to learn about reassignments, "may nevertheless not learn of reassignment before placing a call to a new subscriber."  *Id.* at 8009 ¶ 88.  The Commission observed that it nonetheless "could have interpreted the TCPA to impose a traditional strict liability standard on the caller: *i.e.*, a 'zero call' approach under which no allowance would have been given for the robocaller to learn of the reassignment."  *Id.* at 8009 ¶ 90 n.312.  But the Commission declined to interpret the statute "to require a result that severe."  *Id.*  Rather, the Commission read the statute to "anticipate[] the caller's ability to rely on prior express consent," which the Commission interpreted "to mean reasonable reliance."  *Id.* (internal quotation marks omitted).

The Commission effectuated its "reasonable reliance" approach by enabling a caller who lacks knowledge of a reassignment "to avoid liability for the first call to a wireless number following reassignment."  *Id.* at 8009 ¶ 89.  For that first call, the caller can continue to rely on the consent given by the "previous subscriber."  *Id.* at 8003 ¶ 78.  The Commission did "not presume that a single call to a reassigned number will always be sufficient for callers to gain

34

actual knowledge of the reassignment." *Id.* at 8009 ¶ 90 n.312. But it believed that "[o]ne call represents an appropriate balance between a caller's opportunity to learn of the reassignment and the privacy interests of the new subscriber." *Id.* at 8009 ¶ 90.

2.

In challenging the Commission's resolution, petitioners first contend that the statutory reference to the consent of the "called party" refers to the expected recipient of a call or message, not the actual recipient. When a wireless number is reassigned without the caller's awareness, petitioners' interpretation would mean that a caller would avoid liability for a post-reassignment call because the "called party"—the former owner of the number—had given consent. In petitioners' view, the Commission's contrary interpretation of "called party" to refer to the new (post-reassignment) subscriber is foreclosed by the statute. We disagree.

Another court of appeals has examined the meaning of the term "called party" in the same statutory provision, 47 U.S.C. § 227(b)(1)(A), and in the same situation of a reassigned wireless number formerly belonging to a consenting party. *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637 (7th Cir. 2012). The Seventh Circuit explained that the phrase "called party" appears throughout the broader statutory section, 47 U.S.C. § 227, a total of seven times. 679 F.3d at 640. Four of those instances "unmistakably denote the current subscriber," not the previous, pre-reassignment subscriber. *Id.* Of the three remaining instances, "one denotes whoever answers the call (usually the [current] subscriber)," and the other two are unclear. *Id.* By contrast, the court observed, the "phrase 'intended recipient' does not appear anywhere in § 227, so what justification could there be

35

for equating 'called party' with 'intended recipient of the call'?"  *Id.*  For those and other reasons, the court concluded "that 'called party' in § 227(b)(1) means the person subscribing to the called number at the time the call is made," not the previous subscriber who had given consent.  *Id.* at 643; *see also Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1250-52 (11th Cir. 2014).

We find the Seventh Circuit's analysis persuasive insofar as it supports concluding that the Commission was not *compelled* to interpret "called party" in § 227(b)(1)(A) to mean the "intended recipient" rather than the current subscriber.  The Commission thus could permissibly interpret "called party" in that provision to refer to the current subscriber.

3.

Petitioners next argue that the Commission's one-call safe harbor is arbitrary.  On this score, we agree with petitioners.

When a caller is unaware that a consenting party's wireless number has been reassigned, the Commission chose to allow the caller to make one (and only one) post-reassignment call without incurring liability.  For that one call, the Commission understood the statutory term "prior express consent" to refer to the consent given by the previous subscriber.  30 FCC Rcd. at 8001 ¶ 73 & n.265; *id.* at 8003 ¶ 78.

The Commission allowed for that one liability-free call, rather than impose "a traditional strict liability standard," because it interpreted a caller's ability under the statute to rely on a recipient's "prior express consent" to "mean reasonable

36

reliance." *Id*. at 8009 ¶ 90 n.312. And when a caller has no knowledge of a reassignment, the Commission understandably viewed the caller's continued reliance on the prior subscriber's consent to be "reasonable."

Elsewhere in the Declaratory Ruling, the Commission echoed the same "reasonable reliance" understanding of the statute's approval of calls based on "prior express consent." The ruling accepts that a caller can rely on consent given by a wireless number's "customary user" ("such as a close relative on a subscriber's family calling plan"), rather than by the subscriber herself. *Id*. at 8001 ¶ 75. That is because the "caller in this situation cannot reasonably be expected to divine that the consenting person is not the subscriber." *Id*. at 8001-02 ¶ 75. The Commission reiterated in that regard that, in "construing the term 'prior express consent' in section 227(b)(1)(A), we consider the caller's reasonableness in relying on consent." *Id.* at 8001 ¶ 75.

The Commission thus consistently adopted a "reasonable reliance" approach when interpreting the TCPA's approval of calls based on "prior express consent," including as the justification for allowing a one-call safe harbor when a consenting party's number is reassigned. The Commission, though, gave no explanation of why reasonable-reliance considerations would support limiting the safe harbor to just one call or message. That is, why does a caller's reasonable reliance on a previous subscriber's consent necessarily cease to be reasonable once there has been a single, post-reassignment call? The first call or text message, after all, might give the caller no indication whatsoever of a possible reassignment (if, for instance, there is no response to a text message, as would often be the case with or without a reassignment).

37

The Commission outlined a number of measures callers could undertake "that, over time, may permit them to learn of reassigned numbers." *Id.* at 8007 ¶ 86. But the Commission acknowledged that callers "may nevertheless not learn of reassignment before placing a call to a new subscriber," and that the first post-reassignment call likewise might give no reason to suspect a reassignment. *Id.* at 8009 ¶¶ 88, 90 n.312. In that event, a caller's reasonable reliance on the previous subscriber's consent would be just as reasonable for a second call.

To be sure, the Commission stated that it found "no basis in the statute or the record before [it] to conclude that callers can reasonably rely on prior express consent beyond one call to reassigned numbers." *Id.* at 8009-10 ¶ 90 n.312. But the Commission did not elaborate on—or otherwise support—its conclusory observation to that effect. And the statement is hard to square with the Commission's concession that the first call may give no notice of a reassignment, or with the Commission's disavowal of any expectation that a caller should "divine from the called consumer's mere silence the current status of a telephone number." *Id.* (brackets omitted). In that light, no cognizable conception of "reasonable reliance" supports the Commission's blanket, one-call-only allowance.

At times, the Commission indicated that its one-call safe harbor intends to give callers additional "opportunity" to find out about a possible reassignment. *E.g.*, *id.* at 8009 ¶ 89; *id.* at 8010 ¶ 91. There is no indication, though, that the interest in giving callers such an opportunity is independent of the interest in giving effect to a caller's reasonable reliance. After all, a caller also has an opportunity to learn of a reassignment *before* the first call. The reason to allow even one, liability-free, post-reassignment call—the reason the

38

Commission cared about affording an opportunity to learn about reassignment at all—is in order to give effect to a caller's reasonable reliance on the previous subscriber's consent.

Indeed, the Commission's one-call safe harbor applies "over an unlimited period of time." *Id.* at 8000 ¶ 72 n.257. If the goal were simply to provide an expanded opportunity to learn about a reassignment, the Commission presumably would have allowed for a given period of time. It declined to do so, *id.* at 8009 ¶ 89, opting instead to permit a single call regardless of whether it occurs within minutes or months of a reassignment.

For substantially the same reasons, the Commission's one-call-only approach cannot be salvaged by its suggestion that callers rather than new subscribers should bear the risk when calls are made (or messages are sent) to a reassigned number. *Id.* at 8009-10 ¶ 90 n.312. That consideration would equally support a zero-call, strict-liability rule. But the Commission specifically declined to adopt "a result that severe." *Id.* Having instead embraced an interpretation of the statutory phrase "prior express consent" grounded in conceptions of reasonable reliance, the Commission needed to give some reasoned (and reasonable) explanation of why its safe harbor stopped at the seemingly arbitrary point of a single call or message. The Commission did not do so.

The Seventh Circuit's decision in *Soppet*, discussed earlier, is not to the contrary. There, the court assumed that "any consent previously given . . . lapses when [a] [c]ell [n]umber is reassigned." 679 F.3d at 641. The court, though, did not have before it an agency interpretation under which the previous subscriber's consent does *not* lapse with reassignment: the premise of the Commission's one-call safe

39

harbor is that a caller can continue to rely on the previous subscriber's consent.  The question we face is, why should that necessarily stop with a single call?  *Soppet* does not speak to that question, and so does not cast doubt on our conclusion that the Commission failed to give it a satisfactory answer.

Finally, the Commission's failure in that regard requires setting aside not only its allowance of a one-call safe harbor, but also its treatment of reassigned numbers more generally.  When we invalidate a specific aspect of an agency's action, we leave related components of the agency's action standing only if "we can say without any 'substantial doubt' that the agency would have adopted the severed portion on its own." *Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 71 (D.C. Cir. 2017) (per curiam) (internal quotation marks omitted).

Here, we have no such assurance.  If we were to excise the Commission's one-call safe harbor alone, that would leave in place the Commission's interpretation that "called party" refers to the new subscriber.  And that in turn would mean that a caller is strictly liable for *all* calls made to the reassigned number, even if she has no knowledge of the reassignment.

We cannot be certain that the agency would have adopted that rule in the first instance.  Significantly, the Commission said that it "could have interpreted the TCPA to impose a traditional strict liability standard," i.e., "a 'zero call' approach."  30 FCC Rcd. at 8009 ¶ 90 n.312.  But the agency declined to "require a result that severe," opting instead for a one-call safe harbor.  *Id*.  We cannot say without any substantial doubt that the agency would have embraced the "severe" implications of a pure, strict-liability regime even in the absence of any safe harbor.  As a result, we must set aside

40

the Commission's treatment of reassigned numbers as a whole.

Notably, the Commission is already on its way to designing a regime to avoid the problems of the 2015 ruling's one-call safe harbor.  The Commission recently sought comment on potential methods for "requir[ing] service providers to report information about number reassignments for the purposes of reducing unwanted robocalls."  In re Advanced Methods to Target and Eliminate Unlawful Robocalls, Second Notice of Inquiry, 32 FCC Rcd. 6007, 6010 ¶ 9 (2017).  Most of its proposals envision creating a comprehensive repository of information about reassigned wireless numbers.  *See id.* at 6012-13  ¶¶ 15-19.  The Commission is also considering whether to provide a safe harbor for callers that inadvertently reach reassigned numbers after consulting the most recently updated information.  *See id.* at 6012 ¶ 14.  Those proposals would naturally bear on the reasonableness of calling numbers that have in fact been reassigned, and have greater potential to give full effect to the Commission's principle of reasonable reliance.

## C.

It is undisputed that consumers who have consented to receiving calls otherwise forbidden by the TCPA are entitled to revoke their consent.  *See* 2015 Declaratory Ruling, 30 FCC Rcd. at 7996 ¶ 62.  The statute, however, does not elaborate on the processes by which consumers may validly do so.  The Commission sought to resolve the matter in its Declaratory Ruling.

The Commission had been petitioned to clarify that callers can unilaterally prescribe the exclusive means for consumers to revoke their consent.  It explicitly denied that

41

request.  Allowing "callers to designate the exclusive means of revocation," the Commission believed, could "materially impair" the "right of revocation."  *Id.* at 7997 ¶ 66.

The Commission instead concluded that "a called party may revoke consent at any time and through any reasonable means"—orally or in writing—"that clearly expresses a desire not to receive further messages."  *Id.* at 7989-90 ¶ 47; *id.* at 7996 ¶ 63.  In assessing whether a revocation request meets the "reasonable means" standard, the Commission said it would consider "the totality of the facts and circumstances."  *Id.* at 7996 ¶ 64 n.233.  One relevant factor is "whether the caller could have implemented mechanisms to effectuate a requested revocation without incurring undue burdens."  *Id.* Another consideration is "whether the consumer had a reasonable expectation that he or she could effectively communicate his or her request . . . in that circumstance."  *Id.*

Petitioners challenge the Commission's treatment of revocations on various grounds, none of which we find persuasive.  Petitioners' chief objection is that the Commission's approach is arbitrary and capricious in eschewing the establishment of standardized revocation procedures in favor of an unduly uncertain, any-reasonable-means standard.  Without the certainty of standardized procedures, petitioners fear, they will be able to ward off TCPA liability only by "tak[ing] exorbitant precautions."  ACA Int'l Br. 57.

We think petitioners' concerns are overstated.  The Commission's ruling absolves callers of any responsibility to adopt systems that would entail "undue burdens" or would be "overly burdensome to implement."  30 FCC Rcd. at 7996 ¶ 64 & n.233.  In light of that assurance, callers would have no need to train every retail employee on the finer points of

42

revocation.  And callers will have every incentive to avoid TCPA liability by making available clearly-defined and easy-to-use opt-out methods.  If recipients are afforded such options, any effort to sidestep the available methods in favor of idiosyncratic or imaginative revocation requests might well be seen as unreasonable.  The selection of an unconventional method of seeking revocation might also betray the absence of any "reasonable expectation" by the consumer that she could "effectively communicate" a revocation request in the chosen fashion.  *Id*.

Petitioners observe that the Commission's ruling itself dictates particular opt-out mechanisms for certain types of time-sensitive banking- and healthcare-related calls that the Commission exempted from the TCPA's consumer consent requirements.  *Id*. at 8028 ¶ 138; *id*. at 8032 ¶ 147.  If the Commission prescribed specific opt-out methods for those types of calls, petitioners ask, then why not similarly set out standardized means of revocation for all calls?

The Commission was not required to treat the two situations in a parallel manner.  For the banking- and healthcare-related calls, the Commission found that the communications were sufficiently important to warrant an exemption from the otherwise-applicable obligation to obtain prior consent.  *Id*. at 8023 ¶ 125.  As a result, the default rule for those calls is that they should be *allowed* (without regard to consent), such that the availability of an opt-out can be conditioned on adhering to specific procedures.  By contrast, the default rule for *non*-exempted calls is that they are *disallowed* (absent consent), such that the availability of an opt-out naturally could be broader.  In that context, the Commission could reasonably elect to enable consumers to revoke their consent without having to adhere to specific procedures.

43

Finally, petitioners object to the Declaratory Ruling insofar as it might preclude callers and consumers from contractually agreeing to revocation mechanisms. The Commission correctly concedes, however, that the ruling "did not address whether contracting parties can select a particular revocation procedure by mutual agreement." FCC Br. 64 n.16. The ruling precludes unilateral imposition of revocation rules by callers; it does not address revocation rules mutually adopted by contracting parties. Nothing in the Commission's order thus should be understood to speak to parties' ability to agree upon revocation procedures.

D.

The last set of challenges before us, brought by petitioner Rite Aid, concerns the scope of the Commission's exemption of certain healthcare-related calls from the TCPA's prior-consent requirement for calls to wireless numbers. The Commission is statutorily authorized to exempt from that requirement "calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect." 47 U.S.C. § 227(b)(2)(C).

The Commission was petitioned to exempt from the consent requirement "certain non-telemarketing, healthcare calls" alleged to "provide vital, time-sensitive information patients welcome, expect, and often rely on to make informed decisions." 2015 Declaratory Ruling, 30 FCC Rcd. at 8030 ¶ 143. The agency acknowledged the "exigency and public interest" in various types of healthcare-related calls, including ones "regarding post-discharge follow-up intended to prevent readmission, or prescription notifications." *Id.* at 8031 ¶ 146. But it was "concerned that these policy arguments are not

44

true" for other types of healthcare calls. *Id.* Specifically, the Commission "fail[ed] to see the same exigency and public interest in calls regarding account communications and payment notifications." *Id.*

Consequently, the Commission granted the requested exemption but "restrict[ed] it to calls for which there is exigency and that have a healthcare treatment purpose, specifically: appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up intended to prevent readmission, prescription notifications, and home healthcare instructions." *Id.* The exemption would not cover calls "that include telemarketing, solicitation, or advertising content, or which include accounting, billing, debt-collection, or other financial content." *Id.*

Petitioner Rite Aid challenges the Commission's exemption for select healthcare-related calls on the grounds that it conflicts with another federal statute (the Health Insurance Portability and Accountability Act, or HIPAA) and is arbitrary and capricious. Rite Aid's arguments misunderstand the relevant statutory terrain, and we reject them.

1.

At the outset, we must satisfy ourselves that we have jurisdiction to entertain Rite Aid's challenge. Rite Aid has been styled a petitioner here, but it did not formally petition the Commission in the proceedings before the agency. The petition granted by the Commission in part was filed by the American Association of Healthcare Administrative Management (the Association). Rite Aid expressed "support"

45

for the Association's petition for a declaratory ruling and exemption, and it also asked the Commission to "address certain additional issues."   Comments of Rite Aid, Joint App'x 850.  But it participated only by commenting on the Association's petition rather than filing one of its own.  As a result, with respect to relief that only Rite Aid sought, the Commission "decline[d] to fully address th[at] request for clarification . . . raised in a comment to a pending Petition." 2015 Declaratory Ruling, 30 FCC Rcd. at 8028-29 ¶ 141 n.471.  The Association did not appeal the FCC's partial denial of its requested exemption.  Instead, Rite Aid has petitioned the court to review that denial.

Direct review of final FCC orders is governed by the Hobbs Act, under which "[a]ny party aggrieved by [a] final order" of the Commission may petition for review of that order.  28 U.S.C. § 2344.  We have consistently held that the phrase "party aggrieved" requires that petitioners have been parties to the underlying agency proceedings, not simply parties to the present suit who are aggrieved in a constitutional (Article III) sense.  *See Simmons v. ICC*, 716 F.2d 40, 42 (D.C. Cir. 1983).  The question here is whether commenting on a petition in agency proceedings that resulted in a declaratory ruling suffices to confer "party aggrieved" status on a litigant whose position the agency rejected.

We find it does.  For agency proceedings that do not require intervention as a prerequisite to participation, our decisions have recognized that "party aggrieved" means a party who has "made a full presentation of views to the agency."  *Water Transp. Ass'n v. ICC*, 819 F.2d 1189, 1193 (D.C. Cir. 1987).  Rite Aid fulfilled that requirement.  Just as "submitting comments" confers "party aggrieved" status in the context of a rulemaking (assuming an adverse outcome), *Prof'l Reactor Operator Soc'y v. U.S. Nuclear Regulatory*

46

*Comm'n*, 939 F.2d 1047, 1049 n.1 (D.C. Cir. 1991), one who comments on another's petition for a rulemaking or declaratory ruling has "present[ed] its view to the agency [so as] to qualify as a 'party,'" *S. Pac. Transp. Co. v. ICC*, 69 F.3d 583, 588 (D.C. Cir. 1995)—at least insofar as the issues appealed were also taken up by the petitioner below (as they were here). Rite Aid afforded the Commission an opportunity to consider its position on the Association's exemption request. We therefore proceed to the substance of Rite Aid's challenge.

2.

Rite Aid contends that, "[b]y restricting otherwise permissible HIPAA communications," the Declaratory Ruling "conflicts with another federal law." Rite Aid Br. 12 (quoting *NextWave Pers. Commc'ns, Inc. v. FCC*, 254 F.3d 130, 149 (D.C. Cir. 2001)). It essentially argues that *any* partial exemption of healthcare-related communications would have been unlawful, because HIPAA—the exclusive source of federal law on the disclosure of protected health information—operates of its own force to supersede any TCPA prohibition on healthcare calls. Rite-Aid is incorrect. There is no obstacle to complying with both the TCPA and HIPAA; "[t]he two statutes provide separate protections." *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1125 (11th Cir. 2014).

Under HIPAA regulations, covered entities and their business associates presumptively "may not use or disclose protected health information." 45 C.F.R. § 164.502(a). But they *are* generally permitted to use or disclose that information "for treatment, payment, or health care operations." *Id.* § 164.506(a). Rite Aid complains that the partial exemption granted in the Declaratory Ruling conflicts

47

with HIPAA because it stops short of exempting billing- and account-related communications—i.e., ones "for . . . payment." *Id.* But all that § 164.506(a)'s exclusion does is to carve out an exception to civil and criminal liability for using or disclosing protected health information. *See* 42 U.S.C. §§ 1320d-5, 1320d-6. It says nothing about the Commission's authority to exempt (or refrain from exempting) certain kinds of calls from the TCPA's consent requirement.

In confining the use of its exemption authority, the Commission did not restrict communications that HIPAA requires be permitted to flow freely. It simply declined to make certain exchanges even less burdensome than they would have been by default. If Rite Aid were correct, healthcare providers could use ATDS equipment to bombard nonconsenting wireless users with calls and texts concerning outstanding charges without incurring TCPA liability. Nothing in HIPAA commands such a result, and we see no basis to interpret it to frustrate the TCPA in that way.

3.

Finally, Rite Aid contends that the Declaratory Ruling's exemption for certain healthcare calls is arbitrary and capricious. Neither of its suggested grounds is persuasive.

a. Rite Aid first argues that the Commission failed to explain its purported departure from its earlier practice of exempting HIPAA-protected communications. In addition to its restrictions on calls to wireless numbers, the TCPA also forbids the use of an ATDS "to initiate any telephone call to any *residential* telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party," unless one of three

48

exceptions applies.   47 U.S.C.  § 227(b)(1)(B)  (emphasis added).

In a 2012 Order, the Commission exempted from that consent requirement "prerecorded health care-related calls to residential lines, which are already regulated by" HIPAA.  In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (2012 Order), 27 FCC Rcd. 1830, 1837 ¶ 18 (2012).  Some parts of the Order suggested that its exemption reached no further than the one granted in 2015's Declaratory Ruling for calls to wireless numbers. Exempted calls were described as "promot[ing] important communications . . . such as prescription refills and immunization reminders," *id.* at 1855 ¶ 63 n.192, and "concern[ing] consumers' health, not the purchase of a good or service," *id.* at 1856 ¶ 63 n.195.  But the Order elsewhere characterized its exemption as covering "*all* prerecorded health care-related calls to residential lines *that are subject to HIPAA.*"  *Id.* at 1852 ¶ 57 (emphases added).

The 2012 Order's exemption was codified in 47 C.F.R. § 64.1200(a)(3)(v).  That regulation did not use the phrase "health care-related call[]," but instead referred to "'health care' message . . . [as] defined in the HIPAA Privacy Rule, 45 C.F.R. § 160.103."  47 C.F.R. § 64.1200(a)(3)(v).  Likewise, § 160.103 does not mention the term "health care message." But it does define "health care" as "care, services, or supplies related to the health of an individual."  45 C.F.R. § 160.103. That term includes, among many other things, "[s]ale or dispensing of a drug, device, equipment, or other item in accordance with a prescription."   *Id.*   A "'health care' message" is presumably a message pertaining to any of the topics that "health care" is defined to include.  We assume for present purposes that some calls concerning the "[s]ale . . . of a drug . . . in accordance with a prescription" would relate to

49

"billing," which the 2015 Declaratory Ruling did not exempt from the consent requirement.

Rite Aid is therefore correct that, in one sense, the 2012 exemption swept more broadly than the 2015 version. We also accept that the 2012 Order cited a number of "technology-agnostic justifications" for exempting all prerecorded healthcare-related calls subject to HIPAA and made to residential lines. Rite Aid Br. 5. For example, the Commission believed that such calls "ensure continued customer access to health care-related information" and would not lead to "coercive or abusive" interactions. 2012 Order, 27 FCC Rcd. at 1853-54 ¶¶ 59-60.

The relevant question is whether the Commission acted arbitrarily and capriciously in affording a narrower exemption for healthcare-related calls made to *wireless* numbers. We find that it did not. Even if one might hypothesize "important reasons for treating residential and wireless telephone lines the same," Rite Aid Br. 9, the TCPA itself presupposes the contrary—that calls to residential and wireless numbers warrant differential treatment.

Unlike with the autodialer restrictions on calls to wireless numbers, callers are free to use ATDS equipment to dial residential lines as long as no "artificial or prerecorded voice" is used. 47 U.S.C. § 227(b)(1)(B). The statute itself contemplates that calls to wireless numbers "tread [more] heavily upon . . . consumer privacy interests." 2012 Order, 27 FCC Rcd. at 1855 ¶ 63. That concern directly informed the 2015 exemption's scope: the Commission concluded that messages "not critical to a called party's healthcare . . . do not justify setting aside a consumer's privacy interests." 2015 Declaratory Ruling, 30 FCC Rcd. at 8031 ¶ 146.

50

In short, there is nothing inherently contradictory about easing restrictions on certain kinds of calls to landlines, but not to cellular phones. And Rite Aid fails to mention another variable that confounds direct comparisons between the two exemptions. As codified, the 2012 exemption applies only to calls that "us[e] an artificial or prerecorded voice to deliver a message," 47 C.F.R. § 64.1200(a)(3); the Declaratory Ruling's exemption is not so limited. We therefore reject Rite Aid's first arbitrary-and-capricious challenge.

b. Lastly, Rite Aid argues that the Commission acted arbitrarily by failing to recognize that *all* healthcare-related calls satisfy the TCPA's "emergency purposes" exception to the consent requirement. As used in the Act, "[t]he term emergency purposes means calls made necessary in any situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4). But Rite Aid identifies no calls satisfying that exception that were not already subject to the 2015 exemption. It would be implausible to conclude that calls concerning "telemarking, solicitation, or advertising content, or which include accounting, billing, debt-collection, or other financial content" are made for "emergency purposes." 2015 Declaratory Ruling, 30 FCC Rcd. at 8031 ¶ 146. Even if accounting systems are in some sense "necessary" to the continued provision of healthcare, "[t]imely delivery of these types of messages is not *critical*" to that goal. *Id.* (emphasis added).

In marked contrast, the Commission recently exempted calls concerning certain time-sensitive risks to students' health and safety in the school setting. That list of scenarios included "weather closures, fire, . . . threats," "dangerous persons, health risks (e.g., toxic spills), and unexcused absences." In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 31 FCC Rcd.

51

9054, 9061 ¶ 17, 9063 ¶ 21 (2016).  In declining a request to interpret the emergency-purposes exception far more expansively, we are guided by its role in the statutory scheme. Consumers may find themselves wholly unable to stave off calls satisfying the exception.  That is because, by definition, such calls fall outside the TCPA's consent framework; callers can make them even if recipients are known to object. Advertisements, solicitations, and post-treatment financial communications do not arise from the sorts of "emergencies" that would justify suspending the TCPA's consent regime.

The Commission was empowered to draw the distinction it did, and it adequately explained its reasons for doing so. We therefore reject Rite Aid's arbitrary-and-capricious challenge.

*     *     *     *     *

For the foregoing reasons, we grant in part and deny in part the petitions for review.

*So ordered*.

**AMERICAN ARBITRATION ASSOCIATION**

Case No.: 01-17-0001-5149

JOHNNIE WILLIAMS, JR.,

*Claimant,*

**WRITTEN REPORT OF JEFFREY A. HANSEN**

*v.*

CONN APPLIANCES, INC.,

*Respondent.*

# EXHIBIT B

1

## EXPERT REPORT OF JEFFREY A. HANSEN

1. My name is Jeffrey A. Hansen. I am an adult over the age of 18, a resident of the state of California, and I reside at 2625 Kings View Circle, Spring Valley, CA 91977. Unless indicated otherwise, I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

2. I was asked to prepare this written expert report by Claimant's counsel in the above-captioned matter, Morgan & Morgan, in support of Claimant's Designation of Expert Witnesses.

***3.*** I have been retained in this case at a rate of $300 per hour, for all services rendered, and $380 per hour for depositions.

### *Experience and Credentials.*

4. I am the principal of Hansen Legal Technologies, Inc. My firm is in the business of handling Information Technology, including investigations and analysis of electronic data. I have served as an expert or consultant in more than 150 TCPA class action lawsuits, and as an expert or consultant in numerous other civil cases.

5. With regard to my experience as an expert and consultant in legal matters, generally, I have frequently served as an expert witness and consultant to law firms in conducting computer forensic analysis. I have also assisted in electronic discovery issues.

6. Specific to this case, my firm was retained to assist Claimant's counsel in evaluating and analyzing the telephone dialing systems used by Respondent Conn Appliances in placing telephone calls to Claimant.  I have also been retained to assist Claimant and his counsel in evaluating and analyzing electronic data related to the calls and other electronic data associated with computer systems and/or telephone dialing systems used by Conn Appliances. In that respect, I have extensive experience with data warehousing, including data warehousing related to telemarketing and autodialers in general. I am familiar with the procedures involved in such practices, and I have personally engaged in data warehousing regarding the compilation of certain lists,

including demographic and target audience lists for telemarketing, and have personally repaired defective lists to eliminate improperly formatted and corrupted data.

7.    I also frequently act as a consultant to companies that engage in the use of autodialers, and I am familiar with their use and procedures, and the technical aspects of that business. In that capacity, I have assembled, configured, maintained, operated all aspects of autodialers, and interfaced with the telecommunications providers through whose networks the autodialers operate.

8.    I have set up and maintained all aspects of predictive dialers and autodialers, from predictive dialers operating with just three telephone lines to outbound call centers, run from three locations, capable of generating over 1 million calls per hour. When building these systems, I have used various software and hardware solutions for predictive and autodialers, both proprietary and open source, and customized those systems for their particular uses. I myself have used and maintained predictive and autodialers, and trained others to do the same.

9.    Further, I am familiar with the manner in which outbound dial lists are used and maintained in the industry in which Conn Appliances operates. Similarly, I am familiar and have experience with, and know how to use, databases containing cell block identifiers and ported number lists, both of which identify cellular type telephone numbers and are typically used in these industries.

10.    Over the last twenty-eight (28) years, I have also had extensive experience in a broad range of other areas in the electronic and information technology fields and obtained many certifications such as MCP 4.0, A+, Network+, MCP 2000, MCSA, MCSE, Linux+, I-Net+, Security+, CIW Security Analyst.  From the hardware perspective, I have extensive experience in troubleshooting and repairing at the component level, and building various systems for various purposes. I have designed, built and maintained computer networks in a variety of environments from commercial businesses to very large DoD networks. I have taught approximately 1,000 others the skills to become computer network engineers themselves.

11.     I have had extensive experience in dealing with security breaches and hardening computer networks against those breaches.  I have handled many computer forensic and E-Discovery matters, including internal investigations in companies, working at the FBI sponsored Regional Computer Forensics Laboratory, and founding a computer forensics and E-Discovery firm over 9 years ago.  I have also had extensive experience with the set-up and use of predictive and autodialers. (*See Exhibit A – Resume of Jeffrey A. Hansen*).

12.     I have been called to testify in the following civil matters: *Craig Casey v. Valley Center Insurance Agency Inc*., Case No. 37-2008-00004378-SC-SC-CTL (San Diego Superior Court); *Stemple v. QC Holdings, Inc*., Case No. 12-CV-1997-CAB-WVG (S.D. Cal.); *Hahn v. Massage Envy Franchising*, Case No: 3:12-cv-00153-DMS-BGS (S.D. Cal.); *Abdeljalil v. General Electric Capital Corporatio*n, Case No: 12-cv-02078-JAH-MDD (S.D. Cal.); *Jasminda Webb v. Healthcare Revenue Recovery Group, LLC* Case No: C 13-0737 JD (N.D. Cal.); *Balschmiter v TD Auto Finance, LLC*, Case No: 2:13-cv-01186 (E.D. Wisc.)*; Jordan Marks v Crunch San Diego, LLC*, Case No. 14-CV-0348-BAS (BLM) (S.D. Cal.); *Peter Olney v Job.com,* Case No: 1:12-cv-01724-LJO-SKO (E.D. Cal.); *Carlos Guarisma v ADCAHB Medical Coverages, Inc. and Blue Cross and Blue Shield of Florida, Inc*., Case No: 1:13-cv-21016-JLK (S.D. Fla.); *Farid Mashiri v Ocwen Loan Servicing, LLC*, Case No: 3:12-cv-02838 (S.D. Cal.); *Monty J. Booth, Attorney at Law, P.S. v Appstack, Inc*., Case No. 2:13-cv-01533-JLR (W.D. Wash.); *Rinky Dink, Inc. d/b/a Pet Stop v World Business Lenders, LLC*, Case No. 2:14-cv-00268-JCC (W.D. Wash.); *Michael Reid and Dave Vacarro v. I.C. Systems, In*c., Case No. 2:12-cv-02661-ROS (D. Ariz.); *Jeffrey Molar v NCO Financial System*s Case No. 3:13-cv-00131-BAS-JLB (S.D. Cal.); *Latonya Simms v Simply Fashion Stores LTD, and ExactTarget, Inc*., Case No. 1:14-CV-00737-WTL-DKL (D. Ind.); *Sueann Swaney v Regions Bank*, Case No. CV-13-RRA-0544-S (N.D. Ala.); *Hooker v SiriusXM*, Case No. 4:13-cv-00003 (AWA) (E.D. Va.); *Diana Mey v Frontier Communications*, Case No. 13-cv-01191-RNC (D. Conn.); *Rachel Johnson v Yahoo! Zenaida Calderin v Yahoo!*

*Cas*e No. 14-cv-2028 14-cv-2753 (N.D. IL); *Philip Charvat v Elizabeth Valente*, Case No. 12-cv-5746 (N.D. IL); *Robert Zani v Rite Aid Hdqtrs. Cor*p., Case No. 14-cv-9701(AJN)(RLE)(S.D. NY), *A.D. v Credit One Ban*k Case No. 1:14-cv-10106 (N.D. IL); *Oerge Stoba, and Daphne Stoba v Saveology.com, LLC, Elephant Group, Inc.; Time Warner Cable, Inc*., Case No. 13-cv-2925-BAS-NLS (S.D. Cal.); *Shyriaa Henderson v United Student Aid Funds, Inc*. Case Number: 3:13-cv-1845-L-BLM (S.D. Cal.); *Marciano v Fairwinds Financial Service*s Case No. 6:15-CV-1907-ORL-41 KRS (M.D. Fla); *Alice Lee v Global Tel\*Link Corporatio*n, Case No. 2:15-cv-02495-ODW-PLA [consolidated with 2:15-cv-03464-ODW-PLA (C.D. Cal.); *Alan Brinker v Normandin'*s, Case No. 5:14-cv-03007-EJD-HRL (N.D. Cal*.); Spencer Ung v Universal Acceptance Corporation,* Case No. 15cv127 RHK/FLN (D. Minn*); Seana Goodson v Designed Receivable Solutions,* Case No. 2:15-cv-03308-MMM-JPR (C.D. Cal); *Dominguez v Yahoo!, In*c., Case No. 2:13-cv-01887 (E.D. Penn); *Eli Ashkenazi v Bloomingdales, Inc*., Case No. 3:15-cv-02705-PGS-DEA (D. N.J.); *Abante Rooter and Plumbing, Inc. v Birch Communications, Inc*. Case No. 1:15-cv-03562 (N.D. GA); *Roark v Credit One Bank*, Case No. 0:16-cv-00173-RHK-FLN (D.Minn); *Carl Lowe And Kearby Kaiser v CVS Pharmacy, Inc., Minuteclinic, LLC, and West Corporation*, Case No. 1:14-cv-03687 (N.D. Ill); *Zaklit v Nationstar Mortgage, LLC*., Case No. 5:15-CV-02190-CAS-KK (C.D. Cal); *Charles Banks v Conn Appliance, Inc*., Case No. 01-16-0001-0736 (American Arbitration Association); *Rajesh Verma v Memorial Healthcare Group*, Case No. 3:16-CV-00427-HLA-JRK (M.D. Fla); *Herrick v Godaddy.com*, Case No. 2:16-cv-00254-DJH (D.AZ); *In Re: Monitronics International, Inc., Telephone Consumer Protection Act Litigation*, Case No. 1:13-md-02493-IMK-JSK (N.D.W.V.); *Diana Mey v Ventura Data*, LLC And Public Opinion Strategies, Case No. 5:14-CV-123 (N.D.W.V.); *Lucero v Conn Appliances*, Case No. 01-16-0004-7141 (American Arbitration Association); *Dennis v Progressive Leasing*, Case No. 01-16-0002-8798 (American Arbitration Association – Final Hearing); *Shani Marcus and Frieda Esses Ashkenazi v CVS Pharmacy, Inc*., Case No.: 3:15-cv-259 PGS-LHG (D. N.J.); *Donnell*

*Webster v Conn Appliances, Inc*., Case No.: 01-16-0003-3774 (American Arbitration Association - Final Hearing); *Snyder v Ocwen Loan Servicing*, Case No.: 1:14-cv-08461 (N.D. Ill); *Shamara Abrahams v First Premier Bank*, Case No. 01-16-0003-8128 (American Arbitration Association - Final Hearing); *Wooten v Conn Appliances, Inc*., Case No.: 01-16-0003-5557 (American Arbitration Association – Final Hearing); *SANDRA WEST AND HECTOR MEMBRENO v CALIFORNIA SERICE BUREAU*, Case No.: 4:16-cv-03124-YGR (N.D. Cal.); *Summers v Conn Appliances*, Case No.: 01-16-0004-1183 (American Arbitration Association - Final Hearing); *Sheena Raffin v Medicredit*, Case No.: 2:15-cv-04912-GHK (C.D. Cal); *Verina Freeman and Valecea Diggs v Wilshire Commercial Capital*, Case No.: 2:15-cv-01428-WBS-AC (E.D. Cal); *Tomeo v Citigroup*, Case No.: 1:13-cv-04046 (N.D. Ill); *Douglas Jurist v Receivables Performance Management, LLC*, Case Number 1240022589 (JAMS ARBITRATION); *April Turner v Credit One Bank, N.A*., Case No. 1440005239 (Arbitration Tribunals of JAMS - Final Hearing); *Frederick Luster and Narval Mangal v Green Tree Serivicing. LLC*, Case No. 1:14-cv-01763-ELR (N.D. Georgia)

### ___Work and Analysis in this Case___

13.     I have reviewed various documents and evidence from this case relating to the calls made to Claimant, and I have reviewed various other documents relating to the use and regulation of autodialers. Specifically, I have reviewed the following documents: 1) Exhibit B - FCC 2003 Order (*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 F.C.C. Red. 14014); 2) Exhibit C - The Big 2 Myths You Probably Believe About Manual Dialing - Part 1; 3) Exhibit D - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2; 4) Exhibit E - US patent 3943289; 5) Exhibit F - US patent 4933964; 6) Exhibit G - Noble TCPA Compliance Solution; 7) Exhibit H - ATDS and predictive dialers 1970-1992; 8) Exhibit I - Davox Marketing; 9) Exhibit J - US Patent 3229042; 10) Exhibit K - US Patent 3317678; 11)

Exhibit L – FCC 2015 Order; 12) Exhibit M - FCC response to ACA; 13) Exhibit N - 1992 FCC Order; 14) Exhibit O – FCC 2012 Order; 15) Exhibit P - Wash Times 1991; 16) Exhibit Q – FCC 2008 Order; 17) Exhibit R – Noble Systems - Management Desktop; 18) Exhibit S - Noble Systems - IVR; 19) Exhibit T - Noble Systems - Outbound; 20) Exhibit U - Collecto Order; 21) Exhibit V - Noble Patent App 13902130; 22) Exhibit W - Noble Patent App 13958011; 23) Exhibit X - NSC_Brochure; 24) Exhibit Y - PR Noble Maestro Named a 2015 Product of the Year 010915 AU; 25) Exhibit Z - PR Noble Systems Releases Maestro v8 030315; 26) Exhibit AA - PS Noble Maestro Management; 27) Exhibit AB - PS Noble Outbound; 28) Exhibit AC - PS Noble Solution Intro; 29) Exhibit AD - PS Noble Solution Suite; 30) Exhibit AE - ps noble solution technical overview; 31) Exhibit AF - SS CBVCollectionServices; 32) Exhibit AG - SS ContactCentresAus AUS; 33) Exhibit AH - SS HairClub; 34) Exhibit AI - SS LighthouseCredit; 35) Exhibit AJ - SS Permanent tsb UK; 36) Exhibit AK - ss wakeforestunivphysicians; 37) Exhibit AL – Maestro 2008; 38) Exhibit AM - 2014 - Public Utility Commission of Texas ADAD Application; 39) Exhibit AN - 2015 - Public Utility Commission of Texas ADAD Application; 40) Exhibit AO – 2016 – Public Utility Commission of Texas ADAD Application; 41) Exhibit AP - SEC filing Ended January 31, 2005; 42) Exhibit AQ - SEC filing Ended January 31, 2006; 43) Exhibit AR - SEC filing Ended January 31, 2007; 44) Exhibit AS - SEC filing Ended January 31, 2008; 45) Exhibit AT - SEC filing Ended January 31, 2009; 46) Exhibit AU - SEC filing Ended January 31, 2010; 47) Exhibit AV - SEC filing Ended January 31, 2011; 48) Exhibit AW - SEC filing Ended January 31, 2012; 49) Exhibit AX - SEC filing Ended January 31, 2013; 50) Exhibit AY - SEC filing Ended January 31, 2014; 51) Exhibit AZ - SEC filing Ended January 31, 2015; 52) Exhibit BA - Harmony version 4.1 User Manual; 53) Exhibit BB - Maestro 8.0 User Manual vol. 1 - Setup and Utilities; 54) Exhibit BC - Maestro 8.0 User Manual vol. 2 - Daily Management; 55) Exhibit BD - Maestro 8.0 User Manual vol. 3 - IVR; 56) Exhibit BE - Noble Training Guide 2016.

14.     Additionally, I have analyzed the Noble Systems predictive dialer in other matters involving Conn Appliances, and numerous times over the last 10 years.

15.     Additionally, I have spoken with Noble Systems Engineers regarding the Noble Systems predictive dialer.

16.     Additionally, I regularly attend webinars hosted by Noble Systems regarding their products including the Noble Systems predictive dialer.

17.     Based upon the documents and evidence I have reviewed, and my experience and knowledge of the Noble predictive dialer, I conclude that Conn Appliances used a predictive dialer, a type of automatic telephone dialing system, to place calls to the Claimant.

### *Conn Appliances used a Predictive Dialer, which has the Characteristics of an Automatic Telephone Dialing System*

18.     I have been retained in part to evaluate whether the telephone dialing system used by Conn Appliances to place the calls at issue in this case was a predictive dialer or otherwise has the characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act, 47 U.S.C. § 227. ("TCPA"). According to the FCC:

> "The TCPA defines an 'automatic telephone dialing system' as 'equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.' The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an 'automatic telephone dialing system,' the equipment need only have 'the *capacity* to store or produce telephone numbers (emphasis added)'…."

*(See Exhibit B – In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, at ¶ 131-134 (2003) (the "FCC 2003 Order")).*

19.     Within the industry, "Automatic Telephone Dialing System", or "auto-dialer" for short, has been attributed to any system with the capacity to automatically dial phone numbers.  Naturally, for a system to automatically dial phone numbers, the system must either produce or store those phone numbers.  Within the industry, these terms were not applied to systems that would only call one pre-programed number such as a home security system or speed dial, but were applied to systems used for telemarketing or call centers.  These names have been attributed to these systems for over 50 years.  There are different types of "auto-dialers" such as "predictive dialers," "power dialers," and dialers that deliver pre-recorded messages (commonly referred to as "voice broadcasting").  Within the industry, these systems are not defined by any other terms when used in other dialing modes such as manual or preview.  The fact that these terms have been used to define auto-dialers for over 50 years can be corroborated or discovered by a few clicks through the Patent Office's website (new patents cite old patents) which yields these historical insights.  The FCC's understanding seems to be consistent with the industry's understanding.  (*See Exhibit B – FCC 2003 Order, at ¶¶ 131-134 (finding that a predictive dialer falls within the TCPA's definition of "automatic telephone dialing system"); Exhibit O – FCC 2012 Order footnote 12, ¶ 20; Exhibit L – FCC 2015 Order pp. 11-24; Exhibit M - FCC response to ACA page 57 of 110).*  Within the industry, autodialers only need to store or produce numbers and call them to be an ATDS.  In this case, the predictive dialing system used by Respondent is capable of doing both.  Because the terms used within the industry are the same as the terms used by the FCC and the TCPA, to clarify my use of the terms in my report, I will point out that when referring to the FCC's or TCPA's definition I will clarify, as I did in the previous paragraph, by stating, "characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act."  Otherwise, when I use these terms, I am using them in the context which they have been used for decades within the industry.

*Williams v. Conn Appliances*
WRITTEN REPORT OF JEFFREY A. HANSEN

20.     The term "Predictive dialer" is a technical term used to describe the type of dialing system.  Predictive dialers all work under the same guiding principle: they transfer telephone numbers to be called to a list or "campaign."[1]  This list of numbers is then dialed without human intervention. The calls are made, using multiple telephone lines, in advance of being connected to a live operator.  Using a complex computer algorithm, the dialing system will "predict" how far in advance to make the calls in attempt to prevent time wasted in listening to rings, answering machines, disconnected phone numbers, and calls that are not answered.  This functionality has not changed since Davox marketed their predictive dialers in the 1980's. (*See Exhibit I – Davox Marketing*).

21.     The term "Predictive dialer" was not created by the FCC in their 2003 Order or their 1992 Order.  Nor was the term "automatic telephone dialing system" created by Congress.  These are terms that have been used to describe such equipment, by those in the industry for decades.  Norman A. Sheldon filed a patent (*Exhibit E – US patent 3,943,289*) on July 12, 1974 for what he called a "automatic telephone dialing system" (*Exhibit E – US patent 3,943,289 page 4 column 2 line 63*) which dialed numbers from a sequential number generator and delivered pre-recorded messages to telephone subscribers. He chose to use a sequential number generator because at that time computer storage was very expensive (*Exhibit E – US patent 3,943,289 page 4 column 2 lines 2-11*).  Although he chose to use a sequential number generator, stored lists of numbers had been used for many years prior to his patent. (*See Exhibit J – US Patent 3229042; Exhibit K – US Patent 3317678*).  In July 25, 1989, Bassem M. Girgis filed a patent (*Exhibit F - US patent 4,933,964*) for a "predictive outbound dialing system" (*Exhibit F - US patent 4,933,964 page 19 column 2 line 53*) which used an "input call list" (*Exhibit F - US patent 4,933,964 figure 3*) stored in the system to call those numbers in advance predicting when a live agent would be available using a

---

[1]      A "campaign" is like a "pool" in that it is calling a list of phone numbers organized by some predefined criteria for a specific purpose.  Further, "pool" and "campaign" as used throughout this Report have the same meaning.

*Williams v. Conn Appliances*
WRITTEN REPORT OF JEFFREY A. HANSEN

predictive algorithm.  This system was designed to call out on more lines than available agents from a list of numbers, listen for rings, busy, and answered calls, and connect the calls to agents by predicting when they would be available.  This is the precise capability of the Predictive dialers used today and the predictive dialer used by Conn Appliances.  The functionality of the autodialers and predictive dialers has not changed since long before the TCPA until now with the exception that modern dialers can make more calls in a shorter period of time.  Attached as Exhibit H are examples of articles and job postings illustrating that the exact same type of equipment was used over the last four decades, along with the terms "Automatic Telephone Dialing System" and "Predictive Dialer," long before Congress or the FCC considered the equipment.  (*See Exhibit H - ATDS and predictive dialers 1970-1992; Exhibit M – FCC response to ACA, at pp. 13-14 footnote 3*).  The equipment described in the TCPA and the FCC 2003 Order have precisely the same characteristics as the equipment that is in use today and used by Conn Appliances.

22.   The fact that the dialer places calls to numbers stored by the dialing system and delivers predictive dialed calls indicates that the dialer has the characteristics of an ATDS, as it relates to predictive dialers, as clarified in the FCC 2003 Order:

> The record demonstrates that a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers.  As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.   The principal feature of predictive dialing software is a timing function, not number storage or generation. ...[T]hese machines are not conceptually different from dialing machines without the predictive computer program attached.
>
> ….

11

1

2   The TCPA defines an "automatic telephone dialing system" as "equipment

3   which has the capacity (A) to store or produce telephone numbers to be

4   called, using a random or sequential number generator; and (B) to dial such

5   numbers." The statutory definition contemplates autodialing equipment that

6   either stores or produces numbers. It also provides that, in order to be

7   considered an "automatic telephone dialing system," the equipment need

8   only have the "capacity to store or produce telephone numbers (emphasis

9   added). . .." It is clear from the statutory language and the legislative history

10  that Congress anticipated that the FCC, under its TCPA rulemaking

11  authority, might need to consider changes in technologies. In the past,

12  telemarketers may have used dialing equipment to create and dial 10-digit

13  telephone numbers arbitrarily. As one commenter points out, the evolution of

14  the teleservices industry has progressed to the point where using lists of

15  numbers is far more cost effective. The basic function of such equipment,

16  however, has not changed—the capacity to dial numbers without human

17  intervention. We fully expect automated dialing technology to continue to

18  develop.

19  ….

20  [T]o exclude from these restrictions equipment that use predictive dialing

21  software from the definition of 'automated telephone dialing equipment'

22  simply because it relies on a given set of numbers would lead to an

23  unintended result. ...We believe the purpose of the requirement that

24  equipment have the 'capacity to store or produce telephone numbers to be

25  called' is to ensure that the prohibition on autodialed calls not be

26  circumvented. Therefore, the Commission finds that a predictive dialer falls

27  within the meaning and statutory definition of 'automatic telephone dialing

28  equipment' and the intent of Congress.

(*Exhibit B – FCC* 2003 Order, at *¶¶ 131-134 (finding that a predictive dialer falls within the TCPA's definition of "automatic telephone dialing system").*)

23.     Additionally, the properties of the dialing system has the precise capabilities of an ATDS as further clarified by FCC Order 12-56 (May 21, 2012), wherein, the FCC stated:

> Under the TCPA, the term "automatic telephone dialing system" is defined as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id*. at § 227(a)(1). The Commission has emphasized that this definition covers any equipment that has the specified capacity to generate numbers and dial them without human intervention whether or not the numbers called are randomly or sequentially generated or come from calling lists.

(*See Exhibit O – FCC 2012 Order ¶ 20 and footnote 12*).

24.     Based upon the documents and evidence I have reviewed and my knowledge of the Noble predictive dialer, the calls that Conn Appliances made to Claimant were made using a predictive dialer.  As explained further below, in my expert opinion, the below dialing system that is discussed in detail has the characteristics of an "automatic telephone dialing system" ("ATDS") as defined by the TCPA.

25.     The Noble Systems predictive dialer was used by Conn Appliances. (*See Exhibit AM - 2014 - Public Utility Commission of Texas ADAD Application; Exhibit AN - 2015 - Public Utility Commission of Texas ADAD Application; Exhibit AO - 2016 - Public Utility Commission of Texas ADAD Application*).  The Noble Systems dialer is a predictive dialer that, like other predictive dialers, calls lists of numbers organized as "campaigns." The Noble Systems predictive dialer can be used to make predictive dialed calls along with delivering pre-recorded messages by automatically calling a list of numbers and playing an audio file.  (*See Exhibit U - Collecto Order; Exhibit V - Noble Patent App 13902130; Exhibit W - Noble Patent App 13958011; Exhibit X – NSC_Brochure; Exhibit Y - PR Noble Maestro Named a 2015 Product of the Year*

*Williams v. Conn Appliances*
WRITTEN REPORT OF JEFFREY A. HANSEN

*010915 AU; Exhibit Z - PR Noble Systems Releases Maestro v8 030315; Exhibit AA - PS Noble Maestro Management; Exhibit AB - PS Noble Outbound; Exhibit AC - PS Noble Solution Intro; Exhibit AD - PS Noble Solution Suite; Exhibit AE - ps noble solution technical overview; Exhibit AF - SS CBVCollectionServices; Exhibit AG - SS ContactCentresAus AUS; Exhibit AH - SS HairClub; Exhibit AI - SS LighthouseCredit; Exhibit AJ - SS Permanent tsb UK; Exhibit AK - ss wakeforestunivphysicians; Exhibit R – Noble Systems - Management Desktop; Exhibit S - Noble Systems - IVR; Exhibit T - Noble Systems – Outbound; Exhibit AL - Maestro 2008 pp. 229-258; Exhibit AP - SEC filing Ended January 31, 2005 pp. 4, 6; Exhibit AQ - SEC filing Ended January 31, 2006 pp. 6, 8; Exhibit AR - SEC filing Ended January 31, 2007 pp. 2, 5; Exhibit AS - SEC filing Ended January 31, 2008 pp. 3, 4; Exhibit AT - SEC filing Ended January 31, 2009 pp. 3, 4; Exhibit AU - SEC filing Ended January 31, 2010 pp. 2, 3; Exhibit AV - SEC filing Ended January 31, 2011 pp. 4, 5, 6; Exhibit AW - SEC filing Ended January 31, 2012 pp. 4, 5, 6, 7; Exhibit AX - SEC filing Ended January 31, 2013 p. 3; Exhibit AY - SEC filing Ended January 31, 2014 pp. 3, 4, 5; Exhibit AZ - SEC filing Ended January 31, 2015 p. 2; Exhibit BA - Harmony version 4.1 User Manual pp. 197-242, 451-452; Exhibit BB - Maestro 8.0 User Manual vol. 1 - Setup and Utilities pp. 275-305, 593; Exhibit BC - Maestro 8.0 User Manual vol. 2 - Daily Management pp. 28, 66-69, 89-95, 115-117, 209-212; Exhibit BE - Noble Training Guide 2016 pp. 3, 11*). The Noble Systems predictive dialer is capable of dialing a list of numbers loaded into a "campaign" or "pool" on the dialer.  The Noble Systems predictive dialer then can automatically dial those numbers and deliver predictive dialed calls or agent-less calls delivering pre-recorded messages. (*Id.*) For predictive dialed calls, the Noble Systems predictive dialer will call using multiple telephone lines per agent, and it will use all available telephone lines when making agent-less calls. (*Id.*)  All phone calls, regardless of how dialed, are called using the same equipment, terminals, phone, PBX, and Noble predictive dialer before going to the PSTN (public switched telephone network).

26.     After reviewing the above documents, and based on my experience with predictive dialers and autodialers, and the Noble Systems predictive dialer used by Conn Appliances, I am of the opinion that Conn Appliances used the above predictive dialer to place telephone calls to Claimant, and that the dialer has the capacity to store or produce numbers to be called, using a random or sequential number generator, and the capacity to call such numbers. Specifically, the dialer is capable of automatically and without human intervention calling numbers that are stored as a list, which itself is stored in a table of a database.

27.     Thus, in my expert opinion, the dialing system (as outlined above) has the characteristics of an ATDS as contemplated by the TCPA and clarified by the FCC, because this system has the capacity to store numbers in a list and dial them without human intervention and also has the capacity to generate numbers to form a list for dialing without human intervention.

28.     A predictive dialer has the capacity of an ATDS, not because it predicatively dials calls, but simply because it has the capacity to automatically call numbers stored in a list.  The predictive algorithm in a predictive dialer predicts when agents would be available and is no way related to the storage or production of numbers.  With all the predictive dialers that I have worked with in the last 16 years, the predictive algorithm was in no way related to the storage or production of numbers. The FCC correctly stated this, "The principal feature of predictive dialing software is a timing function, not number storage or generation." (*See Exhibit B – FCC 2003 Order at ¶ 131*)

29.     All predictive dialers have the characteristics of an ATDS, but not all ATDS's are predictive dialers.  As the FCC stated, "The principal feature of predictive dialing software is a timing function, not number storage or generation.... [T]hese machines are not conceptually different from dialing machines without the predictive computer program attached." (*See Exhibit B – FCC 2003 Order at ¶ 131*).  The FCC also has grouped dialers into two categories: those that have live agents (predictive

dialers) and those that are agent-less (pre-record, artificial voice).  (*See Exhibit N - 1992 FCC Order ¶¶ 8, 9*)  I myself use the example of predictive dialers when explaining what capacities are in view in the FCC 2003 Order.  I do this because there are many more features than just storing numbers in a list and automatically calling them, and using the example of the predictive dialer I can highlight that none of those other features have anything to do with computer storage or the generation of numbers. Systems, such as the one listed above, used by Conn Appliances, that are capable of calling lists of numbers to deliver a pre-recorded message or systems that call numbers to deliver a text or SMS message have no live agents involved; therefore, there is little confusion on their capacity to store or produce numbers and to call them. But all those other features in a predictive dialer are in addition to storing numbers and automatically calling them.  Other features found in predictive dialers—such as ACD routing, AMD detection, preview mode and other dialing modes, predictive algorithms, abandon rate, cloud based, skills based routing, blended campaigns, CRM integration, types of databases used by the system, VoIP, POTS lines, T1 lines, PRI lines, operating systems, and computer hardware—all have nothing to do with the system's capacity to store a list of numbers and to automatically call them.  For these reasons, I use the example of predictive dialers to explain what features make it an ATDS, because at the same time I can explain what features do not make it an ATDS.

30.   I would note that predictive dialers, including the Noble Systems predictive dialer, generally have the capacity to deliver pre-recorded messages to telephone consumers without the need of live agents.  As for the Noble Systems predictive dialer there is entire manuals dedicated to the delivery of pre-recorded voice, Text To Speech (artificial voice) and IVR agent-less campaigns. (*See Exhibit Y - PR Noble Maestro Named a 2015 Product of the Year 010915 AU; Exhibit Z - PR Noble Systems Releases Maestro v8 030315; Exhibit AA - PS Noble Maestro Management; Exhibit AB - PS Noble Outbound; Exhibit AC - PS Noble Solution Intro; Exhibit AD - PS Noble Solution Suite; Exhibit AE - ps noble solution technical overview; Exhibit AF*

1  *- SS CBVCollectionServices; Exhibit AG - SS ContactCentresAus AUS; Exhibit AH - SS*
2  *HairClub; Exhibit AI - SS LighthouseCredit; Exhibit AJ - SS Permanent tsb UK; Exhibit*
3  *AK - ss wakeforestunivphysicians; Exhibit S - Noble Systems – IVR; Exhibit T - Noble*
4  *Systems – Outbound; Exhibit AL - Maestro 2008 pp. 248, 249; Exhibit BA - Harmony*
5  *version 4.1 User Manual pp. 198-203; Exhibit BB - Maestro 8.0 User Manual vol. 1 -*
6  *Setup and Utilities pp. 292-301; Exhibit BC - Maestro 8.0 User Manual vol. 2 - Daily*
7  *Management pp. 115, 116, 117; Exhibit BD - Maestro 8.0 User Manual vol. 3 - IVR).*

8  31.    The dialer's mode of operation however does not change the capacity of
9  the system.  Changing the mode of dialing is done by effectively clicking a radio button
10  and clicking "save."  The FCC considered this when clarifying "capacity."  For the
11  Noble Systems predictive dialer this is done with changing the pacing to predictive,
12  preview or blast.  (*Exhibit AL - Maestro 2008 pp. 248, 249; Exhibit BA - Harmony*
13  *version 4.1 User Manual pp. 197-203; Exhibit BB - Maestro 8.0 User Manual vol. 1 -*
14  *Setup and Utilities pp. 293-296; Exhibit BC - Maestro 8.0 User Manual vol. 2 - Daily*
15  *Management pp. 66, 68, 69, 116, 117;*) The administrator of a predictive dialer is not
16  capable of taking away any functionality of the system.  The administrator can only
17  choose to not use it.  The fact that one campaign can be configured to use preview mode
18  and another campaign configured to use predictive, while other agents place calls
19  manually, all occurring at the same time, illustrates the system has the current capacity
20  regardless of the dialing mode selected for a particular campaign.  (*Exhibit AL -*
21  *Maestro 2008 p. 28; Exhibit BC - Maestro 8.0 User Manual vol. 2 - Daily Management*
22  *pp. 119-121*)

23  32.    All predictive dialers, which I have seen, also employ a "manual" mode
24  and a "preview" mode, which presents the calling agent with information about the to-
25  be-called party before the number is actually dialed. The agent then has the ability to
26  accept that lead based on the information presented, or reject it and await the dialer to
27  present a new lead to be called. Because a dialer has a preview mode or a manual mode

1  and the calling party may have used those modes, however, does not mean that the
2  dialer fails to qualify as an ATDS.

3  33.   I am not alone in my understanding of whether manual mode has any
4  effect on the capacity of the predictive dialer.  Recently, Ontario Systems (the creators
5  of the popular Guaranteed Contacts predictive dialer and the FACS system) published a
6  two-part article on the subject of dialing modes and their impact on the predictive
7  dialer's capacity as defined by the FCC.  Using the example of manually dialed calls
8  through the predictive dialer, Ontario Systems highlights that a Predictive dialer is a
9  predictive dialer regardless how it is used.  Manual dialing occurs when one presses all
10  ten digits of the phone number to place the call, not a number stored on the list.
11  Preview mode calls the numbers from the list stored in the predictive dialer's database.
12  The FCC clarified that predictive dialers are an ATDS because of their capacity, not
13  how the operator uses it.  The industry has attributed the name "predictive dialer" to
14  these systems regardless of how they are used.  The two articles from Ontario Systems
15  are relevant in their entirety (*See Exhibit C - The Big 2 Myths You Probably Believe*
16  *About Manual Dialing - Part 1; Exhibit D - The Big 2 Myths You Probably Believe*
17  *About Manual Dialing - Part 2*), however, the summary highlights the main point:

18  In other words, if the technology you use to contact consumers has any
19  capacity to dial predictively, or pull from a database of numbers and dial
20  them, current judicial opinion indicates it is an autodialer.  Period. This is
21  true whether you launch the call manually by pressing a field, or if you enter
22  10 digits on a keypad.  On the other hand, it opined such a call is a manual
23  dial if it's made using a system to contact consumers that is not tied, routed
24  from or to, or in any way connected to your autodialer. If it's not, it is
25  unlikely you are contacting consumers using an automatic telephone dialing
    system as defined by the FCC.

26  (*Exhibit D - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2*).  In
27  other words, to call cell phones, one should use a separate PBX entirely (plain phone
28  system).

---

18

34.     Another manufacturer of a popular predictive dialer agrees.  Noble Systems offers a solution which routes calls to wireless numbers through a separate PBX entirely. *(See Exhibit G - Noble TCPA Compliance Solutio*n).  There is no indication however that Conn Appliances had such a solution in place for the calls at issue in this matter.  On the contrary, Conn Appliances used Noble Systems flagship product which is their predictive dialer.

35.     As stated above, the FCC relies upon the following definition of an "automatic telephone dialing system":

> The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have "the capacity to store or produce telephone numbers (emphasis added)…."

(*See Exhibit B – FCC 2003 Order at ¶ 132*).   This definition is consistent with the definition used by those in the industry long before adopted by Congress or the FCC. (*See Exhibit E - US patent 3,943,289, Exhibit F - US patent 4,933,964, Exhibit H - ATDS and predictive dialers 1970-1992, Exhibit I - Davox Marketing, Exhibit J - US Patent 3229042, Exhibit K - US Patent 3317678*).

36.     Even more recently, on July 10, 2015, the FCC issued a Declaratory Ruling and Order in which the FCC clarified the term "capacity."  (*See Exhibit L – FCC 2015 Order, at ¶¶ 10-24*).

37.     In light of the FCC's July 10, 2015 Declaratory Ruling and Order in which the FCC takes a broad definition of "capacity" as it relates to autodialing numbers and the generation of numbers, I would point out that making a computer generate a list of 10 digit numbers "out of thin air", is a relatively trivial task.  All computers can generate random or sequential numbers.  A computer system simply cannot operate

19

without the ability to do so.  A "pseudo random number generator" is a key element in allowing a computer to "compute."  Computers are designed to do math and counting i.e. "to compute."  For example, typing "seq 6192486000 6192486999 > sequential_numbers_to_call.txt" creates a list of 1000 Sprint Wireless Numbers to be called (this was done on my regular laptop with no additional software installed).  In other words, my laptop running Linux has natively installed a "sequential number generator" that can produce a list of phone numbers.  Windows computers have a similar command line function as well.  Typing "for /L %i in (2480000,1,2489999) do @echo 619%i >> sequential_numbers_to_call.txt" generates the same list on a Windows computer.  The easiest for the novice user would be to simply use the "seq" command illustrated above, the Windows equivalent illustrated above, a loop in bash, /dev/random, or /dev/urandom.  There are many additional ways to generate random or sequential numbers.  The following is a small example:

- awk -v min=6192480000 -v max=6192489999 'BEGIN{srand(); print int(min+rand()*(max-min+1))}'
- shuf -i 6192480000-6192489999 -n 1000 > sprint_numbers.txt
- python -c "import random; print random.randint(6192480000,6192489999)"
- counter=6192480000
  while [ $counter -le 6192489999 ]
  do
  echo $counter
  ((counter++))
  done
- perl   -le   'print   6192480000+int(rand(1000))   for(1..1000)'   > sprint_numbers.txt

38.   Computers' ability to "compute" is completely dependent on their ability to generate numbers.  Computers simply would not function without the ability to do so.

Not only can the operating system be used to generate numbers, but all programing languages that I have seen rely on the ability to generate numbers.  One of the most common programming functions, in all languages, is a loop.  For example, to generate that same list of Sprint wireless sequential numbers a simple loop in the PHP script is all that is needed: "for ($i = 6192480000; $i < 6192490000; $i++)."  One of the examples above is a bash loop.  In both examples, the loop is starting at 6192480000 and counting in increments of 1 until reaching 6192489999.  Computers are completely dependent on their ability to count. For example, a predetermined period of time is set between program updates such as an anti-virus.  A loop would be used to count units of time until a number is reached before attempting another update.  When going to a website, the web browser is instructed to wait before giving up on displaying the page.  That wait period is also a loop in which the computer counts increments of time.  This can be seen in any autodialer, as they have timers that run for various timeout periods.  The generation of random numbers is just as important and as common a task in computer programming as the generation of sequential numbers. The most obvious use is cryptography and certain numerical algorithms, but many other operations need a modest amount of unpredictability. Some simple examples might be to present a user with a "Random Quote of the Day", or determining which way a computer-controlled adversary might move in a computer game. Weaker forms of randomness are used in hash algorithms and in creating amortized searching and sorting algorithms.

39.    The Noble Systems predictive dialer runs on Linux and Maestro or Harmony run on a Microsoft Windows Client to the dialer.  (*See Exhibit AL - Maestro 2008 pp. 31-38; Exhibit BA - Harmony version 4.1 User Manual pp. 22, 45; Exhibit BB - Maestro 8.0 User Manual vol. 1 - Setup and Utilities pp. 33-35, 37-38, 58, 60, 61, 65, 103, 155, 158, 168, 169, 183*) Of course, storage of numbers does not discriminate on how the numbers were produced as computer storage can store any kind of data regardless of how it was produced whether loaded from a list of known numbers or a

list of sequentially generated numbers. (*See Exhibit M – FCC Response to ACA. at. 6, 12, 13, 24, 36, 37, 38, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 52*).

40.    I would note that the industry has classified any system capable of auto-dialing phone numbers as an auto-dialer whether the numbers are stored **or** produced. Also, for systems to produce numbers, those numbers still need to be stored before dialing them.

41.    The FCC's orders and rulings provide me with the information that assists me in forming an opinion about whether Conn Appliances' dialing system has the characteristics of an ATDS. Based on those orders and rulings, based upon my review of the documents and evidence provided in this case, based on my knowledge of computer storage and computer processing, and based on my knowledge of autodialers and predictive dialers, it is also my expert opinion that the calls placed by Conn Appliances to Claimant using the dialer described in detail above were made using a predictive dialer that has the characteristics of automatic telephone dialing systems as defined by the TCPA and FCC.

### *Additional steps taken in Analyzing Conn Appliance's Dialing System*

42.    To analyze the system, the first step was to identify the components of the system.  All the individual components of the system by themselves are incapable of performing any specific task.  For example, predictive dialing software needs to be installed on an operating system such as Microsoft Windows or Linux.  The operating system is required to be installed before any other programs such as the predictive dialing software.  The operating system also is what would allow programs, such as the dialing software, to interact with the hardware of the system (standard computer hardware).  To illustrate, no single component of an automobile is capable of transporting someone from point A to point B, but instead many components are combined to create a single system.  The automobile needs a chassis, akin to the

operating system of a dialer.  The automobile also needs an engine, akin to the dialing software.  Typically, software is not created to perform a task that is handled by the operating system in which the software is installed on, such as the generation of phone numbers discussed earlier in my report.  To do so would be redundant, as would be having two radios in the automobile.  In the case of the Noble Systems predictive dialer, the predictive dialer software is installed on a Linux computer and the administrative software (Maestro or Harmony) is installed on a Microsoft Windows Computer as a client to the dialer.  Earlier in my report, I provided the exact command to generate a list of numbers from either the server hosting the dialer software or the client the operator of the dialer sits at.  Lists are loaded from the client to the dialer, settings to campaigns are made from the client computer using either the Maestro software or Harmony software.  This "Client-Server" relationship is the same as the mainframe-terminal relationship seen in computer systems in the past.  This "Client-Server" relationship is often referred to as a "Distributed Application Structure" because it partitions tasks or workloads over a resource or service much the same way that each component of an automobile is responsible for a particular function in the overall system.  This distributed application model has also been referred to as "Software as a Service" ("SaaS") with web based applications combined with the client computer connecting to the web server.  The FCC highlights that the system is comprised of components in their 2003 order "a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." (*See Exhibit B – FCC 2003 Order, at ¶ 131*) The FCC again highlighted that many systems, even if spread across multiple entities, can form an ATDS.  (*See Exhibit L – FCC 2015 Order ¶¶ 23-24*)

43.    I would note that predictive dialers were intended to primarily call from a defined list of numbers since the time they became popular in the mid 1970's.  On a

technical level, while one could generate and call a list of sequential numbers, it would confuse the algorithm and the dialer would generate many abandoned calls.  As I illustrated earlier, "predictive dialers," and "autodialers" were common parlance within the telemarketing and debt collection industries, but also well understood outside those industries two decades later when the TCPA was enacted. (*See Exhibit M - FCC response to ACA pp. 13-14 footnote 3; Exhibit P - Wash Times 1991*).  As stated earlier in my report, predictive dialers functionality has not changed since Davox marketed their predictive dialers throughout the 1980's.

44.    I would note that the term "predictive dialer" along with the description of the functionality of the predictive dialer is also commonly used by Conn's when describing the Noble Systems predictive dialer outside of litigation (*See Exhibit AP - SEC filing Ended January 31, 2005 pp. 4, 6; Exhibit AQ - SEC filing Ended January 31, 2006 pp. 6, 8; Exhibit AR - SEC filing Ended January 31, 2007 pp. 2, 5; Exhibit AS - SEC filing Ended January 31, 2008 pp. 3, 4; Exhibit AT - SEC filing Ended January 31, 2009 pp. 3, 4; Exhibit AU - SEC filing Ended January 31, 2010 pp. 2, 3; Exhibit AV - SEC filing Ended January 31, 2011 pp. 4, 5, 6; Exhibit AW - SEC filing Ended January 31, 2012 pp. 4, 5, 6, 7; Exhibit AX - SEC filing Ended January 31, 2013 p. 3; Exhibit AY - SEC filing Ended January 31, 2014 pp. 3, 4, 5; Exhibit AZ - SEC filing Ended January 31, 2015 p. 2*)

45.    Finally, in my analysis, the mode of operation does not change the capabilities of the system.  As I pointed out earlier, a predictive dialer can easily be instructed to make auto-dialed calls or to make preview dialed calls with a couple clicks of the mouse.  My analysis was to determine if the system was an "auto-dialer."  Even when the dialer is not placing calls, it is still an auto-dialer, and within the industry there is no other name attributed to such systems when used in other modes or whether the dialer calls from a defined list or generated list. (*Also see Exhibit Q – FCC 2008 Order ¶¶ 12-14*)

1    46.    I would point out that predictive dialers have been included in the

2 definition of an ATDS by the telemarketing and debt collection industry for five decades

3 with or without the ability to generate numbers, and the FCC has specifically included

4 predictive dialers as an ATDS since 1992. (*See Exhibit N - 1992 FCC Order ¶¶ 8,9;*

5 *Exhibit B – FCC 2003 Order, at ¶¶ 131-134; Exhibit H - ATDS and predictive dialers*

6 *1970-1992; Exhibit I - Davox Marketing*)

7    47.    I reserve the right to amend, modify or supplement the statements and

8 opinions set forth herein as appropriate.

9    48.    I declare that the foregoing is true and correct, subject to the laws of

10 perjury of the United States. Executed in Spring Valley, CA on this ⟋⟋⟍ day of

11 December 2017.

12

13 _____

Jeffrey A. Hansen

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Williams v. Conn Appliances*
WRITTEN REPORT OF JEFFREY A. HANSEN

AMERICAN ARBITRATION ASSOCIATION

JOHNNIE WILLIAMS, JR.,

Claimant,

      vs.

CONN APPLIANCES, INC.,

Respondent.

Case No. 01-17-0001-5149

**Report of Adam Sorini, Ph.D., CCFP**

**REPORT OF ADAM SORINI, PH.D., C.C.F.P.,**

# EXHIBIT C

CONFIDENTIAL – ATTORNEY'S EYES ONLY

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     BACKGROUND OF DR. ADAM SORINI ...........................................................1

III.    SUMMARY OF OPINIONS .................................................................................3

IV.    TECHNOLOGY TUTORIAL ..............................................................................3

V.      CONN'S CALL CENTER SYSTEM ....................................................................7

        System Components.............................................................................................7

        Onsite Inspection ................................................................................................8

        Documentation Reviewed.................................................................................12

VI.    REPORT OF JEFFERY HANSEN ......................................................................14

VII.   OTHER TOPICS ................................................................................................20

## TABLE OF EXHIBITS

| Exhibit A | CV of Adam Sorini, Ph.D., CCFP |
|-----------|-------------------------------|
| Exhibit B | List of Materials Reviewed |
|           |                               |

1800646.000 - 1963

CONFIDENTIAL – ATTORNEY'S EYES ONLY

## I.      INTRODUCTION

1.      My name is Adam Sorini. I am a Senior Managing Scientist at Exponent, Inc. ("Exponent"), an engineering and scientific consulting firm headquartered at 149 Commonwealth Drive, Menlo Park, California 94025. Exponent has been retained by counsel for Conn Appliances, Inc. ("Conn" or "Conn's") in the above-captioned matter to provide independent technical expert consulting services. I, Adam Sorini, am the principal investigator in this matter.

2.      I am a salaried employee of Exponent. Exponent charges $320 per hour for my time, plus expenses for work performed in connection with this project. I have received no additional compensation for my work in this case, and my compensation does not depend on the contents of this report, any testimony I may provide, or the ultimate outcome of this case.

3.      As part of this engagement, I have been asked by counsel for Conn to provide technical consulting services related to telephone equipment and software, including analysis of the software provided by Noble System Corporation ("Noble") in use at Conn's San Antonio "call center," which I have been informed is representative of the system used by Conn's in all of its call centers. I have also been asked to review the report of Jeffery A. Hansen, dated December 20, 2017. I have also been asked to provide my opinion regarding the capabilities and characteristics of Conn's telephone system in relation to the definition of an Automatic Telephone Dialing System ("ATDS") given in the Telephone Consumer Protection Act of 1991 ("TCPA").

## II.     BACKGROUND OF DR. ADAM SORINI

4.      I am a Senior Managing Scientist at Exponent, a science and engineering consulting firm. I have worked in Exponent's Electrical Engineering and Computer Science practice for the past six years. I hold a B.S. degree in physics from the University of Michigan and M.S. and Ph.D. degrees in physics from the University of Washington. Prior to joining Exponent, I worked as a post-doctoral researcher at Lawrence Livermore National Laboratory, where I worked on large-scale computational physics research, including DOE Q-type classified (similar to DOD "Top Secret") research and development. I also worked as a post-doctoral researcher at Stanford University, where I developed software to study electronic systems.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

5.     At Exponent, I have investigated numerous telephony systems and networks. I also have analyzed call center equipment and software, including various versions of the Noble software. I also have experience investigating many different types of electronic devices and computer systems such as servers, desktops, laptops, tablets, cell phones, smart medical devices, and other "smart" embedded systems.

6.     I also have expertise in the field of computer security ("cyber-security"), including network security, software/firmware security, and hardware security. Specifically, I have consulted in the field of digital forensics, where I have professional experience analyzing a variety of hardware platforms, file systems, and operating systems, such as Windows, OSX, and Linux.

7.     While with Exponent, I have worked on a variety of projects involving software analysis and development in well-known high-level languages such as Java, C#/.NET, Objective-C, C++, C, MATLAB, Python, PHP, and JavaScript.

8.     I also have experience working with mobile phone hardware, firmware, and software for phones having various makes/models and operating systems, including iOS and Android, as well as writing software applications for each of these operating systems. I perform forensic extraction and analysis of data stored on cellular phones, am familiar with cellular phone database formats, and have inspected and analyzed computerized telephone control software.

9.     I have authored thirty articles (the majority in peer-reviewed publications), including publications such as the Proceedings of the National Academy of Sciences, the Proceedings of The Institute of Electrical and Electronics Engineers (IEEE) Symposia, Nature Communication, and the Physical Review, and have made numerous conference presentations in the field of electronic systems, computer and telephone forensics, and cybersecurity of embedded systems.

10.    Additionally, I am a Certified Cyber Forensics Professional (CCFP), as recognized by the International Information System Security Certification Consortium (ISC²). I

1800646.000 - 1963

CONFIDENTIAL – ATTORNEY'S EYES ONLY

am also a Senior Member of the Institute of Electrical and Electronics Engineers (IEEE). A copy of my CV is attached hereto as Exhibit A.

## III.   SUMMARY OF OPINIONS

11.   The Noble software system used by Conn's is not capable of producing telephone numbers to be called using a random or sequential number generator and dialing such numbers. The call center system in use by Conn's does not have the latent capacity to integrate random or sequential numbers into the Noble software system. Such integration would be outside the design of the Noble software system and outside the expertise and training of Conn's staff.

12.   In addition, the call center system in use by Conn's will only function as intended with substantial and sustained human intervention.

13.   The Report of Jeffrey A. Hansen contains a number of misstatements regarding computer systems and their capabilities. As a result, Mr. Hansen's opinions regarding the capabilities of Conn's system are inaccurate and his understanding of the human intervention involved in the operation of Conn's system is lacking.

## IV.   TECHNOLOGY TUTORIAL

14.   In this section, I explain how certain important components of computer systems function and give a general description of computer systems. These basics of computing systems are necessary to understand what is meant in the computer science industry when describing the capabilities of computer software. In particular, it is important to understand the process by which software developers create software (with given capabilities) and transform the software using a compiler (explained below) into a form that can be loaded and executed on a modern computer. It is also important to understand that software generally relies on an operating system (explained below) to function and that capabilities of a given piece of software can be related to operating system capabilities but are not necessarily the same as operating system capabilities. Rather, application software developers may explicitly request (as explained below) a subset of operating system capabilities that is then fixed for a given piece of software.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

15.     All computer systems consist of four main components: [1] (1) Processor, (2) Memory, (3) Input, and (4) Output. The term "processor" includes components such as the computer's Central Processing Unit ("CPU"). The term "memory" here refers to any storage locations for data and instructions such as the computer's Random-Access Memory ("RAM"). The term "input" includes input files or input devices such as the user's keyboard/mouse. Similarly, the term "output" includes output files or output devices such as the user's display monitor.

16.     The processor is the active part of the computer and its job is to perform arithmetic calculations on data (received via input devices or stored in memory) according to a list of instructions (also received via input or stored in memory).

17.     The input list of instructions is selected from a fixed finite set of "words" understood by the processor (the processor's "instruction set").[2]

18.     The "list of instructions" and data that command the processor can also be referred to as a "computer program" or software. However, most application software is assisted in its operation by a logical component known as the "operating system." The operating system is also software and as such is simply another list of instructions that is understood by the processor.

19.     Another important "special" computer program (in the same sense that the "operating system" is special) is a computer program called a "compiler." When human computer programmers write software, they generally write in a human-readable format known

---

[1]     Patterson, David A., Hennessy, John L. *Computer Organization and Design*. 5th Edition. Elsevier. 2014.

[2]     For example, the x86 or x86_64 instruction set is often used for compiled program on many personal computers. See, for example, "Intel 64 and IA-32 architectures software developer's manual" volumes 1—4 (available at https://software.intel.com/en-us/articles/intel-sdm).

1800646.000 - 1963

CONFIDENTIAL – ATTORNEY'S EYES ONLY

as "source code." A compiler converts the human-readable source code into the above-mentioned machine-readable lists of instructions. The machine-readable lists of instructions are also referred to as "machine code." Machine code is not easily readable by humans. Machine code is also not easy to modify by humans unless they have highly specialized training and knowledge. That is, a compiled or "executable" computer program has its capabilities fixed once and for all when it is "compiled."

20. One example of an executable computer program is the Noble Maestro computer program. This executable list of instructions is fixed and unalterable by the lay user. When the program is executed—for example, by the user "double-clicking" an icon in Windows—the operating system loads the machine code instructions into RAM and begins executing the list of instruction on the processor. The list of instructions is completely fixed; it is the same every time the computer program executes. The capabilities of this program are likewise fixed and unalterable by the user.

21. Because computers simply execute arithmetic operations based on lists of instructions, their operation is deterministic. The same input fed into a processor/memory in a given state will always lead to the same output.

22. Thus, computers are deterministic machines; they are not random in nature. Indeed, devising a list of input instructions that produce "random-looking" output is a challenging mathematical problem.[3] A computer program that attempts to produce "random-looking" output is called a "pseudo-random number generator" (PRNG). The numbers produced by a PRNG are not truly random; however, the number distributions may appear to be random

_____

[3]  See, for example, the National Institute of Standards and Technology Special Publication SP 800-90 series. See also, generally, random.org. For cryptographic challenges in random number generation, see Katz, J. and Lindell, Y. *Introduction to Modern Cryptography* 2nd Edition 2015, for example, at Section 3.3.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

(uniform) to a certain subset of observers. Nevertheless, the production of such numbers is deterministic.

23.     Because the generation of "good" random numbers (meaning generating numbers that appear random or uniform) is an important part of modern computer security, the interface to "good" random numbers is often strongly controlled by the operating system. Software application developers can specify that they want to make use of functionality provided by the operating system in their "source code" before it is compiled. The specification of available functionality is called an "application programming interface." For example, a modern Windows application can ask the operating system for access to strong random numbers by utilizing the Windows Cryptography Application Programming Interface, or "CryptoAPI." A computer program that was not compiled with this capability built-in (via the proper references in the source code) cannot be subsequently modified to have such capabilities and therefore would not be capable of generating random numbers in this way.

24.     As mentioned above, modern operating systems provide the interface to cryptographically strong random numbers. For example, the Linux operating system provides access to its "entropy pool" as a source of random numbers. Further, a Linux application such as the "Bourne Again Shell" (Bash) program allows the user to interface with the entropy pool using a keyboard and monitor and a special file provided by the operating system called the "/dev/urandom" device file. If software application developers want to make use of the numbers produced by this device file, they must make use of an application programming interface to read bytes from this file. If that capability is not explicitly included in the application "source code" before compilation, it cannot simply be tacked on later. Similarly, if software application developers would like to make use of a different PRNG like the "c language" function "rand," they still must explicitly include the API, typically given in the "stdlib.h" header file. The capability for pseudo-random number generation is built in when the executable program is compiled and cannot subsequently be altered without the use of highly specialized tools and reverse engineering knowledge.

1800646.000 - 1963

CONFIDENTIAL – ATTORNEY'S EYES ONLY

## V.     CONN'S CALL CENTER SYSTEM

### *System Components*

25.     Conn's call center system involves various subsystems, all of which are operated by Conn's staff members, such as the Conn's Credit Systems Team ("CST") employees and call center agents, as well as customer service staff.

26.     Conn's system includes a point-of-sale–related system called "AS400" that is used by Conn's employees to manually enter the initial customer information, such as items purchased, telephone numbers, consent information, and other customer data. I was informed by CST members during my onsite visit to see how Conn's operates its specific telephony system that the "back end" storage system for the AS400 is housed off-site and that the "front end" (employee interface) consists of tablet computers. I was also informed that this system was initially set up around 20 years ago. The AS400 system interfaces with the "Latitude" system (see below) as well as the "FiServ" system (see below).

27.     Conn's system also involves a financial services subsystem called "FiServ" that is provided by a third-party and used to perform certain financial operations on customer data such as those required by companies that work with customers to buy items on credit. CST members informed me that data is transferred between the FiServ system and the AS400 system via the Internet and that this system was initially set up around 15 years ago.

28.     Conn's system also involves a data repository component called "Latitude," which is used as a "file cabinet" for customer information. The Latitude system interfaces with both the AS400 system and the Noble system (see below). It is also used, in conjunction with human operator intervention, in building the "work cards" that contain customer data for use by call center agents and CST members. Information in the Latitude system, such as the "Status" value for numbers, can be updated by Conn's call center agents using a "phone panel" from their local Windows workstations after they have finished contacting a customer. Additional data in Latitude are updated many times throughout the day by CST employees. I was informed that this system was set up around May 2012. Updating and maintaining customer data in the Latitude and AS400 systems are also manual processes requiring extensive human intervention.

1800646.000 - 1963

CONFIDENTIAL – ATTORNEY'S EYES ONLY

29.    Conn's system also involves a component called "Noble," which itself is made up of two major parts: "Noble Maestro" and "Noble Harmony." These two parts are both compiled computer programs that are used by Conn's CST employees to control the workflow and pacing of the call center. I was informed that Conn's staff has not made any attempt to modify the compiled/executable Noble computer programs (nor do they have the required expertise to do so). I also was informed that the Latitude and Noble systems communicate roughly every fifteen minutes. In addition to the Noble Maestro and Noble Harmony components, there are also "back-end" Noble servers that are housed off-site at Noble's data center.[4] The employees at Conn's call center have no way to interface directly with the back-end servers at Noble's data center. I was informed that this system was set up around October 2011 and that use of the prior "Avaya" system was discontinued in 2012. I confirmed by visual inspection of Conn's server room that the Avaya system was unplugged and not in use.

30.    The operation of these subsystems by members of Conn's CST team is described in more detail below.

### Onsite Inspection

31.    On February 9, 2018, I traveled to San Antonio, TX, to inspect the telephone system in use at Conn's call center located at 5776 Stemmons #113, San Antonio, TX 78238. It is my understanding that the call center at 5776 Stemmons is representative of the telephone system used by Conn's throughout its collection call centers.

32.    During my inspection, I observed Conn's telephone system to determine whether there was any evidence that the system is capable of producing telephone numbers to be dialed using a random or sequential number generator. I also observed the extensive human input, feedback, and management that is required to keep the system functioning.

---

[4]    I was informed that this back-end system was set up "years back" in concert with Conn's IT department, but those servers reside in a physical rack located in Noble's data center.

1800646.000 - 1963

CONFIDENTIAL – ATTORNEY'S EYES ONLY

33.     I arrived at Conn's call center on February 9, 2018, at approximately 6:45 AM Central Standard Time. At that time, some of the early morning work that involves processing transactions and communication between the AS400, FiServ, and Latitude had already been completed by Conn's CST members.

34.     Shortly after 6:45 AM, I sat down next to a CST member and observed as she worked through an "opening checklist" of tasks required to start up the call center system.

35.     The CST member performed part of her work using a computer running the Windows 7 operating system. Some of her computer-based work utilized the Noble Maestro 8.2.2 software. For example, she performed a "morning check" SQL filtering of input data for the system. The CST member also had to upload various configuration files such as an "exclusion file" that is uploaded via FTP. This work and the additional tasks described below are required to be completed by the CST member between 6:45 AM and 8 AM each day before call center agents can join Noble "groups" to start their regular work day, which indicated to me that the work at the call center cannot begin without the human intervention of the CST member performing these initial tasks.

36.     The CST member also had to receive information by email regarding the setup of the day's "work cards." The work cards, also called "batches" or "lists," include customer information, such as contact information, that has to be associated with Noble "groups" before the call center agents can start their work.

37.     The exact composition of the work cards depends on the day's strategy, which is developed and implemented by Conn's CST members, in accordance with direction from senior management, based on their specialized knowledge and experience. That strategy is updated throughout the day by Conn's CST members based on feedback from the collection agents and other team members as to the pacing and effectiveness of each call campaign.

38.     Local strategy tracking files, such as spreadsheets, are used by CST members to keep track of the current strategy and how the strategy needs to be updated. The strategy specifies the data, such as work cards, which in turn have the specific customer information for

CONFIDENTIAL – ATTORNEY'S EYES ONLY

each call campaign. The customer information ultimately is used by call center agents to attempt to contact customers regarding collection matters. Updating of the strategy is important for the proper functioning of Conn's call center system. A large amount of human effort is put into designing each day's calling strategy and then implementing it. A strategy of dialing random or sequential numbers would be much less effective for Conn's call center because it would not allow Conn's to achieve its ultimate objective: reaching specific customers to attempt to resolve their specific delinquencies.

39.     Around 8 AM, I observed the CST member use the Noble Maestro software to manually open each of the Noble "groups" so call center agents could log in and prepare to begin their work. Without a CST member performing this step, none of Conn's collection agents can log in, and Conn's telephone system will not function properly.

40.     Next, for each group the CST member will load a specific job based on the work cards for each group. The CST member also can append multiple jobs if necessary, as dictated by the current call center strategy. For each job, the CST member must also click an "NC" ("Never Called") Noble status value and load the job. This phase of the Conn's call center system is not capable of running without human intervention. In addition, during this phase the jobs are separated into single hour time slots (the 8 AM slot, the 9 AM slot, and so on), and feedback from the CST members based on the results of the current time slot is used to manually change and update the work card for the next time slot, which all requires significant human intervention.

41.     By around 8:30 AM, the CST member is finished with the initial morning system configuration and Conn's call system is functioning. However, throughout the day, the CST member will have to obtain information on the updated strategy and modify the jobs by hand. For example, the daily strategy contains an estimated set of work cards for 9AM, but the actual set of work cards for that time will have to be specified by the CST member explicitly for the system to function as intended. This process, which is managed and controlled by the CST members, must continue throughout the day for Conn's telephone system to function as intended.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

42.     I also sat with a Conn's call center agent while she performed her work. The agent used a tool to interface with the Latitude system ("phone panel") to update "Status" values after a call.

43.     The call center agent also demonstrated various ways that agents contact customers.

44.     One of the methods I observed required the call center agent to first use a Windows drop-down menu to select a "Log On Dialer" option. Clicking this link then launches a web-based Noble Systems login screen, which requires the call center agent to enter the computer's private IP address. After performing this task, the agent can now utilize a separate web-based interface with buttons to perform tasks such as "resume" or "pause" (referring to the agent's status within the Noble Systems group). The Noble Systems group has to be configured/opened prior to this by a different member of the CST team. The agent can also use this interface to transfer a call to another agent.

45.     Another method I observed, which is referred to as "manual," involves the same web-based interface as listed above; however, the agent has to provide different input. The agent can select an individual customer to contact and then can type in the phone number retrieved from the customer account data into a web browser–based input box. The agent can then initiate the call to that specific number associated with the customer by clicking a button on the workstation interface.

46.     Without the call center agents performing these extensive manual tasks, the call center system cannot function properly. Therefore, at both the managerial level and the implementation level, the call center system requires significant human involvement and intervention.

47.     During my inspection, I was informed by CST members and management that the Noble system component of Conn's call center system has not been updated or upgraded in any significant way since at least June 2016.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

48.     My observations of this software in use during my inspection were consistent with the Noble documentation (described in more detail below) I have reviewed, as well as an affidavit of James K. Noble Jr. dated April 11, 2017 (described in more detail below) regarding the Noble system software licensed to Conn's.

## *Documentation Reviewed*

49.     I have received and reviewed documentation regarding the components of Conn's call center system and their capabilities. I describe this documentation in more detail below.

50.     I reviewed "CONN-JWILLIAMS 000271 - CONN-JWILLIAMS 000784 - Harmony version 4.1 User Manual 090215.pdf" and "Harmony version 4.1 User Manual [Current].pdf." These documents describe the operation of the "Noble Harmony" software component of Conn's system. This documentation does not describe any capabilities of the software to generate random or sequential telephone numbers to be called.

51.     I reviewed "Maestro 8.3 User Manual vol. 3 - IVR [Current].pdf," "Maestro 8.3 User Manual vol. 2 - Daily Management [Current].pdf," "Maestro 8.3 User Manual vol. 1 - Setup and Utilities [Current].pdf," "CONN-JWILLIAMS 000785 - CONN-JWILLIAMS 001380 - Maestro 8.0 User Manual vol. 1 - Setup and Utilities 082115.pdf," "CONN-JWILLIAMS 001381 - CONN-JWILLIAMS 001866 - Maestro 8.0 User Manual vol. 2 - Daily Management 050815.pdf," and "CONN-JWILLIAMS 001867 - CONN-JWILLIAMS 002210 - Maestro 8.0 User Manual vol. 3 - IVR 070815.pdf." These documents describe the operation of the "Noble Maestro" software component of Conn's system. This documentation does not describe any capabilities of the software to generate random or sequential telephone numbers to be called.

52.     I reviewed "CONN-JWILLIAMS 002222 - CONN-JWILLIAMS 002603 - Web Reports version 3.1 User Manual 021114.pdf." This document describes the operation of the "Noble Web Reports" software component of Conn's system. This documentation does not describe any capabilities of the software to generate random or sequential telephone numbers to be called.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

53.     I reviewed "CONN-JWILLIAMS 002604 - CONN-JWILLIAMS 002614 - Telephone Handling Procedure.pdf." This document provides guidance for agents regarding the use of phone status codes. This documentation does not describe any capabilities of the software to generate random or sequential telephone numbers to be called.

54.     I reviewed "CONN-JWILLIAMS 002211 - CONN-JWILLIAMS 002221 - Noble Training Guide 2016.pdf." This document provides guidance for agents regarding the use of their Latitude and Noble systems, such as how to "log in" and begin work for the day or how to stop work to take a break or end their work day. This documentation does not describe any capabilities of the software to generate random or sequential telephone numbers to be called.

55.     I reviewed the Affidavit of James K. Noble, Jr. dated April 11, 2017 associated with Cause No. 3:16-cv-413 HTW-LRA describing the Noble Systems software licensed by Conn's. The document states that the Noble Systems software is not "programmed/designed to store or produce telephone numbers to be called using a random or sequential number generator." This is consistent with my own review of the Noble system documentation and onsite inspection observations. Additionally, it is noted in the affidavit I reviewed that to store or produce such telephone numbers would require that such tasks be "(a) specifically invoked by an end user, or by an executed program using the operating system of the computer or, (b) performed by the program itself." During my onsite inspection, I did not observe any evidence that the scenarios in (a) or (b) above were invoked. Finally, the affidavit states that Conn's "cannot access or change the code of the Relevant Software, nor can it access the Relevant Software's operating system." I did not observe any evidence contrary to this statement, and it is my opinion that modifying the Noble software to store or produce telephone numbers to be called using a random or sequential number generator would constitute a major modification beyond the expertise and training of the Conn's staff.

56.     I also reviewed the document titled "Written Report of Aaron Woolfson" for "Case No. 1:16-0000-6140" dated February 27, 2017 as well as its attachment "Appendix A: Description of Work Flow observed during on-site Inspection at Conn's on November 16, 2016." Both of these documents contain a description of the system in use at Conn's call center that is consistent with my onsite inspection described above. Neither of these documents

CONFIDENTIAL – ATTORNEY'S EYES ONLY

describes any capabilities of the software to generate random or sequential telephone numbers to be called. Rather, these two documents both document in detail the extensive amount of human intervention required for Conn's call center system to function.

## VI.   **REPORT OF JEFFERY HANSEN**

57.     I have reviewed the document titled "Written Report of Jeffery A. Hansen" for "Case No. 01-17-0001-5149" dated December 20, 2017, as well as its attached exhibits. Neither the written report of Jeffrey Hansen nor any of its attached exhibits provide any description of the actual system in use at Conn's call center.

58.     The report of Jeffrey Hansen appears to be based in large part on his review of Noble documentation and other references, some of which appear inappropriate or not directly relevant. For example, Mr. Hansen cites to a "blog" containing the marketing material of an apparent competitor to Noble systems in his Exhibits C and D. This Ontario systems marketing material does not address the functionality of the Noble system in use at Conn's call center. Each "blog" post includes a disclaimer that the post is for general information and marketing purposes and should not be relied on for "any other purpose."

59.     In paragraph 21 of his report, Mr. Hansen cites to the patent US 3943289, which describes an apparatus that, in the main embodiment, connects to a single circuit-switched phone line (two copper wires) and dials a telephone number. The dialer then increments the telephone number by a fixed amount (the amount "one" is suggested in the patent) and dials again. Thus, the patent provides an example of a sequential number dialing apparatus much like that described in 47 U.S.C. § 227. Such an apparatus will sequentially dial numbers as follows: 650-555-0001; 650-555-0002; 650-555-0003; and so on. The system in use at Conn's call center does not use any apparatus like that described in US 3943289. Indeed, it is very different from the apparatus of US 3943289, as explained in more detail below.

60.     The US 3943289 apparatus can also be thought of as an early type of "war dialer." These systems were in more widespread use prior to the widespread use of the internet (primarily via the World Wide Web) and convenient internet/web search tools such as Google. Prior to the widespread use of the internet, PC-to-PC connections were often made using

CONFIDENTIAL – ATTORNEY'S EYES ONLY

modems attached to single circuit switched telephone lines. A modem could only make a data connection to a number that was also connected to a modem, and there was no widespread and easy-to-access indexing of which telephone numbers were connected to modems. Thus, by "war dialing," PC/modem users could scan through all the numbers connected to their local central office and area code. This type of "war dialing" also could be used to identify numbers associated with fax machines. The FCC mentions this type of usage in its request for comments and ruling.[5] In contrast, the Conn's call center system is a completely different type of system, since it does generate and call sequential numbers like the US 3943289 apparatus and, based on my observations, does not have the capability to generate and call sequential telephone numbers.

61.     Mr. Hansen's inclusion in his paragraph 21 of the patent US 3943289 along with his statement that "[t]he functionality of the autodialers and predictive dialers has not changed since long before the TCPA until now…" seems to imply a very broad interpretation of the meaning of ATDS as given in the TCPA. For example, the system in use at Conn's call center is very different from the system described in US 3943289; it is not the case that its functionality "has not changed." Rather, Conn's call center system is a completely different type of system, since it does not have the capability to generate and call sequential telephone numbers.

62.     Furthermore, in paragraph 23 of his report, Mr. Hansen cites to the FCC Order 12-56 (dated May 21, 2012) wherein he quotes that "[t]he Commission has emphasized that this definition covers any equipment that has the specified capacity to generate numbers and dial them without human intervention…" Mr. Hansen apparently cites this to support his broad ("any system") interpretation of an ATDS, but he does not address the impact of "human

---

[5]   See, for example, FCC 02-250 "Notice of Proposed Rulemaking And Memorandum Opinion and Order" adopted September 12, 2002 and FCC 03-153 "Report and Order" adopted June 26, 2003.

1800646.000 - 1963

CONFIDENTIAL – ATTORNEY'S EYES ONLY

intervention." During my onsite inspection of Conn's call center system, I observed that the system requires significant human intervention to function (see paragraphs 34–46).

63.     Mr. Hansen also includes multiple descriptions in his report of the use of random number generators in computing systems. Here, too, his analogy between a general computing system and an ATDS is overly broad and misapplied. The flaws in his analogy between random number generation in computing systems and ATDS systems stems from his oversimplified understanding of computing systems.

64.     For example, Mr. Hansen claims (without providing any citations) that "All computers can generate random […] numbers. A computer system simply cannot operate without the ability to do so. A 'pseudo random number generator' is a key element in allowing a computer to 'compute.'" This is incorrect. The key element in allowing a computer to compute is the processor, which is simply a tool for performing arithmetic operations. Thus, as explained above in the Section IV, a computer system is a deterministic machine. Furthermore, many computer systems can operate without the ability to generate random numbers.

65.     Mr. Hansen's claim that it is "easy" to generate sequential and random numbers and his examples of number generation are misleading. He avoids explaining any of the contexts of his examples and thereby lumps underlying capabilities provided by a set of different software applications and the operating system into this "easy" task.

66.     Generally, all of Mr. Hansen's examples appear to rely on either his use of a command interpreter[6] or his use of a programming language interpreter.[7] Mr. Hansen seems not

---

[6]   For example, the Windows "cmd.exe" shell or a Linux shell such as the Bourne Again Shell known as "Bash."

[7]   For example, CPython.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

to understand that these interpreters are themselves pieces of software that were designed by software developers to have a specific set of capabilities.

67.     The capabilities of command interpreters typically include the ability to read file system files (e.g., read the file "/dev/urandom" on a Linux system) and to parse certain commands given by the user on the "command line" (by interpreting strings as commands to other executable files such as seq or awk). A general piece of software has no understanding of the meaning of a string like "seq 123 456." It only makes sense to a specific command interpreter such as the Linux Bash software.

68.     For example, if I were to take Mr. Hansen's ill-defined example and simply try typing "seq 6192486000 6192486999…" into a Windows shell such as "cmd.exe," I would receive the response: "'seq' is not recognized as an internal or external command, operable program or batch file," as shown in Figure 1.



**Figure 1.**     Error message received when attempting to execute Mr. Hansen's example code on a command interpreter that does not have the intrinsic capabilities to launch the "seq" software program.

69.     This error message is generated because the Windows command shell is an entirely different piece of software than, for example, the Linux command shell, and it runs in a

CONFIDENTIAL – ATTORNEY'S EYES ONLY

completely different context. The command shells themselves have different capabilities, run on different operating systems, and generally cannot launch executable programs associated with the other platform.

70.     Thus, it is not the case that simply "typing" any of Mr. Hansen's example commands will produce a list of random or sequential numbers. His commands rely on the fact that command line interpreters and programming language interpreters (explained below) were preprogrammed with certain capabilities. On the other hand, other computer programs, such as the Noble software, are not preprogrammed with these capabilities.

71.     Mr. Hansen provides a variety of other "commands" that can generate number lists. For example, he uses the "awk" program in one example. The program awk is itself a programming language interpreter for the awk programming language. [8] Furthermore, the program awk will typically be used via a command line interpreter such as Bash. Both Bash and awk are loaded and executed with the help of the operating system (for example, Linux). This "simple" example code cannot execute on a system that does not already have the awk and Bash programs already installed and an operating system that can support them. It relies on the underlying capabilities of the programs awk, Bash, and vmlinux (the Linux kernel) that are "baked in" at compile time. These are not the same capabilities that are baked in to the Noble software at compile time.

72.     Because the source code for the GNU implementation of awk is available online,[9] we can be even more explicit about the level of complexity that Mr. Hansen is glossing over with his example.

---

[8]    See, for example, "The AWK Programming Language," by Alfred V. Aho, Brian W. Kernighan, and Peter J. Weinberger.

[9]    See, for example, the "git repository" at https://git.savannah.gnu.org/git/gawk.git

CONFIDENTIAL – ATTORNEY'S EYES ONLY

73.     By examining the source code in the GNU version of awk, we can see that the software developers for this computer program implemented their random number generator in a file called "builtin.c" and using a function called "do_rand." Based on comments in the source code and the log files for the source code repository, I can see that the "do_rand" function was introduced by the developers in 2010, with major updates in 2013 and 2014.

74.     The "do_rand" function uses an API specified by the header file "random.h." Without the inclusion of the header file explicitly, the function would not be able to generate random numbers. The Noble Maestro, Noble Harmony, and Noble Web Reports software used by Conn's do not include this header file and thus do not have these same capabilities.[10]

75.     Digging a little deeper into the awk source code, we can see that the "random.h" header file included with the GNU awk source code specifies the API for the capabilities implemented in the "random.c" file (in particular, the lower-level function "random" and "random_old" in "random.c"). Without explicitly referencing this API at compile time, the awk program would not be able to generate random numbers as in the example. The Noble software used by Conn's, such as Maestro, Harmony, and Web Reports, do not utilize this API.[11]

76.     Similarly, if we dig into the actual implementation of all of the underlying programs that are being invoked in Mr. Hansen's "simple" examples, we will find that the

---

[10]   In this case, I can say with certainty that the Noble software does not include these specific capabilities because the capabilities are exposed by a specific set of include files (and implemented by a specific set of ".c" files) written by the GNU awk team and located in the GNU awk source code repository. These files are written in a context that can be compiled on a Linux operating system but would not compile on a Windows operating system. Therefore, it would not be possible to use these in a Windows-based program like Noble Maestro and Noble Harmony. In addition, the GNU source code that I have reviewed is generally protected by a "copy left" license and may not be used in commercial software that is not itself open source.

[11]   See Footnote 10.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

software developers who wrote these programs included explicit references to APIs that allow them to implement these capabilities. These capabilities are different from those of the Noble software. Furthermore, whereas the example software (e.g., awk or python) used in Mr. Hansen's examples explicitly reference their abilities to generate random numbers in their documentation, the Noble software documentation makes no reference to any capabilities of this sort (see documentation review in Section V). Additionally, an Affidavit of James K. Noble, Jr. (described above) explicitly states that the Noble system does not produce or generate random numbers and that Conn's is not able or permitted to modify the Noble software system. This is consistent with my onsite observations and review of Noble documentation.

77.     To the extent that Mr. Hansen suggests that the mere capability of a computer to generate random or sequential numbers somehow implies the use of an ATDS or that such numbers could be used by the Noble system, his conclusion is overly simplistic and misleading. Whether computers used by Conn's agents are capable of running different programs that are capable of producing random or sequential numbers is irrelevant. It is equally irrelevant, for example, that a human collections agent had the capability to manually write down a list of sequential numbers. The ability to produce such numbers is relevant only if the numbers can be used as part of the system. Even if the computers used by CST members or agents are capable of running different software that can generate random numbers, I did not observe any indication that numbers produced in this way could be used by Conn's Noble system without substantial modification of the executables and other parts of the system. Such modification would require highly specialized training outside the expertise of Conn's staff. On the contrary, the Conn's call center system relies on manually entered, specific customer information (including telephone numbers) that is initially entered into the "AS400" system and that then traverses into the "Latitude" system. Only after the manual loading of customer numbers as part of overall customer account data via a set path can the Conn's call center system function.

## VII.   OTHER TOPICS

78.     I reserve the right to adjust or supplement my analysis in light of any critiques or comments on my declaration and to offer additional opinions and evidence in reply to any opinions advanced by or on behalf of Claimant.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

I swear under penalty of perjury that the facts discussed in this declaration are true and correct to the best of my knowledge.

Date:  March 15, 2018

_____

Adam Sorini, Ph.D., C.C.F.P.

# Exhibit A

# CV of Adam Sorini, Ph.D., CCFP



# E$^x$ponent®
## Engineering & Scientific Consulting

## Adam Sorini, Ph.D., CCFP-US

Managing Scientist | Electrical Engineering & Computer Science

149 Commonwealth Drive | Menlo Park, CA 94025

(650) 688-6914 tel | asorini@exponent.com

## Professional Profile

Dr. Sorini is a forensics expert specializing in investigations of consumer electronics and computer technologies. Dr. Sorini's work concerns failure analysis of electronics, intellectual property matters, X-ray Computed Tomography (CT), and topics in applied computer science including diverse aspects of cybersecurity such as medical device security, network security, and digital forensics. Dr. Sorini has investigated state-of-the-art consumer electronics hardware, firmware, and software.

Dr. Sorini has a background in computational physics and numerical modelling. While at Stanford and then at Lawrence Livermore National Laboratory, Dr. Sorini implemented massively-parallel sparse-matrix computer software to determine physical properties of electronic systems. Dr. Sorini has experience with a number of computer programming languages including C, C++, FORTRAN, Python, and Java. He also has experience working with very large scale source code databases, both as a software developer and as a technical consultant.

## Academic Credentials & Professional Honors

Ph.D., Physics, University of Washington, 2008

M.S., Physics, University of Washington, 2003

B.S., Physics, University of Michigan, Ann Arbor, with distinction, 2001

## Licenses and Certifications

Certified Cyber Forensics Professional (CCFP), #519162

## Prior Experience

Postdoctoral Researcher, Lawrence Livermore National Laboratory, 2011-2012

Postdoctoral Researcher, Stanford Institute for Materials and Energy Science, 2009-2011

Research Assistant, University of Washington, 2005-2008

Teaching Assistant, University of Washington, 2002-2005

## Publications

Sorini A, and Staroswiecki E.  Cybersecurity for the smart grid. The Power Grid: Smart, Secure, Green, and Reliable. D'Andrade B (ed). Elsevier Ltd., 2017, 233-252.

Sorini A, Jagannathan S. Self-authentication in medical device software: An approach to include cybersecurity in legacy medical devices.  IEEE Symposium on Product Compliance Engineering Proceedings (ISPCE), San Jose, CA, May, 2016.

Jagannathan S, Sorini A. A cybersecurity risk assessment methodology for medical devices. Proceedings, IEEE Symposium on Product Compliance Engineering, May 2015.

Sorini A, Jagannathan S. Forensic analysis of digital time. Exponent Electrical Engineering & Computer Science Newsletter, Volume 1, 2015.

Sorini A, Jagannathan S, McGoran B. Medical device cybersecurity: Preliminary hazard analysis. Exponent Electrical Engineering & Computer Science Newsletter, Volume 1, 2015.

Sorini A, Jagannathan S. Forensic analysis of digital time. MDTC e-letter, Volume 5, No. 2, December 2014.

Huang R, Sorini A, McNulty J. Quantitative solder inspection with computer tomography. Proceedings, IEEE Symposium on Product Compliance Engineering, May 2014.

Lee JJ, Moritz B, Lee WS, Yi M, Jia CJ, Sorini AP, Kudo K, Koike Y, Zhou KJ, Monney C, Strocov V, Patthey L, Schmitt T, Devereaux TP, Shen ZX. Charge-orbital-lattice coupling effects in the dd excitation profile of one-dimensional cuprates. Physical Review B 2014; 89:041104(R).

Chuang YD, Lee WS, Kung YF, Sorini AP, Moritz B, Moore RG, Patthey L, Trigo M, Lu DH, Kirchmann PS, Yi M, Krupin O, Langner M, Zhu Y, Zhou SY, Reis DA, Huse N, Robinson JS, Kaindl RA, Schoenlein RW, Johnson SL, Forst M, Doering D, Denes P, Schlotter WF, Turner JJ, Sasagawa T, Hussain Z, Shen ZX, Devereaux, TP. Real-time manifestation of strongly coupled spin and charge order parameters in stripe-ordered nickelate crystals using time-resolved resonant X-ray diffraction. Physical Review Letters 2013; 110:127404.

Kung YF, Lee W-S, Chen C-C, Kemper AF, Sorini AP, Moritz B, Devereaux TP. Time-dependent charge-order and spin-order recovery in striped systems. Physical Review B 2013; 88:125114.

Lipp MJ, Sorini AP, Bradley J, Maddox B, Moore KT, Cynn H, Devereaux TP, Xiao Y, Chow P, Evans WJ. X-ray emission spectroscopy of cerium across the gamma-alpha volume collapse transition. Physical Review Letters 2012.;109:195705.

Lee WS, Sorini AP, Yi M, Chuang YD, Moritz B, Yang WL, Chu JH, Kuo HH, Gonzalez A, Fisher IR, Hussain Z, Devereaux TP, Shen ZX. Resonant enhancement of charge density wave diffraction in the rare-earth tritellurides. Physical Review B 2012; 85:155142.

Chuang Y-D, Moore R, Zhu Y, Patthey L, Trigo M, Lu D-H, Kirchmann P, Krupin O, Yi M, Langner M, Huse N, Robinson J, Chen Y, Zhou S, Coslovich G, Huber B, Reis D, Kaindl R, Schoenlein R, Doering D, Denes P, Schlotter W, Turner J, Johnson S, Forst M, Sasagawa T, Kung Y, Sorini A, Kemper A, Moritz B, Devereaux T, Lee D-H, Shen Z-X, Hussain Z. Phase fluctuations and the absence of topological defects in photo-excited charge ordered nickelate. Nature Communications 2012; 3:838.

Johnston S, Sorini AP, Moritz B, Devereaux TP, Scalapino DJ. Coincidence between energy gaps and Kohn anomalies in conventional super-conductors. Physical Review B 2011; 84:174523.

Kim YJ, Sorini AP, Stock CS, Perring TG, Van den Brink J, Devereaux TP. Probing high-energy electronic excitations using inelastic neutron scattering. Physical Review B 2011; 84:085132.

Yi M, Lu DH, Chu JH, Analytis JG, Sorini AP, Kemper AF, Mo SK, Moore RG, Hussain Z, Devereaux TP, Fisher IR, Shen Z-X. Symmetry breaking orbital anisotropy on detwinned Ba(Fe1—xCox)2As2 above the spin density wave transition. Proceedings, the National Academy of Sciences 2011; 108:6878.

Wang S, Mao WL, Sorini AP, Chen CC, Devereaux TP, Ding Y, Xiao Y, Chow P, Hiraoka N, Ishii H, Cai YQ, Kao CC. High pressure evolution of Fe2O3 electronic structure revealed by x-ray absorption. Physical Review B 2012; 82:144428.

Chen CC, Moritz B, Jia CJ, Johnston S, Sorini AP, Lee LQ, Ko K, Devereux TP. Numerical studies of photon-based spectroscopies on high-Tc superconductors. Computer Physics Communications 2010; 182:106.

Bradley JA, Seidler GT, Cooper G, Vos M, Hitchcock AP, Sorini AP, Schlimmer C, Nagle KP. Comparative study of the valence electronic excitations of N2 by inelastic x-ray and electron scattering. Physical Review Letters 2010; 105:053202.

Chen CC, Maciejko J, Sorini AP, Moritz B, Singh RRP, Devereaux TP. Orbital order and spontaneous orthorhombicity in iron pnictides. Physical Review B 2010; 82:100504(R). Editor's Choice.

Yang WL, Sorini AP, Chen CC, Moritz B, Lee WS, Vernay F, Olalde-Velasco P, Denlinger JD, Delley B, Chu JH, Analytis JG, Fisher IR, Ren ZA, Yang J, Lu W, Zhao ZX, Van den Brink J, Hussain Z, Shen Z-X, Devereaux TP. Evidence for weak electronic correlations in iron pnictides. Physical Review B 2009; 80:014508. Editor's Choice and Physics Viewpoint article.

Yang WL, Sorini AP, Chen CC, Moritz B, Lee WS, Vernay F, P. Olalde-Velasco, Denlinger JD, Delley B, Chu JH, Analytis JG, Fisher IR, Ren ZA, Yang J, Lu W, Zhao ZX, Van den Brink J, Hussain Z, Shen Z-X, DeVereaux TP. Research highlight: Evidence for weak electronic correlations in the iron pnictides. CMSN Newsletter 2009; 5:4.

Stern EA, Yacoby Y, Seidler GT, Nagle KP, Prange MP, Sorini AP, Rehr JJ, Joachimiak A. Reducing radiation damage in macromolecular crystals at synchrotron sources. Acta Crystallographica 2009; D65:366.

Rehr JJ, Kas JJ, Prange MP, Sorini AP, Takimoto Y, Vila F. Ab initio theory and calculations of x-ray spectra. C.R. Physique 2009; 10:548.

Sorini AP. The passage of fast electrons through matter. Ph.D. dissertation, University of Washington, 2008.

Sorini AP, Rehr JJ, Levine ZH. Magic angle in electron energy loss spectra: relativistic and dielectric corrections. Physical Review 2008; B 77:115126.

Sorini AP, Rehr JJ, Jorissen K. Ab initio real space calculations of electron energy loss spectra. Proceedings, AIP Conference 2008; 999:47.

Kas JJ, Sorini AP, Prange MP, Campbell LW, Soininen JA, Rehr JJ. Many pole model of inelastic losses in x-ray absorption spectra. Physical Review B 2007; 76:195116.

Rehr JJ, Kas JJ, Prange MP, Sorini AP, Campbell LW, Vila FD. Inelastic losses and multi-electron excitations in x-ray spectra. Proceedings, AIP Conference 2007; 882:85.

Sorini AP, Kas JJ, Rehr JJ, Prange MP, Levine ZH. Ab Initio calculations of mean free paths and stopping

powers. Physical Review B 2006; 74:165111.

**Selected Speaking Engagements**

Sorini A. Security-by-design for IoT devices. Arizona Technology Council Internet of Things Committee meeting, Feb 8, 2017.

Sorini A. Self-authentication in medical device software: An approach to include cybersecurity in legacy medical devices.  IEEE Symposium on Product Compliance Engineering Proceedings (ISPCE), San Jose, CA, May, 2016.

Jagannathan S, Sorini A. A cybersecurity risk analysis methodology for medical devices. IEEE Symposium on Product Compliance Engineering. Chicago, IL. May 2015.

Sorini A, Huang R, McNulty J. Quantitative solder inspection with computer tomography. IEEE Symposium on Product Compliance Engineering. San Jose, CA. 2014.

Sorini A, Bradley J, Lipp M, Devereaux T. Pressure dependent x-ray emission satellites in rare-earth metals. Lawrence Livermore National Laboratory, Livermore, CA, September 2011.

Sorini A, Chen C-C, Wang S, Mao W, Devereaux T. Theoretical x-ray spectroscopy for strongly correlated materials at high pressure. APS March Meeting, Dallas, TX, March 2011.

Sorini A, Yang W, Chen C-C, Moritz B, Lee W-S, Vernay F, Olalde-Velasco P, Denlinger J, Delley B, Chu J-H, Analytis J, Fisher I, Ren Z, Yang J, Lu W, Zhao Z-X, Van den Brink J, Hussain Z, Shen Z-X, Devereaux T. Evidence for weak electronic correlations in Fe Pnictides. APS March Meeting, Portland, OR, March 2010.

Sorini A, Yang W, Chen C-C, Moritz B, Lee W-S, Vernay F, Olalde-Velasco P, Denlinger J, Delley B, Chu J-H, Analytis J, Fisher I, Ren Z, Yang J, Lu W, Zhao Z-X, Van den Brink J, Hussain Z, Shen Z-X, Devereaux T. Iron pnictides: Evidence of weak correlations. SLAC IXS Workshop, Menlo Park, CA, August 2009.

Sorini A, Rehr J, Levine Z. Magic angle in EELS: Relativistic and dielectric corrections. Lawrence Livermore National Laboratory, Livermore, CA, August 2008.

Sorini A, Rehr J, Levine Z. Magic angle in EELS: Relativistic and dielectric corrections. Geballe Laboratory for Advanced Materials, Stanford University, Stanford, CA, June 2008.

Sorini A, Rehr J, Levine Z. Magic angle in EELS: Relativistic and dielectric corrections. National Institute of Standards and Technology, Gaithersburg, MD, April 2008.

Sorini A, Rehr J, Levine Z. Effect of dielectric response on the magic angle mystery in EELS. APS March Meeting, New Orleans, LA, March 2008.

# Exhibit B

# List of Materials Reviewed

**Materials Reviewed**

Expert Report of Jeffrey A. Hansen (dated December 20, 2017)
Exhibits A--BE to Expert Report of Jeffrey A. Hansen
Written Report of Aaron Woolfson (dated February 27, 2017)
APPENDIX A to Written Report of Aaron Woolfson
Affidavit of James K. Noble Jr. (dated April 11, 2017)
CONN-JWILLIAMS 000209 - CONN-JWILLIAMS 000211.pdf
CONN-JWILLIAMS 000212 - Account History.pdf
CONN-JWILLIAMS 000213 - CONN-JWILLIAMS 000244.pdf
CONN-JWILLIAMS 000245 - CONN-JWILLIAMS 000270.pdf
CONN-JWILLIAMS 000271 - CONN-JWILLIAMS 000784 - Harmony version 4.1 User Manual 090215.pdf
CONN-JWILLIAMS 000785 - CONN-JWILLIAMS 001380 - Maestro 8.0 User Manual vol. 1 - Setup and Utilities 082115.pdf
CONN-JWILLIAMS 001381 - CONN-JWILLIAMS 001866 - Maestro 8.0 User Manual vol. 2 - Daily Management 050815.pdf
CONN-JWILLIAMS 001867 - CONN-JWILLIAMS 002210 - Maestro 8.0 User Manual vol. 3 - IVR 070815.pdf
CONN-JWILLIAMS 002211 - CONN-JWILLIAMS 002221 - Noble Training Guide 2016.pdf
CONN-JWILLIAMS 002222 - CONN-JWILLIAMS 002603 - Web Reports version 3.1 User Manual 021114.pdf
CONN-JWILLIAMS 002604 - CONN-JWILLIAMS 002614 - Telephone Handling Procedure.pdf
Responses to First Request for Production of Documents.PDF
Responses to First Set of Interrogatories.PDF
Harmony version 4.1 User Manual [Current].pdf
Maestro 8.3 User Manual vol. 1 - Setup and Utilities [Current].pdf
Maestro 8.3 User Manual vol. 2 - Daily Management [Current].pdf
Maestro 8.3 User Manual vol. 3 - IVR  [Current].pdf

**TN**

RETAIL INSTALLMENT CONTRACT AND SECURITY AGREEMENT | TO CONTACT CONN'S CUSTOMER SERVICE HELPDESK CALL 1 877/358-1252

**CONN APPLIANCES, INC.**

Full Name of Buyer: WILLIAMS JR, JOHNNIE F
Co-Buyer:

Date 08/31/2015  Odd 0 Days
AUSTIN PEAY PLAZA
MEMPHIS
TENNESSEE 38128
Acct. No. APPROVED APP    123/456-7890
Salesman BLACKMAN, TERRANCE

Street Address: 2614 NORTHUMBERLAND LN
City/State: MEMPHIS, TN   ZIP 38128
Telephone #'s Home 901/319-6319   Employment 901/319-6319

Invoice No. 189-027794369/001

Buyer and any Co-Buyer are referred to in this contract individually and collectively as "Buyer", "you", or "your", and includes their heirs, personal representatives, and executors. If this contract is signed by a Buyer and a Co-Buyer, each agrees to keep all the promises in this contract even if the other does not. Conn Appliances, Inc. is referred to as "Seller" or "our", and includes all of its successors and assigns. This contract may be assigned and then transferred by Seller, but Buyer may not assign or transfer its rights or obligations without the prior written consent of Seller.

| Quan. | Lot No. | Factory No. | Color or Size | ARTICLES | PRICE | |
|---|---|---|---|---|---|---|
| 1 | | UN32J4000 | | 04173CGG8035 32" LED TV | 269 | 99 |
| 1 | | UN32J4000 | | 04173CGG8035 32" LED TV | 269 | 99 |
| 1 | | CM8440 | | 505HZGZ02487 SHELF SYSTEM | 549 | 99 |
| | | | | 036 MO. REPAIR SERVICE AGREEMENT | 89 | 99 |

Manufacturers warranty, where applicable, will be provided separately.

| | | |
|---|---|---|
| **TOTAL** | 1179 | 96 |
| **SALES TAX** | 109 | 13 |

WITNESSETH THE UNDERSIGNED SELLER HEREBY SELLS AND THE UNDERSIGNED BUYER HEREBY PURCHASES THE ABOVE DESCRIBED PROPERTY SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH IN THIS CONTRACT

## TRUTH-IN-LENDING DISCLOSURE STATEMENT

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all the payments as scheduled. | Total Sale Price The total cost of your purchase on credit including your downpayment of $ 109.00 |
|---|---|---|---|---|
| 20.90 % | $ 367.54 | $ 1247.66 | $ 1615.20 | $ 1724.20 |

Your payment schedule will be:

| No. of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 30 | 53.84 | OCT. 03 2015 , and the same day each month |

Security : You are giving a security interest in:
_X_ the goods or property being purchased

the goods described in Prior Contract(s)#

Late Charge : If a scheduled installment payment is not paid in full upon the 10th day after the scheduled due date, you will be charged either $5 if the installment payment due is $25 or less, or $10 if the installment payment due is more than $25.
Prepayment : You may prepay your debt early. If you pay off your debt early, you will be entitled to a refund of part of the Finance Charge and unearned insurance premium. See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties.

INSURANCE: Credit life insurance, credit disability insurance and credit involuntary unemployment insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost. Buyer's decision to accept or deny credit life insurance, credit disability insurance, or involuntary unemployment insurance is not a factor in Seller's decision to approve the credit extended by this contract.

| TYPE | PREMIUM | SIGNATURE |
|---|---|---|
| CREDIT LIFE | NONE | I want ☐/do not want ☐ Buyer |
| CREDIT LIFE AND | NONE | I want ☐/do not want ☐ Buyer |
| CREDIT DISABILITY | NONE | I want ☐/do not want ☐ Co-Buyer (life only) |
| CREDIT INVOLUNTARY UNEMPLOYMENT (Buyer Only) | NONE | I want ☐/do not want ☐ Buyer |

Property insurance is required in connection with this purchase. Buyer may furnish property insurance through an existing policy of insurance owned or controlled by the Buyer or an insurance policy obtained from an insurance company authorized to do business in Tennessee.

Property Coverage Purchased $  1171.78

I elect to: (1) ☐ purchase property insurance through Seller; or
(2) ☐ supply my own property insurance coverage
Signature

If you purchase property insurance through Seller, it would cost $ 2.90 per year, for a total of $ 71.78 . Seller's coverage might duplicate existing coverage if Buyer has a residential property insurance policy. Seller's coverage ceases on the earlier of the stated maturity date of this contract or when you have fully paid the debt, whichever comes first. Seller's coverage is primary, so it is the first to be used. In the event of a loss on the property it covers. Buyer represents to Seller that at the time Buyer received a copy of this contract, the Buyer did not contain any blank spaces for items that are any time and replace it with an alternative property insurance policy furnished by Buyer from an insurance company acceptable to Seller by calling Seller at the toll-free number provided or by writing Seller and providing evidence of alternative coverage as required above.
For additional details relating to credit insurance purchased through Seller please refer to the "General Information Summary Page," the terms on the reverse side of this contract, and the group certificate of insurance describing other limitations, restrictions, and conditions.

## ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---|
| 1. CASH PRICE (including Sales Tax) | | $ 1289.09 |
| a. CASH DOWN PAYMENT | $ 109.00 | RECEIVED BY |
| b. TRADE IN | $ | (DESCRIBE) |
| 2. TOTAL DOWN PAYMENT (a + b) | $ 109.00 | |
| 3. UNPAID BALANCE OF CASH PRICE (1- 2) | | $ 1180.09 |
| CROSS DISCOUNT (OLD BALANCE) | .00 | |
| FINANCE CHARGE REFUND | $ | |
| SURCHARGE REFUND | $ | |
| TOTAL FINANCE CHARGE REFUND | $ | |
| CREDIT LIFE INS. REFUND | $ | |
| CREDIT DISABILITY INSURANCE REFUND | $ | |
| PROPERTY INS. REFUND | $ | |
| CREDIT INVOLUNTARY UNEMPLOYMENT INS. REFUND | $ | |
| 4. NET BALANCE PRIOR CONTRACT | $ | |
| | **SUB TOTAL** | $ 1180.09 |

**ALL INSURANCE CHARGES PAID TO INSURANCE COMPANIES**

| | | |
|---|---|---|
| *c. OTHER CHARGES PAID TO | $ | |
| *d. CREDIT LIFE INSURANCE | $ NONE | |
| *e. CREDIT DISABILITY INSURANCE | $ NONE | |
| *f. CREDIT INVOLUNTARY UNEMPLOYMENT INSURANCE | $ NONE | |
| *g. PROPERTY INSURANCE | $ 67.57 | |
| 5. (c + d + e + f + g) | **TOTAL OTHER CHARGES** | $ 67.57 |
| 6. AMOUNT FINANCED (3 - 4 + 5) | | $ 1247.66 |
| | FINANCE CHARGE | $ 367.54 |
| | TOTAL OF PAYMENTS | $ 1615.20 |

* We may be retaining a portion of these amounts as compensation.

This instrument is assigned
as collateral to Bank of America, N.A.

ADDITIONAL DISCLOSURES AND CONTRACT TERMS INCLUDING SECURITY INTEREST APPEAR ON REVERSE SIDE HEREOF AND ARE PART OF THIS CONTRACT.
NOTICE TO BUYER: DO NOT SIGN THIS CONTRACT BEFORE YOU READ IT OR IF IT CONTAINS BLANK SPACES. YOU ARE ENTITLED TO A COPY OF THE CONTRACT YOU SIGN. UNDER THE LAW YOU HAVE THE RIGHT TO PAY OFF IN ADVANCE THE FULL AMOUNT DUE AND RECEIVE A PARTIAL REFUND OR CREDIT OF THE FINANCE CHARGE. KEEP THIS CONTRACT TO PROTECT YOUR LEGAL RIGHTS.

ACKNOWLEDGEMENT OF RECEIPT. Buyer understands that the Seller will rely upon this representation and acknowledgement in accepting Buyer's obligation and granting credit. Buyer represents to Seller that at the time Buyer received a copy of this contract, the contract did not contain any blank spaces for items that are essential provisions of the transaction. Buyer also acknowledges receipt of a copy of CONN'S FINANCIAL INFORMATION PRIVACY NOTICE. BUYER AND CO-BUYER ACKNOWLEDGE RECEIPT OF THIS RETAIL INSTALLMENT CONTRACT AND SECURITY AGREEMENT.

Johnnie O Williams Jr
XXX-XX-6276  DATE 08/31/2015

CONN'S
BLACKMAN, TERRANCE
By Authorized Representative

Co-Buyer
NOTICE: See reverse side for important information
Rev. 05/05/14 TN

CORPORATE COPY
EXHIBIT D

CONN-JWILLIAMS 000251

CONSENT TO TELEPHONE/TEXT MESSAGE/EMAIL CONTACT: FOR EACH TELEPHONE NUMBER YOU PROVIDE TO SELLER (EITHER DIRECTLY OR BY PLACING A CALL TO US), YOU CONSENT AND AUTHORIZE US TO PLACE TELEPHONE CALLS TO YOU AT THAT NUMBER. SUCH CONSENT EXPRESSLY INCLUDES AUTHORIZATION FOR SELLER (AND/OR OUR AFFILIATES AND/OR AGENTS) TO SEND TEXT MESSAGES AND/OR PLACE TELEPHONE CALLS TO CELLULAR OR LANDLINE TELEPHONE NUMBERS USING PRE-RECORDED OR ARTIFICIAL VOICE MESSAGES, AS WELL AS CALLS MADE BY AN AUTOMATIC DIALING SYSTEM. SIMILARLY, FOR EACH EMAIL ADDRESS YOU PROVIDE TO SELLER, YOU AUTHORIZE US TO SEND EMAILS TO YOU AT THAT ADDRESS REGARDING YOUR ACCOUNT.

PROMISE TO PAY/ALLOCATION OF PAYMENTS: All goods and services described in each Prior Contract together with goods and services described herein and purchased under this contract are together referred to as the "Property." Buyer agrees to purchase on credit the Property according to the terms of this contract. Buyer promises to pay Seller the Total of Payments shown on the front of this contract in consecutive monthly installments as indicated on the Payment Schedule. Payments received will be applied first to any late charge that you designate to the full amount due, then to any deferral charge, and thereafter to the unpaid balance of the Total of Payments, unless applicable law requires a different application. Any amounts remaining unpaid on the final payment due date will be due in full on that date. If the Property consists of more than one item purchased at the same time, each installment payment shall be allocated to all the various purchase obligations in the same ratio that the original cash price of each item bears to the total cash prices of all such items.

SECURITY INTEREST: Pursuant to the Tennessee law, Buyer grants a security interest in the Property and all proceeds of the Property, each insurance policy financed by this contract and all proceeds of those policies, and any refunds of insurance premiums, and any refunds of repair service contracts, to secure payment of the purchase price of the Property. In the event of default, Seller will have the rights of a secured party under applicable law and, following any notice and opportunity to cure that may be required by applicable law, may repossess the Property but only if done lawfully and without breach of peace. Until the debt is paid in full, Buyer will not transfer, abandon, sell, assign, lease or encumber the Property (except for the security interest granted to Seller) without the Seller's written consent. Buyer agrees that the debt owed under this contract must be paid even if the Property is lost, damaged, or destroyed, and any available property insurance proceeds do not pay off the debt in full.

ARBITRATION CLAUSE: In this clause, "we" and "us" mean Seller and its affiliates, subsidiaries, employees, officers, directors, agents, servicers, or assigns. A "Dispute" is any claim, dispute or controversy arising from or relating to this Agreement, including without limitation disputes relating to the Property, this Agreement, other documents you sign or are provided, any claim, dispute, or controversy alleging fraud, misrepresentation, any other claim, whether under common law, equity, or under federal, state, or local law or regulation, any dispute about collection activity we take regarding monies owed under this Agreement, disputes about the scope and validity of this clause, other disputes as to matters subject to arbitration, and disputes about the enforcement or interpretation of any other part of this Agreement. You agree that upon your election or our election, any Dispute shall be resolved exclusively by binding individual arbitration. Arbitration shall be by the American Arbitration Association ("AAA"). The AAA will apply its consumer rules in effect when the claim is filed. Alternatively, with our consent, you may select another arbitration association and its rules. One arbitrator will arbitrate the Dispute. The arbitrator shall be an attorney, retired judge, or arbitrator experienced in consumer finance and debt collection. The arbitrator shall be registered and in good standing with an arbitration association. The arbitrator shall apply this clause and the rules of the selected arbitration association.

Arbitration will be on an individual basis, not as a class action. You waive your right to be a class representative or class member regarding any claim you may have against us. You also waive any right you may have to any consolidation of individual arbitrators. If we sue in court to collect amounts you owe, you agree that any counterclaim you may bring in any such action shall be brought on an individual basis only and not as a class representative or class member. This paragraph is referred to below as the "Class Action Waiver."

This arbitration clause does not waive any of your rights and remedies to pursue a claim individually (and not as a class action) in binding arbitration. Unless the arbitration organization's rules require otherwise, arbitration costs and fees will be split equally up to $500 each. Thereafter, Seller will pay all arbitrator's costs and fees subject to reapportionment in the award. Seller will pay all such fees necessary to ensure that this arbitration clause is enforceable. Unless prohibited by law or the arbitration organization's rules, the arbitrator may award or apportion arbitrator's fees; attorney's fees and costs. The arbitrator may not award relief in a form or amount not allowed by law. Any arbitration hearing will take place near your residence. This arbitration clause shall be governed by the Federal Arbitration Act, and not by any state law that might otherwise apply. Judgment on the award may be entered in any court with jurisdiction. This arbitration clause and Class Action Waiver shall survive the termination, payoff, assignment or transfer of this Agreement. It shall also inure to the benefit of and be binding on each party and their respective heirs, successors and assigns. If any part of this arbitration clause and Class Action Waiver is found by a court to be unenforceable, the rest remains enforceable. If this Class Action Waiver is found by a court to be unenforceable, the entire arbitration clause shall be unenforceable. Notwithstanding the foregoing, each party retains the right to seek relief in a small claims court for disputes or claims within the scope of its jurisdiction, but any such lawsuits and counterclaims will be subject to the Class Action Waiver in this arbitration clause.

YOU MAY OPT OUT OF THIS CLAUSE. To opt out of this Arbitration Clause, send us a notice that you do not want this clause to apply to this Agreement. For your opt out to be effective, you must send your opt out notice to the following address, by registered mail, within 14 days of this Agreement: Conn Appliances, Inc., 4055 Technology Forest Blvd. Suite 210, The Woodlands, TX, 77381 Attention: Credit Compliance Officer.

LATE CHARGE: If a scheduled installment payment is not paid in full upon the 10th day after the scheduled due date, you will be charged either $5 if the installment payment due is $25 or less, or $10 if the installment payment due is more than $25.

RETURNED PAYMENT CHARGE: Buyer agrees to pay a $30 fee if any check or other instrument tendered as payment is returned or dishonored.

PREPAYMENT: Buyer may prepay the unpaid balance of this contract in full or in part at any time before maturity. Partial prepayment will not accrue payment of any later installment. Upon prepayment in full or if the debt is accelerated after default, Buyer shall receive a refund or credit in an amount that represents at least as great a proportion of the finance charge, after first deducting there from an acquisition cost not to exceed the sum of fifteen dollars ($15.00), as the sum of the monthly time balances beginning one (1) month after prepayment is made bears to the sum of all the monthly time balances under the schedule of payments in this contract. If the amount of the refund or credit is less than one dollar ($1.00), no refund or credit will be made. In addition, Seller shall be entitled to receive any proceeds or refunds of prepaid insurance premiums from any insurance company issuing a policy in conjunction with this debt, and such amount shall be credited to the debt or refunded.

DEFERRAL CHARGE: Before or after default, Seller and Buyer may agree in writing to a deferral of all or part of one or more unpaid installments, and Seller may make and collect a charge not exceeding the Annual Percentage Rate disclosed on the front side of this contract, applied to the amount or amounts deferred for the period of deferral calculated without regard to differences in the lengths of months, but proportionally for a part of a month, counting each day as one-thirtieth of a month. The deferral charge must be paid at the time it is assessed. If an installment is not paid within 10 days after its due date, Seller may unilaterally grant a deferral and make the charges as provided in this section, but no deferral charge will be made for a period after the date that Seller elects to accelerate the maturity of the debt.

ACCELERATION UPON DEFAULT: Buyer shall be in default hereunder if: Buyer fails to pay any scheduled installment when due or perform any of the Buyers other obligation hereunder, or Seller believes in good faith that the prospect of Buyer's payment or performance is impaired. If Buyer is in default, Seller may, at its option, following any notice and opportunity to cure that may be required by applicable law, declare immediately due and payable the entire unpaid balance of this contract less any credits or refunds of unearned Finance Charge or insurance premiums as described above under the paragraph entitled "Prepayment". In the event of default, Buyer also agrees that Seller may, at its option and following any notice and opportunity to cure that may be required by applicable law, terminate any insurance contracts purchased though Seller to obtain refunds of unearned charges to reduce what Buyer owes under this contract.

CANCELLATION OF INSURANCE AND REPAIR SERVICE AGREEMENTS: In the event Buyer defaults on this contract which results in subsequent charge off of the contract by the Seller, the Seller may, at its option, without notice or demand, and Buyer hereby authorizes Seller to, cancel any existing insurance policies sold by Seller and/or repair service agreements purchased with this contract. In the event of insurance policy and/or repair service agreement cancellation, any premium refunds will be applied to the balance of this contract. Any amount remaining after repayment of this contract will be refunded to Buyer. If at any time the Buyer elects to cancel the insurance policy or repair service agreement, all refunds due under the policy and/or agreement, as applicable, will be credited to the contract.

MISCELLANEOUS: Buyer represents to Seller that Buyer has not received an extension of credit from any source other than Seller in connection with the purchase of the Property. Buyer agrees that if Seller fails to exercise any of its rights upon default, such failure shall not be considered a waiver of any of Seller's rights with respect to such default or of any rights upon any subsequent defaults. Any part of this contract contrary to the law of Tennessee shall not invalidate other parts of this contract. Buyer and Seller agree to comply strictly with applicable laws and further agree that Seller's rights (a) may not be exercised except to the extent permitted by applicable law, (b) will be construed so as to comply with applicable laws, and (c) are limited by applicable laws to the extent such laws may not be lawfully waived. Under no circumstances will Buyer ever be required to pay a Finance Charge or other amount in excess of what the law allows. This contract shall be governed by the laws of the State of Tennessee and applicable federal law.

The Property is bought for use primarily for personal, family, or household purposes and will be kept at the residence of the Buyer. Buyer agrees to pay reasonable attorney's fees (but not in excess of 15% of the unpaid debt after default) if this contract is referred for collection to an attorney who is not a salaried employee of Seller, and court costs and disbursements as allowed by law.

ALL PROPERTY IS PURCHASED WITHOUT EXPRESS OR IMPLIED WARRANTIES FROM SELLER, EXCEPT TITLE. SELLER DISCLAIMS ANY AND ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. This provision does not affect any applicable manufacturer warranty. In no event shall Seller have any liability for consequential damages for the use of or any defect in the Property unless this disclaimer is not permitted by applicable law.

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

PROPERTY RETURNS OR EXCHANGES. Buyer agrees that the Property may be returned or exchanged only in accordance with Seller's published Return & Exchange Policy from time to time in effect, including payment of any applicable restocking fee. If a return results in cancellation of this contract, and Buyer is due a refund of a down payment or other amount, Seller may apply the amount of the refund to the applicable restocking fee if the fee is not paid from other funds at the time the Property is returned, and Buyer will receive the excess amount, if any. If the restocking fee exceeds the refund amount, or if no refund is owed, Buyer agrees to pay the amount of the restocking fee upon return of the Property and the obligation will survive the cancellation of this contract.

PARTIAL RETURNS: If this contract finances the purchase of more than one item of Property, and Buyer returns one or more, but not all items, in accordance with Seller's returns policy, Buyer will receive a credit to the payoff balance under this contract for the portion of the Amount Financed represented by the purchase price of the returned item(s) and the sales tax and Finance Charge attributed to these amounts. Buyer will also receive credit for the unearned portion of the credit insurance premium added to the contract which was attributed to the returned item(s). If Buyer also cancels any service repair agreement relating to the returned item(s), Buyer will receive a credit for any unearned service repair agreement fee attributed to this item. In accordance with, the terms of that agreement. The aggregate credit for the returned item(s) will be applied to the final installment(s) under this contract in the inverse order of maturity unless applicable law requires a different application. Except for the affected final installment(s), the credit will not be applied to cure any past due amounts owing under this contract, or result in the reduction of future monthly payment amounts or postponement of scheduled future installments.

FURNISHING OF CREDIT INFORMATION: Seller may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

ELECTRONIC CHECK CONVERSION: When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process as a check transaction.

## ASSIGNMENT

FOR VALUE RECEIVED the Seller hereby sells, assigns and transfers to Conn Credit I, LP a Texas Limited Partnership ("Assignee") (a) all of its rights, title and interest in and to this contract, (b) all of its right, title and interest in and to the indebtedness evidenced hereby or payable hereunder, and (c) all of its right, title and interest in and to all security interests provided herein, including all of its right, title and interest in and to the Property, together with all moneys now and hereafter due and or to become due thereon. Seller has retained all servicing responsibilities. Unless Seller, Assignee, or Bank notifies Buyer otherwise, all payments under this contract must be made to Seller.

The undersigned warrants that the preceding paragraph signed by the Buyer named on the reverse hereof is accurate, complete and up-to-date in all material respects.

SOLD, ASSIGNED, AND TRANSFERRED TO
CONN CREDIT I, LP by CONN APPLIANCES, INC., dba CONN'S

Authorized Signature of Conn Appliances, Inc.
3295 College Street
Beaumont, Texas 77701

CONN-JWILLIAMS 000252

**TN**

RETAIL INSTALLMENT CONTRACT AND SECURITY AGREEMENT

TO CONTACT CONN'S CUSTOMER SERVICE HELPDESK CALL 1-877-358-1252

**CONN APPLIANCES, INC.**

Date 11/29/2015   0 Odd 0 Days

Acct. No. APPROVED APP

Salesman OWENS, LATONYA

AUSTIN PEAY PLAZA
MEMPHIS
TENNESSEE 38128
901/213-4944

Full Name of Buyer
WILLIAMS, JOHNNIE F
Co-Buyer

Street Address 2614 NORTHUMBERLAND LN
City/State MEMPHIS, TN   ZIP 38128
Telephone #'s Home 901/319-6319   Employment 901/319-6319

Invoice No. 189-028319530/001

Buyer and any Co-Buyer are referred to in this contract individually and collectively as "Buyer", "you", or "your", and includes their heirs, personal representatives, and executors. If this contract is signed by a Buyer and a Co-Buyer, each agrees to keep all the promises in this contract even if the other does not. Conn Appliances, Inc. is referred to as "Seller" or "our", and includes all of its successors and assigns. This contract may be assigned and transferred by Seller, but Buyer may resell or transfer its rights or obligations without the prior written consent of Seller.

| Quan. | Lot No. | Factory No. | Color or Size | ARTICLES | PRICE | |
|-------|---------|-------------|---------------|----------|-------|---|
| 1 | | NV100CB | | NOVA COCKTAIL BASE | 139 | 99 |
| 1 | | NV100CT | | NOVA COCKTAIL GLASS | 90 | 00 |
| 1 | | 23R111 | 4CI5410807 | ALL-IN-ONE DESKTOP | 699 | 99 |
| 1 | | OJ5740BPLUS | TH57L4X1CX | PRINTER BUNDLE | 199 | 99 |
| 1 | | DELIVERY | | STANDARD DELIVERY C | 79 | 99 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Manufacturers warranty, where applicable, will be provided separately.

| | TOTAL | 1209 | 96 |
|---|---|---|---|
| IN TESTIMONY THE UNDERSIGNED SELLER HEREBY SELLS AND THE UNDERSIGNED BUYER HEREBY PURCHASES THE ABOVE DESCRIBED PROPERTY SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH IN THIS CONTRACT. | SALES TAX | 111 | 93 |

## TRUTH-IN-LENDING DISCLOSURE STATEMENT

| ANNUAL PERCENTAGE RATE  The cost of your credit as a yearly rate. | FINANCE CHARGE  The dollar amount the credit will cost you. | Amount Financed  The amount of credit provided to you or on your behalf. | Total of Payments  The amount you will have paid after you have made all the payments as scheduled. | Total Sale Price  The total cost of your purchase on credit including your downpayment of $ 115.00 |
|---|---|---|---|---|
| 20.87% | $ 721.03 | $ 2444.27 | $ 3165.30 | $ 3280.30 |

Your payment schedule will be:

| No. of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| 30 | 105.51 | JAN. 03 ,2016 , and the same day each month |

Security : You are giving a security interest in:
  X  the goods or property being purchased
  X  the goods described in Prior Contract(s)#  475058930

Late Charge : If a scheduled installment payment is not paid in full upon the 10th day after the scheduled due date, you will be charged either 5% of the installment payment due or $25 or less, or $10 if the installment payment due is more than $25.

Prepayment : You may prepay your debt early. If you pay off your debt early, you will be entitled to a refund of part of the Finance Charge and unearned insurance premium.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties.

INSURANCE: Credit life insurance, credit disability insurance and credit involuntary unemployment insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost. Buyer's decision to accept or deny credit life insurance, credit disability insurance, or involuntary unemployment insurance is not a factor in Seller's decision to approve the credit extended by this contact.

| TYPE | PREMIUM | SIGNATURE | |
|---|---|---|---|
| CREDIT LIFE | NONE | I want □/do not want □  Buyer  I want □/do not want □  Co-Buyer | < |
| CREDIT LIFE AND | NONE | I want □/do not want □  Buyer | < |
| CREDIT DISABILITY | NONE | I want □/do not want □  Buyer (life only) | < |
| CREDIT INVOLUNTARY UNEMPLOYMENT (Buyer Only) | NONE | I want □/do not want □  Buyer | < |

Property insurance is required in connection with this purchase. Buyer may furnish property insurance through an existing policy of insurance owned or controlled by the Buyer or an insurance policy obtained from an insurance company authorized to do business in Tennessee.

Property Coverage Purchased $   2310.74

I elect to: (1)☑ purchase property insurance through Seller; or
(2)☐ furnish my own property insurance coverage.

Signature [signature]

If you purchase property insurance through Seller, it will cost: $2.90 per $100.00 per year, for a total of 133.53. Seller's coverage might duplicate existing coverage if Buyer has a residential property insurance policy. Seller's coverage ceases on the earlier of the stated maturity date of this contract or when you have fully paid the debt, whichever occurs first. Seller's coverage is primary, so it is the first to be used in the event of a loss on the property it covers. Buyer may cancel Seller's property insurance coverage at any time and replace it with an alternative property insurance policy furnished by Buyer from an insurance company acceptable to Seller by calling Seller at the toll-free number provided in the writing Seller and providing evidence of alternative coverage as required above.

For additional details relating to credit insurance purchased through Seller please refer to the "General Information Summary Page," the terms on the reverse side of this contract, and the group certificate of insurance describing other limitations, restrictions, and conditions.

## ITEMIZATION OF AMOUNT FINANCED

| 1. CASH PRICE (including Sales Tax) | | $ 1321.89 |
|---|---|---|
| a. CASH DOWN PAYMENT | $ 115.00 | RECEIVED BY |
| b. TRADE IN | $ | (DESCRIBE) |
| 2. TOTAL DOWN PAYMENT (a + b) | | $ 115.00 |
| 3. UNPAID BALANCE OF CASH PRICE (1 - 2) | | $ 1206.89 |
| GROSS PRICES (OLD BALANCE) | $ 1103.85 | |
| FINANCE CHARGE REFUND | $ | |
| SURCHARGE REFUND | $ | |
| TOTAL FINANCE CHARGE REFUND | $ | |
| CREDIT LIFE INS. REFUND | $ | |
| CREDIT DISABILITY INSURANCE REFUND | $ | |
| PROPERTY INS. REFUND | $ | |
| CREDIT INVOLUNTARY UNEMPLOYMENT INS. REFUND | $ | |
| 4. NET BALANCE - PRIOR CONTRACT | SEE BELOW | $ 1103.85 |
| | SUB TOTAL | $ 2310.74 |

| ALL INSURANCE CHARGES PAID TO INSURANCE COMPANIES | | |
|---|---|---|
| *c. OTHER CHARGES PAID TO | $ | |
| *d. CREDIT LIFE INSURANCE | $ NONE | |
| *e. CREDIT DISABILITY INSURANCE | $ NONE | |
| *f. CREDIT INVOLUNTARY UNEMPLOYMENT INSURANCE | $ NONE | |
| *g. PROPERTY INSURANCE | $ 133.53 | |
| 5. (c + d + e + f + g) | TOTAL OTHER CHARGES | $ 133.53 |
| 6. AMOUNT FINANCED (3 + 4 + 5) | | $ 2444.27 |
| FINANCE CHARGE | | $ 721.03 |
| TOTAL OF PAYMENTS | | $ 3165.30 |

* We may be retaining a portion of these amounts as compensation.

Assigned to Conn's Receivables 2016-A Trust, which has directly or indirectly pledged all of its rights and interests herein to Wells Fargo Bank, National Association, as Trustee for the benefit of the Series 2016-A Noteholders

as collateral to Bank of America, N.A.

ADDITIONAL DISCLOSURES AND CONTRACT TERMS INCLUDING SECURITY INTEREST APPEAR ON REVERSE SIDE HEREOF AND ARE PART OF THIS CONTRACT.

NOTICE TO BUYER: DO NOT SIGN THIS CONTRACT BEFORE YOU READ IT OR IF IT CONTAINS BLANK SPACES. YOU ARE ENTITLED TO A COPY OF THE CONTRACT YOU SIGN. UNDER THE LAW YOU HAVE THE RIGHT TO PAY OFF IN ADVANCE THE FULL AMOUNT DUE AND RECEIVE A PARTIAL REFUND OR CREDIT OF THE FINANCE CHARGE. KEEP THIS CONTRACT TO PROTECT YOUR LEGAL RIGHTS.

ACKNOWLEDGEMENT OF RECEIPT: Buyer understands that the Seller will rely upon this representation and acknowledgement in accepting Buyer's obligation and granting credit. Buyer represents to Seller that at the time Buyer received a copy of this contract, the contract did not contain any blank spaces for items that are essential provisions of the transaction. Buyer also acknowledges receipt of a copy of CONN'S FINANCIAL INFORMATION PRIVACY NOTICE. BUYER AND CO-BUYER ACKNOWLEDGE RECEIPT OF THIS RETAIL INSTALLMENT CONTRACT AND SECURITY AGREEMENT.

[signature] Johnnie J Williams   11/29/2015 DATE
Co-Buyer
XXX-XX-6276

CONN'S

OWENS, LATONYA
By Authorized Representative

CONN-JWILLIAMS 000264

You certify that you are the subscriber and/or customary user of the telephone number(s) (including, without limitation, wireless number(s)) provided by you to us or our affiliates acting on our behalf. You hereby consent to receive autodialed and/or pre-recorded message calls and SMS messages (including text messages) from us, our affiliates, marketing partners, agents and others calling on our behalf at any telephone numbers that you have provided, including calls related to informational, debt collection, or any other Conn's business purpose. You also hereby consent to receive any such calls and messages to any telephone number that you may provide in the future (including wireless telephone numbers). During the term of this agreement, you also agree to notify Conn's if any telephone number for which you have provided consent is (i) is relinquished by you, or (ii) changed by you. Nothing in this agreement shall designate an exclusive manner for revoking your consent to receive calls at a particular wireless telephone number, or condition your purchase of good or services from Conn's on your consent to receive debt collection, or other calls from or on behalf of Conn's.

**PROMISE TO PAY/ALLOCATION OF PAYMENTS:** All goods and services described in each Prior Contract together with goods and services described herein and purchased under this contract are together referred to as the "Property." Buyer agrees to purchase on credit the Property according to the terms of this contract. Buyer promises to pay Seller the Total of Payments shown of the front of this contract in consecutive monthly installments as indicated in the Payment Schedule. Payments received will be applied first to any late charge that you designate to be paid, then to any Deferral charge, and thereafter to the unpaid balance of the Total of Payments, unless applicable law requires a different application. Any amounts remaining unpaid on the final payment due date will be due in full on that date. If the Property consists of more than one item purchased at the same time, each installment payment shall be allocated to the various purchase obligations in the same ratio that the original cash price of each item bears to the total cash prices of all such items.

**SECURITY INTEREST:** Pursuant to the Tennessee law, Buyer grants a security interest in the Property to secure payment of the Property, each insurance policy financed by this contract and all proceeds of those policies, and any refunds of insurance premiums and any refunds of repair service contracts, to secure payment of the purchase price of the Property. In the event of default, Seller will have the rights of a secured party under applicable law and, following any notice and opportunity to cure that may be required by applicable law, may repossess the Property but only if done lawfully and without breach of the peace. Until the debt is paid in full, Buyer will not transfer, abandon, sell, assign, lease or encumber the Property (except for the security interest granted to Seller) without the Seller's written consent. Buyer agrees that the debt owed under this contract must be paid even if the Property is lost, damaged, or destroyed, and any available property insurance proceeds do not pay off the debt in full.

**ARBITRATION CLAUSE:** In this clause, "we" and "us" mean Seller and its affiliates, subsidiaries, employees, officers, directors, agents, servicers, or assigns. A "Dispute" is any claim, dispute or controversy arising from or relating to this Agreement, including without limitation disputes relating to the Property, this Agreement, other documents you sign or are provided, any claim, dispute, or controversy alleging fraud, misrepresentation, any other claim, whether under common law, statute, or under federal, state, or local law or regulation, any dispute about collection activity we take regarding monies owed under this Agreement, disputes about the scope and validity of this clause, other disputes as to matters subject to arbitration, and disputes about the enforcement or interpretation of any other part of this Agreement. You agree that upon your election or our election, any Dispute shall be resolved exclusively by binding individual arbitration. Arbitration shall be by the American Arbitration Association ("AAA"). The AAA will apply its consumer rules in effect when the claim is filed. Alternatively, with our consent, you may select another arbitration association and its rules. Once arbitration will replace the Dispute. The arbitrator shall be an attorney, retired judge, or arbitrator experienced in consumer finance and debt collection. The arbitrator shall be registered and in good standing with an arbitration association. The arbitrator shall apply this clause and the rules of the selected arbitration association.

Arbitration will be on an individual basis, not as a class action. You waive your right to be a class representative or class member regarding any claim you may have against us. You also waive any right you may have to any consolidation of individual arbitrations. If we lose in court to collect amounts you owe, you agree that any counterclaim you bring in any such action shall be brought on an individual basis only and not as a class representative or class member. This paragraph is referred to below as the "Class Action Waiver."

This arbitration clause does not waive any of your rights and remedies to pursue a class individually (and not as a class action) in binding arbitration. Unless the arbitration organization's rules require otherwise, arbitration costs and fees will be split equally up to $500 each. Thereafter, Seller will pay all additional amounts if you request reapportionment in the award. Seller will pay all such fees necessary to ensure that this arbitration clause is enforceable. Unless prohibited by law or the arbitration organization's rules, the arbitrator may award or apportion arbitrator's fees, attorney's fees and costs. The arbitrator may not award relief in a form or amount not allowed by law. Any arbitration hearing will take place near your residence. This arbitration clause shall be governed by the Federal Arbitration Act, and not by any state law that might otherwise apply. Judgment on the award may be entered in any court with jurisdiction. This arbitration clause and Class Action Waiver shall survive the termination, payoff, assignment or transfer of this Agreement. It shall also inure to the benefit of and binding on each party and their respective heirs, successors and assigns. If any part of this arbitration clause and Class Action Waiver is found by a court to be unenforceable, the rest remains enforceable. If the Class Action Waiver is found by a court to be unenforceable, the entire arbitration clause shall be unenforceable. Notwithstanding the foregoing, each party retains the right to seek relief in a small claims court for disputes or claims within the scope of its jurisdiction, but any such lawsuits and counterclaims will be subject to the Class Action Waiver in this arbitration clause.

**YOU MAY OPT OUT OF THIS CLAUSE.** To opt out of this Arbitration Clause, send us a notice that you do not want this clause to apply to this Agreement. For your opt out to be effective, you must send your opt out notice to the following address, by registered mail, within 14 days of this Agreement: Conn Appliances, Inc., 4055 Technology Forest Blvd. Suite 210, The Woodlands, TX, 77381 Attention: Credit Compliance Officer.

**LATE CHARGE:** If a scheduled installment payment is not paid in full upon the 10th day after the scheduled due date, you will be charged either 5% if the installment payment due is $25 or less, or $10 if the installment payment due is more than $25.

**RETURNED PAYMENT CHARGE:** Buyer agrees to pay a $30 fee if any check or other instrument tendered as payment is returned or dishonored.

**PREPAYMENT:** Buyer may prepay the unpaid balance of this contract in full or in part at any time before maturity. Partial prepayment will not excuse payment of any late installment. Upon prepayment in full or if the debt is accelerated after default, Buyer shall receive a refund or credit in an amount that represents at least as great a proportion of the finance charge, after first deducting there from an acquisition cost not to exceed the sum of fifteen dollars ($15.00), as the sum of the monthly time balances beginning one (1) month after prepayment is made bears to the sum of all the monthly time balances under the schedule of payments in this contract. If the amount of the refund or credit is less than one dollar ($1.00), no refund or credit will be made. In addition, Seller shall be entitled to receive any proceeds or refunds of prepaid insurance premiums from any insurance company-issuing a policy in conjunction with this debt, and such amount shall be credited to the debt or refunded.

**DEFERRAL CHARGE:** Before or after default, Seller and Buyer may agree in writing to a deferral of all or part of one or more unpaid installments, and Seller may make and collect a charge not exceeding the Annual Percentage Rate disclosed on the front side of this contract, applied to the amount or amounts deferred for the period of deferral calculated without regard to differences in the lengths of months, but proportionally for a part of a month, counting each day as one-thirtieth of a month. The deferral charge must be paid at the time it is assessed. If an installment is not paid within 10 days after its due date, Seller may unilaterally grant a deferral and make the charges as provided in this section, but no deferral charge will be made for a period after the date that Seller elects to accelerate the maturity of the debt.

**ACCELERATION UPON DEFAULT:** Buyer shall be in default hereunder if: Buyer fails to pay any scheduled installment when due or perform any of the Buyers other obligation hereunder, or Seller believes in good faith that the prospect of Buyer's payment or performance is impaired. If Buyer is in default, Seller may, at its option, following any notice and opportunity to cure that may be required by applicable law, declare immediately due and payable the entire unpaid balance of this contract less any credits or refunds of unearned Finance Charge or insurance premiums as described above under the paragraph entitled "Prepayment". In the event of default, Buyer also agrees that Seller may, at its option and following any notice and opportunity to cure that may be required by applicable law, terminate any insurance contracts purchased through Seller to obtain refunds of unearned charges to reduce what Buyer owes under this contract.

**CANCELLATION OF INSURANCE AND REPAIR SERVICE AGREEMENTS:** In the event Buyer defaults on this contract which results in subsequent charge off of the contract by the Seller, the Seller may, at its option, without notice or demand, and Buyer hereby authorizes Seller to, cancel any existing insurance policies sold by Seller and/or repair service agreements purchased with this contract. In the event of insurance policy and/or repair service agreement cancellation, any premium refunds will be applied to the balance of this contract. Any amount remaining after repayment of this contract will be refunded to Buyer. If at any time the Buyer elects to cancel the insurance policy or repair service agreement, all refunds due under the policy and/or agreement, as applicable, will be credited to the contract.

**MISCELLANEOUS:** Buyer represents to Seller that Buyer has not received an extension of credit from any source other than Seller in connection with the purchase of the Property. Buyer agrees that if Seller fails to exercise any of its rights upon default, such failure shall not be considered a waiver of any of Seller's rights with respect to such default or of any rights upon any subsequent defaults. Any part of this contract contrary to the law of Tennessee shall not invalidate other parts of this contract. Buyer and Seller agree to comply strictly with applicable laws and further agree that Seller's rights (a) may not be exercised except to the extent permitted by applicable law, (b) will be construed so as to comply with applicable laws, and (c) are limited by applicable laws to the extent such laws may not be lawfully waived. Under no circumstances will Buyer ever be required to pay a Finance Charge or other amount in excess of what the law allows. This contract shall be governed by the laws of the State of Tennessee and applicable federal law.

The Property is bought for use primarily for personal, family, or household purposes and will be kept at the residence of the Buyer. Buyer agrees to pay reasonable attorney's fees (but not in excess of 15% of the unpaid debt after default) if this contract is referred for collection to an attorney who is not a salaried employee of Seller, and court costs and disbursements as allowed by law.

**ALL PROPERTY IS PURCHASED WITHOUT EXPRESS OR IMPLIED WARRANTIES FROM SELLER, EXCEPT TITLE. SELLER DISCLAIMS ANY AND ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.** This provision does not affect any applicable manufacturer warranty. In no event shall Seller have any liability for consequential damages for the use of or any defect in the Property unless this disclaimer is not permitted by applicable law.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

**PROPERTY RETURNS OR EXCHANGES:** Buyer agrees that the Property may be returned or exchanged only in accordance with Seller's published Return & Exchange Policy from time to time in effect, including payment of any applicable restocking fee. If a return results in cancellation of this contract, and Buyer is due a refund of a down payment or other amount, Seller may apply the amount of the refund to the applicable restocking fee if the fee is not paid from other funds at the time the Property is returned, and Buyer will receive the excess amount, if any. If the restocking fee exceeds the refund amount, or if no refund is owed, Buyer agrees to pay the amount of the restocking fee upon return of the Property and the obligation will survive the cancellation of this contract.

**PARTIAL RETURNS:** If this contract finances the purchase of more than one item of Property, and Buyer returns one or more, but not all items, in accordance with Seller's returns policy, Buyer will receive a credit to the payoff balance under this contract for the portion of the Amount Financed represented by the purchase price of the returned item(s) and the sales tax and Finance Charge attributed to these amounts. Buyer will also receive credit for the unearned portion of the credit insurance premium added to the contract which was attributed to the returned item(s). If Buyer also cancels any service repair agreement relating to the returned item(s), Buyer will receive a credit for any unearned service repair agreement fee if permitted by, and in accordance with, the intent of that agreement. The aggregate credit for the returned item(s) will be applied to the final installment(s) under this contract in the inverse order of maturity unless applicable law requires a different application. Except for the affected final installment(s), the credit will not be applied to cure any past due amounts owing under this contract, or result in the reduction of future monthly payment amounts or postponement of scheduled future installments.

**FURNISHING OF CREDIT INFORMATION:** Seller may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**ELECTRONIC CHECK CONVERSION:** When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process as a check transaction.

## ASSIGNMENT

**FOR VALUE RECEIVED**, the Seller hereby sells, assigns and transfers to Conn Credit I, LP a Texas Limited Partnership ("Assignee") (a) all of its rights, title and interest in and to this contract, (b) all of its right, title and interest in and to the indebtedness evidenced hereby or payable hereunder, and (c) all of its right, title and interest in and to all security interests provided herein, including all of its right, title and interest in and to the Property, together with all moneys now and hereafter due and/or to become due thereon. Seller has retained all servicing responsibilities. Unless Seller, Assignee, or Bank notifies Buyer otherwise, all payments under this contract must be made to Seller.

The undersigned warrants that the preceding paragraph signed by the Buyer named on the reverse hereof is accurate, complete and up-to-date in all material respects.

SOLD, ASSIGNED, AND TRANSFERRED TO
CONN CREDIT I, LP by CONN APPLIANCES, INC., dba CONN'S

Authorized Signature of Conn Appliances, Inc.
3295 College Street
Beaumont, Texas 77701

CONN-JWILLIAMS 000265

CONFIDENTIAL

### AFFIDAVIT OF JAMES K. NOBLE, Jr.

STATE OF  GEORGIA  §
  §
COUNTY OF  DeKALB  §

Before me, the undersigned notary, on this day personally appeared James K. Noble, Jr., the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

1.     My name is James K. Noble Jr. I am the President and Chief Executive Officer for Noble Systems Corporation ("Noble Systems"). I am over the age of 18, am competent to make this affidavit, and have personal knowledge of each of the facts set forth herein, which are true and correct.

2.     I am generally familiar with and have personal knowledge of the software that Noble Systems licensed to Conn's (pursuant to relevant license agreements between the parties) for use by Conn's during the period beginning at least from January, 2013 until the date of this Affidavit (the "Relevant Software"). I have personal experience and knowledge of the Relevant Software, including its capabilities and functions.

3.     The Relevant Software does not include any functionality incorporated by Noble Systems, nor is programmed/designed to store or produce telephone numbers to be called using a random or sequential number generator. Indeed, the Relevant Software is not coded by Noble Systems to perform such actions, and it has no code incorporated by Noble Systems that would allow it to perform such actions.

4.     Although a computer can be programmed to perform multiple tasks, only those tasks that are specifically invoked by a particular program from the operating system or programmed by the program itself are, in fact, able to be performed by the specific program running within that computer. To store or produce telephone numbers to be called using a random or sequential number generator would require that these tasks be (a) specifically invoked by an end user, or by an executed program using the operating system of the computer or, (b) performed by the program itself.

5.     The Relevant Software Noble Systems licensed to Conn's is not designed to, nor does it have any functionality incorporated by Noble Systems that is designed to allow Conn's to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers. Indeed, none of Noble Systems' Relevant Software licensed to Conn's is designed by Noble Systems to make use of any commands from any operating system to generate random or sequential numbers as telephone numbers to be dialed. Further, the Relevant Software licensed by Noble Systems to Conn's does not contain any

# EXHIBIT E

CONFIDENTIAL

functionality incorporated by Noble Systems, is not designed to, and does not have any code incorporated by Noble Systems designed to allow it to generate random or sequential numbers for telephone dialing.

6.     To the best of Noble Systems' knowledge as of the date of this Affidavit, Conn's does not have the ability to access or modify the Relevant Software licensed by Noble Systems to enable the Relevant Software to generate random or sequential numbers for telephone dialing.  Indeed, Noble Systems' Relevant Software does not include any such functionality incorporated by Noble Systems, nor is it designed by Noble Systems to allow Conn's to interact with the operating system in a manner that would allow the Relevant Software to store or produce telephone numbers to be called using a random or sequential number generator.  To be best of Noble Systems' knowledge as of the date of this Affidavit, Conn's cannot access or change the code of the Relevant Software, nor can it access the Relevant Software's operating system.  For Conn's to be able to store or produce telephone numbers to be called using a random or sequential number generator using the Relevant Software, it would need an entirely different software program or Noble Systems would need to rewrite, recode, and reprogram Conn's current Relevant Software.

Further Affiant sayeth not.

_[signature]_

SWORN TO and SUBSCRIBED before me by _JAMES K. NOBLE, JR._ on this _8th_ day of March, 2017.

_[notary seal: NATASHA BEGANOVIC, MY COMMISSION EXPIRES, NOTARY PUBLIC, JUNE 7, 2019, GWINNETT COUNTY, GEORGIA]_

_[signature]_ Notary Public in and for the State of _GEORGIA_

## DISSENTING STATEMENT OF
## COMMISSIONER AJIT PAI

**Re: *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, WC Docket No. 07-135**

Congress passed the Telephone Consumer Protection Act (TCPA) to crack down on intrusive telemarketers and over-the-phone scam artists. It prohibits telemarketing in violation of our Do-Not-Call rules and prohibits any person from making calls using the tools that telemarketers had at their disposal in 1991. And the TCPA includes a three-prong enforcement mechanism for remedying violations: States, the FCC, and individual consumers can all take illegal telemarketers to court with statutory penalties starting at $500 per violation.[1]

Yet problems persist. Last year, the FCC received 96,288 complaints for violations of federal Do-Not-Call rules, more than any other category of complaints.[2] On June 10, the Senate Special Committee on Aging held a hearing on ending the epidemic of illegal telemarketing calls.[3] At that hearing, the Attorney General of Missouri testified that the *number one* complaint of his constituents is illegal telemarketing. His office alone received more than 52,000 telemarketing complaints in 2014.[4] And the Federal Trade Commission has reported that "increasingly, fraudsters, who often hide in other countries in an attempt to escape detection and punishment, make robocalls that harass and defraud consumers." The FTC noted that a single scam artist made over 8 million deceptive robocalls to Americans.[5]

The bottom line is this: Far too many Americans are receiving far too many fraudulent telemarketing calls. I know because my family and I get them on our cellphones during the day and on our home phones at night. It's a problem that's only getting worse.

And none of this should be news to the FCC. As I remarked in this very room back in January: "Unwanted telemarketing calls in violation of the National Do-Not-Call Registry are on the rise. In fact, such complaints made up almost 40 percent of consumer complaints in our latest report—and the number of complaints jumped dramatically last year from 19,303 in the first quarter to 34,425 in the third. Let's fix this problem."[6] What has the Commission done since then to enforce the rules? It has issued a single citation to a single potential violator of federal Do-Not-Call rules.[7] That's not going to solve the problem.

The courts haven't been better. The TCPA's private right of action and $500 statutory penalty could incentivize plaintiffs to go after the illegal telemarketers, the over-the-phone scam artists, and the foreign fraudsters. But trial lawyers have found legitimate, domestic businesses a much more profitable target. As Adonis Hoffman, former Chief of Staff to Commissioner Clyburn, recently wrote in *The Wall*

---

[1] 47 U.S.C. §§ 227(b)(3), 227(c)(5), 227(g), 503(b).

[2] *See* FCC, Quarterly Reports – Consumer Inquiries and Complaints, http://go.usa.gov/3VFkB (summing complaints for 2014 from the "Top Complaint Subjects" tables).

[3] Hearing before U.S. Senate Special Committee on Aging, "Ringing Off the Hook: Examining the Proliferation of Unwanted Calls" (June 10, 2015), *available at* http://go.usa.gov/3wVHY.

[4] Overview of Statement of Attorney General Chris Koster, Special Committee on Aging Panel Discussion, at 1 (June 10, 2015), *available at* http://go.usa.gov/3VFkQ.

[5] Federal Trade Commission, Prepared Statement on Combatting Illegal Robocalls: Initiatives to End the Epidemic, United States Senate Special Committee on Aging, at 4 (June 10, 2015), *available at* http://go.usa.gov/3VFkw.

[6] Statement of Commissioner Ajit Pai on FCC Consumer Help Center: A New Consumer Gateway (Jan. 29, 2015), *available at* http://go.usa.gov/3VF9k.

[7] *FreeEats.com Inc.*, File No. EB-TCD-13-00007717, Citation and Order, 30 FCC Rcd 2659 (Enf. Bur. 2015).

## EXHIBIT F

*Street Journal*, a trial lawyer can collect about $2.4 million per suit by targeting American companies.[8] So it's no surprise the TCPA has become the poster child for lawsuit abuse, with the number of TCPA cases filed each year skyrocketing from 14 in 2008 to 1,908 in the first nine months of 2014.

Here's one example.  The Los Angeles Lakers offered its fans a fun opportunity:  Send a text-message to the team, and you might get to place a personalized message on the Jumbotron at the Staples Center.  The Lakers acknowledged receipt of each text with a reply making clear that not every message would appear on the Jumbotron.  The trial bar's response?  A class-action lawsuit claiming that every automated text response was a violation of the TCPA.

Or here's another.  TaxiMagic, a precursor to Uber, sent confirmatory text messages to customers who called for a cab.  Each message indicated the cab's number and when the cab was dispatched to the customer's location.  Did customers appreciate this service?  Surely.  But one plaintiffs' attorney saw instead an opportunity to profit, and a class-action lawsuit swiftly followed.

Some lawyers go to ridiculous lengths to generate new TCPA business.  They have asked family members, friends, and significant others to download calling, voicemail, and texting apps in order to sue the companies behind each app.  Others have bought cheap, prepaid wireless phones so they can sue any business that calls them by accident.  One man in California even hired staff to log every wrong-number call he received, issue demand letters to purported violators, and negotiate settlements.  Only after he was the lead plaintiff in over 600 lawsuits did the courts finally agree that he was a "vexatious litigant."

The common thread here is that in practice the TCPA has strayed far from its original purpose.  And the FCC has the power to fix that.  We could be taking aggressive enforcement action against those who violate the federal Do-Not-Call rules.  We could be establishing a safe harbor so that carriers could block spoofed calls from overseas without fear of liability.  And we could be shutting down the abusive lawsuits by closing the legal loopholes that trial lawyers have exploited to target legitimate communications between businesses and consumers.

Instead, the *Order* takes the opposite tack.  Rather than focus on the illegal telemarketing calls that consumers really care about, the *Order* twists the law's words even further to target useful communications between legitimate businesses and their customers.[9]  This *Order* will make abuse of the TCPA much, much easier.  And the primary beneficiaries will be trial lawyers, not the American public.

I respectfully dissent.

## I.

The *Order* dramatically expands the TCPA's reach.  The TCPA prohibits a person from making "any call" to a mobile phone "using any automatic telephone dialing system,"[10] except in certain defined circumstances.  The statute defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number

---

[8] Adonis Hoffman, "Sorry, Wrong Number, Now Pay Up," *The Wall Street Journal* (June 16, 2015), *available at* http://on.wsj.com/1GuwfMJ; *see also* John Eggerton, "FCC's Hoffman Looks Back, Moves Forward," *Broadcasting & Cable* (Mar. 23, 2015), *available at* http://bit.ly/1GEQYNR (quoting Hoffman as saying "This consumer protection, anti-telemarketing statute has been leveraged by aggressive plaintiffs' lawyers to line their pockets lavishly with millions, while consumers usually get peanuts. . . . I think the TCPA should be known by its real acronym—'Total Cash for Plaintiffs' Attorneys.'  This is just one example where the public interest is not being advanced responsibly.").

[9] The *Order* notes that the "TCPA makes it unlawful for any business—'legitimate' or not—to make robocalls that do not comply with the provisions of the statute."  *Order* at note 6.  Of course it does; rare is the statute that limits its scope to only illegitimate businesses.  The point is that *Order* redirects the TCPA's aim away from undesirable practices commonly used by telemarketers (the elimination of which benefits consumers) and toward desirable communications between businesses and consumers (litigation against which benefits trial lawyers).  As the very name makes clear, the TCPA is a consumer protection statute, not a trial-lawyer protection statute.

[10] 47 U.S.C. § 227(b)(1)(A)(iii).

generator; and (B) to dial such numbers."[11]  As three separate petitions explain, trial lawyers have sought to apply this prohibition to equipment that *cannot* store or produce telephone numbers to be called using a random or sequential number generator and that *cannot* dial such numbers.[12]

That position is flatly inconsistent with the TCPA.  The statute lays out two things that an automatic telephone dialing system must be able to do or, to use the statutory term, must have the "capacity" to do.[13]  If a piece of equipment *cannot* do those two things—if it *cannot* store or produce telephone numbers to be called using a random or sequential number generator and if it *cannot* dial such numbers—then how can it possibly meet the statutory definition?  It cannot.  To use an analogy, does a one-gallon bucket have the capacity to hold two gallons of water?  Of course not.

That's long been the FCC's approach.  When the Commission first interpreted the statute in 1992, it concluded that the prohibitions on using automatic telephone dialing systems "clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services[], because the numbers called *are not generated in a random or sequential fashion*."[14]  Indeed, in that same order, the Commission made clear that calls not "dialed using a random or sequential number generator" "are not autodialer calls."[15]

Confirming this interpretation (what some proponents call the "present capacity" or "present ability" approach[16]) is the statutory definition's use of the present tense and indicative mood.  An automatic telephone dialing system is "equipment which has the capacity" to dial random or sequential numbers,[17] meaning that system actually can dial such numbers at the time the call is made.  Had Congress wanted to define automatic telephone dialing system more broadly it could have done so by

---

[11] 47 U.S.C. § 227(a)(1).  A random number generates numbers randomly: 555-3455, 867-5309, etc.  A sequential number generator generates numbers in sequence: 555-3455, 555-3456, etc.

[12] TextMe, Inc. Petition for Expedited Declaratory Ruling and Clarification, CG Docket No. 02-278 (Mar. 18, 2014); Glide Talk, Ltd. Petition for Expedited Declaratory Ruling, CG Docket No. 02-278 (Oct. 28, 2013); Professional Association for Customer Engagement Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking, CG Docket No. 02-278 (Oct. 18, 2013).

[13] *See* Webster's New International Dictionary at 396 (2nd ed. 1958) (defining "capacity" in relevant part to mean "power of receiving, containing, or absorbing," "extent of room or space," "ability," "capability," or "maximum output").

[14] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd 8752, 8776, para. 47 (1992) (emphasis added).

[15] *Id.* at 8773, para. 39.

[16] *See, e.g.*, Chamber Comments on PACE Petition at 5; CI Comments on Glide Petition at 3–4; Covington Comments on PACE Petition at 4–5; DIRECTV Comments on PACE Petition at 2–3; Fowler Comments on PACE Petition at 1; Glide Reply Comments on PACE Petition at 6; Global Comments on PACE Petition at 2; Internet Association Comments on TextMe Petition at 2–3; NCHER Reply Comments on PACE Petition at 2; Nicor Comments on PACE Petition at 7; Noble Systems Comments on Glide Petition at 4; Path Comments on Glide Petition at 22; Twilio Comments on Glide Petition at 13; YouMail Reply Comments on PACE Petition at 4; Letter from Monica S. Desai, Counsel to Wells Fargo, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1–2 (June 11, 2015); Letter from Steven A. Augustino, Counsel to Five9, Inc., to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1–2 (June 11, 2015); Letter from Monica S. Desai, Counsel to ACA International, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 2–6 (June 11, 2015); Letter from Stephanie L. Podey, Vice President and Associate General Counsel, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 2–3 (June 10, 2015); Letter from Jennifer D. Hindin, Counsel to Sirius XM Radio, Inc., to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 2 (June 8, 2015).

[17] 47 U.S.C. § 227(a)(1).

adding tenses and moods, defining it as "equipment which has, has had, or could have the capacity."[18]
But it didn't.  We must respect the precise contours of the statute that Congress enacted.[19]

The *Order* reaches the contrary conclusion and holds that the term "automatic telephone dialing
system" includes equipment that *cannot* presently store or produce telephone numbers to be called using a
random or sequential number generator and that *cannot* presently dial such numbers.  The apparent test is
whether there is "more than a theoretical potential that the equipment could be modified to satisfy the
'autodialer' definition."[20]  To put it kindly, the *Order*'s interpretation is a bit of a mess.

*For one*, it dramatically departs from the ordinary use of the term "capacity."  Although the
*Order* points to dictionaries to suggest that the word "capacity" means "the potential or suitability for
holding, storing, or accommodating,"[21] those definitions in fact undermine the *Order*'s conclusion.  No
one would say that a one-gallon bucket has the "potential or suitability for holding, storing, or
accommodating" two gallons of water just because it could be modified to hold two gallons.  Nor would
anyone argue that Lambeau Field in Green Bay, Wisconsin, which can seat 80,000 people, has the
capacity (i.e., the "potential or suitability") to seat all 104,000 Green Bay residents just because it could
be modified to have that much seating.[22]  The question of a thing's capacity is whether it can do
something presently, not whether it could be modified to do something later on.

*For another*, the *Order*'s expansive reading of the term "capacity" transforms the TCPA from a
statutory rifle-shot targeting specific companies that market their services through automated random or
sequential dialing into an unpredictable shotgun blast covering virtually all communications devices.
Think about it.  It's trivial to download an app, update software, or write a few lines of code that would
modify a phone to dial random or sequential numbers.  So under the *Order*'s reading of the TCPA, each
and every smartphone, tablet, VoIP phone, calling app, texting app—pretty much any calling device or
software-enabled feature that's not a "rotary-dial phone"[23]—is an automatic telephone dialing system.[24]

Such a reading of the statute subjects not just businesses and telemarketers but almost all our
citizens to liability for everyday communications.  One need not bother with the legislative history to
realize that lawmakers did not intend to interfere with "expected or desired communications between
businesses and their customers."[25]  And one need not be versed in the canon of constitutional avoidance[26]

---

[18] *See, e.g.*, *United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in
construing statutes."); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 57 (1987)
("Congress could have phrased its requirement in language that looked to the past . . . , but it did not choose this
readily available option.").

[19] *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 93–94 (2002) (explaining that "like any key term in an
important piece of legislation, the [statutory provision in question] was the result of compromise between groups
with marked but divergent interests in the contested provision" and that "[c]ourts and agencies must respect and give
effect to these sorts of compromises"); *see also* John F. Manning, *Second-Generation Textualism*, 98 Cal. L. Rev.
1287, 1309–17 (2010) (arguing that respecting legislative compromise means that courts "must respect the level of
generality at which the legislature expresses its policies").

[20] *Order* at para. 18.

[21] *See Order* at para. 19.

[22] The *Order* responds that the analogy is "inapt" because "modern dialing equipment can often be modified
remotely without the effort and cost of adding physical space to an existing structure."  *Order* at para. 16.  This
misses the point.  If asked the seating capacity of Lambeau Field, no one would first study whether one could seat
more than 80,000 "without the effort and cost of adding physical space" (perhaps by adding benches).  Instead,
they'd respond with how many the stadium could seat as is, without *any* modification.

[23] *Order* at para. 18.

[24] Indeed, the *Order* both acknowledges that smartphones are swept in under its reading, *Order* at para. 21, and
explicitly sweeps in all Internet-to-phone text messages via email or via a web portal, *Order* at para. 111.

[25] Report of the Energy and Commerce Committee of the U.S. House of Representatives, H.R. Rep. 102-317, at 17
(1991) (*House Report*).

to know that courts and administrative agencies normally eschew statutory interpretations that chill the speech of every American that owns a phone.[27]  Yet the *Order*'s interpretation does precisely that.

Let me give just one example.  Jim meets Jane at a party.  The next day, he wants to follow up on their conversation and ask her out for lunch.  He gets her cellphone number from a mutual friend and texts her from his smartphone.  Pursuant to the *Order*, Jim has violated the TCPA, and Jane could sue him for $500 in statutory damages.

In response, the *Order* tells smartphone owners not to worry:  "We have no evidence that friends, relatives, and companies with which consumers do business find those calls unwanted and take legal action against the calling consumer."[28]  That's little solace.  There is no evidence of smartphone class-action suits yet because no one has thought the TCPA prohibited the ordinary use of smartphones—at least not before now.  Now that they do, the lawsuits are sure to follow.[29]

The *Order* then protests that interpreting the statute to mean what it says—that automatic telephone dialing equipment must be able to dial random or sequential numbers—"could render the TCPA's protections largely meaningless by ensuring that little or no modern dialing equipment would fit the statutory definition of an autodialer."[30]  But what the Commission deems defeat is in fact a victory for consumers.  Congress expressly targeted equipment that enables telemarketers to dial random or sequential numbers in the TCPA.  If callers have abandoned that equipment, then the TCPA has accomplished the precise goal Congress set out for it.  And if the FCC wishes to take action against newer technologies beyond the TCPA's bailiwick, it must get express authorization from Congress—not make up the law as it goes along.

Next, the *Order* seeks refuge in Commission precedent, claiming that it has "already twice addressed the issue."[31]  Not quite.  Those two rulings both involved "predictive dialers," which the FCC described as having "the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers."[32]  In 2003, the FCC explained that pairing automatic telephone dialing equipment "with predictive dialing software and a database of numbers" (and calling the combination a predictive dialer) would not exclude that equipment from the statutory prohibition.[33]

(...continued from previous page)——————————————

[26] *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (describing the canon as "a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

[27] *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . .").  Notably, the constitutional question is not whether this interpretation of the TCPA would meet the less strict standard governing "commercial speech," *see Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 562–63 (1980), because the TCPA restricts the making of "*any* call"—not just commercial calls—using an automatic telephone dialing system, 47 U.S.C. § 227(b)(1)(A) (emphasis added).  Instead, the question is whether this interpretation is "narrowly tailored to serve the government's legitimate, content-neutral interests."  *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989).  How could anyone answer that question in the affirmative given that the majority of Americans carry a smartphone (what the *Order* now labels an automatic telephone dialing system) in their pockets?

[28] *Order* at para. 21.

[29] This is underscored by the *Order* itself, which opens by emphasizing its position that the TCPA applies not "just [to] bad actors attempting to perpetrate frauds, but also [to] 'legitimate businesses' employing calling practices that consumers find objectionable," and that the FCC "[has] not viewed 'legitimate' businesses as somehow exempt from the statute, nor do we do so today."  *Order* at note 6.  Having opened the door wide, the agency cannot then stipulate restraint among those who would have a financial incentive to walk through it.

[30] *Order* at para. 20.

[31] *Order* at para. 15.

[32] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14091, para. 131 (2003) (*2003 TCPA Order*).

[33] *See id.* at 14092, para. 133.

And in 2008, the FCC found that using such equipment was still prohibited even "when it dials numbers from customer telephone lists" and not "randomly or sequentially."[34]  The key issue in each decision was that the equipment *had the capacity* to dial random or sequential numbers at the time of the call, even if that capacity was not in fact used.  Or, as the Commission phrased it later, it doesn't matter "whether or not the numbers called actually are randomly or sequentially generated or come from a calling list"[35]; if the equipment has the requisite capacity, it's an automatic telephone dialing system.  That's exactly what the statute requires, and it's a far cry from the issue we confront here.

In short, we should read the TCPA to mean what it says:  Equipment that cannot store, produce, or dial a random or sequential telephone number does not qualify as an automatic telephone dialing system because it does not have the capacity to store, produce, or dial a random or sequential telephone number.  The *Order*'s contrary reading is sure to spark endless litigation, to the detriment of consumers and the legitimate businesses that want to communicate with them.

## II.

The *Order* opens the floodgates to more TCPA litigation against good-faith actors for another reason as well.  There is no TCPA liability if a caller obtains the "prior express consent of the called party."[36]  Accordingly, many businesses only call consumers who have given their prior express consent.  But consumers often give up their phone numbers and those numbers are then reassigned to other people.  And when that happens, consumers don't preemptively contact every business to which they have given their number to inform them of the change.  So even the most well-intentioned and well-informed business will sometimes call a number that's been reassigned to a new person.  After all, over 37 million telephone numbers are reassigned each year.[37]  And no authoritative database—certainly not one maintained or overseen by the FCC, which has plenary authority over phone numbers—exists to "track all disconnected or reassigned telephone numbers" or "link[] all consumer names with their telephone numbers."[38]  As four separate petitions explain, trial lawyers have sought to apply a strict liability standard on good-faith actors—so even if a company has no reason to know that it's calling a wrong number, it'll be liable.[39]

Imposing strict liability is not usually how the law works.  Indeed, the Commission has previously rejected an interpretation of the TCPA that would have imposed strict liability on callers after a consumer ports his number from a landline to a wireless phone.[40]  Instead, the FCC endorsed the view

---

[34] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Request of ACA International for Clarification and Declaratory Ruling*, CG Docket No. 02-278, Declaratory Ruling, 23 FCC Rcd 559, 566, para. 12 (2008) (*2008 TCPA Order*).

[35] *Implementation of the Middle Class Tax Relief and Job Creation Act of 2012; Establishment of a Public Safety Answering Point Do-Not-Call Registry*, CG Docket No. 12-129, Report and Order, 27 FCC Rcd 13615, 13629, para. 29 (2012).

[36] 47 U.S.C. § 227(b)(1)(A); *see also* 47 U.S.C. § 227(b)(1)(B) (only prohibiting calls made "without the prior express consent of the called party").

[37] Alyssa Abkowitz, "Wrong Number? Blame Companies' Recycling," *The Wall Street Journal* (Dec. 1, 2011), *available at* http://on.wsj.com/1Txmowl.

[38] Letter from Richard L. Fruchterman, Associate General Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1 (Feb. 5, 2015).

[39] Consumer Bankers Association Petition for Declaratory Ruling, CG Docket No. 02-278 (Sept. 19, 2013); Rubio's Restaurant, Inc. Petition for Expedited Declaratory Ruling, CG Docket No. 02-278 (Aug. 15, 2014); Stage Stores, Inc. Petition for Expedited Declaratory Ruling, CG Docket No. 02-278 (June 4, 2014); United Healthcare Services, Inc. Petition for Expedited Declaratory Ruling, CG Docket No. 02-278 (Jan. 16, 2014).

[40] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Order, 19 FCC Rcd 19215, 19219, para. 9 (2004).

that "[i]t is a flawed and unreasonable construction of any statute to read it in a manner that demands the impossible."[41]  That logic should apply here.

Perhaps more to the point, the statute takes into account a caller's knowledge.  Recall that the statute exempts calls "made with the prior express consent of the called party."  Interpreting the term "called party" to mean the expected recipient—that is, the party expected to answer the call—is by far the best reading of the statute.[42]

Start with an example of ordinary usage.  Your uncle writes down his telephone number for you and asks you to give him a call (what the TCPA terms "prior express consent").  If you dial that number, whom would you say you are calling?  Your uncle, of course.

No one would say that the answer depends on who actually answers the phone.  If your uncle's friend picks up, you'd say you were calling your uncle.  So too if the phone is picked up by the passenger in your uncle's vehicle or your uncle's houseguest.  Nor would your answer change if your uncle wrote down the wrong number, or he lost his phone and someone else answered it.  Who is the called party in each and every one of these situations?  It's obviously the person you expected to call (your uncle), not the person who actually answers the phone.

And no one would say that the answer depends on who actually pays for the service.  If your uncle and aunt share a landline, you'd still say you were calling your uncle even if your aunt's name was on the bill.  And if your uncle and aunt are on a wireless family plan, it's still his number you're dialing even if she's picking up the tab.  In other words, it doesn't matter who the actual subscriber is; what matters when placing a call is whom you expect to answer.

Given ordinary usage, it should be no surprise that the FCC has implicitly endorsed this approach before.  As the Commission wrote in 2008, "calls to wireless numbers provided by the called party . . . are made with the 'prior express consent' of the called party."[43]  In other words, the called party is the person who consented to a call and the person who would ordinarily be expected to answer.

The expected-recipient approach respects Congress's intent that the TCPA "balanc[e] the privacy rights of the individual and the commercial speech rights of the telemarketer."[44]  On the one hand, the expected-recipient approach gives individuals the right to stop unwanted, wrong-number phone calls in the first instance.  Once an individual informs a caller that he has the wrong number, the caller can no

---

[41] *McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000).

[42] Most commenters term this the "intended recipient" approach.  *See, e.g.*, CBA Petition at 3; AFSA Comments on CBA Petition at 2; Nonprofits Comments on Rubio's Petition at 4, 6; Twitter Comments on Stage Petition at 9–11; Letter from Monica S. Desai, Counsel to Wells Fargo, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1 (June 11, 2015); Letter from Monica S. Desai, Counsel to ACA International, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 6–7 (June 11, 2015); Letter from Tracy P. Marshall, Counsel to NRECA, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 2 (June 10, 2015); Letter from Monica S. Desai, Counsel to Abercrombie & Fitch Co. and Hollister Co., to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1–4 (May 13, 2015).

[43] *2008 TCPA Order*, 23 FCC Rcd at 564, para. 9.  The *Order* tries to play gotcha by claiming that the next sentence of that same ruling "directly supports our finding here."  *Order* at note 264.  Not quite.  That sentence states that "the provision of a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber regarding the debt."  *2008 TCPA Order*, 23 FCC Rcd at 564, para. 9.  Like the previous sentence in that order, its clear import is that a creditor may rely on a debtor's provision of a number to call that number (at least so long as the creditor can reasonably expect to reach the debtor at that number).  But the *Order*'s alternative reading would eviscerate that reliance since the creditor would become liable if the debtor wrote down the wrong number or if the debtor was not the subscriber but instead the customary user.  Such a result would be doubly strange since the *Order* itself claims that the TCPA "anticipates" a reliance interest on the part of callers, *Order* at note 313, and the *Order* itself rejects the notion that only the subscriber can consent to receiving calls, *Order* at para. 75.

[44] *House Report* at 10.

longer expect to reach the party that consented and no longer claim to have to consent to continue calling. And so the expected-recipient approach rightfully sanctions the bad actors—often debt collectors[45]—that repeatedly call after an individual has told them they've got the wrong number.

On the other hand, the expected-recipient approach gives legitimate businesses a clear and administrable means of complying with the law and engaging in "normal, expected or desired communications [with] their customers."[46]  A good actor can refuse to call anyone without first securing an individual's consent, and a good actor can stop calling as soon as it learns that a number is wrong. Although taking these steps may not always be easy, they are an administrable means of complying with the statute and a way for any legitimate business to conduct its communications lawfully.

The expected-recipient approach also aligns the incentives of all parties to welcome legitimate calls and punish bad behavior.  Businesses will have every incentive to secure prior express consent before making a call,[47] to ensure that a number is properly dialed,[48] and to stop calling as soon as they learn that a number is wrong because those actions shield businesses from strict liability.  And the approach gives individuals the incentive to tell callers that they've got the wrong number, leading to fewer intrusive calls.

Confirming the expected-recipient interpretation is the canon of avoidance, which counsels that if one interpretation of a statute "would raise a multitude of constitutional problems, the other should prevail."[49]  Here, the expected-recipient interpretation fosters useful and desirable communications between businesses and their customers—communications that consumers have expressly consented to receiving.  In contrast, the *Order*'s strict liability interpretation chills such communications by threatening a company with crippling liability even if it reasonably expects to reach a consenting consumer when making a call.  It is difficult to see how chilling desired communications in this manner is "narrowly tailored to serve the government's legitimate, content-neutral interests."[50]

In contrast, the *Order* rejects the expected-recipient approach and endorses a mishmash interpretation.  According to the *Order*, callers are subject to strict liability after a single attempted call to number that's been reassigned to a new subscriber.  Its interpretation is a veritable quagmire of self-

---

[45] *See, e.g.*, Letter from Margot Saunders, Counsel to National Consumer Law Center, to Marlene Dortch, Secretary, FCC, CG Docket No. 02-278, at 9 (June 6, 2014) ("The Consumer Financial Protection Bureau's Annual Report for 2013 shows that 33% of debt collection complaints involved continued attempts to collect debts not owed, which include complaints that the debt does not belong to the person called."); NCLC *et al.* Comments on CBA Petition at 4; NCLC *et al.* Reply Comments on CBA Petition at 2.

[46] *House Report* at 17.

[47] Indeed, the incentive to secure prior express consent is greater than under a strict liability approach.  Under the expected-recipient approach, consent is more valuable because it is a shield from liability for every call made in good faith.  In contrast, strict liability reduces consent's value to one free call.  Given the substantial cost of securing consent, more businesses are likely to spend the resources in an expected-recipient regime than under strict liability.

[48] Notably, the caller would be not be liable for calls where the consenting party wrote down a wrong number (since the caller would still expect to reach the consenting party by dialing the number given) but would be liable for its own mistakes (since the caller could not expect to reach the consenting party by dialing a number different than that given).

[49] *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005); *see id.* at 380 ("It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation.  The lowest common denominator, as it were, must govern.").

[50] *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989).  As noted earlier, the constitutional question is not whether this interpretation of the TCPA would meet the less strict standard governing "commercial speech," *see Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 562–63 (1980), because the TCPA restricts the making of "*any* call"—not just commercial calls—using an automatic telephone dialing system or a prerecorded or artificial voice, 47 U.S.C. §§ 227(b)(1)(A), 227(b)(1)(B) (emphasis added).

contradiction and misplaced incentives.

*For one*, the *Order*'s chief legal theory does not hold water.  The *Order* insists that the "called party" for purposes of consent must be the subscriber because the TCPA elsewhere prohibits certain calls to "any service for which the called party is charged for the call" and restricts exemptions to calls "that are not charged to the called party."[51]  But Congress did not use the phrase "called party" consistently throughout the TCPA.  For example, the TCPA requires the FCC to prescribe technical standards for "systems that are used to transmit any artificial or prerecorded voice message via telephone" and requires those systems to release a line "within 5 seconds of the time notification is transmitted to the system that *the called party has hung up*."[52]  The Commission has never interpreted this requirement to only apply when the actual subscriber hangs up the phone, which would leave a rather large loophole in the TCPA's enforcement regime.  And the *Order* does not appear to embrace this absurd theory either.  Instead, the law remains what it always has, that the called party for purposes of this provision is whoever picks up the phone.

What is more, the *Order* does not even subscribe to its own legal theory on the question at hand.  Not one paragraph after positing the theory, the *Order* reinterprets the term "called party" to include a number's customary user even if that customary user is not charged for the call because a caller "cannot reasonably be expected to divine that the consenting person is not the subscriber."[53]  But the *Order* can't have it both ways:  Either the legal theory is right and a customary user is not the called party, or the legal theory is wrong.

*For another*, the *Order*'s strict liability approach leads to perverse incentives.  Most significantly, it creates a trap for law-abiding companies by giving litigious individuals a reason *not* to inform callers about a wrong number.  This will certainly help trial lawyers update their business model for the digital age.

This isn't mere hypothesis; it is fact.  Take the case of Rubio's, a West Coast restaurateur.  Rubio's sends its quality-assurance team text messages about food safety issues, such as possible foodborne illnesses, to better ensure the health and safety of Rubio's customers.  When one Rubio's employee lost his phone, his wireless carrier reassigned his number to someone else.  Unaware of the reassignment, Rubio's kept sending texts to what it thought was an employee's phone number.  The new subscriber never asked Rubio's to stop texting him—at least not until he sued Rubio's in court for nearly half a million dollars.

The *Order*'s defenses are underwhelming.  The *Order* points out that callers have the option of "manually dialing"[54] but forgets that dialing a number by hand still violates the TCPA if the equipment is an automatic telephone dialing system (which almost all equipment is under the *Order*).[55]  The *Order* claims a one-call exemption for reassigned numbers would not "demand the impossible"[56] but then

---

[51] *See Order* at para. 74; 47 U.S.C. §§ 227(b)(1)(A)(iii), 227(b)(2)(C).

[52] 47 U.S.C. § 227(d)(3)(B) (emphasis added).

[53] *Order* at para. 75.

[54] *Order* at para. 84.

[55] *See Order* at note 70 (agreeing that any call made from an automatic telephone dialing system triggers liability, even if the "functionalities" making that equipment an automatic telephone dialing system are not actually used to make a particular call).

[56] *Order* at note 312.  The authority the *Order* relies on for its one-call exemption is less than clear.  At one point, it says it is interpreting the phrase "prior express consent."  *Order* at note 300.  Elsewhere, the *Order* says that the TCPA "anticipates" a caller's "reliance" on prior express consent, which it then interprets to mean one call's worth of reliance for reassigned numbers (and zero call's worth of reliance for wrong numbers).  *Order* at note 312.  Still elsewhere, the *Order* is more forthright that it is just "balancing the caller's interest in having an opportunity to learn of reassignment against the privacy interests of consumers to whom the number is reassigned," *Order* at para. 85, which is to admit that the *Order* is rewriting the TCPA, not interpreting it.

imposes liability on callers even if the new subscriber does not tell them that the number has been reassigned.  The *Order* rejects a knowledge standard as "unworkable" because "once there is actual knowledge, callers may not honor do-not-call requests"[57] but ignores the fact that good actors cannot implement a one-call standard while bad actors won't honor that standard anyway.  And the *Order* offers a laundry list of ways that a caller might determine that a number has been reassigned[58] but declines to adopt a safe harbor for good actors that carry out these practices and instead subjects them to wrong-number litigation.

Perhaps most shocking is the *Order*'s claim that the answer to wrong-number calls is for companies to turn the liability back on their own customers.  "Nothing in the TCPA or our rules prevents parties from creating . . . an obligation for the person giving consent to notify the caller when the number has been relinquished," the *Order* states before noting that "the caller may wish to seek legal remedies for violation of the agreement."[59]  In other words, companies can sue their customers.  To be sure, this will create yet more work for the primary beneficiaries of the *Order*: attorneys.  But nothing in the TCPA or our rules suggests that Congress intended the TCPA as a weapon to be used against consumers that forget to inform a business when they switch numbers.

In short, we should not inject a strict liability standard into the TCPA.  Instead, we should interpret the words of the statute in the way most would and make clear that "prior express consent of the called party" means the prior express consent of the party the caller expects to reach.  The *Order*'s contrary reading is sure to encourage yet more litigation, to the detriment of consumers and the legitimate businesses that want to communicate with them.

III.

The *Order* will also make it harder to enforce our prohibitions on illegal telemarketing.  The TCPA's chief sponsor in the Senate, Fritz Hollings, once called indiscriminate telemarketing calls "the scourge of modern civilization."[60]  So it is unsurprising that the TCPA places additional restrictions, such as compliance with federal Do-Not-Call rules,[61] on telemarketing calls whether they are "telephone solicitations" or "unsolicited advertisements."[62]

The *Order* undermines these protections with a special carve-out for the prison payphone industry.  This dispensation lets that industry repeatedly make prerecorded voice calls to consumers in order to "set up a billing relationship" to pay for future services.[63]  You might have no interest in receiving phone calls from those behind bars, but prison payphone providers will be able to robocall you anyway.  This exemption opens the door to more actual robocalls—the same types of robotic calls that made "Rachel from Cardholder Services" infamous.

Indeed, the rationale provided by the Commission to justify this decision provides a roadmap for those seeking a lawful way to avoid our telemarketing rules.  That's because we cannot exempt calls that "include or introduce an advertisement or constitute telemarketing."[64]  So the *Order* must (and does) find that robocalling to "set up a billing relationship" is not advertising the "commercial availability . . . of . . .

---

[57] *Order* at para. 88.

[58] *Order* at para. 86.

[59] *Order* at para. 86 & note 302.

[60] 137 Cong. Rec. S9874 (daily ed. July 11, 1991) (statement of Sen. Hollings).

[61] *See* 47 U.S.C. § 227(c).

[62] *See* 47 U.S.C. §§ 227(a)(4)–(5).

[63] *Order* at para. 42.

[64] *See* 47 C.F.R. § 64.1200(a)(3)(iii); *see also* 47 U.S.C. § 227(b)(2)(B)(ii) (prohibiting the FCC from exempting commercial calls that "include the transmission of any unsolicited advertisement").

services" even though no one would agree to set up billing relationship to pay for a service that isn't commercially available.[65]  And so the *Order* must (and does) find that robocalling to "set up a billing relationship" is not "encouraging the purchase . . . of . . . services" even though the entire point of the call is to get the consumer to agree to pay for services not yet performed.[66]  What telemarketer will continue to hock goods the old-fashioned way when it can escape the TCPA's particular constraints on telemarketing by claiming to just set up billing relationships for services not yet performed?  In other words, the one type of call consumers hate most—telemarketing calls—just got easier.[67]

I do not support creating such a loophole.  In my view, apart from truly exigent circumstances, the FCC should not condone new robocalls to American consumers, period.

\* \* \*

There is, of course, much more to the *Order*.  Many of the decisions just reiterate well-known, settled law that I support.  Yes, the TCPA applies to text messages as the Commission decided back in 2003.[68]  Yes, consumers have the right to revoke prior express consent as we confirmed in 2012.[69]  And yes, a consumer may opt-in to a carrier's call-blocking services—which has been the law of the land since at least 2007.[70]  None of these are surprising outcomes, but none advance the ball.

As for the decisions that strike new ground, a few are good law—for instance, app providers won't face TCPA liability because they don't initiate calls placed by their users.[71]  But most just shift the burden of compliance away from telemarketers and onto legitimate businesses, sometimes in absurd ways.

For instance, how could any retail business possibly comply with the provision that consumers can revoke consent orally "at an in-store bill payment location"?[72]  Would they have to record and review every single conversation between customers and employees?  Would a harried cashier at McDonald's have to be trained in the nuances of customer consent for TCPA purposes?  What exactly would constitute revocation in such circumstances?  Could a customer simply walk up to a McDonald's counter, provide his contact information and a summary "I'm *not* lovin' it," and put the onus on the company?  The prospects make one grimace.

In all, the *Order* is likely to leave the American consumer, not to mention American enterprise, worse off.  That's not something anyone should support.  I certainly don't and accordingly dissent.

---

[65] *Order* at para. 42; 47 C.F.R. § 64.1200(f)(1).

[66] *Order* at para. 42; 47 C.F.R. § 64.1200(f)(12).

[67] In responding that it has crafted a "narrow exemption" reflecting "unique factual and legal circumstances" in a "unique context," *Order* at para. 42 & note 178, the *Order* misses the point.  Of course non-prison payphone telemarketers won't qualify for this particular exemption.  But telemarketers can now avoid federal Do-Not-Call regulations because the *Order* narrows the definitions of telemarketing and advertising to exclude calls to "set up a billing relationship."  That's not even a loophole—that's an invitation for more robocalls.

[68] *See Order* at para. 107; *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

[69] *See Order* at paras. 56–57; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; SoundBite Communications, Inc. Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278, Declaratory Ruling, 27 FCC Rcd 15391, 15397, para. 11 (2012).

[70] *See Order* at paras. 154, 160; *Just and Reasonable Rate for Local Exchange Carriers; Call Blocking by Carriers*, WC Docket No. 07-135, Declaratory Ruling and Order, 22 FCC Rcd 11629, 11631–32, para. 6 & n.21 (Wireline Comp. Bur. 2007).

[71] *See Order* at paras. 32, 36.

[72] *Order* at para. 64.



**Media Contact:**
Brooke Ericson, (202) 418-2300
Brooke.Ericson@fcc.gov

**For immediate release**

### STATEMENT OF COMMISSIONER MICHAEL O'RIELLY
### ON D.C. CIRCUIT TCPA DECISION

WASHINGTON, March 16, 2018. – Commissioner O'Rielly made the following statement in response to the D.C. Circuit's unanimous decision reversing much of the Federal Communications Commission's 2015 order regarding various aspects of the Telephone Consumer Protection Act.  At the time, Commissioner O'Rielly dissented on the item's substance and approved a number of included exemptions, calling claims that the order protected Americans a farce and highlighting that, in its overreach, the order would penalize businesses and institutions acting in good faith to reach their customers using modern technologies.

"I am heartened by the court's unanimous decision, which seems to reaffirm the wording of the statute and rule of law.  This will not lead to more illegal robocalls but instead remove unnecessary and inappropriate liability concerns for legitimate companies trying to reach their customers who want to be called.  In effect, it rejects the former Commission's misguided interpretation of the law, inappropriate expansion of scope, and irrational view of reassigned numbers.  While I disagree with the court's decision on the revocation issue, I believe there is an opportunity here for further review in order to square it with the Second Circuit's more appropriate approach."

### ###

**Office of Commissioner Mike O'Rielly: (202) 418-2300**
**Twitter: @mikeofcc**
**www.fcc.gov/leadership/michael-orielly**

*This is an unofficial announcement of Commission action.  Release of the full text of a Commission order constitutes*
*official action.  See MCI v. FCC, 515 F.2d 385 (D.C. Cir. 1974).*

# EXHIBIT G